SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL

202-371-7370

EMAIL ADDRESS

SHAY.DVORETZKY@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

December 9, 2024

Christopher M. Wolpert
Clerk of Court
U.S. Court of Appeals for the Tenth Circuit
Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257-1823

> RE:  *Liberty Global, Inc. v. United States*, No. 23-1410 (10th Cir.): Federal Rule of Appellate Procedure 28(j) letter regarding *Exxon Mobil Corp. v. United States*, No. 3:22-cv-0515-N (N.D. Tex. Nov. 18, 2024) (slip op. (Op.) attached)

Dear Mr. Wolpert:

*Exxon* confirms that the economic substance doctrine cannot override LGI's deduction, which the plain text of §§ 245A, 964(e), and 1248(j) permit. Those provisions kicked in when LGI recognized indisputably real gain through choices taxpayers may make for tax-motivated reasons.

*First*, *Exxon* confirms that before applying the doctrine, courts must determine whether it's relevant based on caselaw predating § 7701(*o*)'s 2010 enactment. In *Exxon*, the court considered circumstances where the doctrine played no role, before *separately* considering whether the transaction "satisfied" "both prongs of the doctrine" even assuming the "doctrine were" relevant. Op. 36; *see* Op. 30-36, 33 n.2 (citing legislative history).

*Second*, *Exxon* confirms that the doctrine isn't relevant when taxpayers have what the Code requires, because it "applies only to disregard a transaction that lacks economic reality." Op. 31. *Exxon* thus recognizes that, under pre-2010 caselaw, the doctrine isn't relevant to capitalization decisions—which "are almost always influenced by tax considerations," Op. 34—if the taxpayer has what it claims (like real debt). Op. 30-35. The doctrine was "inapplicable" there because there was, "in substance, debt," and the taxpayer could decide to use debt for tax reasons. Op. 35. The Code mandated that a payment "'shall' be treated 'as if it were' a mortgage loan," and the doctrine couldn't "override [that] congressionally mandated tax treatment." Op. 30.

The doctrine isn't relevant here, so it cannot override LGI's deduction. The government doesn't dispute that LGI recognized real gain and had real earnings and profits. Oral Arg. 16:29-43, 28:30-44. The Code permitted LGI, for tax reasons, to convert Telenet Group into a regarded corporation and issue non-qualified preferred stock and debt to TGH, and the Code required recognizing gain to TGH, I.R.C. § 351(g), and increasing TGH's earnings and profits, as a result. LGI Br. 26-27. The Code also dictated that a deduction for LGI's deemed dividend—which reflects real gain—"shall be allowed." I.R.C. § 245A(a); *see* I.R.C. §§ 964(e), 1248(j); LGI Br. 52-60; Reply Br. 17-20. The government cannot distinguish *Varian*, *see* Oral Arg. 23:55-26:50, and the economic substance doctrine cannot override how the Code treats LGI's choices.

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky

*Counsel for Plaintiff-Appellant
  Liberty Global, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this letter complies with the type-volume limitation of Federal Rule of Appellate Procedure 28(j) because, as calculated by Microsoft Word, the body of the letter contains 350 words, and (2) this letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: December 9, 2024                     */s/ Shay Dvoretzky*

                                            Shay Dvoretzky


## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 9, 2024                     */s/ Shay Dvoretzky*

                                            Shay Dvoretzky

# ADDENDUM

*Exxon Mobil Corp. v. United States*, No. 3:22-cv-0515-N (N.D. Tex. Nov. 18, 2024) (slip op.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EXXON MOBIL CORP.,           §
                             §
          Plaintiff          §
                             §
v.                           §          Civil Action No. 3:22-CV-0515-N
                             §
UNITED STATES OF AMERICA,    §
                             §
          Defendant.         §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

When the Court began trial of this case, it was fully prepared to hold, as it had in a prior case, that Plaintiff Exxon Mobil Corp. ("ExxonMobil") was creatively rewriting history for tax purposes. On consideration of the evidence, however, the Court determines that ExxonMobil's tax treatment of this transaction is correct. Most obviously, this transaction is not structured as a run-of-the-mill mineral lease. Far from it. ExxonMobil's tax treatment correctly reflects both the tax law and the economic substance of the transaction.

As a general matter the Court found ExxonMobil's witnesses – both lay and expert – to be credible and helpful. The Court found Defendant United States of America's ("United States") expert to be credible but not helpful. That is to say, the Court believes Dr. Wright truthfully testified as to her opinions and that she is well-qualified to offer those opinions. The problem is the subject matter of her opinions – she was asked to offer opinions regarding oil and gas accounting from a business perspective, rather than opining

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 1

on the correct tax treatment or the economic reality of the transaction. For that reason, the Court discounts her testimony.

Based on the evidence at trial, the Court makes the following findings of fact and conclusions of law. Because the Court generally agrees with ExxonMobil's position, these are largely – though not entirely – drawn from ExxonMobil's proposed findings and conclusions.

## II. FINDINGS OF FACT

1.    ExxonMobil, a New Jersey corporation with its global headquarters and principal place of business in Spring, Texas, is the common parent of an affiliated group of corporations, as defined in 26 U.S.C. § 1504. At the time the lawsuit was filed, ExxonMobil's principal place of business was 5959 Las Colinas Boulevard in Irving, Texas.

### A. The Creation of the Al Khaleej Gas Partnership

2.    On May 2, 2000, ExxonMobil Middle East Gas Marketing Limited ("EMMEGML"), an ExxonMobil subsidiary, and the Government of the State of the Qatar entered into the Development and Production Sharing Agreement, or "DPSA." The DPSA was executed by senior representatives of both parties: the Qatari Minister of Energy, and ExxonMobil's head of upstream operations, Harry Longwell.

3.    Under the DPSA, Qatar Petroleum (Qatar's national oil company) was designated as the State of Qatar's agent to represent the State of Qatar and act on its behalf. The DPSA has the force of Qatari law by virtue of a governmental decree signed on July 12, 2000.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 2

4.     The DPSA created the Enhanced Gas Utilization ("EGU") project, which was renamed "Al Khaleej Gas" ("AKG") in 2002.  The purpose of the project was to develop and market valuable minerals in the North Field – the largest non-associated natural gas field in the world – for sales to purchasers, and to divide the profits and losses between the parties.  As Mr. Longwell explained, the terms of the DPSA were principally negotiated between 1997 and 2000 between the State of Qatar and Mobil Oil Qatar Inc., before the merger of Exxon and Mobil.   The project was intended, in part, to help the State of Qatar meet growing domestic demand for energy.

5.     Under the DPSA, both parties made capital contributions to the partnership. The State of Qatar contributed the rights to develop and market significant volumes of known minerals in three specified reservoirs in the North Field (called K1, K2, and K3). ExxonMobil contributed more than $1 billion in cash to construct the necessary offshore and onshore infrastructure, as well as the technical skills and expertise to develop these reservoirs. Both parties also contributed intellectual capital and resources to the partnership in connection with their joint management of the venture.

### B. The Partners' Joint Management and Joint Business Activity

6.     The DPSA created a governance structure through which ExxonMobil and the State of Qatar jointly managed Al Khaleej Gas.

7.     In the DPSA, the parties created a Management Committee that oversaw and directed the project and approved key decisions.  The Management Committee included an equal number of representatives from ExxonMobil and the State of Qatar.  The members of the Management Committee included senior officials and executives from both parties,

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 3

including two witnesses who testified at trial: Emma Cochrane, a senior ExxonMobil executive in ExxonMobil Gas & Power Marketing who was based in Doha from 2002 to 2005; and Mark Tressler, who served as the Al Khaleej Gas General Manager from 2005 to 2009.  The State of Qatar appointed the chairman of the Committee, and ExxonMobil appointed its secretary.

8.      The Management Committee had broad authority: it directed and oversaw the strategy for, and management of, the business, including all petroleum operations.  It was responsible for, among other things, considering, approving, and overseeing the implementation of budgets and development plans; establishing other joint committees and determining their mandates; reviewing sales agreements endorsed by the Joint Marketing Committee; approving financial statements, reports, and forecasts; making recommendations upon review of audit reports; and discussing and making decisions with respect to other matters submitted to the Committee for consideration, such as engineering, procurement, and construction issues.  While the DPSA assigned some responsibilities specifically to ExxonMobil (for example, conducting "Petroleum Operations"), those tasks were subject to the oversight and supervision of the Management Committee, with both parties acting on a joint basis.

9.      The Management Committee made decisions through unanimous consensus of its members.  In practice, all issues of significance with respect to the management and operation of the business were addressed by the parties on a joint and collaborative basis. The degree of collaboration between ExxonMobil and the State of Qatar distinguished Al Khaleej Gas from ExxonMobil projects in the State of Qatar and elsewhere that did not

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 4

involve joint management of the projects or joint marketing between ExxonMobil and the mineral interest owner. For example, Harry Longwell – a senior ExxonMobil executive who oversaw ExxonMobil's upstream operations across 30 countries and worked at ExxonMobil for 40 years – testified that Al Khaleej Gas was "one of a kind" and "very unique" as a result of joint management, joint marketing, and other features of the business relationship, and that "in effect the Qataris and their operation and development of this resource [were] on equal footing with ExxonMobil."

10. Before each Management Committee meeting, ExxonMobil and the State of Qatar's representatives collaborated in setting the meeting agendas. Both parties were active participants in Management Committee meetings: they each presented topics, asked questions, and engaged in substantive discussions about operational and strategic issues affecting the business. Minutes from 51 different Management Committee Meetings from 2000 through 2011 are in evidence, and they demonstrate the significant degree of joint activity between the parties, consistent with the contractual requirements.

11. The DPSA (and later the Amended and Restated Development and Production Sharing Agreement, or "ARDPSA") required that the parties jointly market and sell all the gas produced by the business, and it mandated that neither party was "authorized to sell Petroleum of any kind except on a joint basis." Under the DPSA, the parties established a Joint Marketing Committee, which oversaw marketing efforts, the negotiation and implementation of sales agreements, and the size of contracts. Like the Management Committee, the Joint Marketing Committee included an equal number of representatives from ExxonMobil and the State of Qatar, and its decisions had to be

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 5

unanimous. The process for setting the meeting agendas was similar to that of the Management Committee: typically, ExxonMobil and Qatari representatives would collaborate on topics for the meeting. Minutes from 37 different Joint Marketing Committee meetings from 2000 through 2011 are in evidence, and like the Management Committee minutes, they too demonstrate the significant degree of joint activity between the parties, consistent with the contractual requirements.

12. Consistent with the Management Committee's mandate under the DPSA and ARDPSA, the parties created other joint committees to help manage the business, including the Technical Committee and the Accounting Committee. The Technical Committee oversaw well functionality and design, reserve evaluations, and workplace safety, among other issues. The Accounting Committee was a forum for the partners' finance specialists to meet and discuss issues related to accounting policies and procedures, the work programs and budgets, and other financial or audit matters delegated by the Management Committee. The Technical and Accounting Committees also had equal numbers of ExxonMobil and State of Qatar representatives and operated in a joint and collaborative fashion.

13. The partners' joint activity with respect to the operation and management of the partnership extended well beyond the formal committees. In between meetings, representatives from ExxonMobil and the State of Qatar worked closely together to discuss operational and strategic issues.

14. Representatives from the State of Qatar also played a significant role in the day-to-day management of the business, and the parties functioned together as one team.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 6

For example, the General Manager of Al Khaleej Gas was appointed by ExxonMobil, whereas the Deputy General Manager was a Qatari national nominated by the State of Qatar.

### C.  The Development and Use of the Al Khaleej Gas Name and Logo

15.    ExxonMobil and the State of Qatar held themselves out to the public as partners, including through the use of the Al Khaleej Gas name and logo.

### D.  The Parties' Joint Negotiation and Approval of Gas Sales Agreements

16.    Pursuant to the DPSA, the partners negotiated and agreed on a set of marketing principles and procedures governing the marketing of sales gas produced by the partnership, which were later incorporated into the ARDPSA.

17.    Consistent with these requirements, the partners worked together to negotiate sales agreements with prospective purchasers, both internationally and domestically.

18.    With respect to the domestic market, the partners negotiated and ultimately approved through the Joint Marketing and Management Committees three purchase agreements for flowing gas for the first phase of the project. Each of those agreements was jointly approved by both parties, as required under the DPSA. Under each of these agreements, ExxonMobil and the State of Qatar were joint sellers selling on common terms.

19.    In total, the demand commitments under these agreements for the first phase of the partnership resulted in the construction of facilities designed to produce approximately 750 million cubic feet per day of sales gas – a significant volume of gas that would help fuel domestic growth.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 7

### E. The Expansion of the Al Khaleej Gas Partnership

20.     From the beginning of their partnership, ExxonMobil and the State of Qatar envisioned that Al Khaleej Gas would be developed in phases, and they began to discuss the details of a second phase of the partnership as early as 2003.  The ensuing negotiations took nearly three years.

21.     In December 2004, the partners entered into a document called "Principles of Understanding," which set forth a high-level framework for the second phase of Al Khaleej Gas, called "AKG-2."  As reflected in the Principles of Understanding, additional demand had been identified in the domestic market.  To meet that demand, the partners contemplated that they would need to construct new facilities to produce an additional 1.2 billion cubic feet of sales gas per day.  On the same day that they executed the Principles of Understanding, the partners signed a letter agreement reinforcing their commitment to work together to secure export sales gas opportunities on a joint basis, including regional sales to potential buyers in Kuwait and Bahrain.

22.     The first phase of Al Khaleej Gas was an economically challenging project for ExxonMobil.  In addition, costs had escalated substantially since the creation of the partnership in 2000, and a potential second phase would require billions of dollars in new offshore and onshore facilities.  ExxonMobil negotiated extensively with the State of Qatar to make the second phase of the project economically viable and to pursue the commercial objective of expanding production to meet Qatar's growing demand for power.

23.     One of the options ExxonMobil proposed in the course of those negotiations — among a host of others — was tax planning, including the possibility of a production

payment.  A production payment is a well-established form of financing that has been used in the petroleum industry for decades.

24.     ExxonMobil tax counsel Troy Babin, who negotiated the production payment with the State of Qatar, testified that the production payment was viewed as a "potential benefit" for a "very challenged project."  Because of its congressionally mandated tax treatment as debt, interest deductions from the production payment could generate potential upside depending on, among other things, ExxonMobil's available foreign tax credits and its U.S. versus foreign asset mix in a given year, assuming that the applicable rules and regulations remained consistent over the 20-plus year life of the project.

25.     ExxonMobil first raised the concept of the production payment with the State of Qatar more than nine months before the ARDPSA was executed, and it was extensively vetted and negotiated in that period in parallel with many other commercial issues. ExxonMobil prepared and presented materials explaining the concept to the Qataris beginning in September 2005.

26.     ExxonMobil and the State of Qatar exchanged numerous drafts of the ARDPSA in the months leading up to its execution, and the production payment was just one of many changes discussed and debated by the parties.  The parties executed the ARDPSA on June 4, 2006.  The ARDPSA retained all of the key governance features of the partnership described above including the Management Committee and the Joint Marketing Committee, which continued to function as set forth in the DPSA, but also restructured the partnership in "quite extensive" ways.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 9

27.     The ARDPSA significantly expanded the volume of gas produced by the partnership.  In the first phase of the partnership, the actual production capacity was 750 million cubic feet of flowing gas per day.  In the second phase of the partnership, the actual production capacity expanded by 1,250 million cubic feet per day, reaching a total of 2 billion cubic feet per day — enough to generate electricity to power approximately 8 million homes in the United States on an average day.  To facilitate that expansion, the State of Qatar contributed additional mineral rights to the partnership, including rights to a new, comparatively liquids-rich reservoir (called K4) that could yield higher value gas products.  ExxonMobil contributed the money to build new offshore wells, platforms, and pipelines, and new onshore facilities necessary to produce the agreed-upon volume of gas — all of which was expected to cost approximately ██████ .

28.     The parties also entered into new sales agreements in connection with the ARDPSA, including a fourth agreement for flowing gas sales (the Gas Supply Agreement, which was executed on the same day as the ARDPSA) and additional agreements for the sale of other gas products produced by the partnership.  In the Gas Supply Agreement, Qatar Petroleum agreed to new "take-or-pay" commitments, which helped address uncertainty over whether the forecasted demand would materialize.

29.     The ARDPSA included other changes as well.  Among other things, the parties agreed to a new option for potential participation in the Subsequent Development Plan by an affiliate of the State of Qatar or Qatar Petroleum; revisions to the agreement to address facilities sharing with other gas projects; updates to the profit sharing arrangement to reflect the expansion of production to 2 billion cubic feet a day; a new accounting

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 10

procedure; a new expert procedure to resolve potential disagreements between the parties; new allocation procedures; and various updates to the form of the agreement, including to reflect the new Al Khaleej Gas name and the previously agreed-upon marketing principles and procedures.

30.     The parties also incorporated the production payment into the ARDPSA. The production payment recapitalized the State of Qatar's equity interest in the partnership. Rather than taking solely a profit share, as it did under the DPSA, the State of Qatar took a reduced profit share (called the "Residual Profit Share") and a production payment. The production payment was carved out of all the mineral interests held by the Al Khaleej Gas partnership (i.e., the mineral rights that the State of Qatar originally contributed in the DPSA, plus the additional mineral rights contributed in the ARDPSA). Thus, the State of Qatar redeemed part of its equity interest in Al Khaleej Gas in exchange for debt (the production payment), and that debt burdened the mineral interests contributed to the partnership by the State of Qatar under both the DPSA and the ARDPSA.

31.     The production payment worked as follows: the State of Qatar received quarterly payments of principal and interest on a fixed schedule ending in 2027, at a market rate of interest. Those details are set forth in Appendix G of the ARDPSA.

32.     The ARDPSA provided that the scheduled quarterly production payments could be adjusted. The production payment amount that was actually paid to the State of Qatar in each quarter — referred to in the ARDPSA as the "Actual Quarterly Production Payment" — was calculated based on a methodology defined in the ARDPSA, using Excel spreadsheets referred to as "production payment models."

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 11

33.     The production payments did not depend on, and were not part of, the profits of the partnership, making them a "fundamentally different economic interest" from the Residual Profit Share. Instead, the production payment was based solely on the value of natural gas produced from the reservoirs, irrespective of whether the partnership generated positive net income.  As ExxonMobil's expert economist, David Plastino, testified at trial, there were quarters in which the Al Khaleej Gas project as a whole was cash flow negative yet the production payment was still paid.

34.     As reflected above, the production payment was limited in dollar amount — it had a defined principal amount of $10.78 billion — and the interest rate was 6.25%.  The interest rate was a market rate.  That rate was calculated based on the recent issuance of RasGas bonds with the same maturity into public markets, which were analogous in relevant respects (including credit risk, reservoir risk, and operational risk) for purposes of setting a market rate for the Al Khaleej Gas production payment.

35.     At the time the ARDPSA was signed, the parties expected that there was a "very high likelihood" of the production payment being paid in full, and that the economic life of the minerals in the North Field that were subject to the parties' agreement would exceed the term of the production payment.  The production payments were in fact paid to the State of Qatar in accordance with the ARDPSA, as evidenced by detailed workpapers and models reflecting the computation of the production payment on a quarterly basis, and partnership records showing that Qatar received payments of principal and interest in accordance with the terms of Appendix G.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 12

36.     In addition to the objective indicia of debt described above (a stated principal amount, a market rate of interest, a fixed maturity date, and a payment schedule), the production payment also had the economic characteristics of debt.  Specifically, the production payment's return profile, its likelihood of repayment, the capital adequacy of Al Khaleej Gas, and the marketability of the production payment all support characterizing the production payment as debt.

37.     The production payment was also separately transferrable from the State of Qatar's Residual Profit Share under Qatari law, which provided the State of Qatar with additional optionality to monetize its interests in the partnership.  The right to separately transfer the production payment had economic value regardless of whether it was, in fact, transferred.

38.     As part of the production payment in Appendix G of the ARDPSA, the parties also agreed that the State of Qatar could earn up to $40 million in additional payments that it was not entitled to receive under the DPSA.  The $40 million amount was negotiated between ExxonMobil and the State of Qatar. Moreover, the potential $40 million in upside to the State of Qatar was larger than other amounts that were expressly negotiated and included in the parties' agreements.

39.     Statements of Petroleum Cost reflect that Al Khaleej Gas made three such additional payments to the State of Qatar, as follows:

- A payment of ███████ was made to the State of Qatar in the ████████████;
- A payment of ███████ was made to the State of Qatar in the ████████████ ████; and

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 13

•    A payment of ███████ was made to the State of Qatar in the ███████
██ .

These three payments total $40 million, and thus the State of Qatar has been paid that
amount in full.

40.    The $40 million amount, which was "potential upside" to the State of Qatar,
came "out of [ExxonMobil's] profit share" and thus represented "reduced profits" for
ExxonMobil.  In addition, ExxonMobil was required to de-book $40 million in reserves as
a result of those payments.

### F.  ExxonMobil's Tax Refund Claims

41.    ExxonMobil timely filed a consolidated corporate income tax return for 2010
and 2011 with the IRS Service Center in Ogden, Utah and its Employer Identification
Number is 135409005.  ExxonMobil paid the total tax reported on its 2010 and 2011 tax
returns.  ExxonMobil reported Al Khaleej Gas as a partnership on Forms 8865 beginning
in 2006.  Before 2006, EMMEGML (the ExxonMobil entity that was party to the
ARDPSA) was a controlled foreign corporation, and therefore earnings from the Al
Khaleej Gas partnership were not included on ExxonMobil's tax return.

42.    In accordance with applicable law (*see* 26 U.S.C. § 636(a)), ExxonMobil
reported the production payment made by Al Khaleej Gas to the State of Qatar as a
mortgage loan, deducting from its income the interest portion of the production payment
in its tax filings beginning in 2006.  For tax years 2006, 2007, 2008, and 2009, the IRS did
not challenge these deductions.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 14

43.     On March 9, 2016, the IRS issued a Statutory Notice of Deficiency for Tax Years 2010 and 2011 that disregarded the Al Khaleej Gas partnership between ExxonMobil and the State of Qatar and disallowed the deduction from income that ExxonMobil had claimed for the interest portion of the production payment.

44.     On April 15, 2016, ExxonMobil submitted Form 4089-B, Notice of Deficiency — Waiver, consenting to the immediate assessment and collection of the tax, and instructed the IRS to pay the tax by applying amounts on deposit with the IRS.

45.     On May 16, 2016, the IRS assessed the tax for 2010 and 2011.  On May 23, 2016, the IRS assessed additional tax for the 2011 tax year.  ExxonMobil paid the tax assessments and timely filed Amended U.S. Corporation Income Tax Returns for tax years 2010 and 2011 seeking refunds of its tax payments.

46.     On March 4, 2022, ExxonMobil timely filed this action (ECF 1).   An amended complaint was filed on July 14, 2023 (ECF 45).

## II. CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the parties and the subject matter of this case.

### A. ExxonMobil Carried Its Burden of Proof Entitling It to the Tax Deductions in Dispute

2.     ExxonMobil is entitled to the interest expense deductions it seeks because it established that the production payment was carved out of mineral property held by the partnership between ExxonMobil and the State of Qatar and therefore meets the statutory requirements of Section 636(a).  First, Al Khaleej Gas is a partnership under federal tax law because ExxonMobil and the State of Qatar engaged in a joint business venture and

shared in the profits and losses of that venture.  Because Al Khaleej Gas is a partnership, the partnership itself is deemed to hold the mineral property contributed by the State of Qatar.  Rev. Rul. 54-84, 1954-1 C.B. 284.

3.      Second, the production payment meets the requirements of the Treasury Regulations and Section 636(a): it is an economic interest that burdens the mineral property held by the partnership, it is limited by dollar amount and time, and it had an economic life that is shorter than that of the partnership's mineral property.  As a result, the production payment "shall" be treated "as if it were" a mortgage loan for tax purposes.  Those proven facts entitle ExxonMobil to deduct interest expense.

### A.  Al Khaleej Gas Is a Partnership Under Federal Tax Law

4.      The tax partnership test is well settled, and it is met here.  Under federal law, a partnership exists for tax purposes where two or more parties "intend[] to join together for the purpose of carrying on the business and sharing in the profits and losses or both." *Comm'r v. Culbertson*, 337 U.S. 733, 741 (1949) (paraphrasing *Comm'r v. Tower*, 327 U.S. 280, 287 (1946), which says "profits or losses" and omits second "the").  That assessment is made "considering all the facts" that are relevant in a particular case, which may include "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on [the parties'] true intent."  *Id.* at 742.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 16

5.      Both the Tax Code and the Treasury Regulations similarly require a showing of a joint business undertaking and the sharing of profits therefrom.  *See* 26 U.S.C. § 761(a) ("[T]he term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate."); Treas. Reg. § 301.7701-1(a)(2) ("A joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom.").  These elements are present here.

6.      Because Al Khaleej Gas is a partnership under federal tax law, the State of Qatar does not hold the mineral property, as is the case in a mineral lease.  Rather, the partnership is deemed to hold the mineral property as a matter of law.  The State of Qatar then held a partnership interest in Al Khaleej Gas, but it no longer owned the minerals that it is deemed to have contributed to the partnership.

### B.  Al Khaleej Gas Is a Joint Business Venture Characterized by Significant Joint Activity by ExxonMobil and the State of Qatar

7.      The Supreme Court has made clear that "a circumstance of prime importance" in determining whether the partnership test has been met is whether there is "participation in management and control of the business."  *Culberson*, 377 U.S. at 747 n.17.  First, ExxonMobil and the State of Qatar intended to — and did — "join together for the purpose of carrying on the business."  *Id.* at 741 (quoting *Tower*, 327 U.S. at 287).  Through Al Khaleej Gas, ExxonMobil and the State of Qatar jointly developed, marketed,

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 17

and sold mineral resources in the North Field, and both partners had a significant role in jointly managing the business.

8. As discussed above, ExxonMobil and the State of Qatar created the Management Committee, which directed and oversaw the strategy for, and management of, the business (including petroleum operations); and the Joint Marketing Committee, which oversaw the negotiation and implementation of all sales contracts, as required by both the DPSA and ARDPSA. As detailed above, both committees included an equal number of representatives from ExxonMobil and the State of Qatar, and both committees met on a regular basis. The parties also created other committees — again with equal representation from both partners — to manage the business on a joint basis, including the Accounting Committee and the Technical Committee. In addition, the agreed-upon marketing principles and procedures, which were incorporated as Appendix C of the ARDPSA, required the partners to negotiate and approve sales agreements on a joint basis, including through a review process that involved both the Joint Marketing Committee and the Management Committee.

9. The evidence demonstrates that the "conduct of the parties in execution of [the contractual] provisions" was consistent with a tax partnership. *Culbertson*, 337 U.S. at 742. As required by the DPSA and ARDPSA, the Management Committee and the Joint Marketing Committee met regularly, discharged their contractual functions, and made decisions unanimously. Moreover, both ExxonMobil and the State of Qatar played a significant role in the operation and function of those committees and in the management of the business more generally.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 18

10.     Additionally, as provided in the agreements, ExxonMobil and the State of Qatar jointly negotiated with prospective purchasers and jointly approved Al Khaleej Gas's sales agreements.  The inclusion of joint marketing in the DPSA and ARDPSA underscores the parties' focus on joint business activity.

11.     On the whole, the degree of collaboration between ExxonMobil and the State of Qatar at all levels was significant, and it establishes that the parties jointly managed the business.  Indeed, the degree of joint activity here is more substantial than other cases in which courts have respected the existence of a partnership for tax purposes.  *See Landreth v. United States*, 70 F. Supp. 991, 994 (N.D. Tex. 1946), *aff'd*, 164 F.2d 340, 341 (5th Cir. 1947); *Methvin v. Comm'r*, 109 T.C.M. (CCH) 1409 (T.C. 2015), *aff'd*, 653 F. App'x 616, 617 (10th Cir. 2016); *Perry v. Comm'r*, 67 T.C.M. (CCH) 2966, at *1 (T.C. 1994).

12.     Each partner also made significant capital contributions to the partnership. ExxonMobil provided billions of dollars in cash to construct offshore platforms, pipelines, and wells, as well as onshore facilities, and the State of Qatar contributed rights to a significant volume of known minerals.  The State of Qatar's contributions of mineral rights are treated as capital contributions to the Al Khaleej Gas partnership under federal tax law. *See, e.g.*, *Landreth*, 70 F. Supp. at 992-93, 995 (treating the right to process natural gas as one partner's capital contribution to a partnership).

13.     In addition, both partners also contributed unique skills and abilities to the partnership.   ExxonMobil contributed its technical expertise and experience in the development and production of natural gas, and the State of Qatar contributed insight into domestic and regional markets and other intellectual capital associated with managing the

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 19

partnership.  *See Culbertson*, 337 U.S. at 742 (identifying as relevant factors the parties' "respective abilities and capital contributions").

14.     Moreover, the partners held themselves out as a joint business to the public, and their statements are similarly consistent with the existence of a partnership for tax purposes.  *See id.* (identifying as relevant factors the parties' "conduct" and "their statements").  As described above, the partners developed and used a distinct trade name and logo, which were designed for the specific purpose of increasing the business's regional visibility.  The use of a trade name strongly suggests a joint enterprise.  The partners held large, public-facing events like the 2010 inauguration ceremony, where they recognized and celebrated their joint business activity — and even used the slogan "Partners in Providing Gas to the Nation" to describe their commercial objective — which further illustrates that the parties "really intended to carry on business as partners."  *Id.* at 743.

15.     The existence and use of a separate Al Khaleej Gas bank account held by the project's operator, RasGas, further shows the partners' intent to conduct a joint business activity.  The fact that payments from purchasers were made into that joint bank account (rather than paid separately and directly to the State of Qatar and ExxonMobil) is indicative of joint business activity and consistent with the existence of a tax partnership under federal law.

### B.  The Partners Shared in the Profits and Losses of Al Khaleej Gas

16.     ExxonMobil and the State of Qatar both shared in Al Khaleej Gas's profits. Under the ARDPSA's revenue-sharing provisions, ExxonMobil received its share of the

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 20

profits through "Cost Recovery Petroleum" and "Profit Petroleum," and the State of Qatar received its share of the profits through the Residual Profit Share (its equity interest in the partnership). The partnership was, in fact, profitable, with both partners receiving meaningful shares of the revenues and profits of the project. This division of profits, together with the joint business activity described above, establishes that Al Khaleej Gas is a partnership for tax purposes. *See* Treas. Reg. § 301.7701-1(a)(2); *Culbertson*, 337 U.S. at 741.

17.  The sharing of losses is not required to establish a partnership under federal tax law. The governing Treasury Regulations specify that the parties need only "divide the *profits*" of the venture to qualify for partnership treatment. Treas. Reg. § 301.7701-1(a)(2) (emphasis added). Similarly, the Supreme Court has established that a partnership may exist where the parties "shar[e] in the profits and losses or both." *Culbertson*, 337 U.S. at 741 (paraphrasing *Tower*, 327 U.S. at 287). Nevertheless, even if the sharing of losses were deemed to be relevant, ExxonMobil and the State of Qatar agreed to — and did — share in the risk of loss and the costs and expenses of the Al Khaleej Gas partnership, both at its formation in 2000 and throughout its operation.

18.  ExxonMobil incurred a risk of loss because, among other things, it invested billions of dollars in constructing Al Khaleej Gas infrastructure, and those investments were at risk if the project was unsuccessful. ExxonMobil and the State of Qatar also shared in a host of other risks associated with the project, including: reservoir or resource risk; performance risk; facilities risk; market risk; price risk; operational risk; and political risk.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 21

19.     In addition, ExxonMobil and the State of Qatar also shared in potential liability to third-party buyers under the sale and purchase agreements discussed above. One of those agreements, the ███ Sale and Purchase Agreement, expressly provided for ████████████████████████████████████████████████████████████ ██████████████████████. Regardless of how liability was specifically apportioned, ExxonMobil and the State of Qatar were both exposed to potential losses under those agreements in each instance.

20.     Both parties also shared in the costs and expenses of the business: ExxonMobil incurred costs directly (by paying those costs), and Qatar incurred costs indirectly (through a reduced profit share). Indeed, an agreement to share in the costs is a key feature of the ARDPSA because the State of Qatar receives profits from production only after ExxonMobil recovers its costs. Under the ARDPSA, ExxonMobil is responsible for paying costs associated with Al Khaleej Gas's operations in the first instance, including capital and operating expenses. The Residual Profit Share is paid to the State of Qatar only after ExxonMobil is reimbursed for those costs, which are recoverable up to a ███ cap for each quarter. Any costs in excess of that cap are carried over and recovered by ExxonMobil in subsequent quarters. Thus, all else being equal, the State of Qatar's profit share is higher when the business's costs and expenses are lower. That is substantively the same as if the State of Qatar had paid its share of the costs out of pocket in the first instance.

21.     Finally, the evidence also establishes that ExxonMobil and the State of Qatar each shared in the upside and downside of the Al Khaleej Gas project. For example, economic modeling established that there was a very high correlation between the

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 22

economic outcomes for ExxonMobil's interest and the State of Qatar's interest (through its Residual Profit Share) and the Al Khaleej Gas project's outcomes. Thus, to the extent that the Al Khaleej Gas project underperformed, the State of Qatar would bear a portion of that downside risk in the form of a lessened Residual Profit Share.

22.    As a result, it is clear that ExxonMobil and the State of Qatar shared in the economics of Al Khaleej Gas, consistent with a partnership under federal tax law. The State of Qatar agreed to share in the losses (or potential losses), as well as the profits, of the business.

23.    For these reasons, Al Khaleej Gas is a partnership under federal tax law: the parties engaged in joint business activity and divided the profits (and, to the extent relevant under applicable law, the losses) therefrom. As explained above, each of the specific factors that the Supreme Court identified in *Culbertson* as potentially relevant to determining whether a partnership exists counsels in favor of concluding that Al Khaleej Gas is a partnership for tax purposes: the agreement; the conduct of the parties; the parties' statements; the relationship of the parties; the parties' respective abilities and capital contributions; and the actual control of income and the purposes for which it was used.

24.    The evidence therefore shows that the parties "in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise" and formed a partnership under federal tax law. *Culbertson*, 337 U.S. at 742.

25.    The fact that there was no juridical entity for Al Khaleej Gas is irrelevant to this analysis. It is blackletter law that a "contractual arrangement" alone can give rise to a partnership for tax purposes, and whether a partnership exists "does not depend on whether

the organization is recognized as an entity under local law." Treas. Reg. § 301.7701-1(a)(1)-(2); *see also Haley v. Comm's*, 203 F.2d 815, 818 (5th Cir. 1953) (same). Courts routinely find tax partnerships where, as here, there is no separate juridical entity. *See, e.g.*, *Estate of Hirsch v. Comm'r*, 46 T.C.M. (CCH) 559 (T.C. 1983) (applying Fifth Circuit law and holding that an account agreement for trading in cotton futures on an exchange created a tax partnership); *Bentex Oil Corp. V. Comm'r*, 20 T.C. 565, 567, 571 (T.C. 1953) (oral agreement regarding the exploration and operation of oil and gas properties created a tax partnership); *Landreth*, 164 F.2d at 341 (affirming tax partnership arising out of contractual relationship).

### C. *Defendant's Arguments Against Partnership Treatment Lack Merit*

26.      The ARDPSA satisfies the partnership test and, under controlling law, that is the end of the inquiry.  Ignoring that controlling authority, Defendant argues that the ARDPSA is a mineral lease.  But a business relationship that meets the partnership test (as here) cannot also be a mineral lease because a mineral lease does not involve the joint business activity that characterizes a partnership.  For example, in *Grandview Mines v. Commissioner*, 282 F.2d 700, 703-04 (9th Cir. 1960), the court expressly applied *Culbertson* in evaluating whether a business relationship was a partnership or a mineral lease.  In that case, the parties' contractual agreement was a mineral lease because there was no joint business activity.  In contrast, the evidence here shows that there is significant joint business activity and Al Khaleej Gas is therefore a partnership.  That means it cannot also be a mineral lease; the two are mutually exclusive.

27.     Defendant focuses on a single provision governing revenue sharing (Article 19) and erroneously contends that it resembles a royalty in a mineral lease.  But there is no authority for classifying a petroleum investment contract based solely on a single provision of the agreement, and for good reason: fiscal terms akin to a royalty could be found in any type of upstream business arrangement, including a joint venture.  That says nothing about the nature of the agreement, which for the reasons described above is a partnership.

28.     Defendant's other reasons for opposing partnership treatment are similarly incorrect:

•       Defendant relies on an email in which Mark Tressler questioned the use of the term "partners" in a letter requesting a tour of processing facilities.  The evidence shows that Mr. Tressler himself testified extensively about the joint business activity between the parties (the relevant inquiry here).  Moreover, the initial draft of this same letter demonstrates that both the AKG Gas Sales Manager and the Qatari Deputy General Manager (who approved the draft letter) believed that ExxonMobil and the State of Qatar were acting as "partners."

•       Defendant questioned witnesses about a single bullet in a slide deck about a separate gas project, Barzan, that referenced "[a]voiding [an] implied 'Partnership.'"  That document post-dated the DPSA by seven years and the ARDPSA by more than a year.  The portion of that document on which Defendant relies referenced the possibility of an implied partnership with Qatar Petroleum (which is not a party to the DPSA or the ARDPSA) that could result from Qatar Petroleum's acquisition of a participation interest in the second

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 25

phase of Al Khaleej Gas; it has nothing to do with the State of Qatar's status as a partner in Al Khaleej Gas.

• Defendant implied during questioning that the negotiation of the ARDPSA itself, with each party modeling its own economics and adopting its own positions in the negotiations, "[d]oesn't sound like partners." But it is irrelevant that an agreement between the partners was negotiated at arm's length — as is the case with virtually all partnership agreements.

• Defendant relies on labels — for example, the fact that the DPSA and the ARDPSA are not called "partnership agreements." But there is no authority to support the argument that the document must be labeled a certain way to satisfy the Supreme Court's test and its focus on joint activity.

Accordingly, ExxonMobil has met its burden of providing that Al Khaleej Gas is a partnership under federal tax law.

### D. The Al Khaleej Gas Production Payment Satisfies Section 636(a)

29. As explained above, Al Khaleej Gas is a partnership under federal tax law, and by operation of law it is deemed to hold the mineral property. When Al Khaleej Gas carved out the production payment from its mineral properties, it satisfied the requirements under Section 636(a) for treatment as a mortgage loan. The evidence shows that the production payment meets the three requirements to qualify as a production payment under the Treasury Regulations. A production payment is: (i) an economic interest that burdens mineral property; (ii) that may be limited by dollar amount, volume, or period of time; and (iii) expected, at the time of its creation, to have an economic life that is shorter than the

life of the minerals that it burdens.  Treas. Reg. § 1.636-3(a)(1).  The production payment in this case meets all of these requirements.  A production payment that is "carved out" of mineral property, as here, is treated "as if it were a mortgage loan."  26 U.S.C. § 636(a).

30.    First, the production payment is an economic interest that burdens the partnership's mineral property because it is "satisfied solely by income from minerals." *Exxon Mobil Corp. v. United States*, 43 F.4th 424, 429, 432 (5th Cir. 2022).  This is clear from the ARDPSA, which provides that Qatar "shall look solely to the Petroleum derived from the Gas in the AKG Contract Reservoirs within the AKG Contract Location to . . . discharge the production payment."  Defendant has conceded this point.

31.    Second, the production payment is limited by both dollar amount and time. This is also clear from the ARDPSA, which provides a defined principal amount of $10.78 billion and an agreed-upon schedule of quarterly principal and interest payments that ends in 2027, three years before the earliest possible termination of the mineral rights granted by the State of Qatar.

32.    Third, the production payment satisfies the economic life requirement.  The production payment is shorter than the term of the mineral rights that the State of Qatar contributed to the partnership and from which the production payment was carved out. Defendant's expert conceded that point as well.  Uncontroverted evidence (including contemporaneous reservoir modeling) also showed that the minerals were expected to have a useful life well beyond 2027, when the production payment ends.

33.    For these reasons, the Al Khaleej Gas production payment satisfies the Treasury Regulations.  Because Al Khaleej Gas is a partnership (as described above), the

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 27

partnership holds the mineral property contributed by the State of Qatar. Therefore, the production payment was "carved out of mineral property" held by the partnership, 26 U.S.C. § 636(a), and it meets the requirements of Section 636(a). That entitles ExxonMobil to deduct interest expense.

34.  Defendant argues that the production payment should be disregarded and collapsed with Qatar's equity interest in the partnership, Qatar's Residual Profit Share, into a single "royalty" for purposes of applying the Treasury Regulations. According to Defendant, that single, collapsed interest is not limited in time or duration. But no authority supports that approach. To the contrary, the law is clear that the tax treatment of two interests is to be determined separately where, as here, the two interests are separately transferrable and there are other indicia of debt, such as a fixed principal, maturity date, and interest rate.

35.  For example, in *John Kelley Co. v. Comm'r*, 326 U.S. 521, 526 (1946), a corporation was reorganized through the issuance of debenture bonds to shareholders, which recapitalized some equity with debt. Even though the shareholders were entitled to the same dollar amount as a result of the bond issuance, the Supreme Court respected the bonds as debt because the shareholders could separately sell them, and they had a fixed maturity date and priority over the common stock. *See id.* The Fifth Circuit similarly respects the existence of separate debt interests when held by shareholders. *See, e.g.*, *Harlan v. United States*, 409 F.2d 904, 909-10 (5th Cir. 1969) (respecting a note that was issued by a shareholder concurrently with capital as a separate debt instrument where there were no restrictions on transferability); *Tomlinson v. 1661 Corp.*, 377 F.2d 291, 297 (5th

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 28

Cir. 1967) (respecting debt advances by shareholders in proportion to their equity interests where the debt was freely transferrable).  The IRS has adopted the same standard as well: a debt instrument that is issued together with other property rights is treated as a separate item for tax purposes if the two interests are separately transferrable and the holder is not economically compelled to keep them together.  That includes instances where, as here, the two interests are contained in the same agreement.

36.     Here, the evidence showed that the State of Qatar could separately "sell, transfer, or assign the rights to the Production Payment" under Qatar law.  Thus, the production payment is a separate, enforceable right.  Moreover, the production payment bears the objective indicia of debt, including a stated principal amount, a market rate of interest, and a fixed maturity date, in addition to the economic characteristics of debt.  Consequently, Defendant's attempt to collapse these interests fails under governing law, and it therefore has no basis to dispute that the production payment satisfies this prong of the Treasury Regulations.[1]

### E.  The Court Cannot Disregard the Production Payment Interest Expense Deductions by Applying Judicial Doctrines

37.     Defendant relies on two judicial doctrines — the substance over form doctrine and the economic substance doctrine — to argue that the Court should disregard the production payment interest expense deductions.  Both doctrines have specific requirements that must be satisfied to disregard a transaction or to treat it as something

---

[1] In view of this determination, the Court does not reach ExxonMobil's alternate argument that the production payment meets the common law definition of debt.

different from what it purports to be. Neither is a "smell test" that authorizes the government or the courts to disregard the plain meaning of a statute that specifies the applicable tax treatment. *Benenson v. Comm'r*, 887 F.3d 511, 523 (1st Cir. 2018).

38.     The substance over form doctrine reflects the premise that a transaction is taxed in accordance with its substance rather than its form. *See, e.g.*, *Estate of Streightoff v. Comm'r*, 954 F.3d 713, 719 (5th Cir. 2020). The economic substance doctrine, on the other hand, is invoked (where it applies) to disregard transactions that are "lacking in economic reality" or that "do not vary control or change the flow of economic benefits." *Salty Brine I, Ltd. v. United States*, 761 F.3d 484, 494 (5th Cir. 2014). It has two prongs in the Fifth Circuit. Under the objective prong, courts look to "whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so." *Tucker v. Comm'r*, 766 F. App'x 132, 140 (5th Cir. 2019). Under the subjective prong, courts look to "whether the transaction was motivated solely by tax-avoidance considerations or was imbued with some genuine business purpose." *Salty Brine I*, 761 F.3d at 494. Both doctrines recognize and respect that parties may choose to finance transactions in tax efficient ways.

39.     Neither doctrine can be invoked to disallow the interest expense deductions at issue here for four principal reasons. First, both doctrines are inapplicable because judicial doctrines cannot override the congressionally mandated tax treatment of the production payment in Section 636(a), which specifies that the production payment "shall" be treated "as if it were" a mortgage loan. Second, the economic substance doctrine is inapplicable for the additional reasons that it does not apply to decisions to capitalize a

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 30

venture with debt rather than equity and because the production payments are indisputably real payments that cannot be disregarded. Finally, even if the economic substance doctrine were to apply, it is satisfied here.

40.     Neither the economic substance doctrine nor the substance over form doctrine should be applied to override the plain language of Section 636(a). As an initial matter, courts follow the plain language of a statute even when the IRS does not like the result. Judicial doctrines do not allow courts to disregard a transaction that complies with the Tax Code in favor of the IRS's characterization of a transaction's substance.

41.     Here, the plain meaning of Section 636(a) is clear and unmistakable: it provides that a carved-out production payment "shall" be treated as debt for tax purposes. 26 U.S.C. § 636(a). The word "shall" is unambiguous. Because the production payment satisfies the requirements that Congress and the Treasury Department have promulgated for a carved-out production payment, neither the substance over form nor economic substance doctrine should be applied to deny ExxonMobil's interest expense deductions.

42.     The economic substance doctrine applies only to disregard a transaction that lacks economic reality. *Salty Brine I, Ltd.*, 761 F.3d at 494. As a threshold matter, the second phase of Al Khaleej Gas — with billions of dollars committed, significant infrastructure, and meaningful changes to the project — was indisputably a bona fide commercial transaction with genuine economic substance. Likewise, the production payments were indisputably real payments to the State of Qatar that formed an integral part of that transaction. Defendant cannot contend otherwise. As a result, the economic substance doctrine does not apply.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 31

43.     Compounding the inapplicability of the doctrine, there is a longstanding exception to application of the economic substance doctrine: it does not apply to the decision whether to finance a venture with debt rather than equity.  Such decisions are respected by courts even where they are based largely or entirely on tax consequences. Because there need not be any tax independent purpose for choosing to finance with debt rather than equity, the economic substance doctrine — which otherwise requires that a transaction be "imbued with tax independent considerations," *Tucker*, 766 F. App'x at 139 — does not apply.

44.     This exception to the economic substance doctrine has deep roots.  Nearly 80 years ago, in *John Kelley Co. v. Commissioner*, the Supreme Court made clear that the "business purpose" test from *Gregory v. Helvering*, 293 U.S. 465 (1935), the seminal case on the economic substance doctrine, was inapplicable to a taxpayer's decision to recapitalize a business with debt.  In determining whether the instruments at issue were debt for tax purposes, the Court expressly distinguished *Gregory*, and it did not consider whether the transactions had a tax-independent business purpose, as the economic substance doctrine would otherwise require.  Rather, the Supreme Court analyzed only whether the transactions bore "indicia of indebtedness" — which included, as here, a fixed interest rate and maturity date.  *John Kelley Co.*, 326 U.S. at 526.  When Congress codified the economic substance doctrine in 2010, the legislative history recognized that the judicial

doctrine did not apply to "the choice between capitalizing a business enterprise with debt or equity," citing *John Kelley Co.*[2]

45.     Since *John Kelley Co.*, courts regularly respect taxpayers' decisions to finance with debt rather than equity, and without regard to tax motivations.  For example, in *Nassau Lens Co. v. Comm'r*, 308 F.2d 39, 44 n.6 (2d Cir. 1962), the court rejected the application of a "business purpose" test in analyzing a taxpayer's decision to capitalize its business with a combination of debt and equity, and it respected the taxpayer's allocation of capital even though there was "no business purpose behind the allocation."  In that case, the taxpayer transferred assets to a corporation in exchange for stock and debenture notes. The corporation claimed interest equivalent deductions on the debentures, which the IRS disallowed.  *Id.* at 42.  The Second Circuit reversed the Tax Court's holding that the deductions were unlawful, reasoning that the Tax Court applied an "erroneous legal standard when it placed such emphasis on [the taxpayer's] lack of a business purpose."  *Id.* at 46.  The Second Circuit held that the loans were "to be recognized or disregarded for tax purposes according to the extent to which they comply with arm's-length standards, not the extent to which the taxpayer has a business purpose."  *Id.*  This is because there is "no rule which permits the Commissioner to dictate what portion of a corporation's operations shall be provided for by equity financing rather than by debt."  *Id.*

---

[2] *See* S. REP. NO. 110-206, at 92-93 (2007); H.R. REP. NO. 111-299, pt. 2, at 291 (2009); H.R. REP. NO. 111-443, at 296 (2010); Staff of the Joint Committee on Tax'n, 111th Cong., Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act," at 152 (JCX-18-10) (Comm. Print 2010).

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 33

46.     The Fifth Circuit, too, has recognized that there is "no authority for the proposition that the stockholders of a corporation may not determine just how much of their funds they care to risk in the form of capital and how much, if any, they are willing to lend as a credit," even where the choice to capitalize with debt "leaves them in a position to enjoy more favorable deduction privileges than if they had put it all in as capital." *Rowan v. United States*, 219 F.2d 51, 54 (5th Cir. 1955); *see also Little v. United States*, 191 F. Supp. 12, 17-18 (E.D. Tex. 1960) (same); *NA Gen. P'ship & Subsidiaries v. Comm'r*, 103 T.C.M. (CCH) 1916 (T.C. 2012) (respecting a decision to recapitalize an entity because proposed changes to the tax regulations would significantly increase the tax cost of the existing structure).

47.     The economic substance doctrine does not apply to decisions between debt and equity financing because those decisions are almost always influenced by tax considerations, as "[t]here may be no tax-independent reason for a taxpayer to choose between these different ways of financing a business." *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1019 (11th Cir. 2001). This is why a court would never disregard a mortgage loan on the ground that the homeowner chose to finance the purchase with debt (rather than paying upfront in cash) for the sole purpose of benefiting from the mortgage interest deduction. The same holds true for capitalizing (or recapitalizing) a business. As Defendant's own expert admitted at trial, there is "nothing wrong" with "considering the tax impact in choosing whether to finance with debt or equity." To apply the economic substance doctrine in that context — and to disregard the capitalization of an entity on the ground that the choice of debt financing was motivated by the deductibility of interest

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 34

expense — would effectively "prohibit tax-planning," a legitimate and well-established aspect of complex commercial transactions.  *Id.* at 1019.

48.    The economic substance doctrine does not apply to the production payment for these reasons.  The evidence shows that the ARDPSA was a complex commercial transaction that was negotiated for years and that "compl[ied] with arm's-length standards."  *Nassau Lens*, 308 F.2d at 46.  Indeed, multiple witnesses described in detail the "very extensive discussions for an extended period of time between [Qatar] and ExxonMobil" with respect to the second phase of the partnership, which is also evidenced by voluminous records of emails, presentations, term sheets, and drafts exchanged between the parties over multiple years.  One component of that transaction was the parties' agreement to recapitalize the partnership with a combination of debt (i.e., the production payment) and equity.  The production payment, in particular, was the subject of extensive negotiations that spanned at least nine months.  And as explained above, the production payment is, in substance, debt.  As a result, the economic substance doctrine does not apply: the decision to include the production payment was a choice between capitalizing with debt and equity, and in that context the doctrine is inapplicable.

49.    To determine whether an interest is "in substance, debt or equity," the Fifth Circuit applies the thirteen-factor test set forth in *Estate of Mixon v. United States*.  464 F.2d 394, 398, 402 (5th Cir. 1972).  These factors were developed by courts to distinguish between debt and equity, and for the specific purpose of going "beyond the form and into the substance of the particular transaction" for "resolving debt-equity controversies."  *Tex. Farm Bureau v. United States*, 725 F.2d 307, 308 (5th Cir. 1984).  Thus, even if the

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 35

substance over form doctrine could be applied here, controlling law would require application of the *Estate of Mixon* factors to determine whether the production payment is, in substance, debt or equity.

50.     Even if the economic substance doctrine were to apply, the production payment should still be respected.  The evidence shows that both prongs of the doctrine are satisfied.

51.     In applying the economic substance doctrine, the Court should "look at the transaction as a whole to determine the economic substance," as isolating only one part of a transaction "does not tell the whole story." *Salty Brine I*, 761 F.3d at 495.  That frame of analysis best advances the purpose of the doctrine, which is to distinguish legitimate transactions with permissible tax planning components from transactions that serve no non-tax purpose at all.  *See Shell Petroleum, Inc. v. United States*, 2008 WL 2714252, at \*32, \*34-35 (S.D. Tex. 2008).  This is because "the tax laws affect the shape of nearly every business transaction." *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978).  But focusing solely on a tax-motivated component of a transaction without regard to the broader context would lose sight of legitimate business objectives that are often pursued through lawful, tax efficient means.

52.     *Shell Petroleum* is instructive.  There, the court reasoned that there was no basis for "dissecting" or "'slicing and dicing' . . . an integrated transaction solely because the Government aggressively chooses to challenge only an isolated component of the overall transaction."  2008 WL 2714252, at \*35.  In applying the doctrine, the court analyzed the transaction as a whole (the creation of a special purpose entity to which a host

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 36

of different properties were transferred) rather than solely the component of the transaction that the government challenged (the transfer of a subset of specific, non-producing properties to the special purpose entity). *Id.* at *37.

53.     That same reasoning applies here.  The "transaction as a whole" is the ARDPSA, not one provision of the agreement in isolation. *Salty Brine I*, 761 F.3d at 495. As in *Shell Petroleum*, the production payment was indisputably part and parcel of a larger "bundle of provisions" in the ARDPSA that were designed to ensure the continued commercial success and growth of the Al Khaleej Gas partnership.  Indeed, multiple witnesses testified about the "very extensive" negotiations regarding the second phase of the project, which spanned at least three years.

54.     The evidence shows that the ARDPSA had real economic substance.  The expansion of the partnership involved "extensive" economic changes.  Qatar contributed significant additional volumes of minerals, including from a new reservoir that could yield higher-value products.  ExxonMobil contributed money to construct new facilities.  Total production capacity more than doubled.  The parties agreed to a new minimum price for sales gas and a "take-or-pay" provision that provided additional demand certainty.  In total, expected cash distributions from the partnership approximately tripled.  Thus, "real dollars" changed hands and the transaction impacted the parties' "net economic positions."

55.     Under the subjective prong, the evidence shows that the ARDPSA had a genuine business purpose: expanding production capacity to satisfy growing domestic demand for power.  Discussions about a second phase of the project began even before the first phase was online, and well before the concept of a production payment or tax planning

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 37

was ever raised.  As a result, the expansion of the partnership through the ARDPSA was not "engineered . . . solely for tax purposes," *Shell Petroleum*, 2008 WL 2714252, at *38, and it satisfies the second prong of the economic substance doctrine in the event that doctrine were to apply (which it does not).

56.    Even if the Court were to apply the economic substance doctrine and analyze the production payment in isolation — which is an inquiry that is not supported by legal authority — the doctrine would still be satisfied.  The evidence demonstrates that the production payment had real economic substance in its own right and changed the economic position of both parties.  Among other things, the evidence shows that the production payment was different in kind from the Residual Profit Share because it is, in substance, debt.  It therefore altered the parties' "legal relations," which is an impact on "non-tax business interests" for purposes of the economic substance doctrine.  *Shell Petroleum*, 2008 WL 2714252, at *32.  The fact that the production payment could be separately transferred creates additional economic value, as testified to by fact and expert witnesses.  Moreover, the production payment created additional upside for the State of Qatar and downside for ExxonMobil.  That additional value created through the production payment is nearly double the Bonus Payments that the parties included as part of their commercial terms, showing that the production payment was commercially significant in the context of the overall transaction.  And because the production payment proceeds were used to finance the acquisition of additional mineral rights from the State of Qatar, the production payment impacted the parties' economics by "creating a reasonable possibility of profit," which also satisfies the objective prong of the doctrine.  *Id.*  Defendant's

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 38

accounting expert acknowledged at trial that she was not asked to, and did not, analyze or opine on whether the production payment had an economic impact on the parties.

57. In addition, there is no dispute that there was a genuine, non-tax business motivation for including the production payment in the ARDPSA: it was included to help make the second phase of the Al Khaleej Gas partnership, a significant commercial deal involving billions of dollars in mineral rights, new infrastructure, and revenue, economically viable.

58. For these reasons, even if the production payment were analyzed in isolation, it too satisfies both prongs of the economic substance doctrine, and there is no basis under governing law to disregard the interest expense deductions that result.

#### CONCLUSION

Any findings of fact that are more properly considered to be conclusions of law, or any conclusions of law that are more properly considered to be findings of fact, are also adopted by the Court as such.

ExxonMobil has established that it was lawfully entitled to deduct interest expense for production payments made to the State of Qatar. The parties shall meet and confer regarding the computations of the amount of the tax refund and statutory interest due to ExxonMobil for tax years 2010 and 2011 and submit a joint letter to the Court with the parties' proposed position or positions on the issue within forty-five (45) days from the date of this decision.

Additionally, ExxonMobil shall within twenty-one (21) days of these findings and conclusions file a motion to seal any identified portion it believes should remain under seal,

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 39

to which the government may respond in the usual course.  The Court will then file, not
under seal, the balance of this Order.

Signed October 30, 2024.

David C. Godbey
Chief United States District Judge