**ORAL ARGUMENT REQUESTED**

No. 23-1410

───────────────────

In the

# United States Court of Appeals
## for the Tenth Circuit

───────────────────

LIBERTY GLOBAL, INC.,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

───────────────────

On Appeal from the United States District Court
for the District of Colorado, Case No. 1:20-cv-03501-RBJ,
Hon. R. Brooke Jackson, *United States Senior District Judge*

───────────────────

**PLAINTIFF-APPELLANT LIBERTY GLOBAL, INC.'S
OPENING BRIEF**

───────────────────

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Gregory S. Tamkin
DORSEY & WHITNEY
1400 Wewatta St., Ste. 400
Denver, CO 80202

Shay Dvoretzky
  *Counsel of Record*
Rajiv Madan
Royce Tidwell
Christopher Bowers
Nathan Wacker
Parker Rider-Longmaid
Sylvia O. Tsakos
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant Liberty Global, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF RELATED CASES ................................................ xii

GLOSSARY ..................................................................................... xiii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 9

STATEMENT OF THE ISSUE ............................................................ 9

PERTINENT STATUTES AND REGULATIONS ............................... 9

STATEMENT OF THE CASE ........................................................... 10

    A.    Legal background ................................................................ 10

        1.    Corporate tax laws are complex, and the Tax Code and Treasury regulations have long permitted businesses to make certain decisions based on anticipated tax consequences. .............................................. 10

        2.    In 2017, the TCJA overhauls the United States' approach to international taxation and allows a deduction for dividends received from foreign corporations. ........................................................... 16

        3.    Dissatisfied with the operation of § 245A, Treasury issues regulations to limit its application. ......................... 20

    B.    Factual background ............................................................ 22

        1.    LGI and its affiliates operate a global telecommunications business. ........................................... 23

        2.    In response to the TCJA, LGI and its affiliates take steps to qualify for the § 245A deduction. ......................... 24

# TABLE OF CONTENTS
(continued)

Page

C.  Procedural background ................................................................30

1.  LGI claims a tax refund in connection with Project Soy and sues in district court. ...............................................30

2.  The district court holds that the temporary Treasury regulations implementing § 245A are invalid because they were promulgated without notice and comment. ..................................................................30

3.  The district court holds that LGI is not entitled to a refund because the IRS could disregard steps one through three under the economic substance doctrine. ..................................................................31

SUMMARY OF ARGUMENT .............................................................33

STANDARD OF REVIEW .................................................................38

ARGUMENT...................................................................................38

A.  The economic substance doctrine is a tool for interpreting tax terms that require inquiry into economic reality and taxpayer motive—it cannot be used to override the Tax Code and regulations.................................................39

1.  Section 7701(*o*) clarifies how courts should apply the economic substance doctrine and reaffirms that the doctrine isn't relevant to all statutes and regulations..................................................................40

2.  Caselaw makes clear that the economic substance doctrine is a tool for interpreting tax terms that make economic reality and taxpayer motive relevant. ..................................................................42

# TABLE OF CONTENTS
## (continued)

**Page**

     3.      The economic substance doctrine isn't relevant, and plays no role, when the statute or regulation doesn't require inquiry into economic reality and taxpayer motive. ........................................................................47

   B.    The IRS cannot use the economic substance doctrine to disallow LGI's § 245A deduction, because the applicable statutory and regulatory provisions don't make economic reality or taxpayer motive relevant to Project Soy. ......................52

     1.      The economic substance doctrine doesn't permit disregarding Telenet Group's conversion to a corporation or its capitalization choices in steps one through three, because the law permits taxpayers to make those choices based on tax consequences. ...............53

     2.      LGI satisfied § 245A's requirements, and the government doesn't dispute that if steps one through three are respected, it cannot use the economic substance doctrine to disallow LGI's claimed § 245A deduction. ....................................................58

   C.    The district court's reasoning lacks merit. ....................................60

     1.      The district court wrote the relevance requirement out of § 7701(*o*). ........................................................................60

     2.      TGH's earnings and profits were not "artificial" — they were just as real as the gain the IRS seeks to tax. ........................................................................62

     3.      The government cannot selectively apply the economic substance doctrine. ...............................................64

CONCLUSION .........................................................................65

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| REQUEST FOR ORAL ARGUMENT | | 65 |
| CERTIFICATE OF COMPLIANCE | | 67 |
| CERTIFICATE OF SERVICE | | 68 |
| ADDENDUM | | Add.1 |
| Order on Cross-Motions for Summary Judgment, Dist. Ct. Doc. 87 (Oct. 31, 2023) | | Add.1 |
| Final Judgment, Dist. Ct. Doc. 88 (Oct. 31, 2023) | | Add.22 |
| I.R.C. § 245A | | Add.23 |
| I.R.C. § 312 | | Add.25 |
| I.R.C. § 351 | | Add.34 |
| I.R.C. § 957 | | Add.39 |
| I.R.C. § 958 | | Add.41 |
| I.R.C. § 964 | | Add.43 |
| I.R.C. § 1248 | | Add.46 |
| I.R.C. § 7701(*o*) | | Add.52 |
| 26 C.F.R. § 1.245A-5T | | Add.53 |
| 26 C.F.R. § 301.7701-1 | | Add.74 |
| 26 C.F.R. § 301.7701-2 | | Add.75 |
| 26 C.F.R. § 301.7701-3 | | Add.83 |

## TABLE OF CONTENTS
(continued)

**Page**

Limitation on Deduction for Dividends Received
from Certain Foreign Corporations and Amounts
Eligible for Section 954 Look-Through Exception,
84 Fed. Reg. 28,398 (June 18, 2019) ............................................. Add.91

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ausmus v. Perdue,*
  908 F.3d 1248 (10th Cir. 2018) ........................................................38

*Benenson v. Commissioner,*
  887 F.3d 511 (1st Cir. 2018) .................................................... 49, 50

*Benenson v. Commissioner,*
  910 F.3d 690 (2d Cir. 2018) ............................................................50

*Blum v. Commissioner,*
  737 F.3d 1303 (10th Cir. 2013) ......................................................47

*Boulware v. United States,*
  552 U.S. 421 (2008) ................................................ 33, 34, 39, 40, 42

*Commissioner v. First Security Bank of Utah, N. A.,*
  405 U.S. 394 (1972) ......................................................................11

*Dover Corp. v. Commissioner,*
  122 T.C. 324 (2004) ................................................................ 12, 54

*Frank Lyon Co. v. United States,*
  435 U.S. 561 (1978) ......................................................................45

*Gregory v. Helvering,*
  293 U.S. 465 (1935) ................................................................ 39, 42, 43

*Helvering v. Gregory,*
  69 F.2d 809 (2d Cir. 1934) .........................................................8, 9

*Hughes Aircraft Co. v. Jacobson,*
  525 U.S. 432 (1999) ......................................................................51

*Illinois Tool Works Inc. v. Commissioner,*
  116 T.C.M. (CCH) 124 (2018) ......................................................57

*James v. Commissioner,*
  899 F.2d 905 (10th Cir. 1990) ......................................................46

*Jewell v. United States,*
  749 F.3d 1295 (10th Cir. 2014) ......................................................38

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Keeler v. Commissioner*,
243 F.3d 1212 (10th Cir. 2001) ................................................................. 46, 47

*Knetsch v. United States*,
364 U.S. 361 (1960) .................................................................................44

*Kraft Foods Co. v. Commissioner*,
232 F.2d 118 (2d Cir. 1956) ..................................................... 5, 11, 57

*Littriello v. United States*,
484 F.3d 372 (6th Cir. 2007) ...................................................... 11, 12

*Nassau Lens Co. v. Commissioner*,
308 F.2d 39 (2d Cir. 1962) ......................................................57

*Obduskey v. McCarthy & Holthus LLP*,
139 S. Ct. 1029 (2019) .............................................................61

*Sala v. United States*,
613 F.3d 1249 (10th Cir. 2010) ......................................... 38, 47, 59, 65

*St. Charles Investment Co. v. Commissioner*,
232 F.3d 773 (10th Cir. 2000) .................................................... 50, 51

*Summa Holdings, Inc. v. Commissioner*,
848 F.3d 779 (6th Cir. 2017) ......................................... 3, 4, 7, 8, 10,
...................................................................... 34, 35, 37, 38, 39, 42,
...................................................................... 48, 49, 51, 52, 54, 62, 63

*Sun Properties, Inc. v. United States*,
220 F.2d 171 (5th Cir. 1955) .............................................................59

*Yamagata v. United States*,
114 Fed. Cl. 159 (2014) ..............................................................12

**STATUTES**

Administrative Procedure Act,
5 U.S.C. § 500 *et seq*..................................................................31

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Tax Cuts and Jobs Act, Pub. L. No. 115-97,
  Tit. I, 131 Stat. 2054........................................................... 1, 2, 16, 17,
  ........................................................................... 18, 19, 20, 22, 24

I.R.C. § 11(b)(1) (2012)........................................................18

I.R.C. § 61(a)(3) ............................................................ 27, 55

I.R.C. § 165............................................................................46

I.R.C. § 245A ............................................................... 1, 2, 3, 5, 6, 7,
  ................................................................. 8, 9, 16, 18, 19, 20,
  ................................................................. 21, 22, 23, 24, 25, 27,
  ................................................................. 28, 30, 31, 33, 34, 36, 37,
  ...........................................38, 52, 53, 58, 59, 60, 63, 64, 65

  I.R.C. § 245A(a) ................................................ 17, 18, 19, 20

  I.R.C. § 245A(c)(1)...........................................................18

I.R.C. § 312(f)(1) ........................................................... 27, 55

I.R.C. § 351 ....................................................... 5, 14, 15, 26, 41,
  ............................................................. 42, 52, 53, 55, 56, 57

  I.R.C. § 351(a) ...................................................................14

  I.R.C. § 351(b) ................................ 7, 15, 27, 35, 55, 56, 63

  I.R.C. § 351(g) ............................. 5, 7, 15, 26, 35, 55, 56

I.R.C. § 469(b) ............................................................. 50, 51

Internal Revenue Code Subpart F,
  I.R.C. §§ 951–965 ..................................... 16, 17, 18, 19, 20

  I.R.C. § 951(a)(1) ...............................................................17

  I.R.C. § 951(b) ....................................................................17

  I.R.C. § 951A........................................................................21

  I.R.C. § 957(a) ................................................................2, 17

  I.R.C. § 964(e) ........................................... 8, 20, 23, 24, 53, 58

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

I.R.C. § 964(e)(1) .................................................................. 2, 19, 20, 27, 58

I.R.C. § 964(e)(4) ...................................................................................... 2

I.R.C. § 964(e)(4)(A) ............................................................................... 20

I.R.C. § 964(e)(4)(A)(i) ..................................................................... 19, 58

I.R.C. § 964(e)(4)(A)(ii) ............................................................... 19, 27, 58

I.R.C. § 964(e)(4)(A)(iii) ....................................................... 19, 27, 28, 58, 59

I.R.C. § 1001(a) ...................................................................................... 14

I.R.C. § 1248 .............................................................................. 18, 19, 24

I.R.C. § 1248(a) ............................................................. 6, 8, 16, 17, 18,
................................................................................. 20, 27, 53, 56, 58

I.R.C. § 1248(h) ............................................................................. 36, 64

I.R.C. § 1248(j) ........................................................................ 2, 19, 36, 64

I.R.C. § 1371(b)(1) ................................................................................. 50

I.R.C. § 6532(a)(1) ................................................................................. 30

I.R.C. § 7701($o$) ........................................................... 7, 33, 36, 39, 40,
............................................................................. 41, 56, 57, 60, 61, 62

I.R.C. § 7701($o$)(1) ....................................................... 31, 32, 38, 39, 40, 61

I.R.C. § 7701($o$)(1)(A) ........................................................................... 40

I.R.C. § 7701($o$)(1)(B) ........................................................................... 40

I.R.C. § 7701($o$)(5)(A) ........................................................................... 40

I.R.C. § 7701($o$)(5)(C) ....................................................... 6, 7, 33, 36, 40, 41, 61

I.R.C. § 7422 .......................................................................................... 30

28 U.S.C. § 1291 ....................................................................................... 9

28 U.S.C. § 1346(a)(1) ................................................................................ 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

RULES AND REGULATIONS

10th Cir. R. 28.2(C)(3) ................................................................ xii

26 C.F.R. § 1.245A-5(k) .............................................................. 22

26 C.F.R. § 1.245A-5T ................................................... 20, 21, 30

  26 C.F.R. § 1.245A-5T(b) ..................................................... 2, 3, 21

  26 C.F.R. § 1.245A-5T(e)(2)(i)(A) ........................................... 21, 22

26 C.F.R. § 1.312-6(b) ........................................................... 27, 55

26 C.F.R. § 301.7701-1 ............................................................. 4, 11

26 C.F.R. § 301.7701-2 ............................................................. 4, 11

  26 C.F.R. § 301.7701-2(a) ...................................................... 13, 14

  26 C.F.R. § 301.7701-2(b) ...................................................... 14, 35

  26 C.F.R. § 301.7701-2(b)(8) ............................... 4, 12, 13, 14, 25, 54

  26 C.F.R. § 301.7701-2(b)(8)(i) .................................................... 26

26 C.F.R. § 301.7701-3 ............................................................. 4, 11

  26 C.F.R. § 301.7701-3(a) ............................................. 12, 13, 14, 54

  26 C.F.R. § 301.7701-3(b) ................................................... 4, 13, 14

  26 C.F.R. § 301.7701-3(c) ............................................... 4, 12, 13, 14

  26 C.F.R. § 301.7701-3(d) ................................................ 4, 13, 14

  26 C.F.R. § 301.7701-3(g)(1)(iv) ............................ 4, 5, 13, 26, 35, 54, 55

Fed. R. App. P. 4(a)(1)(B) ............................................................. 9

*Limitation on Deduction for Dividends Received from*
  *Certain Foreign Corporations and Amounts Eligible*
  *for Section 954 Look-Through Exception,*
  84 Fed. Reg. 28,398 (June 18, 2019) ............................ 20, 21, 22, 59

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Limitation on Deduction for Dividends Received from
  Certain Foreign Corporations and Amounts Eligible
  for Section 954 Look-Through Exception*,
  85 Fed. Reg. 53,068 (Aug. 27, 2020).................................................................22

OTHER AUTHORITIES

Boris I. Bittker & James S. Eustice,
  *Federal Income Taxation of Corporations
  and Shareholders* (Nov. 2020) ..................................................................... 12, 15

H.R. Rep. No. 105-148 (1997) ...............................................................................15

H.R. Rep. No. 111-443 (2010) ......................................................... 41, 42, 55, 62

H.R. Rep. No. 115-466 (2017) ...............................................................................20

IRS Chief Counsel Memorandum 201030024
  (Apr. 16, 2010), https://www.irs.gov/pub/irs-wd/1030024.pdf ...........56

IRS National Office Field Service Advice Memorandum
  No. 199922012 (June 4, 1999) ...........................................................................57

IRS, Notice 2010-62 (Oct. 4, 2010),
  https://www.irs.gov/pub/irs-drop/n-10-62.pdf .............................. 41, 62

Kuntz & Peroni,
  *U.S. International Taxation* (Mar. 2024) ..........................................................16

Leandra Lederman,
  *W(h)ither Economic Substance?*,
  95 Iowa L. Rev. 389 (2010)........................................................................ 10, 11

*Mertens Law of Federal Income Taxation* (Mar. 2024) ................................... 13, 15

Rev. Rul. 2004-59, 2004-24 I.R.B. 1050 (June 14, 2004) .......... 4, 5, 26, 35, 44, 55

Stephen Schwarz & Daniel J. Lathrope,
  *Fundamentals of Corporate Taxation*
  (9th ed. 2016) .....................................................................................................14

## STATEMENT OF RELATED CASES

Plaintiff-Appellant Liberty Global, Inc., is unaware of any prior or related appeals that must be identified under Tenth Circuit Rule 28.2(C)(3).

# GLOSSARY

| | |
|---|---|
| 1-App. | Appellant's Appendix, Volume 1 of 2 |
| 2-App. | Appellant's Appendix, Volume 2 of 2 |
| Add. | Addendum bound with this brief |
| CFC | Controlled foreign corporation, as defined in I.R.C. § 957(a) |
| Commissioner | Commissioner of the Internal Revenue Service |
| I.R.C. | Internal Revenue Code (*i.e.,* Title 26 of the U.S. Code) |
| IRS | Internal Revenue Service |
| LGI | Liberty Global, Inc., a U.S. corporation and subsidiary of Liberty Global plc |
| LGI I | Liberty Global Broadband I Ltd., a U.K. company and subsidiary of LGI |
| Liberty Global plc | A U.K. corporation and ultimate owner of LGI and its affiliates |
| NQPS | Nonqualified preferred stock (*see* I.R.C. § 351(g)) |
| Tax Code or Code | Title 26 of the U.S. Code — the Internal Revenue Code |
| TCJA | Tax Cuts and Jobs Act, Pub. L. No. 115-97, Tit. I, 131 Stat. 2054 |
| Telenet Group | Telenet Group BVBA and later Telenet Group NV/SA, a Belgian subsidiary of Liberty Global plc |

## GLOSSARY
(continued)

| | |
|---|---|
| TGH | Telenet Group Holding NV/SA, a Belgian subsidiary of Liberty Global plc and the holding company of Telenet Group |
| TIF LLC | Telenet International Financing USD LLC, a U.S. limited liability company and subsidiary of TGH |
| Treasury regulations | Title 26 of the Code of Federal Regulations |

## INTRODUCTION

This case is about whether the Internal Revenue Service can override tax statutes and Treasury regulations. Those laws form a reticulated scheme in which a taxpayer's choices may produce different consequences, including qualifying for an entitlement to a deduction or other benefits. Here, Liberty Global, Inc. (LGI), took steps that entitled it to a deduction under a new tax law, the 2017 Tax Cuts and Jobs Act (TCJA), Pub. L. No. 115-97, Tit. I, 131 Stat. 2054. But the IRS didn't like that result, so it tried using temporary regulations to disallow the deduction. Then, after the district court found the regulations invalid, the IRS purported to override the law with the economic substance doctrine. That tactic fails, too. The economic substance doctrine is a canon of construction for interpreting and applying statutory or regulatory provisions that require inquiry into the economic reality of and taxpayer motive for an underlying transaction. Because it's an interpretive canon, it plays no role when, as here, the applicable statutes and regulations *permit* the taxpayer to make choices precisely *because of* their tax consequences.

**1.** The TCJA overhauled the United States' approach to taxing multinational corporations. To encourage repatriation of foreign earnings, Congress added I.R.C. § 245A, which directs that a U.S. corporation "shall

be allowed" to claim a deduction for certain dividends received from foreign corporations. The TCJA also amended other Code provisions to ensure that a U.S. corporation could claim the deduction when it sells stock in a "controlled foreign corporation," or CFC, I.R.C. § 957(a), and when a CFC sells stock of another CFC lower in the corporate chain, by deeming income from those sales to be dividends. *See* I.R.C. §§ 1248(j), 964(e)(1), (4).

LGI is a U.S. corporation that is part of a foreign-owned, multinational group of entities operating a global telecommunications business. LGI recognized that § 245A provided an opportunity to: (1) repatriate profits that its foreign subsidiary earned providing telecommunications services in Belgium, (2) claim a corresponding § 245A deduction, and (3) ensure that its subsidiary's future foreign earnings were taxed under Belgian law. So LGI made a series of choices to claim the § 245A deduction, following the Tax Code and Treasury regulations to a tee.

But Treasury wouldn't have it. Despite acknowledging § 245A's clear terms, Treasury wanted to limit the deduction. So it issued temporary regulations, without notice and comment, purporting to retroactively disallow the deduction for certain transactions. The regulations targeted transactions

like LGI's, declaring that dividends from those transactions would be "ineligible" for the deduction. 26 C.F.R. § 1.245A-5T(b).

After paying its taxes, LGI sued for a refund, claiming the § 245A deduction and explaining that the regulations were invalid. The district court agreed that the regulations were invalid.

So the IRS tried another tack. It contended that LGI *still* couldn't claim the deduction, no matter its compliance with § 245A's terms. In the IRS's view, the steps LGI took to qualify for the deduction were tax-motivated and produced a result Congress didn't intend, so they had to be ignored under the common-law economic substance doctrine. (At the same time, the IRS selectively decided to respect certain steps LGI took so that it could find income to tax, even while denying the corresponding deduction.) The district court agreed, granting summary judgment for the IRS.

The district court and the IRS are wrong. The court's conclusion overrides Congress' choice to allow U.S. corporations to claim deductions for foreign dividends. And it wrongly wields the economic substance doctrine to rewrite, rather than interpret, the law. The IRS has "no basis" here "for recharacterizing the transactions and no basis for recharacterizing the law's

application to them." *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 782 (6th Cir. 2017) (Sutton, J.).

**2.**    Addressing the IRS's overreach requires understanding two kinds of tax-motivated choices businesses can make: choices under a set of Treasury regulations known as "check-the-box" regulations, *see* 26 C.F.R. §§ 301.7701-1 through 301.7701-3, and choices about an entity's capital structure, like whether to finance with debt or equity.

Start with the regulations, which allow businesses to choose how to be classified for federal tax purposes. For example, a foreign entity can be "disregarded," meaning that its existence is ignored for federal tax purposes, and its assets and liabilities are considered to belong to the entity's owner. Or an entity may instead decide to be treated as a corporation for federal tax purposes by, for example, checking a box on an IRS form or by operating as an entity that the regulations say *must* be treated as a corporation. And if a taxpayer chooses to convert to a corporation for tax purposes, the tax laws don't "disregard" the entity, but instead treat it as if it were a newly formed corporation with its own assets and liabilities. *See* 26 C.F.R. §§ 301.7701-2(b)(8), 301.7701-3(a)-(d). A corporate organization "is deemed to occur": the owner of the entity converting to a corporation is treated as contributing "all of the

[entity's] assets and liabilities" to the "new" corporation, in exchange for that corporation's stock. *See id.* § 301.7701-3(g)(1)(iv); Rev. Rul. 2004-59, 2004-24 I.R.B. 1050, 1051 (June 14, 2004).

Section 351 of the Tax Code, in turn, governs when exchanges of property for stock in a corporate organization are taxable. When a person transfers property to a corporation in exchange for stock and non-stock property (like cash or debt), that person is taxed on the "gain" from the exchange, up to the value of the non-stock property. Non-stock property includes debt instruments and "nonqualified preferred stock" (NQPS), I.R.C. § 351(g) — a kind of stock that shares characteristics with debt.

Whether to capitalize with NQPS, debt, cash, common stock, or something else is a choice that § 351 and background principles commit to the taxpayer. *See, e.g., Kraft Foods Co. v. Commissioner*, 232 F.2d 118, 128 n.19 (2d Cir. 1956). And because tax law treats debt and equity differently, taxpayers often choose differently precisely because of anticipated tax consequences.

To qualify for the § 245A deduction, LGI and its affiliates chose to convert a Belgian subsidiary into an entity considered a corporation under the Treasury regulations and chose to capitalize that entity with NQPS and debt — choices that the regulations and statutes contemplated they could

make for tax reasons. The steps are undisputed. One of LGI's "disregarded" foreign subsidiaries, Telenet Group BVBA (Telenet Group), changed its capital structure, including by issuing NQPS and debt, and became a regarded corporation. Those changes caused Telenet Group's holding company, Telenet Group Holding NV/SA (TGH), to recognize gain tied to Telenet Group's profits and value, increasing TGH's earnings and profits. Thus, when LGI's subsidiary sold its interest in TGH, LGI recognized a gain that the Code deemed a dividend equal to the amount of TGH's earnings and profits. *See* I.R.C. § 1248(a). That gain, those earnings and profits, and that dividend all reflected the Code's treatment of Telenet Group's real profits and value from providing telecommunications services. And under § 245A, LGI could claim a deduction equal to the amount of the deemed dividend.

The IRS invoked the economic substance doctrine to override the choices LGI and its affiliates made under the Tax Code and Treasury regulations. The district court agreed, reasoning that LGI had artificially generated earnings and profits and denying the deduction.

**3.**    That was error.

The economic substance doctrine is a tool for interpreting and applying statutory or regulatory terms that make economic reality "relevant."

I.R.C. § 7701(*o*)(5)(C). When ordinary tools of construction show that a term requires inquiry into economic reality and taxpayer motive, the doctrine becomes relevant, and § 7701(*o*) tells courts how to apply it. But statutes and regulations don't always make economic reality and taxpayer motive relevant—and then the doctrine isn't relevant either. In those circumstances, courts must "apply each provision as its text requires," without the economic substance doctrine's overlay. *Summa Holdings*, 848 F.3d at 788-89.

The IRS cannot use the doctrine to disallow LGI's § 245A deduction, because ordinary interpretive principles show that economic reality and taxpayer motive aren't relevant to the statutory and regulatory terms that govern the steps LGI took to qualify for the deduction. *First*, the doctrine doesn't permit disregarding Telenet Group's conversion to a corporation, because Treasury regulations expressly contemplate that businesses may choose their entity classification and require entities to be treated as corporations for tax purposes. *Second*, the doctrine doesn't permit disregarding Telenet Group's choice to use debt and NQPS, because § 351(b) and (g) expressly contemplate choices among capitalization alternatives, consistent with longstanding background precedent permitting capitalization choices to be completely tax-motivated. *Third*, once those entity-classification and

capitalization choices are respected, there's no dispute that the sale of TGH triggered a dividend that qualifies for the § 245A deduction. The IRS wants to disregard certain choices LGI made to disqualify LGI from the deduction while respecting other choices LGI made to ensure there is income to tax. That doesn't work. The economic substance doctrine doesn't authorize the IRS to rewrite statutes or regulations to accomplish its desired result. LGI is entitled to the § 245A deduction.

*    *    *

The tax laws are complex, and the IRS can't "undo transactions" the tax laws "expressly authorize." *Summa Holdings*, 848 F.3d at 782. By design, some provisions, like the check-the-box regulations, are "all form and no substance," permitting taxpayers to make tax-motivated choices and leaving no role for the economic substance doctrine. *Id.* at 786. And the IRS has never disputed that, if it cannot disregard Telenet Group's conversion and capital-ization choices, the interrelated provisions of §§ 245A, 964(e), and 1248(a) *require* it to allow the deduction. Ultimately, the IRS's complaint is that LGI made permissible choices to qualify for a new statutory deduction that the IRS thought it shouldn't receive. But taxpayers aren't required to make choices that "will best pay the Treasury." *Helvering v. Gregory*, 69 F.2d 809,

810 (2d Cir. 1934) (Learned Hand, J.), *aff'd* 293 U.S. 465 (1935). The Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1346(a)(1) and entered final judgment disposing of all claims on October 31, 2023. Add.22. LGI timely appealed on December 27, 2023. 2-App.302; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether LGI is entitled to a deduction under I.R.C. § 245A, and thus to a refund of taxes, penalties, and interest, because the IRS cannot rely on the economic substance doctrine or Treasury regulations to override the operation of § 245A.

## PERTINENT STATUTES AND REGULATIONS

The addendum reproduces pertinent authorities. Add.23-117.

## STATEMENT OF THE CASE

**A.      Legal background**

      **1.      Corporate tax laws are complex, and the Tax Code and Treasury regulations have long permitted businesses to make certain decisions based on anticipated tax consequences.**

Federal tax law involves complicated rules reflecting legislative and regulatory choices about how to measure income and what conduct to incentivize. Some rules impose different tax treatment for different types of entities and allow taxpayers to choose how to classify an entity. Other rules impose different treatment depending on how a business is capitalized—for example, with debt rather than equity—and permit taxpayers to choose how to capitalize. By design, businesses often make choices based on anticipated tax consequences.

      **a.**      Federal tax law is "highly reticulated," and incorporates "a complicated set of tax credits, deductions," and other "rules that balance many competing rationales." *Summa Holdings*, 848 F.3d at 788-89. Not all Code provisions and Treasury regulations are designed to maximize tax revenue. *Id.* at 787-88. Some rules "are designed simply to measure a taxpayer's economic income" and tax it "at specified rates." Leandra Lederman, *W(h)ither Economic Substance?*, 95 Iowa L. Rev. 389, 394-95 (2010). Other rules extend

tax benefits to incentivize behaviors. *Id.* Still others are administrative, allowing taxpayers to make choices purely for federal tax purposes.

Taxpayers, in turn, may "structure their business affairs … to minimize taxes." *Commissioner v. First Security Bank of Utah, N. A.*, 405 U.S. 394, 398 n.4 (1972). So too may taxpayers "adjust their affairs in response to a change in the tax law so as to reduce taxes." *Kraft Foods*, 232 F.2d at 128 n.19.

**b.** Treasury's "check-the-box" regulations, 26 C.F.R. §§ 301.7701-1 through 301.7701-3, are administrative rules that allow certain business entities to choose how to be classified for federal tax purposes. Those choices result in different tax treatment.

Whether an entity is classified as a corporation or a partnership, for example, affects the entity's and its owners' tax treatment. Corporate income is "subject to 'double taxation'—once at the corporate level" "and again at the individual-shareholder level." *Littriello v. United States*, 484 F.3d 372, 375 (6th Cir. 2007). Partnership income, in contrast, is taxed only once, "after it passes through to the individual partners." *Id.*

Before 1996, Treasury classified business entities using intricate rules asking whether the business resembled a corporation. *Id.* at 375-76. But those rules proved difficult to administer as state laws began allowing "new

- 11 -

hybrid business entities," like limited liability companies and limited liability partnerships. *Id.* Those entities had characteristics of corporations *and* partnerships, and often were structured "to take advantage of whatever classification" might provide better tax treatment. *Id.* at 376.

Applying the regulations to hybrid entities became unworkable for businesses and the IRS alike. *Id.* That was equally true for classifying foreign entities, which required examining foreign law. *See Yamagata v. United States*, 114 Fed. Cl. 159, 169-85 (2014). So in 1996, Treasury "gave up on the business-entity classification game" and promulgated the check-the-box regulations. Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* § 2.02[1][a] (Nov. 2020). The regulations were designed to make the decision about how to classify businesses simpler and more administrable for taxpayers and the IRS. *Littriello*, 484 F.3d at 374.

Under the regime, unincorporated businesses "can elect [their] classification for federal tax purposes," 26 C.F.R. § 301.7701-3(a), by checking a box on an IRS form, *id.* § 301.7701-3(c); Bittker § 2.02[1][a]. An entity's decision can be (and often is) purely tax-motivated; there doesn't need to be a non-tax purpose for the decision. *Dover Corp. v. Commissioner*, 122 T.C. 324, 351 n.19 (2004). Similarly, a foreign entity can choose to be classified as a

corporation by assuming a foreign-entity status listed as a per se corporation in the regulations. 26 C.F.R. § 301.7701-2(b)(8). To simplify the treatment of corporate families, the regulations incorporated the concept of "disregarded" entities and corporate organizations.

**Disregarded and regarded entities.** When an eligible entity with a single owner elects "to be disregarded as an entity separate from its owner," *id.* § 301.7701-3(a), its activities are "treated" for federal tax purposes as the owner's activities, *id.* § 301.7701-2(a). A disregarded entity's assets and liabilities thus generally are treated as belonging to the entity's owner. *See* 9 *Mertens Law of Federal Income Taxation* § 35A:43 (Mar. 2024).

The regulations also permit a business to make the opposite choice—that is, to convert from a disregarded entity to a corporation that is separate from its owner for tax purposes. The tax laws treat that newly converted entity as if it were a new corporation with its own assets and liabilities. Upon conversion, a corporate organization "is *deemed* to occur: The owner of the eligible entity contributes all of the assets and liabilities of the entity to the association"—*i.e.*, the "new" corporation—"in exchange for stock of the association." 26 C.F.R. § 301.7701-3(g)(1)(iv) (emphasis added). Like domestic entities, many foreign entities can become disregarded or regarded for

federal tax purposes. *See id.* § 301.7701-3(a)-(d). As noted, the regulations also list foreign entities that are treated as "per se" corporations. *See id.* § 301.7701-2(b)(8). When a foreign entity converts into one of those enumerated entities, the regulations deem it to be a corporation—and thus, a regarded entity—for U.S. tax purposes. *See id.* § 301.7701-2(a)-(b).

**Section 351 corporate organizations.** Section 351 governs the corporate organization "deemed" to have occurred when a disregarded entity becomes a corporation. That section provides rules about when exchanges of property for stock are taxable. Typically, when a person sells or exchanges property, any gain from the sale is immediately taxable. *See* I.R.C. § 1001(a). But § 351 turns off taxation for many exchanges in a corporate organization, because any gain at the time typically would be "more theoretical than real." Stephen Schwarz & Daniel J. Lathrope, *Fundamentals of Corporate Taxation*, 55 (9th ed. 2016). Thus, § 351(a) provides that when someone transfers property to a corporation in exchange only for the corporation's stock, and the transferor controls that corporation immediately afterwards, the parties don't recognize any gain or loss resulting from that transaction. Gain or loss is recognized later, with ensuing tax consequences, when a taxable event occurs.

The rule is different, however, when a person transfers property to a corporation, and in return receives stock *and* non-stock property: under § 351(b), that person recognizes a taxable gain up to the value of that non-stock property. Two examples of non-stock property requiring gain recognition are debt instruments and nonqualified preferred stock, or NQPS. I.R.C. § 351(b), (g). NQPS is a type of debt-like preferred stock, 11 *Mertens Law of Federal Income Taxation* § 43:8 (Mar. 2024), and generally is considered to be a safer investment than stock, *see* H.R. Rep. No. 105-148, at 472 (1997). Section 351 thus treats NQPS as cash and requires the recipient to recognize gain upon receipt in a corporate organization.

**c.** The Tax Code treats debt and equity differently beyond § 351. For example, corporations typically can deduct interest paid on debt, but not dividends paid to shareholders. *See* Bittker § 4.02[2]. Businesses thus often make capitalization choices based on anticipated tax consequences. *Id.* §§ 4.01, 4.02. And they generally can "create a capital structure either of equity alone (including different classes of stock, such as common and preferred) or of a combination of equity and debt." *Id.* § 4.01.

**2.** **In 2017, the TCJA overhauls the United States' approach to international taxation and allows a deduction for dividends received from foreign corporations.**

Before the TCJA, a U.S. corporation's foreign profits were typically taxed when they were "repatriated" in the form of dividends from the corporation's foreign affiliate to the U.S. corporation. Corporations thus had an incentive to keep foreign profits abroad. To encourage repatriation of foreign earnings, the TCJA directs in § 245A that a U.S. corporation "shall be allowed" to claim a deduction in certain situations for dividends received from foreign affiliates.

**a.** The Tax Code has special rules for taxing foreign income—a general rule and special exceptions in Subpart F.

**General rule.** When U.S. persons earn income through a foreign corporation, those U.S. persons typically are not taxed on the foreign corporation's earnings until those earnings are distributed to the U.S. persons as a dividend. Kuntz & Peroni, *U.S. International Taxation* § A1.03[2], at *3 (Mar. 2024). And if a U.S. taxpayer doesn't receive a dividend, the taxpayer is generally taxed only when it sells stock in a foreign company and recognizes a gain. Some or all of the gain from that sale can be recharacterized as a dividend for tax purposes. In particular, if a "United States person"

who owns 10% or more of the stock in a foreign corporation "sells or exchanges [that] stock," "then the gain recognized" from that transaction "shall be included in the gross income" of that U.S. person "as a dividend"—but only "to the extent of the earnings and profits of the foreign corporation" that are "attributable … to such stock." I.R.C. § 1248(a). Stated differently, when a U.S. person sells stock in a foreign corporation, the gain from the sale is taxed as a dividend up to the amount of the foreign corporation's earnings and profits.

**Subpart F.** The Tax Code more directly taxes certain types of income of "controlled foreign corporations," or CFCs. A CFC is "any foreign corporation" that is majority-owned "by United States shareholders," I.R.C. § 957(a)—*i.e.*, "United States persons" owning at least 10% of a foreign corporation's shares, I.R.C. § 951(b). Subpart F of the Code, I.R.C. §§ 951–965, limits the deferral of income for CFCs by generally taxing U.S. shareholders on certain categories of a CFC's income, even if the CFC doesn't distribute its earnings to the U.S. shareholders, *see* I.R.C. § 951(a)(1).

**b.**    In December 2017, Congress passed the TCJA, making significant changes to the United States' approach to international taxation. One key provision, meant to encourage repatriation of foreign income, mandates

that, in certain circumstances, a U.S. shareholder that receives a dividend from a foreign corporation "shall be allowed" to offset that income with a deduction. I.R.C. § 245A(a).

Specifically, § 245A(a) provides that when a domestic corporation that owns at least 10% of a foreign corporation receives a "dividend" from that foreign corporation, the domestic corporation "shall be allowed as a deduction an amount equal to the foreign-source portion of such dividend." The "foreign-source portion" is the total dividend multiplied by the ratio of the foreign corporation's foreign earnings to total earnings. I.R.C. § 245A(c)(1). Thus, when the foreign corporation issuing the dividend has only foreign earnings, the entirety of the divided is deductible under § 245A, and the U.S. shareholder is not taxed on that dividend. Before the TCJA, a corporation could have been taxed up to 35% on that dividend. I.R.C. § 11(b)(1) (2012).

Congress also made changes to interconnecting Tax Code provisions, including § 1248 and Subpart F. For starters, Congress clarified the interaction of §§ 245A and 1248. As noted (at 16-17), § 1248(a) provides that, when a U.S. shareholder sells stock of a foreign corporation, the U.S. shareholder's gain is deemed to be a "dividend" and "shall be included in [the U.S. shareholder's] gross income." Section 245A(a) provides a deduction for the

foreign-source portion of that dividend. And Congress added § 1248(j), which states that "any amount received by the domestic corporation which is treated as a dividend by reason of [§ 1248] shall be treated as a dividend for purposes of applying § 245A." So if a domestic corporation receives an actual or deemed dividend under § 1248, the foreign-source portion of that dividend "shall be" deductible under § 245A.

Congress also amended Subpart F to account for § 245A. That change ensured that § 245A applied equally to a domestic corporation's sale of a CFC, on the one hand, and a CFC's sale of another CFC lower in the corporate chain, on the other. Generally, when a CFC sells stock of another CFC, the selling CFC's gain on the sale is included in its gross income as a deemed dividend. I.R.C. § 964(e)(1). The TCJA incorporated three straightforward rules for how to treat that dividend. *First*, "the foreign-source portion of such dividend" "shall be treated" as the CFC's "subpart F income." I.R.C. § 964(e)(4)(A)(i). *Second*, a "United States shareholder" of the CFC "shall include in gross income" its pro rata share of that "subpart F income." I.R.C. § 964(e)(4)(A)(ii). *Third*, "the deduction under section 245A(a) shall be allowable to the United States shareholder with respect to [that] subpart F income." I.R.C. § 964(e)(4)(A)(iii).

The upshot is that the gain from the sale of any foreign stock that results in a dividend to a U.S. shareholder under § 1248(a) or § 964(e) can be offset by a deduction under § 245A. The taxable increase in income and the deduction go hand-in-hand.

### 3. Dissatisfied with the operation of § 245A, Treasury issues regulations to limit its application.

The TCJA revised the U.S. international tax system beyond § 245A, including by extending the Subpart F regime to a new category of CFC income, known as global intangible low-taxed income (GILTI). *See generally* H.R. Rep. No. 115-466, at 595-669 (2017). While the GILTI rules are generally designed to coexist with § 245A, Treasury didn't like some of the results produced by § 245A, so it promulgated regulations, without notice and comment, to change them. *See Limitation on Deduction for Dividends Received from Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception*, 84 Fed. Reg. 28,398, 28,398-405 (June 18, 2019). When a corporation receives an actual or deemed dividend from a CFC, § 245A provides that the taxpayer "*shall be allowed* as a deduction an amount equal to the foreign-source portion of such dividend," if other requirements are met. I.R.C. § 245A(a) (emphasis added); *see* I.R.C. § 964(e)(1), (4)(A); *supra* pp. 18-20. But

Treasury's regulations purported to limit § 245A's application, even if those statutory requirements are met. 84 Fed. Reg. at 28,398, 28,405; *see* 26 C.F.R. § 1.245A-5T.

The regulations created from whole cloth two categories of Transactions—known as "extraordinary reduction" and "extraordinary disposition" transactions—for which Treasury imposed a "[l]imitation of deduction under section 245A." 26 C.F.R. § 1.245A-5T(b). All or a portion of the dividends received in those transactions would be "ineligible" for the statutory deduction. *Id.* The temporary regulations purported to apply retroactively to transactions occurring after December 31, 2017. 84 Fed. Reg. at 28,405-06.

Treasury recognized that § 245A would sometimes allow CFCs to repatriate funds as dividends in a way that "effectively eliminates subpart F income or income subject to tax under section 951A from the U.S. tax system." *Id.* at 28,398, 28,400; *see id.* at 28,409. Treasury further acknowledged that "when the requirements of section 245A as properly construed are satisfied, it would not be permissible under the statute for the section 245A deduction to be denied … even if, for example, taxpayers choose to generate such income to avail themselves of the benefits of the deduction." *Id.* at 28,400. To avoid the results it didn't like, Treasury thus wanted to carve

some cases out to deny by regulation the deduction that the statute mandates must be allowed. *Id.* at 28,400, 28,409; *see* 26 C.F.R. § 1.245A-5T(e)(2)(i)(A).

In August 2020, Treasury promulgated similar final regulations. *Limitation on Deduction for Dividends Received from Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception*, 85 Fed. Reg. 53,068 (Aug. 27, 2020). Those regulations apply to tax periods "ending on or after June 14, 2019." 26 C.F.R. § 1.245A-5(k).

## B.    Factual background

LGI, a U.S. corporation, is part of a foreign-owned multinational group of corporate entities operating a global telecommunications business. After Congress passed the TCJA, LGI recognized that § 245A provided a favorable opportunity to repatriate profits and economic value earned by two of LGI's Belgian subsidiaries, Telenet Group and its holding company TGH, from providing telecommunications services in Belgium. By undertaking a corporate organization and sale, LGI would repatriate TGH's and Telenet Group's earnings with an offsetting deduction, while subjecting their future earnings to the Belgian tax regime, rather than a mix of U.S. and foreign tax laws.

LGI and its affiliates thus took a series of steps to claim the § 245A deduction. The facts about those steps, known as Project Soy, are undisputed.

In brief, Telenet Group changed its capital structure, including by issuing NQPS and debt, and converted from a disregarded entity to a regarded corporation. Those steps caused TGH to recognize a gain tied to Telenet Group's economic value and reflected as increased earnings and profits for TGH. When another of LGI's foreign subsidiaries sold TGH to LGI's foreign parent, LGI recognized a gain that, under § 964(e), was deemed a dividend equal to the amount of TGH's earnings and profits. LGI was thus entitled to claim a deduction in that amount under § 245A.

### 1.    LGI and its affiliates operate a global telecommunications business.

LGI and its affiliates operate one of the world's largest telecommunications businesses, providing broadband, cable, and communications services to millions of customers. Liberty Global, *Who We Are*, https://www.libertyglobal.com/about/who-we-are/. As is typical of multinational corporations, LGI's corporate structure is complex. At the time of the transaction here, as diagrammed below, LGI was wholly owned by Liberty Global plc, a U.K. corporation. 1-App.13. Through a series of subsidiaries, LGI owned Liberty Global Broadband I Ltd. (LGI I), a U.K. company. LGI I, in turn, indirectly owned 56.6% of TGH, a publicly traded

Belgian entity. 1-App.149. TGH owned 99.99% (for federal tax purposes, all) of Telenet Group, also a Belgian entity. *Id.* TGH had another subsidiary, Telenet International Financing USD LLC (TIF LLC), a U.S. limited liability company, that served as a financing arm, borrowing outside funds to lend as needed to Telenet Group entities. *Id.*; 1-App.189-190. Both Telenet Group and TIF LLC were disregarded entities.

### 2. In response to the TCJA, LGI and its affiliates take steps to qualify for the § 245A deduction.

After Congress enacted § 245A, LGI and its affiliates decided to repatriate earnings from its successful foreign operations, while also seeking to modify its corporate structure so that TGH and Telenet Group's future foreign earnings would be taxed by Belgium. The steps LGI and its affiliates took, known as Project Soy, are undisputed. In short, Telenet Group changed its capital structure and became regarded as a corporation for tax purposes. That conversion—from a disregarded to a regarded entity—triggered a gain that increased earnings and profits for TGH. So when LGI I sold TGH to LGI's U.K. parent, LGI recognized a gain in the amount of TGH's earnings and profits. By mechanical operation of §§ 245A, 964(e), and 1248, that gain triggered a deemed dividend with an offsetting deduction under § 245A.

The IRS doesn't dispute that the gain resulting from Project Soy satisfied § 245A's requirements for a deduction based on dividends received from the sale of TGH.

a.    **Steps one through three.** In December 2018, Telenet Group converted under Belgian law from a BVBA to an NV/SA. Under Treasury regulations, Telenet Group thus changed for tax purposes from a disregarded entity to a regarded corporation holding its own assets and liabilities. *See* 26 C.F.R. § 301.7701-2(b)(8). In preparation for that conversion, LGI subsidiaries changed some stock into debt and restructured so that the earnings and profits of TGH—Telenet Group's majority owner—would increase once Telenet Group converted. 1-App.150-152.

**Step one: TGH's interest in Telenet Group changes from a capital interest to a monetary claim against Telenet Group.** As explained, TGH owned Telenet Group—a disregarded entity at the beginning of Project Soy. 1-App.149; *supra* p. 24. Using Belgian corporate-law processes, Telenet Group reduced the recorded value of its shares by €4.3 billion. 1-App.150. Telenet Group then owed TGH approximately €4.3 billion. *Id.*

**Step two: TIF LLC becomes a direct subsidiary of TGH.** TGH then transferred TIF LLC—also a disregarded entity—from one of its disregarded

subsidiaries to itself, making TIF LLC its direct subsidiary. 1-App.151. Because TIF LLC was disregarded, its loans to Telenet Group were treated as belonging to TGH. *Supra* pp. 13-14.

**Step three: Telenet Group issues NQPS and debt, converts to a corporation, and is treated as transferring that NQPS and debt to TGH in a § 351 exchange, thus causing TGH to recognize gain and increased earnings and profits.** With the components above in place, Telenet Group chose to replace some of its common stock with debt and NQPS, which is similar to debt and treated as non-stock property for purposes of § 351. *See* I.R.C. § 351(g); 1-App.213-217. Telenet Group then converted from a BVBA to an NV/SA under Belgian law. 1-App.152.

When Telenet Group became an NV/SA, a kind of "Société Anonyme," it became a per se corporation for federal tax purposes under the regulations. *See* 26 C.F.R. § 301.7701-2(b)(8)(i) ("corporation" includes a "Société Anonyme"); *supra* pp. 12-14. And when a disregarded entity becomes a corporation, its owner "is deemed" to have "contribute[d] all of the assets and liabilities of the entity" to the "new" entity "in exchange for" the new entity's stock. 26 C.F.R. § 301.7701-3(g)(1)(iv); *see* Rev. Rul. 2004-59. Under the regulations, TGH (Telenet Group's regarded owner) was deemed to

contribute all of Telenet Group's assets and liabilities to the newly formed corporation. In exchange, TGH received common stock of post-conversion Telenet Group, along with NQPS and a debt instrument. *Supra* pp. 14-15.

The upshot was that § 351(b) required TGH to recognize $4.8 billion in gain, representing the "fair market value" of (1) NQPS it received from Telenet Group and (2) debt that Telenet Group owed to TIF LLC. That gain increased TGH's earnings and profits. *See* 26 C.F.R. § 1.312-6(b); I.R.C. §§ 61(a)(3), 312(f)(1).

**b.    Step four: LGI I sells TGH.** Finally, LGI's foreign subsidiary, LGI I, sold its interest in TGH to Liberty Global plc. 1-App.193. LGI I recognized a $2.4 billion gain from that sale, *id.*—a gain representing Telenet Group's actual profits and economic value from operating the telecommunications business. That gain, in turn, was included as a deemed dividend in LGI I's subpart F income to the extent of TGH's earnings and profits (which, after Telenet Group's conversion, exceeded $2.4 billion). *See* I.R.C. §§ 964(e)(1), 1248(a); *supra* pp. 19-20. And LGI, as LGI I's U.S. shareholder, was required to include that amount in LGI's "gross income." I.R.C. § 964(e)(4)(A)(ii). In addition, "the deduction under section 245A shall be allowable" to LGI "with respect to [that] subpart F income included in gross

income." I.R.C. § 964(e)(4)(A)(iii). The gain from the sale of TGH is the very same income that the IRS seeks to tax in this case.

TGH was sold in December 2018, 1-App.153, nearly six months before Treasury issued its temporary regulations, *supra* p. 20. Under those regulations, LGI wouldn't be able to claim a § 245A deduction in connection with Project Soy. 1-App.114-115.

The diagrams on page 29 show Project Soy's steps, depicted according to the legend below:

**Legend**

| | |
|---|---|
| Gray | Foreign Entity |
| White | Domestic Entity |
| ▭ | Corporation |
| ⬭ | Disregarded Entity |
| \| | Direct Ownership |
| ≠ | Indirect Ownership |
| Dotted Line | Relevant Change at Step |



### C.    Procedural background

#### 1.    LGI claims a tax refund in connection with Project Soy and sues in district court.

LGI timely filed its 2018 tax return in October 2019 and paid the taxes the IRS claims it owed. 1-App.13. In December 2019, LGI filed an amended return claiming the § 245A deduction in connection with Project Soy and a corresponding refund based on the invalidity of the temporary regulations. *Id*.; 1-App.22.

After the IRS failed to act on its refund claim, LGI sued. *See* I.R.C. §§ 6532(a)(1), 7422. LGI seeks a refund of $104,487,574 in taxes, $2,175,147 in penalties the IRS assessed against it, and $2,627,128 in interest. 1-App.12-13.

The IRS later separately sued LGI, seeking $283,965,223 in additional taxes and penalties on the ground that steps one through three of Project Soy lacked substance. *See* Compl. 8-10, Dist. Ct. Doc. 1, No. 1:22-cv-02622 (D. Colo. Oct. 7, 2022).

#### 2.    The district court holds that the temporary Treasury regulations implementing § 245A are invalid because they were promulgated without notice and comment.

LGI sought summary judgment, arguing that the temporary regula-tions, 26 C.F.R. § 1.245A-5T, were invalid and that the IRS could not use them to deny LGI's § 245A deduction. 1-App.45-68. LGI explained that the

regulations contravened § 245A's text, were impermissibly retroactive, and violated the Administrative Procedure Act's notice-and-comment requirement. 1-App.46-47; 1-App.60-68. The district court held the regulations invalid, agreeing that Treasury failed to provide notice and an opportunity for comment, without good cause, and that the failure wasn't harmless. 1-App.116-120.

### 3. The district court holds that LGI is not entitled to a refund because the IRS could disregard steps one through three under the economic substance doctrine.

The parties then cross-moved for summary judgment on whether the IRS could invoke the economic substance doctrine to invalidate the deduction. To avoid § 245A's mandatory language, the government claimed that the court should disregard steps one through three under the economic substance doctrine, because they were tax-motivated, produced a result contrary to Congress' intent, and, setting aside tax effects, didn't meaningfully change LGI's economic position. 1-App.156; 1-App.169-172. But the government didn't argue that the doctrine invalidated step four (the sale of TGH), even though the income resulting from step four triggered the § 245A deduction. LGI countered that the economic substance doctrine isn't "relevant" to steps one through three, I.R.C. § 7701($o$)(1), because the controlling

tax laws allow entities to choose, purely for tax purposes, to become re-garded corporations—as Telenet Group did when it converted to an NV/SA. 1-App.134-145. The doctrine also isn't relevant because businesses can make capitalization choices based on anticipated tax consequences. *Id.*

Agreeing with the government, the district court held that LGI wasn't entitled to a refund because the economic substance doctrine allowed the IRS to disregard steps one through three of Project Soy. The court recognized that § 7701(*o*)(1) states that the doctrine applies "[i]n the case of any transac-tion to which [it] is relevant." Add.7-10. But it ruled that the statute doesn't require any relevance determination. *Id.* Instead, "[a]t the risk of tautology," the court concluded that the doctrine "applies when a transaction lacks eco-nomic substance"—that is, it applies when it applies, and when "the tax benefits achieved in the transaction violate congressional intent," without any threshold relevance inquiry. Add.9-12.

Applying the doctrine, the district court held that the IRS could disre-gard steps one through three because they were "interrelated transactions" that didn't change LGI's "economic position" in "a meaningful way (apart from Federal income tax effects)" or have "a substantial non-Federal-in-come-tax purpose," *id.*; *see* Add.16-21. In the court's view, disregarding steps

one through three meant the earnings and profits generated at step three would be disregarded. Add.21. But it held that step four, which "result[ed] in $2.4 billion of taxable gain," still *could* be considered. Add.20-21. The court thus held that LGI couldn't claim a § 245A deduction to offset its gain from the Belgian profits, so LGI wasn't entitled to a refund. Add.21. The court entered final judgment for the government. Add.22.

## SUMMARY OF ARGUMENT

**A.    1.**    The economic substance doctrine is a tool for interpreting statutory or regulatory terms that make economic reality and taxpayer motive relevant. The doctrine is "relevant" under § 7701(*o*), and the statute directs how to apply it, when ordinary interpretive tools show that a tax term's application turns on economic reality and taxpayer motive. But § 7701(*o*)(5)(C) underscores that the doctrine is not relevant in all cases, and that courts should apply preexisting precedent to determine whether it is. Legislative history drives that point home.

**2.**    The Supreme Court's and this Court's precedents show that the economic substance doctrine is relevant for interpreting tax provisions that use general terms—like "reorganization," "interest," "indebtedness," or "ownership"—that "turn on 'the objective economic realities'" of a

transaction, *Boulware v. United States*, 552 U.S. 421, 429 (2008). As a canon of construction, the doctrine helps courts determine whether a transaction falls within the meaning of a statutory or regulatory term.

**3.** But statutes and regulations don't always make economic reality or taxpayer motive relevant. For example, some provisions "are all form and no substance," *Summa Holdings*, 848 F.3d at 786, meaning they allow taxpayers to make choices based on tax consequences—that is, without regard to economic reality and motivated solely by tax-reduction purposes. And sometimes a statute or regulation lacks a hook, under ordinary interpretive principles, that makes the taxpayer's economic position (aside from tax effects) relevant. In those circumstances, the IRS and courts may not consider economic reality or motive. Instead, they must "effectuate Congress' nuanced policy judgments" by "apply[ing] each provision as its text requires," without the economic substance doctrine's gloss. *Id.* at 788-89. Neither courts nor the IRS may "undo transactions that the terms of the Code expressly authorize." *Id.* at 782.

**B.** The IRS cannot use the economic substance doctrine to disallow LGI's § 245A deduction, because ordinary interpretive principles make clear

that economic reality and taxpayer motive aren't relevant to the governing statutory and regulatory provisions as they apply to Project Soy.

1.      The doctrine doesn't permit disregarding Telenet Group's conversion to a corporation or its capitalization choices in steps one through three, including its choice to use NQPS and debt.

*First*, the doctrine isn't relevant to the check-the-box regulations because those regulations allow businesses—like Telenet Group—to become regarded entities "for federal tax purposes." 26 C.F.R. § 301.7701-2(b). The regulations also "deem[]" a corporate organization to have occurred when a disregarded entity becomes a corporation, *see id.* § 301.7701-3(g)(1)(iv); Rev. Rul. 2004-59, and the Code requires recognition of gain when a corporation receives NQPS and other non-stock property, *see* I.R.C. § 351(b), (g). By "design" those provisions are "all form and no substance." *Summa*, 848 F.3d at 786. Thus, when Telenet Group became a regarded corporation for tax purposes, the Tax Code and regulations dictated the consequences. The economic substance doctrine can't override those provisions.

*Second*, § 351(g) expressly contemplates taxpayers' choosing NQPS to capitalize their businesses, and establishes the tax consequences of doing so. The statutory scheme doesn't make economic reality or taxpayer motive

relevant to the choice to use NQPS, and caselaw provides that taxpayers can make capitalization choices—like whether to finance with debt or equity—based on tax consequences, anyway. The economic substance doctrine can't undo a business's financing choices.

**2.** The economic substance doctrine doesn't allow the IRS to disallow the deduction at step four, either. If steps one through three are respected, as they must be, there's no dispute that LGI satisfied § 245A's plain terms and that the IRS must allow the deduction. But even if steps one through three are disregarded, step four would have to be disregarded, too, as the step that produced the tax benefit, meaning there wouldn't be any income triggering the deduction *or* any income for the IRS to tax.

**C.** The district court erred in holding otherwise.

**1.** The court rewrote § 7701(*o*) by collapsing the statutorily mandated assessment of whether the doctrine is relevant into the test of whether the challenged transaction has economic substance. By holding that the "doctrine's relevance is coextensive with the statute's test for economic substance," Add.8, the district court contravened Congress' instruction that "whether the economic substance doctrine is relevant" "shall be made in the same manner as if [§ 7701(*o*)] had never been enacted." I.R.C. § 7701(*o*)(5)(C).

The caselaw and legislative history make clear (and the IRS, too, has acknowledged) that whether the economic substance doctrine is relevant to interpreting and applying a tax provision is a question different from (and antecedent to) whether any particular transaction has economic substance.

**2.** The court also improperly dismissed as "artificial" TGH's earnings and profits resulting from steps one through three of Project Soy. Add.2. Those earnings and profits reflected Telenet Group's profits and economic value from its successful broadband operation. The tax laws unambiguously treat those profits as TGH's profits, too, and the district court wasn't permitted to ignore the plain meaning of those laws because LGI "structure[d] [its] transactions in unanticipated tax-reducing ways." *Summa Holdings*, 848 F.3d at 788-89. Besides, § 1248(h) says that even if LGI didn't "establish[] the amount of [TGH's] earnings and profits," "all gain" from its sale "shall be considered a dividend," which is deductible under § 245A, I.R.C. § 1248(j).

**3.** Even if steps one through three could be disregarded, step four would have to be disregarded, too, because it was necessary to produce the tax benefit, and the IRS cannot explain why it can be treated differently. Thus, there would be no sale, and no gain for the IRS to tax, and LGI is still entitled to a full refund.

## STANDARD OF REVIEW

This Court reviews summary judgment, and decides questions of statutory construction and economic substance, de novo. *Jewell v. United States*, 749 F.3d 1295, 1297 (10th Cir. 2014); *Ausmus v. Perdue*, 908 F.3d 1248, 1252 (10th Cir. 2018); *Sala v. United States*, 613 F.3d 1249, 1252 (10th Cir. 2010).

## ARGUMENT

The IRS cannot use the economic substance doctrine to bar LGI's § 245A deduction. The doctrine is a canon for interpreting statutory and regulatory terms that require inquiry into economic reality and taxpayer motive to help determine whether a particular transaction falls within the meaning of a given term. But the doctrine isn't "relevant," I.R.C. § 7701(*o*)(1), when a term's meaning doesn't turn on economic reality and taxpayer motive—like when a provision is, by design, "all form and no substance." *Summa Holdings*, 848 F.3d at 786. Just so here. The governing statutory and regulatory terms here don't turn on economic reality or taxpayer motive, but instead simply dictate the tax consequences of choices that they permit taxpayers to make for tax reasons. The Court should reverse.

**A.    The economic substance doctrine is a tool for interpreting tax terms that require inquiry into economic reality and taxpayer motive—it cannot be used to override the Tax Code and regulations.**

The economic substance doctrine is a tool for interpreting tax terms that make economic reality and taxpayer motive "relevant," I.R.C. § 7701(*o*)(1), so that transactions are taxed based on economic reality rather than mere labels. *See Summa Holdings*, 848 F.3d at 787. The judge-made doctrine traces back to *Gregory v. Helvering*, 293 U.S. 465 (1935), as a tool for interpreting terms, like "reorganization," "interest," "indebtedness," or "ownership," *infra* pp. 42-47, that "turn on 'the objective economic realities of a transaction rather than … the particular form the parties employed,'" *Boulware*, 552 U.S. at 429. When ordinary tools of construction show that a tax term requires inquiry into economic reality and taxpayer motive, the doctrine becomes relevant, and § 7701(*o*) instructs courts how to apply it. But as § 7701(*o*), caselaw, and legislative history confirm, statutes and regulations do not always make economic reality and taxpayer motive relevant, and so the doctrine plays no role in those circumstances. In all events, the doctrine cannot override statutory or regulatory meaning to make economic reality or taxpayer motive relevant where it isn't. Indeed, the IRS cannot

"recharacterize the meaning of statutes" "to ignore … their words, in favor of [the IRS's] perception of their substance." *Id.* at 785. Courts must apply the Tax Code provisions and regulations as written.

> **1.    Section 7701(*o*) clarifies how courts should apply the economic substance doctrine and reaffirms that the doctrine isn't relevant to all statutes and regulations.**

**a.**    In 2010, Congress enacted I.R.C. § 7701(*o*), clarifying how the economic substance doctrine—"the common law doctrine under which [income] tax benefits … with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose," I.R.C. § 7701(*o*)(5)(A)—applies when it "is relevant." I.R.C. § 7701(*o*)(1). Under § 7701(*o*)(1), if "the economic substance doctrine is relevant," a transaction "shall be treated as having economic substance only if" two requirements are met. *First*, the transaction must meaningfully change "the taxpayer's economic position," aside from "Federal income tax effects." *Id.* § 7701(*o*)(1)(A). *Second*, the taxpayer must have had "a substantial" non-tax purpose for the transaction. *Id.* § 7701(*o*)(1)(B).

But § 7701(*o*) underscores that the doctrine isn't always relevant. "The determination of whether the economic substance doctrine is relevant … shall be made in the same manner as if [§ 7701(*o*)] had never been enacted."

I.R.C. § 7701(*o*)(5)(C). Put differently, Congress left untouched the preexisting judicial rules for when the doctrine comes into play. *Infra* pp. 42-52. That's how the IRS has understood § 7701(*o*), too. *See* IRS, Notice 2010-62 at 5 (Oct. 4, 2010), https://www.irs.gov/pub/irs-drop/n-10-62.pdf.

**b.** Section 7701(*o*)'s legislative history confirms that the doctrine cannot override the plain meaning and application of Code provisions to make economic reality and taxpayer motive relevant when Congress hasn't done so. For example, the House Budget Committee's report acknowledged that, when "tax benefits are clearly consistent with all applicable provisions of the Code and the purposes of such provisions," the benefits shouldn't "be disallowed if the only reason for such disallowance is that the transaction fails the economic substance doctrine." H.R. Rep. No. 111-443, at 296 n.124 (2010). The provision thus "does not change current law standards in determining when to utilize an economic substance analysis"—*i.e.* in determining when the doctrine "is relevant." *Id.* at 295-96. Indeed, § 7701(*o*) was "not intended to alter the tax treatment" of certain transactions that "are respected" "under longstanding judicial and administrative practice," even though they are "largely or entirely based on comparative tax advantages." *Id.* at 296. Those transactions include both "the choice between capitalizing a business

enterprise with debt or equity" and "the choice to enter a … series of transactions that constitute a corporate organization" (like a § 351 transaction)—choices that are often "entirely based on tax advantages." *Id.* When economic reality and taxpayer motive aren't relevant, neither is the doctrine.

>   **2.    Caselaw makes clear that the economic substance doctrine is a tool for interpreting tax terms that make economic reality and taxpayer motive relevant.**

As caselaw makes clear, the economic substance doctrine is an interpretive principle for construing tax terms that "turn on 'the objective economic realities of a transaction.'" *Boulware*, 552 U.S. at 429. Courts developed the doctrine because, "[i]n writing the tax laws, Congress uses many general terms—'income,' 'indebtedness,' 'corporate reorganization'—that refer to real-world economic activities, and it assigns tax consequences to those activities." *Summa Holdings*, 848 F.3d at 785. Economic reality necessarily informs the meaning of those terms, as the caselaw illustrates.

**Reorganization.** Start with *Gregory*, which addressed the meaning of "reorganization." Based on statutory text and structure, the Court determined that the taxpayer's purpose was relevant because the term "reorganization" required consideration of the economic reality of the transaction the taxpayer claimed was a reorganization. The taxpayer had formed

a company, used it to sell stock and transfer assets, and dissolved the company shortly after transferring the assets to herself. *Gregory*, 293 U.S. at 467. She claimed there was a "reorganization," which would have allowed her to transfer certain property tax-free. *Id.*

The Court disagreed. *Id.* at 469. Another statutory provision required the asset distribution to be "in pursuance of a plan of reorganization" to qualify for tax-free treatment. *Id.* at 468. The statute thus made the economic reality of the transaction—including the purpose of the plan—relevant to determining whether it was a "reorganization." And because "[n]o other business was ever transacted, or intended to be transacted," by the new company, *id.* at 467, the transaction fell "outside the plain intent of the statute," *id.* at 469-70. But the Court emphasized that if the "reorganization in reality" had been "effected within the meaning of" the relevant provisions, the taxpayer's "motive … to escape payment of a tax" would have been irrelevant. *Id.* at 468-69. That's because taxpayers undoubtedly may "decrease the amount of" their taxes, "or altogether avoid them, by means which the law permits." *Id.* at 469. Understanding the statute and whether it covered the transaction was the task, and the Court looked at the taxpayer's purpose because that's what the statute required.

**Interest paid on debt.** *Knetsch v. United States*, 364 U.S. 361, 362-63, 365-66 (1960), took the same approach in considering the statutory phrase "interest paid … on indebtedness." Because the term turned on economic reality, the Court had to examine whether the claimed indebtedness was actually debt, meaning it needed to determine whether the taxpayer's economic position had changed. The taxpayer there had labeled cash flows with an insurance company "loans," even though he wasn't making genuine interest payments on debt. *Id.* at 362-63. Although he made "payments" to the company at the beginning of the year for borrowing money, "[w]hat he was ostensibly 'lent' back was in reality" a refund for the interest payments. *Id*. at 365. If the cash flows from the insurance company were loans under the relevant Code provisions, the taxpayer would have been able to claim deductions for interest payments. *Id.* at 362-63. The Court concluded that the term "indebtedness" made economic reality relevant. The Court determined that the loans were a "façade" because they didn't "create[] a true obligation to pay interest." *Id.* at 366-67. That analysis followed from the meaning of the terms "interest" and "indebtedness," which required consideration of economic reality.

**Ownership.** In *Frank Lyon Co. v. United States*, 435 U.S. 561, 580-81, 583-84 (1978), the Court considered whether the taxpayer was an "owner" of property able to claim deductions based on the property's depreciation. Because "ownership" requires consideration of economic reality, the Court assessed whether the taxpayer's economic position had changed because of the transaction *and* the taxpayer's purpose for entering into it. Frank Lyon had purchased a building from a bank "and simultaneously leased the building back to [the bank]." *Id.* at 562. The government argued that the taxpayer couldn't claim the deduction because it didn't truly own the property. *Id.* at 568. Because the meaning of "owner" turned on economic reality rather than labels, the Court considered whether the transaction changed Frank Lyon's economic position and whether Frank Lyon had a non-tax purpose for the sale-and-leaseback agreement. The Court concluded that Frank Lyon was the owner because it had real obligations with respect to the property, paid real "interest," invested its capital in the building, and had entered into the transaction to diversify its business. *Id.* at 580-83. The Court thus concluded that it was required to "honor" Frank Lyon and the bank's "allocation of rights and duties." *Id.* at 583-84.

This Court, too, has used the economic substance doctrine as a tool for understanding whether a transaction qualified for ownership-based deductions. *See James v. Commissioner*, 899 F.2d 905, 905-06, 908-11 (10th Cir. 1990).

**Loss.** This Court also has applied the economic substance doctrine to interpret the term "loss," which likewise makes economic reality relevant. That's because, although a taxpayer generally can claim "a deduction [for] any loss sustained during the taxable year," I.R.C. § 165, whether the taxpayer actually suffered a "loss" depends on economic reality. Thus, a court tasked with deciding whether a taxpayer recognized a loss applies the economic substance doctrine and examines whether the transaction changed the taxpayer's economic position and whether the taxpayer had a substantial business purpose.

For example, in *Keeler v. Commissioner*, 243 F.3d 1212, 1214-15 (10th Cir. 2001), the taxpayer had engaged in "straddle trades," intentionally incurring "inflated losses" late in one year and "corresponding gains" early in the next "to reduce overall tax liability in a given year to as little as zero." The Court concluded that those "losses" couldn't support deductions because they "were not losses at all" given "their offsetting gain." *Id.* at 1218. The taxpayer's economic position hadn't changed, and allowing the deduction

would "violate[] the principle that tax advantages must be linked to actual losses." *Id.*

Similarly, in *Blum v. Commissioner*, 737 F.3d 1303 (10th Cir. 2013), and *Sala*, 613 F.3d at 1253, the Court applied the economic substance doctrine to construe the term "loss" and decide whether aspects of the challenged transactions fell within its scope. In *Blum*, the Court held that the taxpayer couldn't claim a deduction for a purported $45 million loss because "[t]he loss was fictional" and had no "real world effect on [the taxpayer's] pocketbook." 737 F.3d at 1307-08, 1311. The Court reached the same conclusion in *Sala*, where the taxpayer had "actually profited from the transaction," and so did not actually suffer financial loss. 613 F.3d at 1253-54.

### 3. The economic substance doctrine isn't relevant, and plays no role, when the statute or regulation doesn't require inquiry into economic reality and taxpayer motive.

The economic substance doctrine isn't relevant when the meaning of a statute or regulation doesn't turn on economic reality and taxpayer motive. That's because the doctrine is an interpretive canon; it isn't an override when the IRS or courts dislike the result the law produces. It thus has no role when interpretive tools show that the provision in question doesn't turn on

economic reality and taxpayer motive. In those circumstances, the IRS and courts must "effectuate Congress' nuanced policy judgments" by "apply[ing] each provision as its text requires," without the doctrine's gloss. *Summa Holdings*, 848 F.3d at 788-89. Neither courts nor the IRS may "undo transactions that the terms of the Code expressly authorize." *Id.* at 782.

    **a.**    Caselaw makes clear that courts cannot use the economic substance doctrine to interpret or apply statutory or regulatory provisions that do not make economic reality and taxpayer motive relevant. Doing so amounts to judicial legislation, overriding laws that by their terms don't turn on economic reality.

    *i.*    The economic substance doctrine isn't relevant when ordinary interpretive tools show that tax laws don't turn on economic reality and taxpayer motive—like when a provision is, by design, "all form and no substance." *Id.* at 786.

    In *Summa Holdings*, for example, the Sixth Circuit held that the taxpayer was entitled to the claimed deduction because the tax laws, as written, required that result, and economic-substance principles couldn't change the statutes' meaning. *Id.* at 781-82. There, taxpayers transferred money from a "domestic international sales corporation (DISC)," a type of

"congressionally innovated corporation," to family members' Roth IRA accounts, to take advantage of the tax benefits associated with DISCs and Roth IRAs. *Id.* at 781. The Commissioner "acknowledged that the [taxpayers] had complied with the relevant provisions," but invoked economic-substance principles and maintained that Congress didn't intend the taxpayers to claim the tax benefits. *Id.* at 782, 790.

The Sixth Circuit rejected that argument. *Id.* at 785. To be sure, the court explained, the IRS can sometimes "recharacterize the economic substance of a transaction" to "honor the fiscal realities of what taxpayers have done over the form in which they have done it." *Id.* That's because the doctrine "makes sense only when … the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process." *Id.* at 787. But the Commissioner cannot use the doctrine to "recharacterize the meaning of statutes." *Id.* at 785. When a statute allows a transaction—like a contribution from a DISC to a Roth IRA—that, by design, is "all form and no substance," economic-substance principles can't override Congress' choice. *Id.* at 786.

The First Circuit too has concluded that the economic substance doctrine is "a tool of statutory interpretation." *Benenson v. Commissioner*, 887 F.3d

511, 523 (1st Cir. 2018). Thus, in *Benenson*, the court applied the provisions governing DISCs and Roth IRA as written, "rather than relying on a judicially crafted common law solution" to reach a different outcome. *Id.* at 521. The Second Circuit has reached the same conclusion. *See Benenson v. Commissioner*, 910 F.3d 690, 699-701 (2d Cir. 2018).

*ii.*    This Court's precedent aligns with the First, Second, and Sixth Circuits' approach. In *St. Charles Investment Co. v. Commissioner*, 232 F.3d 773, 776 (10th Cir. 2000), for example, this Court explained that the statute's "plain language" controlled, even though the IRS claimed it gave the taxpayer a windfall, contrary to Congress' intent.

In *St. Charles*, a company converted from a C corporation to an S corporation. On its tax returns the following year, the company claimed a deduction for "passive-activity" loss associated with the previous year under I.R.C. § 469(b), which allowed such deductions "[e]xcept as otherwise provided in this section." The Commissioner argued that § 1371(b)(1) disallowed the deduction. That provision provided that "[n]o carryforward, and no carryback, arising for a taxable year for which a corporation is a C corporation may be carried to a taxable year for which such corporation is an S corporation." I.R.C. § 1371(b)(1).

The Court rejected the Commissioner's argument. "[A]s in all cases requiring statutory construction," the Court began "with the plain language of the law." *St. Charles*, 232 F.3d at 776. The Court held that § 469(b) allowed the deduction "[e]xcept as otherwise provided in this section," so a *different* section couldn't disallow the deduction. *Id.* at 776-77. The Court thus "[gave] effect to [Congress'] intent as expressed" in the statutory text—no matter whether that "create[d] a windfall" for the taxpayer. *Id.* at 778-79.

**b.**    The complexity and highly reticulated design of the Tax Code also caution against rewriting tax laws in response to purposive, atextual arguments. The Supreme Court has repeatedly held that courts should not supplement "comprehensive and reticulated" statutory schemes with "extratextual remedies" or "common-law doctrines," and that common-law doctrines "must give way" if they are "inconsistent" with statutory text. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999). If Congress wants courts to consider a transaction's economic reality, it knows how to say so.

Indeed, "if there is one title of the United States Code most deserving of attention to text, it is Title 26." *Summa Holdings*, 848 F.3d at 789. The Code is "highly reticulated" and "uses language, lots of language, with nearly mathematic precision" "to reduc[e] its purpose to text." *Id.* Those choices

underscore that courts should "apply each provision as its text requires," rather than "elevat[ing] purpose over text when taxpayers structure their transactions in unanticipated tax-reducing ways." *Id.* at 788-89. Applying the economic substance doctrine undermines, rather than effectuates, the Code's meaning unless Congress has made clear that economic reality and the taxpayer's motive are relevant.

**B.    The IRS cannot use the economic substance doctrine to disallow LGI's § 245A deduction, because the applicable statutory and regulatory provisions don't make economic reality or taxpayer motive relevant to Project Soy.**

The IRS cannot use the economic substance doctrine to disallow LGI's § 245A deduction, because the statutory and regulatory provisions applicable to Project Soy don't turn on economic reality or taxpayer motive. *First*, at steps one through three, the economic substance doctrine doesn't permit disregarding Telenet Group's conversion to a regarded corporation or its capitalization choices. As discussed, the doctrine applies only where the governing statute or regulations make economic reality and taxpayer motive relevant. But as longstanding precedent makes clear, entities can both choose corporate status under the Treasury regulations purely for tax reasons and decide whether to capitalize with debt or equity—a choice preserved in

§ 351. *Second*, with the initial three steps of Project Soy respected, once LGI I sold TGH at step four, I.R.C. §§ 245A, 964(e), and 1248(a) require the IRS to allow LGI's deduction. The mandatory mechanics of those statutes expressly require LGI to include in its income the deemed dividend resulting from LGI I's sale of TGH. In fact, the government doesn't even argue that it can use the doctrine to invalidate step four, because it needs to respect the sale of TGH to create taxable income in the first place.

1. **The economic substance doctrine doesn't permit disregarding Telenet Group's conversion to a corporation or its capitalization choices in steps one through three, because the law permits taxpayers to make those choices based on tax consequences.**

The IRS cannot rely on the economic substance doctrine to disregard Telenet Group's capitalization choices and conversion to a regarded corporation—the steps preceding LGI I's sale of TGH—because neither the check-the-box regulations nor § 351 turn on economic reality or taxpayer motive.

a. The economic substance doctrine isn't relevant to the regulations governing an entity's conversion to a per se corporation, so it can't be used to disregard Telenet Group's conversion to a regarded corporation and the mandatory consequences that follow under the Code and regulations.

*First*, the regulations expressly allow businesses to decide, "for federal tax purposes" and nothing more, whether to be disregarded or regarded as a corporation. *See* 26 C.F.R. § 301.7701-3(a). Under those regulations, foreign entities also may convert into per se corporations—entities the IRS has determined have features of corporate status warranting their characterization as corporations for tax purposes. *See id.* § 301.7701-2(b)(8); *supra* pp. 13-14. The regulations reflect Treasury's policy of allowing entities to select how an entity is treated for tax purposes by filing a paper with the IRS, or with a foreign authority to convert to a per se corporation. *Supra* pp. 11-13. Indeed, as the Tax Court has held, those "elections are specifically authorized 'for federal tax purposes,'" and the taxpayer need not "have a business purpose." *Dover*, 122 T.C. at 351 n.19. Those choices, by design, are "all form and no substance," *Summa Holdings*, 848 F.3d at 786, so the economic substance doctrine plays no role.

*Second*, once a business makes such a choice, the regulations deem a "corporate organization" to have occurred. The owner of the previously disregarded entity is considered to have "contribute[d] all of the assets and liabilities of [that] entity" to the newly regarded corporation, "in exchange"

for that corporation's stock. 26 C.F.R. § 301.7701-3(g)(1)(iv); *see* Rev. Rul. 2004-59.

For these reasons, the economic substance doctrine doesn't apply to Telenet Group's conversion to an NV/SA and thus a regarded corporation for federal tax purposes, or the resulting § 351 corporate organization—choices that taxpayers can make "based on comparative tax advantages." H.R. Rep. No. 111-443, at 296. That conversion meant that Telenet Group's owner, TGH, was "deemed to have contribute[d] all of the assets and liabilities" of the "old" Telenet Group to the "new" Telenet Group, in exchange for new Telenet Group's common stock, NQPS, and debt. *See* 26 C.F.R. § 301.7701-3(g)(1)(iv); Rev. Rul. 2004-59; *supra* pp. 14-15. As a result, TGH recognized gain, *see* I.R.C. § 351(b), (g), that increased its "earnings and profits," *see* 26 C.F.R. § 1.312-6(b); I.R.C. §§ 61(a)(3), 312(f)(1); *supra* pp. 26-27.

The upshot is simple. The IRS cannot use the economic substance doctrine to disregard Telenet Group's conversion or the statutory or regulatory consequences that follow from that conversion. The doctrine is a tool for construing and applying tax terms that turn on economic reality and taxpayer motive. And ordinary interpretive principles, longstanding precedent, and legislative history make clear that economic reality and taxpayer motive are

*irrelevant* to the check-the-box regulations. Telenet Group converted to a regarded corporation, and the Tax Code and the regulations dictate the outcome of that conversion.

**b.**    Nor can the IRS use the economic substance doctrine to disregard Telenet Group's capitalization choices, including its use of debt and NQPS. To recap: When Telenet Group converted from a disregarded entity to a corporation, it issued NQPS—an instrument that § 351(g) expressly contemplates businesses using as a form of capitalization—and debt. *Supra* p. 26. Section 351 expressly allows taxpayers to capitalize with debt and NQPS and sets out the tax consequences for doing so. *Supra* pp. 14-15; *see* IRS Chief Counsel Memorandum 201030024, at 5-6 (Apr. 16, 2010), https://www.irs.gov/pub/irs-wd/1030024.pdf (NQPS exchanged under § 351(b) triggers gain included as a dividend under § 1248(a)). Nothing in the statutory scheme suggests that economic reality or taxpayer motive is relevant to those choices—in fact, authorities understand the statute to make economic reality and motive irrelevant—and so the economic substance doctrine plays no role.

What's more, § 351's approach of allowing taxpayers to use NQPS no matter the reason is consistent with § 7701(*o*)'s legislative history, *supra*

pp. 41-42, and authorities recognizing more generally that business entities can decide how to capitalize based on expected tax consequences, *supra* p. 15. As the Second Circuit has held, the IRS cannot "dictate what portion of a corporation's operations" are financed by equity versus debt, no matter whether "the taxpayer has a business purpose" for the choice. *Nassau Lens Co. v. Commissioner*, 308 F.2d 39, 46 (2d Cir. 1962). Thus, the Second Circuit in *Nassau* rejected arguments just like those the government makes here, holding that the IRS could not disregard tax benefits arising from the taxpayer's use of debt even though there was "little 'economic' difference" to the debt-versus-equity decision. *Id.* Rather, "tax law deliberately … affords significance to and honors the *type* of investment"—whether debt or equity—that a taxpayer makes. *Kraft Foods*, 232 F.2d at 124; *see generally* IRS National Office Field Service Advice Memorandum No. 199922012 (June 4, 1999) (discussing *Kraft Foods* and confirming taxpayer's choice to capitalize with real debt). There's "no possible application of the economic substance doctrine" to that choice, *Illinois Tool Works Inc. v. Commissioner*, 116 T.C.M. (CCH) 124, 137 (2018), even if the taxpayer's "purpose" is "to obtain … a tax benefit," and even if the choice is to use debt among affiliated entities, *Kraft Foods*, 232 F.2d at 122, 124.

Telenet Group was entitled to capitalize using NQPS and debt. The IRS
must honor that choice, and the tax laws dictate its consequences.

> **2.    LGI satisfied § 245A's requirements, and the
> government doesn't dispute that if steps one through
> three are respected, it cannot use the economic
> substance doctrine to disallow LGI's claimed § 245A
> deduction.**

With steps one through three of Project Soy in place, the IRS can't use
the economic substance doctrine to disallow the § 245A deduction. Indeed,
the government hasn't disputed that step four resulted in gain, *e.g.*, 1-App.-
171-172, so once steps one through three are respected, LGI qualifies for the
§ 245A deduction under the provision's plain text. *See* 1-App.156

**a.**    Sections 245A, 964(e), and 1248(a) apply mechanically to require
the IRS to allow LGI's claimed § 245A deduction. In the final step of Project
Soy, LGI I recognized gain when it sold its interest in TGH. *Supra* pp. 27-28.
Sections 964(e)(1) and 1248(a) required that LGI I's gain "be included in [its]
gross income … as a dividend," I.R.C. § 964(e)(1), "to the extent of the earn-
ings and profits" of TGH, I.R.C. § 1248(a). Section 964(e)(4)(A)(i) directed
that the dividend "shall be treated" as LGI I's "subpart F income." LGI, as
the U.S. shareholder, was required to include *its* pro rata share of that sub-
part F income in LGI's own "gross income." I.R.C. § 964(e)(4)(A)(ii). Section

964(e)(4)(A)(iii) then required that "the deduction under section 245A shall be allowable" to LGI "with respect to [that] subpart F income included in gross income."

The IRS doesn't dispute the mechanical operation of those provisions or otherwise claim, assuming steps one through three are respected, that it can use the economic substance doctrine to deny LGI's deduction. That makes sense, because longstanding caselaw establishes that taxpayers can sell property to realize gain for tax purposes. *See Sun Properties, Inc. v. United States*, 220 F.2d 171, 175 (5th Cir. 1955). Indeed, Treasury recognized that some taxpayers who satisfy § 245A's requirements could claim the deduction even if they "[chose] to generate … income to avail themselves of the benefits of the deduction." 84 Fed. Reg. at 28,400. The Court should apply § 245A as Congress wrote it, and require the IRS to allow LGI's deduction.

**b.**    Even if the economic substance doctrine could be used to disregard steps one through three, it would also require disregarding step four, because step four generated the tax benefit here. *See Sala*, 613 F.3d at 1252. Step four generated both the income that the IRS wants to tax as well as the deemed dividend producing the § 245A deduction. Thus, disregarding step

four means there's no income to tax, and LGI is entitled to a refund anyway. *See infra* pp. 64-65.

### C.    The district court's reasoning lacks merit.

The district court held that the economic substance doctrine prevented LGI from claiming a § 245A deduction. That was error. The court rewrote § 7701(*o*) by sidestepping whether the doctrine "is relevant" in the first place. And the court fundamentally misunderstood Project Soy and the Code when it referred to TGH's earnings and profits as "artificial." Add.2. TGH's earnings and profits reflect *actual* earnings and profits, which, under the applicable tax rules, triggered TGH's, and then LGI I's, real gain. And even if the doctrine could apply, it would require disregarding step four, too—meaning that LGI's income from Project Soy would be disregarded altogether, entitling LGI to a full tax refund.

#### 1.    The district court wrote the relevance requirement out of § 7701(*o*).

The district court held that the economic substance "doctrine's relevance is coextensive with [§ 7701(*o*)'s] test for economic substance," Add.8, meaning that the doctrine "applies when a transaction lacks economic substance," Add.9. That reasoning—which even the district court recognized is

a "tautology," *id*.—is wrong. It contravenes the statute's plain text, legislative history, common sense, and the government's prior positions.

Start with the text. As explained (at 40-41), before the economic substance doctrine can apply, § 7701(*o*)(1) requires a determination that the "doctrine is relevant." And Congress made clear that determining whether the doctrine is "relevant" is separate from the question whether a transaction meets the two prongs of the doctrine. Congress "clarified" how to apply the doctrine, and at the same time said that determining whether the "doctrine is relevant" "shall be made in the same manner as if [§ 7701(*o*)] had never been enacted." I.R.C. § 7701(*o*)(5)(C). It makes no sense that the test for relevance would be the same as the statute's test for economic substance, when Congress said that precedent—not the statute—provided the relevance test. Indeed, if the doctrine were relevant whenever the statute's two-pronged test was satisfied, § 7701(*o*)'s reference to relevance would be surplusage. *See Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019). The correct test for relevance, as explained, is whether ordinary interpretive tools show that the provision in question requires consideration of economic reality and taxpayer motive. Whether they do, and whether any particular transaction

satisfies the economic substance doctrine and thus falls within the scope of a particular provision, are two different questions.

Section 7701(*o*)'s legislative history confirms that the doctrine isn't relevant to all tax laws, as the IRS too has recognized, *see* IRS, Notice 2010-62 at 5. That history notes that the doctrine isn't relevant to "the choice between capitalizing a business enterprise with debt or equity," even if the choice between those "alternatives is largely or entirely based on comparative tax advantages." H.R. Rep. No. 111-443, at 296. That makes sense. Sometimes the Tax Code provides favorable treatment for transactions that "[b]y congressional design" are "all form and no substance." *Summa Holdings*, 848 F.3d at 786. Applying the doctrine to those types of transactions would override Congress' policy judgments by importing questions about a taxpayer's non-tax purpose or changed economic position without any textual basis for doing so.

### 2. TGH's earnings and profits were not "artificial"—they were just as real as the gain the IRS seeks to tax.

The district court's characterization of Project Soy was flawed, too. In its view, the first three steps could be disregarded because they

"generate[d] … artificial earnings and profits," while the IRS could still tax the gain from step four. Add.2. That's wrong.

*First*, TGH's earnings and profits were real. They reflected Telenet Group's profits and increased economic value from its broadband operations. *Supra* pp. 22-24. That value translated to TGH's increased earnings and profits through the straightforward operation of the tax laws, in particular § 351(b). *Supra* pp. 26-27. The district court failed to grapple with the relevant Code provisions and the real-world value in the Telenet Group corporate family. And whether it "was an oversight" by Congress and Treasury to allow businesses to decide both how to be classified for tax purposes *and* how to capitalize "makes no difference. It's what the law allowed." *Summa Holdings*, 848 F.3d at 786.

*Second*, even if the NQPS and debt at step three should be disregarded because it produced supposedly "artificial" earnings and profits, the government respects Telenet Group's conversion—at least in the related district court proceedings where it seeks additional taxes and penalties relating to Project Soy. *Supra* p. 30; Status Report, Dist. Ct. Doc. 42, No. 1:22-cv-02622 (D. Colo. Mar. 20, 2024). Under the government's own approach, then, Telenet Group's conversion to a corporation still triggered some earnings

and profits, along with a gain and corresponding dividend eligible for the § 245A deduction.

*Finally*, § 1248(h) makes all of that beside the point anyway. It says that, if the taxpayer hasn't "establishe[d] the amount of the [foreign corporation's] earnings and profits," then "all gain from the sale" "shall be considered a dividend." And that deemed dividend "shall be treated as a dividend for purposes of applying section 245A." I.R.C. § 1248(j); *supra* pp. 18-19. So even if LGI hadn't established sufficient earnings and profits in steps one through three, the Code still treats the gain as a dividend.

### 3. The government cannot selectively apply the economic substance doctrine.

The government's and district court's reasoning fails even if steps one through three could be disregarded. That's because the IRS cannot selectively disregard those steps but respect step four—which the IRS needs to create the gain that it wants to *tax*. The government's own argument refutes that approach. The government calls all four steps "a unitary plan" to create a tax benefit, 1-App.162, and its complaint is that LGI had no "real business goal" in taking steps one through three between related entities, 1-App.171. But that criticism—though wrong for the reasons explained—applies

equally to all four steps. Thus, the government's own logic doesn't let it respect step four, and only step four, to override the Code and regulations. Indeed, caselaw, fairness, and common sense alike make clear that *if* the economic substance doctrine applies, it must apply to that part of the transaction that triggered the tax benefit. *Sala*, 613 F.3d at 1252. Step four was necessary to produce the benefit because it triggered gain—the gain that the IRS wants to tax *and* that leads to the § 245A deduction. Thus, if the economic substance doctrine applies, it also requires disregarding the income Project Soy produced, necessitating a full refund.

## CONCLUSION

The Court should reverse the grant of summary judgment for the government and order entry of summary judgment for LGI.

## REQUEST FOR ORAL ARGUMENT

This appeal presents an important issue that the district court incorrectly resolved. LGI submits that oral argument would help the Court decide this case.

Dated: April 30, 2024

Respectfully submitted,

*/s/ Shay Dvoretzky*

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Gregory S. Tamkin
DORSEY & WHITNEY
1400 Wewatta St., Ste. 400
Denver, CO 80202

Shay Dvoretzky
  *Counsel of Record*
Rajiv Madan
Royce Tidwell
Christopher Bowers
Nathan Wacker
Parker Rider-Longmaid
Sylvia O. Tsakos
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Plaintiff-Appellant Liberty Global, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 12,987 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(B). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Circuit Rule 32(A) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: April 30, 2024                    Respectfully submitted,

                                         */s/ Shay Dvoretzky*
                                         Shay Dvoretzky
                                         SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP
                                         1440 New York Ave., NW
                                         Washington, DC 20005
                                         202-371-7000
                                         shay.dvoretzky@skadden.com

                                         *Counsel for Plaintiff-Appellant*
                                           *Liberty Global, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2024, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 30, 2024                    Respectfully submitted,

                                        */s/ Shay Dvoretzky*
                                        Shay Dvoretzky
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        1440 New York Ave., NW
                                        Washington, DC 20005
                                        202-371-7000
                                        shay.dvoretzky@skadden.com

                                        *Counsel for Plaintiff-Appellant*
                                          *Liberty Global, Inc.*

[This page intentionally left blank.]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

---

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on the parties' cross-motions for summary judgement. Defendant's motion for summary judgment at ECF No. 75 is DENIED. Plaintiff's motion for summary judgment at ECF No. 76 is GRANTED.

### BACKGROUND

Liberty Global, Inc. (LGI) is a multinational telecommunications company. LGI was advised on tax matters by Deloitte, LLC. In June 2018, Deloitte approached LGI about an opportunity to exploit a perceived opportunity in the international tax provisions of the 2017 Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (TCJA). This loophole was an apparent "mismatch" (as LGI's tax professionals called it) between (1) the rules for paying tax on global intangible low taxed income (GILTI) and subpart F tax on a gain generated by a controlled foreign corporation (CFC), and (2) the qualification of an entity as a CFC. *See*, *e.g.*, ECF No. 76-4 at 96-97 (deposition of LGI's "vice president of group tax strategy," Shawn Penne). In

1

short, a foreign corporation not directly owned by any U.S. person might qualify as a CFC for U.S. tax purposes because ownership may be "attributed" to a U.S. person, but only CFCs with an actual U.S. shareholder on the last day of the taxable year are subject to GILTI or Subpart F.

With Deloitte's assistance, LGI planned a four-step series of transactions, code-named "Project Soy," which was specifically designed to take advantage of the TCJA's "mismatch." Project Soy would allow LGI to avoid GILTI and capital gain taxes on billions of dollars of unrealized gain from LGI's interest in one of its sub-entities. The scheme was designed to generate enough artificial earnings and profits (E&P) --which, but for the mismatch, would have been taxed under subpart F or GILTI -- to offset LGI's taxable gain on Step 4 of the plan, "the TGH Transaction."[1] In the TGH transaction, which occurred in December 2018, an LGI affiliate sold its interest in Telenet Group Holding (TGH), a Belgian company, to LGI's parent company, Liberty Global (based in the UK). The income from the TGH transaction is the income now at issue.

Under the relevant tax laws at the time, LGI was required to recognize income equal to its share of gain from the TGH transaction. It sought to deduct that income using § 245A of the TCJA.. In June 2019, Treasury issued temporary regulations addressing the international tax changes made by the TCJA. LGI filed a consolidated federal income tax return for its 2018 tax year on October 11, 2019, then filed an amended return on December 23, 2019. The initial

---

[1] In Steps 1-3, LGI manufactured $4.8 billion of E&P for TGH. Steps 1 and 3 generated E&P for TGH by issuance of profit certificates from Telenet Group (the operating subsidiary) to TGH. Steps 2 and 3 generated E&P for TGH by creating "springing to life debt"—by converting Telenet Financing into a direct subsidiary of TGH rather than an indirect subsidiary through Telenet Group, and then making Telenet Group a separate entity for tax purposes. Generating E&P was important because the proceeds from the sale of a CFC (the transfer of LGI's interest in TGH to Liberty Global in Step 4 of Project Soy) could be treated as a dividend "to the extent of the [CFC's] E&P" under §§ 964(e)(1) and 1248(a). ECF No. 76-13 at 3 (quoting an internal LGI memo). In other words, if TGH had sufficient E&P, LGI could treat its gain as a dividend and offset the entire $2.4 billion by claiming a § 245A deduction.

2

- Add.2 -

return reported the fourth step of Project Soy in a manner that was consistent with the temporary Treasury regulations.  The amended return adopted the position that the regulations were invalid and claimed a refund of $95,783,237 as a result.

LGI claims that it met the requirements to receive the § 245A deduction for the TGH transaction.  However, because the temporary regulations, adopted in June 2019, were made retroactive, LGI did not receive the full deduction.  After LGI filed its amended return claiming a federal income tax refund, the IRS began to review LGI's Project Soy transactions.  LGI produced some, but not all, of the information requested.  On November 19, 2020 the IRS issued a delinquency notice to LGI regarding the missing information and included a deadline of November 27, 2020 to respond to the notice before the IRS might seek to issue and enforce a formal summons for the information in a federal court proceeding.

On November 27, 2020 LGI filed a complaint in federal district court seeking a refund of approximately $110 million that it alleges to have overpaid for its 2018 year.[2]  Because it still had not provided the information sought by the IRS, the United States answered that discovery was necessary to determine the extent of LGI's earnings and profits and the nature of the transactions.

On April 4, 2022 this Court granted in part LGI's motion for summary judgment, concluding that the 2019 temporary Treasury regulations did not comply with the requirements of the Administrative Procedure Act and therefore did not have valid retroactive effect over the

---

[2] Tax litigators apparently are starting to recommend strategies for bypassing the administrative process (filing a tax return claiming a benefit and then undergoing an audit if selected) by instead paying the tax and then bringing a section 7422 refund suit in federal court.  *See* ECF No. 26 at 2 (citing ECF No. 26-1 at 4, "*Skadden Insights: Challenging Tax Cuts and Jobs Act Regulations and IRS Guidance*" (1/21/2020)).

- Add.3 -

transactions occurring in LGI's 2018 tax year, but denying the motion "to the extent that factual questions remain on LGI's compliance with the underlying tax laws in the TGH transactions." *Liberty Global, Inc. v. United States,* No. 1:20-cv-03501-RBJ, 2022 WL 1001568, at *7 (D. Colo. April 4, 2022).

LGI moved to dismiss the amended complaint in a related case, arguing that the government "failed to comply with the statutory prerequisites necessary to bring its lawsuit." Case No. 1:22-cv-02622-RBJ, ECF No. 24 at 1.  This Court found that the requirements to which LGI referred in that motion did not apply and therefore denied the motion to dismiss.  *United States v. Liberty Global, Inc.,* No. 1:22-cv-02622-RBJ, 2023 WL 4603954, at *2-5 (D. Colo. June 1, 2023).

The United States now contends that LGI is not entitled to the tax refund that it seeks in this proceeding because the economic substance doctrine (or alternatively, the step transaction doctrine) dictates that Steps 1-3 of Project Soy should be disregarded when calculating LGI's tax obligations.  LGI argues that neither doctrine should apply, and therefore, that the E&P generating steps, which permitted the § 245A deduction for the TGH transaction, should be given effect.  Both parties assert that the facts relevant to the analysis of whether and how the economic substance doctrine applies are not contested, and that this lawsuit can be resolved as a legal matter.  *See* ECF No. 70 at 2 (joint letter of intent to file for summary judgment).

I find that the economic substance doctrine does apply, and that its application provides that LGI cannot properly claim the § 245A deduction.  Therefore, I do not reach analysis as to the step transaction doctrine.

4

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Rather, the nonmoving party must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Stated differently, the party must provide "significantly probative evidence" supported by materials such as "affidavits, deposition transcripts, or specific exhibits incorporated therein" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). Where different ultimate inferences may be drawn from the evidence presented by the parties, substituting "the sterile bareness of summary judgment" for the advantages of trial before a live jury with live witnesses is not appropriate. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

## ANALYSIS

The United States contends that LGI is not entitled to the tax refund that it seeks in this proceeding under the economic substance doctrine or alternatively, the step transaction doctrine. ECF No. 76. The economic substance doctrine analysis resolves this dispute.

The economic substance doctrine is one variation of the common law doctrine of "substance over form," which instructs courts to effectuate the "plain intent of the relevant statutory regime"—in this case, the tax code—by viewing transactions in terms of their "objective economic realities" rather than their technical compliance with statutory requirements. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) (concluding that the economic substance doctrine applied to a sale-and-leaseback transaction by looking "to the objective economic realities of a transaction rather than to the particular form the parties employed"). In the tax context, the doctrine permits courts to ignore transactions that are "mere device[s]" for tax avoidance. *See Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935) (refusing to give effect to a corporate reorganization that "technically complied" with statutory requirements but that the Court found had "no business or corporate purpose" other than to transfer corporate shares to the petitioner).

The doctrine is codified in 26 U.S.C. § 7701(o), which provides in relevant part that "[i]n the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction."

The legislative history of § 7701(o) clarifies that the doctrine "involves a conjunctive analysis." H.R. Rep. 111-443 at 297. In other words, for the economic substance doctrine to apply, the transaction must satisfy both prongs of the statutory test—the transaction "must change in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and the

6

taxpayer must have a substantial non-Federal-income-tax purpose for entering into such transaction." *Id.* This clarification in the House Report was intended to "eliminate[] the disparity" in application of the doctrine between federal circuit courts that applied the test conjunctively and courts that applied the test disjunctively. *See id.*

"The ultimate determination of whether a transaction lacks economic substance is a question of law." *Sala v. United States*, 613 F.3d 1249, 1252 (10th Cir. 2010), as amended on reh'g in part, (10th Cir. Nov. 19, 2010) (citing *James v. Comm'r*, 899 F.2d 905, 909 (10th Cir. 1990) ("[W]e review de novo the ultimate characterization of the transactions as shams.")); *see also Frank Lyon*, 435 U.S. at 581 n. 16 ("The general characterization of a transaction for tax purposes is a question of law….").

Application of the provision here requires resolution of several issues: (1) whether the doctrine is "relevant" to this set of facts within the meaning of the statute's prefatory clause; (2) the appropriate level of granularity to be used in selecting the transaction or set of transactions to be analyzed; (3) whether any exemptions exist, and if so, whether they apply here; and (4) whether the conjunctive test—the transaction had no meaningful non-tax effect and the taxpayer had no subjective non-tax purpose—is satisfied here.

      1.   <u>Relevance of the doctrine</u>.

LGI argues in effect that the prefatory clause in § 7701(o)—"[i]n the case of any transaction to which the economic substance doctrine is relevant"—should be distinguished from the operative clause—"a transaction is disregarded for tax purposes unless … [it meaningfully changes the taxpayer's non-tax economic position and was conducted with a substantial non-tax purpose]"— and given independent effect. *See* ECF No. 75 at 7. LGI would have the Court view the prefatory clause as an instruction to conduct a threshold analysis into whether the doctrine is "relevant" to the transaction at issue, and then only if the threshold is met, to continue into the two-pronged inquiry set

out in the operative clause of the statute.  *See id*. ("For purposes of this motion, LGI is not arguing that the Entity Conversion satisfies that two-pronged test.  Instead, LGI asks the Court to decide the threshold legal question of whether the ESD is 'relevant' to the Entity Conversion [step 3 of Project Soy]").

LGI relies on a House Report for the proposition that the legislative intent was to explicitly limit the types of transactions to which the ESD would be "relevant".  *See*, *e.g.*, ECF No. 75 at 4 (citing H.R. Rep. No. 111-443, 296 (2010).  However, contrary to LGI's interpretation, the House Report emphasizes that "the economic substance doctrine *becomes applicable*, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings."  H.R. Rep. No 111-443, 292 (citing *ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998), aff'd 73 T.C.M. (CCH) 2189 (1997), cert. denied 526 U.S. 1017 (1999)) (emphasis added).  The ordinary meaning of the report's statement that the doctrine "becomes applicable" under certain circumstances strongly suggests that the doctrine is "relevant" within the meaning of the statute under the same circumstances.  This statement in turn suggests that the doctrine's relevance is coextensive with the statute's test for economic substance, provided by the operative clause.

Moreover, the conclusion that there is no threshold "relevance" inquiry that precedes the inquiry described in the operative clause—is consistent with the interpretations of the Supreme Court and courts in the Tenth Circuit.  *See*, *e.g.*, *Blum v. Comm'r*, 737 F.3d 1303, 1309 (10th Cir. 2013) (citing *Jackson v. Comm'r*, 966 F.2d 598, 601 (10th Cir. 1992)) (describing the "doctrinal framework" of the economic substance doctrine as "fairly straightforward" and instructing courts to "ask two questions: (1) what was the taxpayer's "subjective business motivation," and (2) did the transaction have objective economic substance?").  The Tenth Circuit there conspicuously omits any mention of a threshold inquiry or a separate or additional question that courts must resolve in

applying the economic substance doctrine.  To manufacture an additional question here—which as LGI argues would then short-circuit the entire statutory analysis—would contravene the Tenth Circuit's instructions and frustrate the purpose of the doctrine itself.

Instead, courts characterize the ultimate inquiry into economic substance as asking whether a transaction's benefits violate the legislative intent.  *See*, *e.g.*, *Gregory*, 293 U.S. at 467 (disregarding a corporation's "so-called reorganization" because it "was nothing more than a contrivance" to evade taxes, and therefore lay "outside the plain intent of the statute").  Certain circumstances raise "red flags" that a transaction lacks economic substance and correspondingly violates Congress's intent, "such as when a transaction produces enormous tax savings without a concomitant economic loss, or when something 'smack[s] of a too-good-to-be-true transaction' and lacks 'an appreciable effect, other than tax reduction.'"  *Blum*, 737 F.3d at 1310 (quoting *James*, 899 F.2d at 908).

The two prongs enumerated in § 7701(o) reflect in the most inclusive terms the situations that violate congressional intent for lack of economic substance: when a taxpayer intentionally enters a transaction that serves no purpose other than tax evasion with the sole purpose of evading taxes.  The statutory prongs are not inconsistent with the more specific "red flags" such as those described above, and in fact those red flags either rephrase the statutory factors or inform analysis of the two statutory prongs as useful sub-inquiries.  For example, the fact that a transaction "lacks an appreciable effect, other than tax reduction" is equivalent to the statutory prong describing the inquiry into the transaction's objective purpose (or lack thereof), and the fact that a transaction "produces enormous tax savings without a concomitant economic loss" is a fact suggestive of both the taxpayer's subjective intent and the objective purpose of the transaction.

At the risk of tautology, I proceed with the conclusion that the economic substance doctrine applies when a transaction lacks economic substance.  The question of whether the doctrine lacks economic substance is equivalent to the question of whether the tax benefits achieved in the

transaction violate congressional intent and is analyzed using the enumerated statutory prongs—which are in turn elaborated and informed by the "red flags" that courts have long described.  *See Blum*, 737 F.3d at 1310 (quoting *James*, 899 F.2d at 908-09) (emphasizing that the "two [statutory] factors, rather than being independent prerequisites to finding an absence of economic substance, are simply 'more precise factors to consider' in that analysis").  There is no "threshold" inquiry separate from the statutory factors.

    2.  <u>Unit of analysis</u>.

The next question is whether, as LGI argues, the Court's analysis should isolate Step 3 of Project Soy—the "entity conversion" in which Telenet Group converted from a BVBA to an NV under Belgian law[3]—or whether, as the government argues, the analysis should consider the steps of Project Soy collectively.  *Compare* ECF No. 75 at 9 *with* ECF No. 75 at 15; *see also Sala*, 613 F.3d at 1252 ("Before analyzing the question of economic substance, [the] court must first determine which transactions control the inquiry.").

The transaction to be examined in an economic substance doctrine analysis is "the transaction that gave rise to the alleged tax benefit."  *Sala*, 613 F.3d at 1252 (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006)).  LGI argues here that, because the tax benefit at issue—"the generation of E&P"—was "created by the Entity Conversion" at Step 3 of Project Soy, that step in isolation "is the transaction to be examined."  ECF No. 75 at 9.  This argument is without merit.

First, Step 3 was not the only step in the transaction that generated E&P—Step 2 also generated "springing to life debt" that created E&P.  Second, generating E&P is not itself a tax

---

[3] BVBAs are akin to limited liability companies in the U.S. and usually are not taxed as separate entities (i.e., they are "disregarded"); NVs are akin to corporations in the U.S. and are considered separate entities for tax purposes.  ECF No. 76 at 5-6.

benefit.  It is a component required to take advantage of the "mismatch" that caused the benefit—in which "a corporation might claim CFC status, [and] yet have no U.S. shareholders to pay GILTI and subpart F tax at year-end."  ECF No. 76 at 5.  The generation of "artificial E&P" that could be used to offset the taxable gain on the TGH transaction was economically feasible for LGI only because of the mismatch.  Creation of the mismatch would not have produced a tax benefit without the generation of E&P, and generation of E&P would not have produced a tax benefit without also establishing the mismatch.  To treat a *necessary* step of the transaction as *sufficient* to produce the transaction's full effect, as LGI proposes, would be logically unsound.

Moreover, to artificially isolate Step 3 from the remainder of the scheme here would contravene the legislative intent of § 7701(o), which was for courts to conduct "necessarily flexible" analyses to effectuate the tax rules.  *Blum*, 737 F.3d at 1311; *see also* H.R. Rep 111-443 at 295 (noting that "a strictly rule-based tax system" cannot prevent all unintended consequences and that courts may therefore "supplement tax rules with anti-tax-avoidance standards, such as the economic substance doctrine, *in order to assure the Congressional purpose is achieved*") (emphasis added).  Congress emphasized that courts may "aggregate, disaggregate, or otherwise recharacterize a transaction when applying the doctrine" to effectuate that purpose.  H.R. Rep. 11-443 at 297.

In *Sala*, the Tenth Circuit held that the district court had erred in including in the economic substance analysis a later segment of Sala's participation in the "Deerhurst Program," when the "only transaction that relate[d] to the $60 million tax loss Sala [sought] to claim" was an earlier segment of participation in the program that had "no connection" to the later segment, there was "a clear break between each phase," and the later phase "had no tax benefits."  613 F.3d at 1252.  Here, by contrast, it is appropriate to aggregate the entity conversion step of Project Soy with the other steps of the transaction.  *Cf. id.*  Unlike the taxpayer's participation in two phases of the Deerhurst Program in *Sala*, only one of which produced the asserted tax benefit, Steps 1 through 3 here each "related" to

11

- Add.11 -

the tax loss that LGI seeks to claim, since each was a component of the carefully choreographed

creation of the TCJA mismatch.  *Cf. id.*  Far from having "no connection" to one another or being

divided by "clear break[s]" in time between phases, as in *Sala*, the steps of Project Soy were

executed in a four-day period in December 2018 and were "so integrated" that LGI admits that it is

"unlikely that Steps 1, 2, and 3 would have been taken except in contemplation of the TGH

transaction in Step 4."  ECF No. 76-8 at 6 (admissions 13(b) and 14(b) by LGI); *cf. Sala*, 613 F.3d at

1252-53.

Just as the Second Circuit in *Bank of New York Mellon Corp. v. Commissioner* affirmed the

district court's authority there to *segregate* "a routine transaction [from] a transaction lacking

economic substance" to avoid stymying the doctrine's purposive application by an arid formalism,

801 F.3d 104, 121 (2d Cir. 2015), the Court here may use its authority to *aggregate* interrelated

transactions to likewise avoid frustrating the doctrine's purpose.  Therefore, the Court rejects LGI's

invitation to conduct the economic substance analysis with an artificially narrow focus on Step 3 of

Project Soy, and instead considers whether Steps 1, 2, and 3 together should be recognized for tax

purposes (affording LGI the claimed deduction) or disregarded for lack of economic substance.

3. <u>Exemptions</u>.

The next question is whether the transaction at issue here is exempted from the economic

substance doctrine either explicitly or by analogy to statutorily enumerated exceptions.  LGI argues

first by analogy to certain permissible tax-motivated decisions that this business transaction must

necessarily fall outside the scope of § 7701(o).  *See* ECF No. 75 at 2 (arguing that "in some cases, the

tax consequences of a transaction are intended to be respected even where the transaction only has

tax effects" and citing as an example that "married couples can elect to file a joint tax return or

separate tax returns each year—a purely tax-motivated decision that affects the couple's tax but is

nonetheless respected").

This argument makes little sense.  The economic substance doctrine applies to "*transactions that have no business purpose or economic substance beyond tax evasion.*"  *Schussel v. Werfel*, 758 F.3d 82, 97 (1st Cir. 2014) (emphasis added); *see also Blum*, 737 F.3d at 1309 (introducing its discussion of the economic substance test by asking "how, exactly, should a court determine whether a *transaction* possessed objective economic substance?") (emphasis added).  Filing taxes—jointly or individually—is not a "transaction."  *Cf.* 26 U.S.C. § 7701(5)(B) (noting that the economic substance doctrine does not apply to the personal activities of individuals but rather "only to transactions entered *into in connection with a trade or business or an activity engaged in for the production of income*") (emphasis added).

Moreover, because filing taxes jointly with one's spouse for a tax advantage does not "upon its face lie[] outside the plain intent" of the tax code, it does not implicate the core purpose of the economic substance doctrine: to prevent business organizations from entering schemes to evade taxes under circumstances in which Congress would have intended that the laws apply.[4]  *See Gregory*, 293 U.S. at 470.  In contrast to the situation in *Gregory*—in which the Court disregarded a corporate reorganization that was a "mere device," because the new corporation, although validly created, was "nothing more than a contrivance" for tax evasion—there is typically no suggestion that a person's marital status is a mere device or contrivance intended solely or primarily for tax benefits.  *Cf. id.*

Here, like in *Gregory* and unlike in LGI's example of spouses filing taxes jointly, the transaction at issue violated congressional intent.  *See* ECF No. 46 at 2 (this Court's explanation that § 245A "works in concert with … GILTI" and that "these sections combine to form the basis of the

_____

[4] Similarly, LGI's citation to *Summa Holdings, Inc. v. Commissioner,* 848 F.3d 779, 788 (6th Cir. 2017), for the proposition that "a taxpayer has a right (and even a duty) to choose how an entity is taxed 'based solely on tax-reduction considerations,'" ECF No. 75 at 12 (and described by counsel during oral argument as LGI's best case) is unpersuasive.  The notion that to limit taxpayers' abilities to evade taxes would infringe upon their rights is simply contrary to the meaning and purpose of the economic substance doctrine.

13

- Add.13 -

new participation-exemption tax system"); *see also* ECF No. 76 at 15-16 (explaining how Project

Soy was designed to, and does, unlink the § 245A deduction from the "appropriate anti-base erosion

safeguards" that the legislature intended).

The related argument that Project Soy is one of the "basic business transactions" that the

legislature intended to exempt from application of the economic substance doctrine likewise fails

under minimal scrutiny.  *See* ECF No. 75 at 2-3 (quoting H.R. Rep. No. 111-443 at 296) (noting that

"the ESD does not apply to '*basic business transactions* that, under longstanding judicial and

administrative practice are respected, merely because the choice between meaningful economic

alternatives is largely or entirely based on comparative tax advantages'") (emphasis added).  As

discussed in the previous section, the transaction at issue here is not merely the entity conversion that

Telenet Group underwent at Step 3, but rather the full choreography of sub-transactions that occurred

in Steps 1 through 3.  It is absurd to imagine that Deloitte would be consulted to devise and carry out

a "basic business transaction" within any ordinary or comprehensible use of the phrase, and no

reasonable factfinder could characterize Project Soy as such.

LGI argues alternatively that because the entity conversion fits within the exception for

"organizations of a corporate entity" enumerated in the committee report, the series of transactions

falls outside the scope of the economic substance doctrine.  *See* ECF No. 75 at 10-11 (citing H.R.

Rep. 111-443 at 296).  This argument is flawed in several respects.  First, the statute contains no

express exceptions, and the list of "exemptions" to which LGI refers appear only in the committee

report as illustrations of the broader concept of "basic business transactions."[5]  As I conclude above,

Project Soy is not a "basic business transaction," and therefore, that exception does not apply here.

---

[5] The exemptions noted in the report are as follows: (i) choice of capitalization of a business, (ii) choices
between foreign and domestic entities; (ii) organizations of a corporate entity; and (iv) choice to use
related parties.  H.R. Rep. 111-443 at 296.

Second, the committee report states that "a transaction or series of transactions that *constitute* a corporate organization or reorganization" might represent the type of basic transaction exempt from application of the doctrine.  H.R. Rep. 111-443 at 296.  The report does not state or imply that any transaction that merely *includes* a reorganization is likewise exempt.  There is no basis to conclude from the fact that one step of Project Soy might fall within an exception that the transaction in aggregate—the appropriate unit of analysis here—should be excepted.[6]

Third, precedent suggests that exceptions are construed narrowly and given limited effect when they would contravene effectuation of the doctrine's purpose.  *See*, *e.g.*, *Gregory*, 293 U.S. at 470 (disregarding under the economic substance doctrine a corporate reorganization, notwithstanding that the transaction itself constituted the type of "corporate organization" identified by the legislature in the committee report as an example of an exception).  Here, at most two sub-transactions of Project Soy relate to a corporate reorganization (the transfer of subsidiaries and the entity conversion), as opposed to the entire transaction in *Gregory*.  Furthermore, here, the explicitly admitted tax motivations of the scheme implicate the economic substance doctrine at least as strongly as did those in *Gregory*.  I therefore conclude that, as in *Gregory*, the legislature's "basic business transaction" exception does not preclude application of the economic substance doctrine here.  *See* 293 U.S. at 470.  None of the examples of transactions suggested in the committee report as meriting respect notwithstanding their tax motivations or consequences applies here, since Project Soy was

---

[6] The government stated at oral argument that its strongest case for the proposition that the economic substance doctrine can apply to a corporate reorganization is *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed Cir. 2006).  While *Coltec* could support the notion that a reorganization step somewhere in the broader transaction does not preclude application of the economic substance doctrine, the court there excluded the corporate reorganization step of the scheme from the economic substance analysis. The court there effectively rejected the argument that the doctrine could not apply to a corporate reorganization as irrelevant.  Here, by contrast, the economic substance inquiry includes the reorganization step.  This Court—by reference to the legislative history and caselaw emphasizing courts' latitude in effectuating Congress's purpose—reaches the same conclusion as the government on this issue but finds *Coltec* relatively unpersuasive in doing so.

15

not merely a simple business operation but rather a coordinated series of simpler steps (as most complex transactions are). To apply the exemption for "basic business transactions" here would allow the exception to swallow the rule. I decline to do so.

> 4. <u>Application of the two-prong test</u>.

The final question at this stage is whether there is a genuine dispute of fact as to whether either "the transaction at issue changed in a meaningful way (apart from Federal income tax effects) LGI's economic position" or whether LGI "had a substantial non-Federal-income-tax purpose for entering into such transaction." *See* H.R. Rep. 111-443 at 297. Since the statutory test is conjunctive, *see id.*, a fact issue as to either prong is sufficient to render summary judgment inappropriate.

On the first prong, LGI admits that each of Steps 1 through 3 "did not change, in a meaningful way, LGI's economic position." ECF No. 76-8 at 3-4. LGI does qualify those responses by noting that Steps 1 through 3 each "had non-tax consequences, including consequences under Belgian corporate law." *See id.*[7] However, the fact that a given operation had some "consequences" under Belgian law does not mandate or imply that it "meaningful[ly]" changed LGI's economic position, and while the Court must at summary judgment draw logical inferences in favor of the non-movant, it need not gap-fill assertions with unfounded inferences.

Therefore, the specific admission as to the first prong controls over the gesture to unenumerated and unexplained "consequences." If none of the steps in isolation meaningfully changed LGI's position, and since LGI provides no basis to infer that the steps cohered toward a broader, non-tax-related effect, it follows that those steps in aggregate (the focus of analysis here) did

---

[7] During the oral argument, however, LGI retreated from that qualification and admitted that both prongs of the statutory test do apply to Project Soy.

not change LGI's position in a meaningful, non-tax-related way. Thus, there is no genuine dispute of fact as to the first statutory prong.

On the second prong, LGI admits that each of Steps 1 through 3 "served no substantial non-tax purpose for LGI." ECF No. 76-8 at 3-4. The fact that LGI "did not direct Telenet Group Holding to enter into" the transaction makes no difference in this analysis. Project Soy was coordinated among LGI, Telenet, and TGH. *See, e.g.*, ECF No. 76-3 at 40:16-20 (Magit Archer admitting in a deposition that "the idea for profit certificates [came] from Liberty Global," but that the profit certificates were actually "issued by Telenet BVBA"); *see also* ECF No. 76-7 at 71-72 (Karl Abelhausen explaining in a deposition that there was no reason for Telenet Group to reduce TGH's capital in October 2018 other than to facilitate issuance of profit certificates under Project Soy). Therefore, it is appropriate to consider LGI's intent as to the effect of the transaction, even if it did not formally execute every step but rather merely orchestrated and facilitated the process.

LGI in its brief asserts that compliance with "Belgian corporate law requirements" was a substantial non-tax purpose for Steps 1 through 3 of Project Soy, within the meaning of the second prong. *See* ECF No. 76-8 at 14-16 (for example, denying the government's request for admission that "conversion of Telenet Group BVBA to Telenet Group NV in Step 3 was not in furtherance of any non-tax purpose" and responding that Step 3 "was in furtherance of non-tax purposes, including Belgian corporate law requirements").[8] This argument is inadequate to raise a genuine issue of material fact as to whether LGI had a substantial non-tax purpose for the transaction in aggregate.

First, LGI's response provides no indication what the Belgian law was or how the entity conversion, the issuance of profit certificates, or the restructuring of subsidiary entities was necessary to promote compliance with that law. Second, the statement that an action was "in furtherance" of

---

[8] Again, this position was essentially abandoned during the oral argument. *See supra*, n. 7.

some end does not suggest that the end was a "substantial purpose" for the action, or that the actor even knew of the end when initiating the action. It seems here that LGI carefully worded its response to the government's Request for Admission to say the former while suggesting the latter. In fact, the evidence suggests that when LGI's board decided to enter Project Soy, it did not discuss (or apparently, even know of) the changes in Belgian law that it now claims the transaction "further[ed]." *Compare id*. (LGI's response to the government's Request for Admission) *with* ECF No. 76-7 at 66-68 (LGI's representative, Karl Abelshausen, testifying at his deposition that the board meeting about whether to approve Project Soy did not include any mention of the upcoming changes in Belgian law, and that LGI's legal team brought those changes to the attention of the board at a "much later" meeting).

Similarly, LGI's gestures to the attendant benefits of the sub-transactions in each of Steps 1 through 3—such as the ability to issue profit certificates by converting Telenet Group from a BVBA to an NV, or the acquisition of preferential distribution rights through the issuance of profit certificates—are inadequate to suggest that those consequences were a "substantial purpose" for entering the transaction, and moreover, are inconsistent with the "economic realities" of the situation that the Court is instructed by precedent to consider. *See Gregory*, 293 U.S. at 468. For example, because TGH owned Telenet Group, it did not need preference against itself, etiolating any need for issuance of profit certificates or preferred stock. This reality suggests that achieving distribution preference was not a substantial purpose for entering the transaction.

Instead, it appears that the only substantial purpose of the transaction was tax evasion. *See* ECF No. 76-8 at 5 (LGI admitting that "from its perspective, the primary purpose of Steps 1, 2, and 3 of the Transactions was to 'generate earnings and profits' for use in Step 4" and adding only that Step 1 was also undertaken to comply with Belgian law). LGI's *ex post* arguments about the possible benefits that the profit certificates and entity conversion provided are inadequate to raise a genuine

18

fact issue about whether those consequences were a "substantial purpose" for those operations, when the evidence demonstrates that LGI either did not know of the benefit when making the decision, did not discuss it as a reason to engage in the overall transaction, or did not achieve the cited benefit from the transaction in reality.

Circumstantial evidence corroborates the admission that LGI's intent in undertaking Project Soy was to obtain tax benefits. *See Sala*, 613 F.3d at 1253 (holding that it was "clear" that the transaction at issue lacked economic substance and emphasizing that the "most compelling" factor suggesting the intent to evade taxes was that the "transaction was designed primarily to create a reportable tax loss that would almost entirely offset Sala's 2000 income with little actual economic risk"). Here, like in *Sala*, the transaction was designed to offset the $2.4 billion gain from the TGH Transaction by generating a nearly equivalent amount of E&P that could be used to convert the gain to a dividend. *See* ECF 76-3 at 89 (Archer testifying that "there was more E&P than there was gain by about $99 million"). The temporal coincidence between the generation of E&P and the sale and the close equivalence in their value permit the court to conclude that the project was "structured from the outset" not to yield any meaningful economic benefits to the company but rather as an artifice for tax benefits. *See Sala*, 613 F.3d at 1253.

Finally, even if an isolated step *did* provide objective benefits for LGI, it does not follow that the achievement of that outcome was a "substantial" non-tax purpose for the entire scheme. *See* ECF No. 76-8 at 5 (LGI characterizing Project Soy as a "*unitary plan*" intended "to achieve [LGI's] expected U.S. federal income tax treatment") (emphasis added). The economic substance inquiry is not a mathematical aggregation of isolated attendant benefits of sub-transactions; it is an inquiry into the interactions between the sub-transactions and what those interactions reveal about the transaction's overall purpose. *See Blum*, 737 F.3d 1312 (rejecting the taxpayers' argument that "because Dr. Hodder testified that each step of OPIS [the transaction] had economic substance, and

19

that there was an 'enormous possible upside' to OPIS," the overall transaction presented a reasonable chance of turning a profit and therefore had economic substance, because to accept that argument would require the court "to look not at the forest but at the trees"); *see also WFC Holdings Corp. v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (rejecting an effort to justify a basis-inflating scheme by "isolat[ing] a kernel of prospective profitability to justify a large, multi-step, multi-property transaction")

Here, as in *Blum* and *WFC Holdings*, even if there was a possible kernel of purpose or a prospective "upside" to any of the steps—for example, accepting LGI's assertion that compliance with Belgian law was considered a motivation, or that the profit certificates would allow LGI some preference in Telenet's distribution rights and that this would matter even though LGI owned Telenet—the isolated benefits of one step cannot be extrapolated to a conclusion that those benefits were even related to the overall purpose of the transaction, let alone that they were a substantial purpose for the transaction. *See id*.

Such an extrapolation would be particularly unfounded in the context of the "unitary plan" of Project Soy. ECF No. 76-8 at 5. There would be little reason for LGI to conceive of the first three steps as part of a larger "project" culminating in the sale of TGH to Liberty Global, if those first three steps were unrelated to the sale and were in fact in pursuit of entirely separate ends—ranging from distribution rights to Belgian corporate compliance. To accept the potential for preferential distribution rights, for example, as a rationale for the machinations of reorganization and conversion that took place in the same transaction would be similarly to "isolate a kernel" of benefit to the taxpayer and extrapolate without any logical or factual basis to an inference about the broader transaction. *WFC Holdings*, 728 F.3d at 746.

LGI has not created a genuine issue as to whether the entire multi-step transaction took place for any substantial reason other than tax evasion. The direct and circumstantial evidence establish

20

only the tax-avoidant purpose for the scheme.  LGI's suggested alternative non-tax purposes for the individual steps are contradicted by the testimony of its own representatives, and in any event, simply do not make sense as justifications for the full transaction.  Therefore, because there is no genuine issue of fact as to either the first or second prong, and both prongs resolve in favor of the application of the economic substance doctrine, it is appropriate as a matter of law to apply the doctrine here and to disregard Steps 1 through 3.

When Steps 1 through 3 are disregarded, the noneconomic E&P generated in the § 351 transaction are not recognized and cannot be used to support the § 245A deduction.  Step 4, the TGH Transaction, would then result in $2.4 billion of taxable gain.  As a matter of law, LGI is not entitled to the deduction at issue here.

## ORDER

For the reasons above, the government's motion for summary judgment at ECF No. 76 is GRANTED.  LGI's motion for summary judgment at ECF No. 75 is DENIED.  Final judgment will enter accordingly.

DATED this 31st day of October, 2023.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge

21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____

**FINAL JUDGMENT**

_____

      This action came on for hearing before the Court on the parties' cross-motions for summary

judgment, and the issues having been duly heard and a decision duly rendered, it is

      ORDERED that this civil action is dismissed with prejudice.  As the prevailing party, the

defendant is awarded its reasonable costs, to be taxed by the Clerk pursuant to Fed. R. Civ. P.

54(d)(1) and D.C.COLO.LCivR 54.1.

      DATED this 31st day of October, 2023.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge


January 1, 1985, or such later taxable years as the Secretary of the Treasury or his delegate may prescribe.

''(3) SECTION 801(d)(10).—The amendment made by section 801(d)(10) [amending section 996 of this title] shall apply to distributions on or after June 22, 1984.

''(4) SECTION 803.—The amendments made by section 803 [amending section 441 of this title] shall apply to taxable years beginning after December 31, 1984.''

#### EFFECTIVE DATE OF 1966 AMENDMENT

Amendment by Pub. L. 89–809 applicable with respect to taxable years beginning after Dec. 31, 1966, see section 104(n) of Pub. L. 89–809, set out as a note under section 11 of this title.

#### EFFECTIVE DATE OF 1962 AMENDMENT

Amendment by Pub. L. 87–834 applicable to distributions made after Dec. 31, 1962, see section 5(d) of Pub. L. 87–834, set out as a note under section 301 of this title.

#### CONSTRUCTION OF 2015 AMENDMENT

Pub. L. 114–113, div. Q, title III, §326(c), Dec. 18, 2015, 129 Stat. 3104, provided that: ''Nothing contained in this section [amending this section and enacting provisions set out as a note above] or the amendments made by this section shall be construed to create any inference with respect to the proper treatment under section 245 of the Internal Revenue Code of 1986 of dividends received from regulated investment companies or real estate investment trusts before the date of the enactment of this Act [Dec. 18, 2015].''

#### DIVIDENDS RECEIVED OR ACCRUED DURING 1987

Pub. L. 100–647, title I, §1006(b)(1), Nov. 10, 1988, 102 Stat. 3393, provided that: ''In the case of dividends received or accrued during 1987—

''(A) subparagraph (B) of section 245(c)(1) of the 1986 Code shall be applied by substituting '80 percent' for the percentage specified therein, and

''(B) subparagraph (B) of section 861(a)(2) of the 1986 Code shall be applied by substituting '¹⁰⁰⁄₉₀ths' for the fraction specified therein.''

#### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

### § 245A. Deduction for foreign source-portion of dividends received by domestic corporations from specified 10-percent owned foreign corporations

#### (a) In general

In the case of any dividend received from a specified 10-percent owned foreign corporation by a domestic corporation which is a United States shareholder with respect to such foreign corporation, there shall be allowed as a deduction an amount equal to the foreign-source portion of such dividend.

#### (b) Specified 10-percent owned foreign corporation

For purposes of this section—

#### (1) In general

The term ''specified 10-percent owned foreign corporation'' means any foreign corporation with respect to which any domestic corporation is a United States shareholder with respect to such corporation.

#### (2) Exclusion of passive foreign investment companies

Such term shall not include any corporation which is a passive foreign investment company (as defined in section 1297) with respect to the shareholder and which is not a controlled foreign corporation.

#### (c) Foreign-source portion

For purposes of this section—

#### (1) In general

The foreign-source portion of any dividend from a specified 10-percent owned foreign corporation is an amount which bears the same ratio to such dividend as—

(A) the undistributed foreign earnings of the specified 10-percent owned foreign corporation, bears to

(B) the total undistributed earnings of such foreign corporation.

#### (2) Undistributed earnings

The term ''undistributed earnings'' means the amount of the earnings and profits of the specified 10-percent owned foreign corporation (computed in accordance with sections 964(a) and 986)—

(A) as of the close of the taxable year of the specified 10-percent owned foreign corporation in which the dividend is distributed, and

(B) without diminution by reason of dividends distributed during such taxable year.

#### (3) Undistributed foreign earnings

The term ''undistributed foreign earnings'' means the portion of the undistributed earnings which is attributable to neither—

(A) income described in subparagraph (A) of section 245(a)(5), nor

(B) dividends described in subparagraph (B) of such section (determined without regard to section 245(a)(12)).

#### (d) Disallowance of foreign tax credit, etc.

#### (1) In general

No credit shall be allowed under section 901 for any taxes paid or accrued (or treated as paid or accrued) with respect to any dividend for which a deduction is allowed under this section.

#### (2) Denial of deduction

No deduction shall be allowed under this chapter for any tax for which credit is not allowable under section 901 by reason of paragraph (1) (determined by treating the taxpayer as having elected the benefits of subpart A of part III of subchapter N).

#### (e) Special rules for hybrid dividends

#### (1) In general

Subsection (a) shall not apply to any dividend received by a United States shareholder from a controlled foreign corporation if the dividend is a hybrid dividend.

#### (2) Hybrid dividends of tiered corporations

If a controlled foreign corporation with respect to which a domestic corporation is a

United States shareholder receives a hybrid dividend from any other controlled foreign corporation with respect to which such domestic corporation is also a United States shareholder, then, notwithstanding any other provision of this title—

    (A) the hybrid dividend shall be treated for purposes of section 951(a)(1)(A) as subpart F income of the receiving controlled foreign corporation for the taxable year of the controlled foreign corporation in which the dividend was received, and

    (B) the United States shareholder shall include in gross income an amount equal to the shareholder's pro rata share (determined in the same manner as under section 951(a)(2)) of the subpart F income described in subparagraph (A).

**(3) Denial of foreign tax credit, etc.**

The rules of subsection (d) shall apply to any hybrid dividend received by, or any amount included under paragraph (2) in the gross income of, a United States shareholder.

**(4) Hybrid dividend**

The term ''hybrid dividend'' means an amount received from a controlled foreign corporation—

    (A) for which a deduction would be allowed under subsection (a) but for this subsection, and

    (B) for which the controlled foreign corporation received a deduction (or other tax benefit) with respect to any income, war profits, or excess profits taxes imposed by any foreign country or possession of the United States.

**(f) Special rule for purging distributions of passive foreign investment companies**

Any amount which is treated as a dividend under section 1291(d)(2)(B) shall not be treated as a dividend for purposes of this section.

**(g) Regulations**

The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including regulations for the treatment of United States shareholders owning stock of a specified 10 percent[1] owned foreign corporation through a partnership.

(Added Pub. L. 115–97, title I, § 14101(a), Dec. 22, 2017, 131 Stat. 2189.)

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE

Pub. L. 115–97, title I, § 14101(f), Dec. 22, 2017, 131 Stat. 2192, provided that: ''The amendments made by this section [enacting this section and amending sections 246, 904, 951, 957, and 1059 of this title] shall apply to distributions made after (and, in the case of the amendments made by subsection (d) [amending section 904 of this title], deductions with respect to taxable years ending after) December 31, 2017.''

---

[1] So in original. Probably should be ''10-percent''.

## § 246. Rules applying to deductions for dividends received

**(a) Deduction not allowed for dividends from certain corporations**

**(1) In general**

The deductions allowed by sections 243[1] 245, and 245A shall not apply to any dividend from a corporation which, for the taxable year of the corporation in which the distribution is made, or for the next preceding taxable year of the corporation, is a corporation exempt from tax under section 501 (relating to certain charitable, etc., organizations) or section 521 (relating to farmers' cooperative associations).

**(2) Subsection not to apply to certain dividends of Federal Home Loan Banks**

**(A) Dividends out of current earnings and profits**

In the case of any dividend paid by any FHLB out of earnings and profits of the FHLB for the taxable year in which such dividend was paid, paragraph (1) shall not apply to that portion of such dividend which bears the same ratio to the total dividend as—

    (i) the dividends received by the FHLB from the FHLMC during such taxable year, bears to

    (ii) the total earnings and profits of the FHLB for such taxable year.

**(B) Dividends out of accumulated earnings and profits**

In the case of any dividend which is paid out of any accumulated earnings and profits of any FHLB, paragraph (1) shall not apply to that portion of the dividend which bears the same ratio to the total dividend as—

    (i) the amount of dividends received by such FHLB from the FHLMC which are out of earnings and profits of the FHLMC—

        (I) for taxable years ending after December 31, 1984, and

        (II) which were not previously treated as distributed under subparagraph (A) or this subparagraph, bears to

    (ii) the total accumulated earnings and profits of the FHLB as of the time such dividend is paid.

For purposes of clause (ii), the accumulated earnings and profits of the FHLB as of January 1, 1985, shall be treated as equal to its retained earnings as of such date.

**(C) Coordination with section 243**

To the extent that paragraph (1) does not apply to any dividend by reason of subparagraph (A) or (B) of this paragraph, the requirement contained in section 243(a) that the corporation paying the dividend be subject to taxation under this chapter shall not apply.

**(D) Definitions**

For purposes of this paragraph—

**(i) FHLB**

The term ''FHLB'' means any Federal Home Loan Bank.

---

[1] So in original. Probably should be followed by a comma.

made by clause (i) [amending this section] shall apply only with respect to distributions after November 30, 1974.''

Pub. L. 94–452, § 2(d)(4), Oct. 2, 1976, 90 Stat. 1512, provided that: ''The amendment made by subsection (b) [amending this section] shall take effect on October 1, 1977, with respect to distributions after December 31, 1975, in taxable years ending after December 31, 1975.''

EFFECTIVE DATE OF 1969 AMENDMENT

Pub. L. 91–172, title IX, § 905(c), Dec. 30, 1969, 83 Stat. 714, as amended by Pub. L. 91–675, Jan. 12, 1971, 84 Stat. 2059, provided that:

''(1) Except as provided in paragraphs (2), (3), (4), and (5), the amendments made by subsections (a) and (b) [amending this section and sections 301 and 312 of this title] shall apply with respect to distributions after November 30, 1969.

''(2) The amendments made by subsections (a) and (b) shall not apply to a distribution before April 1, 1970, pursuant to the terms of—

''(A) a written contract which was binding on the distributing corporation on November 30, 1969, and at all times thereafter before the distribution,

''(B) an offer made by the distributing corporation before December 1, 1969,

''(C) an offer made in accordance with a request for a ruling filed by the distributing corporation with the Internal Revenue Service before December 1, 1969, or

''(D) an offer made in accordance with a registration statement filed with the Securities and Exchange Commission before December 1, 1969.

For purposes of subparagraphs (B), (C), and (D), an offer shall be treated as an offer only if it was in writing and not revocable by its express terms.

''(3) The amendments made by subsections (a) and (b) shall not apply to a distribution by a corporation of specific property in redemption of stock outstanding on November 30, 1969, if—

''(A) every holder of such stock on such date had the right to demand redemption of his stock in such specific property, and

''(B) the corporation had such specific property on hand on such date in a quantity sufficient to redeem all of such stock.

For purposes of the preceding sentence, stock shall be considered to have been outstanding on November 30, 1969, if it could have been acquired on such date through the exercise of an existing right of conversion contained in other stock held on such date.

''(4) The amendments made by subsections (a) and (b) shall not apply to a distribution by a corporation of property (held on December 1, 1969, by the distributing corporation or a corporation which was a wholly owned subsidiary of the distributing corporation on such date) in redemption of stock outstanding on November 30, 1969, which is redeemed and canceled before July 31, 1971, if—

''(A) such redemption is pursuant to a resolution adopted before November 1, 1969, by the Board of Directors authorizing the redemption of a specific amount of stock constituting more than 10 percent of the outstanding stock of the corporation at the time of the adoption of such resolution; and

''(B) more than 40 percent of the stock authorized to be redeemed pursuant to such resolution was redeemed before December 30, 1969, and more than one-half of the stock so redeemed was redeemed with property other than money.

''(5) The amendments made by subsections (a) and (b) shall not apply to a distribution of stock, by a corporation organized prior to December 1, 1969, for the principal purpose of providing an equity participation plan for employees of the corporation whose stock is being distributed (hereinafter referred to as the 'employer corporation') if—

''(A) the stock being distributed was owned by the distributing corporation on November 30, 1969,

''(B) the stock being redeemed was acquired before January 1, 1973, pursuant to such equity participation plan by the shareholder presenting such stock for redemption (or by a predecessor of such shareholder),

''(C) the employment of the shareholder presenting the stock for redemption (or the predecessor of such shareholder) by the employer corporation commenced before January 1, 1971,

''(D) at least 90 percent in value of the assets of the distributing corporation on November 30, 1969, consisted of common stock of the employer corporation, and

''(E) at least 50 percent of the outstanding voting stock of the employer corporation is owned by the distributing corporation at any time within the nine-year period ending one year before the date of such distribution.''

## § 312. Effect on earnings and profits

### (a) General rule

Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

(1) the amount of money,

(2) the principal amount of the obligations of such corporation (or, in the case of obligations having original issue discount, the aggregate issue price of such obligations), and

(3) the adjusted basis of the other property, so distributed.

### (b) Distributions of appreciated property

On the distribution by a corporation, with respect to its stock, of any property (other than an obligation of such corporation) the fair market value of which exceeds the adjusted basis thereof—

(1) the earnings and profits of the corporation shall be increased by the amount of such excess, and

(2) subsection (a)(3) shall be applied by substituting ''fair market value'' for ''adjusted basis''.

For purposes of this subsection and subsection (a), the adjusted basis of any property is its adjusted basis as determined for purposes of computing earnings and profits.

### (c) Adjustments for liabilities

In making the adjustments to the earnings and profits of a corporation under subsection (a) or (b), proper adjustment shall be made for—

(1) the amount of any liability to which the property distributed is subject, and

(2) the amount of any liability of the corporation assumed by a shareholder in connection with the distribution.

### (d) Certain distributions of stock and securities

#### (1) In general

The distribution to a distributee by or on behalf of a corporation of its stock or securities, of stock or securities in another corporation, or of property, in a distribution to which this title applies, shall not be considered a distribution of the earnings and profits of any corporation—

(A) if no gain to such distributee from the receipt of such stock or securities, or property, was recognized under this title, or

(B) if the distribution was not subject to tax in the hands of such distributee by reason of section 305(a).

**(2) Stock or securities**

For purposes of this subsection, the term "stock or securities" includes rights to acquire stock or securities.

**[(e) Repealed. Pub. L. 98–369, div. A, title I, § 61(a)(2)(B), July 18, 1984, 98 Stat. 581]**

**(f) Effect on earnings and profits of gain or loss and of receipt of tax-free distributions**

**(1) Effect on earnings and profits of gain or loss**

The gain or loss realized from the sale or other disposition (after February 28, 1913) of property by a corporation—

(A) for the purpose of the computation of the earnings and profits of the corporation, shall (except as provided in subparagraph (B)) be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain, except that no regard shall be had to the value of the property as of March 1, 1913; but

(B) for purposes of the computation of the earnings and profits of the corporation for any period beginning after February 28, 1913, shall be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain.

Gain or loss so realized shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing taxable income under the law applicable to the year in which such sale or disposition was made. Where, in determining the adjusted basis used in computing such realized gain or loss, the adjustment to the basis differs from the adjustment proper for the purpose of determining earnings and profits, then the latter adjustment shall be used in determining the increase or decrease above provided. For purposes of this subsection, a loss with respect to which a deduction is disallowed under section 1091 (relating to wash sales of stock or securities), or the corresponding provision of prior law, shall not be deemed to be recognized.

**(2) Effect on earnings and profits of receipt of tax-free distributions**

Where a corporation receives (after February 28, 1913) a distribution from a second corporation which (under the law applicable to the year in which the distribution was made) was not a taxable dividend to the shareholders of the second corporation, the amount of such distribution shall not increase the earnings and profits of the first corporation in the following cases:

(A) no such increase shall be made in respect of the part of such distribution which (under such law) is directly applied in reduction of the basis of the stock in respect of which the distribution was made; and

(B) no such increase shall be made if (under such law) the distribution causes the basis of the stock in respect of which the distribution was made to be allocated between such stock and the property received (or

such basis would, but for section 307(b), be so allocated).

**(g) Earnings and profits—increase in value accrued before March 1, 1913**

(1) If any increase or decrease in the earnings and profits for any period beginning after February 28, 1913, with respect to any matter would be different had the adjusted basis of the property involved been determined without regard to its March 1, 1913, value, then, except as provided in paragraph (2), an increase (properly reflecting such difference) shall be made in that part of the earnings and profits consisting of increase in value of property accrued before March 1, 1913.

(2) If the application of subsection (f) to a sale or other disposition after February 28, 1913, results in a loss which is to be applied in decrease of earnings and profits for any period beginning after February 28, 1913, then, notwithstanding subsection (f) and in lieu of the rule provided in paragraph (1) of this subsection, the amount of such loss so to be applied shall be reduced by the amount, if any, by which the adjusted basis of the property used in determining the loss exceeds the adjusted basis computed without regard to the value of the property on March 1, 1913, and if such amount so applied in reduction of the decrease exceeds such loss, the excess over such loss shall increase that part of the earnings and profits consisting of increase in value of property accrued before March 1, 1913.

**(h) Allocation in certain corporate separations and reorganizations**

**(1) Section 355**

In the case of a distribution or exchange to which section 355 (or so much of section 356 as relates to section 355) applies, proper allocation with respect to the earnings and profits of the distributing corporation and the controlled corporation (or corporations) shall be made under regulations prescribed by the Secretary.

**(2) Section 368(a)(1)(C) or (D)**

In the case of a reorganization described in subparagraph (C) or (D) of section 368(a)(1), proper allocation with respect to the earnings and profits of the acquired corporation shall, under regulations prescribed by the Secretary, be made between the acquiring corporation and the acquired corporation (or any corporation which had control of the acquired corporation before the reorganization).

**(i) Distribution of proceeds of loan insured by the United States**

If a corporation distributes property with respect to its stock and if, at the time of distribution—

(1) there is outstanding a loan to such corporation which was made, guaranteed, or insured by the United States (or by any agency or instrumentality thereof), and

(2) the amount of such loan so outstanding exceeds the adjusted basis of the property constituting security for such loan,

then the earnings and profits of the corporation shall be increased by the amount of such excess,

and (immediately after the distribution) shall be decreased by the amount of such excess. For purposes of paragraph (2), the adjusted basis of the property at the time of distribution shall be determined without regard to any adjustment under section 1016(a)(2) (relating to adjustment for depreciation, etc.). For purposes of this subsection, a commitment to make, guarantee, or insure a loan shall be treated as the making, guaranteeing, or insuring of a loan.

**[(j) Repealed. Pub. L. 108–357, title IV, § 413(c)(4), Oct. 22, 2004, 118 Stat. 1507]**

**(k) Effect of depreciation on earnings and profits**

**(1) General rule**

For purposes of computing the earnings and profits of a corporation for any taxable year beginning after June 30, 1972, the allowance for depreciation (and amortization, if any) shall be deemed to be the amount which would be allowable for such year if the straight line method of depreciation had been used for each taxable year beginning after June 30, 1972.

**(2) Exception**

If for any taxable year a method of depreciation was used by the taxpayer which the Secretary has determined results in a reasonable allowance under section 167(a) and which is the unit-of-production method or other method not expressed in a term of years, then the adjustment to earnings and profits for depreciation for such year shall be determined under the method so used (in lieu of the straight line method).

**(3) Exception for tangible property**

**(A) In general**

Except as provided in subparagraph (B), in the case of tangible property to which section 168 applies, the adjustment to earnings and profits for depreciation for any taxable year shall be determined under the alternative depreciation system (within the meaning of section 168(g)(2)).

**(B) Treatment of amounts deductible under section 179, 179B, 179C, 179D, or 179E**

**(i) In general**

For purposes of computing the earnings and profits of a corporation, except as provided in clause (ii), any amount deductible under section 179, 179B, 179C, 179D, or 179E shall be allowed as a deduction ratably over the period of 5 taxable years (beginning with the taxable year for which such amount is deductible under section 179, 179B, 179C, 179D, or 179E, as the case may be).

**(ii) Special rule**

In the case of a corporation that is a real estate investment trust, any amount deductible under section 179D shall be allowed in the year in which the property giving rise to such deduction is placed in service (or, in the case of energy efficient building retrofit property, the year in which the qualifying final certification is made).

**(4) Certain foreign corporations**

The provisions of paragraph (1) shall not apply in computing the earnings and profits of

a foreign corporation for any taxable year for which less than 20 percent of the gross income from all sources of such corporation is derived from sources within the United States.

**(5) Basis adjustment not taken into account**

In computing the earnings and profits of a corporation for any taxable year, the allowance for depreciation (and amortization, if any) shall be computed without regard to any basis adjustment under section 50(c).

**(l) Discharge of indebtedness income**

**(1) Does not increase earnings and profits if applied to reduce basis**

The earnings and profits of a corporation shall not include income from the discharge of indebtedness to the extent of the amount applied to reduce basis under section 1017.

**(2) Reduction of deficit in earnings and profits in certain cases**

If—

(A) the interest of any shareholder of a corporation is terminated or extinguished in a title 11 or similar case (within the meaning of section 368(a)(3)(A)), and

(B) there is a deficit in the earnings and profits of the corporation,

then such deficit shall be reduced by an amount equal to the paid-in capital which is allocable to the interest of the shareholder which is so terminated or extinguished.

**(m) No adjustment for interest paid on certain registration-required obligations not in registered form**

The earnings and profits of any corporation shall not be decreased by any interest with respect to which a deduction is not or would not be allowable by reason of section 163(f), unless at the time of issuance the issuer is a foreign corporation that is not a controlled foreign corporation (within the meaning of section 957) and the issuance did not have as a purpose the avoidance of section 163(f) of this subsection[1]

**(n) Adjustments to earnings and profits to more accurately reflect economic gain and loss**

For purposes of computing the earnings and profits of a corporation, the following adjustments shall be made:

**(1) Construction period carrying charges**

**(A) In general**

In the case of any amount paid or incurred for construction period carrying charges—

(i) no deduction shall be allowed with respect to such amount, and

(ii) the basis of the property with respect to which such charges are allocable shall be increased by such amount.

**(B) Construction period carrying charges defined**

For purposes of this paragraph, the term "construction period carrying charges" means all—

(i) interest paid or accrued on indebtedness incurred or continued to acquire, construct, or carry property,

---

[1] Subsec. (m) was enacted without a period at the end.

(ii) property taxes, and

(iii) similar carrying charges,

to the extent such interest, taxes, or charges are attributable to the construction period for such property and would be allowable as a deduction in determining taxable income under this chapter for the taxable year in which paid or incurred.

**(C) Construction period**

The term ''construction period'' has the meaning given the term production period under section 263A(f)(4)(B).[2]

**(2) Intangible drilling costs and mineral exploration and development costs**

**(A) Intangible drilling costs**

Any amount allowable as a deduction under section 263(c) in determining taxable income (other than costs incurred in connection with a nonproductive well)—

(i) shall be capitalized, and

(ii) shall be allowed as a deduction ratably over the 60-month period beginning with the month in which such amount was paid or incurred.

**(B) Mineral exploration and development costs**

Any amount allowable as a deduction under section 616(a) or 617 in determining taxable income—

(i) shall be capitalized, and

(ii) shall be allowed as a deduction ratably over the 120-month period beginning with the later of—

(I) the month in which production from the deposit begins, or

(II) the month in which such amount was paid or incurred.

**(3) Certain amortization provisions not to apply**

Sections 173 and 248 shall not apply.

**(4) LIFO inventory adjustments**

**(A) In general**

Earnings and profits shall be increased or decreased by the amount of any increase or decrease in the LIFO recapture amount as of the close of each taxable year; except that any decrease below the LIFO recapture amount as of the close of the taxable year preceding the 1st taxable year to which this paragraph applies to the taxpayer shall be taken into account only to the extent provided in regulations prescribed by the Secretary.

**(B) LIFO recapture amount**

For purposes of this paragraph, the term ''LIFO recapture amount'' means the amount (if any) by which—

(i) the inventory amount of the inventory assets under the first-in, first-out method authorized by section 471, exceeds

(ii) the inventory amount of such assets under the LIFO method.

**(C) Definitions**

For purposes of this paragraph—

_____
[2] See References in Text note below.

**(i) LIFO method**

The term ''LIFO method'' means the method authorized by section 472 (relating to last-in, first-out inventories).

**(ii) Inventory assets**

The term ''inventory assets'' means stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year.

**(iii) Inventory amount**

The inventory amount of assets under the first-in, first-out method authorized by section 471 shall be determined—

(I) if the corporation uses the retail method of valuing inventories under section 472, by using such method, or

(II) if subclause (I) does not apply, by using cost or market, whichever is lower.

**(5) Installment sales**

In the case of any installment sale, earnings and profits shall be computed as if the corporation did not use the installment method.

**(6) Completed contract method of accounting**

In the case of a taxpayer who uses the completed contract method of accounting, earnings and profits shall be computed as if such taxpayer used the percentage of completion method of accounting.

**(7) Redemptions**

If a corporation distributes amounts in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to earnings and profits shall be an amount which is not in excess of the ratable share of the earnings and profits of such corporation accumulated after February 28, 1913, attributable to the stock so redeemed.

**(8) Special rule for certain foreign corporations**

In the case of a foreign corporation described in subsection (k)(4)—

(A) paragraphs (4) and (6) shall apply only in the case of taxable years beginning after December 31, 1985, and

(B) paragraph (5) shall apply only in the case of taxable years beginning after December 31, 1987.

**(o) Definition of original issue discount and issue price for purposes of subsection (a)(2)**

For purposes of subsection (a)(2), the terms ''original issue discount'' and ''issue price'' have the same respective meanings as when used in subpart A of part V of subchapter P of this chapter.

(Aug. 16, 1954, ch. 736, 68A Stat. 95; Pub. L. 87–403, § 3(a), Feb. 2, 1962, 76 Stat. 6; Pub. L. 87–834, §§ 13(f)(3), 14(b)(1), Oct. 16, 1962, 76 Stat. 1035, 1040; Pub. L. 88–272, title II, § 231(b)(3), Feb. 26, 1964, 78 Stat. 105; Pub. L. 88–484, § 1(b)(1), Aug. 22, 1964, 78 Stat. 597; Pub. L. 89–570, § 1(b)(3), Sept. 12, 1966, 80 Stat. 762; Pub. L. 91–172, title II, § 211(b)(3), title IV, § 442(a), title IX, § 905(b)(2), Dec. 30, 1969, 83 Stat. 570, 628, 714; Pub. L. 94–455, title II, § 205(c)(1)(D), title XIX, §§ 1901(a)(43), (b)(32)(B)(i),

1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1535, 1771, 1800, 1834; Pub. L. 95–628, § 3(c), Nov. 10, 1978, 92 Stat. 3627; Pub. L. 96–589, § 5(f), Dec. 24, 1980, 94 Stat. 3406; Pub. L. 97–34, title II, § 206(a), (b), Aug. 13, 1981, 95 Stat. 224; Pub. L. 97–248, title II, §§ 205(a)(3), 222(e)(3), title III, § 310(b)(3), Sept. 3, 1982, 96 Stat. 429, 480, 597; Pub. L. 97–448, title III, § 306(a)(6)(B), Jan. 12, 1983, 96 Stat. 2402; Pub. L. 98–369, div. A, title I, §§ 61(a)–(c)(1), 63(b), 111(e)(5), July 18, 1984, 98 Stat. 579–581, 583, 633; Pub. L. 99–121, title I, § 103(b)(1)(C), Oct. 11, 1985, 99 Stat. 509; Pub. L. 99–514, title II, § 201(b), (d)(6), 241(b)(1), title VI, § 631(e)(1), title VIII, § 803(b)(3), title XVIII, §§ 1804(f)(1)(A)–(E), 1809(a)(2)(C)(ii), Oct. 22, 1986, 100 Stat. 2137, 2141, 2181, 2273, 2355, 2804, 2805, 2819; Pub. L. 100–647, title I, §§ 1002(a)(3), 1018(d)(4), (u)(4), Nov. 10, 1988, 102 Stat. 3353, 3578, 3590; Pub. L. 101–239, title VII, §§ 7611(f)(5)(A), 7811(m)(2), Dec. 19, 1989, 103 Stat. 2373, 2412; Pub. L. 101–508, title XI, §§ 11812(b)(5), 11813(b)(14), Nov. 5, 1990, 104 Stat. 1388–535, 1388–555; Pub. L. 105–34, title XVI, § 1604(a)(2), Aug. 5, 1997, 111 Stat. 1097; Pub. L. 108–357, title III, § 338(b)(3), title IV, § 413(c)(4), (5), Oct. 22, 2004, 118 Stat. 1481, 1507; Pub. L. 109–58, title XIII, §§ 1323(b)(3), 1331(b)(5), Aug. 8, 2005, 119 Stat. 1015, 1024; Pub. L. 109–432, div. A, title IV, § 404(b)(2), Dec. 20, 2006, 120 Stat. 2956; Pub. L. 113–295, div. A, title II, § 221(a)(34)(F), (49), Dec. 19, 2014, 128 Stat. 4042, 4045; Pub. L. 117–169, title I, § 13303(b), Aug. 16, 2022, 136 Stat. 1951.)

### Editorial Notes

#### References in Text

Section 263A(f)(1)(B), referred to in subsec. (n)(1)(C), was redesignated section 263A(f)(5)(B) by Pub. L. 115–97, title I, § 13801(a)(1), Dec. 22, 2017, 131 Stat. 2169.

#### Amendments

2022—Subsec. (k)(3)(B). Pub. L. 117–169 designated existing provisions as cl. (i), inserted heading, substituted "For purposes of computing the earnings and profits of a corporation, except as provided in clause (ii)" for "For purposes of computing the earnings and profits of a corporation", and added cl. (ii).

2014—Subsec. (d)(2), (3). Pub. L. 113–295, § 221(a)(49), redesignated par. (3) as (2) and struck out former par. (2) which read as follows: "In the case of a distribution of stock or securities, or property, to which section 115(h) of the Internal Revenue Code of 1939 (or the corresponding provision of prior law) applied, the effect on earnings and profits of such distribution shall be determined under such section 115(h), or the corresponding provision of prior law, as the case may be."

Subsec. (k)(3)(B). Pub. L. 113–295, § 221(a)(34)(F), struck out "179A," after "section 179," in heading and in two places in text.

2006—Subsec. (k)(3)(B). Pub. L. 109–432 substituted "179D, or 179E" for "or 179D" in heading and two places in text.

2005—Subsec. (k)(3)(B). Pub. L. 109–58, § 1331(b)(5), substituted "179, 179A, 179B, 179C, or 179D" for "179, 179A, 179B, or 179C" in heading and two places in text.

Pub. L. 109–58, § 1323(b)(3), substituted "179, 179A, 179B, or 179C" for "179 179A, or 179B" in heading and two places in text.

2004—Subsec. (j). Pub. L. 108–357, § 413(c)(4), struck out subsec. (j) which related to earnings and profits of foreign investment companies.

Subsec. (k)(3)(B). Pub. L. 108–357, § 338(b)(3), substituted "179A, or 179B" for "or 179A" in heading and two places in text.

Subsec. (m). Pub. L. 108–357, § 413(c)(5), struck out ", a foreign investment company (within the meaning of

section 1246(b)), or a foreign personal holding company (within the meaning of section 552)" before "and the issuance".

1997—Subsec. (k)(3)(B). Pub. L. 105–34, in heading substituted "179 or 179A" for "179" and in text substituted "section 179 or 179A shall" for "section 179 shall" and "section 179 or 179A, as the case may be)" for "section 179)".

1990—Subsec. (k)(2). Pub. L. 101–508, § 11812(b)(5), substituted heading for one which read: "Exceptions" and amended text generally. Prior to amendment, text read as follows: "If for any taxable year beginning after June 30, 1972, a method of depreciation was used by the taxpayer which the Secretary has determined results in a reasonable allowance under section 167(a), and which is not—

"(A) a declining balance method,

"(B) the sum of the years-digit method, or

"(C) any other method allowable solely by reason of the application of subsection (b)(4) or (j)(1)(C) of section 167,

then the adjustment to earnings and profits for depreciation for such year shall be determined under the method so used (in lieu of under the straight line method)."

Subsec. (k)(5). Pub. L. 101–508, § 11813(b)(14), substituted "section 50(c)" for "section 48(q)".

1989—Subsec. (b). Pub. L. 101–239, § 7811(m)(2), made clarifying amendment to directory language of Pub. L. 100–647, § 1018(d)(4), see 1988 Amendment note below.

Subsec. (n)(2)(A)(ii). Pub. L. 101–239, § 7611(f)(5)(A), substituted "in which such amount was paid or incurred" for "in which the production from the well begins".

1988—Subsec. (b). Pub. L. 100–647, § 1018(d)(4), as amended by Pub. L. 101–239, § 7811(m)(2), substituted "of any property (other than an obligation of such corporation)" for "of any property" in introductory provisions.

Subsec. (k)(4). Pub. L. 100–647, § 1002(a)(3), substituted "paragraph (1)" for "paragraphs (1) and (3)".

Subsec. (n)(1)(B). Pub. L. 100–647, § 1018(u)(4), made technical amendment to directory language of Pub. L. 99–514, § 803(b)(3)(A). See 1986 Amendment note below.

1986—Subsec. (b). Pub. L. 99–514, § 1804(f)(1)(A), amended subsec. (b) generally, substituting provisions relating to distributions of appreciated property for provisions relating to distribution of certain inventory assets.

Subsec. (c). Pub. L. 99–514, § 1804(f)(1)(B), (C), struck out ", etc." after "liabilities" in heading and struck out par. (3) which read as follows: "any gain recognized to the corporation on the distribution."

Subsec. (k)(3). Pub. L. 99–514, § 201(b), amended par. (3) generally, substituting provisions relating to tangible property to which section 168 applies and amounts deductible under section 179 for provisions relating to recovery property within the meaning of section 168, amounts deductible under section 179, and flexibility if a different recovery percentage is elected under section 168 based on a longer recovery period.

Subsec. (k)(3)(A). Pub. L. 99–514, § 1809(a)(2)(C)(ii), in subpar. (A), struck out "and rules similar to the rules under the next to the last sentence of section 168(b)(2)(A) and section 168(b)(2)(B) shall apply" after "low-income housing".

Subsec. (k)(4). Pub. L. 99–514, § 201(d)(6), struck out last sentence "In determining the earnings and profits of such corporation in the case of recovery property (within the meaning of section 168), the rules of section 168(f)(2) shall apply."

Subsec. (n)(1)(B). Pub. L. 99–514, § 803(b)(3)(A), as amended by Pub. L. 100–647, § 1018(u)(4), struck out "(determined without regard to section 189)" after "incurred".

Subsec. (n)(1)(C). Pub. L. 99–514, § 803(b)(3)(B), added subpar. (C) and struck out former subpar. (C) which read as follows: "The term 'construction period' has the meaning given such term by section 189(e)(2) (determined without regard to any real property limitation)."

Subsec. (n)(3). Pub. L. 99–514, §241(b)(1), struck out '', 177,'' after ''sections 173''.

Subsec. (n)(4). Pub. L. 99–514, §631(e)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: ''Earnings and profits shall be increased or decreased by the amount of any increase or decrease in the LIFO recapture amount (determined under section 336(b)(3)) as of the close of each taxable year; except that any decrease below the LIFO recapture amount as of the close of the taxable year preceding the first taxable year to which this paragraph applies to the taxpayer shall be taken into account only to the extent provided in regulations prescribed by the Secretary.''

Pub. L. 99–514, §1804(f)(1)(D), redesignated par. (5) as (4). Former par. (4), relating to certain untaxed appreciation of distributed property, was struck out.

Subsec. (n)(5) to (7). Pub. L. 99–514, §1804(f)(1)(D), redesignated pars. (6) to (8) as (5) to (7), respectively. Former par. (5) redesignated (4).

Subsec. (n)(8), (9). Pub. L. 99–514, §1804(f)(1)(D), (E), redesignated par. (9) as (8) and substituted provisions of subpars. (A) and (B) for ''paragraphs (5), (6), and (7) shall apply only in the case of taxable years beginning after December 31, 1985.'' Former par. (8) redesignated (7).

1985—Subsec. (k)(3)(A). Pub. L. 99–121 substituted ''19-year real property'' for ''18-year real property'' wherever appearing.

1984—Subsec. (a)(2). Pub. L. 98–369, §61(c)(1)(A), inserted ''(or, in the case of obligations having original issue discount, the aggregate issue price of such obligations)''.

Subsec. (e). Pub. L. 98–369, §61(a)(2)(B), struck out subsec. (e) which provided: ''In the case of amounts distributed in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.''

Subsec. (h). Pub. L. 98–369, §63(b), amended subsec. (h) generally, designating existing provisions as par. (1) and adding par. (2).

Subsec. (j)(3). Pub. L. 98–369, §61(a)(2)(A), struck out par. (3) which provided: ''If a foreign investment company (as defined in section 1246) distributes amounts in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to earnings and profits shall be an amount which is not in excess of the ratable share of the earnings and profits of the company accumulated after February 28, 1913, attributable to the stock so redeemed.''

Subsec. (k)(3)(A). Pub. L. 98–369, §111(e)(5), substituted ''18-year real property and low-income housing'' for ''15-year real property'' in three places.

Pub. L. 98–369, §61(b), substituted ''40 years'' for ''35 years'' in table item relating to 15-year real property. Directory language that table be amended by substituting ''40 years'' for ''35 years'' in item relating to 15-year real property and 20-year real property, was executed by making the substitution in item relating to 15-year real property. The table contained no item relating to 20-year real property.

Subsec. (n). Pub. L. 98–369, §61(a)(1), added subsec. (n).

Subsec. (o). Pub. L. 98–369, §61(c)(1)(B), added subsec. (o).

1983—Subsec. (j)(3). Pub. L. 97–448 substituted ''Redemptions'' for ''Partial liquidations and redemptions'' in heading, and in text struck out ''in partial liquidation or'' after ''distributes amounts''.

1982—Subsec. (e). Pub. L. 97–248, §222(e)(3), struck out ''partial liquidations and'' in heading, and in text struck out ''in partial liquidation (whether before, on, or after June 22, 1954) or'' after ''amounts distributed''.

Subsec. (k)(5). Pub. L. 97–248, §205(a)(3), added par. (5).

Subsec. (m). Pub. L. 97–248, §310(b)(3), added subsec. (m).

1981—Subsec. (k)(3), (4). Pub. L. 97–34 added par. (3), redesignated former par. (3) as (4) substituted ''The provisions of paragraphs (1) and (3)'' for ''The provisions of paragraph (1)'', and inserted provision that the rules of section 168(f)(2) shall apply in determining the earnings

and profits of the corporation in the case of recovery property (within the meaning of section 168).

1980—Subsec. (l). Pub. L. 96–589 added subsec. (l).

1978—Subsec. (c)(3). Pub. L. 95–628 substituted ''gain recognized to the corporation on the distribution'' for ''gain to the corporation recognized under subsection (b), (c), or (d) of section 311, under section 341(f), or under section 617(d)(1), 1245(a), 1250(a), 1251(c), 1252(a), or 1254(a)''.

1976—Subsec. (c)(3). Pub. L. 94–455, §205(c)(1)(D), substituted ''1252(a), or 1254(a)'' for ''or 1252(a)''.

Subsec. (d)(1). Pub. L. 94–455, §1901(a)(43)(A), substituted ''this title'' for ''this Code'' wherever appearing.

Subsec. (h). Pub. L. 94–455, §§1901(a)(43)(B), 1906(b)(13)(A), redesignated subsec. (i) as (h) and struck out ''or his delegate'' after ''Secretary''. Former subsec. (h), which related to earnings and profits of personal service corporations, was struck out.

Subsec. (i). Pub. L. 94–455, §1901(a)(43)(B), (C), redesignated subsec. (j) as (i), and, among other changes, substituted ''paragraph (2)'' for ''subparagraph (B) of the preceding sentence'' and ''of this subsection'' for ''of this paragraph'', and struck out provisions relating to the effective date of this subsec. Former subsec. (i) redesignated (h).

Subsec. (j). Pub. L. 94–455, §§1901(a)(43)(D), (b)(32)(B)(i), 1906(b)(13)(A), redesignated subsec. (l) as (j), struck out ''or his delegate'' after ''Secretary'' in par. (1) and in par. (3) provision relating to the effective date of such paragraph. Former subsec. (j) redesignated (i).

Subsec. (k). Pub. L. 94–455, §§1901(b)(32)(B)(i), 1906(b)(13)(A), redesignated subsec. (m) as (k) and struck out ''or his delegate'' after ''Secretary'' in par. (2). Former subsec. (k), relating to special adjustment on disposition of antitrust stock received as a dividend, was struck out.

Subsec. (l). Pub. L. 94–455, §1901(b)(32)(B)(i), redesignated subsec. (l) as (j).

Subsec. (m). Pub. L. 94–455, §1901(b)(32)(B)(i), redesignated subsec. (m) as (k).

1969—Subsec. (c)(3). Pub. L. 91–172, §211(b)(3), 905(b)(2), substituted ''1250(a), 1251(c), or 1252(a)'', for ''or 1250(a)'' and inserted reference to section 311(d).

Subsec. (m). Pub. L. 91–172, §442(a), added subsec. (m).

1966—Subsec. (c)(3). Pub. L. 89–570 inserted reference to section 617(d)(1).

1964—Subsec. (c)(3). Pub. L. 88–484 authorized adjustment for amount of gain recognized under section 341(f).

Pub. L. 88–272 inserted reference to section 1250(a).

1962—Subsec. (c)(3). Pub. L. 87–834, §13(f)(3), included any gain recognized under section 1245(a).

Subsec. (k). Pub. L. 87–403 added subsec. (k).

Subsec. (l). Pub. L. 87–834, §14(b)(1), added subsec. (l).

### Statutory Notes and Related Subsidiaries

**Effective Date of 2022 Amendment**

Amendment by Pub. L. 117–169 applicable to taxable years beginning after Dec. 31, 2022, see section 13303(d)(1) of Pub. L. 117–169, set out as a note under section 179D of this title.

**Effective Date of 2014 Amendment**

Amendment by Pub. L. 113–295 effective Dec. 19, 2014, subject to a savings provision, see section 221(b) of Pub. L. 113–295, set out as a note under section 1 of this title.

**Effective Date of 2006 Amendment**

Amendment by Pub. L. 109–432 applicable to costs paid or incurred after Dec. 20, 2006, see section 404(c) of Pub. L. 109–432, set out as an Effective Date note under section 179E of this title.

**Effective Date of 2005 Amendment**

Amendment by section 1323(b)(3) of Pub. L. 109–58 applicable to properties placed in service after Aug. 8,

2005, see section 1323(c) of Pub. L. 109–58, set out as an Effective Date note under section 179C of this title.

Amendment by section 1331(b)(5) of Pub. L. 109–58 applicable to property placed in service after Dec. 31, 2005, see section 1331(d) of Pub. L. 109–58, set out as an Effective Date note under section 179D of this title.

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by section 338(b)(3) of Pub. L. 108–357 applicable to expenses paid or incurred after Dec. 31, 2002, in taxable years ending after such date, see section 338(c) of Pub. L. 108–357, set out as an Effective Date note under section 179B of this title.

Amendment by section 413(c)(4), (5) of Pub. L. 108–357 applicable to taxable years of foreign corporations beginning after Dec. 31, 2004, and to taxable years of United States shareholders with or within which such taxable years of foreign corporations end, see section 413(d)(1) of Pub. L. 108–357, set out as an Effective and Termination Dates of 2004 Amendments note under section 1 of this title.

EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–34 effective as if included in the amendments made by section 1913 of the Energy Policy Act of 1992, Pub. L. 102–486, see section 1604(a)(4) of Pub. L. 105–34, set out as a note under section 263 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by section 11812(b)(5) of Pub. L. 101–508 applicable to property placed in service after Nov. 5, 1990, but not applicable to any property to which section 168 of this title does not apply by reason of subsec. (f)(5) of section 168, and not applicable to rehabilitation expenditures described in section 252(f)(5) of Pub. L. 99–514, see section 11812(c) of Pub. L. 101–508, set out as a note under section 42 of this title.

Amendment by section 11813(b)(14) of Pub. L. 101–508 applicable to property placed in service after Dec. 31, 1990, but not applicable to any transition property (as defined in section 49(e) of this title), any property with respect to which qualified progress expenditures were previously taken into account under section 46(d) of this title, and any property described in section 46(b)(2)(C) of this title, as such sections were in effect on Nov. 4, 1990, see section 11813(c) of Pub. L. 101–508, set out as a note under section 45K of this title.

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 7611(f)(5)(A) of Pub. L. 101–239 applicable to costs paid or incurred in taxable years beginning after Dec. 31, 1989, see section 7611(g)(2) of Pub. L. 101–239, set out as a note under section 56 of this title.

Amendment by section 7811(m)(2) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, to which such amendment relates, see section 7817 of Pub. L. 101–239, set out as a note under section 1 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–647 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 1019(a) of Pub. L. 100–647, set out as a note under section 1 of this title.

EFFECTIVE DATE OF 1986 AMENDMENT

If any interest costs incurred after Dec. 31, 1986, are attributable to costs incurred before Jan. 1, 1987, the amendment by section 803(b)(3) of Pub. L. 99–514 is applicable to such interest costs only to the extent such interest costs are attributable to costs which were required to be capitalized under section 263 of the Internal Revenue Code of 1954 and which would have been taken into account in applying section 189 of the Internal Revenue Code of 1954 (as in effect before its repeal by section 803 of Pub. L. 99–514) or, if applicable, section 266 of such Code, see section 7831(d)(2) of Pub. L. 101–239, set out as an Effective Date note under section 263A of this title.

Amendment by section 201(b), (d)(6) of Pub. L. 99–514 applicable to property placed in service after Dec. 31, 1986, in taxable years ending after such date, with exceptions, see sections 203 and 204 of Pub. L. 99–514, set out as a note under section 168 of this title.

Amendment by section 201(b), (d)(6) of Pub. L. 99–514 not applicable to any property placed in service before Jan. 1, 1994, if such property placed in service as part of specified rehabilitations, and not applicable to certain additional rehabilitations, see section 251(d)(2), (3) of Pub. L. 99–514, set out as a note under section 46 of this title.

Amendment by section 241(b)(1) of Pub. L. 99–514 applicable to expenditures paid or incurred after Dec. 31, 1986, except as otherwise provided, see section 241(c) of Pub. L. 99–514, set out as an Effective Date of Repeal note under former section 177 of this title.

Amendment by section 631(e)(1) of Pub. L. 99–514 applicable to any distribution in complete liquidation, and any sale or exchange, made by a corporation after July 31, 1986, unless such corporation is completely liquidated before Jan. 1, 1987, any transaction described in section 338 of this title for which the acquisition date occurs after Dec. 31, 1986, and any distribution, not in complete liquidation, made after Dec. 31, 1986, with exceptions and special and transitional rules, see section 633 of Pub. L. 99–514, set out as an Effective Date note under section 336 of this title.

Amendment by section 803(b)(3) of Pub. L. 99–514 applicable to costs incurred after Dec. 31, 1986, in taxable years ending after such date, except as otherwise provided, see section 803(d) of Pub. L. 99–514, set out as an Effective Date note under section 263A of this title.

Amendment by sections 1804(f)(1)(A)–(E) and 1809(a)(2)(C)(ii) of Pub. L. 99–514 effective, except as otherwise provided, as if included in the provisions of the Tax Reform Act of 1984, Pub. L. 98–369, div. A, to which such amendment relates, see section 1881 of Pub. L. 99–514, set out as a note under section 48 of this title.

Pub. L. 99–514, title XVIII, § 1804(f)(3), Oct. 22, 1986, 100 Stat. 2805, provided that: ''Paragraph (7) of section 312(n) of the Internal Revenue Code of 1954 [now 1986] (as redesignated by paragraph (1)(D) of this subsection), and the amendments made by section 61(a)(2) of the Tax Reform Act of 1984 [amending this section], shall apply to distributions in taxable years beginning after September 30, 1984.''

EFFECTIVE DATE OF 1985 AMENDMENT

Amendment by Pub. L. 99–121 applicable with respect to property placed in service by the taxpayer after May 8, 1985, with specified exceptions, see section 105(b) of Pub. L. 99–121, set out as a note under section 168 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Pub. L. 98–369, div. A, title I, § 61(e)(1)–(3), July 18, 1984, 98 Stat. 582, 583, as amended by Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095, provided that:

''(1) ADJUSTMENTS TO EARNINGS AND PROFITS.—

''(A) PARAGRAPHS (1), (2), AND (3) OF SECTION 312(n).—The provisions of paragraphs (1), (2), and (3) of section 312(n) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] (as added by subsection (a)) shall apply to amounts paid or incurred in taxable years beginning after September 30, 1984.

''(B) PARAGRAPH (4) OF SECTION 312(n).—The provisions of paragraph (4) of section 312(n) of such Code (as so added) shall apply to distributions after September 30, 1984; except that such provisions shall not apply to any distribution to which the amendments made by section 54(a) of this Act [amending section 311 of this title] do not apply.

''(C) LIFO INVENTORY.—The provisions of paragraph (5) of section 312(n) of such Code (as so added) shall

apply to taxable years beginning after September 30, 1984.

''(D) INSTALLMENT SALES.—The provisions of paragraph (6) of section 312(n) of such Code (as so added) shall apply to sales after September 30, 1984, in taxable years ending after such date.

''(E) COMPLETED CONTRACT METHOD.—The provisions of paragraph (7) of section 312(n) of such Code (as so added) shall apply to contracts entered into after September 30, 1984, in taxable years ending after such date.

''(2) SUBSECTION (b).—The amendments made by subsection (b) [amending this section] shall apply to property placed in service in taxable years beginning after September 30, 1984.

''(3) SUBSECTION (c).—The amendments made by subsection (c) [amending this section and section 1275 of this title] shall apply with respect to distributions declared after March 15, 1984, in taxable years ending after such date.''

Amendment by section 61(a)(2) of Pub. L. 98–369 applicable to distributions in taxable years beginning after Sept. 30, 1984, see section 1804(f)(3) of Pub. L. 99–514, set out as an Effective Date of 1986 Amendment note above.

Pub. L. 99–514, title XVIII, §1804(f)(1)(F), Oct. 22, 1986, 100 Stat. 2805, provided that: ''Any reference in subsection (e) of section 61 of the Tax Reform Act of 1984 [set out above] to a paragraph of section 312(n) of the Internal Revenue Code of 1954 [now 1986] shall be treated as a reference to such paragraph as in effect before its redesignation by subparagraph (D) [see 1986 Amendment note above].''

Pub. L. 98–369, div. A, title I, §63(c), July 18, 1984, 98 Stat. 584, provided that: ''The amendment made by this section [amending this section and section 368 of this title] shall apply to transactions pursuant to plans adopted after the date of the enactment of this Act [July 18, 1984].''

Amendment by section 111(e)(5) of Pub. L. 98–369 applicable with respect to property placed in service by the taxpayer after Mar. 15, 1984, subject to certain exceptions, see section 111(g) of Pub. L. 98–369, set out as a note under section 168 of this title.

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 97–448 effective as if included in the provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, to which such amendment relates, see section 311(d) of Pub. L. 97–448, set out as a note under section 31 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 205(a)(3) of Pub. L. 97–248 applicable to periods after Dec. 31, 1982, under rules similar to the rules of section 48(m) of this title, with certain qualifications, see section 205(c)(1) of Pub. L. 97–248, set out as an Effective Date note under section 196 of this title.

Amendment by section 222(e)(3) of Pub. L. 97–248 applicable to distributions after Aug. 31, 1982, with exceptions for certain partial liquidations, see section 222(f) of Pub. L. 97–248, set out as a note under section 302 of this title.

Amendment by section 310(b)(3) of Pub. L. 97–248 applicable to obligations issued after Dec. 31, 1982, with exceptions for certain warrants, see section 310(d) of Pub. L. 97–248, set out as a note under section 103 of this title.

EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–34 applicable to property placed in service after Dec. 31, 1980, in taxable years ending after that date, see section 209(a) of Pub. L. 97–34, set out as an Effective Date note under section 168 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–589 applicable to transactions which occur after Dec. 31, 1980, other than transactions which occur in proceedings in bankruptcy cases or similar judicial proceedings or in proceedings under Title 11, Bankruptcy, commencing on or before Dec. 31, 1980, except as otherwise provided, see section 7 of Pub. L. 96–589, set out as a note under section 108 of this title.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–628 applicable to distributions made after Nov. 10, 1978, see section 3(d) of Pub. L. 95–628, set out as a note under section 301 of this title.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by section 205(c)(1)(D) of Pub. L. 94–455 effective for taxable years ending after Dec. 31, 1975, see section 205(e) of Pub. L. 94–455, set out as a note under section 1254 of this title.

Amendment by section 1901(a)(43) of Pub. L. 94–455 effective for taxable years beginning after Dec. 31, 1976, see section 1901(d) of Pub. L. 94–455, set out as a note under section 2 of this title.

Amendment by section 1901(b)(32) of Pub. L. 94–455 effective for taxable years beginning after Dec. 31, 1976, see section 1901(d) of Pub. L. 94–455, set out as a note under section 2 of this title.

EFFECTIVE DATE OF 1969 AMENDMENT

Amendment by section 211(b)(3) of Pub. L. 91–172 applicable to taxable years beginning after December 31, 1969, see section 211(c) of Pub. L. 91–172, set out as a note under section 301 of this title.

Amendment by section 905(b)(2) Pub. L. 91–172 effective with respect to distributions made after Nov. 30, 1969, see section 905(c) of Pub. L. 91–172, set out as a note under section 311 of this title.

EFFECTIVE DATE OF 1966 AMENDMENT

Amendment by Pub. L. 89–570 applicable to taxable years ending after Sept. 12, 1966, but only in respect of expenditures paid or incurred after such date, see section 3 of Pub. L. 89–570, set out as an Effective Date note under section 617 of this title.

EFFECTIVE DATE OF 1964 AMENDMENT

Amendment by Pub. L. 88–484 applicable with respect to transactions after Aug. 22, 1964 in taxable years ending after such date, see section 2 of Pub. L. 88–484, set out as a note under section 301 of this title.

Amendment by Pub. L. 88–272 applicable to dispositions after Dec. 31, 1963, in taxable years ending after such date, see section 231(c) of Pub. L. 88–272, set out as an Effective Date note under section 1250 of this title.

EFFECTIVE DATE OF 1962 AMENDMENT

Amendment by section 13(f)(3) of Pub. L. 87–834 applicable to taxable years beginning after Dec. 31, 1962, see section 13(g) of Pub. L. 87–834, set out as an Effective Date note under section 1245 of this title.

Pub. L. 87–834, §14(c), Oct. 16, 1962, 76 Stat. 1041, provided that: ''The amendments made by this section [enacting sections 1246 and 1247 of this title and amending this section and sections 751 and 1223 of this title] shall apply with respect to taxable years beginning after December 31, 1962.''

Pub. L. 87–403, §3(g), Feb. 2, 1962, 76 Stat. 8, provided that: ''The amendments made by this section [amending this section and sections 535, 543, 545, 556 and 561 of this title] shall apply only with respect to distributions made after the date of the enactment of this Act [Feb. 2, 1962].''

SAVINGS PROVISION

For provisions that nothing in amendment by Pub. L. 101–508 be construed to affect treatment of certain transactions occurring, property acquired, or items of income, loss, deduction, or credit taken into account prior to Nov. 5, 1990, for purposes of determining liabil-

ity for tax for periods ending after Nov. 5, 1990, see section 11821(b) of Pub. L. 101–508, set out as a note under section 45K of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

SUBPART C—DEFINITIONS; CONSTRUCTIVE
OWNERSHIP OF STOCK

Sec.
316.    Dividend defined.
317.    Other definitions.
318.    Constructive ownership of stock.

## § 316. Dividend defined

**(a) General rule**

For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

**(b) Special rules**

**(1) Certain insurance company dividends**

The definition in subsection (a) shall not apply to the term "dividend" as used in subchapter L in any case where the reference is to dividends of insurance companies paid to policyholders as such.

**(2) Distributions by personal holding companies**

(A) In the case of a corporation which—

(i) under the law applicable to the taxable year in which the distribution is made, is a personal holding company (as defined in section 542), or

(ii) for the taxable year in respect of which the distribution is made under section 563(b) (relating to dividends paid after the close of the taxable year), or section 547 (relating to deficiency dividends), or the corresponding provisions of prior law, is a personal holding company under the law applicable to such taxable year,

the term "dividend" also means any distribution of property (whether or not a dividend as defined in subsection (a)) made by the corporation to its shareholders, to the extent of its undistributed personal holding company income (determined under section 545 without regard to distributions under this paragraph) for such year.

(B) For purposes of subparagraph (A), the term "distribution of property" includes a distribution in complete liquidation occurring within 24 months after the adoption of a plan of liquidation, but—

(i) only to the extent of the amounts distributed to distributees other than corporate shareholders, and

(ii) only to the extent that the corporation designates such amounts as a dividend distribution and duly notifies such distributees of such designation, under regulations prescribed by the Secretary, but

(iii) not in excess of the sum of such distributees' allocable share of the undistributed personal holding company income for such year, computed without regard to this subparagraph or section 562(b).

**(3) Deficiency dividend distributions by a regulated investment company or real estate investment trust**

The term "dividend" also means any distribution of property (whether or not a dividend as defined in subsection (a)) which constitutes a "deficiency dividend" as defined in section 860(f).

**(4) Certain distributions by regulated investment companies in excess of earnings and profits**

In the case of a regulated investment company that has a taxable year other than a calendar year, if the distributions by the company with respect to any class of stock of such company for the taxable year exceed the company's current and accumulated earnings and profits which may be used for the payment of dividends on such class of stock, the company's current earnings and profits shall, for purposes of subsection (a), be allocated first to distributions with respect to such class of stock made during the portion of the taxable year which precedes January 1.

(Aug. 16, 1954, ch. 736, 68A Stat. 98; Mar. 13, 1956, ch. 83, § 5(1), 70 Stat. 49; Pub. L. 88–272, title II, § 225(f)(1), Feb. 26, 1964, 78 Stat. 87; Pub. L. 94–455, title XVI, § 1601(d), title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1746, 1834; Pub. L. 95–600, title III, § 362(d)(1), Nov. 6, 1978, 92 Stat. 2851; Pub. L. 111–325, title III, § 305(a), Dec. 22, 2010, 124 Stat. 3549.)

### Editorial Notes

#### AMENDMENTS

2010—Subsec. (b)(4). Pub. L. 111–325 added par. (4).

1978—Subsec. (b)(3). Pub. L. 95–600 inserted "regulated investment company or" after "distributions by a" in heading and substituted in text "section 860(f)" for "section 859(d)".

1976—Subsec. (b)(2)(B)(ii). Pub. L. 94–455, § 1906(b)(13)(A), struck out "or his delegate" after "Secretary".

Subsec. (b)(3). Pub. L. 94–455, § 1601(d), added par. (3).



provision of law or regulations (including the consolidated return regulations).

(Aug. 16, 1954, ch. 736, 68A Stat. 110; Pub. L. 97–248, title II, §222(d), Sept. 3, 1982, 96 Stat. 479; Pub. L. 99–514, title VI, §631(e)(7), Oct. 22, 1986, 100 Stat. 2273.)

#### Editorial Notes

##### REFERENCES IN TEXT

Subsections (a) and (b) of section 222 of the Tax Equity and Fiscal Responsibility Act of 1982, referred to in subsec. (b), are subsecs. (a) and (b) of Pub. L. 97–248, title II, §222, Sept. 3, 1982, 96 Stat. 478, which amended sections 331(a) and 336(a) of this title.

##### AMENDMENTS

1986—Subsec. (b). Pub. L. 99–514 struck out ''337,'' after ''351,''.

1982—Subsec. (a). Pub. L. 97–248 substituted provision that a distribution shall be treated as in complete liquidation if the distribution is one of a series in redemption of all the stock pursuant to a plan for provision that a distribution was to be treated as in partial liquidation if the distribution was one of a series in redemption of all the stock pursuant to a plan, or the distribution was in redemption of part of the stock pursuant to a plan, and occurred within the taxable year or the next taxable year of the plan being adopted, including but not limited to a distribution which met the requirements of former subsec. (b) of this section, and that for the purposes of sections 562(b) and 6043 of this title, a partial liquidation included a redemption of stock to which section 302 of this title applied.

Subsec. (b). Pub. L. 97–248 added subsec. (b) and struck out former subsec. (b) which provided that a distribution was to be treated as in partial liquidation of a corporation if the distribution was attributable to the cessation of a business which had been carried on for the previous 5-year period and had not been acquired by the corporation in a transaction involving recognition of gain or loss during that time, and if the distributing corporation was actively involved in a trade or business immediately after the distribution under the terms described above for the business being liquidated, and that compliance with the above requirements would be determined without regard to whether or not the distribution was pro rata with respect to all the shareholders of the corporation.

Subsec. (c). Pub. L. 97–248 struck out subsec. (c) which provided that the fact that, with respect to a shareholder, a distribution qualified under section 302(a) by reason of section 302(b) would not be taken into account in determining whether the distribution, with respect to such shareholder, was also a distribution in partial liquidation of the corporation.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–514 applicable to any distribution in complete liquidation, and any sale or exchange, made by a corporation after July 31, 1986, unless such corporation is completely liquidated before Jan. 1, 1987, any transaction described in section 338 of this title for which the acquisition date occurs after Dec. 31, 1986, and any distribution, not in complete liquidation, made after Dec. 31, 1986, with exceptions and special and transitional rules, see section 633 of Pub. L. 99–514, set out as an Effective Date note under section 336 of this title.

##### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to distributions after Aug. 31, 1982, with exceptions for certain partial liquidations, see section 222(f) of Pub. L. 97–248, set out as a note under section 302 of this title.

### PART III—CORPORATE ORGANIZATIONS AND REORGANIZATIONS

Subpart
A.  Corporate organizations.
B.  Effects on shareholders and security holders.
C.  Effects on corporations.
D.  Special rule; definitions.

#### SUBPART A—CORPORATE ORGANIZATIONS

Sec.
351.  Transfer to corporation controlled by transferor.

### §351. Transfer to corporation controlled by transferor

#### (a) General rule

No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

#### (b) Receipt of property

If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

#### (c) Special rules where distribution to shareholders

##### (1) In general

In determining control for purposes of this section, the fact that any corporate transferor distributes part or all of the stock in the corporation which it receives in the exchange to its shareholders shall not be taken into account.

##### (2) Special rule for section 355

If the requirements of section 355 (or so much of section 356 as relates to section 355) are met with respect to a distribution described in paragraph (1), then, solely for purposes of determining the tax treatment of the transfers of property to the controlled corporation by the distributing corporation, the fact that the shareholders of the distributing corporation dispose of part or all of the distributed stock, or the fact that the corporation whose stock was distributed issues additional stock, shall not be taken into account in determining control for purposes of this section.

#### (d) Services, certain indebtedness, and accrued interest not treated as property

For purposes of this section, stock issued for—

(1) services,

(2) indebtedness of the transferee corporation which is not evidenced by a security, or

(3) interest on indebtedness of the transferee corporation which accrued on or after the beginning of the transferor's holding period for the debt,

shall not be considered as issued in return for property.

**(e) Exceptions**

This section shall not apply to—

**(1) Transfer of property to an investment company**

A transfer of property to an investment company. For purposes of the preceding sentence, the determination of whether a company is an investment company shall be made—

(A) by taking into account all stock and securities held by the company, and

(B) by treating as stock and securities—

(i) money,

(ii) stocks and other equity interests in a corporation, evidences of indebtedness, options, forward or futures contracts, notional principal contracts and derivatives,

(iii) any foreign currency,

(iv) any interest in a real estate investment trust, a common trust fund, a regulated investment company, a publicly-traded partnership (as defined in section 7704(b)) or any other equity interest (other than in a corporation) which pursuant to its terms or any other arrangement is readily convertible into, or exchangeable for, any asset described in any preceding clause, this clause or clause (v) or (viii),

(v) except to the extent provided in regulations prescribed by the Secretary, any interest in a precious metal, unless such metal is used or held in the active conduct of a trade or business after the contribution,

(vi) except as otherwise provided in regulations prescribed by the Secretary, interests in any entity if substantially all of the assets of such entity consist (directly or indirectly) of any assets described in any preceding clause or clause (viii),

(vii) to the extent provided in regulations prescribed by the Secretary, any interest in any entity not described in clause (vi), but only to the extent of the value of such interest that is attributable to assets listed in clauses (i) through (v) or clause (viii), or

(viii) any other asset specified in regulations prescribed by the Secretary.

The Secretary may prescribe regulations that, under appropriate circumstances, treat any asset described in clauses (i) through (v) as not so listed.

**(2) Title 11 or similar case**

A transfer of property of a debtor pursuant to a plan while the debtor is under the jurisdiction of a court in a title 11 or similar case (within the meaning of section 368(a)(3)(A)), to the extent that the stock received in the exchange is used to satisfy the indebtedness of such debtor.

**(f) Treatment of controlled corporation**

If—

(1) property is transferred to a corporation (hereinafter in this subsection referred to as the "controlled corporation") in an exchange

with respect to which gain or loss is not recognized (in whole or in part) to the transferor under this section, and

(2) such exchange is not in pursuance of a plan of reorganization,

section 311 shall apply to any transfer in such exchange by the controlled corporation in the same manner as if such transfer were a distribution to which subpart A of part I applies.

**(g) Nonqualified preferred stock not treated as stock**

**(1) In general**

In the case of a person who transfers property to a corporation and receives nonqualified preferred stock—

(A) subsection (a) shall not apply to such transferor, and

(B) if (and only if) the transferor receives stock other than nonqualified preferred stock—

(i) subsection (b) shall apply to such transferor; and

(ii) such nonqualified preferred stock shall be treated as other property for purposes of applying subsection (b).

**(2) Nonqualified preferred stock**

For purposes of paragraph (1)—

**(A) In general**

The term "nonqualified preferred stock" means preferred stock if—

(i) the holder of such stock has the right to require the issuer or a related person to redeem or purchase the stock,

(ii) the issuer or a related person is required to redeem or purchase such stock,

(iii) the issuer or a related person has the right to redeem or purchase the stock and, as of the issue date, it is more likely than not that such right will be exercised, or

(iv) the dividend rate on such stock varies in whole or in part (directly or indirectly) with reference to interest rates, commodity prices, or other similar indices.

**(B) Limitations**

Clauses (i), (ii), and (iii) of subparagraph (A) shall apply only if the right or obligation referred to therein may be exercised within the 20-year period beginning on the issue date of such stock and such right or obligation is not subject to a contingency which, as of the issue date, makes remote the likelihood of the redemption or purchase.

**(C) Exceptions for certain rights or obligations**

**(i) In general**

A right or obligation shall not be treated as described in clause (i), (ii), or (iii) of subparagraph (A) if—

(I) it may be exercised only upon the death, disability, or mental incompetency of the holder, or

(II) in the case of a right or obligation to redeem or purchase stock transferred in connection with the performance of services for the issuer or a related person

(and which represents reasonable compensation), it may be exercised only upon the holder's separation from service from the issuer or a related person.

**(ii) Exception**

Clause (i)(I) shall not apply if the stock relinquished in the exchange, or the stock acquired in the exchange is in—

(I) a corporation if any class of stock in such corporation or a related party is readily tradable on an established securities market or otherwise, or

(II) any other corporation if such exchange is part of a transaction or series of transactions in which such corporation is to become a corporation described in subclause (I).

**(3) Definitions**

For purposes of this subsection—

**(A) Preferred stock**

The term "preferred stock" means stock which is limited and preferred as to dividends and does not participate in corporate growth to any significant extent. Stock shall not be treated as participating in corporate growth to any significant extent unless there is a real and meaningful likelihood of the shareholder actually participating in the earnings and growth of the corporation. If there is not a real and meaningful likelihood that dividends beyond any limitation or preference will actually be paid, the possibility of such payments will be disregarded in determining whether stock is limited and preferred as to dividends.

**(B) Related person**

A person shall be treated as related to another person if they bear a relationship to such other person described in section 267(b) or 707(b).

**(4) Regulations**

The Secretary may prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection and sections 354(a)(2)(C), 355(a)(3)(D), and 356(e). The Secretary may also prescribe regulations, consistent with the treatment under this subsection and such sections, for the treatment of nonqualified preferred stock under other provisions of this title.

**(h) Cross references**

**(1) For special rule where another party to the exchange assumes a liability, see section 357.**

**(2) For the basis of stock or property received in an exchange to which this section applies, see sections 358 and 362.**

**(3) For special rule in the case of an exchange described in this section but which results in a gift, see section 2501 and following.**

**(4) For special rule in the case of an exchange described in this section but which has the effect of the payment of compensation by the corporation or by a transferor, see section 61(a)(1).**

**(5) For coordination of this section with section 304, see section 304(b)(3).**

(Aug. 16, 1954, ch. 736, 68A Stat. 111; Pub. L. 89–809, title II, §203(a), (b), Nov. 13, 1966, 80 Stat. 1577; Pub. L. 94–455, title XIX, §1901(a)(48)(A),

(B), Oct. 4, 1976, 90 Stat. 1772; Pub. L. 96–589, §5(e), Dec. 24, 1980, 94 Stat. 3406; Pub. L. 97–248, title II, §226(a)(1)(B), Sept. 3, 1982, 96 Stat. 491; Pub. L. 100–647, title I, §1018(d)(5)(G), Nov. 10, 1988, 102 Stat. 3580; Pub. L. 101–239, title VII, §7203(a), (b), Dec. 19, 1989, 103 Stat. 2333; Pub. L. 101–508, title XI, §11704(a)(3), Nov. 5, 1990, 104 Stat. 1388–518; Pub. L. 105–34, title X, §§1002(a), 1012(c)(1), 1014(a), Aug. 5, 1997, 111 Stat. 909, 916, 919; Pub. L. 105–206, title VI, §6010(c)(3)(A), (e)(1), July 22, 1998, 112 Stat. 813, 814; Pub. L. 105–277, div. J, title IV, §4003(f)(1), Oct. 21, 1998, 112 Stat. 2681–910; Pub. L. 106–36, title III, §3001(d)(1), June 25, 1999, 113 Stat. 183; Pub. L. 107–147, title IV, §417(9), Mar. 9, 2002, 116 Stat. 56; Pub. L. 108–357, title VIII, §899(a), Oct. 22, 2004, 118 Stat. 1649; Pub. L. 109–135, title IV, §403(kk), Dec. 21, 2005, 119 Stat. 2632.)

**Editorial Notes**

AMENDMENTS

2005—Subsec. (g)(3)(A). Pub. L. 109–135 inserted at end "If there is not a real and meaningful likelihood that dividends beyond any limitation or preference will actually be paid, the possibility of such payments will be disregarded in determining whether stock is limited and preferred as to dividends."

2004—Subsec. (g)(3)(A). Pub. L. 108–357 inserted at end "Stock shall not be treated as participating in corporate growth to any significant extent unless there is a real and meaningful likelihood of the shareholder actually participating in the earnings and growth of the corporation."

2002—Subsec. (h)(1). Pub. L. 107–147 inserted comma after "liability".

1999—Subsec. (h)(1). Pub. L. 106–36 struck out ", or acquires property subject to a liability," after "liability".

1998—Subsec. (c). Pub. L. 105–206, §6010(c)(3)(A), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "In determining control for purposes of this section—

"(1) the fact that any corporate transferor distributes part or all of the stock in the corporation which it receives in the exchange to its shareholders shall not be taken into account, and

"(2) if the requirements of section 355 are met with respect to such distribution, the shareholders shall be treated as in control of such corporation immediately after the exchange if the shareholders own (immediately after the distribution) stock possessing—

"(A) more than 50 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and

"(B) more than 50 percent of the total value of shares of all classes of stock of such corporation."

Subsec. (c)(2). Pub. L. 105–277 inserted ", or the fact that the corporation whose stock was distributed issues additional stock," after "dispose of part or all of the distributed stock".

Subsec. (g)(1)(A) to (C). Pub. L. 105–206, §6010(e)(1), inserted "and" at end of subpar. (A), added subpar. (B), and struck out former subpars. (B) and (C) which read as follows:

"(B) subsection (b) shall apply to such transferor, and

"(C) such nonqualified preferred stock shall be treated as other property for purposes of applying subsection (b)."

1997—Subsec. (c). Pub. L. 105–34, §1012(c)(1), amended heading and text of subsec. (c) generally. Prior to amendment, text read as follows: "In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account."

Subsec. (e)(1). Pub. L. 105–34, §1002(a), inserted last two sentences.

Subsecs. (g), (h). Pub. L. 105–34, §1014(a), added subsec. (g) and redesignated former subsec. (g) as (h).

1990—Subsec. (e)(2). Pub. L. 101–508 substituted "is used" for "are used".

1989—Subsec. (a). Pub. L. 101–239, §7203(a), struck out "or securities" after "stock".

Subsecs. (b), (d), (e)(2). Pub. L. 101–239, §7203(b)(1), struck out "or securities" after "stock".

Subsec. (g)(2). Pub. L. 101–239, §7203(b)(2), substituted "stock or property" for "stock, securities, or property".

1988—Subsecs. (f), (g). Pub. L. 100–647 added subsec. (f) and redesignated former subsec. (f) as (g).

1982—Subsec. (f)(5). Pub. L. 97–248 added par. (5).

1980—Subsec. (a). Pub. L. 96–589, §6(e)(2), struck out provision that stock or securities issued for services shall not be considered as issued in return for property for purposes of this section.

Subsec. (d). Pub. L. 96–589, §5(e)(1), added subsec. (d). Former subsec. (d) redesignated (e)(1).

Subsec. (e). Pub. L. 96–589, §5(e)(2), redesignated former subsec. (d) as par. (1) and added par. (2). Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 96–589, §5(e)(1), redesignated former subsec. (e) as (f).

1976—Subsec. (a). Pub. L. 94–455, §1901(a)(48)(A), struck out "(including, in the case of transfers made on or before June 30, 1967, an investment company)" after "property is transferred to a corporation".

Subsec. (d). Pub. L. 94–455, §1901(a)(48)(B), among other changes, substituted "Exception" for "Application of June 30, 1967, date" in heading and in text provision that this section does not apply to a transfer of property to an investment company for provisions relating to treatment of a transfer of property to an investment company as made on or before June 30, 1967.

1966—Subsec. (a). Pub. L. 89–809, §203(a), inserted "(including, in the case of transfers made on or before June 30, 1967, an investment company)" after "if property is transferred to a corporation".

Subsecs. (d), (e). Pub. L. 89–809, §203(b), added subsec. (d) and redesignated former subsec. (d) as (e).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2005 Amendment

Amendment by Pub. L. 109–135 effective as if included in the provision of the American Jobs Creation Act of 2004, Pub. L. 108–357, to which such amendment relates, see section 403(nn) of Pub. L. 109–135, set out as a note under section 26 of this title.

#### Effective Date of 2004 Amendment

Pub. L. 108–357, title VIII, §899(b), Oct. 22, 2004, 118 Stat. 1649, provided that: "The amendment made by this section [amending this section] shall apply to transactions after May 14, 2003."

#### Effective Date of 1999 Amendment

Pub. L. 106–36, title III, §3001(e), June 25, 1999, 113 Stat. 184, provided that: "The amendments made by this section [amending this section and sections 357, 358, 362, 368, 584, and 1031 of this title] shall apply to transfers after October 18, 1998."

#### Effective Date of 1998 Amendments

Amendment by Pub. L. 105–277 effective as if included in the provision of the Taxpayer Relief Act of 1997, Pub. L. 105–34, to which such amendment relates, see section 4003(l) of Pub. L. 105–277, set out as a note under section 86 of this title.

Amendment by Pub. L. 105–206 effective, except as otherwise provided, as if included in the provisions of the Taxpayer Relief Act of 1997, Pub. L. 105–34, to which such amendment relates, see section 6024 of Pub. L. 105–206, set out as a note under section 1 of this title.

#### Effective Date of 1997 Amendment

Pub. L. 105–34, title X, §1002(b), Aug. 5, 1997, 111 Stat. 909, provided that:

"(1) IN GENERAL.—The amendment made by subsection (a) [amending this section] shall apply to transfers after June 8, 1997, in taxable years ending after such date.

"(2) BINDING CONTRACTS.—The amendment made by subsection (a) shall not apply to any transfer pursuant to a written binding contract in effect on June 8, 1997, and at all times thereafter before such transfer if such contract provides for the transfer of a fixed amount of property."

Pub. L. 105–34, title X, §1012(d), Aug. 5, 1997, 111 Stat. 917, as amended by Pub. L. 105–206, title VI, §6010(c)(1), July 22, 1998, 112 Stat. 813, provided that:

"(1) SECTION 355 RULES.—The amendments made by subsections (a) and (b) [amending sections 355 and 358 of this title] shall apply to distributions after April 16, 1997; except that the amendment made by subsection (a) [amending section 355 of this title] shall apply to such distributions only if pursuant to a plan (or series of related transactions) which involves an acquisition described in section 355(e)(2)(A)(ii) of the Internal Revenue Code of 1986 occurring after such date.

"(2) DIVISIVE TRANSACTIONS.—The amendments made by subsection (c) [amending this section and section 368 of this title] shall apply to transfers after the date of the enactment of this Act [Aug. 5, 1997].

"(3) TRANSITION RULE.—The amendments made by this section [amending this section and sections 355, 358, and 368 of this title] shall not apply to any distribution pursuant to a plan (or series of related transactions) which involves an acquisition described in section 355(e)(2)(A)(ii) of the Internal Revenue Code of 1986 (or, in the case of the amendments made by subsection (c), any transfer) occurring after April 16, 1997, if such acquisition or transfer is—

"(A) made pursuant to an agreement which was binding on such date and at all times thereafter,

"(B) described in a ruling request submitted to the Internal Revenue Service on or before such date, or

"(C) described on or before such date in a public announcement or in a filing with the Securities and Exchange Commission required solely by reason of the acquisition or transfer.

This paragraph shall not apply to any agreement, ruling request, or public announcement or filing unless it identifies the acquirer of the distributing corporation or any controlled corporation, or the transferee, whichever is applicable."

Pub. L. 105–34, title X, §1014(f), Aug. 5, 1997, 111 Stat. 921, provided that:

"(1) IN GENERAL.—The amendments made by this section [amending this section and sections 354 to 356 and 1036 of this title] shall apply to transactions after June 8, 1997.

"(2) TRANSITION RULE.—The amendments made by this section shall not apply to any transaction after June 8, 1997, if such transaction is—

"(A) made pursuant to a written agreement which was binding on such date and at all times thereafter,

"(B) described in a ruling request submitted to the Internal Revenue Service on or before such date, or

"(C) described on or before such date in a public announcement or in a filing with the Securities and Exchange Commission required solely by reason of the transaction."

#### Effective Date of 1989 Amendment

Pub. L. 101–239, title VII, §7203(c), Dec. 19, 1989, 103 Stat. 2334, provided that:

"(1) IN GENERAL.—Except as provided in this subsection, the amendments made by this section [amending this section] shall apply to transfers after October 2, 1989, in taxable years ending after such date.

"(2) BINDING CONTRACT.—The amendments made by this section shall not apply to any transfer pursuant to a written binding contract in effect on October 2, 1989, and at all times thereafter before such transfer.

"(3) CORPORATE TRANSFERS.—In the case of property transferred (directly or indirectly through a partnership or otherwise) by a C corporation, paragraphs (1)

and (2) shall be applied by substituting 'July 11, 1989' for 'October 2, 1989'. The preceding sentence shall not apply where the corporation meets the requirements of section 1504(a)(2) of the Internal Revenue Code of 1986 with respect to the transferee corporation (and where the transfer is not part of a plan pursuant to which the transferor subsequently fails to meet such requirements).''

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–647, title I, §1018(d)(5)(G), Nov. 10, 1988, 102 Stat. 3580, provided that the amendment made by that section is effective with respect to transfers on or after June 21, 1988.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to transfers occurring after Aug. 31, 1982, except for certain transfers pursuant to an application to form a BHC filed with the Federal Reserve Board before Aug. 16, 1982, see section 226(c) of Pub. L. 97–248, set out as a note under section 304 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–589 applicable to transactions which occur after Dec. 31, 1980, other than transactions which occur in proceedings in bankruptcy cases or similar judicial proceedings or in proceedings under Title 11, Bankruptcy, commencing on or before Dec. 31, 1980, except as otherwise provided, see section 7 of Pub. L. 96–589, set out as a note under section 108 of this title.

EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–455, title XIX, §1901(a)(48)(C), Oct. 4, 1976, 90 Stat. 1772, provided that: ''The amendments made by this paragraph [amending this section] shall take effect with respect to transfers of property occurring after the date of the enactment of this Act [Oct. 4, 1976].''

EFFECTIVE DATE OF 1966 AMENDMENT

Pub. L. 89–809, title II, §203(c), Nov. 13, 1966, 80 Stat. 1577, provided that: ''The amendments made by subsections (a) and (b) [amending this section] shall apply with respect to transfers of property to investment companies whether made before, on, or after the date of the enactment of this Act [Nov. 13, 1966].''

SUBPART B—EFFECTS ON SHAREHOLDERS AND
SECURITY HOLDERS

Sec.
354.    Exchanges of stock and securities in certain reorganizations.
355.    Distribution of stock and securities of a controlled corporation.
356.    Receipt of additional consideration.
357.    Assumption of liability.
358.    Basis to distributees.

## § 354. Exchanges of stock and securities in certain reorganizations

### (a) General rule

#### (1) In general

No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

#### (2) Limitation

##### (A) Excess principal amount

Paragraph (1) shall not apply if—
(i) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or
(ii) any such securities are received and no such securities are surrendered.

##### (B) Property attributable to accrued interest

Neither paragraph (1) nor so much of section 356 as relates to paragraph (1) shall apply to the extent that any stock (including nonqualified preferred stock, as defined in section 351(g)(2)), securities, or other property received is attributable to interest which has accrued on securities on or after the beginning of the holder's holding period.

##### (C) Nonqualified preferred stock

###### (i) In general

Nonqualified preferred stock (as defined in section 351(g)(2)) received in exchange for stock other than nonqualified preferred stock (as so defined) shall not be treated as stock or securities.

###### (ii) Recapitalizations of family-owned corporations

(I) In general

Clause (i) shall not apply in the case of a recapitalization under section 368(a)(1)(E) of a family-owned corporation.

(II) Family-owned corporation

For purposes of this clause, except as provided in regulations, the term ''family-owned corporation'' means any corporation which is described in clause (i) of section 447(d)(2)(C)[1] throughout the 8-year period beginning on the date which is 5 years before the date of the recapitalization. For purposes of the preceding sentence, stock shall not be treated as owned by a family member during any period described in section 355(d)(6)(B).

(III) Extension of statute of limitations

The statutory period for the assessment of any deficiency attributable to a corporation failing to be a family-owned corporation shall not expire before the expiration of 3 years after the date the Secretary is notified by the corporation (in such manner as the Secretary may prescribe) of such failure, and such deficiency may be assessed before the expiration of such 3-year period notwithstanding the provisions of any other law or rule of law which would otherwise prevent such assessment.

#### (3) Cross references

**(A) For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including nonqualified preferred stock and an excess principal amount of securities received over securities surrendered, but not including property to which paragraph (2)(B) applies), see section 356.**

**(B) For treatment of accrued interest in the case of an exchange described in paragraph (2)(B), see section 61.**

---

[1] See References in Text note below.


Amendment by section 1601(e) of Pub. L. 105–34 effective as if included in the provisions of the Small Business Job Protection Act of 1996, Pub. L. 104–188, to which it relates, see section 1601(j) of Pub. L. 105–34, set out as a note under section 23 of this title.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–188 applicable to taxable years of foreign corporations beginning after Dec. 31, 1996, and to taxable years of United States shareholders within which or with which such taxable years of foreign corporations end, see section 1501(d) of Pub. L. 104–188, set out as a note under section 904 of this title.

#### EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–66 applicable to taxable years of controlled foreign corporations beginning after Sept. 30, 1993, and to taxable years of United States shareholders in which or with which such taxable years of controlled foreign corporations end, see section 13232(d) of Pub. L. 103–66, set out as a note under section 951 of this title.

#### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–514 effective, except as otherwise provided, as if included in the provisions of the Tax Reform Act of 1984, Pub. L. 98–369, div. A, to which such amendment relates, see section 1881 of Pub. L. 99–514, set out as a note under section 48 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 123(b) of Pub. L. 98–369 applicable to accounts receivable and evidences of indebtedness transferred after Mar. 1, 1984, in taxable years ending after such date, with an exception, see section 123(c) of Pub. L. 98–369, set out as a note under section 864 of this title.

Amendment by section 801(d)(8) of Pub. L. 98–369 applicable to transactions after Dec. 31, 1984, in taxable years ending after such date, see section 805(a)(1) of Pub. L. 98–369, as amended, set out as a note under section 245 of this title.

#### EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–455, title X, §1021(c), Oct. 4, 1976, 90 Stat. 1619, as amended by Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095, provided that: "The amendments made by this section [amending this section and section 958 of this title] shall apply to taxable years of foreign corporations beginning after December 31, 1975, and to taxable years of United States shareholders (within the meaning of section 951(b) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954]) within which or with which such taxable years of such foreign corporations end. In determining for purposes of any taxable year referred to in the preceding sentence the amount referred to in section 956(a)(2)(A) of the Internal Revenue Code of 1986 for the last taxable year of a corporation beginning before January 1, 1976, the amendments made by this section shall be deemed also to apply to such last taxable year."

#### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

### [§ 956A. Repealed. Pub. L. 104–188, title I, § 1501(a)(2), Aug. 20, 1996, 110 Stat. 1825]

Section, added Pub. L. 103–66, title XIII, §13231(b), Aug. 10, 1993, 107 Stat. 496; amended Pub. L. 104–188,

title I, §1703(i)(2), (3), Aug. 20, 1996, 110 Stat. 1876, related to earnings invested in excess passive assets.

#### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF REPEAL

Repeal by Pub. L. 104–188 applicable to taxable years of foreign corporations beginning after Dec. 31, 1996, and to taxable years of United States shareholders within which or with which such taxable years of foreign corporations end, see section 1501(d) of Pub. L. 104–188, set out as an Effective Date of 1996 Amendment note under section 904 of this title.

### § 957. Controlled foreign corporations; United States persons

#### (a) General rule

For purposes of this title, the term "controlled foreign corporation" means any foreign corporation if more than 50 percent of—

(1) the total combined voting power of all classes of stock of such corporation entitled to vote, or

(2) the total value of the stock of such corporation,

is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

#### (b) Special rule for insurance

For purposes only of taking into account income described in section 953(a) (relating to insurance income), the term "controlled foreign corporation" includes not only a foreign corporation as defined by subsection (a) but also one of which more than 25 percent of the total combined voting power of all classes of stock (or more than 25 percent of the total value of stock) is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such corporation, if the gross amount of premiums or other consideration in respect of the reinsurance or the issuing of insurance or annuity contracts not described in section 953(e)(2) exceeds 75 percent of the gross amount of all premiums or other consideration in respect of all risks.

#### (c) United States person

For purposes of this subpart, the term "United States person" has the meaning assigned to it by section 7701(a)(30) except that—

(1) with respect to a corporation organized under the laws of the Commonwealth of Puerto Rico, such term does not include an individual who is a bona fide resident of Puerto Rico, if a dividend received by such individual during the taxable year from such corporation would, for purposes of section 933(1), be treated as income derived from sources within Puerto Rico, and

(2) with respect to a corporation organized under the laws of Guam, American Samoa, or the Northern Mariana Islands—

(A) 80 percent or more of the gross income of which for the 3-year period ending at the close of the taxable year (or for such part of such period as such corporation or any pred-

ecessor has been in existence) was derived from sources within such a possession or was effectively connected with the conduct of a trade or business in such a possession, and

(B) 50 percent or more of the gross income of which for such period (or part) was derived from the active conduct of a trade or business within such a possession,

such term does not include an individual who is a bona fide resident of Guam, American Samoa, or the Northern Mariana Islands.

For purposes of subparagraphs (A) and (B) of paragraph (2), the determination as to whether income was derived from the active conduct of a trade or business within a possession shall be made under regulations prescribed by the Secretary.

(Added Pub. L. 87–834, §12(a), Oct. 16, 1962, 76 Stat. 1017; amended Pub. L. 94–455, title XIX, §1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 99–514, title XII, §§1221(b)(3)(C), 1222(a), 1224(a), 1273(a), Oct. 22, 1986, 100 Stat. 2553, 2556, 2558, 2595; Pub. L. 108–357, title VIII, §908(c)(5), Oct. 22, 2004, 118 Stat. 1656; Pub. L. 115–97, title I, §14101(e)(2), Dec. 22, 2017, 131 Stat. 2192; Pub. L. 115–141, div. U, title IV, §401(a)(164), Mar. 23, 2018, 132 Stat. 1192.)

### Editorial Notes

#### Amendments

2018—Subsec. (b). Pub. L. 115–141 substituted "contracts not described in section 953(e)(2)" for "contracts described in section 953(a)(1)".

2017—Subsec. (a). Pub. L. 115–97 substituted "title" for "subpart" in introductory provisions.

2004—Subsec. (c). Pub. L. 108–357, §908(c)(5)(B), struck out "derived from sources within a possession, was effectively connected with the conduct of a trade or business within a possession, or" after "whether income was" in concluding provisions.

Subsec. (c)(2)(B). Pub. L. 108–357, §908(c)(5)(A), substituted "active conduct of a" for "conduct of an active".

1986—Subsec. (a). Pub. L. 99–514, §1222(a)(1), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "For purposes of this subpart, the term 'controlled foreign corporation' means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation."

Subsec. (b). Pub. L. 99–514, §1222(a)(2), inserted "(or more than 25 percent of the total value of stock)".

Pub. L. 99–514, §1221(b)(3)(C), substituted "insurance income" for "income derived from insurance of United States risks".

Subsec. (c). Pub. L. 99–514, §1273(a), added par. (2) and concluding provisions and struck out former pars. (2) and (3) which read as follows:

"(2) with respect to a corporation organized under the laws of the Virgin Islands, such term does not include an individual who is a bona fide resident of the Virgin Islands and whose income tax obligation under this subtitle for the taxable year is satisfied pursuant to section 28(a) of the Revised Organic Act of the Virgin Islands, approved July 22, 1954 (48 U.S.C. 1642), by paying tax on income derived from all sources both within and outside the Virgin Islands into the treasury of the Virgin Islands, and

"(3) with respect to a corporation organized under the laws of any other possession of the United States, such

term does not include an individual who is a bona fide resident of any such other possession and whose income derived from sources within possessions of the United States is not, by reason of section 931(a), includible in gross income under this subtitle for the taxable year."

Pub. L. 99–514, §1224(a), redesignated subsec. (d) as (c) and struck out former subsec. (c) which provided circumstances under which for purposes of this subpart, the term "controlled foreign corporation" would not include certain corporations created or organized in Puerto Rico or a possession of the United States or under the laws of Puerto Rico or a possession of the United States.

Subsec. (d). Pub. L. 99–514, §1224(a), redesignated subsec. (d) as (c).

1976—Subsec. (c) Pub. L. 94–455 struck out "or his delegate" after "Secretary".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2017 Amendment

Amendment by Pub. L. 115–97 applicable to distributions made after Dec. 31, 2017, see section 14101(f) of Pub. L. 115–97, set out as an Effective Date note under section 245A of this title.

#### Effective Date of 2004 Amendment

Amendment by Pub. L. 108–357 applicable to taxable years ending after Oct. 22, 2004, see section 908(d)(1) of Pub. L. 108–357, set out as an Effective Date note under section 937 of this title.

#### Effective Date of 1986 Amendment

Amendment by section 1221(b)(3)(C) of Pub. L. 99–514 applicable to taxable years of foreign corporations beginning after Dec. 31, 1986, except as otherwise provided, see section 1221(g) of Pub. L. 99–514, set out as a note under section 954 of this title.

Pub. L. 99–514, title XII, §1222(c), Oct. 22, 1986, 100 Stat. 2557, provided that:

"(1) In general.—The amendments made by this section [amending this section and section 552 of this title] shall apply to taxable years of foreign corporations beginning after December 31, 1986; except that for purposes of applying sections 951(a)(1)(B) and 956 of the Internal Revenue Code of 1986, such amendments shall take effect on August 16, 1986.

"(2) Transitional rule.—In the case of any corporation treated as a controlled foreign corporation by reason of the amendments made by this section, property acquired before August 16, 1986, shall not be taken into account under section 956(b) of the Internal Revenue Code of 1986.

"(3) Special rule for beneficiary of trust.—In the case of an individual—

"(A) who is a beneficiary of a trust which was established on December 7, 1979, under the laws of a foreign jurisdiction, and

"(B) who was not a citizen or resident of the United States on the date the trust was established,

amounts which are included in the gross income of such beneficiary under section 951(a) of the Internal Revenue Code of 1986 with respect to stock held by the trust (and treated as distributed to the trust) shall be treated as the first amounts which are distributed by the trust to such beneficiary and as amounts to which section 959(a) of such Code applies."

Pub. L. 99–514, title XII, §1224(b), Oct. 22, 1986, 100 Stat. 2558, provided that:

"(1) In general.—The amendment made by subsection (a) [amending this section] shall apply to taxable years of foreign corporations beginning after December 31, 1986; except that for purposes of applying sections 951(a)(1)(B) and 956 of the Internal Revenue Code of 1986, such amendments shall take effect on August 16, 1986.

"(2) Transitional rule.—In the case of any corporation treated as a controlled foreign corporation by reason of the amendment made by subsection (a), property


acquired before August 16, 1986, shall not be taken into account under section 956(b) of the Internal Revenue Code of 1986.''

Amendment by section 1273(a) of Pub. L. 99–514 applicable to taxable years beginning after Dec. 31, 1986, with certain exceptions and qualifications, see section 1277 of Pub. L. 99–514, set out as a note under section 931 of this title.

## § 958. Rules for determining stock ownership

### (a) Direct and indirect ownership

#### (1) General rule

For purposes of this subpart (other than section 960), stock owned means—

(A) stock owned directly, and

(B) stock owned with the application of paragraph (2).

#### (2) Stock ownership through foreign entities

For purposes of subparagraph (B) of paragraph (1), stock owned, directly or indirectly, by or for a foreign corporation, foreign partnership, or foreign trust or foreign estate (within the meaning of section 7701(a)(31)) shall be considered as being owned proportionately by its shareholders, partners, or beneficiaries. Stock considered to be owned by a person by reason of the application of the preceding sentence shall, for purposes of applying such sentence, be treated as actually owned by such person.

#### (3) Special rule for mutual insurance companies

For purposes of applying paragraph (1) in the case of a foreign mutual insurance company, the term ''stock'' shall include any certificate entitling the holder to voting power in the corporation.

### (b) Constructive ownership

For purposes of sections 951(b), 954(d)(3), 956(c)(2), and 957, section 318(a) (relating to constructive ownership of stock) shall apply to the extent that the effect is to treat any United States person as a United States shareholder within the meaning of section 951(b), to treat a person as a related person within the meaning of section 954(d)(3), to treat the stock of a domestic corporation as owned by a United States shareholder of the controlled foreign corporation for purposes of section 956(c)(2), or to treat a foreign corporation as a controlled foreign corporation under section 957, except that—

(1) In applying paragraph (1)(A) of section 318(a), stock owned by a nonresident alien individual (other than a foreign trust or foreign estate) shall not be considered as owned by a citizen or by a resident alien individual.

(2) In applying subparagraphs (A), (B), and (C) of section 318(a)(2), if a partnership, estate, trust, or corporation owns, directly or indirectly, more than 50 percent of the total combined voting power of all classes of stock entitled to vote of a corporation, it shall be considered as owning all the stock entitled to vote.

(3) In applying subparagraph (C) of section 318(a)(2), the phrase ''10 percent'' shall be substituted for the phrase ''50 percent'' used in subparagraph (C).

Paragraph (1) shall not apply for purposes of section 956(c)(2) to treat stock of a domestic corporation as not owned by a United States shareholder.

(Added Pub. L. 87–834, § 12(a), Oct. 16, 1962, 76 Stat. 1018; amended Pub. L. 88–554, § 4(b)(5), Aug. 31, 1964, 78 Stat. 763; Pub. L. 94–455, title X, § 1021(b), Oct. 4, 1976, 90 Stat. 1619; Pub. L. 104–188, title I, §§ 1703(i)(4), 1704(t)(7), Aug. 20, 1996, 110 Stat. 1876, 1887; Pub. L. 115–97, title I, §§ 14213(a), 14301(c)(31), Dec. 22, 2017, 131 Stat. 2217, 2224.)

### Editorial Notes

#### Amendments

2017—Subsec. (a)(1). Pub. L. 115–97, § 14301(c)(31), substituted ''960'' for ''960(a)(1)'' in introductory provisions.

Subsec. (b). Pub. L. 115–97, § 14213(a)(2), substituted ''Paragraph (1)'' for ''Paragraphs (1) and (4)'' in concluding provisions.

Subsec. (b)(4). Pub. L. 115–97, § 14213(a)(1), struck out par. (4) which read as follows: ''Subparagraphs (A), (B), and (C) of section 318(a)(3) shall not be applied so as to consider a United States person as owning stock which is owned by a person who is not a United States person.''

1996—Subsec. (a)(1). Pub. L. 104–188, § 1704(t)(7), substituted ''section 960(a)(1)'' for ''sections 955(b)(1)(A) and (B), 955(c)(2)(A)(ii), and 960(a)(1)'' in introductory provisions.

Subsec. (b). Pub. L. 104–188, § 1703(i)(4), substituted ''956(c)(2)'' for ''956(b)(2)'' wherever appearing in introductory and closing provisions.

1976—Subsec. (b). Pub. L. 94–455 inserted ''956(b)(2)'' after ''purposes of sections 951(b), 954(d)(3),'', ''to treat the stock of a domestic corporation as owned by a United States shareholder of the controlled foreign corporation for purposes of section 956(b)(2)'' after ''meaning of section 954(d)(3)'' and ''Paragraphs (1) and (4) shall not apply for purposes of section 956(b)(2) to treat stock of a domestic corporation as not owned by a United States shareholder'' following subpar. (4).

1964—Subsec. (b). Pub. L. 88–554 redesignated pars. (4) and (5) as (3) and (4), respectively, struck out former par. (3) which related to ownership of stock by a partnership, estate, trust, or corporation for purposes of applying first sentence of subpars. (A) and (B), and subpar. (C)(i) of section 318(a)(2) of this title, and made amendments throughout subsec. (b) to conform to changes made in section 318 of this title by Pub. L. 88–554.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2017 Amendment

Pub. L. 115–97, title I, § 14213(b), Dec. 22, 2017, 131 Stat. 2217, provided that: ''The amendments made by this section [amending this section] shall apply to—

''(1) the last taxable year of foreign corporations beginning before January 1, 2018, and each subsequent taxable year of such foreign corporations, and

''(2) taxable years of United States shareholders in which or with which such taxable years of foreign corporations end.''

Amendment by section 14301(c)(31) of Pub. L. 115–97 applicable to taxable years of foreign corporations beginning after Dec. 31, 2017, and to taxable years of United States shareholders in which or with which such taxable years of foreign corporations end, see section 14301(d) of Pub. L. 115–97, set out as a note under section 78 of this title.

#### Effective Date of 1996 Amendment

Amendment by section 1703(i)(4) of Pub. L. 104–188 effective as if included in the provision of the Revenue Reconciliation Act of 1993, Pub. L. 103–66, §§ 13001–13444, to which such amendment relates, see section 1703(o) of

Pub. L. 104–188, set out as a note under section 39 of this title.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–455 applicable to taxable years of foreign corporations beginning after Dec. 31, 1975, and to taxable years of United States shareholders within which or with which such taxable years of such corporations end, see section 1021(c) of Pub. L. 94–455, set out as a note under section 956 of this title.

EFFECTIVE DATE OF 1964 AMENDMENT

Amendment by Pub. L. 88–554 effective Aug. 31, 1964, except that for purposes of sections 302 and 304 of this title, such amendments shall not apply to distributions in payment for stock acquisitions or redemptions, if such acquisitions or redemptions occurred before Aug. 31, 1964, see section 4(c) of Pub. L. 88–554, set out as a note under section 318 of this title.

## § 959. Exclusion from gross income of previously taxed earnings and profits

### (a) Exclusion from gross income of United States persons

For purposes of this chapter, the earnings and profits of a foreign corporation attributable to amounts which are, or have been, included in the gross income of a United States shareholder under section 951(a) shall not, when—

(1) such amounts are distributed to, or

(2) such amounts would, but for this subsection, be included under section 951(a)(1)(B) in the gross income of,

such shareholder (or any other United States person who acquires from any person any portion of the interest of such United States shareholder in such foreign corporation, but only to the extent of such portion, and subject to such proof of the identity of such interest as the Secretary may by regulations prescribe) directly or indirectly through a chain of ownership described under section 958(a), be again included in the gross income of such United States shareholder (or of such other United States person). The rules of subsection (c) shall apply for purposes of paragraph (1) of this subsection and the rules of subsection (f) shall apply for purposes of paragraph (2) of this subsection.

### (b) Exclusion from gross income of certain foreign subsidiaries

For purposes of section 951(a), the earnings and profits of a controlled foreign corporation attributable to amounts which are, or have been, included in the gross income of a United States shareholder under section 951(a), shall not, when distributed through a chain of ownership described under section 958(a), be also included in the gross income of another controlled foreign corporation in such chain for purposes of the application of section 951(a) to such other controlled foreign corporation with respect to such United States shareholder (or to any other United States shareholder who acquires from any person any portion of the interest of such United States shareholder in the controlled foreign corporation, but only to the extent of such portion, and subject to such proof of identity of such interest as the Secretary may prescribe by regulations).

### (c) Allocation of distributions

For purposes of subsections (a) and (b), section 316(a) shall be applied by applying paragraph (2) thereof, and then paragraph (1) thereof—

(1) first to the aggregate of—

(A) earnings and profits attributable to amounts included in gross income under section 951(a)(1)(B) (or which would have been included except for subsection (a)(2) of this section), and

(B) earnings and profits attributable to amounts included in gross income under section 951(a)(1)(C) (or which would have been included except for subsection (a)(3) of this section),

with any distribution being allocated between earnings and profits described in subparagraph (A) and earnings and profits described in subparagraph (B) proportionately on the basis of the respective amounts of such earnings and profits,

(2) then to earnings and profits attributable to amounts included in gross income under section 951(a)(1)(A) (but reduced by amounts not included under subparagraph (B) or (C) of section 951(a)(1) because of the exclusions in paragraphs (2) and (3) of subsection (a) of this section), and

(3) then to other earnings and profits.

References in this subsection to section 951(a)(1)(C) and subsection (a)(3) shall be treated as references to such provisions as in effect on the day before the date of the enactment of the Small Business Job Protection Act of 1996.

### (d) Distributions excluded from gross income not to be treated as dividends

Any distribution excluded from gross income under subsection (a) shall be treated, for purposes of this chapter, as a distribution which is not a dividend; except that such distributions shall immediately reduce earnings and profits.

### (e) Coordination with amounts previously taxed under section 1248

For purposes of this section and section 960(c), any amount included in the gross income of any person as a dividend by reason of subsection (a) or (f) of section 1248 shall be treated as an amount included in the gross income of such person (or, in any case to which section 1248(e) applies, of the domestic corporation referred to in section 1248(e)(2)) under section 951(a)(1)(A).

### (f) Allocation rules for certain inclusions

**(1) In general**

For purposes of this section, amounts that would be included under subparagraph (B) of section 951(a)(1) (determined without regard to this section) shall be treated as attributable first to earnings described in subsection (c)(2), and then to earnings described in subsection (c)(3).

**(2) Treatment of distributions**

In applying this section, actual distributions shall be taken into account before amounts that would be included under section 951(a)(1)(B) (determined without regard to this section).

(Added Pub. L. 87–834, §12(a), Oct. 16, 1962, 76 Stat. 1019; amended Pub. L. 94–455, title XIX,


1975—Subsec. (c). Pub. L. 94–164 substituted "same ratio to the surtax exemption" for "same ratio to $25,000" in subsec. (c) as such. Subsec. (c) as such (c) is in effect for taxable years ending after Dec. 31, 1975.

Pub. L. 94–12 substituted "$50,000" for "$25,000".

**Statutory Notes and Related Subsidiaries**

Effective Date of 2017 Amendment

Amendment by Pub. L. 115–97 applicable to taxable years beginning after Dec. 31, 2017, see section 12001(c) of Pub. L. 115–97, set out as a note under section 11 of this title.

Effective Date of 1988 Amendment

Amendment by Pub. L. 100–647 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 1019(a) of Pub. L. 100–647, set out as a note under section 1 of this title.

Effective Date of 1978 Amendment

Amendment by Pub. L. 95–600 applicable to taxable years beginning after Dec. 31, 1978, see section 301(c) of Pub. L. 95–600, set out as a note under section 11 of this title.

Effective and Termination Dates of 1975 Amendments

Amendment by Pub. L. 94–164 applicable to taxable years beginning after Dec. 31, 1975, see section 4(e) of Pub. L. 94–164, set out as a note under section 11 of this title.

Amendment by Pub. L. 94–12 applicable to taxable years ending after Dec. 31, 1974, but to cease to apply for taxable years ending after Dec. 31, 1975, see section 305(b)(1) of Pub. L. 94–12, set out as a note under section 11 of this title.

**§ 963. Repealed. Pub. L. 94–12, title VI, § 602(a)(1), Mar. 29, 1975, 89 Stat. 58]**

Section, added Pub. L. 87–834, §12(a), Oct. 16, 1962, 76 Stat. 1023; amended Pub. L. 88–272, title I, §123(b), Feb. 26, 1964, 78 Stat. 29; Pub. L. 90–364, title I, §102(b), June 28, 1968, 82 Stat. 255; Pub. L. 91–53, §5(b), Aug. 7, 1969, 83 Stat. 95; Pub. L. 91–172, title VII, §701(b), Dec. 30, 1969, 83 Stat. 659, dealt with the receipt of minimum distributions by domestic corporations.

**Statutory Notes and Related Subsidiaries**

Effective Date of Repeal

Repeal effective with respect to taxable years for foreign corporations beginning after Dec. 31, 1975, and to taxable years of United States shareholders (within the meaning of section 951(b) of this title) within which or with which such taxable years of such foreign corporations end, see section 602(f) of Pub. L. 94–12, set out as an Effective Date note under section 954 of this title.

**§ 964. Miscellaneous provisions**

**(a) Earnings and profits**

Except as provided in section 312(k)(4), for purposes of this subpart, the earnings and profits of any foreign corporation, and the deficit in earnings and profits of any foreign corporation, for any taxable year shall be determined according to rules substantially similar to those applicable to domestic corporations, under regulations prescribed by the Secretary. In determining such earnings and profits, or the deficit in such earnings and profits, the amount of any illegal bribe, kickback, or other payment (within the meaning of section 162(c)) shall not be taken into account to decrease such earnings and prof-

its or increase such deficit. The payments referred to in the preceding sentence are payments which would be unlawful under the Foreign Corrupt Practices Act of 1977 if the payor were a United States person.

**(b) Blocked foreign income**

Under regulations prescribed by the Secretary, no part of the earnings and profits of a controlled foreign corporation for any taxable year shall be included in earnings and profits for purposes of sections 952 and 956, if it is established to the satisfaction of the Secretary that such part could not have been distributed by the controlled foreign corporation to United States shareholders who own (within the meaning of section 958(a)) stock of such controlled foreign corporation because of currency or other restrictions or limitations imposed under the laws of any foreign country.

**(c) Records and accounts of United States shareholders**

**(1) Records and accounts to be maintained**

The Secretary may by regulations require each person who is, or has been, a United States shareholder of a controlled foreign corporation to maintain such records and accounts as may be prescribed by such regulations as necessary to carry out the provisions of this subpart and subpart G.

**(2) Two or more persons required to maintain or furnish the same records and accounts with respect to the same foreign corporation**

Where, but for this paragraph, two or more United States persons would be required to maintain or furnish the same records and accounts as may by regulations be required under paragraph (1) with respect to the same controlled foreign corporation for the same period, the Secretary may by regulations provide that the maintenance or furnishing of such records and accounts by only one such person shall satisfy the requirements of paragraph (1) for such other persons.

**(d) Treatment of certain branches**

**(1) In general**

For purposes of this chapter, section 6038, section 6046, and such other provisions as may be specified in regulations—

    (A) a qualified insurance branch of a controlled foreign corporation shall be treated as a separate foreign corporation created under the laws of the foreign country with respect to which such branch qualifies under paragraph (2), and

    (B) except as provided in regulations, any amount directly or indirectly transferred or credited from such branch to one or more other accounts of such controlled foreign corporation shall be treated as a dividend paid to such controlled foreign corporation.

**(2) Qualified insurance branch**

For purposes of paragraph (1), the term "qualified insurance branch" means any branch of a controlled foreign corporation which is licensed and predominantly engaged on a permanent basis in the active conduct of an insurance business in a foreign country if—

(A) separate books and accounts are maintained for such branch,

(B) the principal place of business of such branch is in such foreign country,

(C) such branch would be taxable under subchapter L if it were a separate domestic corporation, and

(D) an election under this paragraph applies to such branch.

An election under this paragraph shall apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the Secretary.

**(3) Regulations**

The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection.

**(e) Gain on certain stock sales by controlled foreign corporations treated as dividends**

**(1) In general**

If a controlled foreign corporation sells or exchanges stock in any other foreign corporation, gain recognized on such sale or exchange shall be included in the gross income of such controlled foreign corporation as a dividend to the same extent that it would have been so included under section 1248(a) if such controlled foreign corporation were a United States person. For purposes of determining the amount which would have been so includible, the determination of whether such other foreign corporation was a controlled foreign corporation shall be made without regard to the preceding sentence.

**(2) Same country exception not applicable**

Clause (i) of section 954(c)(3)(A) shall not apply to any amount treated as a dividend by reason of paragraph (1).

**(3) Clarification of deemed sales**

For purposes of this subsection, a controlled foreign corporation shall be treated as having sold or exchanged any stock if, under any provision of this subtitle, such controlled foreign corporation is treated as having gain from the sale or exchange of such stock.

**(4) Coordination with dividends received deduction**

**(A) In general**

If, for any taxable year of a controlled foreign corporation beginning after December 31, 2017, any amount is treated as a dividend under paragraph (1) by reason of a sale or exchange by the controlled foreign corporation of stock in another foreign corporation held for 1 year or more, then, notwithstanding any other provision of this title—

(i) the foreign-source portion of such dividend shall be treated for purposes of section 951(a)(1)(A) as subpart F income of the selling controlled foreign corporation for such taxable year,

(ii) a United States shareholder with respect to the selling controlled foreign corporation shall include in gross income for the taxable year of the shareholder with or within which such taxable year of the controlled foreign corporation ends an

amount equal to the shareholder's pro rata share (determined in the same manner as under section 951(a)(2)) of the amount treated as subpart F income under clause (i), and

(iii) the deduction under section 245A(a) shall be allowable to the United States shareholder with respect to the subpart F income included in gross income under clause (ii) in the same manner as if such subpart F income were a dividend received by the shareholder from the selling controlled foreign corporation.

**(B) Application of basis or similar adjustment**

For purposes of this title, in the case of a sale or exchange by a controlled foreign corporation of stock in another foreign corporation in a taxable year of the selling controlled foreign corporation beginning after December 31, 2017, rules similar to the rules of section 961(d) shall apply.

**(C) Foreign-source portion**

For purposes of this paragraph, the foreign-source portion of any amount treated as a dividend under paragraph (1) shall be determined in the same manner as under section 245A(c).

(Added Pub. L. 87–834, §12(a), Oct. 16, 1962, 76 Stat. 1027; amended Pub. L. 91–172, title IV, §442(b)(1), Dec. 30, 1969, 83 Stat. 628; Pub. L. 94–455, title X, §1065(b), title XIX, §§1901(b)(32)(B)(iii), 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1654, 1800, 1834; Pub. L. 97–34, title II, §206(c), Aug. 13, 1981, 95 Stat. 225; Pub. L. 97–248, title II, §288(b)(2), Sept. 3, 1982, 96 Stat. 571; Pub. L. 100–647, title VI, §6129(a), Nov. 10, 1988, 102 Stat. 3716; Pub. L. 105–34, title XI, §1111(a), Aug. 5, 1997, 111 Stat. 968; Pub. L. 115–97, title I, §§14102(c)(1), 14212(b)(4), Dec. 22, 2017, 131 Stat. 2193, 2217.)

**Editorial Notes**

REFERENCES IN TEXT

The Foreign Corrupt Practices Act of 1977, referred to in subsec. (a), is title I of Pub. L. 95–213, Dec. 19, 1977, 91 Stat. 1494, which enacted sections 78dd–1 to 78dd–3 of Title 15, Commerce and Trade, and amended sections 78m and 78ff of Title 15. For complete classification of this Act to the Code, see Short Title of 1977 Amendment note set out under section 78a of Title 15 and Tables.

AMENDMENTS

2017—Subsec. (b). Pub. L. 115–97, §14212(b)(4), struck out '', 955,'' after ''sections 952''.

Subsec. (e)(4). Pub. L. 115–97, §14102(c)(1), added par. (4).

1997—Subsec. (e). Pub. L. 105–34 added subsec. (e).

1988—Subsec. (d). Pub. L. 100–647 added subsec. (d).

1982—Subsec. (a). Pub. L. 97–248 inserted provision that payments referred to in sentence beginning ''In determining such earnings and profits'' are payments which would be unlawful under the Foreign Corrupt Practices Act of 1977 if the payor were a United States person.

1981—Subsec. (a). Pub. L. 97–34 substituted ''section 312(k)(4)'' for ''section 312(k)(3)''.

1976—Subsec. (a). Pub. L. 94–455, §§1065(b), 1901(b)(32)(B)(ii), 1906(b)(13)(A), struck out ''or his delegate'' after ''Secretary'', inserted second sentence, and

substituted "312(k)(3)" for "312(m)(3)" after "provided in section".

Subsecs. (b), (c)(1), (2). Pub. L. 94–455, §1906(b)(13)(A), struck out "or his delegate" after "Secretary" whenever appearing.

1969—Subsec. (a). Pub. L. 91–172 inserted reference to the exception provided for in section 312(m)(3).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2017 Amendment

Pub. L. 115–97, title I, §14102(c)(2), Dec. 22, 2017, 131 Stat. 2193, provided that: "The amendments made by this subsection [amending this section] shall apply to sales or exchanges after December 31, 2017.''

Amendment by section 14212(b)(4) of Pub. L. 115–97 applicable to taxable years of foreign corporations beginning after Dec. 31, 2017, and to taxable years of United States shareholders in which or with which such taxable years of foreign corporations end, see section 14212(c) of Pub. L. 115–97, set out as a note under section 851 of this title.

#### Effective Date of 1997 Amendment

Pub. L. 105–34, title XI, §1111(c)(1), Aug. 5, 1997, 111 Stat. 969, provided that: "The amendment made by subsection (a) [amending this section] shall apply to gain recognized on transactions occurring after the date of the enactment of this Act [Aug. 5, 1997].''

#### Effective Date of 1988 Amendment

Pub. L. 100–647, title VI, §6129(b), Nov. 10, 1988, 102 Stat. 3716, provided that: "The amendment made by subsection (a) [amending this section] shall apply to taxable years of foreign corporations beginning after December 31, 1988.''

#### Effective Date of 1982 Amendment

Amendment by Pub. L. 97–248 applicable to payments made after Sept. 3, 1982, see section 288(c) of Pub. L. 97–248, set out as a note under section 162 of this title.

#### Effective Date of 1981 Amendment

Amendment by Pub. L. 97–34 applicable to property placed in service after Dec. 31, 1980, in taxable years ending after that date, see section 209(a) of Pub. L. 97–34, set out as an Effective Date note under section 168 of this title.

#### Effective Date of 1976 Amendment

Amendment by section 1065(b) of Pub. L. 94–455 applicable to payments described in section 162(c) of this title made more than 30 days after Oct. 4, 1976, see section 1066(b) of Pub. L. 94–455, set out as a note under section 952 of this title.

## § 965. Treatment of deferred foreign income upon transition to participation exemption system of taxation

### (a) Treatment of deferred foreign income as subpart F income

In the case of the last taxable year of a deferred foreign income corporation which begins before January 1, 2018, the subpart F income of such foreign corporation (as otherwise determined for such taxable year under section 952) shall be increased by the greater of—

(1) the accumulated post-1986 deferred foreign income of such corporation determined as of November 2, 2017, or

(2) the accumulated post-1986 deferred foreign income of such corporation determined as of December 31, 2017.

### (b) Reduction in amounts included in gross income of United States shareholders of specified foreign corporations with deficits in earnings and profits

#### (1) In general

In the case of a taxpayer which is a United States shareholder with respect to at least one deferred foreign income corporation and at least one E&P deficit foreign corporation, the amount which would (but for this subsection) be taken into account under section 951(a)(1) by reason of subsection (a) as such United States shareholder's pro rata share of the subpart F income of each deferred foreign income corporation shall be reduced by the amount of such United States shareholder's aggregate foreign E&P deficit which is allocated under paragraph (2) to such deferred foreign income corporation.

#### (2) Allocation of aggregate foreign E&P deficit

The aggregate foreign E&P deficit of any United States shareholder shall be allocated among the deferred foreign income corporations of such United States shareholder in an amount which bears the same proportion to such aggregate as—

(A) such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of each such deferred foreign income corporation, bears to

(B) the aggregate of such United States shareholder's pro rata share of the accumulated post-1986 deferred foreign income of all deferred foreign income corporations of such United States shareholder.

#### (3) Definitions related to E&P deficits

For purposes of this subsection—

##### (A) Aggregate foreign E&P deficit

###### (i) In general

The term "aggregate foreign E&P deficit'' means, with respect to any United States shareholder, the lesser of—

(I) the aggregate of such shareholder's pro rata shares of the specified E&P deficits of the E&P deficit foreign corporations of such shareholder, or

(II) the amount determined under paragraph (2)(B).

###### (ii) Allocation of deficit

If the amount described in clause (i)(II) is less than the amount described in clause (i)(I), then the shareholder shall designate, in such form and manner as the Secretary determines—

(I) the amount of the specified E&P deficit which is to be taken into account for each E&P deficit corporation with respect to the taxpayer, and

(II) in the case of an E&P deficit corporation which has a qualified deficit (as defined in section 952), the portion (if any) of the deficit taken into account under subclause (I) which is attributable to a qualified deficit, including the qualified activities to which such portion is attributable.

##### (B) E&P deficit foreign corporation

The term "E&P deficit foreign corporation'' means, with respect to any taxpayer,

- Add.45 -

§ 1402(b)(1)(X), (2), title XIX, §§ 1901(b)(33)(P), (R), 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1732, 1802, 1834; Pub. L. 98–369, div. A, title X, § 1001(b)(21), (e), July 18, 1984, 98 Stat. 1012, related to election by foreign investment companies to distribute income currently.

**Statutory Notes and Related Subsidiaries**

Effective Date of Repeal

Repeal applicable to taxable years of foreign corporations beginning after Dec. 31, 2004, and to taxable years of United States shareholders with or within which such taxable years of foreign corporations end, see section 413(d)(1) of Pub. L. 108–357, set out as an Effective and Termination Dates of 2004 Amendments note under section 1 of this title.

### § 1248. Gain from certain sales or exchanges of stock in certain foreign corporations

**(a) General rule**

If—

(1) a United States person sells or exchanges stock in a foreign corporation, and

(2) such person owns, within the meaning of section 958(a), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation at any time during the 5-year period ending on the date of the sale or exchange when such foreign corporation was a controlled foreign corporation (as defined in section 957),

then the gain recognized on the sale or exchange of such stock shall be included in the gross income of such person as a dividend, to the extent of the earnings and profits of the foreign corporation attributable (under regulations prescribed by the Secretary) to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock sold or exchanged was held by such person while such foreign corporation was a controlled foreign corporation. For purposes of this section, a United States person shall be treated as having sold or exchanged any stock if, under any provision of this subtitle, such person is treated as realizing gain from the sale or exchange of such stock.

**(b) Limitation on tax applicable to individuals**

In the case of an individual, if the stock sold or exchanged is a capital asset (within the meaning of section 1221) and has been held for more than 1 year, the tax attributable to an amount included in gross income as a dividend under subsection (a) shall not be greater than a tax equal to the sum of—

(1) a pro rata share of the excess of—

(A) the taxes that would have been paid by the foreign corporation with respect to its income had it been taxed under this chapter as a domestic corporation (but without allowance for deduction of, or credit for, taxes described in subparagraph (B)), for the period or periods the stock sold or exchanged was held by the United States person in taxable years beginning after December 31, 1962, while the foreign corporation was a controlled foreign corporation, adjusted for distributions and amounts previously included

in gross income of a United States shareholder under section 951, over

(B) the income, war profits, or excess profits taxes paid by the foreign corporation with respect to such income; and

(2) an amount equal to the tax that would result by including in gross income, as gain from the sale or exchange of a capital asset held for more than 1 year, an amount equal to the excess of (A) the amount included in gross income as a dividend under subsection (a), over (B) the amount determined under paragraph (1).

**(c) Determination of earnings and profits**

**(1) In general**

Except as provided in section 312(k)(4), for purposes of this section, the earnings and profits of any foreign corporation for any taxable year shall be determined according to rules substantially similar to those applicable to domestic corporations, under regulations prescribed by the Secretary.

**(2) Earnings and profits of subsidiaries of foreign corporations**

If—

(A) subsection (a) or (f) applies to a sale, exchange, or distribution by a United States person of stock of a foreign corporation and, by reason of the ownership of the stock sold or exchanged, such person owned within the meaning of section 958(a)(2) stock of any other foreign corporation; and

(B) such person owned, within the meaning of section 958(a), or was considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such other foreign corporation at any time during the 5-year period ending on the date of the sale or exchange when such other foreign corporation was a controlled foreign corporation (as defined in section 957),

then, for purposes of this section, the earnings and profits of the foreign corporation the stock of which is sold or exchanged which are attributable to the stock sold or exchanged shall be deemed to include the earnings and profits of such other foreign corporation which—

(C) are attributable (under regulations prescribed by the Secretary) to the stock of such other foreign corporation which such person owned within the meaning of section 958(a)(2) (by reason of his ownership within the meaning of section 958(a)(1)(A) of the stock sold or exchanged) on the date of such sale or exchange (or on the date of any sale or exchange of the stock of such other foreign corporation occurring during the 5-year period ending on the date of the sale or exchange of the stock of such foreign corporation, to the extent not otherwise taken into account under this section but not in excess of the fair market value of the stock of such other foreign corporation sold or exchanged over the basis of such stock (for determining gain) in the hands of the transferor); and

(D) were accumulated in taxable years of such other corporation beginning after December 31, 1962, and during the period or periods—

(i) such other corporation was a controlled foreign corporation, and

(ii) such person owned within the meaning of section 958(a) the stock of such other foreign corporation.

**(d) Exclusions from earnings and profits**

For purposes of this section, the following amounts shall be excluded, with respect to any United States person, from the earnings and profits of a foreign corporation:

**(1) Amounts included in gross income under section 951**

Earnings and profits of the foreign corporation attributable to any amount previously included in the gross income of such person under section 951, with respect to the stock sold or exchanged, but only to the extent the inclusion of an amount from gross income under section 959.

**[(2) Repealed. Pub. L. 100–647, title I, § 1006(e)(14)(A), Nov. 10, 1988, 102 Stat. 3402]**

**(3) Less developed country corporations under prior law**

Earnings and profits of a foreign corporation which were accumulated during any taxable year beginning before January 1, 1976, while such corporation was a less developed country corporation under section 902(d) as in effect before the enactment of the Tax Reduction Act of 1975.

**(4) United States income**

Any item includible in gross income of the foreign corporation under this chapter—

(A) for any taxable year beginning before January 1, 1967, as income derived from sources within the United States of a foreign corporation engaged in trade or business within the United States, or

(B) for any taxable year beginning after December 31, 1966, as income effectively connected with the conduct by such corporation of a trade or business within the United States.

This paragraph shall not apply with respect to any item which is exempt from taxation (or is subject to a reduced rate of tax) pursuant to a treaty obligation of the United States.

**(5) Foreign trade income**

Earnings and profits of the foreign corporation attributable to foreign trade income of a FSC (as defined in section 922) other than foreign trade income which—

(A) is section 923(a)(2) non-exempt income (within the meaning of section 927(d)(6)), or

(B) would not (but for section 923(a)(4)) be treated as exempt foreign trade income.

For purposes of the preceding sentence, the terms ''foreign trade income'' and ''exempt foreign trade income'' have the respective meanings given such terms by section 923. Any

reference in this paragraph to section 922, 923, or 927 shall be treated as a reference to such section as in effect before its repeal by the FSC Repeal and Extraterritorial Income Exclusion Act of 2000.

**(6) Amounts included in gross income under section 1293**

Earnings and profits of the foreign corporation attributable to any amount previously included in the gross income of such person under section 1293 with respect to the stock sold or exchanged, but only to the extent the inclusion of such amount did not result in an exclusion of an amount under section 1293(c).

**(e) Sales or exchanges of stock in certain domestic corporations**

Except as provided in regulations prescribed by the Secretary, if—

(1) a United States person sells or exchanges stock of a domestic corporation, and

(2) such domestic corporation was formed or availed of principally for the holding, directly or indirectly, of stock of one or more foreign corporations,

such sale or exchange shall, for purposes of this section, be treated as a sale or exchange of the stock of the foreign corporation or corporations held by the domestic corporation.

**(f) Certain nonrecognition transactions**

Except as provided in regulations prescribed by the Secretary—

**(1) In general**

If—

(A) a domestic corporation satisfies the stock ownership requirements of subsection (a)(2) with respect to a foreign corporation, and

(B) such domestic corporation distributes stock of such foreign corporation in a distribution to which section 311(a), 337, 355(c)(1), or 361(c)(1) applies,

then, notwithstanding any other provision of this subtitle, an amount equal to the excess of the fair market value of such stock over its adjusted basis in the hands of the domestic corporation shall be included in the gross income of the domestic corporation as a dividend to the extent of the earnings and profits of the foreign corporation attributable (under regulations prescribed by the Secretary) to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock was held by such domestic corporation while such foreign corporation was a controlled foreign corporation. For purposes of subsections (c)(2), (d), and (h), a distribution of stock to which this subsection applies shall be treated as a sale of stock to which subsection (a) applies.

**(2) Exception for certain distributions**

In the case of any distribution of stock of a foreign corporation, paragraph (1) shall not apply if such distribution is to a domestic corporation—

(A) which is treated under this section as holding such stock for the period for which

- Add.47 -

the stock was held by the distributing corporation, and

(B) which, immediately after the distribution, satisfies the stock ownership requirements of subsection (a)(2) with respect to such foreign corporation.

**(3) Application to cases described in subsection (e)**

To the extent that earnings and profits are taken into account under this subsection, they shall be excluded and not taken into account for purposes of subsection (e).

**(g) Exceptions**

This section shall not apply to—

(1) distributions to which section 303 (relating to distributions in redemption of stock to pay death taxes) applies; or

(2) any amount to the extent that such amount is, under any other provision of this title, treated as—

(A) a dividend (other than an amount treated as a dividend under subsection (f)),

(B) ordinary income, or

(C) gain from the sale of an asset held for not more than 1 year.

**(h) Taxpayer to establish earnings and profits**

Unless the taxpayer establishes the amount of the earnings and profits of the foreign corporation to be taken into account under subsection (a) or (f), all gain from the sale or exchange shall be considered a dividend under subsection (a) or (f), and unless the taxpayer establishes the amount of foreign taxes to be taken into account under subsection (b), the limitation of such subsection shall not apply.

**(i) Treatment of certain indirect transfers**

**(1) In general**

If any shareholder of a 10-percent corporate shareholder of a foreign corporation exchanges stock of the 10-percent corporate shareholder for stock of the foreign corporation, such 10-percent corporate shareholder shall recognize gain in the same manner as if the stock of the foreign corporation received in such exchange had been—

(A) issued to the 10-percent corporate shareholder, and

(B) then distributed by the 10-percent corporate shareholder to such shareholder in redemption or liquidation (whichever is appropriate).

The amount of gain recognized by such 10-percent corporate shareholder under the preceding sentence shall not exceed the amount treated as a dividend under this section.

**(2) 10-percent corporate shareholder defined**

For purposes of this subsection, the term "10-percent corporate shareholder" means any domestic corporation which, as of the day before the exchange referred to in paragraph (1), satisfies the stock ownership requirements of subsection (a)(2) with respect to the foreign corporation.

**(j) Coordination with dividends received deduction**

In the case of the sale or exchange by a domestic corporation of stock in a foreign corporation

held for 1 year or more, any amount received by the domestic corporation which is treated as a dividend by reason of this section shall be treated as a dividend for purposes of applying section 245A.

**(k) Cross reference**

For provision excluding amounts previously taxed under this section from gross income when subsequently distributed, see section 959(e).

(Added Pub. L. 87–834, §15(a), Oct. 16, 1962, 76 Stat. 1041; amended Pub. L. 89–809, title I, §104(k), Nov. 13, 1966, 80 Stat. 1562; Pub. L. 91–172, title IV, §442(b)(2), Dec. 30, 1969, 83 Stat. 628; Pub. L. 94–455, title X, §§1022(a), 1042(b), (c)(1), (3), title XIV, §1402(b)(1)(Y), (2), title XIX, §§1901(b)(3)(H), (32)(B)(iii), 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1619, 1636, 1637, 1732, 1793, 1800, 1834; Pub. L. 97–448, title I, §102(c)(1), Jan. 12, 1983, 96 Stat. 2370; Pub. L. 98–369, div. A, title I, §133(a), (b)(2), (c), title VIII, §801(d)(6), title X, §1001(b)(22), (e), July 18, 1984, 98 Stat. 667, 668, 996, 1012; Pub. L. 99–514, title VI, §631(d)(2), title XVIII, §§1810(i)(1), 1875(g)(1), 1876(a)(2), Oct. 22, 1986, 100 Stat. 2272, 2829, 2897; Pub. L. 100–647, title I, §§1006(e)(14), 1012(p)(19), Nov. 10, 1988, 102 Stat. 3402, 3518; Pub. L. 104–188, title I, §1702(g)(1), Aug. 20, 1996, 110 Stat. 1872; Pub. L. 108–357, title IV, §413(c)(22), Oct. 22, 2004, 118 Stat. 1509; Pub. L. 110–172, §11(g)(17), Dec. 29, 2007, 121 Stat. 2491; Pub. L. 115–97, title I, §14102(a)(1), Dec. 22, 2017, 131 Stat. 2192.)

---

**Editorial Notes**

**References in Text**

Section 902(d) as in effect before the enactment of the Tax Reduction Act of 1975, referred to in subsec. (d)(3), means section 902(d) of this title as in effect before the amendment made by Pub. L. 94–12, title VI, §602(c)(6), Mar. 29, 1975, 89 Stat. 59. Section 902 was subsequently amended generally by Pub. L. 99–514, title XII, §1202(a), Oct. 22, 1986, 100 Stat. 2528, and repealed by Pub. L. 115–97, title I, §14301(a), Dec. 22, 2017, 131 Stat. 2221.

The FSC Repeal and Extraterritorial Income Exclusion Act of 2000, referred to in subsec. (d)(5), is Pub. L. 106–519, Nov. 15, 2000, 114 Stat. 2423. For complete classification of this Act to the Code, see Short Title of 2000 Amendments note set out under section 1 of this title and Tables.

**Amendments**

2017—Subsecs. (j), (k). Pub. L. 115–97 added subsec. (j) and redesignated former subsec. (j) as (k).

2007—Subsec. (d)(5). Pub. L. 110–172 inserted "(as defined in section 922)" after "a FSC" in introductory provisions and inserted second sentence in concluding provisions.

2004—Subsec. (d)(5) to (7). Pub. L. 108–357 redesignated pars. (6) and (7) as (5) and (6), respectively, and struck out heading and text of former par. (5). Text read as follows: "If the United States person whose stock is sold or exchanged was a qualified shareholder (as defined in section 1247(c)) of a foreign corporation which was a foreign investment company (as described in section 1246(b)(1)), the earnings and profits of the foreign corporation for taxable years in which such person was a qualified shareholder."

1996—Subsec. (a). Pub. L. 104–188, §1702(g)(1)(A)(ii), in closing provisions inserted at end "For purposes of this section, a United States person shall be treated as having sold or exchanged any stock if, under any provision of this subtitle, such person is treated as realizing gain from the sale or exchange of such stock."

Subsec. (a)(1). Pub. L. 104–188, §1702(g)(1)(A)(i), struck out ", or if a United States person receives a distribu-

tion from a foreign corporation which, under section 302 or 331, is treated as an exchange of stock'' after ''in a foreign corporation''.

Subsec. (e)(1). Pub. L. 104–188, §1702(g)(1)(B), struck out '', or receives a distribution from a domestic corporation which, under section 302 or 331, is treated as an exchange of stock'' after ''of a domestic corporation''.

Subsec. (f)(1)(B). Pub. L. 104–188, §1702(g)(1)(C), substituted ''355(c)(1), or 361(c)(1)'' for ''or 361(c)(1)''.

Subsec. (i)(1). Pub. L. 104–188, §1702(g)(1)(D), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: ''If any shareholder of a 10-percent corporate shareholder of a foreign corporation exchanges stock of the 10-percent corporate shareholder for stock of the foreign corporation, for purposes of this section, the stock of the foreign corporation received in such exchange shall be treated as if it had been—

''(A) issued to the 10-percent corporate shareholder, and

''(B) then distributed by the 10-percent corporate shareholder to such shareholder in redemption or liquidation (whichever is appropriate).''

1988—Subsec. (d)(2). Pub. L. 100–647, §1006(e)(14)(A), struck out par. (2) which related to gain realized from sale or exchange of property in pursuance of plan of complete liquidation.

Subsec. (d)(7). Pub. L. 100–647, §1012(p)(19), added par. (7).

Subsec. (f). Pub. L. 100–647, §1006(e)(14)(E), substituted ''nonrecognition'' for ''section 311, 336, or 337'' in heading.

Subsec. (f)(1). Pub. L. 100–647, §1006(e)(14)(C), struck out '', sale, or exchange'' after ''(h), a distribution'' in last sentence.

Subsec. (f)(1)(B). Pub. L. 100–647, §1006(e)(14)(B), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: ''such domestic corporation distributes, sells, or exchanges stock of such foreign corporation in a transaction to which section 311, 336, or 337 applies,''.

Subsec. (f)(3), (4). Pub. L. 100–647, §1006(e)(14)(D), redesignated par. (4) as (3) and struck out former par. (3) which related to nonapplication of paragraph (1) in certain cases.

1986—Subsec. (d)(6). Pub. L. 99–514, §1876(a)(2), amended par. (6) generally. Prior to amendment, par. (6) read as follows: ''Earnings and profits of the foreign corporation attributable to foreign trade income (within the meaning of section 923(b)) of a FSC.''

Subsec. (e). Pub. L. 99–514, §631(d)(2)(A), substituted ''Except as provided in regulations'' for ''Under regulations''.

Subsec. (f). Pub. L. 99–514, §631(d)(2)(B), inserted ''Except as provided in regulations prescribed by the Secretary—'' after heading.

Subsec. (g). Pub. L. 99–514, §1875(g)(1), inserted ''or'' at end of par. (1), redesignated par. (3) as (2), and struck out former par. (2) which read as follows: ''gain realized on exchanges to which section 356 (relating to receipt of additional consideration in certain reorganizations) applies; or''.

Subsec. (i)(1)(B). Pub. L. 99–514, §1810(i)(1), substituted ''in redemption or liquidation (whichever is appropriate)'' for ''in redemption of his stock''.

1984—Subsec. (b). Pub. L. 98–369, §1001(b)(22), (e), substituted ''6 months'' for ''1 year'', applicable to property acquired after June 22, 1984, and before Jan. 1, 1988. See Effective Date of 1984 Amendment note below.

Subsec. (c)(2)(D). Pub. L. 98–369, §133(c), substituted ''section 958(a)'' for ''section 958(a)(2)''.

Subsec. (d)(6). Pub. L. 98–369, §801(d)(6), added par. (6).

Subsec. (g)(3)(C). Pub. L. 98–369, §1001(b)(22), (e), substituted ''6 months'' for ''1 year'', applicable to property acquired after June 22, 1984, and before Jan. 1, 1988. See Effective Date of 1984 Amendment note below.

Subsec. (i). Pub. L. 98–369, §133(a), added subsec. (i).

Subsec. (j). Pub. L. 98–369, §133(b)(2), added subsec. (j).

1983—Subsec. (c)(1). Pub. L. 97–448 substituted ''section 312(k)(4)'' for ''section 312(k)(3)''.

1976—Subsec. (a). Pub. L. 94–455, §1906(b)(13)(A), struck out ''or his delegate'' after ''Secretary''.

Subsec. (b). Pub. L. 94–455, §1402(b)(2), provided that ''9 months'' would be changed to ''1 year''.

Pub. L. 94–455, §1402(b)(1)(Y), provided that ''6 months'' would be changed to ''9 months'' for taxable years beginning in 1977.

Subsec. (c)(1). Pub. L. 94–455, §§1901(b)(32)(B)(iii), 1906(b)(13)(A), substituted ''section 312(k)'' for ''section 312(m)(3)'', and struck out ''or his delegate'' after ''Secretary''.

Subsec. (c)(2)(A). Pub. L. 94–455, §1042(c)(3)(A), substituted ''subsection (a) or (f) applies to a sale, exchange, or distribution'' for ''subsection (a) applies to a sale or exchange''.

Subsec. (c)(2)(C). Pub. L. 94–455, §1042(b), inserted ''(or on the date of any sale or exchange of the stock of such other foreign corporation occurring during the 5-year period ending on the date of the sale or exchange of the stock of such foreign corporation, to the extent not otherwise taken into account under this section but not in excess of the fair market value of the stock of such other foreign corporation sold or exchanged over the basis of such stock (for determining gain) in the hands of the transferor)''. §1906(b)(13)(A), struck out ''or his delegate'' after ''Secretary''.

Subsec. (d)(2). Pub. L. 94–455, §1906(b)(13)(A), struck out ''or his delegate'' after ''Secretary''.

Subsec. (d)(3). Pub. L. 94–455, §1022(a), substituted provisions of par. (3) relating to ''Less developed country corporations under prior law'' and reading ''Earnings and profits of a foreign corporation which were accumulated during any taxable year beginning before January 1, 1976, while such corporation was a less developed country corporation under section 902(d) as in effect before the enactment of the Tax Reduction Act of 1975'' for prior par. (3) relating to ''Less developed country corporations'' and reading ''Earnings and profits accumulated by a foreign corporation while it was a less developed country corporation (as defined in section 902(d)), if the stock sold or exchanged was owned for a continuous period of at least 10 years, ending with the date of the sale or exchange, by the United States person who sold or exchanged such stock. In the case of stock sold or exchanged by a corporation, if United States persons who are individuals, estates, or trusts (each of whom owned within the meaning of section 958(a), or were considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such corporation) owned, or were considered as owning, at any time during the 10-year period ending on the date of the sale or exchange more than 50 percent of the total combined voting power of all classes of stock entitled to vote such corporation, this paragraph shall apply only if such United States persons owned, or were considered as owning, at all times during the remainder of such 10-year period more than 50 percent of the total combined voting power of all classes of stock entitled to vote of such corporation. For purposes of this paragraph, stock owned by a United States person who is an individual, estate, or trust which was acquired by reason of the death of the predecessor in interest of such United States person shall be considered as owned by such United States person during the period such stock was owned by such predecessor in interest, and during the period such stock was owned by any other predecessor in interest if between such United States person and such other predecessor in interest there was no transfer other than by reason of the death of an individual.''

Subsec. (e). Pub. L. 94–455, §1906(b)(13)(A), struck out ''or his delegate'' after ''Secretary''.

Subsec. (f). Pub. L. 94–455, §1042(c)(1), added subsec. (f). Former subsec. (f) redesignated (g).

Subsec. (g). Pub. L. 94–455, §§1042(c)(1), (3)(B), 1901(b)(3)(H), redesignated former subsec. (f) as (g); inserted ''(other than an amount treated as a dividend under subsection (f))'' in par. (3)(A); and substituted in par. (3)(B) ''ordinary income'' for ''gain from the sale of

an asset which is not a capital asset'', respectively. Former subsec. (g) redesignated (h).

Subsec. (g)(3)(C). Pub. L. 94–455, § 1402(b)(2), provided that ''9 months'' would be changed to ''1 year''.

Pub. L. 94–455, § 1402(b)(1)(Y), provided that ''6 months'' would be changed to ''9 months'' for taxable years beginning in 1977.

Subsec. (h). Pub. L. 94–455, § 1042(c)(1), (3)(C), redesignated former subsec. (g) as (h) and inserted reference to subsec. (f) in two places.

1969—Subsec. (c)(1). Pub. L. 91–172 inserted reference to the exception provided for in section 312(m)(3).

1966—Subsec. (d)(4). Pub. L. 89–809 provided that for taxable years beginning after December 31, 1966, the earnings and profits of the foreign corporation, for purposes of this section, is not to include income effectively connected with the conduct of a trade or business within the United States, and inserted provision that the exclusion does not apply to income which is exempt from tax or subject to a reduced rate of tax pursuant to a treaty.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2017 Amendment

Pub. L. 115–97, title I, § 14102(a)(2), Dec. 22, 2017, 131 Stat. 2192, provided that: ''The amendments made by this subsection [amending this section] shall apply to sales or exchanges after December 31, 2017.''

#### Effective Date of 2004 Amendment

Amendment by Pub. L. 108–357 applicable to taxable years of foreign corporations beginning after Dec. 31, 2004, and to taxable years of United States shareholders with or within which such taxable years of foreign corporations end, see section 413(d)(1) of Pub. L. 108–357, set out as an Effective and Termination Dates of 2004 Amendments note under section 1 of this title.

#### Effective Date of 1996 Amendment

Amendment by Pub. L. 104–188 effective, except as otherwise expressly provided, as if included in the provision of the Revenue Reconciliation Act of 1990, Pub. L. 101–508, title XI, to which such amendment relates, see section 1702(i) of Pub. L. 104–188, set out as a note under section 38 of this title.

#### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–647 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 1019(a) of Pub. L. 100–647, set out as a note under section 1 of this title.

#### Effective Date of 1986 Amendment

Amendment by section 631(d)(2) of Pub. L. 99–514 applicable to any distribution in complete liquidation, and any sale or exchange, made by a corporation after July 31, 1986, unless such corporation is completely liquidated before Jan. 1, 1987, any transaction described in section 338 of this title for which the acquisition date occurs after Dec. 31, 1986, and any distribution, not in complete liquidation, made after Dec. 31, 1986, with exceptions and special and transitional rules, see section 633 of Pub. L. 99–514, set out as an Effective Date note under section 336 of this title.

Pub. L. 99–514, title XVIII, § 1875(g)(2), Oct. 22, 1986, 100 Stat. 2897, provided that: ''The amendment made by paragraph (1) [amending this section] shall apply to exchanges after March 1, 1986.''

Amendment by sections 1810(i)(1) and 1876(a)(2) of Pub. L. 99–514 effective, except as otherwise provided, as if included in the provisions of the Tax Reform Act of 1984, Pub. L. 98–369, div. A, to which such amendment relates, see section 1881 of Pub. L. 99–514, set out as a note under section 48 of this title.

#### Effective Date of 1984 Amendment

Pub. L. 98–369, div. A, title I, § 133(d)(1), July 18, 1984, 98 Stat. 668, provided that: ''The amendment made by

subsection (a) [amending this section] shall apply to exchanges after the date of the enactment of this Act [July 18, 1984] in taxable years ending after such date.''

Amendment by section 133(b)(2), (c) of Pub. L. 98–369 applicable with respect to transactions to which subsec. (a) or (f) of this section applies occurring after July 18, 1984, with election of earlier date for certain transactions, see section 133(d)(2), (3) of Pub. L. 98–369, set out as a note under section 959 of this title.

Amendment by section 801(d)(6) of Pub. L. 98–369 applicable to transactions after Dec. 31, 1984, in taxable years ending after such date, see section 805(a)(1) of Pub. L. 98–369, as amended, set out as a note under section 245 of this title.

Amendment by section 1001(b)(22) of Pub. L. 98–369 applicable to property acquired after June 22, 1984, and before Jan. 1, 1988, see section 1001(e) of Pub. L. 98–369, set out as a note under section 166 of this title.

#### Effective Date of 1983 Amendment

Amendment by Pub. L. 97–448 effective, except as otherwise provided, as if it had been included in the provision of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, to which such amendment relates, see section 109 of Pub. L. 97–448, set out as a note under section 1 of this title.

#### Effective Date of 1976 Amendment

Pub. L. 94–455, title X, § 1022(b), Oct. 4, 1976, 90 Stat. 1619, provided that: ''The amendment made by subsection (a) [amending this section] shall apply to taxable years beginning after December 31, 1975.''

For effective date of amendment by section 1042 of Pub. L. 94–455, see section 1042(e) of Pub. L. 94–455, set out as a note under section 367 of this title.

Pub. L. 94–455, title XIV, § 1402(b)(1), Oct. 4, 1976, 90 Stat. 1731, provided that the amendment made by that section is effective with respect to taxable years beginning in 1977.

Pub. L. 94–455, title XIV, § 1402(b)(2), Oct. 4, 1976, 90 Stat. 1732, provided that the amendment made by that section is effective with respect to taxable years beginning after Dec. 31, 1977.

Amendment by section 1901(b)(3)(H), (32)(B)(iii) of Pub. L. 94–455 effective for taxable years beginning after Dec. 31, 1976, see section 1901(d) of Pub. L. 94–455, set out as a note under section 2 of this title.

#### Effective Date of 1966 Amendment

Amendment by Pub. L. 89–809 applicable with respect to sales or exchanges occurring after Dec. 31, 1966, see section 104(n) of Pub. L. 89–809, set out as a note under section 11 of this title.

#### Effective Date

Pub. L. 87–834, § 15(c), Oct. 16, 1962, 76 Stat. 1044, provided that: ''The amendments made by this section [enacting this section] shall apply with respect to sales or exchanges occurring after December 31, 1962.''

#### Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

#### Transitional Rule

Pub. L. 99–514, title XVIII, § 1875(g)(3), Oct. 22, 1986, 100 Stat. 2897, provided that: ''An exchange shall be treated as occurring on or before March 1, 1986, if—

''(A) on or before such date, the taxpayer adopts a plan of reorganization to which section 356 [of the Internal Revenue Code of 1986] applies, and

''(B) such plan or reorganization is implemented and distributions pursuant to such plan are completed on or before the date of enactment of this Act [Oct. 22, 1986].''

## § 1249. Gain from certain sales or exchanges of patents, etc., to foreign corporations

### (a) General rule

Gain from the sale or exchange of a patent, an invention, model, or design (whether or not patented), a copyright, a secret formula or process, or any other similar property right to any foreign corporation by any United States person (as defined in section 7701(a)(30)) which controls such foreign corporation shall, if such gain would (but for the provisions of this subsection) be gain from the sale or exchange of a capital asset or of property described in section 1231, be considered as ordinary income.

### (b) Control

For purposes of subsection (a), control means, with respect to any foreign corporation, the ownership, directly or indirectly, of stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote. For purposes of this subsection, the rules for determining ownership of stock prescribed by section 958 shall apply.

(Added Pub. L. 87–834, §16(a), Oct. 16, 1962, 76 Stat. 1045; amended Pub. L. 89–809, title I, §104(m)(3), Nov. 13, 1966, 80 Stat. 1563; Pub. L. 94–455, title XIX, §1901(b)(3)(K), Oct. 4, 1976, 90 Stat. 1793; Pub. L. 113–295, div. A, title II, §221(a)(84), Dec. 19, 2014, 128 Stat. 4049.)

#### Editorial Notes

##### Amendments

2014—Subsec. (a). Pub. L. 113–295 struck out ''after December 31, 1962,'' before ''of a patent''.

1976—Subsec. (a). Pub. L. 94–455 substituted ''ordinary income'' for ''gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231''.

1966—Subsec. (a). Pub. L. 89–809 substituted ''Gain'' for ''Except as provided in subsection (c), gain''.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2014 Amendment

Amendment by Pub. L. 113–295 effective Dec. 19, 2014, subject to a savings provision, see section 221(b) of Pub. L. 113–295, set out as a note under section 1 of this title.

##### Effective Date of 1976 Amendment

Amendment by Pub. L. 94–455 effective for taxable years beginning after Dec. 31, 1976, see section 1901(d) of Pub. L. 94–455, set out as a note under section 2 of this title.

##### Effective Date of 1966 Amendment

Amendment by Pub. L. 89–809 applicable with respect to taxable years beginning after Dec. 31, 1966, see section 104(n) of Pub. L. 89–809, set out as a note under section 11 of this title.

##### Effective Date

Pub. L. 87–834, §16(c), Oct. 16, 1962, 76 Stat. 1045, provided that: ''The amendments made by this section [enacting this section] shall apply to taxable years beginning after December 31, 1962.''

## § 1250. Gain from dispositions of certain depreciable realty

### (a) General rule

Except as otherwise provided in this section—

### (1) Additional depreciation after December 31, 1975

#### (A) In general

If section 1250 property is disposed of after December 31, 1975, then the applicable percentage of the lower of—

(i) that portion of the additional depreciation (as defined in subsection (b)(1) or (4)) attributable to periods after December 31, 1975, in respect of the property, or

(ii) the excess of the amount realized (in the case of a sale, exchange, or involuntary conversion), or the fair market value of such property (in the case of any other disposition), over the adjusted basis of such property,

shall be treated as gain which is ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle.

#### (B) Applicable percentage

For purposes of subparagraph (A), the term ''applicable percentage'' means—

(i) in the case of section 1250 property with respect to which a mortgage is insured under section 221(d)(3) or 236 of the National Housing Act, or housing financed or assisted by direct loan or tax abatement under similar provisions of State or local laws and with respect to which the owner is subject to the restrictions described in section 1039(b)(1)(B) (as in effect on the day before the date of the enactment of the Revenue Reconciliation Act of 1990), 100 percent minus 1 percentage point for each full month the property was held after the date the property was held 100 full months;

(ii) in the case of dwelling units which, on the average, were held for occupancy by families or individuals eligible to receive subsidies under section 8 of the United States Housing Act of 1937, as amended, or under the provisions of State or local law authorizing similar levels of subsidy for lower-income families, 100 percent minus 1 percentage point for each full month the property was held after the date the property was held 100 full months;

(iii) in the case of section 1250 property with respect to which a depreciation deduction for rehabilitation expenditures was allowed under section 167(k), 100 percent minus 1 percentage point for each full month in excess of 100 full months after the date on which such property was placed in service;

(iv) in the case of section 1250 property with respect to which a loan is made or insured under title V of the Housing Act of 1949, 100 percent minus 1 percentage point for each full month the property was held after the date the property was held 100 full months; and

(v) in the case of all other section 1250 property, 100 percent.

determines that such recharacterization is appropriate to prevent avoidance of any tax imposed by this title.

**(m) Designation of contract markets**

Any designation by the Commodity Futures Trading Commission of a contract market which could not have been made under the law in effect on the day before the date of the enactment of the Commodity Futures Modernization Act of 2000 shall apply for purposes of this title except to the extent provided in regulations prescribed by the Secretary.

**(n) Convention or association of churches**

For purposes of this title, any organization which is otherwise a convention or association of churches shall not fail to so qualify merely because the membership of such organization includes individuals as well as churches or because individuals have voting rights in such organization.

**(o) Clarification of economic substance doctrine**

**(1) Application of doctrine**

In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—

(A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

(B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

**(2) Special rule where taxpayer relies on profit potential**

**(A) In general**

The potential for profit of a transaction shall be taken into account in determining whether the requirements of subparagraphs (A) and (B) of paragraph (1) are met with respect to the transaction only if the present value of the reasonably expected pre-tax profit from the transaction is substantial in relation to the present value of the expected net tax benefits that would be allowed if the transaction were respected.

**(B) Treatment of fees and foreign taxes**

Fees and other transaction expenses shall be taken into account as expenses in determining pre-tax profit under subparagraph (A). The Secretary shall issue regulations requiring foreign taxes to be treated as expenses in determining pre-tax profit in appropriate cases.

**(3) State and local tax benefits**

For purposes of paragraph (1), any State or local income tax effect which is related to a Federal income tax effect shall be treated in the same manner as a Federal income tax effect.

**(4) Financial accounting benefits**

For purposes of paragraph (1)(B), achieving a financial accounting benefit shall not be taken into account as a purpose for entering into a transaction if the origin of such financial accounting benefit is a reduction of Federal income tax.

**(5) Definitions and special rules**

For purposes of this subsection—

**(A) Economic substance doctrine**

The term "economic substance doctrine" means the common law doctrine under which tax benefits under subtitle A with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose.

**(B) Exception for personal transactions of individuals**

In the case of an individual, paragraph (1) shall apply only to transactions entered into in connection with a trade or business or an activity engaged in for the production of income.

**(C) Determination of application of doctrine not affected**

The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted.

**(D) Transaction**

The term "transaction" includes a series of transactions.

**(p) Cross references**

**(1) Other definitions**

For other definitions, see the following sections of Title 1 of the United States Code:

(1) Singular as including plural, section 1.
(2) Plural as including singular, section 1.
(3) Masculine as including feminine, section 1.
(4) Officer, section 1.
(5) Oath as including affirmation, section 1.
(6) County as including parish, section 2.
(7) Vessel as including all means of water transportation, section 3.
(8) Vehicle as including all means of land transportation, section 4.
(9) Company or association as including successors and assigns, section 5.

**(2) Effect of cross references**

For effect of cross references in this title, see section 7806(a).

(Aug. 16, 1954, ch. 736, 68A Stat. 911; Pub. L. 86–70, § 22(g), (h), June 25, 1959, 73 Stat. 146; Pub. L. 86–624, § 18(i), (j), July 12, 1960, 74 Stat. 416; Pub. L. 86–778, title I, § 103(t), Sept. 13, 1960, 74 Stat. 941; Pub. L. 87–834, §§ 6(c), 7(h), Oct. 16, 1962, 76 Stat. 982, 988; Pub. L. 87–870, § 5(a), Oct. 23, 1962, 76 Stat. 1161; Pub. L. 88–272, title II, §§ 204(a)(3), 234(b)(3), Feb. 26, 1964, 78 Stat. 36, 114; Pub. L. 89–368, title I, § 102(b)(5), Mar. 15, 1966, 80 Stat. 64; Pub. L. 89–809, title I, § 103(l)(1), Nov. 13, 1966, 80 Stat. 1554; Pub. L. 90–364, title I, § 103(e)(6), June 28, 1968, 82 Stat. 264; Pub. L. 91–172, title IV, § 432(c), (d), title IX, § 960(j), Dec. 30, 1969, 83 Stat. 622, 623, 735; Pub. L. 92–606, § 1(f)(4), Oct. 31, 1972, 86 Stat. 1497; Pub. L. 93–406, title III, § 3043, Sept. 2, 1974, 88 Stat. 1003; Pub. L. 94–455, title XII, § 1203(a), title XIX, § 1906(a)(57), (b)(13)(A), (c)(3), Oct. 4, 1976, 90 Stat. 1688, 1832, 1834, 1835; Pub. L. 95–600, title I, § 157(k)(2), title VII, § 701(cc)(2), Nov. 6, 1978, 92 Stat. 2809, 2923; Pub. L. 97–34, title VII, § 725(c)(4), Aug. 13, 1981, 95 Stat. 346; Pub. L. 97–248, title II, § 201(d)(10), formerly

**Internal Revenue Service, Treasury**                    **§ 1.245A–5T**

the accumulation amounted to $55,000, of which $25,000 was accumulated prior to the "uninterrupted period" and $30,000 was accumulated during the uninterrupted period. (See section 316(a) and paragraph (c) of this section.) For 1954 a deduction under section 245 of $31,025 ($8,075 on 1954 earnings of the foreign corporation, plus $22,950 from the $30,000 accumulation at December 31, 1953) for dividends received from a foreign corporation is allowable to Corporation B with respect to the $50,000 received from Corporation A, computed as follows:

(i) $8,075, which is $8,500 (85 percent—the percent specified in section 243 for the calendar year 1954—of the $10,000 of earnings and profits of the taxable year) multiplied by 95 percent (the portion of the gross income of Corporation A derived during the taxable year 1954 from sources within the United States), plus

(ii) $22,950, which is $25,500 (85 percent—the percent specified in section 243 for the calendar year 1954—of $30,000, the part of the earnings and profits accumulated after the beginning of the uninterrupted period) multiplied by 90 percent (the portion of the gross income of Corporation A derived from sources within the United States during that portion of the uninterrupted period ending at the beginning of the taxable year 1954).

*Example 2.* If in *Example 1,* Corporation A for the taxable year 1954 had incurred a deficit of $10,000 (shown to have been incurred before December 31) the amount of the earnings and profits accumulated after the beginning of the uninterrupted period would be $20,000. If Corporation A had distributed $50,000 on December 31, 1954, the deduction under section 245 for dividends received from a foreign corporation allowable to Corporation B for 1954 would be $15,300, computed by multiplying $17,000 (85 percent—the percent specified in section 243 for the calendar year 1954—of $20,000 earnings and profits accumulated after the beginning of the uninterrupted period) by 90 percent (the portion of the gross income of Corporation A derived from United States sources during that portion of the uninterrupted period ending at the beginning of the taxable year 1954).

*Example 3.* Corporation A (a foreign corporation filing its income tax returns on a calendar year basis) whose stock is 100 percent owned by corporation B (a domestic corporation filing its income tax returns on a calendar year basis) for the first time engaged in trade or business within the United States on January 1, 1960, and qualifies under section 245 for the entire period beginning on that date and ending on December 31, 1963. In 1963, A derived 75 percent of its gross income from sources within the United States. A's earnings and profits for 1963 (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year) are $200,000. On De-

cember 31, 1963, corporation A distributes to corporation B 100 shares of corporation C stock which have an adjusted basis in A's hands of $40,000 and a fair market value of $100,000. For purposes of computing the deduction under section 245 for dividends received from a foreign corporation, the amount of the distribution is $40,000. B is allowed a deduction under section 245 of $25,500, i.e., $34,000 ($40,000 multiplied by 85 percent, the percent specified in section 243 for 1963), multiplied by 75 percent (the portion of the gross income of corporation A derived during 1963 from sources within the United States).

[T.D. 6500, 25 FR 11402, Nov. 26, 1960, as amended by T.D. 6752, 29 FR 12701, Sept. 9, 1964; T.D. 6830; 30 FR 8046, June 23, 1965; T.D. 7293, 38 FR 32793, Nov. 28, 1973]

**§§ 1.245A–1T—1.245A–4T   [Reserved]**

**§ 1.245A–5T   Limitation of section 245A deduction and section 954(c)(6) exception (temporary).**

(a) *Overview.* This section provides rules that limit a deduction under section 245A(a) to the portion of a dividend that exceeds the ineligible amount of such dividend or the applicability of section 954(c)(6) when a portion of a dividend is paid out of an extraordinary disposition account or when an extraordinary reduction occurs. Paragraph (b) of this section provides rules regarding ineligible amounts. Paragraph (c) of this section provides rules for determining ineligible amounts attributable to an extraordinary disposition. Paragraph (d) of this section provides rules that limit the application of section 954(c)(6) when one or more section 245A shareholders of a lower-tier CFC have an extraordinary disposition account. Paragraph (e) of this section provides rules for determining ineligible amounts attributable to an extraordinary reduction. Paragraph (f) of this section provides rules that limit the application of section 954(c)(6) when a lower-tier CFC has an extraordinary reduction amount. Paragraph (g) of this section provides special rules for purposes of applying this section. Paragraph (h) of this section provides an anti-abuse rule. Paragraph (i) of this section provides definitions. Paragraph (j) of this section provides examples illustrating the application of this section. Paragraph (k) of this section provides the

557

- Add.53 -

applicability date of this section. Paragraph (l) of this section provides the expiration date of this section.

(b) *Limitation of deduction under section 245A*—(1) *In general.* A section 245A shareholder is allowed a section 245A deduction for any dividend received from an SFC (provided all other applicable requirements are satisfied) only to the extent that the dividend exceeds the ineligible amount of the dividend. See paragraphs (j)(2), (4), and (5) of this section for examples illustrating the application of this paragraph (b)(1).

(2) *Definition of ineligible amount.* The term *ineligible amount* means, with respect to a dividend received by a section 245A shareholder from an SFC, an amount equal to the sum of—

(i) 50 percent of the extraordinary disposition amount (as determined under paragraph (c) of this section), and

(ii) The extraordinary reduction amount (as determined under paragraph (e) of this section).

(c) *Rules for determining extraordinary disposition amount*—(1) *Definition of extraordinary disposition amount.* The term *extraordinary disposition amount* means the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder. See paragraph (j)(2) of this section for an example illustrating the application of this paragraph (c).

(2) *Determination of portion of dividend paid out of extraordinary disposition account*—(i) *In general.* For purposes of determining the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder, the following rules apply—

(A) The dividend is first considered paid out of non-extraordinary disposition E&P with respect to the section 245A shareholder; and

(B) The dividend is next considered paid out of the extraordinary disposition account to the extent of the section 245A shareholder's extraordinary disposition account balance.

(ii) *Definition of non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* means, with respect to a section 245A shareholder and an SFC, an amount of earnings and profits of the SFC equal to the excess, if any, of—

(A) The product of—

(*1*) The amount of the SFC's earnings and profits described in section 959(c)(3), determined as of the end of the SFC's taxable year (for this purpose, without regard to distributions during the taxable year other than as provided in this paragraph (c)(2)(ii)(A)(*1*)), but, if during the taxable year the SFC pays more than one dividend, reduced (but not below zero) by the amounts of any dividends paid by the SFC earlier in the taxable year; and

(*2*) The percentage of the stock (by value) of the SFC that the section 245A shareholder owns directly or indirectly immediately after the distribution (taking into account all transactions related to the distribution); over

(B) The balance of the section 245A shareholder's extraordinary disposition account with respect to the SFC, determined immediately before the distribution.

(3) *Definitions with respect to extraordinary disposition accounts*—(i) *Extraordinary disposition account*—(A) *In general.* The term *extraordinary disposition account* means, with respect to a section 245A shareholder of an SFC, an account the balance of which is equal to the product of the extraordinary disposition ownership percentage and the extraordinary disposition E&P, reduced (but not below zero) by the prior extraordinary disposition amount, and adjusted under paragraph (c)(4) of this section, as applicable.

(B) *Extraordinary disposition ownership percentage.* The term *extraordinary disposition ownership percentage* means the percentage of stock (by value) of an SFC that a section 245A shareholder owns directly or indirectly at the beginning of the disqualified period or, if later, on the first day during the disqualified period on which the SFC is a CFC, regardless of whether the section 245A shareholder owns directly or indirectly such stock of the SFC on the date of an extraordinary disposition giving rise to extraordinary disposition E&P; if not, see paragraph (c)(4) of this section.

**Internal Revenue Service, Treasury**                                    **§ 1.245A–5T**

(C) *Extraordinary disposition E&P.* The term *extraordinary disposition E&P* means an amount of earnings and profits of an SFC equal the sum of the net gain recognized by the SFC with respect to specified property in each extraordinary disposition. In the case of an extraordinary disposition with respect to the SFC arising as a result of a disposition of specified property by a specified entity (other than a foreign corporation), an interest of which is owned directly or indirectly (through one or more other specified entities that are not foreign corporations) by the SFC, the net gain taken into account for purposes of the preceding sentence is the SFC's distributive share of the net gain recognized by the specified entity with respect to the specified property.

(D) *Prior extraordinary disposition amount*—(1) *General rule.* The term *prior extraordinary disposition amount* means, with respect to an SFC and a section 245A shareholder, the sum of the extraordinary disposition amount of each prior dividend received by the section 245A shareholder from the SFC by reason of paragraph (c) of this section and 200 percent of the sum of the amounts included in the section 245A shareholder's gross income under section 951(a) by reason of paragraph (d) of this section (in the case in which the SFC is, or has been, a lower-tier CFC). A section 245A shareholder's prior extraordinary disposition amount also includes—

(*i*) A prior dividend received by the section 245A shareholder from the SFC to the extent not an extraordinary reduction amount and to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary disposition amount had paragraph (c) of this section applied to the dividend;

(*ii*) The portion of a prior dividend (to the extent not a tiered extraordinary disposition amount by reason of paragraph (d) of this section) received by an upper-tier CFC from the SFC that by reason of section 245A(e) was included in the upper-tier CFC's foreign personal holding company income and was included in gross income by the section 245A shareholder under section 951(a) but would have been a tiered extraordinary disposition amount by reason of paragraph (d) of this section had paragraph (d) applied to the dividend;

(*iii*) If a prior dividend received by an upper-tier CFC from a lower-tier CFC gives rise to a tiered extraordinary disposition amount with respect to the section 245A shareholder by reason of paragraph (d) of this section, the qualified portion.

(2) *Definition of qualified portion*—(i) *In general.* The term *qualified portion* means, with respect to a tiered extraordinary disposition amount of a section 245A shareholder and a lower-tier CFC, 200 percent of the portion of the disqualified amount with respect to the tiered extraordinary disposition amount equal to the sum of the amounts included in gross income by each U.S. tax resident under section 951(a) in the taxable year in which the tiered extraordinary disposition amount arose with respect to the lower-tier CFC by reason of paragraph (d) of this section. For purposes of the preceding sentence, the reference to a U.S. tax resident does not include any section 245A shareholder with a tiered extraordinary disposition amount with respect to the lower-tier CFC.

(*ii*) *Determining a qualified portion if multiple section 245A shareholders have tiered extraordinary disposition amounts.* For the purposes of applying paragraph (c)(3)(i)(D)(*2*)(*i*) of this section, if more than one section 245A shareholder has a tiered extraordinary disposition amount with respect to a dividend received by an upper-tier CFC from a lower-tier CFC, then the qualified portion with respect to each section 245A shareholder is equal to the amount described in paragraph (c)(3)(i)(D)(*2*)(*i*) of this section, without regard to this paragraph (c)(3)(i)(D)(*2*)(*ii*), multiplied by a fraction, the numerator of which is the section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC and the denominator of which is the sum of the tiered extraordinary disposition amounts with respect to each section 245A shareholder and the lower-tier CFC.

559

- Add.55 -

(ii) *Extraordinary disposition—(A) In general.* Except as provided in paragraph (c)(3)(ii)(E) of this section, the term *extraordinary disposition* means, with respect to an SFC, any disposition of specified property by the SFC on a date on which it was a CFC and during the SFC's disqualified period to a related party if the disposition occurs outside of the ordinary course of the SFC's activities. An extraordinary disposition also includes a disposition during the disqualified period on a date on which the SFC is not a CFC if there is a plan, agreement, or understanding involving a section 245A shareholder to cause the SFC to recognize gain that would give rise to an extraordinary disposition if the SFC were a CFC.

(B) *Facts and circumstances.* A determination as to whether a disposition is undertaken outside of the ordinary course of an SFC's activities is made on the basis of facts and circumstances, taking into account whether the transaction is consistent with the SFC's past activities, including with respect to quantity and frequency. In addition, a disposition of specified property by an SFC to a related party may be considered outside of the ordinary course of the SFC's activities notwithstanding that the SFC regularly disposes of property of the same type of, or similar to, the specified property to persons that are not related parties.

(C) *Per se rules.* A disposition is treated as occurring outside of the ordinary course of an SFC's activities if the disposition is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, as defined in section 367(d)(4).

(D) *Treatment of dispositions by certain specified entities.* For purposes of paragraph (c)(3)(ii)(A) of this section, an extraordinary disposition with respect to an SFC includes a disposition by a specified entity other than a foreign corporation, provided that immediately before or immediately after the disposition the specified entity is a related party with respect to the SFC, the SFC directly or indirectly (through one or more other specified entities other than foreign corporations) owns an interest in the specified entity, and

the disposition would have otherwise qualified as an extraordinary disposition had the specified entity been a foreign corporation.

(E) *De minimis exception to extraordinary disposition.* If the sum of the net gain recognized by an SFC with respect to specified property in all dispositions otherwise described in paragraph (c)(3)(ii)(A) of this section does not exceed the lesser of $50 million or 5 percent of the gross value of all of the SFC's property held immediately before the beginning of its disqualified period, then no disposition of specified property by the SFC is an extraordinary disposition.

(iii) *Disqualified period.* The term *disqualified period* means, with respect to an SFC that is a CFC on any day during the taxable year that includes January 1, 2018, the period beginning on January 1, 2018, and ending as of the close of the taxable year of the SFC, if any, that begins before January 1, 2018, and ends after December 31, 2017.

(iv) *Specified property.* The term *specified property* means any property if gain recognized with respect to such property during the disqualified period is not described in section 951A(c)(2)(A)(i)(I) through (V). If only a portion of the gain recognized with respect to property during the disqualified period is gain that is not described in section 951A(c)(2)(A)(i)(I) through (V), then a portion of the property is treated as specified property in an amount that bears the same ratio to the value of the property as the amount of gain not described in section 951A(c)(2)(A)(i)(I) through (V) bears to the total amount of gain recognized with respect to such property during the disqualified period. Specified property is also property with respect to which a loss was recognized during the disqualified period if the loss is properly allocable to income not described in section 951A(c)(2)(A)(i)(I) through (V) under the principles of section 954(b)(5) (specified loss). If only a portion of the loss recognized with respect to property during the disqualified period is specified loss, then a portion of the property is treated as specified property in an amount that bears the same ratio to the value of the property as the amount of specified loss bears to

560

the total amount of loss recognized with respect to such property during the disqualified period.

(4) *Successor rules for extraordinary disposition accounts.* This paragraph (c)(4) applies with respect to an extraordinary disposition account upon certain direct or indirect transfers of stock of an SFC by a section 245A shareholder.

(i) *Another section 245A shareholder succeeds to all or portion of account.* Except for a transfer described in §1.1248–8(a)(1), paragraphs (c)(4)(i)(A) through (C) of this section apply when a section 245A shareholder of an SFC (the *transferor*) transfers directly or indirectly a share of stock (or a portion of a share of stock) of the SFC that it owns directly or indirectly (the share or portion thereof, a *transferred share*).

(A) If immediately after the transfer (taking into account all transactions related to the transfer) another person is a section 245A shareholder of the SFC, then such other person's extraordinary disposition account with respect to the SFC is increased by the person's proportionate share of the amount allocated to the transferred share.

(B) For purposes of paragraph (c)(4)(i)(A) of this section, the amount allocated to a transferred share is equal to the product of—

(*1*) The balance of the transferor's extraordinary disposition account with respect to the SFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and before the application of this paragraph (c)(4)(i)(B); and

(*2*) A fraction, the numerator of which is the value of the transferred share and the denominator of which is the value of all of the stock of the SFC that the transferor owns directly or indirectly immediately before the transfer.

(C) For purposes of paragraph (c)(4)(i)(A) of this section, a person's proportionate share of the amount allocated to a transferred share under paragraph (c)(4)(i)(B) of this section is equal to the product of—

(*1*) The amount allocated to the share; and

(*2*) The percentage (expressed as a decimal) of the share (by value) that the person owns directly or indirectly

immediately after the transfer (taking into account all transactions related to the transfer).

(D) The transferor's extraordinary disposition account with respect to the SFC is decreased by the amount by which another person's extraordinary disposition account with respect to the SFC is increased pursuant to paragraph (c)(4)(i)(A) of this section.

(E) If a principal purpose of the transfer is to shift, or to avoid, an amount in the transferor's extraordinary disposition account with respect to the SFC to another person, then for purposes of this section, the transfer may be disregarded or other appropriate adjustments may be made.

(ii) *Certain section 381 transactions.* If assets of an SFC (the *acquired corporation*) are acquired by another SFC (the *acquiring corporation*) pursuant to a transaction described in section 381(a) in which the acquired corporation is the transferor corporation for purposes of section 381, then a section 245A shareholder's extraordinary disposition account with respect to the acquiring corporation is increased by the balance of its extraordinary disposition account with respect to the acquired corporation, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and before the application of this paragraph (c)(4)(ii).

(iii) *Certain distributions involving section 355 or 356.* If, pursuant to a reorganization described in section 368(a)(1)(D) involving a distribution under section 355 (or so much of section 356 as it relates to section 355) by an SFC (the *distributing corporation*) of stock of another SFC (the *controlled corporation*), earnings and profits of the distributing corporation are allocated between the distributing corporation and the controlled corporation, then a section 245A shareholder's extraordinary disposition account with respect to the distributing corporation is allocated on a similar basis between the distributing corporation and the controlled corporation.

(iv) *Certain transfers of stock of lower-tier CFCs by upper-tier CFCs.* If an upper-tier CFC directly or indirectly transfers stock of a lower-tier CFC and if as a result of the transfer a section

561

245A shareholder ceases to be a section 245A shareholder with respect to the lower-tier CFC, then the section 245A shareholder's extraordinary disposition account with respect to the upper-tier CFC is increased by the balance of the section 245A shareholder's extraordinary disposition account with respect to the lower-tier CFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and after application of paragraph (c)(4)(i) of this section, if applicable. If a section 245A shareholder ceases to be a section 245A shareholder with respect to a lower-tier CFC by reason of a direct or indirect transfer of stock of the lower-tier CFC by multiple upper-tier CFCs that occur pursuant to a plan (or series of related transactions), then the balance of the section 245A shareholder's extraordinary disposition account is allocated among the upper-tier CFCs. The portion of the balance of the account allocated to each upper-tier CFC is equal to the balance of the account multiplied by a fraction, the numerator of which is the value of the stock of the lower-tier CFC transferred directly or indirectly by the upper-tier CFC, and the denominator of which is the sum of the value of the stock of the lower-tier CFC transferred directly or indirectly by all upper-tier CFCs.

(d) *Limitation of amount eligible for section 954(c)(6) when there is an extraordinary disposition account with respect to a lower-tier CFC*—(1) *In general.* If an upper-tier CFC receives a dividend from a lower-tier CFC, the dividend is eligible for the exception to foreign personal holding company income under section 954(c)(6) only to the extent that the amount that would be eligible for the section 954(c)(6) exception (determined without regard to this paragraph (d)) exceeds the *disqualified amount*, which is 50 percent of the quotient of the following—

(i) The sum of each section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC; and

(ii) The percentage (expressed as a decimal) of stock of the upper-tier CFC (by value) owned, in the aggregate, by U.S. tax residents that include in gross income their pro rata share of the upper-tier CFC's subpart F income under section 951(a) on the last day of the upper-tier CFC's taxable year. If a U.S. tax resident is a direct or indirect partner in a domestic partnership that is a United States shareholder of the upper-tier CFC, the amount of stock owned by the U.S. tax resident for purposes of the preceding sentence is determined under the principles of paragraph (g)(3) of this section.

(2) *Definition of tiered extraordinary disposition amount*—(i) *In general.* The term *tiered extraordinary disposition amount* means, with respect to a dividend received by an upper-tier CFC from a lower-tier CFC and a section 245A shareholder, the portion of the dividend that would be an extraordinary disposition amount if the section 245A shareholder received as a dividend its pro rata share of the dividend from the lower-tier CFC. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC from a lower-tier CFC by reason of section 964(e)(4) (in such case, see paragraphs (b)(1) and (g)(2) of this section).

(ii) *Section 245A shareholder's pro rata share of a dividend received by an upper-tier CFC.* For the purposes of paragraph (d)(2)(i) of this section, a section 245A shareholder's pro rata share of the amount of a dividend received by an upper-tier CFC from a lower-tier CFC equals the amount by which the dividend would increase the section 245A shareholder's pro rata share of the upper-tier CFC's subpart F income under section 951(a)(2) and §1.951–1(b) and (e) if the dividend were included in the upper-tier CFC's foreign personal holding company income under section 951(a)(1), determined without regard to section 952(c) and as if the upper-tier CFC had no deductions properly allocable to the dividend under section 954(b)(5).

(e) *Extraordinary reduction amount*—(1) *In general.* Except as provided in paragraph (e)(3) of this section, the term *extraordinary reduction amount* means, with respect to a dividend received by a controlling section 245A shareholder from a CFC during a taxable year of the CFC ending after December 31, 2017, in which an extraordinary reduction occurs with respect to

**Internal Revenue Service, Treasury**                    **§ 1.245A–5T**

the controlling section 245A share-holder's ownership of the CFC, the less-er of the amounts described in para-graph (e)(1)(i) or (ii) of this section. *See* paragraphs (j)(4) through (6) of this sec-tion for examples illustrating the appli-cation of this paragraph (e).

(i) The amount of the dividend.

(ii) The amount equal to the sum of the controlling section 245A share-holder's pre-reduction pro rata share of the CFC's subpart F income (as defined in section 952(a)) and tested income (as defined in section 951A(c)(2)(A)) for the taxable year, reduced, but not below zero, by the prior extraordinary reduc-tion amount.

(2) *Rules regarding extraordinary re-duction amounts*—(i) *Extraordinary re-duction*—(A) *In general.* Except as pro-vided in paragraph (e)(2)(i)(C) of this section, an *extraordinary reduction* oc-curs, with respect to a controlling sec-tion 245A shareholder's ownership of a CFC during a taxable year of the CFC, if either of the conditions described in paragraph (e)(2)(i)(A)(*1*) or (*2*) of this section is satisfied. See paragraphs (j)(4) and (5) of this section for exam-ples illustrating an extraordinary re-duction.

(*1*) The condition of this paragraph (e)(2)(i)(A)(*1*) requires that during the taxable year, the controlling section 245A shareholder transfers directly or indirectly (other than by reason of a transfer occurring pursuant to an ex-change described in section 368(a)(1)(E) or (F)), in the aggregate, more than 10 percent (by value) of the stock of the CFC that the section 245A shareholder owns directly or indirectly as of the be-ginning of the taxable year of the CFC, provided the stock transferred, in the aggregate, represents at least 5 percent (by value) of the outstanding stock of the CFC as of the beginning of the tax-able year of the CFC; or

(*2*) The condition of this paragraph (e)(2)(i)(A)(*2*) requires that, as a result of one or more transactions occurring during the taxable year, the percentage of stock (by value) of the CFC that the controlling section 245A shareholder owns directly or indirectly as of the close of the last day of the taxable year of the CFC is less than 90 percent of the percentage of stock (by value) that the controlling section 245A shareholder

owns directly or indirectly on either of the dates described in paragraphs (e)(2)(i)(B)(*1*) and (*2*) of this section (such percentage, the *initial percentage*), provided the difference between the initial percentage and percentage at the end of the year is at least five per-centage points.

(B) *Dates for purposes of the initial per-centage.* For purposes of paragraph (e)(2)(i)(A)(*2*) of this section, the dates described in paragraphs (e)(2)(i)(B)(*1*) and (*2*) of this section are—

(*1*) The day of the taxable year on which the controlling section 245A shareholder owns directly or indirectly its highest percentage of stock (by value) of the CFC; and

(*2*) The day immediately before the first day on which stock was trans-ferred directly or indirectly in the pre-ceding taxable year in a transaction (or a series of transactions) occurring pur-suant to a plan to reduce the percent-age of stock (by value) of the CFC that the controlling section 245A share-holder owns directly or indirectly.

(C) *Transactions pursuant to which CFC's taxable year ends.* A controlling section 245A shareholder's direct or in-direct transfer of stock of a CFC that but for this paragraph (e)(2)(i)(B) would give rise to an extraordinary reduction under paragraph (e)(2)(i)(A) of this sec-tion does not give rise to an extraor-dinary reduction if the taxable year of the CFC ends immediately after the transfer, provided that the controlling section 245A shareholder directly or in-directly owns the stock on the last day of such year. Thus, for example, if a controlling section 245A shareholder exchanges all the stock of a CFC pursu-ant to a complete liquidation of the CFC, the exchange does not give rise to an extraordinary reduction.

(ii) *Rules for determining pre-reduction pro rata share*—(A) *In general.* Except as provided in paragraph (e)(2)(ii)(B) of this section, the term *pre-reduction pro rata share* means, with respect to a con-trolling section 245A shareholder and the subpart F income or tested income of a CFC, the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested in-come under section 951(a)(2) and §1.951–1(b) and (e) or section 951A(e)(1) and

563

- Add.59 -

§1.951A–1(d)(1), respectively, determined based on the controlling section 245A shareholder's direct or indirect ownership of stock of the CFC immediately before the extraordinary reduction (or, if the extraordinary reduction occurs by reason of multiple transactions, immediately before the first transaction) and without regard to section 951(a)(2)(B) and §1.951–1(b)(1)(ii), but only to the extent that such subpart F income or tested income is not included in the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested income under section 951(a)(2) and §1.951–1(b) and (e) or section 951A(e)(1) and §1.951A–1(d)(1), respectively.

(B) *Decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* A controlling section 245A shareholder's pre-reduction pro rata share of subpart F income or tested income of a CFC for a taxable year is reduced by an amount equal to the sum of the amounts by which each U.S. tax resident's pro rata share of the subpart F income or tested income is increased as a result of a transfer directly or indirectly of stock of the CFC by the controlling section 245A shareholder or an issuance of stock by the CFC (such an amount with respect to a U.S. tax resident, a *specified amount*), in either case, during the taxable year in which the extraordinary reduction occurs. For purposes of this paragraph (e)(2)(ii)(B), if there are extraordinary reductions with respect to more than one controlling section 245A shareholder during the CFC's taxable year, then a U.S. tax resident's specified amount attributable to an acquisition of stock from the CFC is prorated with respect to each controlling section 245A shareholder based on its relative decrease in ownership of the CFC. See paragraph (j)(5) of this section for an example illustrating a decrease in a section 245A shareholder's pre-reduction pro rata share for amounts taken into account by a U.S. tax resident.

(C) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* means, with respect to a CFC and section 245A shareholder and a taxable year of the CFC in which an extraordinary reduction occurs, the

sum of the extraordinary reduction amount of each prior dividend received by the section 245A shareholder from the CFC during the taxable year. A section 245A shareholder's prior extraordinary reduction amount also includes—

(*1*) A prior dividend received by the section 245A shareholder from the CFC during the taxable year to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary reduction amount had this paragraph (e) applied to the dividend;

(*2*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper tier-CFC, the portion of a prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year of the lower-tier CFC that, by reason of section 245A(e), was included in the upper-tier CFC's foreign personal holding company income and that by reason of section 951(a) was included in income of the section 245A shareholder, and that would have given rise to a tiered extraordinary reduction amount by reason of paragraph (f) of this section had paragraph (f) applied to the dividend of which the section 245A shareholder would have included a pro rata share of the tiered extraordinary reduction amount in income by reason of section 951(a); and

(*3*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper-tier CFC, the sum of the portion of the tiered extraordinary reduction amount of each prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year that is included in income of the section 245A shareholder by reason of section 951(a).

(3) *Exceptions*—(i) *Elective exception to close CFC's taxable year*—(A) *In general.* For a taxable year of a CFC in which an extraordinary reduction occurs with respect to a controlling section 245A shareholder and for which, absent this paragraph (e)(3), there would be an extraordinary reduction amount or tiered

**Internal Revenue Service, Treasury** § 1.245A–5T

extraordinary reduction amount greater than zero, no amount is considered an extraordinary reduction amount or tiered extraordinary reduction amount with respect to the controlling section 245A shareholder if each controlling section 245A shareholder, pursuant to this paragraph (e)(3), to close the CFC's taxable year for all purposes of the Internal Revenue Code (and, therefore, as to all shareholders of the CFC) as of the end of the date on which the extraordinary reduction occurs, or, if the extraordinary reduction occurs by reason of multiple transactions, as of the end of each date on which a transaction forming a part of the extraordinary reduction occurs. For purposes of applying this paragraph (e)(3), a controlling section 245A shareholder that has an extraordinary reduction (or a transaction forming a part thereof) with respect to a CFC is treated as owning the same amount of stock it owned in the CFC immediately before the extraordinary reduction (or a transaction forming a part thereof) on the end of the date on which the extraordinary reduction occurs (or such transaction forming a part thereof occurs). To the extent that stock of a CFC is treated as owned by a controlling section 245A shareholder as of the close of the CFC's taxable year pursuant to the preceding sentence, such stock is treated as not being owned by any other person as of the close of the CFC's taxable year. If each controlling section 245A shareholder elects to close the CFC's taxable year, that closing will be treated as a change in accounting period for the purposes of § 1.964–1(c).

(B) *Allocation of foreign taxes.* If an election is made pursuant to this paragraph (e)(3) to close a CFC's taxable year and the CFC's taxable year under foreign law (if any) does not close at the end of the date on which the CFC's taxable year closes as a result of the election, foreign taxes paid or accrued with respect to such foreign taxable year are allocated between the period of the foreign taxable year that ends with, and the period of the foreign taxable year that begins after, the date on which the CFC's taxable year closes as a result of the election. If there is more than one date on which the CFC's tax-

able year closes as a result of the election, foreign taxes paid or accrued with respect to the foreign taxable year are allocated to all such periods. The allocation is made based on the respective portions of the taxable income of the CFC (as determined under foreign law) for the foreign taxable year that are attributable under the principles of § 1.1502–76(b) to the periods during the foreign taxable year. Foreign taxes allocated to a period under this paragraph (e)(3)(i)(B) are treated as paid or accrued by the CFC as of the close of that period.

(C) *Time and manner of making election—(1) General rule.* An election pursuant to this paragraph (e)(3) is made and effective if the statement described in paragraph (e)(3)(i)(D)of this section is timely filed (including extensions) by each controlling section 245A shareholder making the election with its original U.S. tax return for the taxable year in which the extraordinary reduction occurs. Before the filing of the statement described in paragraph (e)(3)(iv) of this section, each controlling section 245A shareholder and each U.S. tax resident that on the end of the date on which the extraordinary reduction occurs (or, if the extraordinary reduction occurs by reason of multiple transactions, each U.S. tax resident that on the end of each date on which a transaction forming a part of the extraordinary reduction occurs) owns directly or indirectly stock of the CFC and is a United States shareholder with respect to the CFC must enter into a written, binding agreement agreeing that each controlling section 245A shareholder will elect to close the taxable year of the CFC. If a controlling section 245A shareholder is a member of a consolidated group (within the meaning of § 1.1502–1(h)) and participates in the extraordinary reduction, the agent for such group (within the meaning of § 1.1502–77(c)(1)) must file the election described in this paragraph (e)(3) on behalf of such member.

(2) *Transition rule.* In the case of an extraordinary reduction occurring before the date these regulations are filed as final regulations in the FEDERAL REGISTER, the statement described in paragraph (e)(3)(i)(D) of this section is considered timely filed if it is attached

by each controlling section 245A share-holder to an original or amended re-turn for the taxable year in which the extraordinary reduction occurs.

(D) *Form and content of statement.* The statement required by paragraph (e)(3)(i)(C) of this section is to be titled ''Elective Section 245A Year-Closing Statement.'' The statement must—

(*1*) Identify (by name and tax identi-fication number, if any) each control-ling section 245A shareholder, each U.S tax resident described in paragraph (e)(3)(iii) of this section, and the CFC;

(*2*) State the date of the extraor-dinary reduction (or, if the extraor-dinary reduction includes transactions on more than one date, the dates of all such transactions) to which the elec-tion applies;

(*3*) State the filing controlling sec-tion 245A shareholder's pro rata share of the subpart F income, tested in-come, and foreign taxes described in section 960 with respect to the stock of the CFC subject to the extraordinary reduction, and the amount of earnings and profits attributable to such stock within the meaning of section 1248, as of the date of the extraordinary reduc-tion;

(*4*) State that each controlling sec-tion 245A shareholder and each U.S. tax resident described in paragraph (e)(3)(iii) of this section have entered into a written, binding agreement to elect to close the CFC's taxable year in accordance with paragraph (e)(3)(iii) of this section; and

(*5*) Be filed in the manner prescribed by forms, publications, or other guid-ance published in the Internal Revenue Bulletin.

(E) *Consistency requirements.* If multiple extraordinary reductions occur with respect to one or more controlling section 245A shareholders' ownership in a single CFC during one or more tax-able years of the CFC, then to the ex-tent those extraordinary reductions occur pursuant to a plan or series of re-lated transactions, the election de-scribed in this paragraph (e)(3) section may be made only if it is made for all such extraordinary reductions with re-spect to the CFC. Furthermore, if an extraordinary reduction occurs with respect to a controlling section 245A shareholder's ownership in multiple

CFCs, then, to the extent those ex-traordinary reductions occur pursuant to a plan or series of related trans-actions, the election described in this paragraph (e)(3) may be made only if it is made for all such extraordinary re-ductions with respect to all of the CFCs that have the same or related (within the meaning of section 267(b) or 707(b)) controlling section 245A share-holders.

(ii) *De minimis subpart F income and tested income.* For a taxable year of a CFC in which an extraordinary reduc-tion occurs, no amount is considered an extraordinary reduction amount (or, with respect to a lower-tier CFC, a tiered extraordinary reduction amount under paragraph (f) of this section) with respect to a controlling section 245A shareholder of the CFC if the sum of the CFC's subpart F income and tested income (as defined in section 951A(c)(2)(A)) for the taxable year does not exceed the lesser of $50 million or 5 percent of the CFC's total income for the taxable year.

(f) *Limitation of amount eligible for sec-tion 954(c)(6) where extraordinary reduc-tion occurs with respect to lower-tier CFCs*—(1) *In general.* If an extraor-dinary reduction occurs with respect to a lower-tier CFC and an upper-tier CFC receives a dividend from the lower-tier CFC in the taxable year in which the extraordinary reduction occurs, then the amount of the dividend that would otherwise be eligible for the exception to foreign personal holding company income under section 954(c)(6) (deter-mined without regard to this para-graph (f)) is eligible for such exception only to the extent the dividend exceeds the tiered extraordinary reduction amount. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC by reason of section 964(e)(4) (in this case, see paragraphs (b) and (g)(2) of this section). See paragraph (j)(7) of this section for an example illus-trating the application of this para-graph (f)(1).

(2) *Definition of tiered extraordinary re-duction amount.* The term *tiered extraor-dinary reduction amount* means, with re-spect to the portion of a dividend re-ceived by an upper-tier CFC from a lower-tier CFC during a taxable year of

- Add.62 -

**Internal Revenue Service, Treasury**                                    **§ 1.245A–5T**

the lower-tier CFC that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) (determined without regard to this paragraph (f)), the amount of such dividend equal to the excess, if any, of—

(i) The product of—

(A) The sum of the amount of the subpart F income and tested income of the lower-tier CFC for the taxable year; and

(B) The percentage (by value) of stock of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately before the extraordinary reduction (or the first transaction forming a part thereof); over

(ii) The following amounts—

(A) The sum of each U.S. tax resident's pro rata share of the lower-tier CFC's subpart F income and tested income under section 951(a) or 951A(a), respectively, that is attributable to shares of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately prior to the extraordinary reduction (or the first transaction forming a part thereof), computed without the application of this paragraph (f);

(B) The sum of each prior tiered extraordinary reduction amount and sum of each amount included in an upper-tier CFC's subpart F income by reason of section 245A(e) with respect to prior dividends from the lower-tier CFC during the taxable year;

(C) The sum of the prior extraordinary reduction amounts (but, for this purpose, computed without regard to amounts described in paragraphs (e)(2)(ii)(C)(2) and (3) of this section) of each controlling section 245A shareholder with respect to shares of the lower-tier CFC that were owned by such controlling section 245A shareholder (including indirectly through a specified entity other than a foreign corporation) for a portion of the taxable year but are owned by an upper-tier CFC (including indirectly through a specified entity other than a foreign corporation) at the time of the distribution of the dividend; and

(D) The product of the amount described in paragraph (f)(2)(i)(B) of this section and the sum of the amounts of

each U.S. tax resident's pro rata share of subpart F income and tested income for the taxable year under section 951(a) or 951A(a), respectively, attributable to shares of the lower-tier CFC directly or indirectly acquired by the U.S. tax resident from the lower-tier CFC during the taxable year.

(3) *Transition rule for computing tiered extraordinary reduction amount.* Solely for purposes of applying this paragraph (f) in taxable years of a lower-tier CFC beginning on or after January 1, 2018, and ending before June 14, 2019, a tiered extraordinary reduction amount is determined by treating the lower-tier CFC's subpart F income for the taxable year as if it were neither subpart F income nor tested income.

(g) *Special rules.* The following rules apply for purposes of this section.

(1) *Source of dividends.* A dividend received by any person is considered received directly by such person from the foreign corporation whose earnings and profits give rise to the dividend. Therefore, for example, if a section 245A shareholder sells or exchanges stock of an upper-tier CFC and the gain recognized on the sale or exchange is included in the gross income of the section 245A shareholder as a dividend under section 1248(a), then, to the extent the dividend is attributable under section 1248(c)(2) to the earnings and profits of a lower-tier CFC owned, within the meaning of section 958(a)(2), by the section 245A shareholder through the upper-tier CFC, the dividend is considered received directly by the section 245A shareholder from the lower-tier CFC.

(2) *Certain section 964(e) inclusions treated as dividends.* An amount included in the gross income of a section 245A shareholder under section 951(a)(1)(A) by reason of section 964(e)(4) is considered a dividend received by the section 245A shareholder directly from the foreign corporation whose earnings and profits give rise to the amount described in section 964(e)(1). Therefore, for example, if an upper-tier CFC sells or exchanges stock of a lower-tier CFC, and, as a result of the sale or exchange, a section 245A shareholder with respect to the upper-tier CFC includes an amount in gross income under section 951(a)(1)(A) by

567

- Add.63 -

reason of section 964(e)(4), then the inclusion is treated as a dividend received directly by the section 245A shareholder from the lower-tier CFC whose earnings and profits give rise to the dividend, and the section 245A shareholder is not allowed a section 245A deduction for the dividend to the extent of the ineligible amount of such dividend.

(3) *Rules regarding stock ownership and stock transfers*—(i) *Determining indirect ownership of stock of an SFC or a CFC.* For purposes of this section, if a person owns an interest in, or stock of, a specified entity, including through a chain of ownership of one or more other specified entities, then the person is considered to own indirectly a pro rata share of stock of an SFC or a CFC owned by the specified entity. To determine a person's pro rata share of stock owned by a specified entity, the principles of section 958(a) apply without regard to whether the specified entity is foreign or domestic.

(ii) *Determining indirect transfers for stock owned indirectly.* If, under paragraph (g)(3)(i) of this section, a person is considered to own indirectly stock of an SFC or CFC that is owned by a specified entity, then the following rules apply in determining if the person transfers stock of the SFC or CFC—

(A) To the extent the specified entity transfers stock that is considered owned indirectly by the person immediately before the transfer, the person is considered to transfer indirectly such stock;

(B) If the person transfers an interest in, or stock of, the specified entity, then the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the specified entity that is transferred; and

(C) In the case in which the person owns the specified entity through a chain of ownership of one or more other specified entities, if there is a transfer of an interest in, or stock of, another specified entity in the chain of ownership, then the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the other specified entity transferred.

(iii) *Definition of specified entity.* The term *specified entity* means any partnership, trust, or estate (in each case, domestic or foreign), or any foreign corporation.

(4) *Coordination rules*—(i) *General rule.* A dividend is first subject to section 245A(e). To the extent the dividend is not a hybrid dividend or tiered hybrid dividend under section 245A(e), the dividend is subject to paragraph (e) or (f) of this section, as applicable, and then, to the extent the dividend is not subject to paragraph (e) or (f) of this section, it is subject to paragraph (c) or (d) of this section, as applicable.

(ii) *Coordination rule for paragraphs (c) and (d) and (e) and (f) of this section, respectively.* If an SFC or CFC pays a dividend (or simultaneous dividends), a portion of which may be subject to paragraph (c) or (e) of this section and a portion of which may be subject to paragraph (d) or (f) of this section, the rules of this section apply by treating the portion of the dividend or dividends that may be subject to paragraph (c) or (e) of this section as if it occurred immediately before the portion of the dividend or dividends that may be subject to paragraph (d) or (f) of this section. For example, if a dividend arising under section 964(e)(4) occurs at the same time as a dividend that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) but for the potential application of paragraph (d) this section, then the tiered extraordinary disposition amount with respect to the other dividend is determined as if the dividend arising under section 964(e)(4) occurs immediately prior to the other dividend.

(5) *Ordering rule for multiple dividends made by an SFC or a CFC during a taxable year.* If an SFC or a CFC pays dividends on more than one date during its taxable year or at different times on the same date, this section applies based on the order in which the dividends are paid.

(6) *Partner's distributive share of a domestic partnership's pro rata share of subpart F income.* If a section 245A shareholder or a U.S. tax resident is a direct

or indirect partner in a domestic partnership that is a United States shareholder with respect to a CFC and includes in gross income its pro rata share of the CFC's subpart F income under section 951(a), then, solely for purposes of this section, a reference to the section 245A shareholder's or U.S. tax resident's pro rata share of the CFC's subpart F income included in gross income under section 951(a) includes such person's distributive share of the domestic partnership's pro rata share of the CFC's subpart F income. A person is an indirect partner with respect to a domestic partnership if the person indirectly owns the domestic partnership through one or more specified entities (other than a foreign corporation).

(h) *Anti-abuse rule.* The Commissioner may make appropriate adjustments to any amounts determined under this section if a transaction is engaged in with a principal purpose of avoiding the purposes of this section.

(i) *Definitions.* The following definitions apply for purposes of this section.

(1) *Controlled foreign corporation.* The term *controlled foreign corporation* (or *CFC*) has the meaning provided in section 957.

(2) *Controlling section 245A shareholder.* The term *controlling section 245A shareholder* means, with respect to a CFC, any section 245A shareholder that owns directly or indirectly more than 50 percent (by vote or value) of the stock of the CFC. For purposes of determining whether a section 245A shareholder is a controlling section 245A shareholder with respect to a CFC, all stock of the CFC owned by a related party with respect to the section 245A shareholder or by other persons acting in concert with the section 245A shareholder to undertake an extraordinary reduction is considered owned by the section 245A shareholder. If section 964(e)(4) applies to a sale or exchange of a lower-tier CFC with respect to a controlling section 245A shareholder, all United States shareholders of the CFC are considered to act in concert with regard to the sale or exchange. In addition, if all persons selling stock in a CFC, held directly, sell such stock to the same buyer or buyers (or a related party with respect to the buyer or buyers) as part of the same plan, all sellers will be considered to act in concert with regard to the sale or exchange.

(3) *Disqualified amount.* The term *disqualified amount* has the meaning set forth in paragraph (d)(1) of this section.

(4) *Disqualified period.* The term *disqualified period* has the meaning set forth in paragraph (c)(3)(iii) of this section.

(5) *Extraordinary disposition.* The term *extraordinary disposition* has the meaning set forth in paragraph (c)(3)(ii) of this section.

(6) *Extraordinary disposition account.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(3)(i) of this section.

(7) *Extraordinary disposition amount.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(1) of this section.

(8) *Extraordinary disposition E&P.* The term *extraordinary E&P* has the meaning set forth in paragraph (c)(3)(i)(C) of this section.

(9) *Extraordinary disposition ownership percentage.* The term extraordinary disposition ownership percentage has the meaning set forth in paragraph (c)(3)(i)(B) of this section.

(10) *Extraordinary reduction.* The term *extraordinary reduction* has the meaning set forth in paragraph (e)(2)(i)(A) of this section.

(11) *Extraordinary reduction amount.* The term *extraordinary reduction amount* has the meaning set forth in paragraph (e)(1) of this section.

(12) *Ineligible amount.* The term *ineligible amount* has the meaning set forth in paragraph (b)(2) of this section.

(13) *Lower-tier CFC.* The term *lower-tier CFC* means a CFC whose stock is owned (within the meaning of section 958(a)(2)), in whole or in part, by another CFC.

(14) *Non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* has the meaning set forth in paragraph (c)(2)(ii) of this section.

(15) *Pre-reduction pro rata share.* The term *pre-reduction pro rata share* has the meaning set forth in paragraph (e)(2)(ii) of this section.

(16) *Prior extraordinary disposition amount.* The term *prior extraordinary disposition amount* has the meaning set

forth in paragraph (c)(3)(i)(D) of this section.

(17) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* has the meaning set forth in paragraph (e)(2)(ii)(C) of this section.

(18) *Qualified portion.* The term *qualified portion* has the meaning set forth in paragraph (c)(3)(i)(D)(*2*)(*i*) of this section.

(19) *Related party.* The term *related party* means, with respect to a person, another person bearing a relationship described in section 267(b) or 707(b) to the person, in which case such persons are *related.*

(20) *Section 245A deduction.* The term *section 245A deduction* means, with respect to a dividend received by a section 245A shareholder from an SFC, the amount of the deduction allowed to the section 245A shareholder by reason of the dividend.

(21) *Section 245A shareholder.* The term *section 245A shareholder* means a domestic corporation that is a United States shareholder with respect to an SFC that owns directly or indirectly stock of the SFC.

(22) *Specified 10-percent owned foreign corporation (SFC).* The term *specified 10-percent owned foreign corporation (or SFC)* has the meaning provided in section 245A(b)(1).

(23) *Specified entity.* The term *specified entity* has the meaning set forth in paragraph (g)(3)(iii) of this section.

(24) *Specified property.* The term *specified property* has the meaning set forth in paragraph (c)(3)(iv) of this section.

(25) *Tiered extraordinary disposition amount.* The term *tiered extraordinary disposition amount* has the meaning set forth in paragraph (d)(2)(i) of this section.

(26) *Tiered extraordinary reduction amount.* The term *tiered extraordinary reduction amount* has the meaning set forth in paragraph (f)(2) of this section.

(27) *United States shareholder.* The term *United States shareholder* has the meaning provided in section 951(b).

(28) *Upper-tier CFC.* The term *upper-tier CFC* means a CFC that owns (within the meaning of section 958(a)(2)) stock in another CFC.

(29) *U.S. tax resident.* The term *U.S. tax resident* means a United States person described in section 7701(a)(30)(A) or (C).

(j) *Examples.* The application of this section is illustrated by the examples in this paragraph (j).

(1) *Facts.* Except as otherwise stated, the following facts are assumed for purposes of the examples:

(i) US1 and US2 are domestic corporations, each with a calendar taxable year, and are not related parties with respect to each other.

(ii) CFC1 and CFC2 are foreign corporations that are SFCs and CFCs.

(iii) Each entity uses the U.S. dollar as its functional currency.

(iv) Year 2 begins on or after January 1, 2018, and has 365 days.

(v) Absent application of this section, the dividends received by US1 and US2 from CFC1 meet the requirements to qualify for the section 245A deduction.

(vi) The de minimis rules in paragraphs (c)(3)(ii)(E) and (e)(3)(ii) of this section do not apply.

(2) *Example 1. Extraordinary disposition*—(i) *Facts.* US1 and US2 own 60% and 40%, respectively, of the single class of stock of CFC1. CFC1 owns all of the single class of stock of CFC2. CFC1 and CFC2 use the taxable year ending November 30 as their taxable year. On November 1, 2018, CFC1 sells specified property to CFC2 in exchange for $200x of cash (the "Property Transfer"). The Property Transfer is outside of CFC1's ordinary course of activities. The transferred property has a basis of $100x in the hands of CFC1. CFC1 recognizes $100x of gain as a result of the Property Transfer ($200x−$100x). On December 1, 2018, CFC1 distributes $80x pro rata to US1 ($48x) and US2 ($32x), all of which is a dividend within the meaning of section 316 and treated as a distribution out of earnings described in section 959(c)(3). No other distributions are made by CFC1 to either US1 or US2 in CFC1's taxable year ending November 30, 2019. For its taxable year ending on November 30, 2019, CFC1 has $110x of earnings and profits described in section 959(c)(3), without regard to any distributions during the taxable year.

(ii) *Analysis*—(A) *Identification of extraordinary disposition.* Because CFC1 is a CFC and uses the taxable year ending on November 30, under paragraph

**Internal Revenue Service, Treasury**                    **§ 1.245A–5T**

(c)(3)(iii) of this section, it has a disqualified period beginning on January 1, 2018, and ending on November 30, 2018. In addition, under paragraph (c)(3)(ii) of this section, the Property Transfer is an extraordinary disposition because it (i) is a disposition of specified property by CFC1 on a date on which it was a CFC and during CFC1's disqualified period, (ii) is to CFC2, a related party with respect to CFC1, (iii) occurs outside of the ordinary course of CFC1's activities, and (iv) is not subject to the de minimis rule in paragraph (c)(3)(ii)(E) of this section.

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Because CFC1 undertook an extraordinary disposition, under paragraph (c)(3)(i) of this section, a portion of CFC1's earnings and profits are extraordinary disposition E&P and, therefore, give rise to an extraordinary disposition account with respect to each of CFC1's section 245A shareholders. Under paragraph (i)(21) of this section, US1 and US2 are both section 245A shareholders with respect to CFC1. The amount of the extraordinary disposition account with respect to US1 is $60x, which is equal to the product of the extraordinary disposition E&P (the amount of the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and the extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US1 on January 1, 2018 (60%)), reduced by the prior extraordinary disposition amount ($0). *See* paragraph (c)(3)(i) of this section. Similarly, the amount of the extraordinary disposition account with respect to US2 is $40x, which is equal to the product of the extraordinary disposition E&P (the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US2 on January 1, 2018 (40%)), reduced by the prior extraordinary disposition amount ($0).

(C) *Determination of extraordinary disposition amount with respect to US1.* The dividend of $48x paid to US1 on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of the extraordinary disposition account with respect to US1. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US1, to the extent thereof. With respect to US1, $6x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $66x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 60%) over $60x (the balance of US1's extraordinary disposition account with respect to CFC1, immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $6x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US1. Under paragraph (c)(2)(i)(B) of this section, the remaining $42x of the dividend is next considered paid out of US1's extraordinary disposition account with respect to CFC1, to the extent thereof. Accordingly, $42x of the dividend is considered paid out of the extraordinary disposition account with respect to CFC1 and gives rise to $42x of an extraordinary disposition amount. As a result, US1's prior extraordinary disposition amount is increased by $42x under paragraph (c)(3)(i)(D) of this section, and US1's extraordinary disposition account is reduced to $18x ($60 – $42x) under paragraph (c)(3)(i)(A) of this section.

(D) *Determination of extraordinary disposition amount with respect to US2.* The dividend of $32x paid to US2, on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of extraordinary disposition E&P with respect to US2. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US2, to the extent thereof. With respect to US2, $4x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $44x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 40%) over $40x (the balance of US2's extraordinary disposition account with respect to CFC1,

571

- Add.67 -

immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $4x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US2. Under paragraph (c)(2)(i)(B) of this section, the remaining $28x of the dividend is next considered paid out of US2's extraordinary disposition account with respect to CFC1, to the extent thereof. Accordingly, $28x of the dividend is considered paid out of the extraordinary disposition account with respect to US2 and gives rise to $28x of an extraordinary disposition amount. As a result, US2's prior extraordinary disposition amount is increased by $28x under paragraph (c)(3)(i)(D) of this section, and US2's extraordinary disposition account is reduced to $12x ($40 − $28x) under paragraph (c)(3)(i)(A) of this section.

(E) *Determination of ineligible amount with respect to US1 and US2.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $48x, the ineligible amount is $21x, the sum of 50 percent of the extraordinary disposition amount ($42x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US1 of $48x, $27x is eligible for a section 245A deduction. With respect to US2 and the dividend of $32x, the ineligible amount is $14x, the sum of 50% of the extraordinary disposition amount ($28x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US2 of $32x, $18x is eligible for a section 245A deduction.

(3) *Example 2. Application of section 954(c)(6) exception with extraordinary disposition account*—(i) *Facts.* The facts are the same as in paragraph (j)(2)(i) of this section (the facts in *Example 1*) except that the Property Transfer is a sale by CFC2 to CFC1 instead of a sale by CFC1 to CFC2, the $80x distribution is by CFC2 to CFC1 in a separate transaction that is unrelated to the Property Transfer, and the description of the earnings and profits of CFC1 is applied to CFC2. Additionally, absent the application of this section, section 954(c)(6) would apply to the distribution by CFC2 to CFC1. Under section 951(a)(2) and §1.951–1(b) and (e), US1's pro rata share of any subpart F income of CFC1 is 60% and US2's pro rata share of any subpart F income of CFC2 is 40%.

(ii) *Analysis*—(A) *Identification of extraordinary disposition.* The Property Transfer is an extraordinary disposition under the same analysis as provided in paragraph (j)(2)(ii)(A) of this section (the analysis in *Example 1*).

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Both US1 and US2 are section 245A shareholders with respect to CFC2, US1 has an extraordinary disposition account of $60x with respect to CFC2, and US2 has an extraordinary disposition account of $40x with respect to CFC2 under the same analysis as provided in paragraph (j)(2)(ii)(B) of this section (the analysis in *Example 1*).

(C) *Determination of tiered extraordinary disposition amount*—(1) *In general.* US1 and US2 each have a tiered extraordinary disposition amount with respect to the $80x dividend paid by CFC2 to CFC1 to the extent that US1 and US2 would have an extraordinary disposition amount if each had received as a dividend its pro rata share of the dividend from CFC2. *See* paragraph (d)(2)(i) of this section. Under paragraph (d)(2)(ii) of this section, US1's pro rata share of the dividend is $48x (60% − $80x), that is, the increase to US1's pro rata share of the subpart F income if the dividend were included in CFC1's foreign personal holding company income, without regard to section 952(c) and the allocation of expenses. Similarly, US2's pro rata share of the dividend is $32x (40% − $80x).

(2) *Determination of tiered extraordinary disposition amount with respect to US1.* The extraordinary disposition amount with respect to US1 is $42x, under the same analysis provided in paragraph (j)(2)(ii)(C) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US1 is $42x.

(3) *Determination of extraordinary disposition amount with respect to US2.* The extraordinary disposition amount with respect to US2 is $28x, under the same analysis provided in paragraph (j)(2)(ii)(D) of this section (the analysis in *Example 1*). Accordingly, the tiered

**Internal Revenue Service, Treasury**                                           **§ 1.245A–5T**

extraordinary disposition amount with respect to US2 is $28x.

(D) *Limitation of section 954(c)(6) exception.* The sum of US1 and US2's tiered extraordinary disposition amounts is $70x ($42x + $28x). The portion of the stock of CFC1 (by value) owned (within the meaning of section 958(a)) by U.S. tax residents on the last day of CFC1's taxable year is 100%. Under paragraph (d)(1) of this section, the disqualified amount with respect to the dividend is $35x (50% × ($70x/100%)). Accordingly, the portion of the $80x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $45x ($80x −$35x). Under section 951(a)(2) and §1.951–1(b) and (e), US1 includes $21x (60% × $35x) and US2 includes $14x (60% × $35x) in income under section 951(a).

(E) *Changes in extraordinary disposition account of US1.* Under paragraph (c)(3)(i)(D)(*1*) of this section, US1's prior extraordinary disposition amount with respect to CFC2 is increased by $42x, or 200% of $21x, the amount US1 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(*1*)(*iii*) of this section, US1 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US1's extraordinary disposition account is reduced to $18x ($60x–$42x) under paragraph (c)(3)(i)(A) of this section.

(F) *Changes in extraordinary disposition account of US2.* Under paragraph (c)(3)(i)(D)(*1*) of this section, US2's prior extraordinary disposition amount with respect to CFC2 is increased by $28x, or 200% of $14x, the amount US2 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(*1*)(*iii*) of this section, US2 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US2's extraordinary disposition account is reduced to $12x ($40x–$28x) under paragraph (c)(3)(i)(A) of this section.

(4) *Example 3. Extraordinary reduction*—(i) *Facts.* At the beginning of CFC1's taxable year ending on Decem-

ber 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. Also as of the beginning of Year 2, CFC1 has no earnings and profits described in section 959(c)(1) or (2), and US1 does not have an extraordinary disposition account with respect to CFC1. As of the end of Year 2, CFC1 has $160x of tested income and no other income. CFC1 has $160x of earnings and profits for Year 2. On October 19, Year 2, US1 sells all of its CFC1 stock to US2 for $100x in a transaction (the "Stock Sale") in which US1 recognizes $90x of gain. Under section 1248(a), the entire $90x of gain is included in US1's gross income as a dividend and, pursuant to section 1248(j), the $90x is treated as a dividend for purposes of applying section 245A. At the end of Year 2, under section 951A, US2 takes into account $70x of tested income, calculated as $160x (100% of the $160x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $90x, the amount of dividends received by US1 with respect to the transferred stock, and $128x, the amount of tested income attributable to the transferred stock ($160x) multiplied by 292/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by

573

- Add.69 -

value) of CFC1 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of this section, the entire $90x dividend to US1 is an extraordinary reduction amount with respect to US1 because the dividend is at least equal to US1's pre-reduction pro rata share of CFC1's Year 2 tested income described in paragraph (e)(2)(ii)(A) of this section ($160x), reduced by the amount of tested income taken into account by US2, a U.S. tax resident, under paragraphs (e)(2)(ii)(B) and (i)(29) of this section ($70x).

(C) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $90x, the ineligible amount is $90x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($90x). Therefore, with respect to the dividend received of $90x, no portion is eligible for the dividends received deduction allowed under section 245A(a).

(iii) *Alternative facts—election to close CFC's taxable year.* The facts are the same as in paragraph (j)(4)(i) of this section (the facts of this *Example 3*), except that, pursuant to paragraph (e)(3)(i) of this section, US1 elects to close CFC1's Year 2 taxable year for all purposes of the Internal Revenue Code as of the end of October 19, Year 2, the date on which the Stock Sale occurs; in addition, US1 and US2 enter into a written, binding agreement that US1 will elect to close CFC1's Year 2 taxable year. Accordingly, under section 951A(a), US1 takes into account 100% of CFC1's tested income for the taxable year beginning January 1, Year 2, and ending October 19, Year 2, and US2 takes into account 100% of CFC1's test-

ed income for the taxable year beginning October 20, Year 2, and ending December 31, Year 2. Under paragraph (e)(3)(i)(A) of this section, no amount is considered an extraordinary reduction amount with respect to US1.

(5) *Example 4. Extraordinary reduction; decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax residents—* (i) *Facts.* At the beginning of CFC1's taxable year ending December 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. CFC1 generates $120x of subpart F income during its taxable year ending on December 31, Year 2. On October 1, Year 2, CFC1 distributes a $120x dividend to US1. On October 19, Year 2, US1 sells 100% of its stock of CFC1 to PRS, a domestic partnership, in a transaction in which no gain or loss is realized (the "Stock Sale"). PRS is owned 50% each by A, an individual who is a citizen of the United States, and B, a foreign individual who is not a U.S. tax resident. On December 1, Year 2, US2 and FP, a foreign corporation, contribute property to CFC1; in exchange, each of US2 and FP receives 25% of the stock of CFC1. PRS owns the remaining 50% of the stock of CFC1. US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owns on the first day of Year 2, and that amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of Year 2 the percentage of stock (by value) of CFC1 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the highest percentage of

**Internal Revenue Service, Treasury**                    **§ 1.245A–5T**

stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of pre-reduction pro rata share.* Before the extraordinary reduction, US1 owned 100% of the stock of CFC1. Thus, under paragraph (e)(2)(ii)(A) of this section, the tentative amount of US1's pre-reduction pro rata share of CFC1's subpart F income is $120x. A and US2 are U.S. tax residents pursuant to paragraph (i)(29) of this section because they are United States persons described in section 7701(a)(30)(A) or (C). Thus, US1's pre-reduction pro rata share amount is subject to the reduction described in paragraph (e)(2)(ii)(B) of this section because U.S. tax residents directly or indirectly acquire stock of CFC1 from US1 or CFC1 during the taxable year in which the extraordinary reduction occurs. With respect to US1's pre-reduction pro rata share of CFC1's subpart F income, the reduction equals the amount of subpart F income of CFC1 taken into account under section 951(a) by these U.S. tax residents.

(C) *Determination of decrease in pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* On December 31, Year 2, both PRS and US2 will be United States shareholders with respect to CFC1 and will include in gross income their pro rata share of CFC1's subpart F income under section 951(a). With respect to US2, this amount will be $30x, which is equal to 25% of CFC1's subpart F income for the taxable year. With respect to PRS, its pro rata share of $60x under section 951(a)(2)(A) (50% of $120x) will be reduced under section 951(a)(2)(B) by $48x. The section 951(a)(2)(B) reduction is equal to the lesser of the $120x dividend paid with respect to those shares to US1 or $48x (50% × $120x × 292/365, the period during the taxable year that PRS did not own CFC1 stock). Thus, PRS includes $12x in gross income pursuant to section 951(a). Of this amount, $6x is allocated to A (as a 50% partner of PRS) and, therefore, treated as taken into account by A under paragraphs (e)(2)(ii)(B) and (g)(6) of this section. Thus, A and US2 take into account a total of $36x of CFC1's subpart F income under section 951(a). This amount reduces US1's pre-reduction pro rata share of CFC1's subpart F income to $84x ($120x − $36x) under paragraph (e)(2)(ii)(B) of this section. CFC1 did not generate tested income during the taxable year and, therefore, no amount is taken into account under section 951A with respect to CFC1, and US1 has no pre-reduction pro rata share with respect to tested income of CFC1.

(D) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of this section, the extraordinary reduction amount equals $84x, which is the lesser of the amount of the dividend received by US1 from CFC1 during Year 2 ($120x) and the sum of US1's pre-reduction pro rata share of CFC1's subpart F income ($84x) and tested income ($0).

(E) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $120x, the ineligible amount is $84x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($84x). Therefore, with respect to the dividend received by US1 from CFC1, $36x ($120x − $84x) is eligible for a section 245A deduction.

(6) *Example 5. Controlling section 245A shareholder*—(i) *Facts.* US1 and US2 own 30% and 25% of the stock of CFC1, respectively. FP, a foreign corporation that is not a CFC, owns all of the stock of US1 and US2. FP owns the remaining 45% of the stock of CFC1. On September 30, Year 2, US1 sells all of its stock of CFC1 to US3, a domestic corporation that is not a related party with respect to FP, US1, or US2. No person transferred any stock of CFC1 directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1.

(ii) *Analysis.* Under paragraph (i)(21) of this section, US1 is a section 245A shareholder with respect to CFC1, an SFC. Because US1 owns, together with

US2 and FP (related persons with respect to US1), more than 50% of the stock of CFC1, US1 is a controlling section 245A shareholder of CFC1. The sale of US1's CFC1 stock results in an extraordinary reduction occurring with respect to US1's ownership of CFC1. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the stock of CFC1 that it owned at the beginning of the year and that amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC1 that US1 directly or indirectly owns (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 directly or indirectly owned on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (30%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and end of year percentage (30 percentage points) is at least 5 percentage points.

(7) *Example 6. Limitation of section 954(c)(6) exception with respect to an extraordinary reduction.* (i) *Facts.* At the beginning of CFC1 and CFC2's taxable year ending on December 31, Year 2, US1 and A, an individual who is a citizen of the United States, own 80% and 20% of the single class of stock of CFC1, respectively. CFC1 owns 100% of the stock of CFC2. Both US1 and A are United States shareholders with respect to CFC1 and CFC2, and US1 and A are not related parties with respect to each other. No person transferred CFC2 stock directly or indirectly in Year 2 pursuant to a plan to reduce the percentage of stock (by value) of CFC2 owned by US1, and US1 does not have an extraordinary disposition account with respect to CFC2. At the end of Year 2, and without regard to any distributions during Year 2, CFC2 had $150x of tested income and no other income, and CFC1 had no income or expenses. On June 30, Year 2, CFC2 distributed $150x as a dividend to CFC1, which would qualify for the exception from foreign personal holding company

income under section 954(c)(6) but for the application of this section. On August 7, Year 2, CFC1 sells all of its CFC2 stock to US2 for $100x in a transaction (the "Stock Sale") in which CFC1 realizes no gain or loss. At the end of Year 2, under section 951A, US2 takes into account $60x of tested income, calculated as $150x (100% of the $150x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $150x, the amount of dividends received by CFC1 during Year 2 with respect to the transferred stock, and $90x, the amount of tested income attributable to the transferred stock ($150x) multiplied by 219/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC2, but A is not. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC2. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred indirectly 100% of the CFC2 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC2 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC2 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC2 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC2 stock by value (80%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC2 stock owned by US1, and the difference between the initial percentage and the end of year percentage (80 percentage points) is at least 5 percentage points. Because there is an extraordinary reduction with respect to CFC2

in Year 2 and CFC1 received a dividend from CFC2 in Year 2, under paragraph (f)(1) of this section, it is necessary to determine the limitation on the amount of the dividend eligible for the exception under section 954(c)(6).

(B) *Determination of tiered extraordinary reduction amount.* The limitation on the amount of the dividend eligible for the exception under section 954(c)(6) is based on the tiered extraordinary reduction amount. The sum of the amount of subpart F income and tested income of CFC2 for Year 2 is $150x, and immediately before the extraordinary reduction, CFC1 held 100% of the stock of CFC2. Additionally, US2 is a U.S. tax resident as defined in paragraph (i)(29) of this section because it is a United States person described in section 7701(a)(30)(A) or (C), and US2 has a pro rata share of $60x of tested income under section 951A with respect to CFC2. Accordingly, under paragraph (f)(2) of this section, the tiered extraordinary reduction amount is $90x (($150x × 100%) − $60x).

(C) *Limitation of section 954(c)(6) exception.* Under paragraph (f)(1) of this section, the portion of the $150x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $60x ($150x − $90x). To the extent that the $90x that does not qualify for the exception gives rise to additional subpart F income to CFC1, both US1 and A will take into account their pro rata share of that subpart F income under section 951(a)(2) and § 1.951–1(b) and (e).

(k) *Applicability date.* This section applies to distributions occurring after December 31, 2017.

(l) *Expiration date.* The applicability of this section expires June 14, 2022.

[T.D. 9865, 84 FR 28413, June 18, 2019, as amended by T.D. 9865, 84 FR 38866, Aug. 8, 2019]

## § 1.246–1 Deductions not allowed for dividends from certain corporations.

The deductions provided in sections 243 (relating to dividends received by corporations), 244 (relating to dividends received on certain preferred stock), and 245 (relating to dividends received from certain foreign corporations), are not allowable with respect to any dividend received from:

(a) A corporation organized under the China Trade Act, 1922 (15 U.S.C. ch. 4) (see section 941); or

(b) A corporation which is exempt from tax under section 501 (relating to certain charitable, etc., organizations) or section 521 (relating to farmers' cooperative associations) for the taxable year of the corporation in which the distribution is made or for its next preceding taxable year; for

(c) A corporation to which section 931 (relating to income from sources within possessions of the United States) applies for the taxable year of the corporation in which the distribution is made or for its next preceding taxable year; or

(d) A real estate investment trust which, for its taxable year in which the distribution is made, is taxable under Part II, Subchapter M, Chapter 1 of the Code. See section 243(c)(3), paragraph (c) of § 1.243–2, section 857(c), and paragraph (d) of § 1.857–6.

[T.D. 6500, 25 FR 11402, Nov. 26, 1960, as amended by T.D. 6598, 27 FR 4092, Apr. 28, 1962; T.D. 7767, 46 FR 11264, Feb. 6, 1981]

## § 1.246–2 Limitation on aggregate amount of deductions.

(a) *General rule.* The sum of the deductions allowed by sections 243(a)(1) (relating to dividends received by corporations), 244(a) (relating to dividends received on certain preferred stock), and 245 (relating to dividends received from certain foreign corporations), except as provided in section 246(b)(2) and in paragraph (b) of this section, is limited to 85 percent of the taxable income of the corporation. The taxable income of the corporation for this purpose is computed without regard to the net operating loss deduction allowed by section 172, the deduction for dividends paid on certain preferred stock of public utilities allowed by section 247, any capital loss carryback under section 1212(a)(1), and the deductions provided in sections 243(a)(1), 244(a), and 245. For definition of the term *taxable income*, see section 63.

(b) *Effect of net operating loss.* If the shareholder corporation has a net operating loss (as determined under sec. 172) for a taxable year, the limitation

(f) *Transfers of funds.* The transfers of funds between the United States and Guam required to effectuate the provisions of this section shall be made when convenient for the two governments, but not less frequently than once in each calendar year. In complying with paragraph (b) of this section, only net balances will be transferred between the two governments. Further, amounts transferred pursuant to paragraph (b) of this section may be determined on the basis of estimates rather than the actual amounts derived from information furnished by taxpayers, except that the net collections for 1973 and every third calendar year thereafter are to be transferred on the basis of the information furnished by taxpayers pursuant to paragraph (d) of this section. In order to facilitate the transfer of funds pursuant to this section, the Commissioner of Internal Revenue and the Commissioner of Revenue and Taxation of Guam shall exchange such information, including copies of income tax returns, as will ensure that the provisions of section 7654 and this section are being properly implemented.

[T.D. 7385, 40 FR 50265, Oct. 29, 1975]

## Definitions

### § 301.7701–1  Classification of organizations for federal tax purposes.

(a) *Organizations for federal tax purposes*—(1) *In general.* The Internal Revenue Code prescribes the classification of various organizations for federal tax purposes. Whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law.

(2) *Certain joint undertakings give rise to entities for federal tax purposes.* A joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom. For example, a separate entity exists for federal tax purposes if co- owners of an apartment building lease space and in addition provide services to the occupants either directly or through an agent.

Nevertheless, a joint undertaking merely to share expenses does not create a separate entity for federal tax purposes. For example, if two or more persons jointly construct a ditch merely to drain surface water from their properties, they have not created a separate entity for federal tax purposes. Similarly, mere co-ownership of property that is maintained, kept in repair, and rented or leased does not constitute a separate entity for federal tax purposes. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they do not necessarily create a separate entity for federal tax purposes.

(3) *Certain local law entities not recognized.* An entity formed under local law is not always recognized as a separate entity for federal tax purposes. For example, an organization wholly owned by a State is not recognized as a separate entity for federal tax purposes if it is an integral part of the State. Similarly, tribes incorporated under section 17 of the Indian Reorganization Act of 1934, as amended, 25 U.S.C. 477, or under section 3 of the Oklahoma Indian Welfare Act, as amended, 25 U.S.C. 503, are not recognized as separate entities for federal tax purposes.

(4) *Single owner organizations.* Under §§ 301.7701–2 and 301.7701–3, certain organizations that have a single owner can choose to be recognized or disregarded as entities separate from their owners.

(b) *Classification of organizations.* The classification of organizations that are recognized as separate entities is determined under §§ 301.7701–2, 301.7701–3, and 301.7701–4 unless a provision of the Internal Revenue Code (such as section 860A addressing Real Estate Mortgage Investment Conduits (REMICs)) provides for special treatment of that organization. For the classification of organizations as trusts, see § 301.7701–4. That section provides that trusts generally do not have associates or an objective to carry on business for profit. Sections 301.7701–2 and 301.7701–3 provide rules for classifying organizations that are not classified as trusts.

(c) *Cost sharing arrangements.* A cost sharing arrangement that is described in § 1.482–7 of this chapter, including

830

any arrangement that the Commissioner treats as a CSA under §1.482–7(b)(5) of this chapter, is not recognized as a separate entity for purposes of the Internal Revenue Code. See §1.482–7 of this chapter for the rules regarding CSAs.

(d) *Domestic and foreign business entities.* See §301.7701–5 for the rules that determine whether a business entity is domestic or foreign.

(e) *State.* For purposes of this section and §301.7701–2, the term *State* includes the District of Columbia.

(f) *Effective/applicability dates.* Except as provided in the following sentence, the rules of this section are applicable as of January 1, 1997. The rules of paragraph (c) of this section are applicable on January 5, 2009.

[T.D. 8697, 61 FR 66588, Dec. 18, 1996, as amended by T.D. 9153, 69 FR 49810, Aug. 12, 2004; T.D. 9246, 71 FR 4816, Jan. 30, 2006; T.D. 9441, 74 FR 390, Jan. 5, 2009; T.D. 9568, 76 FR 80136, Dec. 22, 2011]

### §301.7701–2 Business entities; definitions.

(a) *Business entities.* For purposes of this section and §301.7701–3, a *business entity* is any entity recognized for federal tax purposes (including an entity with a single owner that may be disregarded as an entity separate from its owner under §301.7701–3) that is not properly classified as a trust under §301.7701–4 or otherwise subject to special treatment under the Internal Revenue Code. A business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership. A business entity with only one owner is classified as a corporation or is disregarded; if the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner. But see paragraphs (c)(2)(iii) through (vi) of this section for special rules that apply to an eligible entity that is otherwise disregarded as an entity separate from its owner.

(b) *Corporations.* For federal tax purposes, the term *corporation* means—

(1) A business entity organized under a Federal or State statute, or under a statute of a federally recognized Indian tribe, if the statute describes or refers to the entity as incorporated or as a

corporation, body corporate, or body politic;

(2) An association (as determined under §301.7701–3);

(3) A business entity organized under a State statute, if the statute describes or refers to the entity as a joint-stock company or joint-stock association;

(4) An insurance company;

(5) A State-chartered business entity conducting banking activities, if any of its deposits are insured under the Federal Deposit Insurance Act, as amended, 12 U.S.C. 1811 *et seq.*, or a similar federal statute;

(6) A business entity wholly owned by a State or any political subdivision thereof, or a business entity wholly owned by a foreign government or any other entity described in §1.892–2T;

(7) A business entity that is taxable as a corporation under a provision of the Internal Revenue Code other than section 7701(a)(3); and

(8) *Certain foreign entities*—(i) *In general.* Except as provided in paragraphs (b)(8)(ii) and (d) of this section, the following business entities formed in the following jurisdictions:

American Samoa, Corporation
Argentina, Sociedad Anonima
Australia, Public Limited Company
Austria, Aktiengesellschaft
Barbados, Limited Company
Belgium, Societe Anonyme
Belize, Public Limited Company
Bolivia, Sociedad Anonima
Brazil, Sociedade Anonima
Bulgaria, Aktsionerno Druzhestvo.
Canada, Corporation and Company
Chile, Sociedad Anonima
People's Republic of China, Gufen Youxian Gongsi
Republic of China (Taiwan), Ku-fen Yu-hsien Kung-szu
Colombia, Sociedad Anonima
Costa Rica, Sociedad Anonima
Cyprus, Public Limited Company
Czech Republic, Akciova Spolecnost
Denmark, Aktieselskab
Ecuador, Sociedad Anonima or Compania Anonima
Egypt, Sharikat Al-Mossahamah
El Salvador, Sociedad Anonima
Estonia, Aktsiaselts
European Economic Area/European Union, Societas Europaea
Finland, Julkinen Osakeyhtio/Publikt Aktiebolag
France, Societe Anonyme
Germany, Aktiengesellschaft
Greece, Anonymos Etairia
Guam, Corporation

831

- Add.75 -

Guatemala, Sociedad Anonima
Guyana, Public Limited Company
Honduras, Sociedad Anonima
Hong Kong, Public Limited Company
Hungary, Reszvenytarsasag
Iceland, Hlutafelag
India, Public Limited Company
Indonesia, Perseroan Terbuka
Ireland, Public Limited Company
Israel, Public Limited Company
Italy, Societa per Azioni
Jamaica, Public Limited Company
Japan, Kabushiki Kaisha
Kazakstan, Ashyk Aktsionerlik Kogham
Republic of Korea, Chusik Hoesa
Latvia, Akciju Sabiedriba
Liberia, Corporation
Liechtenstein, Aktiengesellschaft
Lithuania, Akcine Bendroves
Luxembourg, Societe Anonyme
Malaysia, Berhad
Malta, Public Limited Company
Mexico, Sociedad Anonima
Morocco, Societe Anonyme
Netherlands, Naamloze Vennootschap
New Zealand, Limited Company
Nicaragua, Compania Anonima
Nigeria, Public Limited Company
Northern Mariana Islands, Corporation
Norway, Allment Aksjeselskap
Pakistan, Public Limited Company
Panama, Sociedad Anonima
Paraguay, Sociedad Anonima
Peru, Sociedad Anonima
Philippines, Stock Corporation
Poland, Spolka Akcyjna
Portugal, Sociedade Anonima
Puerto Rico, Corporation
Romania, Societate pe Actiuni
Russia,        Otkrytoye        Aktsionernoy
    Obshchestvo
Saudi Arabia, Sharikat Al-Mossahamah
Singapore, Public Limited Company
Slovak Republic, Akciova Spolocnost
Slovenia, Delniska Druzba
South Africa, Public Limited Company
Spain, Sociedad Anonima
Surinam, Naamloze Vennootschap
Sweden, Publika Aktiebolag
Switzerland, Aktiengesellschaft
Thailand, Borisat Chamkad (Mahachon)
Trinidad and Tobago, Limited Company
Tunisia, Societe Anonyme
Turkey, Anonim Sirket
Ukraine, Aktsionerne Tovaristvo Vidkritogo
    Tipu
United Kingdom, Public Limited Company
United States Virgin Islands, Corporation
Uruguay, Sociedad Anonima
Venezuela, Sociedad Anonima or Compania
    Anonima

(ii) *Clarification of list of corporations in paragraph (b)(8)(i) of this section*—(A) *Exceptions in certain cases.* The following entities will not be treated as corporations under paragraph (b)(8)(i) of this section:

(*1*) With regard to Canada, a Nova Scotia Unlimited Liability Company (or any other company or corporation all of whose owners have unlimited liability pursuant to federal or provincial law).

(*2*) With regard to India, a company deemed to be a public limited company solely by operation of section 43A(1) (relating to corporate ownership of the company), section 43A(1A) (relating to annual average turnover), or section 43A(1B) (relating to ownership interests in other companies) of the Companies Act, 1956 (or any combination of these), provided that the organizational documents of such deemed public limited company continue to meet the requirements of section 3(1)(iii) of the Companies Act, 1956.

(*3*) With regard to Malaysia, a Sendirian Berhad.

(B) *Inclusions in certain cases.* With regard to Mexico, the term Sociedad Anonima includes a Sociedad Anonima that chooses to apply the variable capital provision of Mexican corporate law (Sociedad Anonima de Capital Variable).

(iii) *Public companies.* For purposes of paragraph (b)(8)(i) of this section, with regard to Cyprus, Hong Kong, and Jamaica, the term Public Limited Company includes any Limited Company that is not defined as a private company under the corporate laws of those jurisdictions. In all other cases, where the term Public Limited Company is not defined, that term shall include any Limited Company defined as a public company under the corporate laws of the relevant jurisdiction.

(iv) *Limited companies.* For purposes of this paragraph (b)(8), any reference to a Limited Company includes, as the case may be, companies limited by shares and companies limited by guarantee.

(v) *Multilingual countries.* Different linguistic renderings of the name of an entity listed in paragraph (b)(8)(i) of this section shall be disregarded. For example, an entity formed under the laws of Switzerland as a Societe Anonyme will be a corporation and treated in the same manner as an Aktiengesellschaft.

**Internal Revenue Service, Treasury**                               **§ 301.7701–2**

(b)(9) *Business entities with multiple charters.* (i) An entity created or organized under the laws of more than one jurisdiction if the rules of this section would treat it as a corporation with reference to any one of the jurisdictions in which it is created or organized. Such an entity may elect its classification under § 301.7701–3, subject to the limitations of those provisions, only if it is created or organized in each jurisdiction in a manner that meets the definition of an eligible entity in § 301.7701–3(a). The determination of a business entity's corporate or non-corporate classification is made independently from the determination of whether the entity is domestic or foreign. See § 301.7701–5 for the rules that determine whether a business entity is domestic or foreign.

(ii) *Examples.* The following examples illustrate the rule of this paragraph (b)(9):

*Example 1.* (i) *Facts.* X is an entity with a single owner organized under the laws of Country A as an entity that is listed in paragraph (b)(8)(i) of this section. Under the rules of this section, such an entity is a corporation for Federal tax purposes and under § 301.7701–3(a) is unable to elect its classification. Several years after its formation, X files a certificate of domestication in State B as a limited liability company (LLC). Under the laws of State B, X is considered to be created or organized in State B as an LLC upon the filing of the certificate of domestication and is therefore subject to the laws of State B. Under the rules of this section and § 301.7701–3, an LLC with a single owner organized only in State B is disregarded as an entity separate from its owner for Federal tax purposes (absent an election to be treated as an association). Neither Country A nor State B law requires X to terminate its charter in Country A as a result of the domestication, and in fact X does not terminate its Country A charter. Consequently, X is now organized in more than one jurisdiction.

(ii) *Result.* X remains organized under the laws of Country A as an entity that is listed in paragraph (b)(8)(i) of this section, and as such, it is an entity that is treated as a corporation under the rules of this section. Therefore, X is a corporation for Federal tax purposes because the rules of this section would treat X as a corporation with reference to one of the jurisdictions in which it is created or organized. Because X is organized in Country A in a manner that does not meet the definition of an eligible entity in § 301.7701–3(a), it is unable to elect its classification.

*Example 2.* (i) *Facts.* Y is an entity that is incorporated under the laws of State A and has two shareholders. Under the rules of this section, an entity incorporated under the laws of State A is a corporation for Federal tax purposes and under § 301.7701–3(a) is unable to elect its classification. Several years after its formation, Y files a certificate of continuance in Country B as an unlimited company. Under the laws of Country B, upon filing a certificate of continuance, Y is treated as organized in Country B. Under the rules of this section and § 301.7701–3, an unlimited company organized only in Country B that has more than one owner is treated as a partnership for Federal tax purposes (absent an election to be treated as an association). Neither State A nor Country B law requires Y to terminate its charter in State A as a result of the continuance, and in fact Y does not terminate its State A charter. Consequently, Y is now organized in more than one jurisdiction.

(ii) *Result.* Y remains organized in State A as a corporation, an entity that is treated as a corporation under the rules of this section. Therefore, Y is a corporation for Federal tax purposes because the rules of this section would treat Y as a corporation with reference to one of the jurisdictions in which it is created or organized. Because Y is organized in State A in a manner that does not meet the definition of an eligible entity in § 301.7701–3(a), it is unable to elect its classification.

*Example 3.* (i) *Facts.* Z is an entity that has more than one owner and that is recognized under the laws of Country A as an unlimited company organized in Country A. Z is organized in Country A in a manner that meets the definition of an eligible entity in § 301.7701–3(a). Under the rules of this section and § 301.7701–3, an unlimited company organized only in Country A with more than one owner is treated as a partnership for Federal tax purposes (absent an election to be treated as an association). At the time Z was formed, it was also organized as a private limited company under the laws of Country B. Z is organized in Country B in a manner that meets the definition of an eligible entity in § 301.7701–3(a). Under the rules of this section and § 301.7701–3, a private limited company organized only in Country B is treated as a corporation for Federal tax purposes (absent an election to be treated as a partnership). Thus, Z is organized in more than one jurisdiction. Z has not made any entity classification elections under § 301.7701–3.

(ii) *Result.* Z is organized in Country B as a private limited company, an entity that is treated (absent an election to the contrary) as a corporation under the rules of this section. However, because Z is organized in each jurisdiction in a manner that meets the definition of an eligible entity in § 301.7701–3(a),

833

it may elect its classification under § 301.7701–3, subject to the limitations of those provisions.

*Example 4.* (i) *Facts.* P is an entity with more than one owner organized in Country A as a general partnership. Under the rules of this section and § 301.7701–3, an eligible entity with more than one owner in Country A is treated as a partnership for federal tax purposes (absent an election to be treated as an association). P files a certificate of continuance in Country B as an unlimited company. Under the rules of this section and § 301.7701–3, an unlimited company in Country B with more than one owner is treated as a partnership for federal tax purposes (absent an election to be treated as an association). P is not required under either the laws of Country A or Country B to terminate the general partnership in Country A, and in fact P does not terminate its Country A partnership. P is now organized in more than one jurisdiction. P has not made any entity classification elections under § 301.7701–3.

(ii) *Result.* P's organization in both Country A and Country B would result in P being classified as a partnership. Therefore, since the rules of this section would not treat P as a corporation with reference to any jurisdiction in which it is created or organized, it is not a corporation for federal tax purposes.

(c) *Other business entities.* For federal tax purposes—

(1) The term *partnership* means a business entity that is not a corporation under paragraph (b) of this section and that has at least two members.

(2) *Wholly owned entities*—(i) *In general.* Except as otherwise provided in this paragraph (c), a business entity that has a single owner and is not a corporation under paragraph (b) of this section is disregarded as an entity separate from its owner.

(ii) *Special rule for certain business entities.* If the single owner of a business entity is a bank (as defined in section 581, or, in the case of a foreign bank, as defined in section 585(a)(2)(B) without regard to the second sentence thereof), then the special rules applicable to banks under the Internal Revenue Code will continue to apply to the single owner as if the wholly owned entity were a separate entity. For this purpose, the special rules applicable to banks under the Internal Revenue Code do not include the rules under sections 864(c), 882(c), and 884.

(iii) *Tax liabilities of certain disregarded entities*—(A) *In general.* An entity that is disregarded as separate from its owner for any purpose under this section is treated as an entity separate from its owner for purposes of—

(*1*) Federal tax liabilities of the entity with respect to any taxable period for which the entity was not disregarded;

(*2*) Federal tax liabilities of any other entity for which the entity is liable; and

(*3*) Refunds or credits of Federal tax.

(B) *Examples.* The following examples illustrate the application of paragraph (c)(2)(iii)(A) of this section:

*Example 1.* In 2006, X, a domestic corporation that reports its taxes on a calendar year basis, merges into Z, a domestic LLC wholly owned by Y that is disregarded as an entity separate from Y, in a state law merger. X was not a member of a consolidated group at any time during its taxable year ending in December 2005. Under the applicable state law, Z is the successor to X and is liable for all of X's debts. In 2009, the Internal Revenue Service (IRS) seeks to extend the period of limitations on assessment for X's 2005 taxable year. Because Z is the successor to X and is liable for X's 2005 taxes that remain unpaid, Z is the proper party to sign the consent to extend the period of limitations.

*Example 2.* The facts are the same as in *Example 1,* except that in 2007, the IRS determines that X miscalculated and underreported its income tax liability for 2005. Because Z is the successor to X and is liable for X's 2005 taxes that remain unpaid, the deficiency may be assessed against Z and, in the event that Z fails to pay the liability after notice and demand, a general tax lien will arise against all of Z's property and rights to property.

(iv) *Special rule for employment tax purposes*—

(A) *In general.* Except as provided in paragraph (c)(2)(iv)(C) of this section, paragraph (c)(2)(i) of this section (relating to certain wholly owned entities) does not apply to taxes imposed under Subtitle C—Employment Taxes and Collection of Income Tax (Chapters 21, 22, 23, 23A, 24, and 25 of the Internal Revenue Code).

(B) *Treatment of entity.* Except as provided in paragraph (c)(2)(iv)(C) of this section, an entity that is disregarded as an entity separate from its owner for any purpose under this section is treated as a corporation with respect to taxes imposed under Subtitle C—Employment Taxes and Collection of Income Tax (Chapters 21, 22, 23, 23A, 24,

**Internal Revenue Service, Treasury**                                    **§ 301.7701–2**

and 25 of the Internal Revenue Code). For special rules regarding the application of certain employment tax exceptions, see §§ 31.3121(b)(3)–1(d), 31.3127–1(b), and 31.3306(c)(5)–1(d) of this chapter.

(C) *Special rules.* (*1*) Paragraphs (c)(2)(iv)(A) and (B) of this section do not apply to withholding requirements imposed by section 3406 (backup withholding). Thus, in the case of an entity that is disregarded as an entity separate from its owner for any purpose under this section, the owner is subject to the withholding requirements imposed by section 3406 (backup withholding).

(*2*) Paragraph (c)(2)(i) of this section applies to taxes imposed under subtitle A of the Code, including Chapter 2—Tax on Self-Employment Income. Thus, an entity that is treated in the same manner as a sole proprietorship under paragraph (a) of this section is not treated as a corporation for purposes of employing its owner; instead, the entity is disregarded as an entity separate from its owner for this purpose and is not the employer of its owner. The owner will be subject to self-employment tax on self-employment income with respect to the entity's activities. Also, if a partnership is the owner of an entity that is disregarded as an entity separate from its owner for any purpose under this section, the entity is not treated as a corporation for purposes of employing a partner of the partnership that owns the entity; instead, the entity is disregarded as an entity separate from the partnership for this purpose and is not the employer of any partner of the partnership that owns the entity. A partner of a partnership that owns an entity that is disregarded as an entity separate from its owner for any purpose under this section is subject to the same self-employment tax rules as a partner of a partnership that does not own an entity that is disregarded as an entity separate from its owner for any purpose under this section.

(D) *Example.* The following example illustrates the application of paragraph (c)(2)(iv) of this section:

*Example.* (i) LLCA is an eligible entity owned by individual A and is generally disregarded as an entity separate from its owner for Federal tax purposes. However, LLCA is treated as an entity separate from its owner for purposes of subtitle C of the Internal Revenue Code. LLCA has employees and pays wages as defined in sections 3121(a), 3306(b), and 3401(a).

(ii) LLCA is subject to the provisions of subtitle C of the Internal Revenue Code and related provisions under 26 CFR subchapter C, Employment Taxes and Collection of Income Tax at Source, parts 31 through 39. Accordingly, LLCA is required to perform such acts as are required of an employer under those provisions of the Internal Revenue Code and regulations thereunder that apply. All provisions of law (including penalties) and the regulations prescribed in pursuance of law applicable to employers in respect of such acts are applicable to LLCA. Thus, for example, LLCA is liable for income tax withholding, Federal Insurance Contributions Act (FICA) taxes, and Federal Unemployment Tax Act (FUTA) taxes. See sections 3402 and 3403 (relating to income tax withholding); 3102(b) and 3111 (relating to FICA taxes), and 3301 (relating to FUTA taxes). In addition, LLCA must file under its name and EIN the applicable Forms in the 94X series, for example, Form 941, ''Employer's Quarterly Employment Tax Return,'' Form 940, ''Employer's Annual Federal Unemployment Tax Return;'' file with the Social Security Administration and furnish to LLCA's employees statements on Forms W–2, ''Wage and Tax Statement;'' and make timely employment tax deposits. See §§ 31.6011(a)–1, 31.6011(a)–3, 31.6051–1, 31.6051–2, and 31.6302–1 of this chapter.

(iii) A is self-employed for purposes of subtitle A, chapter 2, Tax on Self-Employment Income, of the Internal Revenue Code. Thus, A is subject to tax under section 1401 on A's net earnings from self-employment with respect to LLCA's activities. A is not an employee of LLCA for purposes of subtitle C of the Internal Revenue Code. Because LLCA is treated as a sole proprietorship of A for income tax purposes, A is entitled to deduct trade or business expenses paid or incurred with respect to activities carried on through LLCA, including the employer's share of employment taxes imposed under sections 3111 and 3301, on A's Form 1040, Schedule C, ''Profit or Loss for Business (Sole Proprietorship).''

(v) *Special rule for certain excise tax purposes*—(A) *In general.* Paragraph (c)(2)(i) of this section (relating to certain wholly owned entities) does not apply for purposes of—

(*1*) Federal tax liabilities imposed by Chapters 31, 32 (other than section 4181), 33, 34, 35, 36 (other than section 4461), 38, and 49 of the Internal Revenue Code, or any floor stocks tax imposed

835

on articles subject to any of these taxes;

(*2*) Collection of tax imposed by Chapters 33 and 49 of the Internal Revenue Code;

(*3*) Registration under sections 4101, 4222, 4412;

(*4*) Claims of a credit (other than a credit under section 34), refund, or payment related to a tax described in paragraph (c)(2)(v)(A)(*1*) of this section or under section 6426 or 6427; and

(*5*) Assessment and collection of an assessable payment imposed by section 4980H and reporting required by section 6056.

(B) *Treatment of entity.* An entity that is disregarded as an entity separate from its owner for any purpose under this section is treated as a corporation with respect to items described in paragraph (c)(2)(v)(A) of this section.

(C) *Example.* The following example illustrates the provisions of this paragraph (c)(2)(v):

*Example.* (i) LLCB is an eligible entity that has a single owner, B. LLCB is generally disregarded as an entity separate from its owner. However, under paragraph (c)(2)(v) of this section, LLCB is treated as an entity separate from its owner for certain purposes relating to excise taxes.

(ii) LLCB mines coal from a coal mine located in the United States. Section 4121 of chapter 32 of the Internal Revenue Code imposes a tax on the producer's sale of such coal. Section 48.4121–1(a) of this chapter defines a "producer" generally as the person in whom is vested ownership of the coal under state law immediately after the coal is severed from the ground. LLCB is the person that owns the coal under state law immediately after it is severed from the ground. Under paragraph (c)(2)(v)(A)(*1*) of this section, LLCB is the producer of the coal and is liable for tax on its sale of such coal under chapter 32 of the Internal Revenue Code. LLCB must report and pay tax on Form 720, "Quarterly Federal Excise Tax Return," under its own name and taxpayer identification number.

(iii) LLCB uses undyed diesel fuel in an earthmover that is not registered or required to be registered for highway use. Such use is an off-highway business use of the fuel. Under section 6427(l), the ultimate purchaser is allowed to claim an income tax credit or payment related to the tax imposed on diesel fuel used in an off-highway business use. Under paragraph (c)(2)(v) of this section, for purposes of the credit or payment allowed under section 6427(l), LLCB is the person that could claim the amount on its Form 720

or on a Form 8849, "Claim for Refund of Excise Taxes." Alternatively, if LLCB did not claim a payment during the time prescribed in section 6427(i)(2) for making a claim under section 6427, § 1.34–1 of this chapter provides that B, the owner of LLCB, could claim the income tax credit allowed under section 34 for the nontaxable use of diesel fuel by LLCB.

(iv) Assume the same facts as in paragraph (c)(2)(v)(C) *Example* (i) and (ii) of this section. If LLCB does not pay the tax on its sale of coal under chapter 32 of the Internal Revenue Code, any notice of lien the Internal Revenue Service files will be filed as if LLCB were a corporation.

(vi) *Special rule for reporting under section 6038A*—(A) *In general.* An entity that is disregarded as an entity separate from its owner for any purpose under this section is treated as an entity separate from its owner and classified as a corporation for purposes of section 6038A if—

(*1*) The entity is a domestic entity; and

(*2*) One foreign person has direct or indirect sole ownership of the entity.

(B) *Definitions*—(*1*) *Indirect sole ownership.* For purposes of paragraph (c)(2)(vi)(A)(*2*) of this section, indirect sole ownership means ownership by one person entirely through one or more other entities disregarded as entities separate from their owners or through one or more grantor trusts, regardless of whether any such disregarded entity or grantor trust is domestic or foreign.

(*2*) *Entity disregarded as separate from its owner.* For purposes of paragraph (c)(2)(vi)(B)(*1*) of this section, an entity disregarded as an entity separate from its owner is an entity described in paragraph (c)(2)(i) of this section.

(*3*) *Grantor trust.* For purposes of paragraph (c)(2)(vi)(B)(*1*) of this section, a grantor trust is any portion of a trust that is treated as owned by the grantor or another person under subpart E of subchapter J of chapter 1 of the Code.

(C) *Taxable year.* The taxable year of an entity classified as a corporation for section 6038A purposes pursuant to paragraph (c)(2)(vi)(A) of this section is—

(*1*) The same as the taxable year of the foreign person described in paragraph (c)(2)(vi)(A)(*2*) of this section, if that foreign person has a U.S. income

**Internal Revenue Service, Treasury** §301.7701–2

tax or information return filing obligation for its taxable year; or

(2) The calendar year, if paragraph (c)(2)(vi)(C)(*I*) of this section does not apply, unless otherwise provided in forms, instructions, or published guidance.

(d) *Special rule for certain foreign business entities*—(1) *In general.* Except as provided in paragraph (d)(3) of this section, a foreign business entity described in paragraph (b)(8)(i) of this section will not be treated as a corporation under paragraph (b)(8)(i) of this section if—

(i) The entity was in existence on May 8, 1996;

(ii) The entity's classification was relevant (as defined in §301.7701–3(d)) on May 8, 1996;

(iii) No person (including the entity) for whom the entity's classification was relevant on May 8, 1996, treats the entity as a corporation for purposes of filing such person's federal income tax returns, information returns, and withholding documents for the taxable year including May 8, 1996;

(iv) Any change in the entity's claimed classification within the sixty months prior to May 8, 1996, occurred solely as a result of a change in the organizational documents of the entity, and the entity and all members of the entity recognized the federal tax consequences of any change in the entity's classification within the sixty months prior to May 8, 1996;

(v) A reasonable basis (within the meaning of section 6662) existed on May 8, 1996, for treating the entity as other than a corporation; and

(vi) Neither the entity nor any member was notified in writing on or before May 8, 1996, that the classification of the entity was under examination (in which case the entity's classification will be determined in the examination).

(2) *Binding contract rule.* If a foreign business entity described in paragraph (b)(8)(i) of this section is formed after May 8, 1996, pursuant to a written binding contract (including an accepted bid to develop a project) in effect on May 8, 1996, and all times thereafter, in which the parties agreed to engage (directly or indirectly) in an active and substantial business operation in the jurisdic-

tion in which the entity is formed, paragraph (d)(1) of this section will be applied to that entity by substituting the date of the entity's formation for May 8, 1996.

(3) *Termination of grandfather status*—(i) *In general.* An entity that is not treated as a corporation under paragraph (b)(8)(i) of this section by reason of paragraph (d)(1) or (d)(2) of this section will be treated as permanently as a corporation under paragraph (b)(8)(i) of this section from the earliest of:

(A) The effective date of an election to be treated as an association under §301.7701–3;

(B) A termination of the partnership under section 708(b)(1)(B) (regarding sale or exchange of 50 percent or more of the total interest in an entity's capital or profits within a twelve month period);

(C) A division of the partnership under section 708(b)(2)(B); or

(D) The date any person or persons, who were not owners of the entity as of November 29, 1999, own in the aggregate a 50 percent or greater interest in the entity.

(ii) *Special rule for certain entities.* For purposes of paragraph (d)(2) of this section, paragraph (d)(3)(i)(B) of this section shall not apply if the sale or exchange of interests in the entity is to a related person (within the meaning of sections 267(b) and 707(b)) and occurs no later than twelve months after the date of the formation of the entity.

(e) *Effective/applicability date.* (1) Except as otherwise provided in this paragraph (e), the rules of this section apply as of January 1, 1997, except that paragraph (b)(6) of this section applies on or after January 14, 2002, to a business entity wholly owned by a foreign government regardless of any prior entity classification, and paragraph (c)(2)(ii) of this section applies to taxable years beginning after January 12, 2001. The reference to the Finnish, Maltese, and Norwegian entities in paragraph (b)(8)(i) of this section is applicable on November 29, 1999. The reference to the Trinidadian entity in paragraph (b)(8)(i) of this section applies to entities formed on or after November 29, 1999. Any Maltese or Norwegian entity

that becomes an eligible entity as a result of paragraph (b)(8)(i) of this section in effect on November 29, 1999, may elect by February 14, 2000, to be classified for Federal tax purposes as an entity other than a corporation retroactive to any period from and including January 1, 1997. Any Finnish entity that becomes an eligible entity as a result of paragraph (b)(8)(i) of this section in effect on November 29, 1999, may elect by February 14, 2000, to be classified for Federal tax purposes as an entity other than a corporation retroactive to any period from and including September 1, 1997. However, paragraph (d)(3)(i)(D) of this section applies on or after October 22, 2003.

(2) Paragraph (c)(2)(iii) of this section applies on and after September 14, 2009. For rules that apply before September 14, 2009, see 26 CFR part 301, revised as of April 1, 2009.

(3)(i) *General rule.* Except as provided in paragraph (e)(3)(ii) of this section, the rules of paragraph (b)(9) of this section apply as of August 12, 2004, to all business entities existing on or after that date.

(ii) *Transition rule.* For business entities created or organized under the laws of more than one jurisdiction as of August 12, 2004, the rules of paragraph (b)(9) of this section apply as of May 1, 2006. These entities, however, may rely on the rules of paragraph (b)(9) of this section as of August 12, 2004.

(4) The reference to the Estonian, Latvian, Liechtenstein, Lithuanian, and Slovenian entities in paragraph (b)(8)(i) of this section applies to such entities formed on or after October 7, 2004, and to any such entity formed before such date from the date any person or persons, who were not owners of the entity as of October 7, 2004, own in the aggregate a 50 percent or greater interest in the entity. The reference to the European Economic Area/European Union entity in paragraph (b)(8)(i) of this section applies to such entities formed on or after October 8, 2004.

(5)(i) Except as provided in paragraph (e)(5), paragraph (c)(2)(iv) of this section applies with respect to wages paid on or after January 1, 2009.

(ii) Paragraph (c)(2)(iv)(B) applies with respect to wages paid on or after September 14, 2009. For rules that

apply before September 14, 2009, see 26 CFR part 301 revised as of April 1, 2009.

(iii) Paragraph (c)(2)(iv)(C)(*1*) of this section applies with respect to wages paid on or after November 1, 2011. For rules that apply before November 1, 2011, see 26 CFR part 301, revised as of April 1, 2011. However, taxpayers may apply paragraph (c)(2)(iv)(C)(*1*) of this section with respect to wages paid on or after January 1, 2009.

(6)(i) Except as provided in this paragraph (e)(6), paragraph (c)(2)(v) of this section applies to liabilities imposed and actions first required or permitted in periods beginning on or after January 1, 2008.

(ii) Paragraphs (c)(2)(v)(B) and (c)(2)(v)(C) *Example* (iv) of this section apply on and after September 14, 2009.

(iii) Paragraph (c)(2)(v)(A)(*5*) of this section applies for periods after December 31, 2014.

(iv) References to Chapter 49 in paragraph (c)(2)(v) of this section apply to taxes imposed on amounts paid on or after July 1, 2012.

(7) The reference to the Bulgarian entity in paragraph (b)(8)(i) of this section applies to such entities formed on or after January 1, 2007, and to any such entity formed before such date from the date that, in the aggregate, a 50 percent or more interest in such entity is owned by any person or persons who were not owners of the entity as of January 1, 2007. For purposes of the preceding sentence, the term *interest* means—

(i) In the case of a partnership, a capital or profits interest; and

(ii) In the case of a corporation, an equity interest measured by vote or value.

(8) Paragraph (c)(2)(iv)(C)(*2*) of this section applies on the later of—

(i) August 1, 2016; or

(ii) The first day of the latest-starting plan year beginning after May 4, 2016, and on or before May 4, 2017, of an affected plan (based on the plans adopted before, and the plan years in effect as of, May 4, 2016) sponsored by an entity that is disregarded as an entity separate from its owner for any purpose under this section. For rules that apply before the applicability date of paragraph (c)(2)(iv)(C)(*2*) of this section, see 26 CFR part 301 revised as of April 1,

**Internal Revenue Service, Treasury**                    **§ 301.7701–3**

2016. For the purposes of this paragraph (e)(8)—

(A) An affected plan includes any qualified plan, health plan, or section 125 cafeteria plan if the plan benefits participants whose employment status is affected by paragraph (c)(2)(iv)(C)(2) of this section;

(B) A qualified plan means a plan, contract, pension, or trust described in paragraph (A) or (B) of section 219(g)(5) (other than paragraph (A)(iii)); and

(C) A health plan means an arrangement described under § 1.105–5 of this chapter.

(9) *Reporting required under section 6038A.* Paragraph (c)(2)(vi) of this section applies to taxable years of entities beginning after December 31, 2016, and ending on or after December 13, 2017.

[T.D. 8697, 61 FR 66589, Dec. 18, 1996, as amended by T.D. 8844, 64 FR 66583, Nov. 29, 1999; T.D. 9012, 67 FR 49864, Aug. 1, 2002; T.D. 9093, 68 FR 60298, Oct. 22, 2003; T.D. 9153, 69 FR 49810, Aug. 12, 2004; T.D. 9183, 70 FR 9221, Feb. 25, 2005; T.D. 9197, 70 FR 19698, Apr. 14, 2005; T.D. 9235, 70 FR 74658, Dec. 16, 2005; T.D. 9246, 71 FR 4817, Jan. 30, 2006; T.D. 9356, 72 FR 45893, Aug. 16, 2007; T.D. 9388, 73 FR 15065, Mar. 21, 2008; T.D. 8697, 73 FR 18442, Apr. 4, 2008; 73 FR 21415, Apr. 21, 2008; T.D. 9433, 73 FR 72346, Nov. 28, 2008; T.D. 9462, 74 FR 46904, Sept. 14, 2009; T.D. 9553, 76 FR 66182, Oct. 26, 2011; T.D. 9554, 76 FR 67365, Nov. 1, 2011; T.D. 9596, 77 FR 37807, June 25, 2012; T.D. 9655, 79 FR 8601, Feb. 12, 2014; T.D. 9670, 79 FR 36206, June 26, 2014; T.D. 9766, 81 FR 26694, May 4, 2016; T.D. 9796, 81 FR 89851, Dec. 13, 2016; T.D. 9869, 84 FR 31479, July 2, 2019]

**§ 301.7701–3  Classification of certain business entities.**

(a) *In general.* A business entity that is not classified as a corporation under § 301.7701–2(b) (1), (3), (4), (5), (6), (7), or (8) (an *eligible entity*) can elect its classification for federal tax purposes as provided in this section. An eligible entity with at least two members can elect to be classified as either an association (and thus a corporation under § 301.7701–2(b)(2)) or a partnership, and an eligible entity with a single owner can elect to be classified as an association or to be disregarded as an entity separate from its owner. Paragraph (b) of this section provides a default classification for an eligible entity that does not make an election. Thus, elections are necessary only when an eligible entity chooses to be classified ini-

tially as other than the default classification or when an eligible entity chooses to change its classification. An entity whose classification is determined under the default classification retains that classification (regardless of any changes in the members' liability that occurs at any time during the time that the entity's classification is relevant as defined in paragraph (d) of this section) until the entity makes an election to change that classification under paragraph (c)(1) of this section. Paragraph (c) of this section provides rules for making express elections, including a rule under which a domestic eligible entity that elects to be classified as an association consents to be subject to the dual consolidated loss rules of section 1503(d). Paragraph (d) of this section provides special rules for foreign eligible entities. Paragraph (e) of this section provides special rules for classifying entities resulting from partnership terminations and divisions under section 708(b). Paragraph (f) of this section sets forth the effective date of this section and a special rule relating to prior periods.

(b) *Classification of eligible entities that do not file an election*—(1) *Domestic eligible entities.* Except as provided in paragraph (b)(3) of this section, unless the entity elects otherwise, a domestic eligible entity is—

(i) A partnership if it has two or more members; or

(ii) Disregarded as an entity separate from its owner if it has a single owner.

(2) *Foreign eligible entities*—(i) *In general.* Except as provided in paragraph (b)(3) of this section, unless the entity elects otherwise, a foreign eligible entity is—

(A) A partnership if it has two or more members and at least one member does not have limited liability;

(B) An association if all members have limited liability; or

(C) Disregarded as an entity separate from its owner if it has a single owner that does not have limited liability.

(ii) *Definition of limited liability.* For purposes of paragraph (b)(2)(i) of this section, a member of a foreign eligible entity has limited liability if the member has no personal liability for the debts of or claims against the entity by

839

§ 301.7701–3                                    26 CFR Ch. I (4–1–23 Edition)

reason of being a member. This deter-
mination is based solely on the statute
or law pursuant to which the entity is
organized, except that if the under-
lying statute or law allows the entity
to specify in its organizational docu-
ments whether the members will have
limited liability, the organizational
documents may also be relevant. For
purposes of this section, a member has
personal liability if the creditors of the
entity may seek satisfaction of all or
any portion of the debts or claims
against the entity from the member as
such. A member has personal liability
for purposes of this paragraph even if
the member makes an agreement under
which another person (whether or not a
member of the entity) assumes such li-
ability or agrees to indemnify that
member for any such liability.

(3) *Existing eligible entities*—(i) *In gen-
eral.* Unless the entity elects otherwise,
an eligible entity in existence prior to
the effective date of this section will
have the same classification that the
entity claimed under §§ 301.7701–1
through 301.7701–3 as in effect on the
date prior to the effective date of this
section; except that if an eligible enti-
ty with a single owner claimed to be a
partnership under those regulations,
the entity will be disregarded as an en-
tity separate from its owner under this
paragraph (b)(3)(i). For special rules re-
garding the classification of such enti-
ties prior to the effective date of this
section, see paragraph (h)(2) of this sec-
tion.

(ii) *Special rules.* For purposes of
paragraph (b)(3)(i) of this section, a for-
eign eligible entity is treated as being
in existence prior to the effective date
of this section only if the entity's clas-
sification was relevant (as defined in
paragraph (d) of this section) at any
time during the sixty months prior to
the effective date of this section. If an
entity claimed different classifications
prior to the effective date of this sec-
tion, the entity's classification for pur-
poses of paragraph (b)(3)(i) of this sec-
tion is the last classification claimed
by the entity. If a foreign eligible enti-
ty's classification is relevant prior to
the effective date of this section, but
no federal tax or information return is
filed or the federal tax or information
return does not indicate the classifica-
tion of the entity, the entity's classi-
fication for the period prior to the ef-
fective date of this section is deter-
mined under the regulations in effect
on the date prior to the effective date
of this section.

(c) *Elections*—(1) *Time and place for fil-
ing*—(i) *In general.* Except as provided
in paragraphs (c)(1) (iv) and (v) of this
section, an eligible entity may elect to
be classified other than as provided
under paragraph (b) of this section, or
to change its classification, by filing
Form 8832, Entity Classification Elec-
tion, with the service center designated
on Form 8832. An election will not be
accepted unless all of the information
required by the form and instructions,
including the taxpayer identifying
number of the entity, is provided on
Form 8832. See § 301.6109–1 for rules on
applying for and displaying Employer
Identification Numbers.

(ii) *Further notification of elections.* An
eligible entity required to file a Fed-
eral tax or information return for the
taxable year for which an election is
made under § 301.7701–3(c)(1)(i) must at-
tach a copy of its Form 8832 to its Fed-
eral tax or information return for that
year. If the entity is not required to
file a return for that year, a copy of its
Form 8832 (''Entity Classification Elec-
tion'') must be attached to the Federal
income tax or information return of
any direct or indirect owner of the en-
tity for the taxable year of the owner
that includes the date on which the
election was effective. An indirect
owner of the entity does not have to
attach a copy of the Form 8832 to its
return if an entity in which it has an
interest is already filing a copy of the
Form 8832 with its return. If an entity,
or one of its direct or indirect owners,
fails to attach a copy of a Form 8832 to
its return as directed in this section,
an otherwise valid election under
§ 301.7701–3(c)(1)(i) will not be invali-
dated, but the non-filing party may be
subject to penalties, including any ap-
plicable penalties if the Federal tax or
information returns are inconsistent
with the entity's election under
§ 301.7701–3(c)(1)(i). In the case of re-
turns for taxable years beginning after
December 31, 2002, the copy of Form
8832 attached to a return pursuant to

840

- Add.84 -

**Internal Revenue Service, Treasury**                                    **§ 301.7701–3**

this paragraph (c)(1)(ii) is not required to be a signed copy.

(iii) *Effective date of election.* An election made under paragraph (c)(1)(i) of this section will be effective on the date specified by the entity on Form 8832 or on the date filed if no such date is specified on the election form. The effective date specified on Form 8832 can not be more than 75 days prior to the date on which the election is filed and can not be more than 12 months after the date on which the election is filed. If an election specifies an effective date more than 75 days prior to the date on which the election is filed, it will be effective 75 days prior to the date it was filed. If an election specifies an effective date more than 12 months from the date on which the election is filed, it will be effective 12 months after the date it was filed. If an election specifies an effective date before January 1, 1997, it will be effective as of January 1, 1997. If a purchasing corporation makes an election under section 338 regarding an acquired subsidiary, an election under paragraph (c)(1)(i) of this section for the acquired subsidiary can be effective no earlier than the day after the acquisition date (within the meaning of section 338(h)(2)).

(iv) *Limitation.* If an eligible entity makes an election under paragraph (c)(1)(i) of this section to change its classification (other than an election made by an existing entity to change its classification as of the effective date of this section), the entity cannot change its classification by election again during the sixty months succeeding the effective date of the election. However, the Commissioner may permit the entity to change its classification by election within the sixty months if more than fifty percent of the ownership interests in the entity as of the effective date of the subsequent election are owned by persons that did not own any interests in the entity on the filing date or on the effective date of the entity's prior election. An election by a newly formed eligible entity that is effective on the date of formation is not considered a change for purposes of this paragraph (c)(1)(iv).

(v) *Deemed elections*—(A) *Exempt organizations.* An eligible entity that has been determined to be, or claims to be, exempt from taxation under section 501(a) is treated as having made an election under this section to be classified as an association. Such election will be effective as of the first day for which exemption is claimed or determined to apply, regardless of when the claim or determination is made, and will remain in effect unless an election is made under paragraph (c)(1)(i) of this section after the date the claim for exempt status is withdrawn or rejected or the date the determination of exempt status is revoked.

(B) *Real estate investment trusts.* An eligible entity that files an election under section 856(c)(1) to be treated as a real estate investment trust is treated as having made an election under this section to be classified as an association. Such election will be effective as of the first day the entity is treated as a real estate investment trust.

(C) *S corporations.* An eligible entity that timely elects to be an S corporation under section 1362(a)(1) is treated as having made an election under this section to be classified as an association, provided that (as of the effective date of the election under section 1362(a)(1)) the entity meets all other requirements to qualify as a small business corporation under section 1361(b). Subject to §301.7701–3(c)(1)(iv), the deemed election to be classified as an association will apply as of the effective date of the S corporation election and will remain in effect until the entity makes a valid election, under §301.7701–3(c)(1)(i), to be classified as other than an association.

(vi) *Examples.* The following examples illustrate the rules of this paragraph (c)(1):

*Example 1.* On July 1, 1998, X, a domestic corporation, purchases a 10% interest in Y, an eligible entity formed under Country A law in 1990. The entity's classification was not relevant to any person for federal tax or information purposes prior to X's acquisition of an interest in Y. Thus, Y is not considered to be in existence on the effective date of this section for purposes of paragraph (b)(3) of this section. Under the applicable Country A statute, all members of Y have limited liability as defined in paragraph (b)(2)(ii) of this section. Accordingly, Y is classified as an association under paragraph (b)(2)(i)(B) of

841

this section unless it elects under this paragraph (c) to be classified as a partnership. To be classified as a partnership as of July 1, 1998, Y must file a Form 8832 by September 14, 1998. See paragraph (c)(1)(i) of this section. Because an election cannot be effective more than 75 days prior to the date on which it is filed, if Y files its Form 8832 after September 14, 1998, it will be classified as an association from July 1, 1998, until the effective date of the election. In that case, it could not change its classification by election under this paragraph (c) during the sixty months succeeding the effective date of the election.

*Example 2.* (i) Z is an eligible entity formed under Country B law and is in existence on the effective date of this section within the meaning of paragraph (b)(3) of this section. Prior to the effective date of this section, Z claimed to be classified as an association. Unless Z files an election under this paragraph (c), it will continue to be classified as an association under paragraph (b)(3) of this section.

(ii) Z files a Form 8832 pursuant to this paragraph (c) to be classified as a partnership, effective as of the effective date of this section. Z can file an election to be classified as an association at any time thereafter, but then would not be permitted to change its classification by election during the sixty months succeeding the effective date of that subsequent election.

(2) *Authorized signatures*—(i) *In general.* An election made under paragraph (c)(1)(i) of this section must be signed by—

(A) Each member of the electing entity who is an owner at the time the election is filed; or

(B) Any officer, manager, or member of the electing entity who is authorized (under local law or the entity's organizational documents) to make the election and who represents to having such authorization under penalties of perjury.

(ii) *Retroactive elections.* For purposes of paragraph (c)(2)(i) of this section, if an election under paragraph (c)(1)(i) of this section is to be effective for any period prior to the time that it is filed, each person who was an owner between the date the election is to be effective and the date the election is filed, and who is not an owner at the time the election is filed, must also sign the election.

(iii) *Changes in classification.* For paragraph (c)(2)(i) of this section, if an election under paragraph (c)(1)(i) of this section is made to change the clas-

sification of an entity, each person who was an owner on the date that any transactions under paragraph (g) of this section are deemed to occur, and who is not an owner at the time the election is filed, must also sign the election. This paragraph (c)(2)(iii) applies to elections filed on or after November 29, 1999.

(3) *Consent to be subject to section 1503(d)*—(i) *Rule.* A domestic eligible entity that elects to be classified as an association consents to be treated as a dual resident corporation for purposes of section 1503(d) (such an entity, a *domestic consenting corporation*), for any taxable year for which it is classified as an association and the condition set forth in §1.1503(d)–1(c)(1) of this chapter is satisfied.

(ii) *Transition rule—deemed consent.* If, as a result of the applicability date (see paragraph (c)(3)(iii) of this section) relating to paragraph (c)(3)(i) of this section, a domestic eligible entity that is classified as an association has not consented to be treated as a domestic consenting corporation pursuant to paragraph (c)(3)(i) of this section, then the domestic eligible entity is deemed to consent to be so treated as of its first taxable year beginning on or after December 20, 2019. The first sentence of this paragraph (c)(3)(ii) does not apply if the domestic eligible entity elects, on or after December 20, 2018 and effective before its first taxable year beginning on or after December 20, 2019, to be classified as a partnership or disregarded entity such that it ceases to be a domestic eligible entity that is classified as an association. For purposes of the election described in the second sentence of this paragraph (c)(3)(ii), the sixty month limitation under paragraph (c)(1)(iv) of this section is waived.

(iii) *Applicability date.* The sixth sentence of paragraph (a) of this section and paragraph (c)(3)(i) of this section apply to a domestic eligible entity that on or after December 20, 2018 files an election to be classified as an association (regardless of whether the election is effective before December 20, 2018). Paragraph (c)(3)(ii) of this section applies as of December 20, 2018.

**Internal Revenue Service, Treasury** §301.7701–3

(d) *Special rules for foreign eligible entities*—(1) *Definition of relevance*—(i) *General rule.* For purposes of this section, a foreign eligible entity's classification is relevant when its classification affects the liability of any person for federal tax or information purposes. For example, a foreign entity's classification would be relevant if U.S. income was paid to the entity and the determination by the withholding agent of the amount to be withheld under chapter 3 of the Internal Revenue Code (if any) would vary depending upon whether the entity is classified as a partnership or as an association. Thus, the classification might affect the documentation that the withholding agent must receive from the entity, the type of tax or information return to file, or how the return must be prepared. The date that the classification of a foreign eligible entity is relevant is the date an event occurs that creates an obligation to file a federal tax return, information return, or statement for which the classification of the entity must be determined. Thus, the classification of a foreign entity is relevant, for example, on the date that an interest in the entity is acquired which will require a U.S. person to file an information return on Form 5471.

(ii) *Deemed relevance*—(A) *General rule.* For purposes of this section, except as provided in paragraph (d)(1)(ii)(B) of this section, the classification for Federal tax purposes of a foreign eligible entity that files Form 8832, "Entity Classification Election", shall be deemed to be relevant only on the date the entity classification election is effective.

(B) *Exception.* If the classification of a foreign eligible entity is relevant within the meaning of paragraph (d)(1)(i) of this section, then the rule in paragraph (d)(1)(ii)(A) of this section shall not apply.

(2) *Entities the classification of which has never been relevant.* If the classification of a foreign eligible entity has never been relevant (as defined in paragraph (d)(1) of this section), then the entity's classification will initially be determined pursuant to the provisions of paragraph (b)(2) of this section when the classification of the entity first be-

comes relevant (as defined in paragraph (d)(1)(i) of this section).

(3) *Special rule when classification is no longer relevant.* If the classification of a foreign eligible entity is not relevant (as defined in paragraph (d)(1) of this section) for 60 consecutive months, then the entity's classification will initially be determined pursuant to the provisions of paragraph (b)(2) of this section when the classification of the foreign eligible entity becomes relevant (as defined in paragraph (d)(1)(i) of this section). The date that the classification of a foreign entity is not relevant is the date an event occurs that causes the classification to no longer be relevant, or, if no event occurs in a taxable year that causes the classification to be relevant, then the date is the first day of that taxable year.

(4) *Effective date.* Paragraphs (d)(1)(ii), (d)(2), and (d)(3) of this section apply on or after October 22, 2003.

(e) *Coordination with section 708(b).* Except as provided in §301.7701–2(d)(3) (regarding termination of grandfather status for certain foreign business entities), an entity resulting from a transaction described in section 708(b)(1)(B) (partnership termination due to sales or exchanges) or section 708(b)(2)(B) (partnership division) is a partnership.

(f) *Changes in number of members of an entity*—(1) *Associations.* The classification of an eligible entity as an association is not affected by any change in the number of members of the entity.

(2) *Partnerships and single member entities.* An eligible entity classified as a partnership becomes disregarded as an entity separate from its owner when the entity's membership is reduced to one member. A single member entity disregarded as an entity separate from its owner is classified as a partnership when the entity has more than one member. If an elective classification change under paragraph (c) of this section is effective at the same time as a membership change described in this paragraph (f)(2), the deemed transactions in paragraph (g) of this section resulting from the elective change preempt the transactions that would result from the change in membership.

(3) *Effect on sixty month limitation.* A change in the number of members of an entity does not result in the creation

843

of a new entity for purposes of the sixty month limitation on elections under paragraph (c)(1)(iv) of this section.

(4) *Examples.* The following examples illustrate the application of this paragraph (f):

*Example 1. A,* a U.S. person, owns a domestic eligible entity that is disregarded as an entity separate from its owner. On January 1, 1998, *B,* a U.S. person, buys a 50 percent interest in the entity from *A.* Under this paragraph (f), the entity is classified as a partnership when *B* acquires an interest in the entity. However, *A* and *B* elect to have the entity classified as an association effective on January 1, 1998. Thus, *B* is treated as buying shares of stock on January 1, 1998. (Under paragraph (c)(1)(iv) of this section, this election is treated as a change in classification so that the entity generally cannot change its classification by election again during the sixty months succeeding the effective date of the election.) Under paragraph (g)(1) of this section, *A* is treated as contributing the assets and liabilities of the entity to the newly formed association immediately before the close of December 31, 1997. Because *A* does not retain control of the association as required by section 351, *A*'s contribution will be a taxable event. Therefore, under section 1012, the association will take a fair market value basis in the assets contributed by *A,* and *A* will have a fair market value basis in the stock received. *A* will have no additional gain upon the sale of stock to *B,* and *B* will have a cost basis in the stock purchased from *A.*

*Example 2.* (i) On April 1, 1998, *A* and *B,* U.S. persons, form *X,* a foreign eligible entity. *X* is treated as an association under the default provisions of paragraph (b)(2)(i) of this section, and *X* does not make an election to be classified as a partnership. *A* subsequently purchases all of *B*'s interest in *X.*

(ii) Under paragraph (f)(1) of this section, *X* continues to be classified as an association. *X,* however, can subsequently elect to be disregarded as an entity separate from *A.* The sixty month limitation of paragraph (c)(1)(iv) of this section does not prevent *X* from making an election because *X* has not made a prior election under paragraph (c)(1)(i) of this section.

*Example 3.* (i) On April 1, 1998, *A* and *B,* U.S. persons, form *X,* a foreign eligible entity. *X* is treated as an association under the default provisions of paragraph (b)(2)(i) of this section, and *X* does not make an election to be classified as a partnership. On January 1, 1999, *X* elects to be classified as a partnership effective on that date. Under the sixty month limitation of paragraph (c)(1)(iv) of this section, *X* cannot elect to be classified as an association until January 1, 2004 (*i.e.,*

sixty months after the effective date of the election to be classified as a partnership).

(ii) On June 1, 2000, *A* purchases all of *B*'s interest in *X.* After *A*'s purchase of *B*'s interest, *X* can no longer be classified as a partnership because *X* has only one member. Under paragraph (f)(2) of this section, *X* is disregarded as an entity separate from *A* when *A* becomes the only member of *X. X,* however, is not treated as a new entity for purposes of paragraph (c)(1)(iv) of this section. As a result, the sixty month limitation of paragraph (c)(1)(iv) of this section continues to apply to *X,* and *X* cannot elect to be classified as an association until January 1, 2004 (*i.e.,* sixty months after January 1, 1999, the effective date of the election by *X* to be classified as a partnership).

(5) *Effective date.* This paragraph (f) applies as of November 29, 1999.

(g) *Elective changes in classification*— (1) *Deemed treatment of elective change*— (i) *Partnership to association.* If an eligible entity classified as a partnership elects under paragraph (c)(1)(i) of this section to be classified as an association, the following is deemed to occur: The partnership contributes all of its assets and liabilities to the association in exchange for stock in the association, and immediately thereafter, the partnership liquidates by distributing the stock of the association to its partners.

(ii) *Association to partnership.* If an eligible entity classified as an association elects under paragraph (c)(1)(i) of this section to be classified as a partnership, the following is deemed to occur: The association distributes all of its assets and liabilities to its shareholders in liquidation of the association, and immediately thereafter, the shareholders contribute all of the distributed assets and liabilities to a newly formed partnership.

(iii) *Association to disregarded entity.* If an eligible entity classified as an association elects under paragraph (c)(1)(i) of this section to be disregarded as an entity separate from its owner, the following is deemed to occur: The association distributes all of its assets and liabilities to its single owner in liquidation of the association.

(iv) *Disregarded entity to an association.* If an eligible entity that is disregarded as an entity separate from its owner elects under paragraph (c)(1)(i) of this section to be classified as an association, the following is deemed to

**Internal Revenue Service, Treasury**                    **§ 301.7701–3**

occur: The owner of the eligible entity contributes all of the assets and liabilities of the entity to the association in exchange for stock of the association.

(2) *Effect of elective changes*—(i) *In general.* The tax treatment of a change in the classification of an entity for federal tax purposes by election under paragraph (c)(1)(i) of this section is determined under all relevant provisions of the Internal Revenue Code and general principles of tax law, including the step transaction doctrine.

(ii) *Adoption of plan of liquidation.* For purposes of satisfying the requirement of adoption of a plan of liquidation under section 332, unless a formal plan of liquidation that contemplates the election to be classified as a partnership or to be disregarded as an entity separate from its owner is adopted on an earlier date, the making, by an association, of an election under paragraph (c)(1)(i) of this section to be classified as a partnership or to be disregarded as an entity separate from its owner is considered to be the adoption of a plan of liquidation immediately before the deemed liquidation described in paragraph (g)(1)(ii) or (iii) of this section. This paragraph (g)(2)(ii) applies to elections filed on or after December 17, 2001. Taxpayers may apply this paragraph (g)(2)(ii) retroactively to elections filed before December 17, 2001, if the corporate owner claiming treatment under section 332 and its subsidiary making the election take consistent positions with respect to the federal tax consequences of the election.

(3) *Timing of election*—(i) *In general.* An election under paragraph (c)(1)(i) of this section that changes the classification of an eligible entity for federal tax purposes is treated as occurring at the start of the day for which the election is effective. Any transactions that are deemed to occur under this paragraph (g) as a result of a change in classification are treated as occurring immediately before the close of the day before the election is effective. For example, if an election is made to change the classification of an entity from an association to a partnership effective on January 1, the deemed transactions specified in paragraph (g)(1)(ii) of this section (including the liquidation of

the association) are treated as occurring immediately before the close of December 31 and must be reported by the owners of the entity on December 31. Thus, the last day of the association's taxable year will be December 31 and the first day of the partnership's taxable year will be January 1.

(ii) *Coordination with section 338 election.* A purchasing corporation that makes a qualified stock purchase of an eligible entity taxed as a corporation may make an election under section 338 regarding the acquisition if it satisfies the requirements for the election, and may also make an election to change the classification of the target corporation. If a taxpayer makes an election under section 338 regarding its acquisition of another entity taxable as a corporation and makes an election under paragraph (c) of this section for the acquired corporation (effective at the earliest possible date as provided by paragraph (c)(1)(iii) of this section), the transactions under paragraph (g) of this section are deemed to occur immediately after the deemed asset purchase by the new target corporation under section 338.

(iii) *Application to successive elections in tiered situations.* When elections under paragraph (c)(1)(i) of this section for a series of tiered entities are effective on the same date, the eligible entities may specify the order of the elections on Form 8832. If no order is specified for the elections, any transactions that are deemed to occur in this paragraph (g) as a result of the classification change will be treated as occurring first for the highest tier entity's classification change, then for the next highest tier entity's classification change, and so forth down the chain of entities until all the transactions under this paragraph (g) have occurred. For example, Parent, a corporation, wholly owns all of the interest of an eligible entity classified as an association (S1), which wholly owns another eligible entity classified as an association (S2), which wholly owns another eligible entity classified as an association (S3). Elections under paragraph (c)(1)(i) of this section are filed to classify S1, S2, and S3 each as disregarded as an entity separate from its owner effective on the same day. If no order is

845

specified for the elections, the following transactions are deemed to occur under this paragraph (g) as a result of the elections, with each successive transaction occurring on the same day immediately after the preceding transaction S1 is treated as liquidating into Parent, then S2 is treated as liquidating into Parent, and finally S3 is treated as liquidating into Parent.

(4) *Effective date.* Except as otherwise provided in paragraph (g)(2)(ii) of this section, this paragraph (g) applies to elections that are filed on or after November 29, 1999. Taxpayers may apply this paragraph (g) retroactively to elections filed before November 29, 1999 if all taxpayers affected by the deemed transactions file consistently with this paragraph (g).

(h) *Effective date*—(1) *In general.* Except as otherwise provided in this section, the rules of this section are applicable as of January 1, 1997.

(2) *Prior treatment of existing entities.* In the case of a business entity that is not described in §301.7701–2(b) (1), (3), (4), (5), (6), or (7), and that was in existence prior to January 1, 1997, the entity's claimed classification(s) will be respected for all peri0ods prior to January 1, 1997, if—

(i) The entity had a reasonable basis (within the meaning of section 6662) for its claimed classification;

(ii) The entity and all members of the entity recognized the federal tax consequences of any change in the entity's classification within the sixty months prior to January 1, 1997; and

(iii) Neither the entity nor any member was notified in writing on or before May 8, 1996, that the classification of the entity was under examination (in which case the entity's classification will be determined in the examination).

(3) *Deemed elections for S corporations.* Paragraph (c)(1)(v)(C) of this section applies to timely S corporation elections under section 1362(a) filed on or after July 20, 2004. Eligible entities that filed timely S elections before July 20, 2004 may also rely on the provisions of the regulation.

Editorial Note: For Federal Register citations affecting §301.7701–3, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

**§ 301.7701–4   Trusts.**

(a) *Ordinary trusts.* In general, the term "trust" as used in the Internal Revenue Code refers to an arrangement created either by a will or by an inter vivos declaration whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries under the ordinary rules applied in chancery or probate courts. Usually the beneficiaries of such a trust do no more than accept the benefits thereof and are not the voluntary planners or creators of the trust arrangement. However, the beneficiaries of such a trust may be the persons who create it and it will be recognized as a trust under the Internal Revenue Code if it was created for the purpose of protecting or conserving the trust property for beneficiaries who stand in the same relation to the trust as they would if the trust had been created by others for them. Generally speaking, an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit.

(b) *Business trusts.* There are other arrangements which are known as trusts because the legal title to property is conveyed to trustees for the benefit of beneficiaries, but which are not classified as trusts for purposes of the Internal Revenue Code because they are not simply arrangements to protect or conserve the property for the beneficiaries. These trusts, which are often known as business or commercial trusts, generally are created by the beneficiaries simply as a device to carry on a profit-making business which normally would have been carried on through business organizations that are classified as corporations or partnerships under the Internal Revenue Code. However, the fact that the corpus of the trust is not supplied by the beneficiaries is not sufficient reason in itself for classifying the

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### 26 CFR Part 1

[TD 9865]

RIN 1545–BO64

### Limitation on Deduction for Dividends Received From Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final temporary regulations.

**SUMMARY:** This document contains temporary regulations under section 245A of the Internal Revenue Code (the "Code") that limit the dividends received deduction available for certain dividends received from current or former controlled foreign corporations. This document also contains temporary regulations that limit the applicability of the exception to foreign personal holding company income for certain dividends received by upper-tier controlled foreign corporations from lower-tier controlled foreign corporations and temporary regulations under section 6038 to facilitate administration of certain rules in the temporary regulations. The temporary regulations affect certain U.S. persons that are domestic corporations that receive certain dividends from current or former controlled foreign corporations or are United States shareholders of upper-tier controlled foreign corporations that receive certain dividends from lower-tier controlled foreign corporations. The text of the temporary regulations also serves as the text of the proposed regulations set forth in a notice of proposed rulemaking published in the Proposed Rules section of this issue of the **Federal Register**.

**DATES:**

*Effective date:* These regulations are effective on June 18, 2019.

*Applicability dates:* For dates of applicability, see §§ 1.245A–5T(k), 1.954(c)(6)–1T(b), and 1.6038–2T(m).

**FOR FURTHER INFORMATION CONTACT:** Logan M. Kincheloe at (202) 317–6937 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### Background

#### I. In General

This document contains amendments to 26 CFR part 1 under sections 245A, 954(c)(6), and 6038 (the "temporary regulations"). Any terms used but not defined in this preamble have the

meanings given them in the temporary regulations. Added to the Code by section 14101(a) of the Tax Cuts and Jobs Act (the "Act"), section 245A generally allows a domestic corporation a 100-percent dividends received deduction (the "section 245A deduction") for the foreign-source portion of a dividend received after December 31, 2017, from a specified 10 percent-owned foreign corporation (an "SFC"). Section 954, which predates the Act and remains in effect, generally provides that a dividend received by a controlled foreign corporation (a "CFC"), as defined in section 957, is included in the CFC's foreign personal holding company income ("FPHCI"), as defined in section 954(c). Pursuant to section 954(c)(6), however, a dividend received by a CFC from a related CFC is not included in the CFC's FPHCI if certain requirements are satisfied (the "section 954(c)(6) exception").

The temporary regulations limit the availability of the section 245A deduction and the section 954(c)(6) exception in specific and narrow cases where the deduction or exception, respectively, effectively eliminates subpart F income or income subject to tax under section 951A from the U.S. tax system. Specifically, the temporary regulations address transactions that have the effect of avoiding tax under section 965, 951A, or 951 by inappropriately converting income that should have been subject to U.S. tax into nontaxed income. The temporary regulations also include rules under section 6038 to facilitate administration of certain rules in the temporary regulations. The temporary regulations do not include general rules relating to dividends eligible for the section 245A deduction; those rules will be included in separate guidance.

### II. Scope of Participation Exemption

In order to transition to the new participation exemption system provided under section 245A and certain other provisions of the Act, the Act imposed a tax on certain earnings and profits of a U.S.-owned foreign corporation that had not previously been subject to U.S. tax. *See* section 965. Section 965 was designed to ensure that previously untaxed foreign income of the foreign corporation that accrued before the advent of the participation exemption system generally is subject to U.S. tax (although at a reduced rate). This transition tax applied to the last taxable year of the foreign corporation beginning before January 1, 2018, and generally increased the subpart F income of the foreign corporation by the amount of its previously untaxed

earnings as of no later than December 31, 2017.

The Act's legislative history indicates congressional concern that the new participation exemption could heighten the incentive to shift profits to low-taxed foreign jurisdictions or tax havens absent base erosion protections. *See* Senate Committee on the Budget, 115th Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71, at 365 (Comm. Print 2017) ("Senate Explanation"). For example, without appropriate limits, domestic corporations might be incentivized to shift income to low-taxed foreign affiliates, "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed." *See id.*

This risk of base erosion is acute with respect to certain types of income, such as passive or mobile income and income derived from intangible property, which historically have posed transfer pricing challenges. To prevent base erosion, the Act retained the subpart F regime (section 951 et. seq.) and enacted a new regime under section 951A for global intangible lowed-taxed income (the "GILTI regime"), both of which subject certain foreign income of a CFC to current U.S. taxation in the hands of the CFC's United States shareholders (within the meaning of section 951(b)) (each shareholder, a "U.S. shareholder"). In order to avoid double taxation when a CFC distributes earnings and profits that have been taxed on a current basis to a U.S. shareholder, the earnings and profits are designated as "previously taxed earnings and profits" (also known as "PTEP") under section 959. Section 959 generally provides that PTEP are not subject to U.S. tax when distributed to a U.S. shareholder.

The subpart F regime, which was established under the Revenue Act of 1962, Public Law 87–834, sec. 12, 76 Stat. at 1006, subjects certain income earned by a CFC to U.S. taxation in the hands of the CFC's U.S. shareholders on a current basis at the full ordinary tax rate, regardless of whether the CFC distributes the earnings attributable to such income. H.R. Rep. No. 1447 at 58 (1962). In general, the subpart F regime applies to certain passive or highly mobile income in order to address base erosion concerns. Thus, for example, section 954(c) provides that subpart F income includes FPHCI. FPHCI includes certain types of passive or mobile income that are relatively easy to situate in tax-advantaged jurisdictions, such as dividends, interest, rents, and royalties.

The GILTI regime generally subjects a CFC's U.S. shareholders to current

taxation on intangible income earned by the CFC in a manner similar to the treatment of a CFC's subpart F income. *See* section 951A; *see also* Senate Explanation at 366 (explaining that such income is often associated with profit shifting). Intangible income is determined for this purpose on an aggregate basis at the U.S. shareholder level and is based on a formulaic approach under which a ''normal return'' equal to 10 percent of the basis of certain tangible assets is calculated and then each dollar of income above the ''normal return'' is effectively treated as intangible income (regardless of whether such income is actually attributable to intangible property). *See* Senate Explanation at 366. However, for purposes of this determination, certain income of the CFC—such as income taxed under another Code provision (for example, under the rules for subpart F income in sections 951 through 964 or under section 882 in the case of income effectively connected with the conduct of a U.S. trade or business), immobile income (such as foreign oil and gas extraction income), or highly taxed income that is excluded from subpart F income by reason of the high-tax exception of section 954(b)(4)—is not taken into account. *See also id.* (''[C]ertain items of income earned by CFCs should be excluded from the GILTI, either because they should be exempt from U.S. tax—as they are generally not the type of income that is the source of base erosion concerns—or are already taxed currently by the United States''). The CFC's U.S. shareholders are subject to current U.S. tax on the CFC's income in excess of the CFC's normal return, potentially at a reduced rate through a deduction under section 250, at the corporate U.S. shareholder level. The differing treatment under the GILTI regime with respect to excess returns (taxed currently, though potentially at a reduced rate) versus normal returns (exempt from tax) generally has the effect of differentiating between income that poses base erosion concerns and income that does not pose such concerns. The GILTI regime applies in the first taxable year of a CFC beginning on or after January 1, 2018. Section 245A applies to distributions made by SFCs (which include CFCs) on or after that date.

The rules under section 959 generally treat PTEP (including PTEP that arise by reason of the subpart F regime, the GILTI regime, or the transition tax under section 965) as being distributed before non-previously taxed earnings and profits and also prevent section 245A

from applying to PTEP. *See* section 959(c) (providing ordering rules that treat PTEP as being distributed first) and section 959(d) (providing that a distribution of PTEP to a U.S shareholder is not treated as a dividend). Thus, both the interaction of the definitions of subpart F income and tested income with the ordering rules for distributions of PTEP and the overall structure of the international provisions of the Act contemplate that only residual earnings remaining after the potential application of sections 951(a), 951A, and 965 generally are eligible for the section 245A deduction. That is, section 245A(a) applies only to certain ''dividends'' received from foreign corporations. Therefore, sections 951(a), 951A, and 965 generally have priority over section 245A because, when they apply to a foreign corporation's earnings, distributions of those earnings do not qualify as dividends under section 959(d), and, therefore, section 245A does not apply.

The statutory text of the participation exemption system under section 245A, the GILTI regime, the subpart F regime, and the PTEP rules collectively operate as a comprehensive framework with respect to a CFC's foreign earnings after the application of the transition tax under section 965. A central feature of this regime is that income derived by CFCs is eligible for the section 245A deduction only if the earnings being distributed have not been first subject to the subpart F or GILTI regimes. The scope of the section 245A deduction (and the authority set forth in section 245A(g)) is thus informed not only by the text of section 245A in isolation, but also by the role of section 245A in the overall structure of the international provisions and its interaction with the subpart F and GILTI provisions.

Section 245A(g) provides that the Secretary shall issue such regulations as are necessary or appropriate to carry out the provisions of section 245A.

## III. Scope of Section 954(c)(6)

Section 954(c)(6) was enacted by the Tax Increase Prevention and Reconciliation Act of 2005, Public Law 109–222. In general, and subject to certain limitations, the section 954(c)(6) exception is intended to facilitate intragroup foreign-to-foreign funds flows by providing that dividends, interest, rents, and royalties received or accrued by a CFC from another related CFC are not treated as FPHCI to the extent attributable or properly allocable to income of the related person which is neither subpart F income nor income treated as effectively connected with the conduct of a trade or business in the

United States. *See* H.R. Rep. No. 109–304 at 45 (2005). Section 954(c)(6)(A) also provides that the Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the provision, including regulations to prevent the abuse of the purposes of the provision. As most recently extended by the Consolidated Appropriations Act of 2016, Public Law 114–113, section 954(c)(6) applies to taxable years of foreign corporations beginning after December 31, 2005, and before January 1, 2020, and to taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

Notice 2007–9, 2007–5 I.R.B. 401, provides guidance under section 954(c)(6). The notice describes additional guidance that the Treasury Department and the IRS intend to issue regarding the application of section 954(c)(6), including certain anti-abuse rules.

## Explanation of Provisions

### I. Overview

The transition tax, the subpart F and GILTI regimes, and the participation exemption under section 245A together form a comprehensive and closely integrated set of tax rules with respect to the earnings of foreign corporations with requisite levels of U.S. ownership. These related provisions must be read and interpreted together in order to ensure that each provision functions as part of a coherent whole, as intended. Although the section 245A deduction is generally available for untaxed foreign-source earnings, read collectively this integrated set of statutory rules can be reasonably understood to require that the deduction not apply to earnings and profits attributable to income of a type that is properly subject to the subpart F or GILTI regimes, which address base erosion-type income. Otherwise, as explained in Part II of this Explanation of Provisions, the section 245A deduction could undermine the anti-base erosion measures that Congress intended to prevent income shifting. Accordingly, and consistent with the coherent functioning of the interlocking statutory scheme for taxation of CFC earnings, the section 245A deduction generally will not apply to distributions of earnings and profits that are attributable to subpart F income or tested income. The interpretation reflected in these rules ensures that these provisions will operate compatibly with, not contradictorily to, each other.

Section 245A is designed to operate residually, such that the section 245A

deduction generally applies to any earnings of a CFC to the extent that they are not first subject to the subpart F regime, the GILTI regime, or the exclusions provided in section 245A(c)(3) (and were not subject to section 965). That is, the text of the subpart F and GILTI regimes explicitly defines the types of income to which they apply, and section 245A applies to any remaining untaxed foreign earnings. Under ordinary circumstances, this formulation works appropriately, as earnings are first subject to the subpart F or GILTI regimes before the determination of dividends to which section 245A could potentially apply. However, in certain atypical circumstances, a literal application of section 245A (read in isolation) could result in the section 245A deduction applying to earnings and profits of a CFC attributable to the types of income addressed by the subpart F or GILTI regimes—the specific types of earnings that Congress described as presenting base erosion concerns. These circumstances arise when a CFC's fiscal year results in a mismatch between the effective date for GILTI and the final measurement date under section 965 or involve unanticipated interactions between section 245A and the rules for allocating subpart F income and GILTI when there is a change in ownership of a CFC. Moreover, the Treasury Department and the IRS are aware that some taxpayers are undertaking transactions with a view to eliminating current or future taxation of all foreign earnings of a CFC, including earnings attributable to base erosion-type income, by structuring into these situations. These transactions have the potential to substantially undermine the anti-base erosion framework for post-2017 foreign earnings.

Based on the structure and history of the international provisions of the Code, including changes made by the Act, the Treasury Department and the IRS have concluded that section 245A was not intended to eliminate taxation with respect to the foreign earnings of a CFC that are attributable to income of a type that is subject to taxation under the subpart F or GILTI regimes. In these cases where the literal effect of section 245A would reverse the intended effect of the subpart F and GILTI regimes, this conflict is best resolved, and the structure of the statutory scheme is best preserved, by limiting section 245A's effect. The Treasury Department and the IRS do not believe Congress intended section 245A to defeat the purposes of subpart F and GILTI regimes in these instances. Accordingly, given the

authority in section 245A(g) directing the Secretary to issue such regulations as are necessary or appropriate to carry out the provisions of section 245A, and the authority under section 7805(a) to issue rules and regulations made necessary by reason of changes in the tax laws, the temporary regulations under section 245A are designed to ensure that the section 245A deduction operates properly within the context of a closely coordinated set of rules and, as a result, is not available to eliminate the taxation of subpart F income and tested income in these limited circumstances. However, consistent with the broad application of section 245A, the temporary regulations apply only to certain well-defined circumstances in which subpart F or tested income earned by a CFC would otherwise escape taxation to its U.S. shareholders as a result of the unanticipated interaction of section 245A and certain rules applicable to the inclusion of subpart F income and GILTI under sections 951(a) and 951A, respectively.

To prevent the avoidance of U.S. tax in these specific and narrow circumstances, the temporary regulations limit the section 245A deduction only with respect to certain dividends received by a domestic corporation in connection with specific transactions that facilitate the avoidance of taxation of subpart F income or tested income and that, in many cases, may have been entered into with a purpose of avoiding the consequences of the new international tax regime as adopted by Congress in the Act. This limited denial ensures that the section 245A deduction will continue to apply to earnings and profits that are attributable to all other classes of income to which Congress intended them to apply. The Treasury Department and the IRS emphasize, however, that when the requirements of section 245A as properly construed are satisfied, it would not be permissible under the statute for the section 245A deduction to be denied for these other classes of income—even if, for example, taxpayers choose to generate such income to avail themselves of the benefits of the deduction. The Treasury Department and the IRS furthermore do not believe it would be permissible to modify the definition of subpart F income or tested income, or to recharacterize income as subpart F income or tested income, under the authority of section 245A(g).

Similar to section 245A, the exemption from subpart F income under section 954(c)(6) can be used in the context of certain transactions to avoid taxation of income that would otherwise be taxed under the subpart F or GILTI

regimes. Such transactions are not dependent upon the availability of section 245A at the level of the United States shareholder. This type of concern was first generally described in Notice 2007–9, but has been exacerbated by the enactment of section 951A as part of the Act because (1) dividends qualifying for section 954(c)(6) generally are not treated as tested income pursuant to section 951A(c)(2)(A)(i)(IV); and (2) the same structured transactions used to avoid subpart F inclusions can also be used to avoid GILTI inclusions. Given the authority in section 954(c)(6)(A) for the Treasury Department and the IRS to issue regulations preventing the abuse of section 954(c)(6), the temporary regulations under section 954(c)(6) are designed to ensure that the section 954(c)(6) exception is not used to erode the U.S. tax base through certain transactions preventing the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes. Consistent with the temporary regulations issued under section 245A, these rules are targeted to ensure that the section 954(c)(6) exception is not available for this limited category of earnings.

## II. Limitation of Amounts Eligible for Section 245A Deduction

### A. Scope

In the case of a dividend received by a domestic corporation from an SFC, the temporary regulations limit the amount of the section 245A deduction to the portion of a dividend not constituting an "ineligible amount." *See* § 1.245A–5T(b). In general, the ineligible amount is the sum of (i) 50 percent of the portion of a dividend attributable to certain earnings and profits resulting from transactions between related parties during a period after the measurement date under section 965(a)(2) and in which the SFC was a CFC but during which section 951A did not apply to it (referred to as the "extraordinary disposition amount") and (ii) the portion of a dividend attributable to certain earnings and profits generated during any taxable year ending after December 31, 2017, in which the domestic corporation reduces its ownership of the CFC (referred to as the "extraordinary reduction amount").

### B. Extraordinary Disposition Amount

Under the Act, there may be a gap between when section 951A first applies to the U.S. shareholders of a CFC (as of its first taxable year beginning after December 31, 2017) and the last date on which the earnings and profits of the CFC are measured for purposes of

section 965, which, under section 965(a), is December 31, 2017 (such period, the "disqualified period"). For example, a fiscal year CFC with a taxable year ending November 30 would have a disqualified period from January 1, 2018, the day after its final E&P measurement date under section 965, to November 30, 2018, the last date before section 951A applies with respect to its income. The Treasury Department and the IRS are aware that during the disqualified period, CFCs may have engaged in certain transactions with related parties with a goal of creating stepped-up basis for the buyer, while generating earnings and profits for the seller CFC that are not subject to any current tax and may be eligible for the section 245A deduction. Because the transactions generally are structured to avoid creating subpart F income and occur during the disqualified period, the income from these transactions generally is not subject to U.S. tax under the transition tax under section 965, the subpart F regime, or the GILTI regime. Such earnings and profits could, for example, reduce taxable gain that would otherwise be recognized on the subsequent disposition of stock of the CFC, thus potentially allowing the CFC and its future earnings to be removed from the U.S. tax system without the imposition of any U.S. tax.

The Treasury Department and the IRS have determined that it would be inconsistent with the closely interdependent set of international tax rules implemented by the Act, specifically the transition tax, the GILTI regime, and the participation exemption, for the earnings and profits resulting from these transactions to be eligible for a section 245A deduction even if the other requirements of section 245A are otherwise satisfied. Thus, the temporary regulations limit the amount of the section 245A deduction allowed to a section 245A shareholder (as defined in § 1.245A–5T(i)(21)) with respect to a dividend received from an SFC. Specifically, the deduction is limited to 50 percent of the extraordinary disposition amount, which is the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the section 245A shareholder's "extraordinary disposition account." *See* § 1.245A–5T(b)(2) and (c)(1). In general, this account represents the shareholder's pro rata share of the SFC's "extraordinary disposition E&P," reduced by the section 245A shareholder's prior extraordinary disposition amounts, if any. *See* § 1.245A–5T(c)[(3)(i)(C)(*1*)].

Extraordinary disposition E&P is an amount equal to the earnings of an SFC arising from gain recognized by reason of one or more "extraordinary dispositions." *See* § 1.245A–5T(c)(3)(i)(C).

The section 245A deduction is limited to 50 percent of the extraordinary disposition amount to reflect the fact that taxpayers generally would have been eligible for a deduction under either (i) section 250(a)(1)(B) had section 951A applied to the SFC during the disqualified period or (ii) section 965(c) had the net gain been subject to the transition tax under section 965.

For a disposition by an SFC to be an extraordinary disposition, the disposition must (i) be of specified property (defined in § 1.245A–5T(c)(3)(iv) as any property other than property that produces gross income described in section 951A(c)(2)(A)(i)(I) through (V)), (ii) occur during the SFC's disqualified period (as defined in § 1.245A–5T(c)(3)(iii)) and when the SFC was a CFC, (iii) be outside of the ordinary course of the SFC's activities, and (iv) be to a related party. *See* § 1.245A–5T(c)(3)(ii). For these purposes, a disposition by an SFC includes certain indirect dispositions by the SFC through a partnership or other pass-through entities (including through ownership structures involving tiered pass-through entities). *See id.*

In addition, pursuant to an exception intended to limit compliance and administrative burdens, no dispositions by an SFC are considered to be an extraordinary disposition if they do not exceed a threshold of the lesser of $50 million or 5 percent of the gross value of the SFC's property. *See* § 1.245A–5T(c)(3)(ii)(E).

The temporary regulations provide a facts-and-circumstances rule for determining whether a disposition occurs outside of the ordinary course of an SFC's activities. The temporary regulations also provide a per se rule that a disposition is treated as outside of the ordinary course of an SFC's activities if the disposition is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, within the meaning of section 367(d)(4). *See id.* The temporary regulations include this latter rule because the disposition of intangible property is not an ordinary course transaction (relative to, for example, a routine sale of raw materials from one SFC to another for manufacturing); moreover, during the disqualified period taxpayers may have had a particularly strong incentive to dispose of intangible property (which

often has low basis) to generate significant amounts of earnings and profits to the seller (without being subject to current tax) that may be eligible for the section 245A deduction.

As described, the Treasury Department and the IRS have determined that the extraordinary disposition rules should not apply to all earnings and profits generated by a CFC during the disqualified period. Rather, the temporary regulations focus on a narrowly and objectively defined class of earnings and profits in circumstances that are inconsistent with the international tax regime adopted by the Act. The Treasury Department and the IRS request comments on whether there should be any further refining of these rules.

The temporary regulations provide shareholder account rules to ensure that a section 245A shareholder's extraordinary disposition account is properly tracked and reduced in appropriate cases (for example, for prior extraordinary disposition amounts). *See* § 1.245A–5T(c)(3)(i). These shareholder account rules also contain successor rules for a section 245A shareholder that acquires stock of an SFC from another section 245A shareholder with respect to which there is an extraordinary disposition account and for certain section 381 transactions and distributions involving section 355 (or so much as section 356 as relates to section 355). *See* § 1.245A–5T(c)(4).

To address cases in which the section 245A deduction might be available for an SFC held through a pass-through entity or foreign corporation, the temporary regulations provide that a section 245A shareholder is treated as owning a pro rata share of stock of an SFC that is owned by a partnership, trust, or estate (domestic or foreign), or a foreign corporation in which the section 245A shareholder owns an interest or stock, as applicable. *See* § 1.245A–5T(g)(3)(i) (providing rules for stock ownership and transfers).

The Treasury Department and the IRS request comments as to how the extraordinary disposition account rules should apply in circumstances in which an SFC is transferred to a partnership, including the extent to which principles similar to section 704(c)(1)(B) apply to prevent the use of partnerships to circumvent the purposes of the temporary regulations, such as where an SFC is subsequently transferred to a non-contributing partner. As a general matter, the Treasury Department and the IRS believe that § 1.701–2(b), as well as the judicial doctrines of economic substance, substance over form, and step transaction, prevent taxpayers from

forming or availing of partnerships with a principal purpose of avoiding the application of these rules. The treatment of partnerships under section 245A will be addressed in separate guidance; and it is anticipated that this guidance will provide rules ensuring that partnerships may not be formed or availed of to avoid the purposes of the temporary regulations.

The Treasury Department and the IRS further request comments on the treatment of consolidated groups under the temporary regulations, including for purposes of maintaining extraordinary disposition accounts. The Treasury Department and the IRS believe that consolidated groups generally should be treated in the same manner as a single taxpayer for the purposes of § 1.245A–5T(c). Subject to any comments received, it is expected that future rules will provide that consolidated groups generally should not be advantaged or disadvantaged as a result of owning directly or indirectly stock of an SFC through multiple members relative to a standalone corporation owning the same stock.

The Treasury Department and the IRS also request comments on whether and how the rules applicable to disqualified basis in proposed § 1.951A–2(c)(5) should be coordinated with § 1.245A–5T(c). In this regard, proposed § 1.951A–2(c)(5) provides rules for the allocation and apportionment of deductions and losses attributable to disqualified basis, which is asset basis created in certain disqualified transfers during the disqualified period. These deductions and losses are allocated and apportioned solely to gross income that is not tested income, subpart F income, or effectively connected income (defined as "residual CFC gross income"), thereby ensuring that such "costless" tax basis does not inappropriately reduce future tax liability. Thus, the Treasury Department and the IRS are considering the extent to which it would be appropriate to coordinate the two sets of rules, taking into account the ability of the IRS to administer and taxpayers to comply with such rules, and request comments on this issue.

*C. Extraordinary Reduction Amount*

The Treasury Department and the IRS are aware that certain transactions in which a section 245A shareholder of a CFC transfers stock of the CFC, or certain transactions in which the shareholder's ownership of the CFC is diluted, could give rise to results that would be inconsistent with the integrated structure of the U.S. tax system for the taxation of CFC earnings, including section 245A, the subpart F regime, and the GILTI regime. In these cases, absent proper limitation, the section 245A deduction would be allowed inappropriately with respect to a CFC's current year income that, but for the ownership changes, would have been subject to tax under the subpart F or GILTI regimes. Unlike the transactions described in Part II.B of this Explanation of Provisions, the transactions giving rise to these results can occur in any taxable year ending after the Act (and particularly section 245A) is in effect.

These results could arise, for example, as a consequence of the application of section 951(a)(2)(B). Section 951(a)(2)(B), a longstanding provision in the subpart F regime, prevents double taxation of the same earnings by reducing a U.S. shareholder's pro rata share of subpart F income (or, following the Act, tested income as defined in section 951A(c)(2)(A)) of a CFC by dividends received by another person with respect to the same share of stock. However, if section 245A were to apply without limitation to dividends from a CFC that reduce another U.S. shareholder's pro rata share of subpart F income or tested income of the CFC under section 951(a)(2)(B), earnings that would otherwise be subject to the subpart F or GILTI regimes would escape U.S. taxation to the extent of the reduction. For example, in the case of a transfer of CFC stock from one section 245A shareholder (the transferor) to another section 245A shareholder (the transferee), a dividend (including by reason of section 1248) from the CFC to the transferor during the tax year of the transfer might both (i) be excluded from the transferor's income by reason of the section 245A deduction and (ii) reduce the transferee's pro rata share of subpart F income or tested income of the CFC by reason of section 951(a)(2)(B). The Treasury Department and the IRS have determined that it would be inconsistent with the residual definition of section 245A eligible earnings and the interaction of section 245A and the subpart F and GILTI regimes, which form an integrated set of rules to tax post-2017 foreign earnings, to allow a section 245A deduction for a dividend paid out of earnings and profits attributable to subpart F income or tested income where such dividends, by operation of section 951(a)(2)(B), and could result in double non-taxation of such income. Such a result would also be contrary to the legislative intent underlying the interaction of these provisions. *See* Senate Explanation at 365 (noting, in the absence of rules such as the new GILTI regime, the incentive to shift income to low-taxed foreign affiliates, "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed.").

Similar results can arise in other cases where the stock of a CFC is transferred during a CFC's tax year by a U.S. shareholder to a foreign person where, after the transfer, the CFC remains a CFC but has no U.S. shareholder that owns (within the meaning of section 958(a)) stock of the CFC. Before the Act, section 958(b)(4) prevented certain attribution of stock under section 318 from a foreign person to a U.S. person. However, the Act repealed section 958(b)(4) such that a foreign corporation may be treated as a CFC despite having no direct or indirect U.S. shareholder that owns (within the meaning of section 958(a)) stock of the CFC and that accordingly can recognize an income inclusion under section 951 or 951A. In general, a U.S. shareholder that owns stock in a CFC on the last day within the foreign corporation's year that it is a CFC is taxable on its pro rata share of the CFC's subpart F income or tested income for purposes of the GILTI regime. However, by reason of the Act's repeal of section 958(b)(4), a U.S. shareholder may transfer a CFC to a person that will not be taxed with respect to an inclusion under the subpart F or GILTI regimes without itself being subject to such an inclusion. Absent any specific limitation in these circumstances, any earnings and profits of the CFC distributed as a dividend (including by reason of section 1248) to the transferor U.S. shareholder during the CFC's taxable year might be eligible for the section 245A deduction. However, had the transfer not occurred (or had the CFC ceased to be a CFC as a result of the transfer), the earnings and profits may have been subject to tax under the subpart F or GILTI regimes and, therefore, would not have been eligible for the section 245A deduction.

In the circumstances described in this section, a broad application of section 245A would present taxpayers with a planning opportunity to completely avoid the application of the subpart F and GILTI regimes on an annual basis. The Treasury Department and the IRS have determined that this result would undermine the integrated provisions constituting the Act's framework for taxing post-2017 CFC earnings and would contravene legislative intent. To address this concern, the temporary regulations limit the amount of the section 245A deduction allowed to a "controlling section 245A shareholder" with respect to a dividend from a CFC

to the portion of the dividend that is paid out of earnings other than the "extraordinary reduction amount." *See* § 1.245A–5T(b)(1) and (e). A controlling section 245A shareholder of a CFC is a section 245A shareholder of the CFC that, taking into account ownership of the CFC by certain other persons (such as related persons), owns more than 50 percent of the stock of the CFC. *See* § 1.245A–5T(i)(2). For purposes of applying these rules, a controlling section 245A shareholder also includes any other shareholder who would not otherwise be a controlling section 245A shareholder but acts in concert with the controlling section 245A shareholder. This includes shareholders that sell their shares of the same CFC to the same buyer or buyers (or a related party with respect to the buyer or buyers) as part of the same plan as the controlling section 245A shareholder's extraordinary reduction.

Under the temporary regulations, for an extraordinary reduction amount to exist with respect to a controlling section 245A shareholder of a CFC, an "extraordinary reduction" must occur during the CFC's taxable year with respect to the shareholder's ownership of the CFC. *See* § 1.245A–5T(e). An extraordinary reduction generally occurs when either (i) the controlling section 245A shareholder transfers more than 10 percent of its stock of the CFC (for example, an extraordinary reduction occurs if the shareholder owns 90 percent of the stock of the CFC and it transfers stock representing more than nine percent of the stock of the CFC) or (ii) there is a greater than ten percent change in the controlling section 245A shareholder's overall ownership of the CFC (for example, if the shareholder owns 90 percent of the stock of the CFC and, as a result of an issuance to a foreign person, the shareholder's ownership of the CFC is reduced such that it no longer owns at least 81 percent of the stock of the CFC). *See* § 1.245A–5T(e)(2)(i)(A). The temporary regulations include the first prong because if, for example, a section 245A shareholder of a CFC were to transfer shares of stock of the CFC to another section 245A shareholder of the CFC and the other shareholder were to transfer an equal number of similar shares to the first shareholder, neither of the shareholders' overall ownership of the CFC would change, but the amount taken into account by each of the shareholders by reason of section 951(a)(2)(B) might be reduced as a result of dividends paid with respect to shares transferred by the other.

An extraordinary reduction amount is earnings and profits representing the amount of dividends paid by the corporation that are attributable to subpart F income or tested income with respect to a CFC, to the extent such subpart F income or tested income (i) would have been taken into account by the controlling section 245A shareholder under section 951 or 951A had the extraordinary reduction not occurred and (ii) is not taken into account by a domestic corporation or a citizen or resident of the United States (that is, a person described in section 7701(a)(30)(A) or (C)). *See* § 1.245A–5T(e)(1) and (2).

The limitation of the section 245A deduction in the case of an extraordinary reduction will generally result in a dividend being included in the income of the controlling section 245A shareholder and not offset by a section 245A deduction. In cases where the CFC has tested income during its taxable year that would have been subject to the GILTI regime but for the extraordinary reduction, a controlling section 245A shareholder might prefer to have an income inclusion under section 951A, potentially benefitting from the deduction available under section 250. Therefore, the temporary regulations provide an election under which a controlling section 245A shareholder is not required to reduce its section 245A deduction if it elects (and, in some cases, certain other United States persons also agree) to close the CFC's taxable year for all purposes of the Code on the date of the extraordinary reduction. *See* § 1.245A–5T(e)(3)(i). The closing of the taxable year of the CFC results in all U.S. shareholders that own (within the meaning of section 958(a)) stock of the CFC on such date taking into account their pro rata share of subpart F income or tested income earned by the CFC as of that date.

In addition, pursuant to an exception intended to limit compliance and administrative burdens, for a taxable year in which an extraordinary reduction occurs, no amount is considered an extraordinary reduction amount if the sum of the CFC's subpart F income and tested income for the taxable year does not exceed the lesser of $50 million or 5 percent of the CFC's total income for the year. *See* § 1.245A–5T(e)(3)(ii).

*D. Coordination Rules*

To address cases in which a dividend could qualify as either a hybrid dividend under the rules of section 245A(e) or an ineligible amount under the temporary regulations, the temporary regulations provide a coordination rule pursuant to which a dividend is first subject to the hybrid dividend rules of section 245A(e) and then, to the extent no a hybrid dividend, is subject to the temporary regulations. *See* § 1.245A–5T(g)(3)(iv). In future guidance relating to proposed regulations under section 245A(e) and certain other sections (83 FR 67612), the Treasury Department and the IRS anticipate modifying those regulations to reflect this coordination rule.

In addition, to address cases in which a dividend might be either an extraordinary disposition amount under § 1.245A–5T(c) or an extraordinary reduction amount under § 1.245A–5T(e), the temporary regulations provide a coordination rule pursuant to which a dividend is first subject to the rules of § 1.245A–5T(e) and then, to the extent not an extraordinary reduction amount, is subject to the rules of § 1.245A–5T(c). *See* § 1.245A–5T(g)(5). Because of this ordering rule, the extraordinary disposition amount with respect to a dividend will not exceed the amount by which the dividend exceeds the extraordinary reduction amount with respect to the dividend.

*E. Transactions Described in Section 964(e)(4)*

The rules in these temporary regulations for determining eligibility for the section 245A deduction also apply to deemed dividends arising by reason of section 964(e)(4), which the Act added to the Code. Section 964(e)(4) provides in certain cases that a sale by a CFC of stock of another foreign corporation is treated as a dividend from the target foreign corporation to the selling CFC that is, in turn, treated as subpart F income of the selling CFC and included in the gross income of the U.S. shareholders of the selling CFC. Pursuant to section 964(e)(4)(A)(iii), the section 245A deduction is allowed to any U.S. shareholder with respect to such subpart F income included in gross income in the same manner as if such subpart F income were a dividend received by the shareholder from the selling CFC. Thus, section 964(e)(4) presents the same concerns as direct dividends; absent a rule to the contrary, taxpayers might use section 964(e)(4) to avoid the results applicable to actual distributions from an upper-tier CFC to a U.S. shareholder or to constructive dividends under section 1248 that are addressed elsewhere by these temporary regulations. Therefore, the rules in these temporary regulations for determining eligibility for the section 245A deduction also apply to deemed dividends arising by reason of section 964(e)(4). Moreover, all U.S. shareholders of the selling CFC are

deemed to act in concert for purposes of the temporary regulations with respect to transactions described in section 964(e)(4).

## III. Limitation of Amount Eligible for Section 954(c)(6) Exception With Respect to Certain Dividends

### A. In General

As described in Part I of this Explanation of Provisions, the section 954(c)(6) exception may cause dividends from one CFC to another to result in tax consequences similar to, but not dependent upon, those that can be effectuated using section 245A in conjunction with the disqualified period, section 951(a)(2)(B), or the repeal of section 958(b)(4).

To protect against avoidance of the rules for extraordinary dispositions (described in Part II.B of this Explanations of Provisions), the temporary regulations rely on authority under section 954(c)(6)(A) to prevent the section 954(c)(6) exception from applying in cases where a dividend from a lower-tier CFC to an upper-tier CFC would be an extraordinary disposition amount if distributed directly to the section 245A shareholders of the lower-tier CFC. *See* § 1.245A–5T(d). In these cases, the section 954(c)(6) exception applies only to the extent that the amount of the dividend exceeds the sum of each section 245A shareholder's extraordinary disposition account with respect to the lower-tier CFC, divided by the aggregate ownership of all U.S. tax residents of the upper-tier CFC that have section 951(a) inclusions and multiplied by 50 percent. The amount is divided by the aggregate ownership of these U.S. tax residents to take into account the fact that the U.S. tax residents (including individuals) will include in gross income a pro rata share of the portion of the dividend not eligible for the section 954(c)(6) exception. The amount is multiplied by 50 percent in order to provide similar treatment for a dividend received by a section 245A shareholder from a CFC and a dividend received by an upper-tier CFC from a lower-tier CFC. In both cases, the 50 percent reduction of the section 245A deduction approximates the reduced tax rate by reason of the deduction provided under section 250(a)(1)(B) with respect to section 951A inclusions or section 965(c) with respect to the transition tax.

Unlike the disallowance of the section 245A deduction under § 1.245A–5T(b) with respect to an extraordinary disposition amount, which applies only to corporate U.S. shareholders, the limitation to the application of the section 954(c)(6) exception with respect to a dividend received by an upper-tier CFC can result in a subpart F inclusion to any U.S. shareholder, including individuals. In addition, the temporary regulations limit the section 954(c)(6) exception in these cases, rather than limiting the application of section 245A only when the lower-tier CFC earnings and profits are distributed through intervening CFCs to a section 245A shareholder. This approach prevents deferral of tax with respect to the applicable subpart F income or tested income and minimizes the administrative and compliance burdens that would be created by continuing to track the relevant earnings at the upper-tier CFC.

Similarly, to prevent these inappropriate uses of the section 954(c)(6) exception to avoid the rules for extraordinary reductions (described in Part II.C of this Explanation of Provisions), the temporary regulations apply to limit the amount of any distribution from that CFC out of earnings and profits attributable to subpart F income or tested income that can qualify for the section 954(c)(6) exception in a taxable year in which an extraordinary reduction occurs with respect to the stock of a CFC. Similar to the rules relating to extraordinary disposition amounts, the limitation to the section 954(c)(6) exception with respect to a dividend received by an upper-tier CFC can result in a subpart F inclusion to any U.S. shareholder, including individuals. To the extent a CFC-to-CFC dividend otherwise satisfies the requirements of section 954(c)(6), it is eligible for the section 954(c)(6) exception only to the extent it exceeds the distributing lower-tier CFC's "tiered extraordinary reduction amount," taking into account certain prior inclusions under section 951(a). *See* § 1.245A–5T(f)(1). Such amount is equal to the upper-tier CFC's ownership percentage in the lower-tier CFC multiplied by the lower-tier CFC's subpart F income and tested income for the taxable year, with the resulting product reduced by four amounts. The first amount is the pro rata share of the lower-tier CFC's subpart F income and tested income for the taxable year that is taken into account by U.S. tax residents and attributable to the shares of the lower-tier CFC owned by the upper-tier CFC. The second amount is the amount included in an upper-tier CFC's subpart F income resulting from prior dividends paid by the lower-tier CFC giving rise to tiered extraordinary reduction amounts or the application of section 245A(e). The third amount is for certain prior

extraordinary reduction amounts with respect to the lower-tier CFC arising in cases in which the lower-tier CFC was a first-tier CFC at some point in the taxable year and paid a dividend to one or more controlling section 245A shareholders at that time. The fourth amount is for subpart F income and tested income taken into account by a U.S. tax resident as a result of an issuance of stock directly by the lower-tier CFC during the taxable year. *See* § 1.245A–5T(f)(2). Comments are requested as to whether a lower-tier CFC's tiered extraordinary reduction amount should be reduced for a pro rata portion of a dividend paid on stock of the lower-tier CFC that was held by non-U.S. shareholders before and after an extraordinary reduction. For purposes of applying § 1.245A–5T(f)(1) and (2) in taxable years of a lower-tier CFC beginning on or after January 1, 2018, and ending before June 14, 2019, a transition rule is provided such that the tiered extraordinary reduction amount of a lower-tier CFC is determined by treating the lower-tier CFC's subpart F income for the taxable year as if it were neither subpart F income nor tested income. *See* § 1.245A–5T(f)(3).

The rule in § 1.245A–5T(f)(1) applies to both actual distributions and deemed distributions that occur by reason of stock dispositions subject to section 964(e)(1) but not section 964(e)(4). Dispositions subject to section 964(e)(1) but not section 964(e)(4) are treated as dividends from the target foreign corporation (or other entity whose earnings and profits gave rise to a dividend under section 964(e)(1)) to the selling CFC and, thus, must be tested for eligibility under section 954(c)(6). Additionally, ordering and coordination rules apply with respect to the rules relating to the availability of the section 954(c)(6) exception and generally mirror the rules for the section 245A deduction by giving priority to § 1.245A–5T(f) over § 1.245A–5T(d). *See* § 1.245A–5T(g)(4)(ii). As in the rules relating to extraordinary reduction amounts, a controlling section 245A shareholder of a lower-tier CFC may elect to close the taxable year of the CFC in cases where an extraordinary reduction occurs and the CFC would have a tiered extraordinary reduction amount. *See* § 1.245A–5T(e).

Finally, the Treasury Department and the IRS are studying whether § 1.245A–5T(f), or a similar rule, should also apply to dividends received by an upper-tier CFC from a lower-tier CFC where such CFCs are owned by individuals and there may be a reduction in the individuals' ownership of the lower-tier CFC. Individuals are

not eligible to claim deductions under section 245A and, therefore, dividends subject to section 954(c)(6) do not present the risk of permanently eliminating items of subpart F income, investments in United States property taxed under section 951(a)(1)(B), or tested income from the U.S. tax base. At the same time, section 954(c)(6) dividends might result in a reduction of a U.S. shareholder's pro rata share of a CFC's subpart F income or tested income, thereby resulting in deferred taxation of items that otherwise would have been taxed currently. Therefore, comments are requested as to whether § 1.245A–5T(f), or a similar rule, should be extended to CFCs owned by individuals.

*B. Dividends Received by CFCs Ineligible for Section 245A Deduction*

Section 245A(a), by its terms, applies only to certain dividends received by "a domestic corporation." Section 1.952–2, however, which sets forth rules for determining gross income and taxable income of a foreign corporation, provides that for these purposes a foreign corporation is treated as a domestic corporation. *See* § 1.952–2(a)(1) and (b)(1). Accordingly, questions have arisen as to whether § 1.952–2 could be interpreted such that a foreign corporation could claim a section 245A deduction despite the statutory restriction in section 245A(a) expressly limiting the deduction to domestic corporations. *See* H.R. Rep. No. 115–466, at 599, fn. 1486 (2017).

The Treasury Department and the IRS intend to address issues related to the application of § 1.952–2, taking into account various comments received in connection with the Act, including in connection with the proposed section 951A regulations, in a future guidance project. This guidance will clarify that, in general, any provision that is expressly limited in its application to domestic corporations does not apply to CFCs by reason of § 1.952–2. The Treasury Department and the IRS continue to study whether, and to what extent, proposed regulations should be issued that provide that dividends received by a CFC are eligible for a section 245A deduction. The Treasury Department and the IRS have determined, however, that in no case would any person, including a foreign corporation, be allowed a section 245A deduction directly or indirectly for the portion of a dividend paid to a CFC that is not eligible for the section 954(c)(6) exception as a result of these temporary regulations. Permitting the deduction in such a case would undermine the application of the rule that reduces the amount of the dividend eligible for the section 954(c)(6) exception (discussed in Part III.A of this Explanation of Provisions).

## IV. Information Reporting Under Section 6038

Under section 6038(a)(1), U.S. persons that control foreign business entities must file certain information returns with respect to those entities, which includes information listed in section 6038(a)(1)(A) through (a)(1)(E), as well as information that "the Secretary determines to be appropriate to carry out the provisions of this title." The temporary regulations provide that ineligible amounts, tiered extraordinary disposition amounts, and tiered extraordinary reduction amounts must be reported on the appropriate information reporting form in accordance with section 6038. *See* § 1.6038–2T(f)(16). Because transactions subject to these temporary regulations may have occurred in taxable years for which returns have been filed before the issuance of these regulations, or for which returns will be filed before revision of forms and instructions for reporting the information required by § 1.6038–2T(f)(16), the temporary regulations provide a transition rule. The transition rule mandates that taxpayers report the required information on the first return filed following the issuance of revised forms, instructions, or other guidance with respect to reporting such information. The transition rule also requires a corporation to report the information with respect to a predecessor corporation (such as a lower-tier foreign corporation that distributes its assets to the corporation in a liquidation described in section 332) to ensure that all of the amounts are properly reported notwithstanding any intervening transactions.

## V. Applicability Dates

Consistent with the applicability date of section 245A, and pursuant to section 7805(b)(2), the rules in the temporary regulations relating to eligibility of distributions for the section 245A deduction apply to distributions occurring after December 31, 2017.

Pursuant to section 7805(b)(1) and (2), the rules in the temporary regulations relating to the eligibility of dividends for the section 954(c)(6) exception also apply to distributions occurring after December 31, 2017, subject to the transition rule in § 1.245A–5T(f)(3) for determining tiered extraordinary reduction amounts.

## VI. Good Cause

The Treasury Department and the IRS are issuing these temporary regulations without prior notice and the opportunity for public comment pursuant to section 553(b)(3)(B) of the Administrative Procedure Act (the "APA"), which provides that advance notice and the opportunity for public comment are not required with respect to a rulemaking when an "agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Under the "public interest" prong of 5 U.S.C. 553(b)(3)(B), the good cause exception appropriately applies where notice-and-comment would harm, defeat, or frustrate the public interest, rather than serving it. The Treasury Department and the IRS are similarly utilizing the good cause exception in section 553(d)(3) of the APA to issue these temporary regulations with an immediate effective date, rather than an effective date no earlier than 30 days after the date of publication.

Among the circumstances in which the good cause exception may be invoked for impracticability or to serve the public interest are situations where the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal, including if announcement of a proposed rule would enable or increase the sort of financial manipulation the rule sought to prevent. Good cause may also apply where a delayed effective date would have a significant deleterious effect upon the parties to which the regulation applies. Additionally, the good cause exception may apply when the regulations are by their nature short term and there is an opportunity to comment before final rules are introduced. Finally, good cause is supported where regulations are required to be issued and effective by a certain statutory deadline, and in light of the circumstances affecting the agency and its functions leading up to that statutory deadline, the agency is unable during that timeframe to conduct a timely and fulsome notice-and-comment process. Here, these rationales, separately and in combination, provide good cause for the Treasury Department and the IRS's decision to bypass the notice-and-comment and delayed effective date requirements with respect to these temporary regulations. Each rationale is discussed below in turn.

First, good cause exists with respect to these temporary regulations because any period for notice and comment, as well as a delayed effective date, would provide taxpayers with the opportunity to engage in the transactions to which these rules relate with confidence that they achieve the intended tax avoidance results absent the applicability of the regulations. The Treasury Department and the IRS are aware that taxpayers have considered engaging in the transactions described in these temporary regulations, but some may have been deterred from doing so because of uncertainty about the operation and interaction of the various provisions of the Act. By limiting the deduction under section 245A for these transactions, these temporary regulations remove that uncertainty and—if subjected to notice-and-comment and a delayed effective date—could embolden some taxpayers to engage in aggressive tax planning to take advantage of the unintended interactions among the Act's provisions, with the comfort that their actions were not subject to the rules of the temporary regulations during the period of notice and comment and before the regulations' effective date. This concern applies with respect to both the extraordinary disposition and extraordinary reduction rules for an ongoing period. For the extraordinary reduction rules, both the extraordinary reduction and the associated use of section 245A can occur at any time going forward, and although the gap period for entering into extraordinary dispositions has closed, the ability to utilize the section 245A deduction for earnings generated in the extraordinary disposition would apply indefinitely absent these temporary regulations.

For example, a taxpayer who became aware of the tax effects achievable using the transactions described in these temporary regulations could, with confidence, utilize extraordinary disposition E&P or engage in an extraordinary reduction to exit the U.S. taxing jurisdiction without paying any tax during a period of notice and comment and delayed effectiveness. The proliferation of these types of transactions would cause the regulations to exacerbate the very financial manipulation that they are intended to prevent, and accordingly, this rationale supports a finding of good cause for dispensing with pre-promulgation notice and public comment, as well as foregoing a delayed effective date, for these temporary regulations pursuant to 5 U.S.C. 553(b) and (d).

The second reason for a finding of good cause arises from the fact that these temporary regulations, as applied retroactively, will affect taxable years of certain taxpayers ending in 2018. As a result, these regulations can apply to taxable years for which tax returns have been or may be due during a period of comment and delayed effectiveness. Deferring the effectiveness of the temporary regulations until after such a period could increase taxpayer compliance costs because certain taxpayers would only be able to come into compliance with the regulations by amending and refiling returns and paying additional taxes owed with interest.

Third, good cause is supported where a regulation is temporary, with public comment permitted and meaningfully considered before finalization of the temporary rule. In this regard, the temporary regulations have a fixed expiration date and are cross-referenced in a notice of proposed rulemaking published in the Proposed Rules section of this issue of the **Federal Register**. Comments are requested on all aspects of these rules, and specific comment requests contained in this preamble are incorporated by reference into the cross-referenced notice of proposed rulemaking. The Treasury Department and the IRS will consider all written comments properly and timely submitted when finalizing these temporary regulations.

Finally, these temporary regulations are part of an effort to implement the provisions of the Act, which effected sweeping and complex statutory changes to the international tax regime. In conjunction with developing and issuing these temporary regulations, the Treasury Department and the IRS have also been tasked with issuing regulations implementing the numerous provisions enacted or modified by the Act, along with attendant changes to forms and other sub-regulatory guidance and attention to the orderly administration of the U.S. tax system.

Good cause exists for the issuance of temporary regulations relating to the transactions affected by these temporary regulations partially because of the statutory deadline in section 7805(b)(2), which provides (among other rules) that a regulation may be applied retroactively if it is issued within 18 months of the date of enactment of the statutory provision to which it relates. The rules in these temporary regulations relate to sections 245A, 951A, and 965, which were enacted as part of the Act on December 22, 2017. Thus, to qualify for retroactivity under section 7805(b)(2), a regulation retroactive to

the enactment of these provisions must be effective no later than June 22, 2019. These temporary regulations need to apply retroactively from the date of the underlying statutory provisions to ensure that the international tax regime enacted by Congress in the Act, and its interaction with existing tax rules, functions correctly for all affected periods. Retroactivity is also required to prevent treating taxpayers comparatively advantageously if they have engaged in the types of transactions described in these temporary regulations prior to the issuance date of these temporary regulations.

The discussion of good cause with respect to the temporary regulations in this Part VI is consistent with the Policy Statement on the Tax Regulatory Process issued on March 5, 2019, by the Treasury Department and the IRS (the "Statement"). The Statement emphasized the Treasury Department and the IRS's obligation under the APA to issue interim final regulations without prior notice and comment only in conjunction with "a statement of good cause explaining the basis for that finding." The Statement further explains that good cause for interim final regulations may exist, for example, where "such regulations may be necessary and appropriate to stop abusive practices or to immediately resolve an injurious inconsistency between existing regulations and a new statute or judicial decision." As the discussion in this Part VI illustrates, this is the case with respect to these temporary regulations.

**Special Analyses**

**I. Regulatory Planning and Review—Economic Analysis**

Executive Orders 13563 and 12866 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

These temporary regulations have been designated by the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) as subject to review under Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Treasury Department

and the Office of Management and Budget regarding review of tax regulations. OIRA has determined that the proposed rulemaking is significant and subject to review under Executive Order 12866 and section 1(b) of the Memorandum of Agreement. Accordingly, the proposed regulations have been reviewed by the Office of Management and Budget.

*A. Background*

The Tax Cuts and Jobs Act (the Act) transitioned the United States from a primarily deferral-based international tax system (subject to the immediate taxation of generally mobile or passive income under the subpart F regime) to a participation exemption system coupled with immediate taxation of certain offshore earnings (in some cases, at a reduced rate of tax).[1] This transition was effected through several interlocking provisions of the Code—sections 245A, 951A, and 965. All three provisions have different effective dates and thus the Act created periods in which some but not all of them apply. The new system also operates alongside the pre-Act subpart F regime that taxes certain offshore earnings using a longstanding rule for attributing pro rata shares of a foreign corporation's earnings to its U.S. shareholders.

1. Background: Section 245A—Dividends Received Deduction

The Act included section 245A, which provides a participation exemption system for repatriation of certain offshore earnings. Prior to the Act, dividends paid by foreign corporations to their U.S. shareholders were generally taxable. Section 245A(a) reverses this result in the case of corporate U.S. shareholders by providing, subject to certain exceptions, a 100-percent deduction for any dividend received by a corporate U.S. shareholder from a specified 10-percent owned foreign corporation.[2] A 100-percent deduction for dividends essentially means that this income is not

taxed in the United States at the corporate level. The existing rules in sections 951(a) and 959 continue to apply, meaning that generally only earnings associated with income that is not taxed under the subpart F regime (or under the GILTI regime, discussed below) can, upon distribution, give rise to a dividend eligible for the section 245A deduction. Because subpart F (and GILTI) taxation is not reduced by distributions made during the year (except in the case of certain transfers of stock of a CFC during a taxable year), any distribution of earnings and profits that is taxed under the subpart F regime (or GILTI regime) is a distribution of PTEP (that is, a distribution of previously taxed earnings and profits) that is not treated as a dividend by reason of section 959(d), and thus cannot qualify for section 245A. Section 245A applies to distributions made after December 31, 2017.

Because the pre-Act international tax regime imposed U.S. tax on most non-mobile, non-passive earnings and profits only when those earnings were repatriated, a significant amount of untaxed earnings and profits had been accumulated offshore when the Act was passed. The enactment of section 245A by the Act thus presented a potential windfall, allowing taxpayers who had held earnings and profits offshore to distribute all of those earnings back to the United States tax-free. Congress did not intend for section 245A to apply to such pre-Act earnings, and thus included a so-called transition tax (section 965) "[t]o avoid a potential windfall for corporations that deferred income, and to ensure that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system." H. Rep. No. 115–409 at 375.

2. Background: Section 965—Transition Tax

Section 965 imposed a transition tax on the post-1986 earnings and profits of foreign corporations that had gone untaxed under the pre-Act international tax regime and would not be subject to the GILTI regime because the income was earned in a year prior to that regime being in effect. Absent section 965, such earnings and profits would have been eligible for tax-free distribution under section 245A. Specifically, section 965(a) increases certain foreign corporations' subpart F income for their last taxable year beginning before January 1, 2018, by the amount of their non-previously taxed earnings and profits computed as of no later than December 31, 2017. This has the effect of subjecting all offshore post-1986

untaxed earnings of most U.S. shareholders as of no later than December 31, 2017, to U.S. tax (albeit at a reduced rate by reason of section 965(c)), turning all such earnings into PTEP under section 959. As a result, none of those earnings and profits are eligible for the section 245A deduction, and such earnings and profits, once taxed under section 965, are instead treated in the same way as if they had been taxed under the pre-Act subpart F regime.

For a calendar year CFC, the transition tax generally provides a mechanism for ensuring that only earnings and profits subject to the new international tax system can qualify for the dividends received deduction under section 245A. This appears to be the intended purpose of section 965(a), as the legislative history of the Act provides that "[t]he [transition tax applies in] the last taxable year of a deferred foreign income corporation that begins before January 1, 2018, which is that foreign corporation's last taxable year before the transition to the new corporate tax regime elsewhere in the bill goes into effect." H. Rep. 115–466 at 613. This is not the case, however, for fiscal year CFCs (*i.e.*, CFCs with a taxable year other than the calendar year) as there is a gap period with respect to such entities during which certain of their earnings may escape taxation.

3. Background: Section 951A—GILTI Regime

By subjecting post-1986 earnings and profits to a transition tax, section 965 was generally intended to ensure that only earnings first subjected to the anti-base erosion provisions of the Act could qualify for section 245A. While the Act preserved the existing subpart F regime, legislative history shows congressional concern that the participation exemption system could heighten the incentive to shift profits to low-taxed foreign jurisdictions or tax havens after the Act. *See* Senate Explanation at 365. For example, Congress expressed concern that a domestic corporation might allocate income susceptible to base erosion to certain foreign affiliates "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed." *See id.* As a result of these concerns, the Act added another, complementary regime to address the additional base erosion incentives engendered by the participation exemption. This regime taxes a U.S. shareholder on its global intangible low-taxed income, or GILTI, with respect to its CFCs at a reduced

---

[1] A deferral-based system is a system in which taxable foreign-source income generally is taxed only when it is repatriated to the United States. A participation exemption system is one in which foreign-source income is generally not taxed by the resident country (in this case, the United States). As explained further below, in the United States the participation exemption system is coupled with immediate taxation of certain types of earnings to avoid erosion of the U.S. tax base. These taxed foreign earnings can then be repatriated to the United States without further tax.

[2] A specified 10-percent owned foreign corporation is any foreign corporation, other than a passive foreign investment corporation with respect to a shareholder that is not also a CFC, with at least one corporate U.S. shareholder. Section 245A(b).

rate (by reason of section 250) under new section 951A.

Section 951A(a) generally subjects a U.S. shareholder to current taxation each year on its GILTI with respect to its CFCs. The GILTI of a U.S. shareholder is generally defined as its pro rata share of its CFCs' taxable income for the year in excess of a normal return—a formulaic amount equal to 10 percent of the tax basis of the CFCs' tangible assets. *See* section 951A(b), (c), (d). For purposes of this determination, specific types of income of a CFC, including income taxed under another Code provision (including the subpart F regime), certain immobile income, or certain highly taxed income, are not taken into account. *See* Senate Explanation at 366 (explaining that such income is either already taxed or does not present base erosion concerns). The GILTI regime applies in the first taxable year of a CFC beginning after December 31, 2017. Thus, in the case of calendar year CFCs, the application of the GILTI regime generally must be taken into account with respect to all new earnings and profits of a CFC earned immediately after section 965 has caused all of the CFC's pre-Act earnings to be taxed. *See* Public Law 115–97, sec. 14201(d).

As is the case with respect to the subpart F regime, the tax base subject to the GILTI regime is not reduced by distributions made by a CFC during a taxable year (except in the case of certain transfers of stock of a CFC during a taxable year), and section 951A(f)(1)(A) provides that an income inclusion under the GILTI regime is treated in the same manner as an inclusion of subpart F income under the subpart F regime for purposes of section 959. These rules cause a CFC's earnings attributable to GILTI to be taxed under the GILTI regime in section 951A regardless of whether those earnings and profits are distributed before the end of the CFC's year, thus converting such earnings into PTEP and turning distributions (including those made before the end of the year in which the earnings and profits were earned) by the CFC into PTEP distributions that do not constitute dividends eligible for section 245A. Section 959(c), (d). Section 951A(a)(2) also applies for purposes of determining a U.S. shareholder's pro rata share of its CFCs' income and other relevant items for purposes of section 951A. Section 951A(e).

*B. Need for the Temporary Regulations*

Sections 245A, 965, and 951A generally act to tax foreign source income equivalently across taxpayers and sources so long as a U.S. shareholder owns the same amount of stock of a calendar year CFC throughout the CFC's entire taxable year. Deviations from that condition, however, potentially allow taxpayers to avoid tax by claiming a section 245A deduction in situations where otherwise identical income would be subject to U.S. tax. This circumstance is inconsistent with the purposes of the new international tax regime enacted by Congress.[3] These temporary regulations are needed to limit section 245A to its intended scope and, thereby, prevent the provision from converting income that should be subject to U.S. tax into non-taxable dividends.

There are two situations in which deviations from the condition described in this section can give rise to these results. These are where (1) a U.S. corporation is the shareholder of a fiscal year CFC during 2018 and (2) a CFC pays a dividend and experiences a direct or indirect change in ownership during a taxable year.

The differing application of the GILTI regime with respect to fiscal year and calendar year CFCs creates one scenario where the interaction of section 245A with other new international tax provisions might be used to avoid tax. For a calendar year CFC, any earnings and profits accumulated as of no later than December 31, 2017, that had not been taxed under the subpart F regime generally were taxed under section 965 in the CFC's 2017 taxable year, turning such earnings and profits into PTEP. Then, starting in the calendar year CFC's taxable year beginning on January 1, 2018, the CFC's income became subject to the complementary subpart F and new GILTI regimes, and any income taxed under those provisions now also becomes PTEP. Concurrent with the applicability date of the GILTI regime, section 245A applies to dividends distributed after December 31, 2017, out of earnings that have not been taxed under the subpart F and GILTI regimes. These interlocking provisions create a cohesive regime in which the section 245A deduction applies only for distributions of post-2017 earnings and profits that are properly not taxed as the subpart F income or GILTI regimes. Operating in tandem, these provisions address Congress's concerns with section 245A by applying that provision (1) without granting windfalls for taxpayers that had historically kept earnings and profits offshore (by taxing all such earnings and profits under section 965 immediately before section 245A applies) and (2) without allowing a section 245A deduction for income susceptible to a heightened risk of base erosion. As a result of these provisions, only post-2017 earnings and profits that are not subject to the subpart F or GILTI regimes can qualify for a dividends received deduction under section 245A upon distribution from a calendar year CFC. Such earnings and profits are generally the normal return on a CFC's property (*i.e.,* 10 percent of tax basis in tangible property), certain immobile income, or certain highly-taxed income that Congress believed would not raise windfall or base erosion concerns.

By contrast, the provisions that apply harmoniously to a calendar year CFC fail to form a cohesive regime when applied to a fiscal year CFC for its first taxable year that ends in 2018. Consider a CFC with a taxable year ending November 30. This CFC's income is still subject to the subpart F regime for all relevant taxable years. Section 965 also applies to the CFC's historical earnings and profits as of no later than December 31, 2017, and section 245A applies to distributions made by the CFC after December 31, 2017. However, the GILTI regime does not begin to apply to the CFC's income until the first taxable year of the CFC beginning after December 31, 2017, and thus does not first apply until the CFC's taxable year that begins on December 1, 2018. As a result of the gap in these effective dates, (1) the ordinary earnings of the CFC during the gap period avoid tax (which is a direct outgrowth of the effective dates); and (2) assets can be transferred between related parties in non-ordinary course transactions during that time period in such a way that current and future earnings and profits associated with the built-in gain in those assets can permanently avoid taxation by the United States because they are not subject to the GILTI regime and are not subject to the transition tax under section 965. Such earnings and profits might nevertheless be eligible to be distributed tax-free under section 245A. Such income, however, is economically identical to income earned by a calendar year CFC. Absent the temporary regulations, similar income from CFCs that differ only in their taxable year would be subject to different taxation. This difference between calendar year and fiscal year CFCs is significant and presents the potential for substantial tax avoidance when utilized to artificially generate earnings and profits in non-ordinary course transactions between related parties.

---

[3] The discussion herein assumes that the transactions at issue would otherwise withstand scrutiny under section 7701(o) (*i.e.,* the economic substance doctrine) and related judicial doctrines. Taxpayers should draw no inferences from this assumption, however, as the IRS may challenge such transactions on these and other grounds.

These temporary regulations refer to the portion of a dividend attributable to earnings and profits arising from such a transaction during this period as an "extraordinary disposition amount." An extraordinary disposition amount consists of certain earnings and profits resulting from transactions between related parties during the disqualified period. *See* the Explanation of Provisions section of this preamble for definitions of all relevant terms and conditions. Although the period during which extraordinary dispositions may have occurred has passed, the regulations will potentially apply to any distributions of the associated earnings and profits after 2017.

The second issue occurs because the application of the allocation rules under sections 951(a) and 951A (which determine a U.S. shareholder's pro rata share of a CFC's subpart F income or tested income for GILTI purposes) together with section 245A creates situations in which earnings and profits may not be properly subject to the new international tax regime that Congress enacted to prevent the inappropriate application of the section 245A deduction. For example, this situation may arise because of the "dividend offset" rule in section 951(a)(2)(B), which, subject to certain limitations, reduces a U.S. shareholder's pro rata share of subpart F income or tested income for dividends paid to another owner of the same stock of the CFC during the taxable year (such reduction being a rough approximation of the portion of subpart F income and tested income for the year that is properly attributable to the other owner).

In order to illustrate this concern, consider the following example. A corporate U.S. shareholder generally is taxed with respect to a CFC's subpart F income as of the end of the CFC's taxable year. Suppose, however, that the U.S. shareholder received a dividend from the CFC in an amount equal to its subpart F income and thereafter transferred ownership of the CFC to a new U.S. shareholder shortly before the end of the CFC's taxable year. If a section 245A deduction applied to the dividend, the corporate U.S. shareholder would not be taxed on the distribution. Furthermore, the second U.S. shareholder's subpart F inclusion for the CFC's taxable year may be reduced to approximately zero as a result of the dividend offset rule. As a consequence, absent the application of these temporary regulations, income that should have been subject to U.S. taxation under the subpart F regime could escape taxation altogether.

In contrast to the first issue, this second issue implicates the interlocking provisions of the international tax regime on an ongoing basis. As described in Part II.C of the Explanation of Provisions section of this preamble, section 245A could facilitate the avoidance of the subpart F and GILTI regimes by allowing a U.S. shareholder to transfer, before the end of a CFC's taxable year, stock of the CFC to a new shareholder who will not be taxed on the CFC's subpart F income or tested income. As a consequence of the repeal of section 958(b)(4), this new shareholder might be a foreign person who is not taxable with respect to the CFC's subpart F income or tested income. Alternatively, the new shareholder may not be taxable with respect to these amounts as a result of the dividend offset rule of section 951(a)(2)(B), notwithstanding the fact that if the prior owner of the stock is a corporate U.S. shareholder, the section 245A deduction may apply to dividends received by such prior owner. In these cases, current year subpart F income and GILTI could escape taxation altogether, a result that would undermine the post-Act system for taxing foreign earnings. These temporary regulations refer to earnings and profits representing the portion of a dividend of a CFC attributable to subpart F income or tested income of the CFC that, absent a transfer of stock of the CFC pursuant to an extraordinary reduction, would have been subject to the subpart F or GILTI regimes as an "extraordinary reduction amount." An extraordinary reduction amount consists of certain earnings and profits generated during a CFC's taxable year beginning after 2017 in which a domestic corporate U.S. shareholder reduces its ownership of the CFC by certain threshold amounts (*e.g.,* a decrease in ownership of more than 10 percent). For this purpose, "certain earnings and profits" refers to income generally subject to inclusion under the subpart F or GILTI regimes. See the Explanation of Provisions section of this preamble for definitions of all relevant terms and conditions.

Results similar to the ones described in this section for extraordinary disposition amounts and extraordinary reduction amounts can be achieved using the exemption from subpart F income under section 954(c)(6) and lower-tier CFC dividends to upper-tier CFCs. Accordingly, the temporary regulations limit the application of the section 954(c)(6) exception in order to prevent similar results in circumstances in which a lower-tier CFC pays a dividend to another CFC, instead of directly to a U.S. shareholder.

## C. Overview of the Temporary Regulations

The Treasury Department and the IRS have determined that it is appropriate to limit the section 245A deduction to distributions of earnings and profits that are attributable to certain normal return, high-taxed, or immobile income, which will ensure that similar income is taxed similarly. The temporary regulations do not permit section 245A deductions for the portions of dividends made by CFCs that are attributable to ineligible amounts, which comprise extraordinary reduction amounts and 50 percent of any extraordinary disposition amounts.

To accomplish this, the temporary regulations disallow a deduction for transactions that have the effect of avoiding tax under section 951, 951A, or 965. The extraordinary disposition rules accomplish this by denying the deduction under section 245A for a narrowly and objectively defined class of earnings and profits generated by transactions undertaken in the disqualified period in circumstances that raise abuse concerns. The extraordinary reduction rules accomplish this by denying the deduction under section 245A for certain earnings distributed in the same year as reductions in ownership of CFC stock by a controlling section 245A shareholder. The temporary regulations contain similar rules with respect to section 954(c)(6).

## D. Economic Analysis of the Temporary Regulations

### 1. Baseline

The Treasury Department and the IRS have assessed the benefits and costs of the temporary regulations relative to a no-action baseline reflecting anticipated Federal income tax-related behavior in the absence of these temporary regulations.

### 2. Summary of Economic Effects

To assess the economic effects of these regulations, the Treasury Department and the IRS considered the economic effects of disallowing the 245A deduction for (i) extraordinary disposition amounts and (ii) extraordinary reduction amounts.

The disallowance of the dividends received deduction for extraordinary disposition amounts applies, in plain language, only to earnings and profits accrued prior to issuance of the temporary regulations. Thus, no substantive economic activities can be affected by this disallowance and the

- Add.102 -

economic decisions affected are only those associated with taxpayers' financing of their tax liability.

The Treasury Department and the IRS's analysis therefore focuses on those provisions of the temporary regulations that disallow the dividends received deduction for extraordinary reduction amounts. Absent the temporary regulations, U.S. taxation of income of a CFC that would otherwise be subject to the subpart F or GILTI regime could be avoided by a transfer of ownership of the CFC to other entities in such a way that the income of the CFC would not be subject to U.S. tax. Thus, the economic effects stem from those transfers that would give rise to an extraordinary reduction amount ("ER transfers") and that would not be undertaken as a result of the temporary regulations. The Treasury Department and the IRS project that a substantial portion of these ER transfers would have been undertaken for tax avoidance purposes only and would have negative effects on economic performance (giving rise to a positive economic effect from the temporary regulations) but that those effects would be minor because the transfers would take place among related parties and over short time frames. Thus, there would be only negligible losses in economic performance due to inefficient changes in management, risk-bearing, or other economic activity. Instead, the primary economic losses due to these transfers (and thus gains from the temporary regulations) are likely to consist of resources that would be expended in carrying out such tax planning activities. The Treasury Department and the IRS project that these saved resource costs would be small.

The Treasury Department and the IRS considered that at least some ER transfers that would not be pursued as a result of the temporary regulations would have provided positive economic benefits, such as through more efficient risk-bearing or other managerial control benefits. The Treasury Department and the IRS project that the aggregate value of these foregone benefits will be minimal because the transfers for which a deduction is disallowed and that are likely not to be undertaken as a result of the temporary regulations are not generally associated with productive economic activities. In this regard, the Treasury Department and the IRS expect that economically-motivated transfers of CFCs should not be inhibited by the temporary regulations because the temporary regulations, taking into account the election to close a CFC's taxable year, often will result in the same or similar tax liability to a seller

as if the transfer had not occurred. Thus, the temporary regulations should not discourage economically-motivated transfers of CFCs. If anything, the temporary regulations will discourage transfers of CFCs that would not have occurred absent the tax results the temporary regulations seek to prevent. These transfers, which would be motivated by tax avoidance, likely would not be economically productive.

The temporary regulations will require taxpayers to compute, track, and report information relevant for determination of extraordinary dispositions and extraordinary reductions. The compliance burden component of the Treasury Department and the IRS's estimate of the economic effects of the temporary regulations reflects only those record-keeping and related compliance activities that would not have been undertaken in the absence of the temporary regulations. The Treasury Department and the IRS project that these additional costs, relative to the baseline, will be modest. In general, with respect to the initial year of an extraordinary disposition or any extraordinary reduction, taxpayers are already required to keep track of the required information for other purposes. For example, to the extent that a U.S. taxpayer sells stock in its CFC, earns income in its CFC, or receives a dividend from a CFC, the taxpayer would otherwise record the information needed to determine eligibility for the section 245A deduction under the temporary regulations. Additionally, once calculated the costs to track amounts related to extraordinary dispositions in future years are expected to be minimal. For all of these reasons, the Treasury Department and the IRS expect the non-revenue economic effects of these temporary regulations to be small.[4]

The Treasury Department and the IRS have not undertaken a quantitative estimate of the economic benefits arising from avoided transactions that constitute extraordinary reductions. Any such estimates would be highly uncertain because these tax provisions are new and because the transfers would be between related parties and primarily of short duration, both of which factors make estimation difficult. The tax planning costs of effecting these transfers are also highly uncertain because these specific tax planning efforts are new.

While it is not currently feasible for the Treasury Department and the IRS to

quantify these economic effects, part I.D.3 of these Special Analyses explains the rationale behind the provisions of these temporary regulations and provides a qualitative assessment of the alternatives considered.

The Treasury Department and the IRS solicit comments on this assessment of the economic effects of the temporary regulations.

3. Analysis of Specific Provisions

i. Ordering of Distributions of Earnings and Profits With Respect to Extraordinary Disposition Amounts

a. Background and Alternatives Considered

Any transaction that gave rise to an extraordinary disposition has already taken place because the disqualified period has closed for all taxpayers. Thus, the temporary regulations should have no economic effect with respect to these transactions. Nevertheless, the denial of a section 245A deduction with respect to the related extraordinary disposition E&P may in some cases lead CFCs to retain earnings rather than distribute them in order to defer the associated U.S. tax. The undistributed earnings in this case may lead to a so-called "lockout effect" pursuant to which some portion of the offshore capital remains in less productive ventures than would otherwise be the case had the earnings and profits been eligible for a section 245A deduction.

The temporary regulations address this potential concern by providing an ordering rule such that extraordinary distribution E&P generally are the last earnings and profits deemed distributed by a CFC. As a result, CFCs generally may distribute all other earnings and profits that are eligible for a section 245A deduction before extraordinary disposition E&P for which a section 245A deduction is not allowed. This rule will generally minimize the capital allocation inefficiencies stemming from a potential lockout effect by deferring the application of the temporary regulations to the latest extent possible. Moreover, the Treasury Department and the IRS expect that the extraordinary disposition E&P will not often be associated with liquid assets, such as cash. An extraordinary disposition requires a non-ordinary course transaction among related parties. The Treasury Department and the IRS are aware that transactions giving rise to an extraordinary disposition typically involve the issuance of related party debt or stock. These instruments are not the sort of assets that implicate lockout effect concerns because they would

---

[4] This claim refers solely to the economic benefit arising from this provision and does not refer to any estimate of the tax revenue effects of the provision.

rarely be used as consideration for making a payment to a third party.

The Treasury Department and the IRS considered as an alternative not providing an ordering rule. For the reasons mentioned above, this alternative was not adopted. In particular, the lack of an ordering rule would have inhibited taxpayers from accessing future offshore earnings that had been appropriately subject to tax under Act, which would have frustrated the congressional purpose underlying the participation exemption. By essentially reviving the lockout effect that had motivated certain international aspects of the Act, this alternative approach may have trapped capital in suboptimal offshore uses.

### b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are direct or indirect U.S. shareholders of certain foreign corporations that are eligible for the section 245A deduction or the section 954(c)(6) exception with respect to distributions from the foreign corporation, and the foreign corporation uses a fiscal year, as opposed to the calendar year, as its taxable year. The foreign corporation must have engaged in a sale of property to a related party (1) during the period between January 1, 2018, and the end of the foreign corporation's last taxable year beginning before 2018, (2) outside the ordinary course of the foreign corporation's activities, and (3) generally, while the corporation was a CFC. Additionally, the property sold must give rise to tested income and the value of the property sold must exceed the lesser of $50 million or 5 percent of the total value of the property of the foreign corporation.

The Treasury Department and the IRS have not estimated how many taxpayers are likely to be affected by these regulations because data on the taxpayers that may have engaged in these particular transactions is not readily available. However, based on tabulations of the 2014 Statistics of Income Study file the Treasury Department and the IRS estimate that there are approximately 5,000 domestic corporations with at least one fiscal year CFC. The actual number of affected taxpayers is smaller than the number of domestic corporations with at least one fiscal year CFC, because a domestic corporation will not be affected unless its fiscal year CFC engages in a non-routine sale with a related party that is of sufficient magnitude that the temporary regulations to apply.

### ii. Definition of Extraordinary Reduction

#### a. Background and Alternatives Considered

The temporary regulations limit the amount of the 245A deduction whenever there is an "extraordinary reduction." The temporary regulations generally define an extraordinary reduction, subject to certain conditions, as when either the controlling section 245A shareholder transfers more than 10 percent of its stock of the CFC or there is a greater than 10 percent change in the controlling section 245A shareholder's overall ownership of the CFC.

The Treasury Department and the IRS, in defining an extraordinary reduction, considered other percentage thresholds. They expect that the ownership change threshold provides an effective balance of compliance costs for taxpayers, effective administration of section 245A, and revenue considerations. The Treasury Department and the IRS do not have appropriate data or models to precisely compute an optimal percentage threshold. The Treasury Department and the IRS solicit comments on the economic and revenue consequences of the ownership change threshold and alternative thresholds. The Treasury Department and the IRS particularly solicit comments that provide data, models, or analysis suitable for evaluating alternative thresholds.

#### b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are U.S. shareholders that own directly or indirectly stock of a CFC that has a controlling U.S. shareholder that owns 50 percent or more of the stock of the CFC. Additionally, during the taxable year, the controlling U.S. shareholder generally must directly or indirectly sell stock in the CFC that exceeds 10 percent of the controlling U.S. shareholder's interest in the CFC and 5 percent of the total value of the stock of the CFC. Furthermore, in the year of the ownership reduction, the subpart F income and tested income of the CFC must exceed the lesser of $50 million or 5 percent of the CFC's total income for the year.

The Treasury Department and the IRS have not estimated how many taxpayers are likely to be affected by these regulations because data on the taxpayers that may have engaged or would engage in these particular transactions is not readily available. However, based on 2014 Statistics of Income tax data, the Treasury Department and the IRS estimate that there are approximately 15,000 domestic corporations with CFCs. The Treasury Department and the IRS project that the actual number of affected taxpayers is likely much smaller than the number of domestic corporations with CFCs, given that the controlling U.S. shareholder must engage in a sale of stock of a CFC in a year in which the CFC pays a dividend in order for the temporary regulations to apply.

### iii. Election To Avoid Taxable Dividend by Closing the CFC's Taxable Year

#### a. Background and Alternatives Considered

The Treasury Department and the IRS provide taxpayers with an election to avoid having a taxable dividend with respect to an extraordinary reduction amount by closing the taxable year of the CFC for all purposes of the Code on the date of the extraordinary reduction. Such an election would subject the earnings and profits that, absent the election, would give rise to an extraordinary reduction amount instead to taxation under the subpart F or GILTI regimes, and therefore, exemption under section 245A for any remaining earnings is appropriate. By providing this election, the Treasury Department and the IRS allow taxpayers to choose the tax treatment that would have been imposed in the absence of the interactions among provisions.

In addition to ensuring that similar income is taxed similarly, this election increases the choices available to taxpayers, thus increasing flexibility and thereby minimizing the burden imposed by these regulations. To the extent taxpayers choose this election, tax burdens could be reduced relative to tax burdens under the temporary regulations in the absence of the election, because denying the section 245A deduction could result in higher tax (i.e., at ordinary corporate rates) than imposition of a reduced tax under the GILTI regime. The Treasury Department and the IRS chose to allow such election because if the election were not allowed, some taxpayers would be taxed more heavily than the Treasury Department and the IRS have determined is intended under the Act.

#### b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are described in Part I.D.3.ii.b of this Special Analyses.

## II. Paperwork Reduction Act

The collections of information in the temporary regulations are in §§ 1.245A–5T(e)(3) and 1.6038–2T(f)(16).

The collection of information in § 1.245A–5T(e)(3) is elective for a domestic corporation that is a controlling U.S. shareholder of a CFC receiving a dividend from the CFC and wants to elect to have none of the dividend considered an extraordinary reduction amount by closing the CFC's tax year. The collection of information is satisfied by timely filing of the "Elective Section 245A Year-Closing Statement" with the domestic corporation's original Form 1120, U.S. Corporation Income Tax Return, for the taxable year in which the dividend is received. For purposes of the Paperwork Reduction Act, the reporting burden associated with § 1.245A–5T will be reflected in the Paperwork Reduction Act submission associated with Form 1120 (OMB control no. 1545–0123).

The collection of information in § 1.6038–2T(f)(16) is mandatory for every U.S. person that controls a foreign corporation that has paid a dividend for which a deduction under section 245A was limited by an ineligible amount under § 1.245A–5T(b) or paid a dividend for which the section 954(c)(6) exception was limited by a tiered extraordinary disposition amount or tiered extraordinary reduction amount under § 1.245A–5T(d) and (f), respectively, during an annual accounting period and files Form 5471 for that period (OMB control number 1545–0123 in the case of business taxpayers, formerly, OMB control number 1545–0704). The collection of information in § 1.6038–2T(f)(16) is satisfied by providing information about the ineligible amount, tiered

extraordinary disposition amount, or tiered extraordinary reduction amount for the corporation's accounting period as Form 5471 and its instructions may prescribe. For purposes of the Paperwork Reduction Act, the reporting burden associated with § 1.6038–2T(f)(16) will be reflected in the applicable Paperwork Reduction Act submission, associated with Form 5471. As provided below, the estimated number of respondents for the reporting burden associated with § 1.6038–2T(f)(16) is 12,000–18,000, based on estimates provided by the Research, Applied Analytics and Statistics Division of the IRS.

The related new or revised tax form is as follows:

| | New | Revision of existing form | Number of respondents (estimate) |
|---|---|---|---|
| Schedule to Form 5471 ........................................................................... | | ✓ | 12,000–18,000 |

The current status of the Paperwork Reduction Act submissions related to the new revised Form 5471 as a result of the information collections in the temporary regulations is provided in the accompanying table. The reporting burdens associated with the information collections in §§ 1.245A–5T–(e)(3) and 1.6038–2T(f)(16) are included in the aggregated burden estimates for OMB control number 1545–0123, which represents a total estimated burden time for all forms and schedules for corporations of 3.157 billion hours and total estimated monetized costs of $58.148 billion ($2017). The overall burden estimates provided in 1545–0123 are aggregate amounts that relate to the entire package of forms associated with the OMB control number and will in the future include but not isolate the estimated burden of the tax forms that will be revised as a result of the information collections in the proposed regulations. These numbers are therefore unrelated to the future calculations needed to assess the burden

imposed by the temporary regulations. The Treasury Department and the IRS urge readers to recognize that these numbers are duplicates of estimates provided for informational purposes in other proposed and final regulatory actions and to guard against over-counting the burden that international tax provisions imposed prior to the Act.

In September 2018, the IRS released and invited comment on drafts of new revised Form 5471 in order to give members of the public the opportunity to benefit from certain specific provisions made to the Code. The IRS received no comments on the draft revised Form 5471 on the portions of the form that relate to section 245A during the comment period. Consequently, the IRS made the form available in December 2018 for use by the public. The IRS is contemplating making additional changes to Form 5471 to implement these temporary regulations.

No burden estimates specific to the temporary regulations are currently

available. The Treasury Department and the IRS have not identified any burden estimates, including those for new information collections, related to the requirements under the temporary regulations. Those estimates would capture both changes made by the Act and those that arise out of discretionary authority exercised in the temporary regulations. The Treasury Department and the IRS request comments on all aspects of information collection burdens related to the temporary regulations, including estimates for how much time it would take to comply with the paperwork burdens described above for each relevant form and ways for the IRS to minimize the paperwork burden. Proposed revisions to these forms that reflect the information collections contained in these temporary regulations will be made available for public comment at *www.irs.gov/draftforms* and will not be finalized until after approved by OMB under the PRA.

| Information collection | Type of filer | OMB No.(s) | Status |
|---|---|---|---|
| Form 5471 ............................... | Business (NEW Model) .......... | 1545–0123 | Approved by OMB on 12/21/2018. |
| | *Link: https://www.federalregister.gov/documents/2018/12/21/2018-27735/agency-information-collection-activities-submission-for-omb-review-comment-request-multiple-irs.* | | |

### III. Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act of 1995 requires

that agencies assess anticipated costs and benefits and take certain other actions before issuing a final rule that

includes any Federal mandate that may result in expenditures in any one year by a state, local, or tribal government, in

the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. In 2019, that threshold is approximately $154 million. These temporary regulations do not include any Federal mandate that may result in expenditures by state, local, or tribal governments, or by the private sector in excess of that threshold.

## IV. Executive Order 13132: Federalism

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either imposes substantial, direct compliance costs on state and local governments, and is not required by statute, or preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. These temporary regulations do not have federalism implications and do not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

**Drafting Information**

The principal author of the temporary regulations is Logan M. Kincheloe, Office of Associate Chief Counsel (International). However, other personnel from the Treasury Department and the IRS participated in their development.

**List of Subjects in 26 CFR Part 1**

Income taxes, Reporting and recordkeeping requirements.

**Amendments to the Regulations**

Accordingly, 26 CFR part 1 is amended as follows:

## PART 1—INCOME TAXES

■ **Paragraph 1.** The authority citation for part 1 is amended by adding a sectional authority for § 1.245A–5 to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

*  *  *  *  *

Section 1.245A–5 also issued under 26 U.S.C. 245A(g), 951A(a), 954(c)(6)(A), and 965(o).

*  *  *  *  *

■ **Par. 2.** Reserved sections 1.245A–1 through 4 and § 1.245A–5T are added to read as follows:

Sec.
1.245A–1    [Reserved].
1.245A–2    [Reserved].
1.245A–3    [Reserved].
1.245A–4    [Reserved].
1.245A–5T    Limitation of section 245A deduction and section 954(c)(6) exception (temporary).

**§ 1.245A–5T    Limitation of section 245A deduction and section 954(c)(6) exception (temporary).**

(a) *Overview.* This section provides rules that limit a deduction under section 245A(a) to the portion of a dividend that exceeds the ineligible amount of such dividend or the applicability of section 954(c)(6) when a portion of a dividend is paid out of an extraordinary disposition account or when an extraordinary reduction occurs. Paragraph (b) of this section provides rules regarding ineligible amounts. Paragraph (c) of this section provides rules for determining ineligible amounts attributable to an extraordinary disposition. Paragraph (d) of this section provides rules that limit the application of section 954(c)(6) when one or more section 245A shareholders of a lower-tier CFC have an extraordinary disposition account. Paragraph (e) of this section provides rules for determining ineligible amounts attributable to an extraordinary reduction. Paragraph (f) of this section provides rules that limit the application of section 954(c)(6) when a lower-tier CFC has an extraordinary reduction amount. Paragraph (g) of this section provides special rules for purposes of applying this section. Paragraph (h) of this section provides an anti-abuse rule. Paragraph (i) of this section provides definitions. Paragraph (j) of this section provides examples illustrating the application of this section. Paragraph (k) of this section provides the applicability date of this section. Paragraph (l) of this section provides the expiration date of this section.

(b) *Limitation of deduction under section 245A*—(1) *In general.* A section 245A shareholder is allowed a section 245A deduction for any dividend received from an SFC (provided all other applicable requirements are satisfied) only to the extent that the dividend exceeds the ineligible amount of the dividend. See paragraphs (j)(2), (4), and (5) of this section for examples illustrating the application of this paragraph (b)(1).

(2) *Definition of ineligible amount.* The term *ineligible amount* means, with respect to a dividend received by a section 245A shareholder from an SFC, an amount equal to the sum of—

(i) 50 percent of the extraordinary disposition amount (as determined under paragraph (c) of this section), and

(ii) The extraordinary reduction amount (as determined under paragraph (e) of this section).

(c) *Rules for determining extraordinary disposition amount*—(1) *Definition of extraordinary disposition amount.* The term *extraordinary*

*disposition amount* means the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder. See paragraph (j)(2) of this section for an example illustrating the application of this paragraph (c).

(2) *Determination of portion of dividend paid out of extraordinary disposition account*—(i) *In general.* For purposes of determining the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder, the following rules apply—

(A) The dividend is first considered paid out of non-extraordinary disposition E&P with respect to the section 245A shareholder; and

(B) The dividend is next considered paid out of the extraordinary disposition account to the extent of the section 245A shareholder's extraordinary disposition account balance.

(ii) *Definition of non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* means, with respect to a section 245A shareholder and an SFC, an amount of earnings and profits of the SFC equal to the excess, if any, of—

(A) The product of—

(*1*) The amount of the SFC's earnings and profits described in section 959(c)(3), determined as of the end of the SFC's taxable year (for this purpose, without regard to distributions during the taxable year other than as provided in this paragraph (c)(2)(ii)(A)(*1*)), but, if during the taxable year the SFC pays more than one dividend, reduced (but not below zero) by the amounts of any dividends paid by the SFC earlier in the taxable year; and

(*2*) The percentage of the stock (by value) of the SFC that the section 245A shareholder owns directly or indirectly immediately after the distribution (taking into account all transactions related to the distribution); over

(B) The balance of the section 245A shareholder's extraordinary disposition account with respect to the SFC, determined immediately before the distribution.

(3) *Definitions with respect to extraordinary disposition accounts*—(i) *Extraordinary disposition account*—(A) *In general.* The term *extraordinary disposition account* means, with respect to a section 245A shareholder of an SFC, an account the balance of which is equal to the product of the extraordinary disposition ownership percentage and the extraordinary disposition E&P, reduced (but not below zero) by the

prior extraordinary disposition amount, and adjusted under paragraph (c)(4) of this section, as applicable.

(B) *Extraordinary disposition ownership percentage.* The term *extraordinary disposition ownership percentage* means the percentage of stock (by value) of a SFC that a section 245A shareholder owns directly or indirectly at the beginning of the disqualified period or, if later, on the first day during the disqualified period on which the SFC is a CFC, regardless of whether the section 245A shareholder owns directly or indirectly such stock of the SFC on the date of an extraordinary disposition giving rise to extraordinary disposition E&P; if not, see paragraph (c)(4) of this section.

(C) *Extraordinary disposition E&P.* The term *extraordinary disposition E&P* means an amount of earnings and profits of an SFC equal the sum of the net gain recognized by the SFC with respect to specified property in each extraordinary disposition. In the case of an extraordinary disposition with respect to the SFC arising as a result of a disposition of specified property by a specified entity (other than a foreign corporation), an interest of which is owned directly or indirectly (through one or more other specified entities that are not foreign corporations) by the SFC, the net gain taken into account for purposes of the preceding sentence is the SFC's distributive share of the net gain recognized by the specified entity with respect to the specified property.

(D) *Prior extraordinary disposition amount*—(1) *General rule.* The term *prior extraordinary disposition amount* means, with respect to an SFC and a section 245A shareholder, the sum of the extraordinary disposition amount of each prior dividend received by the section 245A shareholder from the SFC by reason of paragraph (c) of this section and 200 percent of the sum of the amounts included in the section 245A shareholder's gross income under section 951(a) by reason of paragraph (d) of this section (in the case in which the SFC is, or has been, a lower-tier CFC). A section 245A shareholder's prior extraordinary disposition amount also includes—

(*i*) A prior dividend received by the section 245A shareholder from the SFC to the extent not an extraordinary reduction amount and to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary disposition amount had paragraph (c) of this section applied to the dividend;

(*ii*) The portion of a prior dividend (to the extent not a tiered extraordinary disposition amount by reason of paragraph (d) of this section) received by an upper-tier CFC from the SFC that by reason of section 245A(e) was included in the upper-tier CFC's foreign personal holding company income and was included in gross income by the section 245A shareholder under section 951(a) but would have been a tiered extraordinary disposition amount by reason of paragraph (d) of this section had paragraph (d) of this section applied to the dividend;

(*iii*) If a prior dividend received by an upper-tier CFC from a lower-tier CFC gives rise to a tiered extraordinary disposition amount with respect to the section 245A shareholder by reason of paragraph (d) of this section, the qualified portion.

(*2*) *Definition of qualified portion*—(*i*) *In general.* The term *qualified portion* means, with respect to a tiered extraordinary disposition amount of a section 245A shareholder and a lower-tier CFC, 200 percent of the portion of the disqualified amount with respect to the tiered extraordinary disposition amount equal to the sum of the amounts included in gross income by each U.S. tax resident under section 951(a) in the taxable year in which the tiered extraordinary disposition amount arose with respect to the lower-tier CFC by reason of paragraph (d) of this section. For purposes of the preceding sentence, the reference to a U.S. tax resident does not include any section 245A shareholder with a tiered extraordinary disposition amount with respect to the lower-tier CFC.

(*ii*) *Determining a qualified portion if multiple section 245A shareholders have tiered extraordinary disposition amounts.* For the purposes of applying paragraph (c)(3)(i)(D)(*2*)(*i*) of this section, if more than one section 245A shareholder has a tiered extraordinary disposition amount with respect to a dividend received by an upper-tier CFC from a lower-tier CFC, then the qualified portion with respect to each section 245A shareholder is equal to the amount described in paragraph (c)(3)(i)(D)(*2*)(*i*) of this section, without regard to this paragraph (c)(3)(i)(D)(*2*)(*ii*), multiplied by a fraction, the numerator of which is the section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC and the denominator of which is the sum of the tiered extraordinary disposition amounts with respect to each section 245A shareholder and the lower-tier CFC.

(ii) *Extraordinary disposition*—(A) *In general.* Except as provided in

paragraph (c)(3)(ii)(E) of this section, the term *extraordinary disposition* means, with respect to an SFC, any disposition of specified property by the SFC on a date on which it was a CFC and during the SFC's disqualified period to a related party if the disposition occurs outside of the ordinary course of the SFC's activities. An extraordinary disposition also includes a disposition during the disqualified period on a date on which the SFC is not a CFC if there is a plan, agreement, or understanding involving a section 245A shareholder to cause the SFC to recognize gain that would give rise to an extraordinary disposition if the SFC were a CFC.

(B) *Facts and circumstances.* A determination as to whether a disposition is undertaken outside of the ordinary course of an SFC's activities is made on the basis of facts and circumstances, taking into account whether the transaction is consistent with the SFC's past activities, including with respect to quantity and frequency. In addition, a disposition of specified property by an SFC to a related party may be considered outside of the ordinary course of the SFC's activities notwithstanding that the SFC regularly disposes of property of the same type of, or similar to, the specified property to persons that are not related parties.

(C) *Per se rules.* A disposition is treated as occurring outside of the ordinary course of an SFC's activities if the disposition is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, as defined in section 367(d)(4).

(D) *Treatment of dispositions by certain specified entities.* For purposes of paragraph (c)(3)(ii)(A) of this section, an extraordinary disposition with respect to an SFC includes a disposition by a specified entity other than a foreign corporation, provided that immediately before or immediately after the disposition the specified entity is a related party with respect to the SFC, the SFC directly or indirectly (through one or more other specified entities other than foreign corporations) owns an interest in the specified entity, and the disposition would have otherwise qualified as an extraordinary disposition had the specified entity been a foreign corporation.

(E) *De minimis exception to extraordinary disposition.* If the sum of the net gain recognized by an SFC with respect to specified property in all dispositions otherwise described in paragraph (c)(3)(ii)(A) of this section does not exceed the lesser of $50 million or 5 percent of the gross value

of all of the SFC's property held immediately before the beginning of its disqualified period, then no disposition of specified property by the SFC is an extraordinary disposition.

(iii) *Disqualified period.* The term *disqualified period* means, with respect to an SFC that is a CFC on any day during the taxable year that includes January 1, 2018, the period beginning on January 1, 2018, and ending as of the close of the taxable year of the SFC, if any, that begins before January 1, 2018, and ends after December 31, 2017.

(iv) *Specified property.* The term *specified property* means any property if gain recognized with respect to such property during the disqualified period is not described in section 951A(c)(2)(A)(i)(I) through (V). If only a portion of the gain recognized with respect to property during the disqualified period is gain that is not described in section 951A(c)(2)(A)(i)(I) through (V), then a portion of the property is treated as specified property in an amount that bears the same ratio to the value of the property as the amount of gain not described in section 951A(c)(2)(A)(i)(I) through (V) bears to the total amount of gain recognized with respect to such property during the disqualified period.

(4) *Successor rules for extraordinary disposition accounts.* This paragraph (c)(4) applies with respect to an extraordinary disposition account upon certain direct or indirect transfers of stock of an SFC by a section 245A shareholder.

(i) *Another section 245A shareholder succeeds to all or portion of account.* Except for a transfer described in § 1.1248–8(a)(1), paragraphs (c)(4)(i)(A) through (C) of this section apply when a section 245A shareholder of an SFC (the *transferor*) transfers directly or indirectly a share of stock (or a portion of a share of stock) of the SFC that it owns directly or indirectly (the share or portion thereof, a *transferred share*).

(A) If immediately after the transfer (taking into account all transactions related to the transfer) another person is a section 245A shareholder of the SFC, then such other person's extraordinary disposition account with respect to the SFC is increased by the person's proportionate share of the amount allocated to the transferred share.

(B) For purposes of paragraph (c)(4)(i)(A) of this section, the amount allocated to a transferred share is equal to the product of—

(1) The balance of the transferor's extraordinary disposition account with respect to the SFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends

and before the application of this paragraph (c)(4)(i)(B); and

(2) A fraction, the numerator of which is the value of the transferred share and the denominator of which is the value of all of the stock of the SFC that the transferor owns directly or indirectly immediately before the transfer.

(C) For purposes of paragraph (c)(4)(i)(A) of this section, a person's proportionate share of the amount allocated to a transferred share under paragraph (c)(4)(i)(B) of this section is equal to the product of—

(1) The amount allocated to the share; and

(2) The percentage (expressed as a decimal) of the share (by value) that the person owns directly or indirectly immediately after the transfer (taking into account all transactions related to the transfer).

(D) The transferor's extraordinary disposition account with respect to the SFC is decreased by the amount by which another person's extraordinary disposition account with respect to the SFC is increased pursuant to paragraph (c)(4)(i)(A) of this section.

(E) If a principal purpose of the transfer is to shift, or to avoid, an amount in the transferor's extraordinary disposition account with respect to the SFC to another person, then for purposes of this section, the transfer may be disregarded or other appropriate adjustments may be made.

(ii) *Certain section 381 transactions.* If assets of an SFC (the *acquired corporation*) are acquired by another SFC (the *acquiring corporation*) pursuant to a transaction described in section 381(a) in which the acquired corporation is the transferor corporation for purposes of section 381, then a section 245A shareholder's extraordinary disposition account with respect to the acquiring corporation is increased by the balance of its extraordinary disposition account with respect to the acquired corporation, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and before the application of this paragraph (c)(4)(ii).

(iii) *Certain distributions involving section 355 or 356.* If, pursuant to a reorganization described in section 368(a)(1)(D) involving a distribution under section 355 (or so much of section 356 as it relates to section 355) by an SFC (the *distributing corporation*) of stock of another SFC (the *controlled corporation*), earnings and profits of the distributing corporation are allocated between the distributing corporation and the controlled corporation, then a section 245A shareholder's extraordinary disposition account with

respect to the distributing corporation is allocated on a similar basis between the distributing corporation and the controlled corporation.

(iv) *Certain transfers of stock of lower-tier CFCs by upper-tier CFCs.* If an upper-tier CFC directly or indirectly transfers stock of a lower-tier CFC and if as a result of the transfer a section 245A shareholder ceases to be a section 245A shareholder with respect to the lower-tier CFC, then the section 245A shareholder's extraordinary disposition account with respect to the upper-tier CFC is increased by the balance of the section 245A shareholder's extraordinary disposition account with respect to the lower-tier CFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and after application of paragraph (c)(4)(i) of this section, if applicable. If a section 245A shareholder ceases to be a section 245A shareholder with respect to a lower-tier CFC by reason of a direct or indirect transfer of stock of the lower-tier CFC by multiple upper-tier CFCs that occur pursuant to a plan (or series of related transactions), then the balance of the section 245A shareholder's extraordinary disposition account is allocated among the upper-tier CFCs. The portion of the balance of the account allocated to each upper-tier CFC is equal to the balance of the account multiplied by a fraction, the numerator of which is the value of the stock of the lower-tier CFC transferred directly or indirectly by the upper-tier CFC, and the denominator of which is the sum of the value of the stock of the lower-tier CFC transferred directly or indirectly by all upper-tier CFCs.

(d) *Limitation of amount eligible for section 954(c)(6) when there is an extraordinary disposition account with respect to a lower-tier CFC*—(1) *In general.* If an upper-tier CFC receives a dividend from a lower-tier CFC, the dividend is eligible for the exception to foreign personal holding company income under section 954(c)(6) only to the extent that the amount that would be eligible for the section 954(c)(6) exception (determined without regard to this paragraph (d)) exceeds the *disqualified amount,* which is 50 percent of the quotient of the following—

(i) The sum of each section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC; and

(ii) The percentage (expressed as a decimal) of stock of the upper-tier CFC (by value) owned, in the aggregate, by U.S. tax residents that include in gross income their pro rata share of the upper-

tier CFC's subpart F income under section 951(a) on the last day of the upper-tier CFC's taxable year. If a U.S. tax resident is a direct or indirect partner in a domestic partnership that is a United States shareholder of the upper-tier CFC, the amount of stock owned by the U.S. tax resident for purposes of the preceding sentence is determined under the principles of paragraph (g)(3) of this section.

(2) *Definition of tiered extraordinary disposition amount*—(i) *In general.* The term *tiered extraordinary disposition amount* means, with respect to a dividend received by an upper-tier CFC from a lower-tier CFC and a section 245A shareholder, the portion of the dividend that would be an extraordinary disposition amount if the section 245A shareholder received as a dividend its pro rata share of the dividend from the lower-tier CFC. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC from a lower-tier CFC by reason of section 964(e)(4) (in such case, see paragraphs (b)(1) and (g)(2) of this section).

(ii) *Section 245A shareholder's pro rata share of a dividend received by an upper-tier CFC.* For the purposes of paragraph (d)(2)(i) of this section, a section 245A shareholder's pro rata share of the amount of a dividend received by an upper-tier CFC from a lower-tier CFC equals the amount by which the dividend would increase the section 245A shareholder's pro rata share of the upper-tier CFC's subpart F income under section 951(a)(2) and § 1.951–1(b) and (e) if the dividend were included in the upper-tier CFC's foreign personal holding company income under section 951(a)(1), determined without regard to section 952(c) and as if the upper-tier CFC had no deductions properly allocable to the dividend under section 954(b)(5).

(e) *Extraordinary reduction amount*— (1) *In general.* Except as provided in paragraph (e)(3) of this section, the term *extraordinary reduction amount* means, with respect to a dividend received by a controlling section 245A shareholder from a CFC during a taxable year of the CFC ending after December 31, 2017, in which an extraordinary reduction occurs with respect to the controlling section 245A shareholder's ownership of the CFC, the lesser of the amounts described in paragraph (e)(1)(i) or (ii) of this section. *See* paragraphs (j)(4) through (6) of this section for examples illustrating the application of this paragraph (e).

(i) The amount of the dividend.

(ii) The amount equal to the sum of the controlling section 245A shareholder's pre-reduction pro rata share of the CFC's subpart F income (as defined in section 952(a)) and tested income (as defined in section 951A(c)(2)(A)) for the taxable year, reduced, but not below zero, by the prior extraordinary reduction amount.

(2) *Rules regarding extraordinary reduction amounts*—(i) *Extraordinary reduction*—(A) *In general.* Except as provided in paragraph (e)(2)(i)(C) of this section, an *extraordinary reduction* occurs, with respect to a controlling section 245A shareholder's ownership of a CFC during a taxable year of the CFC, if either of the conditions described in paragraph (e)(2)(i)(A)(*1*) or (*2*) of this section is satisfied. See paragraphs (j)(4) and (5) of this section for examples illustrating an extraordinary reduction.

(*1*) The condition of this paragraph (e)(2)(i)(A)(*1*) requires that during the taxable year, the controlling section 245A shareholder transfers directly or indirectly (other than by reason of a transfer occurring pursuant to an exchange described in section 368(a)(1)(E) or (F)), in the aggregate, more than 10 percent (by value) of the stock of the CFC that the section 245A shareholder owns directly or indirectly as of the beginning of the taxable year of the CFC, provided the stock transferred, in the aggregate, represents at least 5 percent (by value) of the outstanding stock of the CFC as of the beginning of the taxable year of the CFC; or

(*2*) The condition of this paragraph (e)(2)(i)(A)(*2*) requires that, as a result of one or more transactions occurring during the taxable year, the percentage of stock (by value) of the CFC that the controlling section 245A shareholder owns directly or indirectly as of the close of the last day of the taxable year of the CFC is less than 90 percent of the percentage of stock (by value) that the controlling section 245A shareholder owns directly or indirectly on either of the dates described in paragraphs (e)(2)(i)(B)(*1*) and (*2*) of this section (such percentage, the *initial percentage*), provided the difference between the initial percentage and percentage at the end of the year is at least five percentage points.

(B) *Dates for purposes of the initial percentage.* For purposes of paragraph (e)(2)(i)(A)(*2*) of this section, the dates described in paragraphs (e)(2)(i)(B)(*1*) and (*2*) of this section are—

(*1*) The day of the taxable year on which the controlling section 245A shareholder owns directly or indirectly its highest percentage of stock (by value) of the CFC; and

(*2*) The day immediately before the first day on which stock was transferred directly or indirectly in the preceding taxable year in a transaction (or a series of transactions) occurring pursuant to a plan to reduce the percentage of stock (by value) of the CFC that the controlling section 245A shareholder owns directly or indirectly.

(C) *Transactions pursuant to which CFC's taxable year ends.* A controlling section 245A shareholder's direct or indirect transfer of stock of a CFC that but for this paragraph (e)(2)(i)(B) would give rise to an extraordinary reduction under paragraph (e)(2)(i)(A) of this section does not give rise to an extraordinary reduction if the taxable year of the CFC ends immediately after the transfer, provided that the controlling section 245A shareholder directly or indirectly owns the stock on the last day of such year. Thus, for example, if a controlling section 245A shareholder exchanges all the stock of a CFC pursuant to a complete liquidation of the CFC, the exchange does not give rise to an extraordinary reduction.

(ii) *Rules for determining pre-reduction pro rata share*—(A) *In general.* Except as provided in paragraph (e)(2)(ii)(B) of this section, the term *pre-reduction pro rata share* means, with respect to a controlling section 245A shareholder and the subpart F income or tested income of a CFC, the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested income under section 951(a)(2) and § 1.951–1(b) and (e) or section 951A(e)(1) and § 1.951A–1(d)(1), respectively, determined based on the controlling section 245A shareholder's direct or indirect ownership of stock of the CFC immediately before the extraordinary reduction (or, if the extraordinary reduction occurs by reason of multiple transactions, immediately before the first transaction) and without regard to section 951(a)(2)(B) and § 1.951– 1(b)(1)(ii), but only to the extent that such subpart F income or tested income is not included in the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested income under section 951(a)(2) and § 1.951–1(b) and (e) or section 951A(e)(1) and § 1.951A–1(d)(1), respectively.

(B) *Decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* A controlling section 245A shareholder's pre-reduction pro rata share of subpart F income or tested income of a CFC for a taxable year is reduced by an amount equal to the sum of the amounts by which each U.S. tax

resident's pro rata share of the subpart F income or tested income is increased as a result of a transfer directly or indirectly of stock of the CFC by the controlling section 245A shareholder or an issuance of stock by the CFC (such an amount with respect to a U.S. tax resident, a *specified amount*), in either case, during the taxable year in which the extraordinary reduction occurs. For purposes of this paragraph (e)(2)(ii)(B), if there are extraordinary reductions with respect to more than one controlling section 245A shareholder during the CFC's taxable year, then a U.S. tax resident's specified amount attributable to an acquisition of stock from the CFC is prorated with respect to each controlling section 245A shareholder based on its relative decrease in ownership of the CFC. See paragraph (j)(5) of this section for an example illustrating a decrease in a section 245A shareholder's pre-reduction pro rata share for amounts taken into account by a U.S. tax resident.

(C) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* means, with respect to a CFC and section 245A shareholder and a taxable year of the CFC in which an extraordinary reduction occurs, the sum of the extraordinary reduction amount of each prior dividend received by the section 245A shareholder from the CFC during the taxable year. A section 245A shareholder's prior extraordinary reduction amount also includes—

(*1*) A prior dividend received by the section 245A shareholder from the CFC during the taxable year to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary reduction amount had this paragraph (e) applied to the dividend;

(*2*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper tier-CFC, the portion of a prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year of the lower-tier CFC that, by reason of section 245A(e), was included in the upper-tier CFC's foreign personal holding company income and that by reason of section 951(a) was included in income of the section 245A shareholder, and that would have given rise to a tiered extraordinary reduction amount by reason of paragraph (f) of this section had paragraph (f) applied to the dividend of which the section 245A

shareholder would have included a pro rata share of the tiered extraordinary reduction amount in income by reason of section 951(a); and

(*3*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper-tier CFC, the sum of the portion of the tiered extraordinary reduction amount of each prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year that is included in income of the section 245A shareholder by reason of section 951(a).

(3) *Exceptions*—(i) *Elective exception to close CFC's taxable year*—(A) *In general.* For a taxable year of a CFC in which an extraordinary reduction occurs with respect to a controlling section 245A shareholder and for which, absent this paragraph (e)(3), there would be an extraordinary reduction amount or tiered extraordinary reduction amount greater than zero, no amount is considered an extraordinary reduction amount or tiered extraordinary reduction amount with respect to the controlling section 245A shareholder if each controlling section 245A shareholder elects, pursuant to this paragraph (e)(3), to close the CFC's taxable year for all purposes of the Internal Revenue Code (and, therefore, as to all shareholders of the CFC) as of the end of the date on which the extraordinary reduction occurs, or, if the extraordinary reduction occurs by reason of multiple transactions, as of the end of each date on which a transaction forming a part of the extraordinary reduction occurs. For purposes of applying this paragraph (e)(3), a controlling section 245A shareholder that has an extraordinary reduction (or a transaction forming a part thereof) with respect to a CFC is treated as owning the same amount of stock it owned in the CFC immediately before the extraordinary reduction (or a transaction forming a part thereof) on the end of the date on which the extraordinary reduction occurs (or such transaction forming a part thereof occurs). To the extent that stock of a CFC is treated as owned by a controlling section 245A shareholder as of the close of the CFC's taxable year pursuant to the preceding sentence, such stock is treated as not being owned by any other person as of the close of the CFC's taxable year. If each controlling section 245A shareholder elects to close the CFC's taxable year, that closing will be treated as a change in accounting period for the purposes of § 1.964–1(c).

(B) *Allocation of foreign taxes.* If an election is made pursuant to this paragraph (e)(3) to close a CFC's taxable

year and the CFC's taxable year under foreign law (if any) does not close at the end of the date on which the CFC's taxable year closes as a result of the election, foreign taxes paid or accrued with respect to such foreign taxable year are allocated between the period of the foreign taxable year that ends with, and the period of the foreign taxable year that begins after, the date on which the CFC's taxable year closes as a result of the election. If there is more than one date on which the CFC's taxable year closes as a result of the election, foreign taxes paid or accrued with respect to the foreign taxable year are allocated to all such periods. The allocation is made based on the respective portions of the taxable income of the CFC (as determined under foreign law) for the foreign taxable year that are attributable under the principles of § 1.1502–76(b) to the periods during the foreign taxable year. Foreign taxes allocated to a period under this paragraph (e)(3)(i)(B) are treated as paid or accrued by the CFC as of the close of that period.

(C) *Time and manner of making election*—(*1*) *General rule.* An election pursuant to this paragraph (e)(3) is made and effective if the statement required by paragraph (e)(3)(iv) of this section is timely filed (including extensions) by each controlling section 245A shareholder making the election with its original U.S. tax return for the taxable year in which the extraordinary reduction occurs. Before the filing of the statement described in paragraph (e)(3)(iv) of this section, each controlling section 245A shareholder and each U.S. tax resident that on the end of the date on which the extraordinary reduction occurs (or, if the extraordinary reduction occurs by reason of multiple transactions, each U.S. tax resident that on the end of each date on which a transaction forming a part of the extraordinary reduction occurs) owns directly or indirectly stock of the CFC and is a United States shareholder with respect to the CFC must enter into a written, binding agreement agreeing that each controlling section 245A shareholder will elect to close the taxable year of the CFC. If a controlling section 245A shareholder is a member of a consolidated group (within the meaning of § 1.1502–1(h)) and participates in the extraordinary reduction, the agent for such group (within the meaning of § 1.1502–77(c)(1)) must file the statement described in this paragraph (e)(3) on behalf of such member.

(*2*) *Transition rule.* In the case of an extraordinary reduction occurring before the date these regulations are filed as final regulations in the **Federal**

**Register**, the statement required by paragraph (e)(3)(iv) of this section is considered timely filed if it is attached to each controlling section 245A shareholder to an original or amended return for the taxable year in which the extraordinary reduction occurs.

(D) *Form and content of statement.* The statement required by paragraph (e)(3)(iii) of this section is to be titled ''Elective Section 245A Year-Closing Statement.'' The statement must—

(*1*) Identify (by name and tax identification number, if any) each controlling section 245A shareholder, each U.S tax resident described in paragraph (e)(3)(iii) of this section, and the CFC;

(*2*) State the date of the extraordinary reduction (or, if the extraordinary reduction includes transactions on more than one date, the dates of all such transactions) to which the election applies;

(*3*) State the filing controlling section 245A shareholder's pro rata share of the subpart F income, tested income, and foreign taxes described in section 960 with respect to the stock of the CFC subject to the extraordinary reduction, and the amount of earnings and profits attributable to such stock within the meaning of section 1248, as of the date of the extraordinary reduction;

(*4*) State that each controlling section 245A shareholder and each U.S. tax resident described in paragraph (e)(3)(iii) of this section have entered into a written, binding agreement to elect to close the CFC's taxable year in accordance with paragraph (e)(3)(iii) of this section; and

(*5*) Be filed in the manner prescribed by forms, publications, or other guidance published in the Internal Revenue Bulletin.

(E) *Consistency requirements.* If multiple extraordinary reductions occur with respect to one or more controlling section 245A shareholders' ownership in a single CFC during one or more taxable years of the CFC, then to the extent those extraordinary reductions occur pursuant to a plan or series of related transactions, the election described in this paragraph (e)(3) section may be made only if it is made for all such extraordinary reductions with respect to the CFC. Furthermore, if an extraordinary reduction occurs with respect to a controlling section 245A shareholder's ownership in multiple CFCs, then, to the extent those extraordinary reductions occur pursuant to a plan or series of related transactions, the election described in this paragraph (e)(3) may be made only if it is made for all such extraordinary reductions with respect to all of the

CFCs that have the same or related (within the meaning of section 267(b) or 707(b)) controlling section 245A shareholders.

(ii) *De minimis subpart F income and tested income.* For a taxable year of a CFC in which an extraordinary reduction occurs, no amount is considered an extraordinary reduction amount with respect to a controlling section 245A shareholder of the CFC if the sum of the CFC's subpart F income and tested income (as defined in section 951A(c)(2)(A)) for the taxable year does not exceed the lesser of $50 million or 5 percent of the CFC's total income for the taxable year.

(f) *Limitation of amount eligible for section 954(c)(6) where extraordinary reduction occurs with respect to lower-tier CFCs*—(1) *In general.* If an extraordinary reduction occurs with respect to a lower-tier CFC and an upper-tier CFC receives a dividend from the lower-tier CFC in the taxable year in which the extraordinary reduction occurs, then the amount of the dividend that would otherwise be eligible for the exception to foreign personal holding company income under section 954(c)(6) (determined without regard to this paragraph (f)) is eligible for such exception only to the extent the dividend exceeds the tiered extraordinary reduction amount. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC by reason of section 964(e)(4) (in this case, see paragraphs (b) and (g)(2) of this section). See paragraph (j)(7) of this section for an example illustrating the application of this paragraph (f)(1).

(2) *Definition of tiered extraordinary reduction amount.* The term *tiered extraordinary reduction amount* means, with respect to the portion of a dividend received by an upper-tier CFC from a lower-tier CFC during a taxable year of the lower-tier CFC that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) (determined without regard to this paragraph (f)), the amount of such dividend equal to the excess, if any, of—

(i) The product of—

(A) The sum of the amount of the subpart F income and tested income of the lower-tier CFC for the taxable year; and

(B) The percentage (by value) of stock of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately before the extraordinary reduction (or the first transaction forming a part thereof); over

(ii) The following amounts—

(A) The sum of each U.S. tax resident's pro rata share of the lower-tier CFC's subpart F income and tested income under section 951(a) or 951A(a), respectively, that is attributable to shares of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately prior to the extraordinary reduction (or the first transaction forming a part thereof), computed without the application of this paragraph (f);

(B) The sum of each prior tiered extraordinary reduction amount and sum of each amount included in an upper-tier CFC's subpart F income by reason of section 245A(e) with respect to prior dividends from the lower-tier CFC during the taxable year;

(C) The sum of the prior extraordinary reduction amounts (but, for this purpose, computed without regard to amounts described in paragraphs (e)(2)(ii)(C)(*2*) and (*3*) of this section) of each controlling section 245A shareholder with respect to shares of the lower-tier CFC that were owned by such controlling section 245A shareholder (including indirectly through a specified entity other than a foreign corporation) for a portion of the taxable year but are owned by an upper-tier CFC (including indirectly through a specified entity other than a foreign corporation) at the time of the distribution of the dividend; and

(D) The product of the amount described in paragraph (f)(2)(i)(B) of this section and the sum of the amounts of each U.S. tax resident's pro rata share of subpart F income and tested income for the taxable year under section 951(a) or 951A(a), respectively, attributable to shares of the lower-tier CFC directly or indirectly acquired by the U.S. tax resident from the lower-tier CFC during the taxable year.

(3) *Transition rule for computing tiered extraordinary reduction amount.* Solely for purposes of applying this paragraph (f) in taxable years of a lower-tier CFC beginning on or after January 1, 2018, and ending before June 14, 2019, a tiered extraordinary reduction amount is determined by treating the lower-tier CFC's subpart F income for the taxable year as if it were neither subpart F income nor tested income.

(g) *Special rules.* The following rules apply for purposes of this section.

(1) *Source of dividends.* A dividend received by any person is considered received directly by such person from the foreign corporation whose earnings and profits give rise to the dividend. Therefore, for example, if a section 245A shareholder sells or exchanges stock of an upper-tier CFC and the gain

recognized on the sale or exchange is included in the gross income of the section 245A shareholder as a dividend under section 1248(a), then, to the extent the dividend is attributable under section 1248(c)(2) to the earnings and profits of a lower-tier CFC owned, within the meaning of section 958(a)(2), by the section 245A shareholder through the upper-tier CFC, the dividend is considered received directly by the section 245A shareholder from the lower-tier CFC.

(2) *Certain section 964(e) inclusions treated as dividends.* An amount included in the gross income of a section 245A shareholder under section 951(a)(1)(A) by reason of section 964(e)(4) is considered a dividend received by the section 245A shareholder directly from the foreign corporation whose earnings and profits give rise to the amount described in section 964(e)(1). Therefore, for example, if an upper-tier CFC sells or exchanges stock of a lower-tier CFC, and, as a result of the sale or exchange, a section 245A shareholder with respect to the upper-tier CFC includes an amount in gross income under section 951(a)(1)(A) by reason of section 964(e)(4), then the inclusion is treated as a dividend received directly from the lower-tier CFC whose earnings and profits give rise to the dividend, and the section 245A shareholder is not allowed a section 245A deduction for the dividend to the extent of the ineligible amount of such dividend.

(3) *Rules regarding stock ownership and stock transfers*—(i) *Determining indirect ownership of stock of an SFC or a CFC.* For purposes of this section, if a person owns an interest in, or stock of, a specified entity, including through a chain of ownership of one or more other specified entities, then the person is considered to own indirectly a pro rata share of stock of an SFC or a CFC owned by the specified entity. To determine a person's pro rata share of stock owned by a specified entity, the principles of section 958(a) apply without regard to whether the specified entity is foreign or domestic.

(ii) *Determining indirect transfers for stock owned indirectly.* If, under paragraph (g)(3)(i) of this section, a person is considered to own indirectly stock of an SFC or CFC that is owned by a specified entity, then the following rules apply in determining if the person transfers stock of the SFC or CFC—

(A) To the extent the specified entity transfers stock that is considered owned indirectly by the person immediately before the transfer, the person is

considered to transfer indirectly such stock;

(B) If the person transfers an interest in, or stock of, the specified entity, the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the specified entity that is transferred; and

(C) In the case in which the person owns the specified entity through a chain of ownership of one or more other specified entities, if there is a transfer of an interest in, or stock of, another specified entity in the chain of ownership, then the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the other specified entity transferred.

(iii) *Definition of specified entity.* The term *specified entity* means any partnership, trust, or estate (in each case, domestic or foreign), or any foreign corporation.

(4) *Coordination rules*—(i) *General rule.* A dividend is first subject to section 245A(e). To the extent the dividend is not a hybrid dividend or tiered hybrid dividend under section 245A(e), the dividend is subject to paragraph (e) or (f) of this section, as applicable, and then, to the extent the dividend is not subject to paragraph (e) or (f) of this section, it is subject to paragraph (c) or (d) of this section, as applicable.

(ii) *Coordination rule for paragraphs (c) and (d) and (e) and (f) of this section, respectively.* If an SFC or CFC pays a dividend (or simultaneous dividends), a portion of which may be subject to paragraph (c) or (e) of this section and a portion of which may be subject to paragraph (d) or (f) of this section, the rules of this section apply by treating the portion of the dividend or dividends that may be subject to paragraph (c) or (e) of this section as if it occurred immediately before the portion of the dividend or dividends that may be subject to paragraph (d) or (f) of this section. For example, if a dividend arising under section 964(e)(4) occurs at the same time as a dividend that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) but for the potential application of paragraph (d) this section, then the tiered extraordinary disposition amount with respect to the other dividend is determined as if the dividend arising under section 964(e)(4) occurs immediately prior to the other dividend.

(5) *Ordering rule for multiple dividends made by an SFC or a CFC during a taxable year.* If an SFC or a CFC pays dividends on more than one

date during its taxable year or at different times on the same date, this section applies based on the order in which the dividends are paid.

(6) *Partner's distributive share of a domestic partnership's pro rata share of subpart F income.* If a section 245A shareholder or a U.S. tax resident is a direct or indirect partner in a domestic partnership that is a United States shareholder with respect to a CFC and includes in gross income its pro rata share of the CFC's subpart F income under section 951(a), then, solely for purposes of this section, a reference to the section 245A shareholder's or U.S. tax resident's pro rata share of the CFC's subpart F income included in gross income under section 951(a) includes such person's distributive share of the domestic partnership's pro rata share of the CFC's subpart F income. A person is an indirect partner with respect to a domestic partnership if the person indirectly owns the domestic partnership through one or more specified entities (other than a foreign corporation).

(h) *Anti-abuse rule.* The Commissioner may make appropriate adjustments to any amounts determined under this section if a transaction is engaged in with a principal purpose of avoiding the purposes of this section.

(i) *Definitions.* The following definitions apply for purposes of this section.

(1) *Controlled foreign corporation.* The term *controlled foreign corporation* (or *CFC*) has the meaning provided in section 957.

(2) *Controlling section 245A shareholder.* The term *controlling section 245A shareholder* means, with respect to a CFC, any section 245A shareholder that owns directly or indirectly more than 50 percent (by vote or value) of the stock of the CFC. For purposes of determining whether a section 245A shareholder is a controlling section 245A shareholder with respect to a CFC, all stock of the CFC owned by a related party with respect to the section 245A shareholder or by other persons acting in concert with the section 245A shareholder to undertake an extraordinary reduction is considered owned by the section 245A shareholder. If section 964(e)(4) applies to a sale or exchange of a lower-tier CFC with respect to a controlling section 245A shareholder, all United States shareholders of the CFC are considered to act in concert with regard to the sale or exchange. In addition, if all persons selling stock in a CFC, held directly, sell such stock to the same buyer or buyers (or a related party with respect to the buyer or buyers) as part of the same

- Add.112 -

plan, all sellers will be considered to act in concert with regard to the sale or exchange.

(3) *Disqualified amount.* The term *disqualified amount* has the meaning set forth in paragraph (d)(1) of this section.

(4) *Disqualified period.* The term *disqualified period* has the meaning set forth in paragraph (c)(3)(iii) of this section.

(5) *Extraordinary disposition.* The term *extraordinary disposition* has the meaning set forth in paragraph (c)(3)(ii) of this section.

(6) *Extraordinary disposition account.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(3)(i) of this section.

(7) *Extraordinary disposition amount.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(1) of this section.

(8) *Extraordinary disposition E&P.* The term *extraordinary disposition E&P* has the meaning set forth in paragraph (c)(3)(i)(C) of this section.

(9) *Extraordinary disposition ownership percentage.* The term extraordinary disposition ownership percentage has the meaning set forth in paragraph (c)(3)(i)(B) of this section.

(10) *Extraordinary reduction.* The term *extraordinary reduction* has the meaning set forth in paragraph (e)(2)(i)(A) of this section.

(11) *Extraordinary reduction amount.* The term *extraordinary reduction amount* has the meaning set forth in paragraph (e)(1) of this section.

(12) *Ineligible amount.* The term *ineligible amount* has the meaning set forth in paragraph (b)(2) of this section.

(13) *Lower-tier CFC.* The term *lower-tier CFC* means a CFC whose stock is owned (within the meaning of section 958(a)(2)), in whole or in part, by another CFC.

(14) *Non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* has the meaning set forth in paragraph (c)(2)(ii) of this section.

(15) *Pre-reduction pro rata share.* The term *pre-reduction pro rata share* has the meaning set forth in paragraph (e)(2)(ii) of this section.

(16) *Prior extraordinary disposition amount.* The term *prior extraordinary disposition amount* has the meaning set forth in paragraph (c)(3)(i)(D) of this section.

(17) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* has the meaning set forth in paragraph (e)(2)(ii)(C) of this section.

(18) *Qualified portion.* The term *qualified portion* has the meaning set forth in paragraph (c)(3)(i)(D)(*2*)(*i*) of this section.

(19) *Related party.* The term *related party* means, with respect to a person, another person bearing a relationship described in section 267(b) or 707(b) to the person, in which case such persons are *related.*

(20) *Section 245A deduction.* The term *section 245A deduction* means, with respect to a dividend received by a section 245A shareholder from an SFC, the amount of the deduction allowed to the section 245A shareholder by reason of the dividend.

(21) *Section 245A shareholder.* The term *section 245A shareholder* means a domestic corporation that is a United States shareholder with respect to an SFC that owns directly or indirectly stock of the SFC.

(22) *Specified 10-percent owned foreign corporation (SFC).* The term *specified 10-percent owned foreign corporation* (or *SFC*) has the meaning provided in section 245A(b)(1).

(23) *Specified entity.* The term *specified entity* has the meaning set forth in paragraph (g)(3)(iii) of this section.

(24) *Specified property.* The term *specified property* has the meaning set forth in paragraph (c)(3)(iv) of this section.

(25) *Tiered extraordinary disposition amount.* The term *tiered extraordinary disposition amount* has the meaning set forth in paragraph (d)(2)(i) of this section.

(26) *Tiered extraordinary reduction amount.* The term *tiered extraordinary reduction amount* has the meaning set forth in paragraph (f)(2) of this section.

(27) *United States shareholder.* The term *United States shareholder* has the meaning provided in section 951(b).

(28) *Upper-tier CFC.* The term *upper-tier CFC* means a CFC that owns (within the meaning of section 958(a)(2)) stock in another CFC.

(29) *U.S. tax resident.* The term *U.S. tax resident* means a United States person described in section 7701(a)(30)(A) or (C).

(j) *Examples.* The application of this section is illustrated by the examples in this paragraph (j).

(1) *Facts.* Except as otherwise stated, the following facts are assumed for purposes of the examples:

(i) US1 and US2 are domestic corporations, each with a calendar taxable year, and are not related parties with respect to each other.

(ii) CFC1 and CFC2 are foreign corporations that are SFCs and CFCs.

(iii) Each entity uses the U.S. dollar as its functional currency.

(iv) Year 2 begins on or after January 1, 2018, and has 365 days.

(v) Absent application of this section, the dividends received by US1 and US2

from CFC1 meet the requirements to qualify for the section 245A deduction.

(vi) The de minimis rules in paragraphs (c)(3)(ii)(E) and (e)(3)(ii) of this section do not apply.

(2) *Example 1. Extraordinary disposition*—(i) *Facts.* US1 and US2 own 60% and 40%, respectively, of the single class of stock of CFC1. CFC1 owns all of the single class of stock of CFC2. CFC1 and CFC2 use the taxable year ending November 30 as their taxable year. On November 1, 2018, CFC1 sells specified property to CFC2 in exchange for $200x of cash (the "Property Transfer"). The Property Transfer is outside of CFC1's ordinary course of activities. The transferred property has a basis of $100x in the hands of CFC1. CFC1 recognizes $100x of gain as a result of the Property Transfer ($200x − $100x). On December 1, 2018, CFC1 distributes $80x pro rata to US1 ($48x) and US2 ($32x), all of which is a dividend within the meaning of section 316 and treated as a distribution out of earnings described in section 959(c)(3). No other distributions are made by CFC1 to either US1 or US2 in CFC1's taxable year ending November 30, 2019. For its taxable year ending on November 30, 2019, CFC1 has $110x of earnings and profits described in section 959(c)(3), without regard to any distributions during the taxable year.

(ii) *Analysis*—(A) *Identification of extraordinary disposition.* Because CFC1 is a CFC and uses the taxable year ending on November 30, under paragraph (c)(3)(iii) of this section, it has a disqualified period beginning on January 1, 2018, and ending on November 30, 2018. In addition, under paragraph (c)(3)(ii) of this section, the Property Transfer is an extraordinary disposition because it (i) is a disposition of specified property by CFC1 on a date on which it was a CFC and during CFC1's disqualified period, (ii) is to CFC2, a related party with respect to CFC1, (iii) occurs outside of the ordinary course of CFC1's activities, and (iv) is not subject to the de minimis rule in paragraph (c)(3)(ii)(E) of this section.

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Because CFC1 undertook an extraordinary disposition, under paragraph (c)(3)(i) of this section, a portion of CFC1's earnings and profits are extraordinary disposition E&P and, therefore, give rise to an extraordinary disposition account with respect to each of CFC1's section 245A shareholders. Under paragraph (i)(21) of this section, US1 and US2 are both section 245A shareholders with respect to CFC1. The amount of the extraordinary disposition account with respect to US1 is $60x, which is equal to the product of the extraordinary disposition E&P (the amount of the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and the extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US1 on January 1, 2018 (60%)), reduced by the prior extraordinary disposition amount ($0). *See* paragraph (c)(3)(i) of this section. Similarly, the amount of the extraordinary disposition

account with respect to US2 is $40x, which is equal to the product of the extraordinary disposition E&P (the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US2 on January 1, 2018 (40%)), reduced by the prior extraordinary disposition amount ($0).

(C) *Determination of extraordinary disposition amount with respect to US1.* The dividend of $48x paid to US1 on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of the extraordinary disposition account with respect to US1. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US1, to the extent thereof. With respect to US1, $6x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $66x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 60%) over $60x (the balance of US1's extraordinary disposition account with respect to CFC1, immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $6x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US1. Under paragraph (c)(2)(i)(B) of this section, the remaining $42x of the dividend is next considered paid out of US1's extraordinary disposition account with respect to CFC1, to the extent thereof. Accordingly, $42x of the dividend is considered paid out of the extraordinary disposition account with respect to CFC1 and gives rise to $42x of an extraordinary disposition amount. As a result, US1's prior extraordinary disposition amount is increased by $42x under paragraph (c)(3)(i)(D) of this section, and US1's extraordinary disposition account is reduced to $18x ($60 − $42x) under paragraph (c)(3)(i)(A) of this section.

(D) *Determination of extraordinary disposition amount with respect to US2.* The dividend of $32x paid to US2, on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of extraordinary disposition E&P with respect to US2. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US2, to the extent thereof. With respect to US2, $4x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $44x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 40%) over $40x (the balance of US2's extraordinary disposition account with respect to CFC1, immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $4x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US2. Under paragraph (c)(2)(i)(B) of this section, the remaining $28x of the dividend is next considered paid out of US2's extraordinary disposition account with

respect to CFC1, to the extent thereof. Accordingly, $28x of the dividend is considered paid out of the extraordinary disposition account with respect to US2 and gives rise to $28x of an extraordinary disposition amount. As a result, US2's prior extraordinary disposition amount is increased by $28x under paragraph (c)(3)(i)(D) of this section, and US2's extraordinary disposition account is reduced to $12x ($40 − $28x) under paragraph (c)(3)(i)(A) of this section.

(E) *Determination of ineligible amount with respect to US1 and US2.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $48x, the ineligible amount is $21x, the sum of 50 percent of the extraordinary disposition amount ($42x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US1 of $48x, $27x is eligible for a section 245A deduction. With respect to US2 and the dividend of $32x, the ineligible amount is $14x, the sum of 50% of the extraordinary disposition amount ($28x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US2 of $32x, $18x is eligible for a section 245A deduction.

(3) *Example 2. Application of section 954(c)(6) exception with extraordinary disposition account*—(i) *Facts.* The facts are the same as in paragraph (j)(2)(i) of this section (the facts in *Example 1*) except that the Property Transfer is a sale by CFC2 to CFC1 instead of a sale by CFC1 to CFC2, the $80x distribution is by CFC2 to CFC1 in a separate transaction that is unrelated to the Property Transfer, and the description of the earnings and profits of CFC1 is applied to CFC2. Additionally, absent the application of this section, section 954(c)(6) would apply to the distribution by CFC2 to CFC1. Under section 951(a)(2) and § 1.951–1(b) and (e), US1's pro rata share of any subpart F income of CFC1 is 60% and US2's pro rata share of any subpart F income of CFC2 is 40%.

(ii) *Analysis*—(A) *Identification of extraordinary disposition.* The Property Transfer is an extraordinary disposition under the same analysis as provided in paragraph (j)(2)(ii)(A) of this section (the analysis in *Example 1*).

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Both US1 and US2 are section 245A shareholders with respect to CFC2, US1 has an extraordinary disposition account of $60x with respect to CFC2, and US2 has an extraordinary disposition account of $40x with respect to CFC2 under the same analysis as provided in paragraph (j)(2)(ii)(B) of this section (the analysis in *Example 1*).

(C) *Determination of tiered extraordinary disposition amount*—(1) *In general.* US1 and US2 each have a tiered extraordinary disposition amount with respect to the $80x dividend paid by CFC2 to CFC1 to the extent that US1 and US2 would have an extraordinary disposition amount if each had received as a dividend its pro rata share of the dividend from CFC2. *See* paragraph (d)(2)(i) of this section. Under paragraph (d)(2)(ii) of this section, US1's pro rata share of the dividend is $48x (60% − $80x), that is, the increase to US1's pro rata share of the dividend from CFC2. Under paragraph (d)(2)(ii) of this section, US2's pro rata share of the dividend is $32x (40% − $80x).

(2) *Determination of tiered extraordinary disposition amount with respect to US1.* The extraordinary disposition amount with respect to US1 is $42x, under the same analysis provided in paragraph (j)(2)(ii)(C) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US1 is $42x.

(3) *Determination of extraordinary disposition amount with respect to US2.* The extraordinary disposition amount with respect to US2 is $28x, under the same analysis provided in paragraph (j)(2)(ii)(D) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US2 is $28x.

(D) *Limitation of section 954(c)(6) exception.* The sum of US1 and US2's tiered extraordinary disposition amounts is $70x ($42x + $28x). The portion of the stock of CFC1 (by value) owned (within the meaning of section 958(a)) by U.S. tax residents on the last day of CFC1's taxable year is 100%. Under paragraph (d)(1) of this section, the disqualified amount with respect to the dividend is $35x (50% × ($70x/100%)). Accordingly, the portion of the $80x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $45x ($80x − $35x). Under section 951(a)(2) and § 1.951–1(b) and (e), US1 includes $21x (60% × $35x) and US2 includes $14x (60% × $35x) in income under section 951(a).

(E) *Changes in extraordinary disposition account of US1.* Under paragraph (c)(3)(i)(D)(1) of this section, US1's prior extraordinary disposition amount with respect to CFC2 is increased by $42x, or 200% of $21x, the amount US1 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(1)(iii) of this section, US1 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US1's extraordinary disposition account is reduced to $18x ($60x − $42x) under paragraph (c)(3)(i)(A) of this section.

(F) *Changes in extraordinary disposition account of US2.* Under paragraph (c)(3)(i)(D)(1) of this section, US2's prior extraordinary disposition amount with respect to CFC2 is increased by $28x, or 200% of $14x, the amount US2 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(1)(iii) of this section, US2 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US2's extraordinary disposition account is reduced to $12x ($40x − $28x) under paragraph (c)(3)(i)(A) of this section.

(4) *Example 3. Extraordinary reduction*—(i) *Facts.* At the beginning of CFC1's taxable

subpart F income if the dividend were included in CFC1's foreign personal holding company income, without regard to section 952(c) and the allocation of expenses. Similarly, US2's pro rata share of the dividend is $32x (40% − $80x).

(2) *Determination of tiered extraordinary disposition amount with respect to US1.* The extraordinary disposition amount with respect to US1 is $42x, under the same analysis provided in paragraph (j)(2)(ii)(C) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US1 is $42x.

year ending on December 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. Also as of the beginning of Year 2, CFC1 has no earnings and profits described in section 959(c)(1) or (2), and US1 does not have an extraordinary disposition account with respect to CFC1. As of the end of Year 2, CFC1 has $160x of tested income and no other income. CFC1 has $160x of earnings and profits for Year 2. On October 19, Year 2, US1 sells all of its CFC1 stock to US2 for $100x in a transaction (the ''Stock Sale'') in which US1 recognizes $90x of gain. Under section 1248(a), the entire $90x of gain is included in US1's gross income as a dividend and, pursuant to section 1248(j), the $90x is treated as a dividend for purposes of applying section 245A. At the end of Year 2, under section 951A, US2 takes into account $70x of tested income, calculated as $160x (100% of the $160x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $90x, the amount of dividends received by US1 with respect to the transferred stock, and $128x, the amount of tested income attributable to the transferred stock ($160x) multiplied by 292/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC1 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of this section, the entire $90x dividend to US1 is an extraordinary reduction amount with respect to US1 because the dividend is at least equal to US1's pre-reduction pro rata share of CFC1's Year 2 tested income described in paragraph (e)(2)(ii)(A) of this section ($160x), reduced by the amount of

tested income taken into account by US2, a U.S. tax resident, under paragraphs (e)(2)(ii)(B) and (i)(29) of this section ($70x).

(C) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $90x, the ineligible amount is $90x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($90x). Therefore, with respect to the dividend received of $90x, no portion is eligible for the dividends received deduction allowed under section 245A(a).

(iii) *Alternative facts—election to close CFC's taxable year.* The facts are the same as in paragraph (j)(4)(i) of this section (the facts of this *Example 3*), except that, pursuant to paragraph (e)(3)(i) of this section, US1 elects to close CFC1's Year 2 taxable year for all purposes of the Internal Revenue Code as of the end of October 19, Year 2, the date on which the Stock Sale occurs; in addition, US1 and US2 enter into a written, binding agreement that US1 will elect to close CFC1's Year 2 taxable year. Accordingly, under section 951A(a), US1 takes into account 100% of CFC1's tested income for the taxable year beginning January 1, Year 2, and ending October 19, Year 2, and US2 takes into account 100% of CFC1's tested income for the taxable year beginning October 20, Year 2, and ending December 31, Year 2. Under paragraph (e)(3)(i)(A) of this section, no amount is considered an extraordinary reduction amount with respect to US1.

(5) *Example 4. Extraordinary reduction; decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax residents*—(i) *Facts.* At the beginning of CFC1's taxable year ending December 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. CFC1 generates $120x of subpart F income during its taxable year ending on December 31, Year 2. On October 1, Year 2, CFC1 distributes a $120x dividend to US1. On October 19, Year 2, US1 sells 100% of its stock of CFC1 to PRS, a domestic partnership, in a transaction in which no gain or loss is realized (the ''Stock Sale''). PRS is owned 50% each by A, an individual who is a citizen of the United States, and B, a foreign individual who is not a U.S. tax resident. On December 1, Year 2, US2 and FP, a foreign corporation, contribute property to CFC1; in exchange, each of US2 and FP receives 25% of the stock of CFC1. PRS owns the remaining 50% of the stock of CFC1. US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owns on the first day of Year 2, and that amount is more than 5% of the total value of the

stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of Year 2 the percentage of stock (by value) that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the highest percentage of stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of pre-reduction pro rata share.* Before the extraordinary reduction, US1 owned 100% of the stock of CFC1. Thus, under paragraph (e)(2)(ii)(A) of this section, the tentative amount of US1's pre-reduction pro rata share of CFC1's subpart F income is $120x. A and US2 are U.S. tax residents pursuant to paragraph (i)(29) of this section because they are United States persons described in section 7701(a)(30)(A) or (C). Thus, US1's pre-reduction pro rata share amount is subject to the reduction described in paragraph (e)(2)(ii)(B) of this section because U.S. tax residents directly or indirectly acquire stock of CFC1 from US1 or CFC1 during the taxable year in which the extraordinary reduction occurs. With respect to US1's pre-reduction pro rata share of CFC1's subpart F income, the reduction equals the amount of subpart F income of CFC1 taken into account under section 951(a) by these U.S. tax residents.

(C) *Determination of decrease in pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* On December 31, Year 2, both PRS and US2 will be United States shareholders with respect to CFC1 and will include in gross income their pro rata share of CFC1's subpart F income under section 951(a). With respect to US2, this amount will be $30x, which is equal to 25% of CFC1's subpart F income for the taxable year. With respect to PRS, its pro rata share of $60x under section 951(a)(2)(A) (50% of $120x) will be reduced under section 951(a)(2)(B) by $48x. The section 951(a)(2)(B) reduction is equal to the lesser of the $120x dividend paid with respect to those shares to US1 or $48x (50% × $120x × 292/365, the period during the taxable year that PRS did not own CFC1 stock). Thus, PRS includes $12x in gross income pursuant to section 951(a). Of this amount, $6x is allocated to A (as a 50% partner of PRS) and, therefore, treated as taken into account by A under paragraphs (e)(2)(ii)(B) and (g)(6) of this section. Thus, A and US2 take into account a total of $36x of CFC1's subpart F income under section 951(a). This amount reduces US1's pre-reduction pro rata share of CFC1's subpart F income to $84x ($120x − $36x) under paragraph (e)(2)(ii)(B) of this section. CFC1 did not generate tested income during the taxable year and, therefore, no amount is taken into account under section 951A with respect to CFC1, and US1 has no pre-reduction pro rata share with respect to tested income of CFC1.

(D) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of

this section, the extraordinary reduction amount equals $84x, which is the lesser of the amount of the dividend received by US1 from CFC1 during Year 2 ($120x) and the sum of US1's pre-reduction pro rata share of CFC1's subpart F income ($84x) and tested income ($0).

(E) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $120x, the ineligible amount is $84x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($84x). Therefore, with respect to the dividend received by US1 from CFC1, $36x ($120x − $84x) is eligible for a section 245A deduction.

(6) *Example 5. Controlling section 245A shareholder*—(i) *Facts.* US1 and US2 own 30% and 25% of the stock of CFC1, respectively. FP, a foreign corporation that is not a CFC, owns all of the stock of US1 and US2. FP owns the remaining 45% of the stock of CFC1. On September 30, Year 2, US1 sells all of its stock of CFC1 to US3, a domestic corporation that is not a related party with respect to FP, US1, or US2. No person transferred any stock of CFC1 directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1.

(ii) *Analysis.* Under paragraph (i)(21) of this section, US1 is a section 245A shareholder with respect to CFC1, an SFC. Because US1 owns, together with US2 and FP (related persons with respect to US1), more than 50% of the stock of CFC1, US1 is a controlling section 245A shareholder of CFC1. The sale of US1's CFC1 stock results in an extraordinary reduction occurring with respect to US1's ownership of CFC1. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the stock of CFC1 that it owned at the beginning of the year and that amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC1 that US1 directly or indirectly owns (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 directly or indirectly owned on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (30%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and end of year percentage (30 percentage points) is at least 5 percentage points.

(7) *Example 6. Limitation of section 954(c)(6) exception with respect to an extraordinary reduction.* (i) *Facts.* At the beginning of CFC1 and CFC2's taxable year ending on December 31, Year 2, US1 and A, an individual who is a citizen of the United States, own 80% and 20% of the single class of stock of CFC1, respectively. CFC1 owns 100% of the stock of CFC2. Both US1 and A are United States shareholders with respect to CFC1 and CFC2, and US1 and A are not related parties with respect to each other. No person transferred CFC2 stock directly or indirectly in Year 2 pursuant to a plan to reduce the percentage of stock (by value) of

CFC2 owned by US1, and US1 does not have an extraordinary disposition account with respect to CFC2. At the end of Year 2, and without regard to any distributions during Year 2, CFC2 had $150x of tested income and no other income, and CFC1 had no income or expenses. On June 30, Year 2, CFC2 distributed $150x as a dividend to CFC1, which would qualify for the exception from foreign personal holding company income under section 954(c)(6) but for the application of this section. On August 7, Year 2, CFC1 sells all of its CFC2 stock to US2 for $100x in a transaction (the "Stock Sale") in which CFC1 realizes no gain or loss. At the end of Year 2, under section 951A, US2 takes into account $60x of tested income, calculated as $150x (100% of the $150x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $150x, the amount of dividends received by CFC1 during Year 2 with respect to the transferred stock, and $90x, the amount of tested income attributable to the transferred stock ($150x) multiplied by 219/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC2, but A is not. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC2. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred indirectly 100% of the CFC2 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC2 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC2 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC2 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC2 stock by value (80%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC2 stock owned by US1, and the difference between the initial percentage and the end of year percentage (80 percentage points) is at least 5 percentage points. Because there is an extraordinary reduction with respect to CFC2 in Year 2 and CFC1 received a dividend from CFC2 in Year 2, under paragraph (f)(1) of this section, it is necessary to determine the limitation on the amount of the dividend eligible for the exception under section 954(c)(6).

(B) *Determination of tiered extraordinary reduction amount.* The limitation on the amount of the dividend eligible for the exception under section 954(c)(6) is based on the tiered extraordinary reduction amount. The sum of the amount of subpart F income and tested income of CFC2 for Year 2 is $150x, and immediately before the

extraordinary reduction, CFC1 held 100% of the stock of CFC2. Additionally, US2 is a U.S. tax resident as defined in paragraph (i)(29) of this section because it is a United States person described in section 7701(a)(30)(A) or (C), and US2 has a pro rata share of $60x of tested income under section 951A with respect to CFC2. Accordingly, under paragraph (f)(2) of this section, the tiered extraordinary reduction amount is $90x (($150x × 100%) − $60x).

(C) *Limitation of section 954(c)(6) exception.* Under paragraph (f)(1) of this section, the portion of the $150x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $60x ($150x − $90x). To the extent that the $90x that does not qualify for the exception gives rise to additional subpart F income to CFC1, both US1 and A will take into account their pro rata share of that subpart F income under section 951(a)(2) and § 1.951–1(b) and (e).

(k) *Applicability date.* This section applies to distributions occurring after December 31, 2017.

(l) *Expiration date.* The applicability of this section expires June 14, 2022.

■ **Par. 3.** Section 1.954(c)(6)–1T is added to read as follows:

### § 1.954(c)(6)–1T Certain cases in which section 954(c)(6) exception not available (temporary).

(a) *Cross-references to other rules.* For a non-exclusive list of rules that limit the applicability of the exception to foreign personal holding company income under section 954(c)(6), see—

(1) Section 1.245A–5T(d) (rules regarding the application of section 954(c)(6) to extraordinary disposition amounts);

(2) Section 1.245A–5T(f) (rules regarding the application of section 954(c)(6) to tiered extraordinary reduction amounts);

(3) Section 1.245A(e)–1(c) (rules regarding tiered hybrid dividends);

(4) Section 1.367(b)–4(e)(4) (rules regarding income inclusion and gain recognition in certain exchanges following an inversion transaction);

(5) Section 964(e)(4)(A) (rules regarding certain gain from the sale or exchange of stock that is recharacterized as a dividend); and

(6) Section 1.7701(l)–4(e) (rules regarding recharacterization of certain transactions following an inversion transaction).

(b) *Applicability date.* This section applies on or after June 14, 2019.

(c) *Expiration date.* The applicability of this section expires June 14, 2022.

■ **Par. 4.** Section 1.6038–2T is added to read as follows:

**28424**    **Federal Register** / Vol. 84, No. 117 / Tuesday, June 18, 2019 / Rules and Regulations

**§ 1.6038–2T   Information returns required of United States persons with respect to annual accounting periods of certain foreign corporations beginning after December 31, 1962 (temporary).**

(a) through (e) [Reserved].

(f)(1) through (15) [Reserved].

(16) *Dividends for which section 245A deduction or section 954(c)(6) exception is limited*—(i) *General rule.* If for the annual accounting period, the corporation distributes or receives a dividend that gives rise to an ineligible amount (as defined in § 1.245A–5T((i)(12)), a tiered extraordinary disposition amount (as defined in § 1.245A–5T(i)(25)), or a tiered extraordinary reduction amount (as defined in § 1.245A–5T(i)(26)), then Form 5471 (or a successor form) must contain such information about the ineligible amount, tiered extraordinary disposition amount, or tiered extraordinary reduction amount, as applicable, in the form and manner and to the extent prescribed by the form, instructions to the form, publication, or other guidance published in the Internal Revenue Bulletin.

(ii) *Transition rule.* If the corporation (or predecessor corporation) distributed or received a dividend that gave rise to an ineligible amount, a tiered extraordinary disposition amount, or a tiered extraordinary reduction amount in an annual accounting period for which the Form 5471 (or successor form) has been filed before the date of publication of these Temporary regulations, the corporation must provide the information described in paragraph (f)(16)(i) of this section on the first Form 5471 (or successor form) filed by the corporation after the issuance of guidance setting forth the form and manner of reporting such information.

(g) through (l) [Reserved].

(m)(1) [Reserved].

(2) *Special rule for paragraph (f)(16).* Paragraph (f)(16) of this section applies with respect to information for annual accounting periods in which a dividend subject to § 1.245A–5T is paid.

(n) *Expiration date.* The applicability of paragraphs (f)(16) and (m) of this section expires June 14, 2022.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: June 4, 2019.

**David J. Kautter,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2019–12442 Filed 6–14–19; 4:15 pm]

**BILLING CODE 4830–01–P**