No. 23-1410

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

LIBERTY GLOBAL, INC.,
*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee*.

---

On Appeal from the United States District Court for the
District of Colorado, No. 1:20-cv-03501-RBJ (Jackson, J.)

---

**BRIEF FOR THE CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA AND THE AMERICAN FUEL &
PETROCHEMICAL MANUFACTURERS AS *AMICI CURIAE* IN
SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

---

Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1800 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 457-0480

Lauren Willard Zehmer
  *Counsel of Record*
Kevin Otero
Jesse Boretsky
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

May 7, 2024

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ................................................................................. 5

I.  The Economic Substance Doctrine's History and Purpose Support a Narrow Application. ....................................................................... 5

    A.  The economic substance doctrine evolved with implicit safeguards preventing its application in unintended circumstances. ....................................................................... 5

    B.  These safeguards ensure that Congress, and not the IRS, retains the legislative pen with respect to federal tax matters. ....................... 7

II.  The Codified Economic Substance Doctrine Requires a Threshold Relevance Inquiry, Which Would Exclude from Its Parameters Basic Business Transactions and Tax Consequences Intended by Congress. ......... 9

    A.  The district court's interpretation of the statutory language of section 7701(o)(1) violates the presumption against surplusage and conflicts with section 7701(o)(5)(C). ......................................... 11

    B.  The relevance requirement effectuates Congress' intent to carve out basic business transactions from Section 7701(o). ...................... 13

    C.  The district court's expansion of the economic substance doctrine will deter Congressionally intended tax incentives and investments. ....................................................................... 18

III.  Adopting the District Court's Reasoning Will Inject Significant Uncertainty into the Federal Tax Laws, Increasing Costs to Businesses, Consumers, and the Economy.................................... 21

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE ........................................................................ 25

CERTIFICATE OF DIGITAL SUBMISSION ...................................................... 26

CERTIFICATE OF SERVICE ................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altria Grp., Inc. v. United States*,
  658 F.3d 276 (2d Cir. 2011) ...............................................20

*Altria Grp., Inc. v. United States*,
  694 F. Supp. 2d 259 (S.D.N.Y. 2010) .............................20

*Bryant v. Comm'r*,
  928 F.2d 745 (6th Cir. 1991) .................................................6

*Chapman v. Comm'r*,
  618 F.2d 856 (1st Cir. 1980).............................................21

*Cottage Sav. Ass'n v. Comm'r*,
  499 U.S. 554 (1991).........................................................16

*Dover Corp. v. Comm'r*,
  122 T.C. 324 (2004)........................................................15

*Gitlitz v. Comm'r*,
  531 U.S. 206 (2001)....................................................8, 19

*Gregory v. Helvering*,
  293 U.S. 465 (1935)......................................................5, 6

*Hanover Bank v. Comm'r*,
  369 U.S. 672 (1962)................................................8, 19, 20

*Horn v. Comm'r*,
  968 F.2d 1229 (D.C. Cir. 1992).............................................7

*Liberty Glob., Inc. v. United States*,
  2022 WL 1001568 (D. Colo. Apr. 4, 2022) ...........................9

*Liberty Glob., Inc. v. United States*,
  2023 WL 8062792 (D. Colo. Oct. 31, 2023)..................4, 12

*Marx v. Gen. Rev. Corp.*,
   568 U.S. 371 (2013) ...................................................................... 12

*New Mexico v. Dep't of the Interior*,
   854 F.3d 1207 (10th Cir. 2017) .................................................... 20

*Phillips Petroleum Co. v. Lujan*,
   4 F.3d 858 (10th Cir. 1993) .......................................................... 20

*Reinberg v. Comm'r*,
   90 T.C. 116 (1988) ......................................................................... 7

*Sacks v. Comm'r*,
   64 T.C.M. (CCH) 1003 (1992) ..................................................... 19

*Sacks v. Comm'r*,
   69 F.3d 982 (9th Cir. 1995) ......................................................... 19

*Sidell v. Comm'r*,
   225 F.3d 103 (1st Cir. 2000) ........................................................ 21

*Siegel v. Comm'r*,
   45 T.C. 566 (1966) ......................................................................... 6

*Summa Hldgs., Inc. v. Comm'r*,
   848 F.3d 779 (6th Cir. 2017) ....................................................... 15

*Trinova Corp. v. Mich. Dep't of Treasury*,
   498 U.S. 358 (1991) ...................................................................... 19

*United States v. Cumberland Pub. Serv. Co.*,
   338 U.S. 451 (1950) ........................................................................ 7

*United States v. Generes*,
   405 U.S. 93 (1972) ........................................................................ 21

*United States v. Menasche*,
   348 U.S. 528 (1955) ...................................................................... 11

*Williams v. Taylor*,
   529 U.S. 362 (2000) ...................................................................... 11

**Statutes**

26 U.S.C. §

    6662(b)(6) ...........................................................................................10
    6662(i) .................................................................................................10
    7701(o) ..................................................................................................3
    7701(o)(1) .....................................................................................3, 9, 11
    7701(o) ............................................................................................3, 11

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 ....................................................9

**Regulations**

26 C.F.R. § 1.338-3 ...............................................................................17

26 C.F.R. § 301.7701-3 (2000) .............................................................15

**Other Authorities**

H.R. Rep. No. 111–443 (2010) ...........................................3, 12, 13, 14, 19

I.R.S. Field Service Advice 200122007 (Feb. 13, 2001).........................17

I.R.S. LB&I-04-0422-0014, *Interim Guidance Memorandum on
    Economic Substance Doctrine and Related Penalties* (Apr. 22, 2022)..............22

I.R.S. Notice 2014–58, 2014–44 I.R.B. 746 (Oct. 10, 2014) ..................12

Myron Scholes et al., *Taxes and Business Strategy: A Planning
    Approach* (4th ed. 2008) .......................................................................17

Jodi J. Schwartz, *Economic-Substance Doctrine and Subchapter C:
    What, Me Worry?*, 89 Taxes 113 (2011) .........................................10, 14

Staff of J. Comm. on Tax'n, JCX-18-10, *Technical Explanation of the
    Revenue Provisions of the Reconciliation Act of 2010, as Amended,
    in Combination with the Patient Protection and Affordable Care Act*
    (Mar. 21, 2010) ......................................................................13, 14, 18

# INTEREST OF *AMICI CURIAE* [1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, such as this one, that raise issues of concern to the business community.

The American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association whose members comprise virtually all U.S. refining and petrochemical manufacturing capacity. AFPM's members supply consumers with a wide variety of products that are used daily in homes and businesses. AFPM members help meet the fuel and petrochemical needs of the nation, strengthen economic and national security, and support nearly three million American jobs. Among its other missions, AFPM engages in legal advocacy on issues important to its members.

---

[1] All parties have consented in writing to the filing of this brief. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

*Amici*'s members depend on predictable and certain application of tax laws to plan their business operations in both the short and long terms. In this case, the district court adopted an interpretation of the codified economic substance doctrine that, contrary to the statutory text and legislative history, would excessively broaden the doctrine's scope and upend reliance on a raft of otherwise routine business transactions. This ruling creates uncertainty and confusion for companies' ordinary business planning and risks chilling bona fide investments and transactions that Congress seeks to encourage through the tax laws.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The economic substance doctrine has been employed by courts, in limited circumstances, to deny a taxpayer tax benefits provided under the plain text of the Internal Revenue Code of 1986, as amended (the "Code")[2] and its associated regulations on the grounds that a transaction lacked non-tax economic consequences. Absent appropriate safeguards, application of the economic substance doctrine could have caused the operation of the federal tax laws to be wholly uncertain and unpredictable. The courts, however, narrowed the contexts in which the doctrine was applied and thereby avoided such wholesale uncertainty. In so doing, the courts prevented an overly aggressive application of the doctrine by the Internal Revenue Service (the "IRS").

---

[2]    Unless otherwise indicated, all section references are to the Code.

In 2010, Congress codified the economic substance doctrine as section 7701(o) of the Code.  26 U.S.C. § 7701(o).  Congress adopted the limited application of the doctrine developed by the courts before its codification.  Specifically, Congress required a threshold "relevance" inquiry before the doctrine could be applied.  Section 7701(o) applies only "[i]n the case of any transaction to which the economic substance doctrine is *relevant*."  26 U.S.C. § 7701(o)(1) (emphasis added).  The existence of this relevancy requirement is further reinforced by section 7701(o)(5)(C), which clarifies that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted."  26 U.S.C. § 7701(o)(5)(C).

Congressional intent to limit the application of section 7701(o) to only a subset of "relevant" transactions is also evident in the legislative history.  For example, Congress specified that section 7701(o) should not be applied to deny the tax consequences flowing from basic business transactions or those tax consequences specifically intended by Congress.  *See* H.R. Rep. No. 111-443, pt. 1, at 296 (2010).

Through caselaw and codification, the courts and Congress have confirmed that the economic substance doctrine should be used only in a narrow category of cases, lest it undermine entirely any certainty and predictability in the Code.  The district court below, however, drastically expanded the scope of the doctrine by

effectively treating the section 7701(o) relevance requirement as surplusage through a flawed and circular interpretation that the doctrine "applies when a transaction lacks economic substance." *Liberty Glob., Inc. v. United States*, 2023 WL 8062792, at *9 (D. Colo. Oct. 31, 2023). By doing so, the district court dismantled this essential guardrail of the economic substance doctrine.

Affirming the district court's interpretation of the relevance requirement would have a chilling impact for American businesses, which depend on clear and predictable tax rules to plan their affairs. If the doctrine may be applied without regard to the carefully prescribed judicial and Congressional limitations, the tax consequences of any transaction become unpredictable, making it more difficult for companies to decide how to deploy their resources or make business decisions. The district court's interpretation is particularly damaging because it creates new potential tax consequences for large categories of otherwise routine and uncontroversial transactions that have long been beyond the scope of the economic substance doctrine, and which Congress explicitly intended to exclude from the doctrine's reach.

This Court should reject the district court's overly expansive interpretation of the relevance requirement to avoid an inappropriate expansion of the doctrine that was rejected by Congress and would impose significant costs on American businesses, their customers, and the wider economy.

**ARGUMENT**

## I.     The Economic Substance Doctrine's History and Purpose Support a Narrow Application.

### A.     The economic substance doctrine evolved with implicit safeguards preventing its application in unintended circumstances.

The economic substance doctrine is a judicially developed tool under which the federal income tax consequences of a transaction flowing from a literal application of the Code and its associated regulations may be altered for transactions that lack any economic substance apart from perceived tax benefits. The doctrine applied, in limited circumstances, as a narrow exception to the general rule that taxpayers are free to structure their transactions as they see fit to minimize taxes, as well as the principle that the federal tax laws should consist of clear, unambiguous and mechanical rules to allow taxpayers to have settled expectations as to outcomes. Because the doctrine operates after a transaction has occurred and can upset a taxpayer's settled expectations and reliance on the plain language of the Code, courts have applied it only in narrow circumstances and subject to clear limitations. For example, courts have declined to apply the economic substance doctrine where Congress intended the particular tax benefit at issue and where longstanding judicial and administrative practice allows certain basic transactional choices to be made principally for tax saving reasons.

The doctrine's contours trace their origin to the Supreme Court's seminal holding in *Gregory v. Helvering*, 293 U.S. 465 (1935), where for income tax

purposes the Court disregarded a transaction styled as a corporate reorganization when the transaction had "no business or corporate purpose" other than to disguise the payment of a taxable dividend as a tax-free reorganization. *Id.* at 469. Over time, the courts applied the doctrine in specific and limited circumstances, recognizing that, as the Sixth Circuit has explained, the question of whether a transaction has economic substance is a "threshold issue designed to winnow out the most abusive tax shelters." *Bryant v. Comm'r*, 928 F.2d 745, 749 (6th Cir. 1991). Courts also developed various prefatory limitations to the doctrine's application.

First, the courts refrained from applying the doctrine to basic business transactions, where the form of the transactions was consistent with the underlying substance. Thus, for example, in *Siegel v. Commissioner*, 45 T.C. 566 (1966), the Tax Court respected the separate existence of a bona fide foreign corporation even though tax considerations were taken into account when organizing the corporation as a foreign rather than domestic corporation. *Id.* at 577. The court noted that "the Code . . . permitted that result, and petitioner was free to take advantage of it. The question [of whether to respect the corporate form] . . . is not to be clouded by the use of a foreign corporation, rather than a domestic corporation, to escape U.S. taxation . . . ." *Id.* at 576.

Second, the courts refrained from applying the doctrine where the tax consequences at issue were intended by Congress. This principle is clearly

6

articulated in *Horn v. Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992), where the court stated that "Congress undoubtedly has the power to grant beneficial tax treatment to economically meaningless behavior . . . ." *Id.* at 1234. *See also United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950) (holding that even a "major motive" to reduce taxes will not vitiate a sale made "following a genuine liquidation and dissolution" where Congress has deliberately chosen to "impose[] no tax on liquidating distributions in kind or on dissolution, whatever may be the motive for such liquidation."); *Reinberg v. Comm'r*, 90 T.C. 116, 134 (1988) ("[W]e should not disregard the existence of an asset for which Congress intended tax advantages merely because the parties attempted to maximize the advantage of those benefits . . . . In instances where there are no shams and depreciable assets exist, some person or entity is entitled to the intended tax advantages.").

### B. These safeguards ensure that Congress, and not the IRS, retains the legislative pen with respect to federal tax matters.

The application of the economic substance doctrine can result in overriding express statutory or regulatory language in favor of an after-the-fact redetermination of tax consequences. But the doctrine is not a prophylactic measure to deny tax benefits merely because the efficacy or advisability of such consequences may be later questioned from a tax policy perspective. In the words of the *Horn* court, the economic substance doctrine is merely a "judicial device[] for divining and effectuating congressional intent, not for supplanting it." *Horn*, 968 F.2d at 1234.

Further, the economic substance doctrine is *not* a vehicle allowing the IRS or the courts to correct perceived flaws or "loopholes" in the tax law. Such an approach would infringe on the proper role of the legislative branch in drafting, enacting and amending federal tax legislation, and courts have correctly rejected such entreaties on this basis. *See Hanover Bank v. Comm'r*, 369 U.S. 672, 688 (1962) ("[T]he Government now urges this Court to do what the legislative branch of the Government failed to do or elected not to do. This, of course, is not within our province."); *Gitlitz v. Comm'r*, 531 U.S. 206, 220 (2001) ("Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern."). Thus, although the IRS (and a reviewing court) may disagree with the results of a transaction or question the tax policy of providing tax benefits to such results, that itself does not provide sufficient basis for invoking the economic substance doctrine.

This case illustrates the consequences of such a flawed approach. An earlier stage of this litigation concerned a dispute over the validity of the temporary regulations promulgated by the Treasury Department under section 245A (the "Temporary Regulations"). In those regulations, the Treasury Department would have changed the effective date of one of the statutes at issue to retroactively address what it perceived to be a legislative mismatch that led to the very tax consequences at issue in the case. The district court invalidated the Temporary Regulations

8

because they violated the Administrative Procedure Act's notice and comment requirements. *Liberty Glob., Inc. v. United States*, 2022 WL 1001568, at *14 (D. Colo. Apr. 4, 2022). Having lost the ability to achieve its goal administratively, the IRS turned to seek the same result in the courts under the economic substance doctrine. But the doctrine does not provide the IRS (and the courts) a backdoor tool to correct perceived legislative errors or to retroactively effectuate a different tax policy objective.

## II.   The Codified Economic Substance Doctrine Requires a Threshold Relevance Inquiry, Which Would Exclude from Its Parameters Basic Business Transactions and Tax Consequences Intended by Congress.

In 2010, to help clarify and encourage uniform application of the economic substance doctrine, Congress codified the doctrine in section 7701(o). Section 7701(o) provides that, for any transaction where the economic substance doctrine is relevant, such transaction is treated as having economic substance only if: (i) it "changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position[;]" and (ii) the taxpayer has a "substantial purpose (apart from Federal income tax effects) for entering into [the] transaction." 26 U.S.C. § 7701(o)(1).

This codified doctrine was made effective for "transactions entered into after the date of enactment [of section 7701(o)]," which was March 30, 2010. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409(e)(1),

124 Stat. 1029, 1070. Also relevant, in conjunction with the codification of the economic substance doctrine, Congress created a new strict liability penalty for transactions lacking economic substance, which imposes a 20% penalty on any underpayment attributable to a failure to satisfy the economic substance doctrine. 26 U.S.C. § 6662(b)(6). That penalty is increased to 40% if the transaction is not adequately disclosed on the tax return. 26 U.S.C. § 6662(i). Because of these punitive penalties, it is particularly important to properly apply the relevance screen to narrow the scope of the doctrine's application in a manner consistent with the intent of Congress.

As explained above, the pre-codification history of the economic substance doctrine implicitly incorporated a relevance inquiry by excluding basic business transactions and transactions intended to receive tax benefits by Congress, even if the courts did not formally discuss "relevance" pre-codification. Rather, "[b]efore codification, the courts . . . never had to decide specifically whether economic substance [wa]s 'relevant;'" they simply applied the doctrine, or declined to do so. Jodi J. Schwartz, *Economic-Substance Doctrine and Subchapter C: What, Me Worry?*, 89 Taxes 113, 125 (2011). Both the statute and its accompanying legislative history, however, make the pre-codification implicit relevance requirement explicit, which cannot be overridden by extra-textual policy considerations.

10

**A.    The district court's interpretation of the statutory language of section 7701(o)(1) violates the presumption against surplusage and conflicts with section 7701(o)(5)(C).**

Section 7701(o)(1) requires applying the economic substance doctrine "[i]n the case of any transaction *to which the economic substance doctrine is relevant*." 26 U.S.C. § 7701(o)(1) (emphasis added).    Additionally, section 7701(o)(5)(C) further provides that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." 26 U.S.C. § 7701(o)(5)(C).

Together, the text and structure of these provisions clearly establish that Congress mandated that courts apply a threshold relevance inquiry before they may apply the economic substance doctrine.    Indeed, by limiting the application of the economic substance doctrine to those provisions to which it is relevant, it is axiomatic that there must be some categories of transactions to which it is *not* relevant.    Any other result renders the use of the term "relevance" mere surplusage. It is "a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (internal quotation marks omitted)).    This canon is "strongest" when, as is the case here with section 7701(o)(5)(C), an interpretation would "render superfluous another

part of the same statutory scheme." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013).

Ironically, despite the plain meaning of sections 7701(o)(1) and 7701(o)(5)(C), the district court enunciated a novel and concededly tautological rule that the economic substance doctrine "applies when a transaction lacks economic substance," which the court in that same sentence acknowledged was "at risk of tautology" (yet nonetheless adopted this interpretation of the statute). *Liberty Glob.*, 2023 WL 8062792, at *9. The logical incoherence of the district court's framework is further evidence that its flawed interpretation of the relevance requirement should be reversed.

By its terms and context, the determination of relevance should be made in light of the pre-codification caselaw discussed above. Although this is clear from the statutory text, the legislative history also draws a tight link between the requirement and the pre-codification caselaw. In particular, the House Committee Report ("House Report") accompanying the bill contains several explicit statements about Congress's intent in enacting the relevance requirement. *See generally* H.R. Rep. No. 111-443.[3] As to the language of section 7701(o)(5)(C), the House Report states: "the provision does not change current law standards in determining *when* to

---

[3]    *See* I.R.S. Notice 2014–58, 2014–44 I.R.B. 746 (Oct. 10, 2014) (citing the House Report as legislative history).

utilize an economic substance analysis." *Id.* at 295–96 (emphasis added).  Moreover, as detailed below, the report states specifically that, consistent with pre-codification caselaw, the doctrine should not be applied to basic business transactions or to disallow Congressionally intended tax benefits, both categories important to this case.

**B.    The relevance requirement effectuates Congress' intent to carve out basic business transactions from Section 7701(o).**

The legislative history of section 7701(o) makes clear that its enactment was not intended to change the tax treatment of basic business transactions.  As the House Report noted:

> The provision is not intended to alter the tax treatment of certain basic business transactions that, under longstanding judicial and administrative practice are respected, merely because the choice between meaningful economic alternatives is largely or entirely based on comparative tax advantages. Among these basic transactions are (1) the choice between capitalizing a business enterprise with debt or equity; (2) a U.S. person's choice between utilizing a foreign corporation or a domestic corporation to make a foreign investment; (3) the choice to enter a transaction or series of transactions that constitute a corporate organization or reorganization under subchapter C; and (4) the choice to utilize a related-party entity in a transaction, provided that the arm's length standard of section 482 and other applicable concepts are satisfied.

H.R. Rep. No. 111-443, pt. 1, at 296 (footnotes omitted); *see also* Staff of J. Comm. on Tax'n, JCX-18-10, *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act"* 152–53 (Mar. 21, 2010).   The legislative

history also states that the foregoing examples are "illustrative and not exclusive." H.R. Rep. No.111-443, pt. 1, at 296 n.125; *see also* JCX-18-10, *supra*, at 152 n.345.

The need for Congress to exclude a broad category of basic business transactions from the purview of section 7701(o)—beyond the non-exclusive list the House Report provided—is perhaps obvious, but it is worth considering other contexts to gain an appreciation for the disruptive implications of failing to adopt a broad exclusion.  In each case discussed below, the decision whether to undertake the transaction, and/or the form and manner for the transaction, is inherently tax motivated.  As the prominent tax attorney Jodi Schwartz noted, certain tax elections and similar measures are "inherently tax-motivated and exclusively provide tax benefits."  *See* Schwartz, *supra*, at 142.  Allowing for a section 7701(o) challenge to these events would leave the tax consequences entirely to the enforcement discretion of the IRS, creating uncertainty and interfering with ordinary course business planning.

First, the effective deletion of the relevance requirement would cast doubt on the cornerstone principle that, in selecting the legal form of a business enterprise, taxpayers are free to be guided by considerations of maximizing tax efficiency.  The Code imposes different obligations on businesses and their owners depending on which legal form they choose.  For example, if a business is organized as a corporation under state law and taxed as a subchapter C corporation, the Code

generally imposes two layers of tax: one on the net income of the corporation, and a second when the corporate profits are distributed to shareholders. By contrast, if a business is organized as a partnership or elects to be taxed as a subchapter S corporation, the Code generally imposes only one layer of tax (*i.e.*, at the owner level). The district court's opinion risks subjecting these standard entity form decisions to the scrutiny of the economic substance doctrine and enforcement discretion of the IRS.

Second, related to this principle, domestic and foreign entities are in many instances free to choose their federal tax status under the elective "check-the-box" classification system. The check-the-box regime, by design, only affects an entity's tax treatment and has no other legal or commercial consequences. That is, the check-the-box rules give taxpayers a choice in how they are taxed only and thus are "all form and no substance." *Summa Hldgs., Inc. v. Comm'r,* 848 F.3d 779, 786 (6th Cir. 2017). Moreover, they expressly allow elective changes in classification, although such changes can once again only serve a tax-reduction purpose. *See* 26 C.F.R. § 301.7701-3(c)(1)(i), (g)(1)(ii) (2000); *see also Dover Corp. v. Comm'r*, 122 T.C. 324 (2004) (respecting the consequences of a tax-motivated check-the-box entity classification change). A check-the-box election cannot "change[] in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position," as required by section 7701(o)(1)(A). Thus, section 7701(o) should not

be relevant to determining whether such an election has been made and the consequences flowing therefrom.

Third, the district court's interpretation of the relevance requirement would threaten foundational principles of the Code, such as the right of taxpayers to dispose of property to recognize losses or to accelerate a built-in gain to use existing losses. In its most recent consideration of the economic substance doctrine, the Supreme Court held in *Cottage Savings Association v. Commissioner*, 499 U.S. 554 (1991), that a taxpayer was entitled to claim a deduction for a loss resulting from the exchange of property for similar property in a transaction which admittedly had no purpose other than tax savings, but which the Court found had produced an actual economic loss. *Id.* at 566. Addressing the meaning of "sale or other disposition" for purposes of section 1001, the Supreme Court emphasized that the principles of administrative convenience embodied in section 1001 require a "straightforward" test which does not turn on the taxpayer's subjective motives. *Id.* at 559. Thus, the relevance requirement is essential to ensuring that economic substance scrutiny does not upend the fundamental principle that a tax-reduction purpose for the recognition of losses is neither invalid nor improper.

Lastly, the district court's erasure of the relevance requirement would undermine Congress's choice to permit taxpayers to take advantage of elections under section 338, especially in the context of an acquisition by a non-corporate

purchaser.  Section 338 elections generally allow for the recharacterization of stock purchases as asset purchases for federal tax purposes, without the practical and legal complexity of acquiring assets.  The election is available only where the purchaser is a corporation.  Where the purchaser would otherwise not be a corporation, the non-corporate purchaser would, in the ordinary course, add an additional step to the acquisition by incorporating and capitalizing a wholly owned subsidiary and causing it to acquire the stock of the target entity.  The availability of the election in this context has long been accepted.  *See* I.R.S. Field Service Advice 200122007 (Feb. 13, 2001); *see also* 26 C.F.R. § 1.338-3(b)(1).  This reduces inefficiencies otherwise produced by the tax system and allows the parties to share the tax benefits associated with an asset purchase.  *See* Myron Scholes et al., *Taxes and Business Strategy: A Planning Approach*, 522 (4th ed. 2008) ("As a result of the tax benefits from the basis step-up, the acquirer should be willing to pay a higher purchase price if the Section 338(h)(10) election is made.").

The House Report demonstrates Congress's intent that basic business transactions be excluded from the application of section 7701(o).  And rather than list a series of exemptions, Congress effectuated its intent to carve out basic business transactions from the economic substance doctrine through the threshold relevancy requirement.  Here, the district court sought to "have its cake and eat it too" by recognizing the exclusion of a narrow category of basic business transactions while

17

simultaneously concluding that there is no independent relevance determination required by the statute.  It is simply impossible to reconcile the district court's internally contradictory attempt to preserve the basic business transactions exception while removing the operative clause from the statute that effectuates it.

### C. The district court's expansion of the economic substance doctrine will deter Congressionally intended tax incentives and investments.

The Joint Committee on Taxation, in its report on the statutory enactment of section 7701(o), explains "[i]f the realization of the tax benefits is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such benefits be disallowed."  JCX-18-10, *supra*, at 152 n.344.  The district court's interpretation of Section 7701(o) is irreconcilable with this position.

Congress's application of this broad principle is perhaps most clear in its enactment of tax incentives to specifically encourage taxpayer investment in activities that would not be undertaken in the absence of such incentives.  As noted by the Joint Committee, "it is not intended" that certain tax credits be disallowed in a transaction "pursuant to which, in form and substance, a taxpayer makes the type of investment or undertakes the type of activity that the credit was intended to encourage."  *Id*.  The same footnote then provides a few examples for illustration: section 42 (low-income housing credit), section 45 (renewable energy and refined

18

coal production tax credit), section 45D (new markets tax credit), section 47 (rehabilitation credit), and section 48 (renewable energy credit).

The report is consistent with a long line of caselaw through which the courts have accepted Congress's balancing of considerations in enacting incentives, without the court substituting its own determination of their efficacy. *See Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 385 (1991) ("It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing State."); *Sacks v. Comm'r*, 69 F.3d 982, 991 (9th Cir. 1995) ("Absence of pre-tax profitability does not show 'whether the transaction had economic substance beyond the creation of tax benefits,' where Congress has purposely used tax incentives to change investors' conduct." (citation omitted)), *rev'g*, 64 T.C.M. (CCH) 1003 (1992).

And this underlying principle extends from credits and incentives to Congress's codification of the economic substance doctrine. As articulated in the House Report, "[i]f the tax benefits are clearly consistent with all applicable provisions of the Code and the purposes of such provisions, it is not intended that such tax benefits be disallowed if the only reason for such disallowance is that the transaction fails the economic substance doctrine as defined in this provision." H.R. Rep. No. 111-443, pt. 1, at 296 n.124. This broad statement is also consistent with pre-codification caselaw. *See Hanover Bank*, 369 U.S. at 688; *Gitlitz*, 531 U.S. at

220; *see also*, *Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 284 (S.D.N.Y. 2010) ("[T]he economic substance doctrine simply has no application if it is clear that a claimed deduction is within the intent of a provision of the Code."), *aff'd*, 658 F.3d 276 (2d Cir. 2011). This is also consistent with the principle that Congressional intent is best ascertained by a clear application of the statutory text. *See New Mexico v. Dep't of the Interior*, 854 F.3d 1207, 1227 (10th Cir. 2017) ("The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete." (quoting *Phillips Petroleum Co. v. Lujan,* 4 F.3d 858, 861 (10th Cir. 1993))). As such, tax consequences that are clear and clearly intended should be available to taxpayers without the threat of an indiscriminate application of section 7701(o).

Rather than a list of tax incentives or intended tax consequences, the statute effectuates this goal by requiring an initial determination that the economic substance doctrine is relevant. The district court's reasoning undermines this critical narrowing step, and thereby casts doubt on taxpayers' ability to receive the benefits of congressionally designed incentives. Equally important, the district court's approach would more broadly allow the IRS and the courts to seize the legislative pen by sidestepping a safeguard intended to prevent the economic substance doctrine from being used as a prophylactic measure to strong arm otherwise clear statutory provisions.

20

**III.    Adopting the District Court's Reasoning Will Inject Significant Uncertainty into the Federal Tax Laws, Increasing Costs to Businesses, Consumers, and the Economy.**

The Supreme Court and the courts of appeals have long recognized the need for certainty in applying the tax laws.  "[I]n tax law," the Supreme Court has emphasized, "certainty is desirable."  *United States v. Generes*, 405 U.S. 93, 105 (1972).  Tax law is an "intricate web" that "demands clear rules so that it may be administered with as little uncertainty as possible." *Sidell v. Comm'r*, 225 F.3d 103, 111 (1st Cir. 2000).  Indeed, tax uncertainty comes at a high cost.  If a business cannot reasonably determine the tax consequences of its actions in advance—or cannot determine the circumstances under which the IRS and the courts may one day decide to retroactively alter those consequences—it cannot efficiently allocate its resources.  "[M]uch tax planning must proceed on the basis of settled rules" and "[a]voidance of risk and uncertainty are often the keys to a successful transaction." *Chapman v. Comm'r*, 618 F.2d 856, 874 (1st Cir. 1980).  In the absence of reasonable predictability, businesses will be forced to delay, or even forgo, significant investments or other decisions until they await final word on their tax liability from the IRS or the courts.

In the context of the codified economic substance doctrine, the need for courts to adhere to the certainty Congress provided is particularly acute.  Along with the significant strict liability penalties enacted by Congress, taxpayers must contend

with the increasing risk of overly aggressive applications of the doctrine by the IRS. Indeed, shortly after the district court issued its order invalidating the Temporary Regulations, the IRS issued an internal memorandum substantially relaxing the procedural requirements by removing the need for examiners to obtain prior executive approval to raise the economic substance doctrine and corresponding penalties on audit. *See* I.R.S. LB&I-04-0422-0014, *Interim Guidance Memorandum on Economic Substance Doctrine and Related Penalties* (Apr. 22, 2022). The district court's present order thus exemplifies the risk that the IRS will expand the scope of the economic substance doctrine and use it as a blunt instrument to disallow or recharacterize transactions of which it does not approve, and which Congress and the IRS have demonstrably failed to address through the proper formal tax legislative process.

As a result, taxpayers will be left with the prospect of a greatly increased burden in the form of audit and litigation costs incurred to defend against more economic substance assessments. Tax disputes are by their nature protracted and expensive, a fact which the federal government has long recognized, and thus impose massive costs on businesses. *See* U.S. Gov't Accountability Off., GAO/GGD-97-71, *Internal Revenue Service: IRS Initiatives to Resolve Disputes Over Tax Liabilities* 1 (1997) ("Congress intended that federal agencies avoid [the problems of costly and timing-consuming litigation] by offering prompt and inexpensive

administrative processes for resolving disputes; yet, over the last 30 years, agency processes have grown more formal, costly, and time consuming.").  This is particularly the case when confronting an unavoidably nebulous judicial doctrine like the economic substance doctrine.  The increased litigation costs, inefficiencies and diversion of resources, when incurred by businesses, harm consumers when costs are passed on and result in higher prices and reduced output.  The interests of businesses, consumers and the government are best served when the economic substance doctrine is interpreted as a principled, predictable and administrable judicial doctrine that aligns with Congressional intent rather than an *in terrorem* measure that gives substantial power to the IRS and courts to take away tax benefits that would otherwise accrue under the plain text of the Code and its regulations.

# CONCLUSION

The Court should reject the district court's flawed interpretation of the relevance requirement and over-expansion of the economic substance doctrine.

Dated: May 7, 2024

Respectfully submitted,

*s/ Lauren Willard Zehmer*

Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1800 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 457-0480

Lauren Willard Zehmer
  *Counsel of Record*
Kevin Otero
Jesse Boretsky
COVINGTON & BURLING, LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with:

(1) the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this brief contains 5,349 words; and

(2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Times New Roman font using Microsoft Word for Microsoft 365 MSO v.2308.

Dated: May 7, 2024                              *s/ Lauren Willard Zehmer*
                                                Lauren Willard Zehmer

                                                *Counsel of Record for Amici Curiae*
                                                *Chamber of Commerce of the United*
                                                *States of America and American Fuel &*
                                                *Petrochemical Manufacturers*

## CERTIFICATE OF DIGITAL SUBMISSION

In accordance with this Circuit's CM/ECF Procedures Section II(J), I certify that:

(1) this document contains no information subject to the privacy redaction requirements of 10th Cir. R. 25.5;

(2) the hard copies to be submitted to the Clerk of the Court are exact copies of the version submitted electronically, and,

(3) the digital submission was scanned with Advanced Endpoint Protection Cortex XDR Agent v.8.2.2, and according to the program is free of viruses.

Dated: May 7, 2024

*s/ Lauren Willard Zehmer*
Lauren Willard Zehmer

*Counsel of Record for Amici Curiae*
*Chamber of Commerce of the United*
*States of America and American Fuel &*
*Petrochemical Manufacturers*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Lauren Willard Zehmer*
Lauren Willard Zehmer

*Counsel of Record for Amici Curiae*
*Chamber of Commerce of the United*
*States of America and American Fuel &*
*Petrochemical Manufacturers*