No. 23-1410

I N  T HE

# United States Court of Appeals for the Tenth Circuit

---

LIBERTY GLOBAL, INC.,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee*.

---

Appeal from the United States District Court
for the District of Colorado
No. 1:20-CV-03501
Judge R. Brooke Jackson

---

**BRIEF OF THE NATIONAL ASSOCIATION OF
MANUFACTURERS AS *AMICUS CURIAE*
IN SUPPORT OF NEITHER PARTY**

---

Michael J. Desmond
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
MDesmond@gibsondunn.com

Lucas C. Townsend
 *Counsel of Record*
Jonathan C. Bond
Matt Donnelly
Lael D. Weinberger
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 887-3731
LTownsend@gibsondunn.com

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the National Association of Manufacturers ("NAM") is a national trade association representing manufacturers across the United States.  The NAM does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF *AMICUS CURIAE* ..........................................................1

INTRODUCTION ............................................................................2

BACKGROUND ...............................................................................6

I.     The Economic-Substance Doctrine In The Courts ...........................6

II.    Codifying The Economic-Substance Doctrine .................................7

III.   The District Court's Analysis ....................................................11

ARGUMENT ...............................................................................11

I.     Section 7701($o$) Requires Analyzing Relevance Before Analyzing The
       Merits Of The Economic-Substance Doctrine ...............................12

       A.    The Text Of § 7701($o$)(1) Identifies Relevance Separately
             From, And Prior To, Analysis Of The Merits ......................13

       B.    Pre-Codification Case Law Supports A Relevance Requirement.......16

       C.    The History Of Section 7701($o$) Helps Explains Why
             Relevance Is Separate From The Merits .............................19

II.    The District Court's Flawed Interpretation Would Dramatically
       Expand Application Of The Economic-Substance Doctrine Contrary
       To Congress's Command ...........................................................20

       A.    The Tax Code Regularly Authorizes Tax-Beneficial Treatment
             That Would Otherwise Be Disqualified Under The Economic-
             Substance Doctrine ..................................................22

             1.    Depreciation Elections ............................................22

             2.    Election Out Of Installment Sale Treatment..........................24

             3.    Elections To Adjust Or Preserve Basis In Property.................25

             4.    Transfer Of Tax Credits .........................................26

       B.    A Meaningful "Relevance" Analysis Is Needed To Avoid
             Undercutting These Tax Provisions And To Promote Judicial
             Efficiency .................................................................27

CONCLUSION ...............................................................................29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ACM P'ship v. Comm'r*,
  157 F.3d 231 (3d Cir. 1998) .................................................................18

*Advoc. Health Care Network v. Stapleton*,
  581 U.S. 468 (2017).............................................................................14

*Alternative Carbon Resources, LLC v. United States*,
  939 F.3d 1320 (Fed. Cir. 2019) ..........................................................10

*Bank of New York Mellon Corp. v. Comm'r*,
  801 F.3d 104 (2d Cir. 2015) ...............................................................10

*Blum v. Comm'r*,
  737 F.3d 1303 (10th Cir. 2013) ....................................................2, 3, 7

*Casebeer v. Comm'r*,
  909 F.2d 1360 (9th Cir. 1990) ...............................................................3

*Compaq Computer Corp. & Subsidiaries v. Comm'r*,
  277 F.3d 778 (5th Cir. 2001) ...............................................................17

*Cottage Sav. Ass'n v. Comm'r*,
  499 U.S. 554 (1991)..............................................................................17

*Cross Refined Coal, LLC v. Comm'r*,
  45 F.4th 150 (D.C. Cir. 2022)...................................................4, 18, 28

*Feldman v. Comm'r*,
  779 F.3d 448 (7th Cir. 2015) ...............................................................10

*Frank Lyon Co. v. United States*,
  435 U.S. 561 (1978)............................................................................6, 7

*Helvering v. Gregory*,
  69 F.2d 809 (2d Cir. 1934) .....................................................................6

*Historic Boardwalk Hall, LLC v. Comm'r*,
  694 F.3d 425 (3d Cir. 2012) ................................................................18

*IES Indus., Inc. v. United States*,
  253 F.3d 350 (8th Cir. 2001) ...............................................................17

*James v. Comm'r*,
  899 F.2d 905 (10th Cir. 1990) ...............................................................7

*Knetsch v. United States*,
364 U.S. 361 (1960) ........................................................................ 6

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .......................................................................... 14

*Liberty Global, Inc. v. United States*,
2023 WL 8062792 (D. Colo. Oct. 31, 2023) ........................... 11, 15, 21

*Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61 (2011) ......................................................................... 13

*Sacks v. Comm'r*,
69 F.3d 982 (9th Cir. 1995) .......................................................... 18

*Shockley v. Comm'r*,
872 F.3d 1235 (11th Cir. 2017) .................................................... 10

*Summa Holdings, Inc. v. Comm'r*,
848 F.3d 779 (6th Cir. 2017) ........................................................ 17

*Fid. Int'l Currency Advisor A Fund, LLC ex rel. Tax Matters Partner v.*
*United States*,
661 F.3d 667 (1st Cir. 2011) ......................................................... 10

*United Parcel Serv. of Am., Inc. v. Comm'r*,
254 F.3d 1014 (11th Cir. 2001) .................................................... 18

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ....................................................................... 13

*Wright v. Comm'r*,
809 F.3d 877 (6th Cir. 2016) ........................................................ 10

**Statutes**

26 U.S.C. § 167 ................................................................................ 22

26 U.S.C. § 453 ................................................................................ 24

26 U.S.C. § 754 ................................................................................ 25

26 U.S.C. § 6418 .............................................................................. 26

26 U.S.C. § 6662 ...................................................................... 8, 9, 19

26 U.S.C. § 6676 ................................................................................ 8

26 U.S.C. § 7701 ............................................... 3, 4, 7, 8, 11, 12, 13, 14, 15

Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010) ................... 2, 7

**Other Authorities**

ABA Section of Taxation, *Comments on Notice 2010-62*
(Jan. 18, 2011)........................................................................9

Joseph Bankman, *The Economic Substance Doctrine*,
74 S. Cal. L. Rev. 5 (2000) ..................................................3, 7

Jasper L. Cummings, Jr., The Supreme Court's Federal Tax
Jurisprudence (Am. Bar Ass'n, 2010) .................................20

Estimates of Federal Tax Expenditures for Fiscal Years 2022-2026
(JCX-22-22), Joint Committee on Taxation (2022) ...........21

Timothy R. Hicks, *Government Victories Using the Economic
Substance Doctrine: A Changing of the Tide in Tax Practice?*,
38 Cumb. L. Rev. 101 (2008) ..............................................8

IRS Notice 2010-62, 2010-40 I.R.B. 412 ....................................4

Joint Committee on Taxation Report for Sec. 7701(*o*) (JCX-18-10)
(Mar. 21, 2010) ..............................................................16, 19

LB&I-04-0422-0014 (Apr. 22, 2022) ........................................10

LB&I-4-0711-015 (July 15, 2011).........................................9, 10

LMSB-20-0910-024 (Sept. 14, 2010) ..........................................9

Leandra Lederman, *W(h)ither Economic Substance?*,
95 Iowa L. Rev. 389 (2010)................................................18

Charlene D. Luke, *The Relevance Games: Congress's Choices for
Economic Substance Gamemakers*, 66 Tax Law. 551 (2013)...........19

Martin J. McMahon, *Economic Substance, Purposive Activity, and
Corporate Tax Shelters*, 94 Tax Notes 1017 (2002) .........18

NAM Manufacturers' Outlook Survey, Fourth Quarter 2023,
https://nam.org/wp-content/uploads/2024/01/Outlook-Survey-
December-2023-Q4.pdf .......................................................2

*PwC Seeks Quick Action From Treasury, IRS to Mitigate Uncertainty
Created by Economic Substance Codification*, Tax Notes
(Apr. 22, 2010)......................................................................9

Rebecca Rosenberg, *Codification of the Economic Substance
Doctrine: Agency Response and Certain Other Unforeseen
Consequences*, 10 Wm. & Mary Bus. L. Rev. 199 (2018)...............7, 8

*Treasury Legislative Counsel, Practitioners Continue Debate over*
*Codification of Economic Substance Doctrine*, Federal Tax Day
(Oct. 25, 2010) ......................................................................................................9

## INTEREST OF *AMICUS CURIAE* [1]

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 States and in every industrial sector. Manufacturing employs 13 million men and women in the United States, contributes $2.85 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

Tax policy plays a critical role in manufacturers' ability to thrive in the United States and compete effectively in a global economy. Tax certainty is critical to supporting growth and long-term investment in U.S. manufacturing. At the end of 2023, the NAM surveyed members about tax outlook. Eighty-nine percent of respondents noted that tax burdens on manufacturing activities would make it more difficult to

---

[1]  *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. Counsel for all parties have consented to the filing of this brief.

expand their workforce, invest in new equipment, or expand facilities.  NAM Manufacturers' Outlook Survey, Fourth Quarter 2023, https://nam.org/wp-content/uploads/2024/01/Outlook-Survey-December-2023-Q4.pdf.

It is essential that American manufacturers have clarity on the effects of their tax planning.  This case presents groundbreaking litigation about the meaning and effect of the term "relevance" in § 7701(*o*) of the Internal Revenue Code (26 U.S.C. or "the Code").  Congress enacted § 7701(*o*) in 2010 to codify the economic-substance doctrine.[2]  As one of first impression, this case will have significant effects on manufacturers in the Tenth Circuit and beyond.  Accordingly, the NAM offers its perspective to the Court on the importance of clearly addressing the relevance requirement for applying the economic-substance doctrine.

## INTRODUCTION

The economic-substance doctrine was developed by courts to address a particular type of tax avoidance:  transactions that, although technically compliant with the applicable tax statute, were engaged in only for tax purposes or produced no economic result beyond mere tax avoidance.  *Blum v. Comm'r*, 737 F.3d 1303, 1309 (10th Cir. 2013).  The doctrine holds that "the Commissioner may rightfully disregard a transaction" that "lack[s] economic substance" in that sense.  *Id.*  "[A] transaction has economic substance if it is 'likely to produce economic benefits aside

---

[2]    Pub. L. No. 111-152, 124 Stat. 1029, § 1409(a) (Mar. 30, 2010).

from a tax deduction.'" *Id*. at 1312 (quoting *Casebeer v. Comm'r*, 909 F.2d 1360, 1365 (9th Cir. 1990)).  The common-law economic-substance doctrine requires answering "two questions: (1) what was the taxpayer's subjective business motivation, and (2) did the transaction have objective economic substance?" *Id*. at 1309 (internal quotation marks omitted).  Congress codified this test, requiring that *both* the subjective and objective prongs be met for a transaction to survive scrutiny.  26 U.S.C. § 7701(*o*)(1), (5)(A).

The economic-substance doctrine exists in tension, however, with another basic tenet of the Code:  Congress uses tax law to further policies and incentivize behaviors that might otherwise be uneconomic.  Such tax-based incentives presuppose that businesses often make choices based on their tax consequences.  It therefore cannot be that *any* decision or transaction that is driven by tax considerations is automatically illegitimate.

Cognizant of that inherent tension, courts have long exercised restraint in applying the economic-substance doctrine to avoid undermining congressional policy choices reflected in the Code.  In general, "a transaction that is clearly supported by the text, intent, and purpose [of the Code]," as construed by a court, "will withstand judicial scrutiny regardless of whether it otherwise meets the economic substance test." Joseph Bankman, *The Economic Substance Doctrine*, 74 S. Cal. L. Rev. 5, 12 (2000).  In other words, if a transaction clearly comports with Congress's intent in a

particular tax provision, the economic-substance doctrine does not apply. *See, e.g.*, *Cross Refined Coal, LLC v. Comm'r*, 45 F.4th 150, 160–61 (D.C. Cir. 2022). This Court has not specifically addressed when the codified economic-substance doctrine should apply.

When Congress codified the test for the economic-substance doctrine in 2010, Congress made clear that it was *not* expanding the circumstances where the doctrine would apply. Rather, Congress instructed courts to continue determining when the doctrine is "relevant" as if the codification "had never been enacted." 26 U.S.C. § 7701(*o*)(5)(C); *see also* IRS Notice 2010-62, 2010-40 I.R.B. 412 (discussing an analysis of "authorities[] prior to the enactment of section 7701(*o*)" providing that the economic-substance doctrine was "not relevant").

The district court below failed to heed this statutory mandate by refusing to conduct any threshold relevance inquiry before applying the economic-substance doctrine. As codified, the doctrine is limited to transactions "to which [it] is relevant" and courts "shall" make a "determination" whether the doctrine "is relevant." 26 U.S.C. § 7701(*o*)(1), (5)(C). That determination whether the doctrine should apply at all necessarily must be made *before* the court proceeds to apply it. The district court's failure to conduct that inquiry flouts Congress's command.

The district court's decision well illustrates problems that taxpayers and tax experts warned Congress about when codifying the economic-substance doctrine:

that the doctrine could become an enforcement mechanism for the IRS to attack tax-motivated transactions that the agency might disfavor but that align with statutory purpose and congressional intent.  The relevance provision Congress enacted, properly applied at the outset of the analysis, would avoid this problem by preserving courts' responsibility to police the IRS's invocation of economic substance.  The threshold "relevance" inquiry ensures that the initial decision of whether the doctrine even applies—whether it is "relevant"—is made by the court.  Bypassing that initial inquiry risks enabling the Commissioner to thwart Congress's policy choices, potentially swallowing significant portions of the Code.

Failure to make that threshold relevance determination also could lead to serious practical difficulties.  It could stack the deck against taxpayers with pejorative findings on tax purpose or economic insignificance, in circumstances where a purpose inquiry should not have been conducted.  Taxpayers also may be burdened with contesting this analysis, first on audit, and later in litigation, in circumstances where the economic substance inquiry should have been unnecessary.

Had the district court followed the statutory mandate to conduct a threshold relevance inquiry, it first should have evaluated the taxpayer's reported tax position against the backdrop of the underlying statutory provisions and their legislative intent.  The court should thereby have determined if the taxpayers' reporting position fell outside clear application of the statutes, making an economic substance inquiry

"relevant." The NAM takes no position on the outcome of that evaluation. Nor does the NAM take a position on how the "transaction" should be defined for purposes of applying the doctrine. But the NAM urges this Court to make clear that courts must undertake the threshold analysis Congress mandated of whether the economic-substance doctrine is even relevant *before* applying the two-part economic-substance inquiry codified in the statute.

## BACKGROUND

### I. The Economic-Substance Doctrine In The Courts

Almost a century ago, the Second Circuit (in an opinion by Judge Learned Hand) and then the Supreme Court laid the foundations for the economic-substance doctrine. *Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934), *aff'd*, 293 U.S. 465, 469 (1935). Both the Second Circuit and the Supreme Court agreed that the transaction steps at issue could be disregarded for tax purposes because they did nothing *other* than affect tax consequences. "[T]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory*, 293 U.S. at 469.

Over the ensuing decades, the Supreme Court consistently reiterated that courts should not give tax effect to "sham" transactions or transactions lacking "substance"—transactions that did nothing but bring about a tax benefit. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Frank Lyon Co. v. United States*, 435 U.S.

6

561, 583–84 (1978).  Courts applied that principle to both sham transactions (transactions that did not actually happen) and transactions that actually happened but lacked economic substance.  Bankman, *supra*, at 12.  For both types, the principle was that substance would prevail over efforts to avoid tax.  *Id*.  *See generally James v. Comm'r*, 899 F.2d 905, 908 (10th Cir. 1990).

As one might expect of a doctrine that straddles form and substance, ambiguities arose.  The circuits split three ways over the test to apply (requiring various combinations of objective economic substance and business purpose).  *Blum*, 737 F.3d at 1310; *see generally* Rebecca Rosenberg, *Codification of the Economic Substance Doctrine: Agency Response and Certain Other Unforeseen Consequences*, 10 Wm. & Mary Bus. L. Rev. 199, 206–07 (2018).

## II.     Codifying The Economic-Substance Doctrine

In 2010, Congress codified the economic-substance doctrine by specifying when and, in certain respects, how, the doctrine applies.  Pub. L. No. 111-152, 124 Stat. 1029, § 1409(a) (Mar. 30, 2010).  Codified at 26 U.S.C. § 7701(*o*), the Code now defines the economic-substance doctrine as "the common law doctrine under which tax benefits . . . with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose."  26 U.S.C. § 7701(*o*)(5)(A).  The statute resolved the circuit conflict concerning the applicable test by making clear that a transaction must have both objective economic substance

and a subjective business purpose to avoid being disregarded. *Id.* § 7701(*o*)(1), (5)(A).

In the leadup to codification, tax practitioners debated the optimal balance between the IRS and the judiciary in deciding economic-substance issues. *See, e.g.*, Timothy R. Hicks, *Government Victories Using the Economic Substance Doctrine: A Changing of the Tide in Tax Practice?*, 38 Cumb. L. Rev. 101, 118 (2008) (citing arguments). In the end, Congress concluded that the existing law before codification had appropriately left to the courts the decision about when to apply (or not) the economic-substance doctrine. "The preliminary question of relevance is left to the courts." Rosenberg, 10 Wm. & Mary Bus. L. Rev. at 211. Specifically, Congress provided that any "determination" of relevance "shall be made in the same manner as if this subsection had never been enacted." 26 U.S.C. § 7701(*o*)(5)(C).

Congress also imposed hefty strict-liability penalties for taxpayers whose reporting positions rest on transactions that are found to lack economic substance. The amount of the penalty varies depending on whether the taxpayer disclosed the transaction adequately to the IRS. 26 U.S.C. §§ 6662(b)(6), 6676. If the transaction generating the tax benefits is "not adequately disclosed in the return nor in a statement attached to the return," the penalty would be 40 percent of the underpayment. *Id.* § 6662(i). If one took the precaution of disclosing the transaction, and the transaction was then disallowed under the economic-substance doctrine, the penalty

would be cut down to the (still substantial) 20 percent of the underpayment. *Id.* § 6662(a).

Since codification, the economic-substance doctrine has not been applied often. The IRS's cautious approach may reflect a response to strong urging from the tax community after the enactment of § 7701(*o*) that the IRS should administer the statute in accordance with its purpose as a clarification of judge-made law (coupled with stricter penalties) and not as a mandate to expand the application of the doctrine via broader enforcement. *See, e.g.*, ABA Section of Taxation, *Comments on Notice 2010-62* (Jan. 18, 2011); *Treasury Legislative Counsel, Practitioners Continue Debate over Codification of Economic Substance Doctrine*, Federal Tax Day M.4 (Oct. 25, 2010); *PwC Seeks Quick Action From Treasury, IRS to Mitigate Uncertainty Created by Economic Substance Codification*, Tax Notes (Apr. 22, 2010). Whatever the IRS's reasons, the agency erected additional internal checks and safeguards to limit when the doctrine is invoked. Soon after the doctrine's codification, the IRS issued guidance that required IRS agents to clear various hurdles before invoking the doctrine: agents had to obtain approval from the appropriate Director of Field Operations before raising the codified economic-substance doctrine on audit, LMSB-20-0910-024 (Sept. 14, 2010), and IRS auditors had to conduct a multi-step analysis before seeking approval from the Director of Field Operations. LB&I-4-

0711-015 (July 15, 2011).  In 2022, however, the IRS issued further guidance cur-
tailing the controls and directives it had put in place in 2010 and 2011, signaling an
intent to increase scrutiny of transactions under the doctrine.  LB&I-04-0422-0014
(Apr. 22, 2022).

Courts, meanwhile, have had little occasion to address the codified economic
substance doctrine.  Most post-codification decisions involve transactions that pre-
dated the codification.  Because the statute "is not retroactive," courts have had little
reason to consult the codified doctrine.  *Bank of New York Mellon Corp. v. Comm'r*,
801 F.3d 104, 115 n.7 (2d Cir. 2015) (noting that the codified provision is not retro-
active and is therefore inapplicable); *Feldman v. Comm'r*, 779 F.3d 448, 455 (7th
Cir. 2015) (same); *see also, e.g.*, *Fid. Int'l Currency Advisor A Fund, LLC ex rel.
Tax Matters Partner v. United States*, 661 F.3d 667, 670 (1st Cir. 2011) (citing the
statute along with common law authorities without explanation in adjudicating is-
sues regarding transaction that predated the statute); *Shockley v. Comm'r*, 872 F.3d
1235, 1247 (11th Cir. 2017) (same); *Wright v. Comm'r*, 809 F.3d 877, 885 (6th Cir.
2016) (same).  One Federal Circuit decision, *Alternative Carbon Resources, LLC v.
United States*, 939 F.3d 1320, 1329 (Fed. Cir. 2019), did address the codified doc-
trine—and acknowledged that relevance is separate from the merits.  But even that
case addressed the relevance issue only summarily because it found the relevance
argument easy to resolve.

10

## III.    The District Court's Analysis

The district court here engaged in a three-step analysis to deny Liberty Global, Inc., favorable tax treatment that might otherwise result from the facial operation of the tax law.  First, the court held that § 7701(*o*) did not require any threshold inquiry into the economic-substance doctrine's "relevance."  It reasoned that the statute's prefatory clause requiring a "transaction to which the economic substance doctrine is relevant" was "coextensive with the statute's test for economic substance" and therefore did no independent work.  *Liberty Global, Inc. v. United States*, 2023 WL 8062792, at *4 (D. Colo. Oct. 31, 2023).  The district court did not discuss or cite the statutory provision instructing courts to make a "determination" of "relevan[ce]" as if the codification "had never been enacted." 26 U.S.C. § 7701(*o*)(5)(C).  Second, the court held that multiple steps of the relevant "transaction" needed to be analyzed, rather than just one step, and broadly applied the economic-substance doctrine to each step.  2023 WL 8062792, at *6.  Third, the court held that the transaction (as broadly defined) was not "exempt" from the codified doctrine.  *Id*. at *6–8.  In that manner, the district court *both* eliminated the gatekeeping relevance inquiry *and* adopted an expansive interpretation of the statutory economic substance test.

## ARGUMENT

The district court erred in construing § 7701(*o*) not to require any threshold "relevance" determination before applying the economic-substance doctrine.  The

11

court failed to heed § 7701(*o*)(5)(C)'s express instruction to make that determination and turned § 7701(*o*)(1)'s reference to transactions to which the doctrine "is relevant" upside-down. The district court's error, if not corrected, risks subjecting broad categories of transactions to economic substance scrutiny that would not have been subject to the doctrine under the common law. This would undermine Congress's policymaking power and create substantial uncertainty for taxpayers, including the NAM's members.

## I. Section 7701(*o*) Requires Analyzing Relevance Before Analyzing The Merits Of The Economic-Substance Doctrine

Section 7701(*o*) codifies the economic-substance doctrine developed in case law over many decades and presents in an organized form the approach to the economic-substance doctrine endorsed by Congress. Courts must construe this statute as it would any other—according to its plain language. That language specifies that the doctrine applies only if it "is relevant" to a transaction. 26 U.S.C. § 7701(*o*)(1). And it directs that a determination of the doctrine's "relevan[ce] to a transaction shall be made." *Id.* § 7701(*o*)(5)(C). That statutorily mandated determination presupposes that the doctrine is not relevant to all transactions. Moreover, the statute directs courts to conduct the relevance inquiry "in the same manner as if [§ 7701(*o*)] had never been enacted," *id.*—that is, in accordance with pre-codification case law, which recognized that the doctrine was not relevant to all transactions.

12

By assuming instead that the doctrine should apply to every transaction, the district court contravened § 7701(*o*).

### A.    The Text Of § 7701(*o*)(1) Identifies Relevance Separately From, And Prior To, Analysis Of The Merits

Statutory analysis "starts 'where all such inquiries must begin: with the language of the statute itself.'" *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Two of its provisions—§ 7701(*o*)(1) and § 7701(*o*)(5)(C)—make clear that a threshold relevance determination is necessary.

First, § 7701(*o*)(1) says:

> In the case of any transaction to which the economic substance doctrine is *relevant*, such transaction shall be treated as having economic substance only if—
>> (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
>> (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

26 U.S.C. § 7701(*o*)(1) (emphasis added). It follows that, if the doctrine is *not* relevant to a particular transaction, the test set forth in § 7701(*o*)(1)(A) and (B) never comes into play. The introductory clause begins with a reference to the transaction. The statute then limits the transaction under consideration to any that "is *relevant*" and provides "*such transaction* shall be treated as having economic substance only if" the test for applying the economic substance doctrine is satisfied. § 7701(*o*)(1)

13

(emphasis added). Everything before the word "such" is defining the kind of transaction that is subject to the two-part conjunctive analysis set out in the remainder of § 7701(*o*)(1). That is the natural reading of § 7701(*o*)(1)'s plain language. And it is necessary to avoid rendering part of the provision superfluous. With this statute as with any other, this Court should strive to "give effect" to "every clause and word of [the] statute." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 478 (2017) (internal quotation marks omitted); *see also Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("we must give effect to every word of a statute wherever possible").

Second, § 7701(*o*)(5)(C) makes clear that courts must determine whether the doctrine is relevant to a transaction. Codified in a part setting forth "[d]efinitions and special rules" for "this subsection," § 7701(*o*)(5), that provision instructs that "[t]he determination of whether the economic substance doctrine is *relevant* to a transaction shall be made in the same manner as if [§ 7701(*o*)] had never been enacted," § 7701(*o*)(5)(C) (emphasis added). That language unmistakably mandates a determination of relevance by stating that such a "determination . . . shall be made." *Id.* The text of § 7701(*o*)(5)(C) also leaves no doubt that the relevance determination is distinct from the merits of the economic-substance analysis: Unlike § 7701(*o*)(1), which specifies a particular standard for economic substance that resolved a circuit conflict (and thus abrogated the approach some courts had taken), § 7701(*o*)(5)(C) tells courts to determine relevance as they previously had done. Taken together, the

two provisions show unambiguously that relevance is separate from the merits of the economic substance analysis and courts must make a relevance determination.

The district court's contrary interpretation below defies both provisions. It renders almost the entire introductory clause of § 7701(*o*)(1) superfluous. In the court's view, "the doctrine's relevance is coextensive with the statute's test for economic substance, provided by the operative clause." *Liberty Global*, 2023 WL 8062792, at *4. In other words, the district court posited that the *starting point* is to apply the economic-substance criteria set forth in § 7701(*o*)(1)(A) and (B)—*i.e.*, to ask if the transaction had a "meaningful" economic effect on the taxpayer, and whether the taxpayer had a "substantial purpose" other than tax avoidance for the transaction. The court effectively blue-penciled § 7701(*o*)(1) to say: "~~In the case of~~ any transaction ~~to which the economic substance doctrine is relevant, such transaction~~ shall be treated as having economic substance only if." The court itself also acknowledged that its interpretation presented the "risk of tautology." *Id*. at *5. That was an understatement: The court's approach is unavoidably tautological.

Moreover, the district court's approach renders § 7701(*o*)(5)(C) entirely superfluous. Under the district court's reading, Congress's express direction to conduct a relevance inquiry ("shall be made") and its specification of how to do so ("in

the same manner as if [§ 7701(*o*)] had never been enacted") are a dead letter.  Congress would have had no reason to spell out how courts should conduct an inquiry that would never be necessary.

As between an interpretation that gives effect to the introductory clause of the statute and to its subpart (*o*)(5)(C), and an interpretation that would render both entirely superfluous, the choice should be easy.  The statute makes clear by its terms that a court must analyze relevance separately from, and prior to, analyzing the merits of the two-part conjunctive test.

### B.    Pre-Codification Case Law Supports A Relevance Requirement

Case law predating the 2010 legislation strongly supports this interpretation.  Section 7701(*o*)(5)(C) expressly incorporates prior judicial practice by providing that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if [§ 7701(*o*)] had never been enacted."  Although the pre-codification cases did not apply the "relevance" label, they recognized that the economic-substance doctrine does not apply to every single transaction reported or reflected on a tax return.

The Joint Committee on Taxation's technical analysis of the 2010 legislation emphasized this point.  It noted that the statute "is not intended to alter the tax treatment of certain basic business transactions that, under longstanding judicial and administrative practice[,] are respected."  Joint Committee on Taxation Report for Sec.

7701(*o*) (JCX-18-10) at 152 (Mar. 21, 2010) (JCT Report).  Pre-2010 decisions recognized that certain business transactions are not properly subject to economic substance scrutiny in two contexts.

First, courts did not engage in economic substance scrutiny when precedent had already established that the particular form of transaction is permissible.  Precedent determined that a prior transaction has economic substance or is not a sham, and a new case presenting the same kind of transaction need not go through economic substance analysis.  *See, e.g.*, *IES Indus., Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) (finding a particular foreign stock transaction to be valid); *Compaq Computer Corp. & Subsidiaries v. Comm'r*, 277 F.3d 778, 782–83 (5th Cir. 2001) (agreeing with the *IES* decision in a case involving an identical transaction).

Second, courts recognized that Congress can affirmatively provide for favorable tax treatment of a transaction in circumstances that might otherwise be uneconomic, thereby excluding that transaction from economic substance scrutiny.  As the Sixth Circuit explained, when a tax code provision is used for its "congressionally sanctioned purposes—tax avoidance—the Commissioner had no basis for recharacterizing the transactions and no basis for recharacterizing the law's application to them."  *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 782 (6th Cir. 2017) (Sutton, J.).  *See generally Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554 (1991) (a transaction receives a tax benefit when Congress has so provided in the Code).  In short, if a

transaction clearly comports with Congress's intent in a particular tax provision, the economic-substance doctrine does not apply. *See Cross Refined Coal*, 45 F.4th at 160–61 (taxpayer can take advantage of tax credits designed by Congress); *Sacks v. Comm'r*, 69 F.3d 982, 991–992 (9th Cir. 1995) (same); *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1019–20 (11th Cir. 2001) (same, so long as the transaction is not a sham); *Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 462–63 (3d Cir. 2012) (same).

These examples highlight the fundamental tension in the economic-substance doctrine between honoring the text of the tax law and not allowing technical compliance to be manipulated to defeat Congress's intent. The doctrine's central premise is that transactions undertaken solely to achieve tax benefits generally should be disregarded even if they comply with the letter of the Code. *See, e.g.*, *ACM P'ship v. Comm'r*, 157 F.3d 231, 247 (3d Cir. 1998). But Congress *also* uses the Code to pursue policy ends, including by incentivizing particular transactions. *See, e.g.*, Martin J. McMahon, *Economic Substance, Purposive Activity, and Corporate Tax Shelters*, 94 Tax Notes 1017, 1019 (2002) ("The real difficulty in applying the business purpose, economic substance, and purposive activity doctrines derives from the fact that the code abounds with provisions that . . . are *intended* to influence economic behavior."); Leandra Lederman, *W(h)ither Economic Substance?*, 95 Iowa L. Rev. 389, 396 (2010) ("Taking the government up on proffered tax benefits is, by

definition, not abusive.").  Sometimes Congress wants people to take measures that lower their taxes—those measures are the point that Congress is trying to promote, and the tax reduction is the means to that end.  The Technical Explanation of § 7701(*o*) makes this point clearly: "If the realization of the tax benefits of a transaction is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such tax benefits be disallowed."  JCT Report at 152 n.344.  The relevance inquiry recognizes this reality and ensures that economic-substance doctrine does not ignore it.

## C. The History Of Section 7701(*o*) Helps Explains Why Relevance Is Separate From The Merits

The economic-substance doctrine was a creature of case law before it was codified.  The codification introduced a substantial penalty: 40 percent of the underpayment added as a penalty on a strict-liability basis.  26 U.S.C. § 6662(i).  It is not surprising, therefore, that the codification set a meaningful gatekeeping requirement in more explicit terms than many of the older, pre-codification cases had employed.  The "relevance" language made its way into § 7701(*o*) over the course of a decade of legislative revisions, largely in response to repeated taxpayer concerns (expressed in correspondence and testimony to Congress) that the courts (not the IRS) should ultimately determine when the doctrine applied.  *See generally* Charlene D. Luke, *The Relevance Games: Congress's Choices for Economic Substance Gamemakers*, 66 Tax Law. 551 (2013).

Prior to the codification, courts would typically invoke economic substance only at the suggestion of the IRS. *See* Jasper L. Cummings, Jr., The Supreme Court's Federal Tax Jurisprudence 155 (Am. Bar Ass'n, 2010). Historically, the threshold question of when the doctrine should apply was not explicitly framed as a "relevance" inquiry. This may be why the district court—looking at pre-codification case law—thought there was no relevance requirement. This is doubly incorrect. As described above, prior case law recognizes that the economic-substance doctrine does not apply to every conceivable transaction reported or reflected on a tax return. In addition, the district court failed to consider that the increased penalties in the codified version of the doctrine only increase the importance of a relevance inquiry—as Congress recognized.

## II. The District Court's Flawed Interpretation Would Dramatically Expand Application Of The Economic-Substance Doctrine Contrary To Congress's Command

The district court's approach of bypassing the threshold relevance inquiry has serious practical consequences. Removing that safeguard would expand the reach of the economic-substance doctrine in ways that could nullify Congress's policy judgments.

Tax law has long provided taxpayers with various ways to mitigate their tax liability through elections, choices around the timing of income and deductions, and other provisions. Increasingly Congress has added to these provisions by enacting

credits, deductions and other tax expenditures designed to favor certain activities that would be uneconomic absent preferential tax treatment. *See, e.g.*, Estimates of Federal Tax Expenditures for Fiscal Years 2022-2026 (JCX-22-22), Joint Committee on Taxation (2022). In some cases, the line between a tax benefit Congress conferred to incentivize certain behavior and an aggressive interpretation or application of a Code provision designed simply to exploit advantageous tax treatment may be uncertain. The NAM takes no position here on whether Liberty Global's transaction, however defined, crossed that line. Rather, the NAM takes issue only with the District Court's rejection of a threshold "relevance" inquiry.

There are myriad instances under the tax law where the economic-substance doctrine clearly should not apply. The following sections describe four examples. In each, the district court's framework could require taxpayers and courts to run through an entirely unnecessary economic-substance gantlet. It might be that, at the end, the district court would basically do the equivalent of a relevance inquiry under the label of "exemptions." *Liberty Global*, 2023 WL 8062792 at *6–7. That should provide little comfort. The district court's framework would still have increased uncertainty and decreased judicial efficiency by failing to consider relevance at the beginning as required by Congress. The framework also puts a thumb on the scale and risks creating an improper analytical bias in favor of the IRS, particularly in edge cases where adverse findings on the subjective and/or objective prongs of the

codified doctrine improperly influence the *post hoc* "exemption" inquiry in circumstances where those findings should never have been made in the first instance.

A.    **The Tax Code Regularly Authorizes Tax-Beneficial Treatment That Would Otherwise Be Disqualified Under The Economic-Substance Doctrine**

Matters of tax compliance, enforcement, and reporting can be broken into two categories: (1) reporting positions and (2) structured transactions. In theory, simply choosing to report an item on a tax return in a way that produces the most tax advantage should not be subject to challenge under economic substance principles because reporting itself does not involve a "transaction." But the distinction breaks down in practice. Taxpayers often make investment decisions based on an understanding of the favorable way they might be treated for tax purposes. That, in turn, makes those investment decisions themselves "transactions" subject to scrutiny. Against that backdrop, we provide below several examples highlighting issues with the district court's analytical framework in the context of both reporting positions and structured transactions.

1.    **Depreciation Elections**

Taxpayers are generally allowed to recover the cost of investments made in their businesses through depreciation deductions claimed over a fixed period. 26 U.S.C. § 167. Congress has, however, often provided for accelerated cost recovery through "bonus depreciation" deductions that can be claimed over a much shorter

period, often entirely in the same year that the investment is made. For most tax-payers, accelerating cost recovery—taking a full deduction immediately rather than over a period of several years—is advantageous. But not always: The interaction of the accelerated deduction with, for example, expiring tax credits or carryover losses, might make bonus depreciation disadvantageous for a taxpayer over the long run. For this reason, Congress gave taxpayers the flexibility to elect out of bonus depreciation under § 168(k)(7), with such an election driven entirely by tax consid-erations and planning. A similar election is available for certain small businesses under § 179.

While electing out of bonus depreciation is done solely for the purpose of minimizing tax and has no non-tax economics, it flows from the plain language of the statute and is fully consistent with congressional intent. Accordingly, the codi-fied economic-substance doctrine should not be "relevant" to the election and a tax-payer should not be required to demonstrate or litigate the subjective and objective prongs of that doctrine. Yet by skipping over the threshold relevance inquiry, that is precisely what the district court's decision would require, resulting in preordained failure to survive economic substance scrutiny with the hope and expectation that a *post hoc* "exemption" would apply.

23

## 2.    Election Out Of Installment Sale Treatment

Generally, when a taxpayer sells or exchanges property at a gain, the taxpayer must recognize the full amount of gain as taxable income in the year of the sale. However, as a benefit to taxpayers, Congress provided that when a taxpayer sells property and the consideration is made in multiple payments over the course of more than one year, then the taxpayer can defer recognition of the full gain under the installment method.  26 U.S.C. § 453.  Under this method, for tax purposes, income recognition is typically spread out over the term of the payments.  While this is generally a benefit, in certain circumstances a taxpayer could prefer to recognize all of the gain in year one for tax planning reasons.  For instance, if the taxpayer has a tax credit carryforward that expires in the year of sale, it can only utilize the full benefit of the tax credit if it has the flexibility to elect out of the installment method treatment.  Under § 453(d), taxpayers are given the option to elect out of installment sale treatment.  This wholly tax-driven election (available without regard to the time-value of the taxes saved compared to the profit realized) might not withstand economic substance scrutiny were the doctrine "relevant."  However, it is readily excluded from such scrutiny under the gating relevance inquiry because Congress has provided specifically for this flexibility in tax planning.  Yet under the district court's framework, without a threshold relevance inquiry, a cumbersome analysis of the objective and subjective elements of § 7701(*o*) would be required, even if the election

is ultimately recognized as "exempt" from application of the codified economic-substance doctrine.

### 3.    Elections To Adjust Or Preserve Basis In Property

When a taxpayer acquires an interest in a partnership, the taxpayer has two sets of basis (a tax proxy for investment) to consider: its basis in the partnership interest itself, often referred to as "outside basis," and its basis in the underlying assets of the partnership, often referred to as "inside basis."  This can result in a mismatch if, for example, an interest in a partnership is acquired (giving rise to out-side basis) but the purchase price is not applied to assets held inside the partnership (inside basis).  This mismatch limits the partner's ability to recover the cost of their investment through depreciation when compared to acquisition of the assets directly, rather than through a partnership.

Congress has created an election that can address this mismatch (and eliminate the timing issues) in the taxable year in which there has been either a transfer of a partnership interest by a partner or a distribution of partnership property.  26 U.S.C. § 754.  By reason of the partnership's making a § 754 election, the taxpayer in the example would be able to receive the effect of a personal step-up in its share of the inside basis of the manufacturing equipment from $750,000 to $1 million.

The § 754 election (and other basis-shifting elections, *e.g.*, § 362(e)(2)(C)) is available without regard to the time-value of the tax savings to the taxpayers or the

profit potential of the underlying transaction.  In each case, the transaction giving rise to the election, together with the election, could provide immediate or near-term tax savings the present value of which may exceed (perhaps substantially) the present value of the reasonably expected pre-tax profit from the transaction.  However, these tax timing benefits are both well understood and clearly intended by Congress, and the economic-substance doctrine should have no relevance to either.  But again, under the district court's framework and without a threshold "relevance" inquiry, a cumbersome and time-consuming economic substance analysis would be required.

### 4.    Transfer Of Tax Credits

To support the goal of achieving net-zero carbon emissions, Congress recently provided for the transfer of certain tax credits supporting investment in carbon-neutral energy transition technologies.  26 U.S.C. § 6418.  If a taxpayer is not in a position to fully utilize one of these tax credits that it has otherwise properly qualified for, the taxpayer can sell the credit (for cash, tax-free) to an unrelated taxpayer who is able to utilize it immediately.  The transferability provisions mark a sharp departure from historic treatment of business tax credits, which were generally only of value to a taxpayer if and to the extent of its positive income tax liability.

The federal tax incentives reflected in the underlying credits have the potential to spur transformative investment in certain areas of the country and certain portions of the economy.  The economic-substance doctrine was developed in an era that

generally pre-dates the concept of a transferrable federal tax credit of the scope and scale available under this new law.  Nevertheless, the district court's framework calls into question whether the economic-substance doctrine will somehow be deemed "relevant" to these transactions.  Congress sanctioned the credit without regard to the expected profit of the credit purchaser, the amount of the resulting tax savings or the subjective intent of the taxpayer in claiming and reporting the credits.  If one claimed the credit but without any other profit or non-tax intent, this could trigger economic-substance doctrine analysis—unless a threshold relevance inquiry makes it possible to consider congressional intent up front.  In this context, uncertainty concerning the "relevance" of the economic-substance doctrine (and hence the validity of the credit transfer transactions) puts into jeopardy the financing of these federally subsidized investments in the Tenth Circuit.  That uncertainty exists, and is amplified under an analytical framework that rejects a threshold relevance inquiry.

**B.    A Meaningful "Relevance" Analysis Is Needed To Avoid Undercutting These Tax Provisions And To Promote Judicial Efficiency**

These four examples just scratch the surface of Code provisions where the statutory design and Congress's purpose would support favorable tax treatment—irrespective of whether the "transaction" has "economic substance."  Yet under the district court's framework—ignoring the "relevance" inquiry and going straight to

the substantive analysis to conclude that no "exception" to § 7701(*o*) applies—normative application of the tax law and unambiguous congressional intent would often be overridden, negating favorable tax treatment and triggering a 40% strict liability penalty.

This is a significant concern. Consider the efforts the IRS put into challenging the taxpayers in *Cross Refined Coal, LLC v. Commissioner*, 45 F.4th 150 (D.C. Cir. 2022). As the court ultimately found, the transactions at issue were the type of otherwise uneconomic activity that Congress's refined coal tax credit scheme was intended to incentivize. Notwithstanding this reality, the IRS continued to challenge these "tax-motivated" but wholly appropriate transactions. The IRS ultimately (and rightly) lost in both the Tax Court and the D.C. Circuit. In the end, a commonsense reading of the law prevailed—but only after some five years of disputing the issue with the IRS. *See id*. at 155.

Congress continues to use tax credits to incentivize emerging technologies and other economic activity Congress deems valuable. Recent examples include the clean energy-related tax credits referenced above. Taxpayers in the Tenth Circuit may be well-advised to look outside the circuit to site next generation tax credit-funded energy projects if its courts are not applying § 7701(*o*) with the care that Congress intended.

28

## CONCLUSION

This Court should vacate and remand the case for a threshold determination of whether the economic-substance doctrine applies to the transactions at issue.

Respectfully submitted this 7th day of May, 2024.

s/   Lucas C. Townsend

| | |
|---|---|
| Michael J. Desmond | Lucas C. Townsend |
| GIBSON, DUNN & CRUTCHER LLP | *Counsel of Record* |
| 333 South Grand Avenue | Jonathan C. Bond |
| Los Angeles, CA  90071 | Matt Donnelly |
| MDesmond@gibsondunn.com | Lael D. Weinberger |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 1050 Connecticut Avenue, N.W. |
| | Washington, DC  20036 |
| | (202) 887-3731 |
| | LTownsend@gibsondunn.com |

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5), because it contains 6,474 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman in 14-point font.



/s/  Lucas C. Townsend
Counsel of Record

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2024, a true and accurate copy of the foregoing filing was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

/s/  Lucas C. Townsend
Counsel of Record
