# No. 23-1410

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

———————————

### LIBERTY GLOBAL, INC.,

**Plaintiff-Appellant,**

v.

### UNITED STATES,

**Defendant-Appellee.**

———————————

### ORAL ARGUMENT REQUESTED

———————————

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF COLORADO
## SENIOR JUDGE R. BROOKE JACKSON
### No. 1-20-cv-03501

———————————

### BRIEF FOR THE APPELLEE

———————————

**DAVID A. HUBBERT**
*Deputy Assistant Attorney General*

**FRANCESCA UGOLINI**          **(202) 514-3361**
**JENNIFER M. RUBIN**          **(202) 307-0524**
**JUDITH A. HAGLEY**           **(202) 514-8126**
**POOJA A. BOISTURE**          **(202) 514-6072**
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, DC 20044*

*Of Counsel:*
**MATT KIRSCH**
*Acting United States Attorney*

# TABLE OF CONTENTS

**Page**

Table of contents............................................................................i
Table of authorities ...................................................................... iii
Glossary .......................................................................................ix
Statement of related cases ............................................................xi
Statement of the issue .................................................................. 1
Statement of the case ................................................................... 1

    A.  Background ............................................................... 2

        1.   U.S. international tax regime ......................... 2

        2.   Reg. §1.245A-5T .......................................... 5

        3.   Economic-substance doctrine ...................... 11

    B.   LGI and its CFCs .................................................. 13

    C.   Project Soy ............................................................ 14

    D.   LGI's 2018 tax return ........................................... 22

    E.   District Court proceedings.................................... 23

        1.   First summary-judgment motion ................. 23

        2.   Second summary-judgment motion ............. 24

Summary of argument ................................................................ 28
Argument:

    The District Court correctly determined that Project Soy's E&P-generating steps should be disregarded for tax purposes under §7701(*o*)'s codified economic-substance doctrine................ 30

    A.   Introduction:  Economic-substance doctrine........................ 30

    B.   The District Court correctly applied §7701(*o*) to LGI's tax-avoidance scheme ........................................................... 40

**Page**

    1.    It is undisputed that LGI satisfied neither requirement under §7701(*o*)(1)(A)&(B) ........................ 41

    2.    The economic-substance doctrine is relevant to Project Soy .................................................................. 42

C.    There is no threshold relevancy test divorced from the facts and circumstances of each case .................................... 43

D.    Contrary to LGI's new theory, the economic-substance doctrine is a substantive anti-abuse provision that applies to all tax provisions unless Congress expressly states otherwise ...................................................................... 48

E.    No component of Project Soy is immune from analysis under the economic-substance doctrine ............................... 52

F.    LGI's new alternative arguments have been waived and are meritless in any event ...................................................... 58

G.    Alternatively, Reg. §1.245A-5T precludes LGI's refund claim, and the District Court erred in invalidating it .......... 64

    1.    Temporary regulations are not required to undergo notice-and-comment procedures ................................... 65

    2.    Treasury had good cause to forgo the notice-and-comment requirements ................................................ 67

Conclusion ................................................................................ 70

Statement regarding oral argument ........................................ 70

Certificate of compliance ........................................................ 71

Certificate of service .............................................................. 72

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*ACM P'ship v. Commissioner*,
   T.C. Memo. 1997-115,
   *aff'd*, 157 F.3d 231 (3d Cir. 1998) ............................................. 33, 44

*AEP Co. v. United States*, 326 F.3d 737
   (6th Cir. 2003) ............................................................................. 55

*Alternative Carbon Resources, LLC v. United States*,
   939 F.3d 1320 (Fed. Cir. 2019) .......................................... 45, 47, 53

*Asiana Airlines v. F.A.A.*, 134 F.3d 393
    (D.C. Cir. 1998) ...................................................................... 65-67

*Badaracco v. Commissioner*,
   464 U.S. 386 (1984) ...................................................................... 68

*Bank of N.Y. Mellon Corp. v. Commissioner*,
   801 F.3d 104 (2d Cir. 2015) ................................... 31, 33, 50, 53, 63

*Benenson v. Commissioner*, 887 F.3d 511
   (1st Cir. 2018) ........................................................................ 35, 51

*Benenson v. Commissioner*, 910 F.3d 690
   (2d Cir. 2018) ..................................................................... 35, 36, 51

*Blum v. Commissioner*, 737 F.3d 1303
   (10th Cir. 2013) ................................................ 11, 26, 31, 32, 34, 45

*Bohrer v. Commissioner*, 945 F.2d 344
   (10th Cir. 1991) ........................................................................... 31

*Chemoil Corp. v. United States*, No. 19-CV-6314,
   2023 WL 6257928 (S.D.N.Y. Sept. 26, 2023) .................... 45, 47, 53

*Christian Heritage Acad. v. Oklahoma Secondary Sch.
   Activities Ass'n*, 483 F.3d 1025 (10th Cir. 2007) ......................... 60

*Coltec Indus., Inc. v. United States*,
   454 F.3d 1340 (Fed. Cir. 2006) .............. 32, 37, 49, 54, 55, 62, 63

*Cross Refined Coal, LLC v. Commissioner*,
   45 F.4th 150 (D.C. Cir. 2022) ...................................................... 47

*Dow Chem. Co. v. United States*, 435 F.3d 594
   (6th Cir. 2006) ............................................................................. 31

*Doyon, Ltd. v. United States*, 214 F.3d 1309
   (Fed. Cir. 2000) ........................................................................... 34

**Cases (cont'd):**                                         **Page(s)**

*Golsen v. Commissioner*, 445 F.2d 985
(10th Cir. 1971).................................................................54

*Gregory v. Helvering*, 293 U.S. 465 (1935)................ 11, 31, 47, 54, 55

*Horn v. Commissioner*, 968 F.2d 1229
(D.C. Cir. 1992) ..............................................................34

*James v. Commissioner*, 899 F.2d 905
(10th Cir. 1990)..........................................................45, 51

*Keeler v. Commissioner*, 243 F.3d 1212
(10th Cir. 2001)........................ 33, 34, 37, 38, 45, 49, 51

*Methodist Hosp. of Sacramento v. Shalala*,
38 F.3d 1225 (D.C. Cir. 1994).......................................69

*Mobil Oil Corp. v. DOE*, 728 F.2d 1477
(Temp. Emer. Ct. App. 1984) .......................................69

*N. Arapahoe Tribe v. Hodel*, 808 F.2d 741
(10th Cir. 1987).............................................................68

*Platt v. Union Pac. R. Co.*, 99 U.S. 48 (1878)...............................67

*PPL Corp. v. Commissioner*, 569 U.S. 329 (2013) .............................50

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123
(10th Cir. 2011)........................................................48, 58

*Rogers v. United States*, 281 F.3d 1108
(10th Cir. 2002)........................................................27, 49

*Sala v. United States*, 613 F.3d 1249
(10th Cir. 2010).................................38, 45, 49, 51, 62-64

*Salem Fin., Inc. v. United States*,
786 F.3d 932 (Fed. Cir. 2015)....................50, 51, 54, 63

*Santander Holdings USA, Inc. v. United States*,
844 F.3d 15 (1st Cir. 2016)........................ 31, 38, 50, 63

*Southgate Master Fund, LLC v. United States*,
659 F.3d 466 (5th Cir. 2011) .......................................37

*St. Charles Inv. Co. v. Commissioner*,
232 F.3d 773 (10th Cir. 2000) ......................................51

*Summa Holdings, Inc. v. Commissioner*,
848 F.3d 779 (6th Cir. 2017) .............................35, 51, 52

*Tucker v. Commissioner*, 766 F. App'x 132
(5th Cir. 2019).........................................................54, 56, 57

*Tucker v. Commissioner*, T.C. Memo. 2017-183 .................................57

**Cases (cont'd):**                                                                 **Page(s)**

*United States v. Liberty Glob., Inc.*, No. 1:22-CV-02622-
RBJ, 2023 WL 4603954 (D. Colo. June 1, 2023) ........................... 23

*Van Sant & Co. v. Town of Calhan*, 83 F.4th 1254
(10th Cir. 2023)................................................................. 48

*Wells Fargo & Co. v. United States*, 957 F.3d 840
(8th Cir. 2020)............................................................. 50, 63

*WFC Holdings Corp. v. United States*, 728 F.3d 736
(8th Cir. 2013)................................................................. 54

**Statutes:**

Administrative Procedure Act (5 U.S.C.):

§553(b) ............................................................................ 23
§559 ................................................................................ 65

Internal Revenue Code (26 U.S.C.):

§61(a) ............................................................................... 2
§245A.......................................... 3-10, 12-15, 19-22, 26, 29, 35, 40
42, 43, 50, 52, 58-60, 62, 64
§245A(g) ...................................................................... 6, 24
§351 ................................................................. 16, 25, 52, 54
§351(b)........................................................... 16, 18, 19
§368 ............................................................................... 54
§§901-909 ......................................................................... 2
§951 ............................................................. 3, 7, 8, 21
§951(a) ............................................................................. 3
§951(b).............................................................................. 3
§951A ...................................... 3, 4, 6, 8, 9, 11, 12, 20, 52
§957(a) ............................................................................. 3
§958 ................................................................................ 7
§959(d)............................................................. 4, 9, 14, 20
§964(e)(1) ....................................................................... 20
§964(e)(4)......................................................................... 7

**Statutes (cont'd):**                                                        **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§964(4)(A) ................................................................................ 20
§965 ................................................................................... 3, 4
§1248 ............................................................................. 7, 9, 20
§1248(a) ................................................................................. 7
§1248(h) ........................................................................... 58, 60
§7701(*o*) ............................... 1, 2, 11, 12, 24-30, 33, 34, 39, 40, 44-47
52, 53, 55, 58, 62, 63
§7701(*o*)(1) ...................................................................... 33, 46
§7701(*o*)(1)(A)&(B) ................................................. 28, 40, 41, 59
§7701(*o*)(5)(A) ...................................................... 40, 50, 59, 63
§7701(*o*)(5)(B) .......................................................... 34, 50
§7701(*o*)(5)(C) ................................................ 25, 33, 39, 44, 63
§7701(*o*)(5)(D) ............................................................. 40, 53
§7805(a) ............................................................................... 24
§7805(b) ........................................................................... 24, 66
§7805(b)(1) ............................................................................ 67
§7805(b)(1)(B) ...................................................................... 66
§7805(b)(2) ............................................................................ 10
§7805(e) ................................................................ 10, 24, 65-67
§7805(f) ............................................................................... 67

Tax Cuts & Jobs Act, P.L. 115-97,
131 Stat. 2054 ............................................................... 3

**Regulations:**

61 Fed. Reg. 66,584 (1996) .......................................................... 56
84 Fed. Reg. 28,398 (2019) .......................................................... 8-12
85 Fed. Reg. 53,068 (2020) .......................................................... 10

**Regulations (cont'd):**                                                   **Page(s)**

Treasury Regulations (26 C.F.R):

§1.245A-5T .......................................5, 6, 8, 10-12, 21-24, 64, 68, 69
§1.245A-5T(e)(3)(i) ............................................................... 10
§1.245A-5T(k)&(l) ............................................................... 10
§1.1248-7(a).......................................................................... 60
§301.7701-3(g)(2)(i) ............................................................. 56

**Other Authorities:**

10 *Mertens Law of Fed. Income Tax'n* (2024) ............................ 3, 4
*Attorney General's Manual on the APA* (1947) ................................ 69
Bittker & Lokken, *Federal Tax'n of Income, Estates &*
   *Gifts* (3d ed. 1999)..................................................... 33, 37
Fuller & Neumann, *U.S. Tax Review*, 89 Tax Notes
   Int'l 57 (Jan. 1, 2018)........................................................ 6
H.R. Conf. Rep. 100-1104 (1988) ...................................... 66
H.R. Conf. Rep. 115-466 (2017) .................................... 6, 11, 52
H.R. Rep. 111-443 (2010) ......... 11, 32, 33, 35, 38, 42-44, 46, 47, 55, 63
H.R. Rep. 115-409 (2017) ...................................................... 5, 6
IRS Internal Revenue Manual (I.R.M.) 4.46.4.12.9 ......................... 47
Joint Comm. on Taxation, *General Explanation of P.L.*
   *115-97,* JCS-1-18 (2018) ................................................ 57
Joint Comm. on Taxation*, Report of Investigation of*
   *Enron Corp.*, JCS-3-03 (2003) ........................................... 38
Kuntz & Peroni, *U.S. Int'l Tax'n* (2024)........................................ 2, 4
Notice 2010-62, 2010-40 I.R.B. 411.......................................... 45
NYS Bar Ass'n Tax Section, *Report on the GILTI*
   *Provisions of the Code* (May 4, 2018)........................................6-8
S. Prt. 115-20, Comm. on the Budget
   (Comm. Print 2017) .............................................. 5, 6, 57
Stmt. of Sen. Grassley, *Economic Substance Provision is*
   *Right Policy* (Nov. 6, 2007)............................................. 39

**Other Authorities (cont'd):**                    **Page(s)**

Tax Notes, *Members of ABA Tax Section Criticize Proposed Check-the-Box Regs*, 2000 TNT 158-46 (August 15, 2000)..............................................................56

-ix-

# GLOSSARY

| Term | Definition |
|------|------------|
| 1-App. | Appellant's Appendix, Volume 1 of 2 |
| 2-App. | Appellant's Appendix, Volume 2 of 2 |
| 1-Supp.App. | Appellee's Supplemental Appendix, Volume 1 of 2 |
| 2-Supp.App. | Appellee's Supplemental Appendix, Volume 2 of 2 |
| Add. | Addendum bound with Appellant's brief |
| APA | Administrative Procedure Act, 5 U.S.C. §551 *et seq.* |
| Br. | Opening brief filed by Liberty Global, Inc. |
| CFC | Controlled foreign corporation |
| Chamber-Br. | Amicus brief filed by Chamber of Commerce of the United States of America and the American Fuel & Petrochemical Manufacturers |
| Code | Internal Revenue Code (26 U.S.C.) |
| E&P | Earnings and profits |
| GILTI | Global intangible low-taxed income |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| I.R.M. | IRS Internal Revenue Manual |
| LGI | Appellant Liberty Global, Inc., a U.S. corporation |
| LG-UK | Liberty Global plc, a U.K. corporation and owner of LGI |

-x-

| Term | Definition |
|------|------------|
| NFTC-Br. | Amicus brief filed by National Foreign Trade Council, Inc. |
| NAM-Br. | Amicus brief filed by National Association of Manufacturers |
| NTUF-Br. | Amicus brief filed by National Taxpayers Union Foundation |
| NYS Bar | New York State Bar Association |
| Reg. | Treasury Regulations (26 C.F.R.) |
| TCJA | Tax Cuts & Jobs Act of 2017, P.L. 115-97, 131 Stat. 2054 |
| TGH | Telenet Group Holding, a Belgian subsidiary of Liberty Global plc |
| Telenet Financing | Telenet Financing USD LLC |

## STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(3), counsel for the United

States state that there are no prior or related appeals.

## STATEMENT OF THE ISSUE

Whether the District Court correctly determined that the long-standing economic-substance doctrine (now codified at §7701(*o*) of the Internal Revenue Code (26 U.S.C.)) applied to a tax-avoidance scheme that generated a $2.4 billion[1] tax deduction based on transactions that the taxpayer concedes lacked economic substance and business purpose.

The issue was raised (1-App.156, 240-241) and ruled on (Add.7-17).

## STATEMENT OF THE CASE

Liberty Global, Inc. (LGI) seeks a $110 million tax refund for 2018 based on a highly engineered tax-avoidance scheme involving only related parties. Code-named Project Soy, the scheme was developed by LGI's tax team for the sole purpose of sheltering $2.4 billion in taxable gain from U.S. taxation. The scheme relies on steps that LGI concedes were economically meaningless, thereby violating the economic-substance doctrine, a longstanding, now-codified substantive tax principle that is designed to prevent tax-avoidance schemes exactly like

---

[1] Dollar figures are approximations. Euro figures have been converted to dollars using the applicable euro-to-dollar conversion, i.e., 1.1809. (2-Supp.App.465.)

-2-

Project Soy.  The District Court granted summary judgment to the Government, applying §7701(*o*) to disallow Project Soy's gain elimination.

### A.  Background

#### 1.    U.S. international tax regime

Operating under a system of worldwide taxation, the United States has traditionally taxed the foreign income of its citizens and residents just as it taxes their domestic income (providing a foreign tax credit to alleviate double taxation).  I.R.C. §§61(a), 901-909.  Thus, if a U.S. taxpayer (whether a corporation or an individual) conducts business and earns income in a foreign country, that taxpayer pays U.S. income tax on those earnings.  Kuntz & Peroni, *U.S. Int'l Tax'n* §A1.06 (2024).  Historically, U.S. taxpayers did not have to pay U.S. tax on the earnings of foreign corporations until those earnings were distributed to them (i.e., repatriated), unless an anti-deferral rule applied to deem an immediate repatriation.  *Id.*  The result for U.S. owners of foreign corporations was "the *deferral* of U.S. taxes."  *Id*.

For decades, Congress has sought to limit the tax deferral available with respect to foreign corporations controlled by U.S. owners

(CFCs)[2] — i.e., with more than 50% U.S. ownership.  Initially, its main mechanism for doing that was a set of laws enacted in 1962, commonly called "subpart F" (referring to their placement in the Code).  *See* I.R.C. §951 *et seq.*  In general, subpart F restricts tax deferral on foreign income for U.S. taxpayers who own at least 10% of a CFC (U.S. shareholder[3]) by taxing them immediately on certain CFC earnings (primarily passive income, such as interest), even though the earnings are not actually distributed to the U.S. shareholder.  I.R.C. §951(a).

In 2017, Congress revamped how CFC earnings are taxed.  *See* Tax Cuts & Jobs Act (TCJA), P.L. 115-97, 131 Stat. 2054.  The TCJA largely eliminated tax deferral by taxing U.S. shareholders currently on all foreign earnings, except for certain limited categories of income.  *See* 10 *Mertens Law of Fed. Income Tax'n* §38B:107 (2024).

Congress implemented this tax reform through three new interlocking provisions — §§951A, 965, and 245A — operating in harmony along with the pre-TCJA subpart F regime.  *Mertens,* above, §38B:107.  In general, §965 imposed a one-time transition tax on

---

[2]  CFC is defined in §957(a).

[3]  U.S. shareholder is defined in §951(b).

-4-

unrepatriated foreign earnings for which tax had been deferred prior to
the TCJA (i.e., earnings accumulated from 1986-2017), and §951A
subjects the bulk of post-TCJA CFC earnings to current taxation. *Id*.
Section 951A generally taxes CFC earnings not already taxed currently
to the shareholder under subpart F (other than a deemed 10% return on
tangible-asset investments) — i.e., earnings referred to as GILTI (global
intangible low-taxed income). *Id*. Any residual earnings not taxed
under subpart F or GILTI (essentially earnings from tangible assets)
may be exempt from taxation. *Id*. The exemption is implemented
through §245A, which provides a 100% dividends-received deduction for
a "very limited" class of foreign earnings (i.e., earnings not subject to
subpart F or GILTI). Kuntz, above, §A1.06[8]. Foreign earnings taxed
under subpart F, GILTI, or §965 are classified as previously taxed
"earnings and profits" (E&P), and distributions of previously taxed E&P
are not eligible for the §245A dividends-received deduction because they
definitionally are not "dividends." I.R.C. §959(d). *See Mertens*, above,
§38B:107 (§245A deduction was "designed to operate residually,"
applying only to CFC earnings that "are not first subject" to subpart F
or GILTI).

In designing the TCJA, Congress sought to ensure that most foreign income of U.S.-owned foreign corporations remains in the "U.S. tax base." S. Prt. 115-20, Comm. on the Budget, at 370 (Comm. Print 2017). Congress implemented that goal by retaining subpart F and adding GILTI, which together protect the "U.S. tax base" by limiting the type of foreign earnings eligible for tax exemption under §245A. *Id.*; H.R. Rep. 115-409, at 375, 388-390 (2017). Congress emphasized that these "anti-base erosion measures" were "critical" because of the tax-avoidance potential presented by §245A. H.R. Rep. 115-409, at 400.

### 2. Reg. §1.245A-5T

Most tax reform projects require action by Treasury to implement. The TCJA was no exception. *See* https://www.irs.gov/newsroom/tax-reform-guidance (listing Treasury's TCJA guidance, including dozens of regulations). It was a major tax overhaul that depended on regulations to ensure that the new provisions worked together as intended. Given the complexity of the TCJA's international tax changes, Congress understood that it was especially prone to exploitation by multinational corporations and relied on Treasury to prevent unintended consequences by coordinating the interlocking provisions and filling in

any gaps. *E.g.*, H.R. Conf. Rep. 115-466, at 645 (2017); H.R. Rep. 115-409, at 377, 392; S. Prt. 115-20, at 373. As pertinent here, Congress granted Treasury specific regulatory authority to ensure that §245A operated as intended. I.R.C. §245A(g). *See* H.R. Rep. 115-409, at 370 (§245A was intended to be limited by "appropriate anti-base erosion safeguards," including §951A's GILTI regime).

When the TCJA was first enacted, the tax bar understood that §245A was designed to be of "limited significance" because most foreign income would be subject to GILTI and thus not "qualify for" its deduction. Fuller & Neumann, *U.S. Tax Review*, 89 Tax Notes Int'l 57, 58 (Jan. 1, 2018). But Treasury learned that some taxpayers sought to undermine congressional intent.

In May 2018, the NYS Bar warned Treasury about potential gaps in the TCJA that could prevent the GILTI regime from operating as intended.[4] NYS Bar Ass'n Tax Section, *Report on the GILTI Provisions of the Code* (May 4, 2018). It concluded that "regulations will be needed to resolve many ambiguities and unanswered questions under the

---

[4] This public report is part of the administrative record for Reg. §1.245A-5T. (1-Supp.App.15.)

statute." *Id*. at 17.  The report described gaps in the TCJA that potentially could allow taxpayers to claim §245A deductions for income meant to be subject to the subpart F and GILTI regimes if they sold their CFC stock to a foreign buyer before the last day of the CFC's tax year.[5]  *Id*. at 53-55, 57.  (This problem is illustrated below, pp.9-10.)  In that case, CFC status may be technically preserved due to the TCJA's amendments to the §958 attribution rules, even though the CFC's tax nexus to the United States is severed for all practical purposes.  (The CFC's tax nexus is severed because the CFC no longer has any actual U.S. shareholders, and only U.S. shareholders who actually own CFC stock on the last day of the CFC's tax year have subpart F or GILTI inclusions.)  Under that scenario, because no U.S. shareholder would be responsible for paying tax under subpart F or GILTI on that year's CFC earnings, the earnings go untaxed and become available to support a

---

[5]  Gain from the sale of CFC stock is treated as a "dividend" eligible for the §245A dividends-received deduction in certain circumstances.  If a U.S. shareholder sells (or is deemed to sell) its CFC stock for a gain, the gain is treated as a dividend, to the extent of the CFC's untaxed E&P.  I.R.C. §1248(a).  Similarly, if a CFC sells the stock of another CFC, any gain on that sale is treated as a dividend to the same extent it would have been under §1248, I.R.C. §964(e)(4); gain that exceeds the CFC's untaxed E&P is taxed to the U.S. shareholder under §951.

§245A deduction, which could eliminate tax on the sale of the CFC stock. *Id*. at 54, 57. The Report recommended potential solutions, including a "new rule" that would close the CFC's tax year on the date of the stock sale, so that the selling U.S. shareholder would own the CFC on the last day of its year and thus be required to recognize GILTI and subpart F inclusions. *Id*. at 59.

Treasury later learned that the problem was not just theoretical; taxpayers were actively exploiting the statutory gap in the TCJA.[6] 84 Fed. Reg. 28,398, 28,400 (2019). Accordingly, Treasury promulgated a temporary regulation, Reg. §1.245A-5T, in June 2019 to close that gap.[7] *Id*. Under Reg. §1.245A-5T, a taxpayer cannot claim the §245A deduction from a transaction to the extent that it reduces or eliminates its interest in the CFC, unless it closes the CFC's tax year as of the date of that transaction. In that way, the U.S. shareholder's share of the CFC's current-year earnings are taxed under §§951 and 951A, and only

---

[6] Sections 245A, 951, and 951A do not specifically address the situation where a CFC's earnings constitute GILTI or subpart F income but the CFC no longer has any U.S. shareholders to recognize that income. The regulations fill that gap.

[7] The regulation also closed a gap created by the asymmetrical effective dates of §§245A and 951A. *See* 84 Fed. Reg. at 28,400-28,401.

residual earnings leftover after applying those provisions may qualify for §245A. *Id.* at 28,402-28,403.

To illustrate the gap and the operation of the regulation, consider two hypothetical taxpayers. Taxpayer A owns 100% of the stock of a CFC with $900 in current-year earnings. $800 of those earnings represent GILTI, which Taxpayer A must include in its income under §951A, leaving the CFC with $100 in untaxed earnings. Taxpayer A sells all of its CFC stock to a foreign related party on December 31, 2018, the last day of the CFC's tax year, for a gain of $10,000. The gain from the stock sale is treated as a dividend to the extent of the CFC's untaxed earnings (i.e., $100). I.R.C. §§959(d), 1248. Taxpayer A can claim a §245A deduction of $100, reducing its taxable gain on the stock sale to $9,900.

Assume the same facts for Taxpayer B, except that Taxpayer B sells the stock on December 28, 2018. In that situation, the $800 in GILTI earnings are not subject to tax under §951A because the CFC has no U.S. shareholder at the end of its tax year (i.e., December 31, 2018), and the CFC therefore has $900 in untaxed earnings for that year. Without the regulation, Taxpayer B can claim a §245A deduction

to the extent of the CFC's untaxed earnings (i.e., $900), reducing its taxable gain on the stock sale to $9,100.  Under the regulation, Taxpayer B's §245A deduction is limited to the CFC's residual non-GILTI earnings, i.e., $100, and it has taxable gain of $9,900, just like Taxpayer A.[8]

Reg. §1.245A-5T was issued as a temporary regulation and applied retroactively to distributions occurring after December 31, 2017.  Reg. §1.245A-5T(k)&(l).  Congress has authorized Treasury to promulgate temporary and retroactive regulations in certain circumstances.  A temporary regulation is permitted so long as it (i) is also issued as a proposed regulation, and (ii) expires within three years of issuance.  I.R.C. §7805(e).  Reg. §1.245A-5T complied with both requirements.  84 Fed. Reg. at 28,398 (noting proposed regulations); 85 Fed. Reg. 53,068 (2020) (finalizing proposed regulations and removing Reg. §1.245A-5T).  A regulation may be applied retroactively if (as relevant here) it is issued within 18 months of the date of enactment of the statutory provision to which it relates.  I.R.C. §7805(b)(2).  Here,

---

[8] To claim the limited deduction, Taxpayer B must elect to close the CFC's year.  Reg. §1.245A-5T(e)(3)(i).

Reg. §1.245A-5T was promulgated on June 18, 2019, within 18 months of the TCJA's enactment.  84 Fed. Reg. at 28,406.

### 3.    Economic-substance doctrine

Aware that sophisticated taxpayers would likely seek to exploit the TCJA, Congress directed Treasury to use all of its anti-abuse tools in enforcing the new law.  *E.g.*, H.R. Conf. Rep. 115-466, at 645 ("The conferees intend that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders … to minimize tax under [§951A] be disregarded.").  One such tool is the economic-substance doctrine.  For almost a century, transactions that "comply with the literal terms of the tax code" have been disregarded for tax purposes if they have no economic substance but are merely tax-avoidance schemes.  *Blum v. Commissioner*, 737 F.3d 1303, 1309 (10th Cir. 2013); *see Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (disregarding corporate reorganization that complied with statutory "terms").  Congress codified this bedrock tax principle in 2010, *see* I.R.C. §7701(*o*), to "enhance[ ] the application of the economic substance doctrine" and "improve its effectiveness at deterring unintended consequences."  H.R. Rep. 111-443, at 295 (2010).

In issuing Reg. §1.245A-5T, Treasury noted that it assumed that the transactions targeted by the regulation "would otherwise withstand scrutiny under section 7701(*o*) (i.e., the economic substance doctrine)." 84 Fed. Reg. at 28,408 n.3.  It warned that transactions falling within the regulation's scope that lacked economic substance or business purpose would be "challenge[d]" under §7701(*o*) as well.  *Id.*

Of particular concern were taxpayers engaging in economically meaningless transactions in order to manufacture CFC earnings, and thereby supersize their §245A deductions.  To illustrate, recall the hypothetical above where Taxpayer B relied on the statutory gap to claim a $900 §245A deduction that reduced its $10,000 stock-sale gain to $9,100.  Assume the same facts except Taxpayer C utilizes mechanical tax rules (as opposed to business operations) to manufacture $9,100 in E&P that represents GILTI.  When that engineered E&P is added to the CFC's regular E&P of $900, it has (i) $9,900 in E&P that represents GILTI but is not subject to tax under §951A (because the CFC has no U.S. shareholder at the end of its tax year), and (ii) $100 in E&P that is properly exempt from tax, for a total of $10,000 in untaxed E&P for that year.  By manufacturing $9,100 of

"untaxed" E&P, Taxpayer C is able to claim a §245A deduction of $10,000, which eliminates all taxable gain from the stock sale, contrary to congressional intent (*see*, above, pp.3-6).

### B.    LGI and its CFCs

LGI is a U.S. telecommunications corporation and parent of a group of companies that file a consolidated tax return.  (1-App.211.) LGI, in turn, is owned by a U.K. company, Liberty Global plc (LG-UK). (*Id*.)  During the year at issue (2018), LGI (through a CFC) was a majority owner of another CFC, the Belgian telecommunications company Telenet Group Holding (TGH).  (1-App.212.)  TGH, in turn, owned Telenet Group, a separate Belgian entity that was "disregarded" for U.S. tax purposes (i.e., Telenet Group's assets and liabilities were treated as being owned directly by TGH).  (*Id*.)  (*See* 1-App.149, 154 (charts depicting corporate structure before and after Project Soy).)

Shortly after the TCJA was enacted, LGI's tax advisors analyzed the law's impact on its CFCs and concluded that LGI would no longer be able to defer taxation on its share of TGH's earnings, which would be subject to current taxation under GILTI.  (1-Supp.App.105-115.)  They determined that it would be "beneficial" for LGI to remove TGH from

the "U.S. tax net" by transferring its TGH stock to a foreign affiliate. (1-Supp.App.105-106, 114-115.)  But that transfer would be a taxable event that would generate a $2.4 billion taxable gain for LGI.  (1-App.193, 221.)  During the second half of 2018, LGI's tax advisors developed a plan to shelter that gain from U.S. taxation and code-named it Project Soy.  (1-App.198.)

### C.    Project Soy

Project Soy utilized the statutory gap in the TCJA (described above, pp.6-8), which LGI called a "mismatch."  (1-Supp.App.174; 2-Supp.App.289-292, 445; 1-App.194-195, 221.)  LGI could not, however, rely on the statutory "mismatch" alone to shield from U.S. tax its entire $2.4 billion in gain because TGH had only a small amount of untaxed E&P.  As explained above, only untaxed E&P may support a dividend that qualifies for §245A's deduction.  I.R.C. §959(d).  In 2018, LGI's share of what it called TGH's "regular" E&P was less than $400 million. (1-Supp.App.181-185; 2-Supp.App.466.)  Even if LGI could rely on the statutory mismatch to avoid GILTI and subpart F tax on that regular E&P by selling TGH (a calendar-year entity) before year end, and then use that untaxed E&P to claim a $400 million §245A dividends-received

deduction, it would still owe tax on $2 billion in gain from selling TGH. (1-App.193, 221.)  To borrow from the hypotheticals (pp.9-10, 12-13), LGI needed a plan to move from Taxpayer B's situation to that of Taxpayer C.  To solve this dilemma, LGI's tax advisors developed Project Soy to manufacture additional E&P to increase its §245A deduction by more than $2 billion and completely offset its gain on the sale.  (1-Supp.App.168-170, 181-182; 2-Supp.App.218.)

Working with its external tax advisors at Deloitte, LGI revised Project Soy at least sixteen times during the last half of 2018, seeking to maximize its tax benefits.  (1-App.198; 1-Supp.App.93, 122-123; 2-Supp.App.323, 442-443.)  As implemented, Project Soy generated billions[9] in E&P for TGH through three steps executed December 25-26, 2018.  (1-App.148-154, 188-189, 193-194.)  LGI then sold its TGH stock on December 28, 2018, shortly before its tax year ended.  (1-App.153.) It used the manufactured E&P to increase its §245A deduction to completely offset the $2.4 billion gain from its sale of TGH stock.  (2-Supp.App.466.)  The overnight increase in E&P was generated by

---

[9]  LGI's share of this manufactured E&P would exceed $2.4 billion. (1-Supp.App.181-182; 2-Supp.App.466.)

noncommercial transactions undertaken to exploit mechanical operation of certain tax rules.  (1-App.211-224.)  We briefly summarize those rules, before describing Project Soy's discrete steps.

To manufacture billions in E&P, Project Soy utilized §351's corporate-organization rules and the fact that Telenet Group was a "disregarded entity" for U.S. tax purposes.  (1-App.188-189, 215-218.)  Section 351 ordinarily allows a taxpayer to contribute assets to a corporation in exchange for common stock without recognizing taxable gain.  (1-Supp.App.135-136, 151-153.)  But if the taxpayer receives something other than common stock — known as "boot" — the boot could trigger gain under §351(b), which in turn creates E&P.  (*Id.*)

When an entity (like Telenet Group) converts from one that is disregarded for U.S. tax purposes to one that is regarded as a corporation, a §351 exchange is deemed to occur:  the disregarded entity's owner (TGH) is deemed to contribute the assets and liabilities of that entity (Telenet Group) to a new one in exchange for the new entity's stock.  (1-App.214-215.)  As described below, LGI used Steps 1 and 3 of Project Soy to create a type of stock that would be treated as boot in the deemed §351 exchange (i.e., profit certificates).  (1-App.215-

217; 1-Supp.App.144-146.)  LGI used Steps 2 and 3 to generate other gain-producing boot, which it called "springing-to-life" debt (explained below at n.10).  (1-App.218.)

**Step 1 (relating to profit certificates)** — **initiated October 15 and executed December 26, 2018**:  Telenet Group (TGH's operating subsidiary) reduced TGH's share capital, i.e., the recorded value of TGH's ownership in Telenet Group, by $5 billion.  (1-App.150.) TGH was momentarily left with only a small capital interest ($73,000) and a "claim" against Telenet Group for $5 billion.  (1-App.149-150, 152; 2-Supp.App.452.)  The capital reduction supported the profit certificates utilized in Step 3 to trigger gain.  (1-App.187.)

**Step 2 (relating to "springing to life" debt)** — **December 25, 2018**: Telenet Group transferred a financing subsidiary (Telenet Financing USD LLC) to TGH for a nominal price of $4, i.e., Telenet Financing became a direct subsidiary of TGH, as opposed to an indirect subsidiary through Telenet Group.  (1-App.151, 190.)  This transfer caused certain preexisting intercompany debt to "spring to life" for U.S.

tax purposes and generate gain upon the conversion in Step 3.[10]  (1-App.203-204.)

**Step 3 (relating to entity conversion and issuance of profit certificates) — December 26, 2018**: Step 3 had two parts.  In Step 3A, Telenet Group converted from a BVBA to an NV under Belgian law. (1-App.152.)  BVBAs are akin to limited liability companies in the U.S. and often are not taxed as separate entities for U.S. tax purposes (i.e., they are "disregarded"); NVs are akin to corporations in the U.S. and are separate entities for tax purposes.  (1-App.213-215.)  By converting, Telenet Group changed from a disregarded entity treated as a division of its parent (TGH) to a regarded corporation separate from TGH for

---

[10]  According to LGI, "springing to life" debt is preexisting intercompany debt between two disregarded entities that becomes a recognized asset when one of the entities converts to being regarded for tax purposes.  (1-Supp.App.148-165; 1-App.189.)  Before Project Soy, that debt was between Telenet Group and its indirect subsidiary (Telenet Financing).  Because both were disregarded entities with the same owner (TGH), the debt was disregarded for U.S. tax purposes. (*Id.*)  In Step 2 of Project Soy, Telenet Financing was transferred to TGH.  (*Id.*)  Telenet Group's conversion in Step 3 made the debt cognizable for U.S. tax purposes, giving rise to a receivable treated as being issued to TGH.  (*Id.*)  Because that receivable represented the receipt of a "new" asset for TGH for tax purposes, it was treated as boot under §351(b), generating E&P.  (*Id.*)  But the "springing-to-life" debt was not new funding — just the same intercompany debt that was previously ignored for U.S. tax purposes.  (*Id.*)

U.S. tax purposes. (*Id*.) The conversion caused the intercompany debt transferred in Step 2 (previously disregarded for U.S. tax purposes) to "spring to life" and trigger gain under §351(b). (1-App.203-205.) In Step 3B, Telenet Group issued the profit certificates, i.e., boot, to TGH in the amount of its capital claim from Step 1, $5 billion, triggering gain in that amount under §351(b). (1-App.152, 187-189.)

Through these unusual, interdependent related-party steps, LGI turned what could have been a tax-free conversion where no gain is recognized into an event that generated enormous amounts of E&P.[11] LGI intended that manufactured E&P to go untaxed (thanks to the statutory mismatch that LGI sought to exploit) and thus become available to inflate the §245A deduction that LGI would claim when it sold its interest in TGH in Step 4. (1-App.181, 188-189; 1-Supp.App.145-157, 181-182; 2-Supp.App.231, 252-255.) LGI admits that Steps 1-3 served only its tax-avoidance purpose and had no economic effects. (1-App.179-181; 2-App.503-505; 2-Supp.App.451.)

---

[11] $2 billion of LGI's share of the E&P generated on December 26 would have been taxed as GILTI in 2018 but for the fact that TGH had no U.S. shareholders at year-end. (1-Supp.App.82.)

**Step 4 (removing TGH from U.S. ownership)** — **December 28, 2018**: LGI (through a CFC) sold its interest in TGH to its foreign parent (LG-UK) in exchange for a $3.2 billion intercompany note, thus eliminating any U.S. ownership of TGH and any U.S. taxation of TGH's 2018 and future earnings. (1-App.153.)

**Summary of Project Soy**: LGI's interest in TGH had greatly appreciated, and its gain on selling TGH was $2.4 billion. (1-App.193.) To the extent that TGH had untaxed E&P, however, the gain on the stock sale would be characterized as a dividend and could be offset by the §245A dividends-received deduction. I.R.C. §§245A, 959(d), 964(e)(1), (4)(A), 1248. By taking into account the E&P generated in Steps 1-3 of Project Soy on December 25-26, and claiming that those earnings were not subject to GILTI tax under §951A because TGH had no U.S. shareholder on December 31st, LGI could characterize the entire $2.4 billion stock-sale gain as a dividend eligible for a fully offsetting deduction under §245A. (1-App.205, 224.)

LGI could have transferred its interest in TGH outside the U.S. tax net without engaging in the E&P-generating Steps 1-3. (1-App.181.) But without Steps 1-3, it would have had relatively little

untaxed E&P to use to support a §245A deduction (like Taxpayer B in the hypothetical above), and almost all of its $2.4 billion gain would have been subject to U.S. tax under §951.  (*Id.*; 1-Supp.App.173-185.)

As it considered and revised Project Soy during 2018, LGI closely monitored legislative and regulatory developments.  (1-App.196; 1-Supp.App.84-88, 160-161.)  It knew that Project Soy was exploiting a statutory "mismatch."  (1-Supp.App.160-161, 174; 2-Supp.App.289-292, 445.)  LGI also knew that this gap could be filled by Treasury.  (2-Supp.App.297.)  During a October 2018 meeting, LGI discussed how Congress left "significant portions" of the TCJA's implementation "to be governed by Regulatory guidance issued by US Treasury over [the] next year."  (2-Supp.App.450.)  It closely followed agency pronouncements to see if "Treasury [would] close the … mismatch" (1-Supp.App.84), in which event it would reconsider Project Soy (1-Supp.App.86-88, 160-161; 2-Supp.App.445).

Although Project Soy was implemented in late December 2018, before Treasury closed the gap in June 2019, LGI was not caught unaware by Reg. §1.245A-5T.  Treasury's plan to close the gap was publicly reported, and LGI knew that Treasury might act retroactively.

*See* 1-Supp.App.54-55 (news article predating Project Soy); 1-Supp.App.88 (Project Soy Executive Summary noting that regulations could be "retroactive"). Weeks before it finalized Project Soy, LGI executives were advised that Treasury regulations impacting its tax-avoidance plan could be "issued until June 30, 2019 to be retroactive to January 1, 2018." (1-Supp.App.88.)

### D. LGI's 2018 tax return

LGI filed its 2018 federal tax return in October 2019, months after Reg. §1.245A-5T was promulgated. (1-Supp.App.81.) LGI initially complied with the regulation, electing on its original return to close TGH's 2018 tax year as of the date LGI sold it (i.e., December 28). (1-App.229.) It reported $2 billion of the E&P generated by Project Soy as GILTI, paid the related tax, and claimed a §245A deduction of $360 million using its residual untaxed E&P. (1-Supp.App.82.) Two months later, it filed an amended return in which LGI (i) asserted that Reg. §1.245A-5T was invalid and (ii) recomputed its tax liability as if the regulation did not apply, reporting no GILTI and claiming a §245A deduction of $2.4 billion. (1-App.229-230; 1-Supp.App.82.)

Before the IRS could complete its examination of LGI's 2018 tax return, LGI filed this suit, seeking a $110 million refund.  (1-App.12; 1-Supp.App.22.)  Because LGI "truncated the administrative process," the Government was forced to file a related suit to collect the additional taxes due for 2018.  *United States v. Liberty Glob., Inc.*, No. 1:22-CV-02622-RBJ, 2023 WL 4603954, at *5 (D. Colo. June 1, 2023).  Computational issues remain in that pending collection suit.  (2-Supp.App.469.)

## E.    District Court proceedings

The refund suit was resolved through two rounds of summary-judgment motions, the first concerning Reg. §1.245A-5T and the second concerning the economic-substance doctrine.

### 1.    First summary-judgment motion

In its first summary-judgment motion, LGI argued that Reg. §1.245A-5T was invalid because (i) Treasury failed to follow the notice-and-comment requirements of the Administrative Procedure Act (APA), *see* 5 U.S.C. §553(b); (ii) Reg. §1.245A-5T was impermissibly retroactive; and (iii) the regulation exceeded Treasury's authority.  (1-Supp.App.28-51.)  The Government argued that (i) the temporary regulations were

governed by §7805(e)'s procedural requirements rather than the APA's requirements; (ii) §7805(b) authorized retroactive regulations; and (iii) §§245A(g) and 7805(a) authorized the regulations.  (1-Supp.App.56-80.)

Addressing only the first argument, the District Court determined that Reg. §1.245A-5T was procedurally invalid because it was issued without notice and comment.  (1-App.116.)  The court recognized that §7805(e) specifically authorized temporary regulations for three years, so long as they were simultaneously issued as proposed regulations subject to notice and comment.  (1-App.120.)  But it concluded that those specific procedures did not displace the APA requirements.  (*Id*.)  The court further determined that Reg. §1.245A-5T did not qualify for the APA's "good cause" exception, even though it recognized that the regulation was needed to deter taxpayers from undermining the TCJA's new tax regime.  (1-App.120-124.)

### 2.    Second summary-judgment motion

The parties subsequently cross-moved for summary judgment regarding whether LGI's refund claim should be disallowed under §7701(*o*)'s codified economic-substance doctrine.  LGI represented to the

District Court that its "sole argument" was that the economic-substance doctrine was not "relevant" to Project Soy. (1-App.260-261.) LGI conceded that the E&P-generating steps of Project Soy failed both prongs of the codified economic-substance doctrine. (2-App.505.) But it argued (i) that the economic-substance doctrine "does not apply to 'basic business transactions,'" such as corporate organizations under §351 and entity selections, and (ii) that Steps 1-3 of Project Soy were exempt from the doctrine as basic business transactions. (1-App.129 (citation omitted).)

The Government disagreed with LGI's attempt to short circuit the economic-substance analysis. It argued that §7701(*o*) created no categorical exemptions and directed courts to look to existing precedent, which applied the economic-substance doctrine to all types of transactions, including those governed by §351 or involving an entity selection. (1-App.241 (citing §7701(*o*)(5)(C)).)

The District Court determined that the economic-substance doctrine applied to LGI's tax-avoidance scheme and that the Project Soy steps that generated billions in E&P (Steps 1-3) should be disregarded for tax purposes such that the manufactured E&P could not be used to

inflate LGI's §245A deduction.  (Add.21.)  The court first rejected LGI's contention that §7701(*o*) required the court to conduct a separate threshold analysis into whether the doctrine is relevant to Project Soy divorced from the facts of the case.  (Add.7-10.)  As the court explained, under existing precedent, courts (including this Court) regularly applied the economic-substance doctrine without first engaging in any separate, threshold inquiry.  (Add.8-9 (citing *Blum*, 737 F.3d at 1309).)  The court determined that the doctrine is "relevant" within the meaning of §7701(*o*) whenever "a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings."  (Add.8 (quoting §7701(*o*)'s legislative history).)  Applying that fact-intensive standard, the court concluded that the doctrine was "relevant" here because Project Soy exploited a legislative "mismatch" through transactions that served no economic purpose other than tax savings (Add.1-2) and thereby "violated congressional intent" (Add.13).  As the court explained, "Congress intended that only earnings that are exempt from GILTI would be eligible for the §245A dividends-received deduction" (1-App.113), and "Project Soy was designed to, and does, unlink the §245A deduction from the 'appropriate

anti-base erosion safeguards' that the legislature intended" (Add.14 (citation omitted)).

The District Court also rejected LGI's contention that Steps 1-3 of Project Soy were exempt from §7701(*o*) as "basic business transactions." (Add.14-15.)  As the court explained, the statute contained no categorical exceptions, and Project Soy was not a basic business transaction but was instead a highly structured tax-avoidance scheme. (Add.14-16.)

The District Court applied §7701(*o*)'s two-prong inquiry to the undisputed facts and concluded that Steps 1-3 of Project Soy (i.e., the E&P-generating steps) failed both requirements of the codified economic-substance doctrine.  (Add.16-21.)  In so ruling, the court relied on LGI's admissions that these steps did not change LGI's economic position in any meaningful way and served no substantial non-tax purpose.  (Add.16-17.)  The court further determined that the undisputed evidence "corroborates" those admissions.[12]  (Add.19.)

---

[12] The Government also challenged Project Soy under the step-transaction doctrine, a common-law tax doctrine distinct from the economic-substance doctrine.  (1-App.172-174, 257-259.)  *See Rogers v. United States*, 281 F.3d 1108, 1113-1118 (10th Cir. 2002) (explaining

(continued…)

## SUMMARY OF ARGUMENT

This case involves a tax-avoidance scheme — code-named Project Soy — that generated a $2.4 billion tax deduction based on economically meaningless related-party transactions. That massive tax benefit was contrary to congressional intent and relied on what LGI termed a statutory "mismatch." Under the long-standing economic-substance doctrine, now codified at §7701(*o*), such tax benefits must be disallowed unless the taxpayer can demonstrate that they were generated by a transaction that has both economic substance and business purpose. I.R.C. §7701(*o*)(1)(A)&(B). LGI concedes that Steps 1-3 of Project Soy had neither.

1.     Applying §7701(*o*) and this Court's economic-substance-doctrine precedent to LGI's admissions and other undisputed evidence, the District Court correctly determined that Project Soy's deduction-inflating steps (Steps 1-3) should be disregarded for tax purposes. The court further correctly determined that the economic-substance doctrine

---

the differences between the doctrines). The District Court did not reach that argument. (Add.4.) If this Court were to reverse the economic-substance ruling, it should remand the case for consideration of this alternative doctrine.

was relevant here because Congress did not intend to provide massive §245A deductions based on an economically empty, tax-motivated transaction.

2.      In attempting to limit the economic-substance doctrine, LGI rewrites §7701(*o*) and ignores its history and the relevant precedent. The codified doctrine (i) does not impose a threshold relevance test divorced from the facts and circumstances of each case, (ii) is not an interpretive canon, and (iii) does not contain categorical exemptions for corporations.  The doctrine's applicability in any given case is heavily dependent on the taxpayer's facts and circumstances, as every court — including this Court — has repeatedly determined, including courts addressing §7701(*o*).  And, contrary to LGI's reimagining, the economic-substance doctrine is a substantive anti-abuse rule that is part of the Code, and it applies to all Code provisions unless Congress clearly indicates otherwise.  LGI's alternative theories for prevailing have been waived and lack merit.

## ARGUMENT

**The District Court correctly determined that Project Soy's E&P-generating steps should be disregarded for tax purposes under §7701(*o*)'s codified economic-substance doctrine**

### A.    Introduction:  Economic-substance doctrine

Project Soy was an elaborate tax-avoidance scheme designed to shelter $2.4 billion in gain from U.S. taxation based on paper shuffling between related parties.  To shelter that gain, LGI's tax advisors manufactured billions in E&P overnight in late 2018 so that LGI could avoid U.S. tax when it sold its appreciated interest in TGH two days later.  It is undisputed that the steps taken to generate that E&P (i.e., Steps 1-3 of Project Soy) failed both prongs of §7701(*o*); indeed, LGI concedes as much.  (2-App.503-505.)  But LGI claims that it is nevertheless entitled to its massive tax treasure because it "mechanical[ly]" complied with the terms of multiple Code provisions (Br.24), and the economic-substance doctrine cannot "override tax statutes" (Br.1).  LGI is wrong.[13]

---

[13]  LGI's position on appeal also conflicts with its concession in the District Court that the economic-substance doctrine applies "even though the taxpayer has otherwise complied with the technical tax rules."  (1-App.128.)

For almost a century, transactions that "comply with the literal terms of the tax code" have been disregarded for tax purposes if they have no economic substance but are merely tax-avoidance schemes. *Blum*, 737 F.3d at 1307, 1309 (disregarding tax benefits from transaction that mechanically complied with applicable "technical rules").  This Court — like every other circuit — has repeatedly disallowed tax benefits under the economic-substance doctrine even where taxpayers "comply with the letter of the tax code." *Bohrer v. Commissioner*, 945 F.2d 344, 347 (10th Cir. 1991) (collecting cases); *see, e.g., Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (disregarding tax benefits under the economic-substance doctrine despite "formal compliance with Code provisions") (citation omitted); *Bank of N.Y. Mellon Corp. v. Commissioner*, 801 F.3d 104, 113 (2d Cir. 2015) (same); *Santander Holdings USA, Inc. v. United States*, 844 F.3d 15, 23 (1st Cir. 2016) (same).  The Supreme Court has long endorsed this critical principle.  *E.g., Gregory*, 293 U.S. at 470 (disregarding corporate reorganization that complied with a statute's "terms").  And Congress codified it 14 years ago to deter transactions exactly like Project Soy, i.e., "[t]ax avoidance transactions [that] relied upon the

interaction of highly technical tax law provisions to produce tax consequences not contemplated by Congress." H.R. Rep. 111-443, at 295.

Courts disregard tax benefits generated by the "mechanical operation" of the tax rules (Br.24) in economically meaningless transactions because Congress and Treasury are presumed to draft tax rules for meaningful transactions. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352-1354 (Fed. Cir. 2006). Virtually all sophisticated tax shelters are designed to satisfy the applicable tax rules, but courts (including this Court) have consistently rejected them under the economic-substance and other anti-abuse doctrines. *Id.*; *Blum*, 737 F.3d at 1309-1315. When drafting corporate tax rules, Congress and the Treasury Department generally assume that the underlying transaction has economic substance; the economic-substance doctrine tests that assumption. If that assumption proves to be false, then the transaction is disregarded for tax purposes. Far from "rewrit[ing]" the rules (Br.3), the doctrine filters out transactions for which the rules were never meant to apply.

The codified economic-substance doctrine broadly applies to "any" transaction to which it "is relevant," I.R.C. §7701(*o*)(1), and the "determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted," I.R.C. §7701(*o*)(5)(C).  Before §7701(*o*) was enacted, the doctrine was deemed a "cardinal rule of the tax code," *Keeler v. Commissioner*, 243 F.3d 1212, 1215 (10th Cir. 2001), presumed to be relevant to "all" transactions unless Congress explicitly provided otherwise.  Bittker & Lokken, *Federal Tax'n of Income, Estates & Gifts* ¶4.3.1 at 4-27 (3d ed. 1999).  That baseline assumption was retained in the 2010 codification.  I.R.C. §7701(*o*)(5)(C); *Bank of N.Y.*, 801 F.3d at 114 (§7701(*o*) "did not create categorical exceptions to the doctrine").  The doctrine's relevance in any given case can only be determined after examining the material facts and law, as Congress explained when it codified the doctrine:  "The doctrine of economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings."  H.R. Rep. 111-443, at 292 (quoting *ACM P'ship v. Commissioner*, T.C. Memo. 1997-

115, at *36, *aff'd in relevant part*, 157 F.3d 231 (3d Cir. 1998)).

Although Congress's articulation of how the doctrine's relevance is
determined may sound like a "tautology" (Br.60-61; Add.9), it accurately
describes how courts — including this Court — have long applied the
doctrine. *E.g., Blum*, 737 F.3d at 1309-1315; *Keeler*, 243 F.3d at 1217-
1219.

Of course, Congress can enact a tax benefit that explicitly applies
even in economically meaningless transactions. *See Doyon, Ltd. v.
United States*, 214 F.3d 1309, 1311 (Fed. Cir. 2000) (statute that
explicitly provided that "no provision of the Internal Revenue Code … or
principle of law shall apply" to deny certain tax benefits prevented the
IRS from objecting that the underlying transaction "lacked economic
substance or business purpose"); *Horn v. Commissioner*, 968 F.2d 1229,
1234-1235 (D.C. Cir. 1992) (economic-substance inquiry was
"irrelevant" where statute "grant[s] beneficial tax treatment to
economically meaningless behavior"). Section 7701(*o*) itself contains an
exception for "personal transactions of individuals." I.R.C.
§7701(*o*)(5)(B). For those transactions, and other instances where a
taxpayer can demonstrate that Congress "affirmatively" provides tax

benefits for "uneconomic" transactions (NAM-Br.17), the economic-substance doctrine is not relevant as a matter of law.  But such instances are rare.  In all other cases, the doctrine's relevance turns on the case's "facts and circumstances," as Congress emphasized when it codified the doctrine.  H.R. Rep. 111-443, at 296 & n.126.

The primary case cited by LGI, *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779 (6th Cir. 2017), represents another rare instance where Congress intended to afford tax benefits for economically meaningless transactions.  That case concerned a unique corporate entity — called a DISC — that Congress explicitly authorized to engage in transactions "that have no economic substance at all" so as to provide a specific tax benefit for U.S. exporters.  *Id*. at 786.  Given that explicit Congressional directive, the court determined that a different tax doctrine (the "substance-over-form doctrine") was inapplicable.[14]  *Id*.  Nothing in §245A or its history evidences any

---

[14]  LGI cites two other cases (Br.49-50) that concerned the same DISC entity and family of taxpayers as *Summa* and reached the same determination.  *See Benenson v. Commissioner*, 887 F.3d 511, 518, 522 (1st Cir. 2018) (Congress and Treasury specifically designed a "structure that might otherwise run afoul" of the tax laws if executed by normal "C corporations" rather than DISCs); *Benenson v.*

(continued…)

similar intent to provide massive tax benefits for the admittedly economically meaningless transaction here.  In fact, the opposite is true.  *See*, above, pp.3-6.

As demonstrated below, the District Court correctly determined that the economic-substance doctrine applied to Project Soy.  *See* §B.  Tellingly, none of the amici actually defend Project Soy.  Rather, they express concern for "routine business transactions" (*e.g.*, Chamber-Br.2), ignoring the court's finding that Project Soy was anything but a "basic business transaction" (Add.14).  It was a highly engineered tax-avoidance plan, put together by <u>tax</u> — not <u>business</u>— people, that evolved through sixteen iterations and involved unusual features, like "springing-to-life" debt and "profit certificates,'" that LGI has conceded are economically meaningless.  (1-App.179-180, 187; 2-App.503-505.)

The attempts to limit the economic-substance doctrine pressed by LGI and its amici are unavailing.  The codified doctrine (i) does not impose a threshold relevance test divorced from the facts and

_____

*Commissioner*, 910 F.3d 690, 694 (2d Cir. 2018) (same).  In this trio of cases, courts determined that "the economic reality of what was done 'was the thing which the statute intended.'"  *Id*. at 699 (citation omitted).  The District Court found the exact opposite here.  (Add.13-14.)

circumstances of each case, *see* §C, (ii) is not an interpretive canon, *see* §D, and (iii) does not contain categorical exemptions for corporations, *see* §E.[15]  LGI's alternative theories for prevailing have been waived and lack merit.  *See* §F.

Before turning to these arguments, we emphasize the critical role that the economic-substance doctrine serves in tax enforcement, because LGI and its amici seek to obscure it.  This Court rightly deems the economic-substance doctrine a "cardinal rule of the tax code." *Keeler*, 243 F.3d at 1215.  Far from being a "dangerous tool" (NTUF-Br.1), the economic-substance doctrine has properly been considered an "extremely important" background norm that acts as a "preamble to the Code, describing the framework within which <u>all</u> statutory provisions are to function."  Bittker, above, ¶4.3.1 at 4-27 (emphasis added). Indeed, it serves to "prevent taxpayers from subverting the legislative purpose of the tax code."  *Coltec*, 454 F.3d at 1353.  It thus stands as the "cornerstone of sound taxation," *Southgate Master Fund, LLC v. United States*, 659 F.3d 466, 479 (5th Cir. 2011) (citation omitted), and "guards

---

[15]  The amici raise other incorrect and/or irrelevant points, beyond the space constraints of this brief to address.  Our silence should not be interpreted as acquiescence.

against abuse of loopholes that Congress and the IRS have not anticipated," *Santander*, 844 F.3d at 21 n.7.

Over the years, Congress has repeatedly emphasized the crucial role that the economic-substance doctrine plays in disallowing abusive transactions before (and whether or not) Congress stamps them out with legislation.[16]  *E.g.*, Joint Comm. on Taxation, *Report of Investigation of Enron Corp.*, JCS-3-03, at 128 (2003); H.R. Rep. 111-443, at 295 ("A strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences.").  In codifying the doctrine, Congress sought to "enhance[ ]" — not rein in — its enforcement.  *Id.*  Any suggestion

---

[16]  That Congress or Treasury may later close a statutory "loophole" does not mean that they blessed economically meaningless transactions that "exploit[ed]" the loophole before corrective action was taken.  *Keeler*, 243 F.3d at 1215-1216 (applying economic-substance doctrine to transaction that occurred before Congress closed the "loophole"); *Santander*, 844 F.3d at 17-18 (applying economic-substance doctrine to transaction that occurred before it was "forbidden by regulation").  Similarly, the economic-substance doctrine applies even where Congress and Treasury choose not to change the technical tax rules, leaving it to the IRS to evaluate transactions under the economic-substance doctrine on a case-by-case basis.  *See, e.g., Sala v. United States*, 613 F.3d 1249, 1253 (10th Cir. 2010).

that §7701(*o*) was enacted to limit the economic-substance doctrine is baseless and conflicts with its text and history.[17]  *See* I.R.C. §7701(*o*)(5)(C); 1-App.242-243.

At bottom, LGI's complaints (echoed by amici) boil down to a dislike of judicial doctrines that bring — what LGI terms — a "purposive, atextual" approach to the "complexity and highly reticulated design of the Tax Code" (Br.51).  But the courts have long employed this approach in order to protect the fisc from raids by taxpayers who would manipulate that complex and reticulated design in ways that Congress did not intend.  And given that Congress has codified the economic-substance doctrine, incorporating it into that statutory "design," LGI's complaints should be dismissed for what they are — a self-serving plea for change directed to the wrong branch of Government.

---

[17]  Before §7701(*o*) was enacted, Congress had long sought to codify the economic-substance doctrine to strengthen its applicability. *E.g.*, Stmt. of Sen. Grassley, *Economic Substance Provision is Right Policy* (Nov. 6, 2007) (describing prior versions of the codification that had passed the Senate numerous times since 2003) (available at https://www.finance.senate.gov/ranking-members-news/grassley-economic-substance-provision-is-right-policy-fits-into-senate-farm-bill).

-40-

**B. The District Court correctly applied §7701(*o*) to LGI's tax-avoidance scheme**

Under the codified economic-substance doctrine, a "transaction" (or "a series of transactions," I.R.C. §7701(*o*)(5)(D)) "shall be treated as having economic substance only if" the taxpayer satisfies a two-part test: (i) "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position," <u>and</u> (ii) "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." I.R.C. §7701(*o*)(1)(A)&(B). If the taxpayer fails to demonstrate either prong, then the "tax benefits" generated by the transaction "are not allowable." I.R.C. §7701(*o*)(5)(A). The District Court correctly applied §7701(*o*)'s test to the undisputed facts and determined that Steps 1-3 of Project Soy lacked economic substance such that the E&P engineered by those steps should be disregarded for tax purposes in calculating LGI's §245A deduction. It also correctly determined that the doctrine was relevant to LGI's deduction-inflating scheme.

## 1.    It is undisputed that LGI satisfied neither requirement under §7701(*o*)(1)(A)&(B)

The District Court correctly determined that LGI's E&P-generating transactions failed both parts of the economic-substance test.  LGI admitted precisely that.  (Add.16-19.)  LGI admitted that Steps 1-3 of Project Soy "did not change, in a meaningful way, LGI's economic position."  (Add.16 (quoting 1-App.179-180).)  LGI likewise admitted that Steps 1-3 "served no substantial non-tax purpose for LGI."  (Add.17 (quoting 1-App.179-180).)  Given those admissions, LGI expressly conceded during the summary-judgment hearing that it could not satisfy either part of §7701(*o*)(1)(A)&(B).  (2-App.503-505.)  LGI does not contend otherwise on appeal.

LGI complains (Br.60) that the District Court "referred" to the E&P generated in Steps 1-3 of Project Soy as "artificial."  That complaint is baseless.  Whether that E&P was artificial or real does not alter the fact that LGI has conceded that the intercompany paper transfers that engineered billions in E&P overnight — Steps 1-3 of Project Soy — cannot satisfy §7701(*o*)(1)(A)&(B)'s requirements.  That concession alone justifies disregarding Steps 1-3 under those provisions.

In any event, the billions in E&P engineered by Steps 1-3 of Project Soy are properly understood as "artificial" because they arose from a series of "carefully choreographed" steps that were designed to produce an inflated §245A deduction (Add.12), steps that LGI admitted lacked economic substance (2-App.505). No non-tax economic activity triggered the E&P. LGI's economically meaningless decision to trigger a built-in gain through paper transactions (Br.25-27) had no business purpose beyond inflating its E&P for an outsized tax deduction. Congress simply did not intend for taxpayers to manufacture an exploitive §245A deduction via transactions lacking substance.

### 2. The economic-substance doctrine is relevant to Project Soy

The District Court correctly determined that the economic-substance doctrine was "relevant" here. (Add.8, 13-15.) As it correctly explained, the doctrine is "relevant" whenever "a taxpayer seeks to claim tax benefits, <u>unintended by Congress</u>, by means of transactions that serve no economic purpose other than tax savings." (Add.8 (quoting H.R. Rep. 111-443, at 292) (emphasis added).) Such is the case here. Steps 1-3 of Project Soy served no economic purpose other than tax savings that were contrary to "congressional intent." (Add.13-14; 1-

App.113-114.)  Congress intended that earnings subject to GILTI would be taxed and thus ineligible for the §245A deduction.  (*Id.*)  *See*, above, pp.3-6.  Project Soy generated $2 billion in E&P that constituted GILTI (1-Supp.App.82) but avoided the GILTI tax through an unintended legislative "mismatch" (Add.1-2).

LGI and the amici do not address the District Court's analysis of congressional intent.  Their silence is understandable.  The undisputed evidence makes clear that LGI was fully aware that the massive tax benefit generated by Project Soy was predicated on what it termed a statutory "mismatch," not intentional congressional design.  *See*, above, pp.14-15.  As LGI acknowledges, the "GILTI rules are generally designed to coexist with §245A" (Br.20).  Congress did not intend the §245A deduction to apply to untaxed GILTI.  *See*, above, pp.3-6.  The economic-substance doctrine properly prevents such "unintended consequences" arising in economically empty transactions.  H.R. Rep. 111-443, at 295.

## C.  There is no threshold relevancy test divorced from the facts and circumstances of each case

LGI and the amici contend (Br.37; *e.g.*, NAM-Br.5) that the District Court should have determined whether the economic-substance

doctrine was relevant here <u>before</u> analyzing the transaction. The court correctly rejected that argument. (Add.7-10.) In codifying the doctrine, Congress did not add a separate threshold relevance inquiry to the economic-substance-doctrine framework. To the contrary, Congress directed that the "determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." I.R.C. §7701(*o*)(5)(C). And prior to §7701(*o*), consideration of the doctrine's relevance depended on factual analysis, with no threshold step.

Prior to the codification, courts determined whether the economic-substance doctrine applied in any given case by analyzing the facts in light of the congressional purpose at issue, as the District Court correctly held (Add.8-9). *E.g., ACM*, T.C. Memo. 1997-115, at *36 ("The doctrine of economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings.") (quoted at H.R. Rep. 111-443, at 292). This Court — like all other courts of appeals — routinely has applied the two-part economic-substance inquiry without first

engaging in a separate, threshold fact-free relevance inquiry, as some amici candidly admit (Chamber-Br.10; NFTC-Br.12-13). *See Blum*, 737 F.3d at 1309-1315; *Sala*, 613 F.3d at 1252-1255; *Keeler*, 243 F.3d at 1217-1219; *James v. Commissioner*, 899 F.2d 905, 908-909 (10th Cir. 1990).

Similarly, cases addressing §7701(*o*) uniformly have determined whether the economic-substance doctrine was relevant only <u>after</u> analyzing the transaction at issue in light of the applicable law. *See Alternative Carbon Resources, LLC v. United States*, 939 F.3d 1320, 1330-1331 (Fed. Cir. 2019); *Chemoil Corp. v. United States*, No. 19-CV-6314, 2023 WL 6257928, at *5-6 (S.D.N.Y. Sept. 26, 2023); Add.8-10. Administrative practice similarly looks to case-specific facts and law. *See* Notice 2010-62, 2010-40 I.R.B. 411 (declining to provide list of "transactions to which the economic substance doctrine either applies or does not apply"). Examining the facts and circumstances is not an "effective deletion of the relevance requirement" (Chamber-Br.14); it is how the courts and Treasury determine whether the doctrine <u>is</u> relevant. LGI and its amici cite no decision from this Court (or any other court) that is to the contrary.

The legislative history cited by LGI and its amici emphasize this point. Although the codification "provides a uniform definition of economic substance," and thereby resolved various circuit conflicts that had defined it somewhat differently, §7701(*o*) "does not alter the flexibility of the courts in other respects," including the "current law standards in determining when to utilize an economic substance analysis." H.R. Rep. 111-443, at 295-296. And under those flexible standards, "the essential nature of the transaction or situation is examined in light of the basic purpose or plan which [the tax benefit at issue] was designed by the Congress to effectuate." *Id*. at 296 n.124. That inquiry necessarily overlaps with §7701(*o*)(1)'s two-prong analysis, but analyzing the "relevance" question in its factual context does not render the statute's reference to relevance "surplusage" (Br.61).

What Congress and the courts have long understood, and what LGI and the amici would have this Court ignore, is that what appears on paper to be a "basic business transaction" may in reality be an attempt to manipulate the Code and regulations in ways unintended by Congress and Treasury. *See* cases discussed below, pp. 54-57. And it is only <u>after</u> analyzing "all the facts and circumstances" that one can

accurately discern whether that transaction is in fact a "basic business transaction" such that the economic-substance doctrine is not relevant. H.R. Rep. 111-443, at 296; *see id.* at 296 & n.126 (noting that various taxpayer "choice[s]," such as "capitaliz[ation]" decisions, will continue to be evaluated "based on all the facts and circumstances"). Several recent cases involving energy tax credits illustrate this point. *Compare Alternative Carbon*, 939 F.3d at 1329-1331 (disallowing energy tax credits under §7701(*o*) after analyzing the transaction's facts) *and Chemoil*, 2023 WL 6257928, at \*5-6 (same) *with Cross Refined Coal, LLC v. Commissioner*, 45 F.4th 150, 159 (D.C. Cir. 2022) (rejecting sham-partnership challenge and allowing energy tax credits; distinguishing *Alternative Carbon* factually). To determine what side of the line a particular taxpayer's transaction falls on, courts must analyze all the facts and circumstances to discern whether "what was done" was what "the statute intended."[18]  *Gregory*, 293 U.S. at 468-469.

---

[18]  As a practical matter, the IRS does not challenge routine business transactions under the economic-substance doctrine, as a review of the relevant authorities makes clear.  Internal IRS procedures cited by amici confirm that the doctrine is not invoked in run-of-the-mill transactions.  (*See* NFTC-Br.13 (citing guidance)); *see also* I.R.M. 4.46.4.12.9, Ex.4.46.4-4.

**D.    Contrary to LGI's new theory, the economic-substance doctrine is a substantive anti-abuse provision that applies to all tax provisions unless Congress expressly states otherwise**

LGI stakes its appeal on a new argument:  that the economic-substance doctrine is merely an "interpretive canon" (Br.1, 47) limited to tax provisions that "require inquiry into the economic reality of and taxpayer motive for an underlying transaction" (Br.1).  That argument was not presented below.  (1-App.127-146, 260-279.)  As a "general rule," this Court deems "waived" any "arguments raised for the first time on appeal," whether "'[t]he newly raised argument is a bald-faced new issue or a new theory on appeal that falls under the same general category as an argument presented' in the district court."  *Van Sant & Co. v. Town of Calhan*, 83 F.4th 1254, 1276 (10th Cir. 2023) (citation omitted).  If, as here, the appellant makes no attempt to "argue for plain error" review, the Court will not consider the "new legal theory."  *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130-1131 (10th Cir. 2011).

LGI's new argument also lacks merit.  To begin with, the economic-substance doctrine is no mere "interpretive canon," as LGI maintains (Br.1).  It is a substantive anti-abuse rule — long applied by

the courts and now codified by Congress — that constitutes a "cardinal rule of the tax code." *Keeler*, 243 F.3d at 1215.  It empowers courts to disregard the claimed tax benefits of a transaction — despite mechanical compliance with the black-letter provisions of the Code — if the transaction "lacks economic substance." *Sala*, 613 F.3d at 1253. Although courts have compared the doctrine to <u>substantive</u> "canons" that serve as background norms and are "employed in circumstances where the literal terms of a statute can undermine the ultimate purpose of the statute," *Coltec*, 454 F.3d at 1354, it is not used (as LGI would have it) to interpret the meaning of specific, limited tax terms.  The doctrine applies more broadly to prevent taxpayers like LGI from "exploit[ing] a feature of the tax code." *Rogers*, 281 F.3d at 1113 n.2.

By codifying the economic-substance doctrine as a substantive tax rule in 2010, Congress confirmed that the doctrine is no mere "interpretive" canon.  It defined the "economic substance doctrine" as "the common law doctrine under which tax benefits under subtitle A [i.e., income-tax provisions] with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose," even if the transaction otherwise complies with the

statute's terms.  I.R.C. §7701(*o*)(5)(A).  That definition reflects the well-established understanding that the economic-substance doctrine is a background norm that applies to <u>all</u> income-tax provisions (with a minor exception for personal transactions of individuals not applicable here, I.R.C. §7701(*o*)(5)(B)), including the income-tax deduction provided in §245A.  "Economic reality" and "taxpayer motive" are thus relevant considerations for <u>all</u> tax provisions, unless Congress explicitly provides otherwise.  Indeed, it is a "black-letter principle that 'tax law deals in economic realities, not legal abstractions,'" even in cases where taxpayer abuse has not been alleged.  *PPL Corp. v. Commissioner*, 569 U.S. 329, 340 (2013) (citation omitted).

Finally, LGI's reimagining of the economic-substance doctrine is belied by the case law.  For example, several courts of appeals have disallowed foreign tax credits under the economic-substance doctrine, even though the foreign tax credit does not, as a textual matter, require any analysis of economic reality or business purpose.  *See Wells Fargo & Co. v. United States*, 957 F.3d 840 (8th Cir. 2020); *Santander*, 844 F.3d 15; *Bank of N.Y.*, 801 F.3d 104; *Salem Fin., Inc. v. United States*, 786 F.3d 932 (Fed. Cir. 2015).  These courts nevertheless applied the

economic-substance doctrine because it involved a "broader inquiry" than the technical rules at issue and operated as a "prerequisite to the application of any Code provision allowing deductions." *Id.* at 941-942 (citation omitted).

LGI's summary of cases applying the economic-substance doctrine (Br.42-47) makes our point. The doctrine was relevant in each case because nothing in the statutory provisions at issue made economic reality and taxpayer motive irrelevant. Accordingly, the background norm applied — i.e., "transactions lacking an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes." *James*, 899 F.2d at 908. In describing that across-the-board "cardinal rule," *Keeler*, 243 F.3d at 1215, and its "well-established standards," *Sala*, 613 F.3d at 1253, this Court simply has not limited its applicability as LGI represents.[19]

LGI's reliance on *Summa* and the related *Benenson* decisions (Br.48-50) is unavailing. The analysis in those cases was limited to the "substance-over-form" doctrine and the unique "design" of "DISCs"

---

[19] LGI's reliance (Br.50) on *St. Charles Inv. Co. v. Commissioner*, 232 F.3d 773, 776 (10th Cir. 2000) is misplaced, as that case did not concern the economic-substance doctrine.

whereby the Code "expressly authorize[d]" tax-avoidance transactions that lacked any economic substance to further other policy goals. *Summa*, 848 F.3d at 782, 786; *see*, above, n.14. In sharp contrast, nothing in the TCJA or its history evidence that Congress intended §245A to be used to provide massive tax benefits for economically empty tax-avoidance schemes. To the contrary, Congress intended that income that qualified as GILTI be taxed under §951A, which would thereby limit the §245A deduction, *see*, above, pp.3-6, and it explicitly directed that "non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders … to minimize tax under [§951A] be disregarded." H.R. Conf. Rep. 115-466, at 645.

## E. No component of Project Soy is immune from analysis under the economic-substance doctrine

Similarly lacking merit is LGI's claim that Congress intended to exclude from the scope of §7701(*o*) the particular transactions utilized in Project Soy, i.e., §351 corporate organizations and a business's entity-selection or capitalization "choice" (Br.52-57 (citing Treasury's check-the-box regulations, which allow taxpayers to choose their status for tax purposes)). The amici likewise argue (*e.g.*, Chamber-Br.13) that "basic business transactions" are immune from economic-substance analysis.

Those arguments were properly rejected by the District Court.
(Add.14.)

Section 7701(*o*), like the common law economic-substance
doctrine, requires that every corporate transaction — even those
comprised of multiple transactions including ones that are innocuous in
isolation — can be subject to the economic-substance doctrine based on
the overall context and facts and circumstances.  This includes, for
example, any "series of transactions."  I.R.C. §7701(*o*)(5)(D).  There are
no "categorical exceptions" to the economic-substance doctrine, as the
courts addressing §7701(*o*) have uniformly concluded.  *Bank of N.Y.*,
801 F.3d at 114; *Alternative Carbon*, 939 F.3d at 1330-1331; *Chemoil*,
2023 WL 6257928, at *5; Add.7-16.

Judicial precedent belies any argument that certain corporate
transactions are immune from scrutiny.  Courts have applied the
economic-substance doctrine in a wide range of circumstances to
disregard tax consequences arising from transactions that were
economically meaningless, including transactions that LGI and the
amici suggest are off limits:

- §351 organizations and related capitalization choices:  *Coltec*,
  454 F.3d at 1351, 1360 (disregarding inflated stock basis
  created in a §351 capitalization exchange); *WFC Holdings Corp.
  v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (same); *cf.
  Gregory*, 293 U.S. at 469-470 (disregarding corporate
  reorganization under §368's precursor);

- Entity selection/classification:  *Tucker v. Commissioner*, 766 F.
  App'x 132, 139 (5th Cir. 2019), *aff'g*, T.C. Memo. 2017-183
  (disregarding transaction that depended on an entity-
  classification election under Treasury's check-the-box
  regulations); *Salem*, 786 F.3d at 933, 951 (disregarding
  transactions that depended on taxpayer's election to use a trust
  with a nominal U.K. trustee for purposes of claiming foreign
  tax credits);

- Funding choices:  *Golsen v. Commissioner*, 445 F.2d 985, 989
  (10th Cir. 1971) (disregarding interest deduction because the
  "superimposed loan transactions had no economic substance");

> *AEP Co. v. United States*, 326 F.3d 737, 744 (6th Cir. 2003)
>
> (same).[20]

Several of these cases (*Gregory*, *Coltec*, and *AEP*) were cited by

Congress when it enacted §7701(*o*) and thus informed its understanding

of the doctrine's scope. H.R. Rep. 111-443, at 294 nn.115 & 119, 296

nn.128-131.

     Moreover, in arguing for exemption, LGI myopically focuses on

individual components of Project Soy, ignoring that they were designed

to operate in tandem to produce an unintended tax benefit (Add.10-12,

14), as it has admitted (1-App.181-182). For example, LGI focuses on

Telenet Group's entity conversion in Step 3 of Project Soy, compares it

to a "check-the-box election" for entity classification, and then insists

that such taxpayer choices are beyond the purview of the doctrine.

(Br.35.) But check-the-box elections were designed to simplify the

process for selecting entity type, not to facilitate abusive transactions,

as Treasury emphasized when it promulgated the check-the-box

---

[20] Although LGI and the amici emphasize a taxpayer's freedom to choose debt rather than equity funding, the debt transferred in Step 2 of Project Soy does not represent a genuine "choice" to capitalize a business with debt (rather than equity) because the financing was already in place — just disregarded. (1-App.189.) *See*, above, n.10.

regulations.  *See* 61 Fed. Reg. 66,584, 66,585 (1996) (warning that Treasury would continue to scrutinize entity selections, especially in the "international context," that "are used to achieve results that are inconsistent with the policies and rules of particular Code provisions"). The regulations themselves make this clear.  *E.g.*, Reg. §301.7701-3(g)(2)(i) (the "tax treatment" of an entity selection "is determined under all relevant provisions of the Internal Revenue Code and general principles of tax law, including the step transaction doctrine").  Indeed, in 1999, the ABA Tax Section (speaking through several large law firms, including firms currently representing LGI and one of its amici) expressly relied on the IRS's ability to use the "economic substance doctrine" to curtail abusive schemes involving entity classifications as a basis for opposing amendment of the check-the-box regulations to identify specific abusive arrangements.  *See* Tax Notes, *Members of ABA Tax Section Criticize Proposed Check-the-Box Regs*, 2000 TNT 158-46, at 8 (August 15, 2000) (publishing ABA Comment letter).

Tucker illustrates this point.  There, the Tax Court and the Fifth Circuit disregarded a multi-step scheme that relied on a check-the-box election to avoid tax due under subpart F because "Congress 'neither

contemplated nor intended to encourage this type of mechanical manipulation of the rules.'" *Tucker*, 766 F. App'x at 139 (quoting T.C. Memo 2017-183, at [*48-49]). As the Tax Court explained, the taxpayer's "manipulation of the elective regime" for entity classification "is patently inconsistent with legislative intent and is a prime example of the kind of behavior that concerned the regulators when the flexible check-the-box rules were promulgated." *Tucker,* T.C. Memo 2017-183, at [*50] (citing Treasury's warning in the regulations' preamble).

So too here. LGI's "mechanical" (Br.24) manipulation of the tax rules related to the entity conversion in Step 3 of Project Soy cannot shield from scrutiny its attempt to avoid more than $2 billion in taxable gain. That conversion cannot properly be understood divorced from the other interrelated meaningless steps or from LGI's overall aim to use the conversion for a purpose that Congress and Treasury did not intend — avoidance of GILTI and subpart F tax. (Add.1-2, 13-15.) Congress pressed this exact point when it enacted the TCJA, urging Treasury to "deter tax avoidance through use of entity classification elections." S. Prt. 115-20, at 369; *accord* Joint Comm. on Taxation, *General Explanation of P.L. 115-97*, JCS-1-18, at 367 (2018).

-58-

### F.    LGI's new alternative arguments have been waived and are meritless in any event

LGI's second summary-judgment motion raised only one issue — whether §7701(*o*) was "applicable" here.  (1-App.128.)  It raised no alternative argument to support its refund claim in the event that the court rejected its relevance argument (1-App.127-146), asking only that the court hold that "neither the ESD nor the step-transaction doctrine can apply to disregard any step of Project Soy" (1-App.146).  LGI reiterated in its response to the Government's cross-motion that its "<u>sole</u> argument is that these doctrines are not relevant to the transactions at issue."  (1-App.260-261 (emphasis added).)  On appeal, LGI backtracks from that position, briefly raising (Br.63-65) two alternative arguments for its refund claim.  Both are waived, *see Richison*, 634 F.3d at 1130-1131, and meritless.

<u>New §245A argument</u>.  LGI contends (Br.63-64) that, even if the economic-substance doctrine applies, it is entitled to some or all of the $2 billion §245A deduction asserted in its refund claim (1-Supp.App.82) because (i) Telenet Group's conversion in Step 3 of Project Soy "triggered some earnings" unrelated to Steps 1 and 2, or (ii) §1248(h) treats all of LGI's gain from the sale of TGH stock as a dividend eligible

for §245A's dividends-received deduction because LGI cannot establish

the amount of TGH's E&P.  This undeveloped argument was not even

hinted at in the District Court and as such was waived.

This argument is also meritless.  LGI's reliance on the conversion

in Step 3 is misplaced.  In applying the economic-substance doctrine,

the District Court "disregard[ed] Steps 1 through 3" for tax purposes

(Add.21), which includes the conversion in Step 3.[21]  LGI conceded, and

the court found, that Step 3 — just like Steps 1 and 2 — failed both

prongs of §7701(*o*)(1)(A)&(B), *see*, above, pp.40-41, and thus any "tax

benefits" generated by Step 3's entity-conversion "are not allowable,"

I.R.C. §7701(*o*)(5)(A).

---

[21]  LGI's suggestion (Br.63) that the "government respects Telenet
Group's conversion" in Step 3 for tax purposes in the "related district
court proceedings" (i.e., the Government's collection suit) is inaccurate.
In the status report cited by LGI (Br.63), the Government stated its
"position that the Court has already ruled that the tax attributes
generated by Steps 1-3 of Project Soy should be disregarded for tax
purposes," which includes all tax attributes of the conversion in Step 3.
Dist. Ct. Doc. 42 at 3, No. 1:22-cv-02622 (D. Colo. Mar. 20, 2024)
(emphasis added).  LGI similarly acknowledged in a report filed in this
case that, in the "related pending case," the Government seeks
additional taxes due "if the first three steps of 'Project Soy' are
disregarded for U.S. tax purposes."  (2-Supp.App.469 (emphasis added).)

LGI's reliance on §1248(h) is also misplaced.  Only "the Commissioner" — not the taxpayer — can determine that gain on a CFC-stock sale should be treated as a dividend when a taxpayer fails to establish the amount of the CFC's E&P.  Reg. §1.1248-7(a).  To hold otherwise, as LGI urges, would permit any taxpayer to shield from tax all gain on sales of CFC stock merely by claiming to be unable to establish its E&P amount.

New argument related to LGI's sale of TGH stock.  LGI further contends that, even if the economic-substance doctrine applies, it is entitled to its claimed refund because the Court should disregard the tax consequences of its sale of TGH stock in Step 4 of Project Soy (which triggered LGI's $2.4 billion gain) if it disregards the tax consequences of Steps 1-3 (which generated the E&P used to avoid that gain by inflating LGI's §245A deduction).  That argument was not properly presented to the District Court and distorts how the economic-substance doctrine operates.

The District Court properly treated as "waived" any argument premised on disregarding LGI's sale of TGH.  *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1031 (10th

Cir. 2007) (disregarding argument discussed "in less than one page of its brief"). LGI briefly floated this issue in its summary-judgment reply brief. (1-App.276-277.) But that fleeting mention ran counter to LGI's larger theme that there was only <u>one</u> issue for the court to decide (i.e., whether the economic-substance doctrine was relevant). (1-App.260-261.) LGI later abandoned any alternative argument when responding to the court's request for proposed judgments. (2-Supp.App.468-474.) In the Joint Report setting out the parties' judgment proposals, the Government proposed that, if the court were to conclude that the economic-substance doctrine applied, "Liberty Global would receive no refund and the action would be dismissed on the merits"; LGI, for its part, proposed no alternative relief if the court determined that the doctrine applied, stating only that it was entitled to a refund if the doctrine were inapplicable. (2-Supp.App.468.) The court accordingly denied the entire refund claim after determining that the doctrine applied. (2-App.301.)

In any event, LGI's argument based on Step 4 is meritless. The District Court properly disregarded the tax consequences of only Steps 1-3 of Project Soy because those were the steps that admittedly lacked

economic substance and that were implemented for the sole purpose of generating tax benefits.  The Government did not argue, and the court did not hold, that LGI's sale of TGH stock in Step 4 lacked economic substance.  (2-App.524-525.)  Step 4 was respected for tax purposes because LGI's TGH stock was a genuine business investment that predated Project Soy, and the stock sale had "real effects" that carry forward into future years.  *Id*.  Moreover, Step 4 is separable from the other steps.  (1-App.181.)  The economic-substance doctrine properly applied to disregard the E&P generated by the economically meaningless steps (which LGI used to inflate its §245A deduction) while respecting the tax consequences of the "legitimate" substantive stock sale.  *Sala*, 613 F.3d at 1252.

Nothing in §7701(*o*) or the relevant case law requires ignoring the income from the stock sale.  It is well established that courts can apply the economic-substance doctrine to disregard the substance-less components of a transaction while leaving other components intact.  In *Coltec*, for example, the Federal Circuit respected the final step of the transaction — the sale of stock — even though it disregarded the prior steps that inflated the taxpayer's basis in the stock.  454 F.3d at 1360.

That the stock sale was "necessary to produce" the disallowed tax benefit (Br.65) — a stock-sale loss based on inflated basis — did not require the sale itself to be disregarded. The sale there, like the sale here, was substantive and had genuine economic effects. Similarly, in the foreign-tax-credit generator cases discussed above (*Bank of N.Y.*, *Salem*, *Santander*, and *Wells Fargo*), the courts did not disregard the income generated in the transaction (i.e., the U.S.-source income cycled through a foreign trust), even though that income was necessary to trigger the foreign tax credits disregarded by the courts. Section 7701(*o*) does not disturb these cases, I.R.C. §7701(*o*)(5)(C),[22] and refers only to "tax benefits" — not income — being disallowed under the economic-substance doctrine, I.R.C. §7701(*o*)(5)(A). *See* H.R. Rep. 111-443, at 296 (§7701(*o*) "does not alter the court's ability to aggregate, disaggregate, or otherwise recharacterize a transaction when applying the doctrine").

*Sala* is not to the contrary (Br.65). Citing *Coltec*, the Court in *Sala* determined that the proper focus of the economic-substance

---

[22] Indeed, the legislative history heavily relies on *Coltec*, H.R. Rep. 111-443, at 292-296.

doctrine is on the transaction that generates the disputed tax consequences and not on any related "legitimate" transaction. 613 F.3d at 1252. The District Court's analysis here is fully consistent with that approach. The Government disputes only the E&P engineered by Steps 1-3 of Project Soy and thus the proper focus of the economic-substance analysis is on those steps. The Government respects the tax consequences of Step 4 — the economically substantive stock sale — including the tax consequences that benefit LGI. In this regard, LGI's stock sale accomplished its overarching tax-avoidance goal of removing TGH from the "U.S. tax net," eliminating LGI's tax liability for any of TGH's post-2018 earnings. (1-Supp.App.105-106, 114-115.) LGI also benefits from the §245A deduction triggered by the sale, to the extent of its share of TGH's pre-Project Soy untaxed E&P. (1-App.162; 2-App.525.)

## G. Alternatively, Reg. §1.245A-5T precludes LGI's refund claim, and the District Court erred in invalidating it

If the Court were to disagree with the District Court's economic-substance determination, it should remand the case for the court to consider two alternative grounds for rejecting LGI's refund claim: the step-transaction doctrine (*see*, above, n.12) and Reg. §1.245A-5T. As to

the second ground, the District Court invalidated the regulation because Treasury did not first undertake the APA's notice-and-comment procedures. That holding cannot withstand scrutiny and should be reversed. LGI's alternative arguments challenging the regulation should be addressed by the District Court in the first instance.

### 1. Temporary regulations are not required to undergo notice-and-comment procedures

Congress may modify the APA's notice-and-comment requirements through a subsequent statute, "to the extent that it does so expressly." 5 U.S.C. §559. Modification does not require magic words, only "that Congress's intent to make a substantive change be clear." *Asiana Airlines v. F.A.A.*, 134 F.3d 393, 397 (D.C. Cir. 1998) (citation and emphasis omitted).

In §7805(e), Congress's intent to modify the APA's requirements for temporary Treasury regulations is clear. Section 7805(e) explicitly recognizes a distinct type of regulation: temporary regulations, which expire after three years and must be issued with proposed regulations.[23] When Congress added §7805(e) to the Code in 1988, it acknowledged

---

[23] There is no dispute that Treasury complied with both requirements.

that temporary regulations are "effective immediately," unlike proposed regulations which undergo notice and comment.  H.R. Conf. Rep. 100-1104, at 217 (1988).  And it specifically contemplated that the three-year limit it was adding to temporary regulations through §7805(e) "[was] not to affect the[ir] validity."  *Id.* at 218.  When Congress later revised §7805(b) in 1996 to delineate Treasury's ability to make regulations retroactive, it did not disturb Treasury's authority to promulgate temporary regulations with immediate effect.  To the contrary, by allowing final regulations to be retroactive to the date on which a related proposed or temporary regulation was filed, *see* I.R.C. §7805(b)(1)(B), and thereby to take effect for periods before the notice-and-comment process, these rules <u>expressly</u> deviate from the APA's general rulemaking requirements.

The D.C. Circuit dealt with a similar issue in *Asiana Airlines*.  There, an agency issued an interim final rule before providing notice and comment, pursuant to its statutory authority.  134 F.3d at 398.  The court ruled that Congress's specified procedures for the agency's rulemaking could not be reconciled with the APA's notice-and-comment requirements; any interpretation requiring that the interim final rule

undergo notice and comment would "deprive th[e] special procedural provision of any effect." *Id.* Accordingly, the court held that the agency was not required to conform to the APA's notice-and-comment procedures. *Id.*

Similarly, the procedures Congress designed in §7805(e) are so clearly different from those required by the APA that Congress "must have intended to displace the norm." *Asiana Airlines*, 134 F.3d at 397. The §7805(e) procedures would be rendered meaningless if temporary regulations were required to undergo notice and comment. Treasury would have no reason to ever issue a temporary regulation when pursuing a final regulation would involve the same process and would avoid a three-year sunset period. Congress would not have separately authorized temporary regulations, as it did in §7805(b)(1), (e), and (f), only to allow them to be effectively nullified. *See Platt v. Union Pac. R. Co.*, 99 U.S. 48, 58 (1878) ("Congress is not to be presumed to have used words for no purpose.").

## 2. Treasury had good cause to forgo the notice-and-comment requirements

The APA separately permits departure from the notice-and-comment procedures where the agency can demonstrate good cause,

which Treasury did here.  5 U.S.C. §553(b)(B).  The good-cause exception is "an important safety valve to be used where delay would do real harm."  *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987) (citation and emphasis omitted).  Good cause is present here because Treasury had "reason to be concerned about taxpayer behavior that would undermine the new tax scheme created by the TCJA," as the District Court recognized.  (1-App.122.)  Further, issuing Reg. §1.245A-5T as only a proposed regulation, with no force of law, could have provided taxpayers a road map for executing a transaction that would be difficult for the IRS to uncover in an audit.  That serious tax-enforcement problem would not have been alleviated by applying final regulations retroactively, as the District Court erroneously assumed (1-App.122).  Taxpayers who filed tax returns inconsistently with the proposed regulations would be under no duty to amend those returns when the regulation is finalized, even though the regulation is retroactively effective.  *See Badaracco v. Commissioner*, 464 U.S. 386, 393 (1984).  Without temporary regulations, the IRS is left with the daunting task of trying to discover complex tax-avoidance schemes like Project Soy through an ordinary audit.

Treasury's issuance of Reg. §1.245A-5T prior to notice and comment avoided the very real harm of proliferation of such manipulation. Given that LGI alone sought a $100 million refund, the risk to the public fisc had other taxpayers exploited the loophole was significant. Issuing a regulation immediately to avoid that loss is a prototypical example of good cause.[24] *See, e.g.*, *Attorney General's Manual on the APA* 31 (1947) ("an agency may contemplate the issuance of financial controls under such circumstances that advance notice of such rules would tend to defeat their purpose; in such circumstances, the 'public interest' might well justify the omission of notice and public rule making proceedings"); *Mobil Oil Corp. v. DOE*, 728 F.2d 1477, 1491-1492 (Temp. Emer. Ct. App. 1984) (good cause where proposing a regulation would alert affected parties to a loophole).

---

[24] Treasury issued Reg. §1.245A-5T within thirteen months of being advised about the loophole, which was relatively quickly, given the complexity of the TCJA and the fact that its implementation required Treasury to issue dozens of regulations. *See*, above, pp.5-6; *see also Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 (D.C. Cir. 1994) (good cause where agency tasked with promulgating regulations for complicated statutes within tight deadlines).

## CONCLUSION

The judgment of the District Court should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States respectfully inform the Court that

oral argument would help the Court decide this complicated tax case.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

s/ Judith A. Hagley

| | |
|---|---|
| FRANCESCA UGOLINI | (202) 514-3361 |
| JENNIFER M. RUBIN | (202) 307-0524 |
| JUDITH A. HAGLEY | (202) 514-8126 |
| POOJA A. BOISTURE | (202) 514-6072 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, DC 20044*
  *Judith.a.hagley@usdoj.gov*
  *Appellate.Taxcivil@usdoj.gov*

*Of Counsel:*
MATT KIRSCH
  *Acting United States Attorney*

JUNE 27, 2024

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B):

    [X]  this brief contains 12,998 words, **or**

    [ ]  this brief uses a monospaced typeface and contains _____ lines of text.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century Schoolbook 14, **or**

    [ ]  this brief has been prepared in a monospaced typeface using _____ with _____.

Date: June 27, 2024    /s/ Judith A. Hagley
    Judith A. Hagley
    Attorney for Appellee United States
    P.O. Box 502
    Washington, DC 20044
    (202) 514-8126
    Judith.a.hagley@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I further certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Windows Defender, and according to the program are free of viruses.

Date: June 27, 2024    s/ Judith A. Hagley
                       Judith A. Hagley
                       Attorney for Appellee United States
                       P.O. Box 502
                       Washington, DC 20044
                       (202) 514-8126
                       Judith.a.hagley@usdoj.gov