**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

LIBERTY GLOBAL, INC.,

    Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee.

------------------------------

THE CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA;
AMERICAN FUEL &
PETROCHEMICAL
MANUFACTURERS; NATIONAL
FOREIGN TRADE COUNCIL, INC.;
NATIONAL TAXPAYERS UNION
FOUNDATION; NATIONAL
ASSOCIATION OF
MANUFACTURERS; ALLIANCE FOR
BUSINESS PARTNERSHIPS;
AMERICAN FOREST & PAPER
ASSOCIATION,

    Amici Curiae.

No. 23-1410

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-03501-RBJ)**
_____

Shay Dvoretzky, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C.
(Jeremy Patashnik, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York;

Gregory S. Tamkin, Dorsey & Whitney, Denver, Colorado; Rajiv Madan, Royce Tidwell, Christopher Bowers, Nathan Wacker, Parker Rider-Longmaid and Sylvia O. Tsakos, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., with him on the briefs), for Plaintiff-Appellant.

Judith A. Hagley (Matt Kirsch, of Counsel, Acting United States Attorney; David A. Hubbert, Deputy Assistant Attorney General; Francesca Ugolini; Jennifer M. Rubin; and Pooja A. Boisture, with her on the brief), Tax Division, Department of Justice, Washington, D.C. for Defendant-Appellee.

Anne Gordon, National Foreign Trade Council, Inc.; Rocco Femia, Robert J. Kovacev, and Jeffrey Tebbs, Miller & Chevalier Chartered, Washington, D.C., on the brief for National Foreign Trade Council, Inc., as Amicus Curiae in support of Plaintiff-Appellant.

Tyler S. Badgley and Kevin R. Palmer, U.S. Chamber Litigation Center; Richard S. Moskowitz and Tyler Kubik, American Fuel & Petrochemical Manufacturers; and Lauren Willard Zehmer, Kevin Otero, and Jesse Boretsky, Covington & Burling LLP, Washington D.C., on the Brief for The Chamber of Commerce of the United States of America and the American Fuel & Petrochemical Manufacturers, as Amicus Curiae in support of Plaintiff-Appellant.

Tyler Martinez, National Taxpayers Union Foundation, Washinton, D.C., on the brief for National Taxpayers Union Foundation, as Amicus Curiae in support of Plaintiff-Appellant.

George Gerachis, Esq., Vison & Elkins LLP, Houston, Texas; Gary Huffman, Esq., Vison & Elkins LLP, Washington, D.C.; and Kathleen Pakenham, Esq., Vinson & Elkins LLP, New York, New York, on the brief for American Forest & Paper Association as Amicus Curiae in support of Plaintiff-Appellant.

Michael J. Desmond, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Lucas C. Townsend, Jonathan C. Bond, Matt Donnelly, and Lael D. Weinberger, Gibson, Dunn & Crutcher LLP, Washington, D.C., on the brief for The National Association of Manufacturers as Amicus Curiae in support of Neither Party.

George M. Clarke III, Joseph B. Judkins, Joy A. Williamson, Carlton A. Tarpley, and David M. Brotz, Baker & McKenzie LLP, Washington, D.C., on the brief for Alliance for Business Partnerships as Amicus Curiae in support of Neither Party.

———————————————————

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges.

———————————————————

2

**MURPHY**, Circuit Judge.

_____

## I. INTRODUCTION

This appeal turns on the answer to the following narrow question: Is the codified economic substance doctrine, 26 U.S.C. § 7701(o), relevant to "Project Soy," a complex series of transactions Liberty Global, Inc. ("LGI") undertook to exploit a "last day of year rule/mismatch" in the international tax provisions of the 2017 Tax Cuts and Jobs Act ("TCJA"), Pub. L. No. 115-97, Subtitle D, 131 Stat. 2189-238 (2017)?[1] Supp. App. at

---

[1] LGI's alternate arguments for reversal, briefly alluded to at pages sixty-two to sixty-four of its opening brief, are waived for purposes of this appeal. LGI argues that even if the economic substance doctrine applies, it is still entitled to some quantum of the 26 U.S.C. § 245A deduction asserted in its refund claim because some aspects of Project Soy's first three steps have (or must be treated as having) economic substance. Those assertions are waived for two independent reasons. In response to the government's requests for admissions, LGI conceded the first three steps of Project Soy lack economic substance under the test set out in § 7701(o)(1). App. at 174, 181-86; *Liberty Glob., Inc. v. United States (ESD Order)*, No. 1:20-cv-03501-RBJ, 2023 WL 8062792, at *9 (D. Colo. Oct. 31, 2023) ("On the first prong, [§ 7701(o)(1)(A),] LGI admits that each of Steps 1 through 3 'did not change, in a meaningful way, LGI's economic position.'"); *Id.* ("On the second prong, [§ 7701(o)(1)(B),] LGI admits that each of Steps 1 through 3 'served no substantial non-tax purpose for LGI.'"). Given LGI's specific admissions in the district court that steps one through three of Project Soy lack economic substance under the codified economic substance doctrine, it cannot now argue on appeal that some aspects of those steps have economic substance. Second, in seeking summary judgment, LGI pressed only a single issue: whether the codified economic substance doctrine was "applicable" to Project Soy. App. at 128. LGI raised no alternative argument to support its refund claim in the event the district court rejected its relevance argument. *See* App. at 127-46. It, instead, asked only that the district court conclude "neither the [economic substance doctrine] nor the step-transaction doctrine can apply to disregard any step of Project Soy." App. at 146. In its response to the government's cross-motion for summary judgment, LGI reiterated that its "sole argument is that these doctrines are not relevant to the transactions at issue." App. at 260-61. "Our adversarial system endows the parties with the opportunity—and duty—to craft their own legal theories for relief in the district court. It is the

289-94. This court answers that question in the affirmative and, in so doing, rejects LGI's assertion the economic substance doctrine is a mere interpretive tool that cannot be used to override the literal terms of the tax code. *See, e.g.*, *Blum v. Comm'r*, 737 F.3d 1303, 1309 (10th Cir. 2013) (holding transactions that "comply with the literal terms of the tax code" can be disregarded under the federal common law version of the economic substance doctrine if they are mere tax-avoidance schemes); *Sala v. United States*, 613 F.3d 1249, 1253 (10th Cir. 2010) (same); *see also* 26 U.S.C. § 7701(o)(5) (defining the economic substance doctrine as "the common law doctrine under which tax benefits . . . with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose" and mandating that the determination of whether the "doctrine is relevant to a transaction shall be made in the same manner as if [§ 7701(o)] had never been enacted"). Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the judgment of the district court.

## II. BACKGROUND

LGI, a United States corporation, is the parent of an affiliated group of multinational companies that, together, file a consolidated United States tax return. App. at 13-14, 28, 211, 280. *See generally* 26 U.S.C. § 1504(a)(1). In June 2018, LGI began to

---

significant but limited job of our appellate system to correct errors made by the district court in assessing the legal theories presented to it, not to serve as a second-shot forum where secondary, back-up theories may be mounted for the first time." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (cleaned up). For this exact reason, LGI's argument that the economic substance doctrine applies to either all or none of the steps of Project Soy is also waived.

explore the possibility of exploiting a loophole in the international tax provisions of the

TCJA to shelter profits. This loophole was, as labeled by LGI and its tax professionals, a

"last day of year rule/mismatch." Supp. App. at 289-94, 445. The mismatch was

"between (1) the rules for paying tax on global intangible low taxed income (GILTI) and

subpart F tax on a gain generated by a controlled foreign corporation (CFC), and (2) the

qualification of an entity as a CFC." *ESD Order*, 2023 WL 8062792, at *1 (quoting the

deposition of LGI's "vice president of group tax strategy"). As succinctly described by

the district court, "a foreign corporation not directly owned by any U.S. person might

qualify as a CFC for U.S. tax purposes because ownership may be 'attributed' to a U.S.

person, but only CFCs with an actual U.S. shareholder on the last day of the taxable year

are subject to GILTI or Subpart F." *Id.*[2]

---

[2] Both parties helpfully explain how the United States taxed the foreign income of its citizens/residents prior to passage of the TCJA—including the income taxation of CFCs, foreign corporations controlled by "United States shareholders." 26 U.S.C. § 957; *see* Appellant's Opening Br. at 16; Appellee's Response Br. at 2-3. It is enough to say that, as a general matter, United States taxpayers did not have to pay taxes on earnings of foreign corporations until those earnings were distributed to them, i.e., repatriated. *See* Appellant's Opening Br. at 16 ("Corporations thus had an incentive to keep foreign profits abroad."); Appellee's Response Br. at 2 ("The result for U.S. owners of foreign corporations was 'the *deferral* of U.S. taxes.'" (quoting Joel D. Kuntz & Robert J. Peroni, *U.S. International Taxation* § A1.06 (2024)). Special rules did, however, somewhat limit tax deferral as to CFCs. *See* 26 U.S. Code Subtitle A Chapter 1 Subchapter N Part III Subpart F, 26 U.S.C. §§ 951-65 (commonly referred to as subpart F). The parties likewise helpfully explain how the TCJA altered the taxation of foreign income, specifically including the income of CFCs. *See* Appellant's Opening Br. at 17-20 (explaining the TCJA made "significant changes to the United States' approach to international taxation" for the purpose of "encourag[ing] repatriation of foreign income"); Appellee's Response Br. at 2-5 ("The TCJA largely eliminated tax deferral by taxing U.S. shareholders currently on all foreign earnings, except for certain limited categories of income." (citing 10 Jacob Mertens, *Mertens Law of Federal Income Taxation* §38B:107 (2024)). For purposes

With assistance from its tax professionals across the United States and Europe, LGI planned a four-step series of transactions, codenamed "Project Soy." App. at 198; Supp. App. at 93, 122-23, 323, 444. Project Soy was specifically designed to take advantage of a "last day of year rule/mismatch" in the international tax provisions of the TCJA. Supp. App. at 289-94, 445. "Project Soy would allow LGI to avoid GILTI and capital gain taxes on billions of dollars of unrealized gain from LGI's interest in one of its sub-entities." *ESD Order*, 2023 WL 8062792, at *1.[3] It achieved this goal by generating

---

of this appeal, it is enough to note § 245A plays a part in that process. *See* Appellant's Opening Br. at 17-20; Appellee's Response Br. at 2-5.

It is unnecessary to recount at length the statutory history briefly summarized above. The district court explained in detail why the § 245A credit claimed by LGI in this refund suit is inconsistent with the purpose of Congress in enacting the TCJA. *Liberty Glob., Inc. v. United States (Temporary Regulation Order)*, No. 1:20-cv-03501-RBJ, 2022 WL 1001568, at *1-2 (D. Colo. Apr. 4, 2022) (explaining how Congress intended § 245A to work in tandem with 26 U.S.C. § 951A, the provision of the tax code governing taxation of GILTI). As the United States rightfully notes, LGI does not address the district court's analysis of congressional intent, let alone assert Project Soy is consistent with the scheme Congress set out in the TCJA. *See* Appellee's Response Br. at 42-43. Instead, LGI asserts on appeal far more abstract arguments as to the inapplicability of § 7701(o): asserting the economic substance doctrine does not apply because (1) Project Soy mechanically or technically complied with the provisions of subpart F and § 245A and/or (2) Project Soy used steps or substeps that are categorically immune from the doctrine. As set out below, these arguments can be resolved without a detailed analysis of the international tax provisions of the TCJA. And, in any event, the TCJA scheme is described at length in both the district court's *Temporary Regulation Order* and its *ESD Order*.

[3] During the 2018 tax year in question, LGI was owned by a United Kingdom company, Liberty Global plc ("LG-UK"). App. at 211. LGI, through a CFC, was a majority owner of the Belgian telecommunications company Telenet Group Holding ("TGH"). *Id.* at 212. TGH was also a CFC. *Id.* TGH, in turn, owned Telenet Group, a separate Belgian entity that was "disregarded" for U.S. tax purposes, i.e., Telenet Group's assets and liabilities were treated as being owned directly by TGH. *Id.* at 149, 154; *see also generally* U.S. Dep't of Treasury, Internal Revenue Serv., Form

artificial earnings and profits in steps one through three of the Project. *See id.* Absent the

"last day of year rule/mismatch" identified by LGI and its tax professionals, these

earnings "would have been taxed under subpart F." *Id.* Instead, these artificial earnings

were used to offset LGI's taxable gain on the transaction that took place at step four of

the Project. *See id.* At step four, an LGI affiliate sold its interest in TGH to LG-UK. *See*

*id.*[4] The income from this step four transaction is the income now at issue in this appeal.

---

8832: Entity Classification Election at 4-5 (2013), https://www.irs.gov/pub/irs-pdf/f8832.pdf (defining relevant terminology in a section titled "Definitions").

[4] The district court provided the following summary of Project Soy's steps:

> In Steps 1-3, LGI manufactured $4.8 billion of E&P [(earnings and profit)] for TGH. Steps 1 and 3 generated E&P for TGH by issuance of profit certificates from Telenet Group (the operating subsidiary) to TGH. Steps 2 and 3 generated E&P for TGH by creating "springing to life debt"—by converting Telenet Financing into a direct subsidiary of TGH rather than an indirect subsidiary through Telenet Group, and then making Telenet Group a separate entity for tax purposes. Generating E&P was important because the proceeds from the sale of a CFC (the transfer of LGI's interest in TGH to [LG-UK] in Step 4 of Project Soy) could be treated as a dividend "to the extent of the [CFC's] E&P" under [26 U.S.C.] §§ 964(e)(1) and 1248(a). In other words, if TGH had sufficient E&P, LGI could treat its gain as a dividend and offset the entire $2.4 billion by claiming a § 245A deduction.

*ESD Order*, 2023 WL 8062792, at *1 n.1 (internal citation omitted); *see also* Appellant's Opening Br. at 24-29 (extensively describing the steps and overall nature of Project Soy); Appellee's Response Br. at 14-22 (same). Again, this court concludes it is unnecessary to describe at length the Project and its steps/substeps. LGI's briefing emphasizes how, in seeking to take advantage of the deduction set out in § 245A, Project Soy technically complied with the mechanical aspects of Title 26. *See* Appellant's Opening Br. at 24-29. Although emphasizing the unusual nature of certain aspects of the Project—namely the use of springing-to-life debt and profit certificates—the government does not assert for purposes of this appeal that Project Soy fails to mechanically comply with Title 26. *See* Appellee's Response Br. at 14-22. Thus, it is unnecessary to recount at length in this opinion the various

As it considered and revised Project Soy during 2018, LGI closely monitored legislative and regulatory developments. App. at 196; Supp. App. at 84-88, 160-61. LGI recognized the mismatch it intended to exploit could be eliminated through issuance of Treasury regulations. Supp. App. at 84, 297, 450. Ultimately, a plan on the part of Treasury to close the gap was publicly reported. Supp. App. at 54-55, 88. Before it finalized Project Soy, however, LGI executives were advised Treasury regulations impacting the plan could be issued up "until June 30, 2019 to be retroactive to January 1, 2018." Supp. App. at 88. Treasury issued such a regulation in the form of 26 C.F.R. § 1.245A-5T.

LGI filed its 2018 tax return in October 2019, months after the promulgation of § 1.245A-5T. Supp. App. at 81. LGI initially complied with the regulation, electing on its original return to close TGH's 2018 tax year as of the date LGI sold it, i.e., December 28. App. at 229. It reported almost $2 billion of the earnings and profit generated by Project Soy as GILTI, paid the related tax, and claimed a § 245A deduction of approximately $360 million using its residual untaxed earnings and profit. Supp. App. at 82. Two months later, LGI filed an amended return in which it (1) asserted § 1.245A-5T was invalid; and (2) recomputed its tax liability as if the regulation did not apply, reporting no GILTI and claiming a § 245A deduction of $2.4 billion. App. at 229-30; Supp. App. at 82. Before the Internal Revenue Service could complete its examination of LGI's 2018

---

steps/substeps of Project Soy. Nevertheless, for the benefit of interested readers, a comprehensive pictorial representation created by LGI of the final, i.e., sixteenth, iteration of Project Soy, App. at 148-54, is attached to this opinion as an appendix.

tax return, LGI filed this suit, seeking close to $110 million in refund. App. at 12; Supp. App. at 22.

The refund suit was resolved through two rounds of summary judgment motions, the first concerning the validity of § 1.245A-5T and the second concerning the applicability of the economic-substance doctrine.

In its first summary judgment motion, LGI argued § 1.245A-5T was invalid on several grounds. Supp. App. at 28-51. The district court determined § 1.245A-5T was procedurally invalid because it was issued without notice and comment. *Temporary Regulation Order*, 2022 WL 1001568, at *3-7.[5]

The parties then cross-moved for summary judgment regarding whether LGI's refund claim should be disallowed under § 7701(o)'s codified economic-substance doctrine. In its motion, LGI made clear its "sole argument" was that the economic substance doctrine was not "relevant" to Project Soy. App. at 260-61. LGI conceded all aspects of the first three steps of Project Soy failed both prongs of the codified economic substance doctrine. *See supra* n.1; *see also* App. at 505. It argued, instead, that (1) the economic substance doctrine "does not apply to 'basic business transactions,'" such as corporate organizations under 26 U.S.C. § 351 and entity selections; and (2) steps one through three of Project Soy were exempt from the doctrine as basic business

---

[5] The United States argues for the validity of the temporary regulation as an alternative basis to affirm should this court conclude § 7701(o) is not relevant to Project Soy. Because, however, this court affirms the district court's application of the economic substance doctrine to Project Soy, we do not further consider the validity of § 1.245A-5T.

transactions. App. at 129. In response the government argued § 7701(o) created no

categorical exemptions and directed courts to look to existing precedent, which applied

the economic substance doctrine to all types of transactions, including those governed by

§ 351 or involving an entity selection. App. at 241.

The district court ruled the economic substance doctrine applied to, i.e., was

relevant to, Project Soy. *ESD Order*, 2023 WL 8062792, at *4-5. Importantly, it

determined the doctrine is "relevant" within the meaning of § 7701(o) whenever "a

taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions

that serve no economic purpose other than tax savings." *Id.* at *4 (quoting § 7701(o)'s

legislative history).[6] Applying that standard, the district court concluded the doctrine was

---

[6] LGI makes much of the fact the district court rejected its contention § 7701(o) required the district court to conduct a separate threshold analysis into whether the doctrine is relevant to Project Soy, an analysis LGI asserts is divorced from whether the transaction "changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and whether "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." *ESD Order*, 2023 WL 8062792, at *4 (citing *Blum v. Comm'r*, 737 F.3d 1303, 1309 (10th Cir. 2013), for the "conclusion that there is no threshold 'relevance' inquiry that precedes the inquiry described in the operative clause"). According to LGI, this ruling renders the statutory term "relevant" surplusage. In the context of this case, the issue is a red herring. Ultimately, the district court concluded the doctrine was relevant because Project Soy was an attempt by LGI to mechanically utilize the provisions of the TCJA to obtain a benefit not intended by Congress. *See id.* at *4-5; *see also supra* n.2 (explaining the district court concluded LGI's generation of a § 245A deduction was based on earnings and profits not subject to GILTI and subpart F was at odds with congressional intent in enacting the TCJA); *supra* n.2 (recognizing LGI does not assert on appeal that Congress intended that § 245A operate in the fashion used in Project Soy). This understanding of the relevance of the doctrine is entirely consistent with extant precedent. *See* 26 U.S.C. § 7701(o)(5)(C) ("The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted."); *see also Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935) (observing that, to assess economic substance, a court must look to the purpose of the statute to

relevant because Project Soy exploited a legislative mismatch through transactions that

served no economic purpose other than tax savings and, thereby, "violated congressional

intent." *Id.* at \*7. "Congress intended that only earnings that are exempt from GILTI

would be eligible for the § 245A dividends-received deduction." *Temporary Regulation*

*Order*, 2022 WL 1001568, at \*1. The district court concluded that "Project Soy was," on

the other hand, "designed to, and does, unlink the § 245A deduction from the appropriate

anti-base erosion safeguards that the legislature intended." *ESD Order*, 2023 WL

8062792, at \* 7 (quotation omitted).

The district court also rejected LGI's contention that the first three steps of Project

Soy were exempt from § 7701(o) as "basic business transactions." *Id.* at \*7. The district

court noted § 7701(o) contained no categorical exceptions and, furthermore, Project Soy

---

determine "whether what was done . . . was the thing which the statute intended"); *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 113 (2d Cir. 2015) ("The economic substance doctrine exists to provide courts a 'second look' to ensure that particular uses of tax benefits comply with Congress's purpose in creating that benefit."); *Horn v. Comm'r*, 968 F.2d 1229, 1236 (D.C. Cir. 1992) ("The sham transaction doctrine is an important judicial device for preventing the misuse of the tax code; but the doctrine cannot be used to preempt congressional intent. As Government counsel properly conceded at oral argument, Congress has the power to authorize these transactions, whether or not they are economic shams."); *cf.* H.R. Rep. No. 111-443, pt. 1, at 295 (2010) ("Tax avoidance transactions have relied upon the interaction of highly technical tax law provisions to produce tax consequences not contemplated by Congress. . . . A strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences. Thus, many courts have long recognized the need to supplement tax rules with anti-tax-avoidance standards, such as the economic substance doctrine, in order to assure the Congressional purpose is achieved.").

was not a basic business transaction but was, instead, a highly structured tax-avoidance scheme. *Id.* at *7-8.

Finally, the district court applied § 7701(o)'s two-prong inquiry to the undisputed facts and concluded steps one through three of Project Soy failed both requirements of the codified economic substance doctrine. *Id.* at *9-11. It relied on LGI's admissions that these steps (1) did not change LGI's economic position in any meaningful way and (2) served no substantial non-tax purpose. *Id.*; *see also supra* n.1; 26 U.S.C. § 7701(o)(1). The district court recognized, however, that the undisputed evidence "corroborate[d]" LGI's admissions that the first three steps of Project Soy lacked economic substance. *ESD Order*, 2023 WL 8062792, at *10. Accordingly, the district court ruled as follows:

> [B]ecause there is no genuine issue of fact as to either the first or second prong, and both prongs resolve in favor of the application of the economic substance doctrine, it is appropriate as a matter of law to apply the doctrine here and to disregard Steps 1 through 3.
>
> When Steps 1 through 3 are disregarded, the noneconomic E&P generated in [those steps] are not recognized and cannot be used to support the § 245A deduction. Step 4, the TGH Transaction, would then result in $2.4 billion of taxable gain. As a matter of law, LGI is not entitled to the deduction at issue here.

*Id.* at *11.

### III. ANALYSIS

LGI, supported by numerous business-interest Amici Curiae, asserts the district court erred in concluding § 7701(o)'s economic substance doctrine is relevant to Project Soy. This Court reviews the district court's grant of summary judgment, specifically including questions of statutory construction and the applicability of the economic

substance doctrine, de novo. *Jewell v. United States*, 749 F.3d 1295, 1297 (10th Cir. 2014) (summary judgment); *Ausmus v. Perdue*, 908 F.3d 1248, 1252 (10th Cir. 2018) (statutory construction); *Sala*, 613 F.3d at 1252 (applicability of economic substance doctrine).

As the district court's *Temporary Regulation Order* and *ESD Order* make clear, Project Soy was an elaborate tax-avoidance scheme designed to shield billions in income from the newly enacted TCJA international tax scheme based on economically meaningless transactions between closely related entities. Nevertheless, LGI asserts it is entitled to its manufactured deductions because (1) it "mechanical[ly]" complied with the terms of the Tax Code and (2) the codified economic-substance doctrine cannot "override tax statutes." Appellant's Opening Br. at 1, 24. LGI's arguments are inconsistent with precedent and otherwise unpersuasive.

For decades, transactions that "comply with the literal terms of the tax code" have been disregarded for tax purposes under federal common law if they have no economic substance but are, instead, mere tax-avoidance schemes. *Blum*, 737 F.3d at 1309; *Sala*, 613 F.3d at 1253; *Rogers v. United States*, 281 F.3d 1108, 1115-16 (10th Cir. 2002); *Bohrer v. Comm'r*, 945 F.2d 344, 347-48 (10th Cir. 1991) (collecting cases from numerous circuits affirming a Tax Court determination that "transactions were sham even if they did comply with the letter of the tax code")[7]; *see also, e.g., Dow Chem. Co. v.*

---

[7] LGI's reliance on this court's decision in *St. Charles Inv. Co. v. Commissioner*, 232 F.3d 773 (10th Cir. 2000), is somewhat mystifying. *St. Charles*

*United States*, 435 F.3d 594, 599 (6th Cir. 2006); *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 113 (2d Cir. 2015); *Santander Holdings USA, Inc. v. United States*, 844 F.3d 15, 23 (1st Cir. 2016); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006). The relevant Supreme Court precedent from almost a century ago is in accord. *Gregory v. Helvering*, 293 U.S. 465, 470 (1935) (disregarding corporate reorganization that complied with code's "terms").[8] This precedent is determinative because § 7701(o)(5)(A) provides that the codified economic substance doctrine "means

---

involves an issue of pure statutory construction. *Id.* at 776. The economic substance doctrine is not even mentioned in the case.

[8] As argued convincingly by the government, the economic substance doctrine is a "cardinal rule of the tax code," Appellee's Response Br. at 37 (quoting *Keeler v. Comm'r*, 243 F.3d 1212, 1215 (10th Cir. 2001)), because "Congress and Treasury are presumed to draft tax rules for meaningful transactions," *id.* at 32 (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352-54 (Fed. Cir. 2006)). "[B]ecause of the complexity of the U.S. tax system and because business arrangements are often comprised of multiple steps from a tax perspective, the literal application of the U.S. tax laws to complex business transactions can create fundamental 'transactional inconsistencies.'" Bret Wells, *Economic Substance Doctrine: How Codification Changes Decided Cases*, 10 Fla. Tax Rev. 411, 413 (2010) [hereinafter Wells, *ESD: Codification*]; *see also id.* at 413 n.6 ("It is appropriate to refer to transactional inconsistencies as a *mistake* because Congress has articulated a desire that the tax laws should accurately account for the income of the taxpayer. *See* [26 U.S.C.] § 446(b) (providing that if the taxpayer's method of accounting 'does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income'). When a transactional inconsistency causes a taxpayer's income to not be clearly and accurately reflected on a tax return, the purposes of § 446(b) have been frustrated."); *cf.* H.R. Rep. No. 111-443, pt. 1, at 295 (2010) ("A strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences. Thus, many courts have long recognized the need to supplement the tax rules with anti-tax-avoidance standards, such as the economic substance doctrine, in order to assure the Congressional purpose is achieved.").

the common law doctrine under which tax benefits . . . with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose."[9] Thus, this court is bound to reject LGI's assertion that the codified economic substance doctrine is irrelevant to transactions that mechanically comply with the Tax Code.[10]

Alternatively, LGI claims Congress intended to exclude from the scope of § 7701(o) the transactions utilized in the steps or substeps of Project Soy. *See* Appellant's

---

[9] Although this court need not, and does not, rely on legislative history to reject LGI's contention that the economic substance doctrine is inapplicable to transactions that mechanically comply with the Tax Code, that history strongly supports our holding. *See* Wells, *ESD: Codification*, *supra* note 8, at 418 & nn.27-31 ("[T]he decision to codify the economic substance doctrine also was motivated by a congressional concern over the decision of the Court of Federal Claims in *Coltec Industries, Inc. v. United States*[,62 Fed. Cl. 716 (2004), *vacated and remanded*, 454 F.3d 1340 (Fed. Cir. 2006)]. In the *Coltec* case, the Court of Federal Claims outright questioned the legitimacy of the economic substance doctrine, stating that 'the use of the "economic substance" doctrine to trump "mere compliance with the Code" would violate the separation of powers.'" (footnotes omitted)). That is, Congress was motivated in part to codify the economic substance doctrine out of concern courts would conclude the doctrine could not be used to disregard mechanical compliance with the Tax Code. *See id.*

[10] Congress can certainly enact a tax benefit that explicitly applies even in economically meaningless transactions. *See, e.g.*, *Horn*, 968 F.2d at 1234-35 (recognizing economic-substance inquiry was "irrelevant" when statute "grant[s] beneficial tax treatment to economically meaningless behavior"). The primary case relied on by LGI, *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779 (6th Cir. 2017), is just such a case. *Summa Holdings* concerned a unique corporate entity, called a DISC, that Congress explicitly authorized to engage in transactions "that have no economic substance at all" to provide a specific tax benefit for U.S. exporters. *Id.* at 786. *Summa Holdings* held, given Congress's explicit directive, that a relative to the economic substance doctrine—the "substance-over-form doctrine"—was inapplicable. *Id.* As noted above, nothing in the TCJA evidences any similar intent to provide massive tax benefits for the admittedly economically meaningless transaction at issue here. *See supra* n.2. Thus, *Summa Holdings* does not advance LGI's arguments.

Opening Br. at 52-57 (identifying 26 U.S.C. § 351 corporate organizations and, in addition, a business's entity-selection or capitalization "choice"). In resolving this issue against LGI, the district court set forth, inter alia, two rationales. First, the district court noted no such exceptions appear in the text of § 7701(o). *ESD Order*, 2023 WL 8062792, at *8 ("[T]he statute contains no express exceptions, and the list of 'exemptions' to which LGI refers appear only in the committee report as illustrations of the broader concept of 'basic business transactions.'"). Second, even assuming some basic transactions could be exempt from applicability of § 7701(o), that did not mean, the district court concluded, Project Soy was exempt. *Id.* ("The [committee] report does not state or imply that any transaction that merely *includes* a reorganization is likewise exempt. There is no basis to conclude from the fact that one step of Project Soy might fall within an exception that the transaction in aggregate—the appropriate unit of analysis here—should be excepted."). The district court's second rationale is undoubtedly correct and more than sufficient to resolve this issue in favor of the United States. That is, the district court properly determined that the appropriate transaction for analysis was the entirety of Project Soy and that, so analyzed, Project Soy is not a basic business transaction. This is true even if some of Project Soy's steps or substeps are of the type of transactions identified as "basic" in the legislative history. Thus, it is unnecessary for this court to resolve whether any particular type or category of basic business transaction, standing alone or differently bundled than in Project Soy, is exempt from the reach of § 7701(o).

The district court correctly determined the proper unit of measurement for application of the economic substance doctrine was the entirety of Project Soy. *Id.* at *5-

6; *see* 26 U.S.C. § 7701(o)(5)(D) ("The term 'transaction' includes a series of transactions."); *see also Sala*, 613 F.3d at 1252 ("Before analyzing the question of economic substance, . . . this court must first determine which transactions control the inquiry."). Project Soy was a tightly integrated series of transactions that took place over a short, four-day period for the specific purpose of taking advantage of an unintended "mismatch" in the international tax provisions of the TCJA. *ESD Order*, 2023 WL 8062792, at *6 ("[T]he steps of Project Soy were executed in a four-day period in December 2018 and were 'so integrated' that LGI admits that it is 'unlikely that Steps 1, 2, and 3 would have been taken except in contemplation of the TGH transaction in Step 4.' ECF No. 76-8 at 6 (admissions 13(b) and 14(b) by LGI)."). LGI does not, and could not, argue that Project Soy is a basic business transaction in the mold of those identified in the legislative history of § 7701(o). And, this court rejects LGI's argument that simply because it partially composed Project Soy with such transactions, this court is obligated to hold § 7701(o) irrelevant. No precedent supports such an approach and, as noted by the district court, such an approach would "stymy[] the doctrine's purposive application by an arid formalism." *Id.* (citing *Bank of N.Y. Mellon*, 801 F.3d at 121). If this court gave its imprimatur to the rule advocated for by LGI, taxpayers, tax professionals, and attorneys would quickly find ways to inoculate their complex transactions from application of § 7701(o) by including therewithin "basic business transactions." *See* Bret Wells, *Economic Substance Doctrine: How Codification Changes Decided Cases*, 10 Fla. Tax Rev. 411, 414 (2010) ("Given the creativity and sophistication of the tax bar, taxpayers

17

can affirmatively find ways to put themselves into a *mistake* situation if the tax laws were literally applied.").

## IV. CONCLUSION

The economic substance doctrine codified in § 7701(o) is relevant to attempts by taxpayers to mechanically utilize the provisions of the Tax Code to obtain a benefit not intended by Congress. That is exactly what LGI did with Project Soy. And, as LGI admitted, the first three steps of the Project lack economic substance under the test set out in § 7701(o)(1). LGI cannot escape the application of § 7701(o) by including within its integrated structure steps that might, if standing alone, be considered basic business transactions. Accordingly, the district court correctly determined LGI is not entitled to any of the § 245A deductions claimed in its amended 2018 tax return. For these reasons, the judgment of the United States District Court for the District of Colorado is hereby **AFFIRMED**.

Appellate Case: 23-1410    Document: 124-1    Date Filed: 04/21/2026    Page: 19



# Project Soy

**January 3, 2019**
**Final Version**

**CONFIDENTIAL –**
DO NOT DISTRIBUTE WITHOUT PRIOR
WRITTEN CONSENT FROM
LIBERTY GLOBAL TAX



LIBERTY GLOBAL

Appellate Case: 23-1410    Document: 124-1    Date Filed: 04/21/2026    Page: 20

# Telenet Group Holding NV – Current Relevant Structure
Simplified Diagram (September 2018)

LIBERTY GLOBAL

# Telenet Group BVBA Capital Reduction
**Completed on 26 December 2018**


LIBERTY GLOBAL

## Step 1

Telenet Group BVBA ("Telenet Group") decreases its issued share capital to its shareholders, Telenet Group Holding NV ("TGH") and Telenet International Finance Sarl ("TIF") (holding 1 share). The amount of the capital decrease is €4.283B.

### Considerations:

- Two month waiting period after publication in Belgian Official Gazette of notarial deed approving capital decrease

- Requirement that Telenet is below 5x net total debt to consolidated EBITDA (as currently the case currently case)

- No documentation (e.g., IC loan agreement) required from claim of TGH and TIF against Telenet Group created by capital reduction during waiting period

### Timing

- *Capital Reduction approved by Telenet Group Holding NV (s/h of Telenet Group BVBA) Board on 12 Oct 2018*

- *Publication in Belgian Gazette occurred 29 October*

- *Deed concluding capital reduction (together with step 3) notarized on 26 December 2018*

Diagram:

- Liberty Global plc (UK)
- Liberty Global, Inc. (US)
- Class A + C: 83% value, 8% vote
- Class B: 17% value, 92% vote
- Liberty Global Broadband I Ltd. (UK)
- Public /Other
- Binan Investments (NL)
- 43.4%
- 56.6%
- Telenet Group Holding NV/SA (BE)
- Share capital reduction
- Telenet Group BVBA (BE)
- Telenet Group BVBA Subs (Various)

Appellate Case: 23-1410    Document: 124-1    Date Filed: 04/21/2026    Page: 22

# Finance Company Reorganization
## Completed on 25 December 2018





### Step 2

TIF transfers 100% of the outstanding shares of Telenet Financing USD LLC ("TF LLC") to TGH in exchange for cash based on fair market value.

### Considerations:

- FMV of TF LLC is expected to be nominal due to back-to-back loan positions
- Transfers will need to constitute a Permitted Disposal
- Covenants:
  - TF LLC shares are pledged, new -NY law security document will need to be entered into by TGH to ensure that the shares remain pledged
  - Designate TF LLC as Permitted Affiliate Parent; LG to coordinate deliverables

### Timing

- Documents signed / effective 25 December 2018
- As TGH board has already met for December, minutes won't reflect ratification of step (but has been approved in earlier meeting); final opinion / ratification will follow

# Telenet Group BVBA Conversion and Profit Certificate Issuance
**Completed on 26 December 2018**

LIBERTY GLOBAL



## Step 3

A) Upon completion of the capital reduction from Step 1, Telenet Group converts to be an NV/SA under Belgian law.

B) At the same time, TNG and TIF use the claim to the amount of the capital decrease as a contribution in return for the newly issued profit certificates from Telenet Group.

### Considerations:

- The amount of the contribution and number of profit certificates to be issued is equal to capital decrease amount (€4.2B); such amount may exceed 50% of the value of outstanding shares, resulting in suspension of (already limited) voting rights of exceeding profit certificates

- Commercial implications of Telenet legal form and name change

- Statement of assets and liabilities of Telenet Group and statutory auditors report required

- LG to coordinate deliverables relating to the security package under the financing docs

### Timing

- Will occur as part of one notarial deed, including completion of capital reduction, conversion to NV and profit certificate issuance

- Deed including conversion and profit certificate issuance to be notarized on 26 December 2018 making step 3 effective

- As TGH board has already met for December, minutes won't reflect ratification of step (but has been approved in earlier meeting); final opinion / ratification will follow

Appellate Case: 23-1410    Document: 124-1    Date Filed: 04/21/2026    Page: 23

# Transfer of Binan Investments
**Completed on 28 December 2018**

LIBERTY GLOBAL



**Step 4**

Liberty Global Broadband II Ltd transfers Binan Investments BV ("Binan") to Liberty Global plc in exchange for an intercompany note of €2,899,000,000, equal to the fair market value of Binan.

**_Considerations_:**

- UK Tax Considerations
- NL tax and legal
- LG to coordinate with Belgian counsel regarding change in shareholder chain; LG to issue:
  1) Transparency declaration to Telenet Group Holding NV and the FSMA within 4 trading days as from the transfer of the shares in Binan
  2) The change in the chain of control over Telenet Group Holding NV will have to be included and described in the annual grandfathering notification update in August 2019.

**_Timing_**

- _Deed of transfer to be executed by NL notary on 28 December 2018_

Appellate Case: 23-1410     Document: 124-1     Date Filed: 04/21/2026     Page: 25

# Ending Structure
*Simplified Diagram (December 2018)*



No. 23-1410, *Liberty Global Inc. v. United States*
**EID**, J., dissenting.

In 2018, Liberty Global, Inc. ("LGI"), a U.S. telecommunications corporation, sought to exploit a tax loophole created by the 2017 Tax Cuts and Jobs Act ("TCJA"), Pub. L. No. 115-97, tit. I, 131 Stat. 2054, using a four-step sequence called "Project Soy." In short, LGI, in conjunction with its foreign affiliates, repatriated foreign-corporate income by changing the corporate form and capital structure of one of its subsidiaries and selling the interest in this subsidiary before the last day of the tax year to generate a deduction under I.R.C. § 245A. The district court invalidated the claimed deduction under the "economic substance doctrine," codified in I.R.C. § 7701(o), because the transactions at issue did not meaningfully change LGI's economic position and did not have a substantial nontax business purpose.

Despite acknowledging that the doctrine applies only "[i]n the case of any transaction to which the economic substance doctrine is relevant," the district court— "[a]t the risk of tautology"—concluded that the "economic substance doctrine applies when a transaction lacks economic substance." App'x Vol. II at 288. In other words, the court determined that there is no threshold relevancy inquiry separate from the statutory factors, rendering multiple sections of the Tax Code superfluous in the process.

The majority holds that this does not constitute reversable error, contradicting not only the clear statutory language of § 7701(o), but also decades of precedent. Accordingly, I dissent.

## I.

## A.

In my view, the district court erred in its interpretation of I.R.C. § 7701(o) when it concluded that the economic substance doctrine applies to all transactions.

I begin with the text. Indeed, "if there is one title of the United States Code most deserving of attention to text, it is Title 26." *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 789 (6th Cir. 2017). In 2010, Congress enacted I.R.C. § 7701(o), which codified and clarified the applicability of the economic substance doctrine: "the common law doctrine under which [income] tax benefits . . . with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose." *Id.* § 7701(o)(5)(A). The prefatory clause in § 7701(o)(1) clarifies that the economic substance doctrine comes into play only some of the time:

> In the case of any transaction to which the economic substance doctrine is *relevant*, such transaction shall be treated as having economic substance only if—
> > (A)   the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
> > (B)   the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

*Id.* § 7701(o)(1) (emphasis added). If that was not enough proof of the existence of a relevancy requirement, Congress included another subsection titled "Determination of application of doctrine not affected." *Id.* § 7701(o)(5)(C). That section instructs

2

courts to make "[t]he determination of whether the economic substance doctrine is relevant . . . in the same manner as if this subsection had never been enacted." *Id.*

These provisions make clear that there exists a mandatory relevancy determination before the government may invoke the economic substance doctrine to disallow tax benefits. If Congress meant the economic substance doctrine to apply to all transactions like the district court suggests, it would not have included the prefatory language in § 7701(o)(1) referencing the relevancy of the doctrine. And it certainly would not have included § 7701(o)(5)(C) to explain how to make the "determination of whether the economic substance doctrine is relevant." In fact, the district court's contrary conclusion that there is no threshold relevancy inquiry violates the "cardinal principle of statutory construction that we must 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). As the Supreme Court has explained, that principle is strongest when, as here, an interpretation would "render superfluous another part of the same statutory scheme." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013). Yet, the district court's conclusion that the doctrine is relevant whenever the statute's two-pronged test is satisfied does exactly that to § 7701(o)(1) and renders any reference to "relevancy" mere surplusage. *See Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019).

In my view, that interpretation is not only wrong—it borders on the absurd, improperly casting our court into the role of creating rather than construing

3

legislation. Congress said exactly what it meant: the economic substance doctrine is not relevant to all transactions. The district court's alternative reading of § 7701(o) fails to accord separate meaning to the express and repeated use of the term "relevant" in the statute and was thus erroneous.

The majority's affirmation of the district court's relevancy determination is equally problematic. The majority does not explicitly adopt the district court's conclusion that there is no threshold relevancy test but declares this issue "a red herring" because it agrees with the district court that the economic substance doctrine applies here. Maj. Op. at 10 n.6. In doing so, the majority abandons its responsibility to meaningfully interpret text and precedent and merely looks to the "purpose of the statute," effectively handing the government a blank check to declare any transactions it does not like to be within the doctrine. *Id.*

The conclusion that the relevancy clause does have meaning is reinforced by the structure of the Tax Code. As the reticulated provisions of the Code demonstrate, our tax system balances competing goals of generating revenue for the government, maximizing efficiency, ensuring fairness, incentivizing behavior, and easing administrability. Implicit in the Code is that Congress is not wholly concerned with maximizing tax revenue for the government. Instead, as various amici point out, many provisions provide favorable tax treatment to certain transactions to incentivize behavior for noneconomic reasons, *see e.g.*, I.R.C. § 6418 (providing for the transfer of certain tax credits supporting investment in carbon-neutral energy transition technologies), or to facilitate the calculation and collection of taxes, *see e.g.*, 26

4

C.F.R. § 301.7701-3(a) (allowing businesses to elect their classification as an entity for federal tax purposes).

In those instances, Congress explicitly allows (and encourages) taxpayers to make tax-motivated decisions that are detached from the taxpayer's economic position. Thus, applying the economic substance doctrine to all transactions only makes sense if the sole goal of the tax system is to maximize revenue. Otherwise, the economic substance doctrine, which focuses on changes to the taxpayer's economic position and nontax motivations for engaging in a transaction, would frustrate provisions designed to incentivize socially beneficial behavior or ease the administrability of the tax system. Therefore, it makes sense that Congress made the economic substance doctrine relevant to only some transactions and provisions of the Tax Code.

## B.

Having established that § 7701(o) contains a meaningful threshold relevancy determination, one question remains: When is the economic substance doctrine relevant?

Recall that § 7701(o)(5) sets forth how courts should determine the applicability of the economic substance doctrine. "The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." I.R.C. § 7701(o)(5). In other words, we determine whether the doctrine is relevant in the same way courts have always done when invoking the common law doctrine. The problem is that prior to

5

codification, courts did not explicitly engage in a relevancy determination.[1]  In fact,

no case decided prior to the enactment of § 7701(o) used the term "relevant" in

analyzing whether to apply the economic substance doctrine in a particular case.

They either applied the doctrine or did not, never explaining when the common law

doctrine was relevant.

Therefore, we must survey the caselaw before enactment of § 7701(o) to

discern any general principles that determine when the economic substance doctrine

is relevant.  In my view, the best reading of these pre-codification cases is that the

economic substance doctrine is relevant when the favorable tax treatment provided

by another provision's text turns on "objective economic realities of a transaction" or

the taxpayer's economic motive.  *Boulware v. United States*, 552 U.S. 421, 429

(2008).  In other words, the economic substance doctrine can be relevant only when

there is a dispute about whether the taxpayer actually has done in substance what a

Code provision—from an economic perspective—requires.  In that way, the doctrine

acts as a substantive canon to interpret statutory terms that involve an economic

condition.  *See Santander Holdings USA, Inc. v. United States*, 844 F.3d 15, 21 (1st

---

[1] The majority assumes that because previous cases did not directly address relevance, the only threshold relevance determination is whether a transaction's use of the Tax Code to achieve specific benefits is in accordance with congressional purpose in enacting these rules.  *See* Maj. Op. at 10 n.6.  However, the majority does not explain how collapsing the relevance test this way does not render the relevancy clause "surplusage," instead dismissing the issue of relevance as "a red herring."  *Id*. Because I believe the relevance clause makes it clear that a meaningful threshold relevance determination exists, I take a closer look at how courts have considered relevancy in practice, even if they did not address it explicitly.

Cir. 2016) ("The federal income tax is, and always has been, based on statute. The economic substance doctrine . . . can thus perhaps best be thought of as a tool of statutory interpretation[.]"). In essence, the doctrine adds a substance requirement to provisions dealing with economic realities. But for the doctrine to apply, the statutory language must explicitly incorporate a term related to economic reality or the taxpayer's economic motive. This definition of relevance precludes the application of the economic substance doctrine to certain basic business transactions where Congress sanctioned choices for administrability purposes or to transactions that take advantage of noneconomic incentive provisions enacted by Congress.

I start with *Gregory v. Helvering*, 293 U.S. 465 (1935), the origin of the economic substance doctrine. There, the Supreme Court recognized that "it cannot be doubted" that a taxpayer has a "legal right . . . to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." *Id.* at 469. But the Court nonetheless invoked the economic substance doctrine to deny a tax benefit to a taxpayer who claimed that a series of transactions constituted a tax-free "reorganization." *Id.* at 467. The statutory text required the transaction to be "in pursuance of a plan of reorganization" to qualify for tax-free treatment. *Id.* at 468. Thus, the statutory provision made the economic reality, including the economic purpose of the plan, relevant to determine whether the transaction was a "reorganization" within the meaning of the Code. Accordingly, whether the transaction had economic substance was relevant. And because "[n]o other business was ever transacted, or intended to be transacted," by one of the

7

companies involved in the scheme, the transaction fell "outside the plain intent of the statute." *Id.* at 467, 469–70. The key takeaway: the doctrine was relevant because the operative statute conditioned the favorable tax treatment on the transaction's economic reality and intent, namely whether what the taxpayer called a "reorganization" was, in fact, a reorganization.

In the decades that followed, the Court repeatedly tied economic substance inquires to specific statutory terms that are pertinent to the transaction. For instance, in *Knetch v. United States*, 364 U.S. 361 (1960), the Court interpreted the statutory phrase "interest paid . . . on indebtedness" to determine whether the transaction was actually debt and, thus, qualified for interest payment deductions. *Id.* at 362–63, 365–66. Because the favorable tax treatment turned on economic reality, the Court considered whether the arrangements had "nontax substance" beyond a tax deduction. *Id.* at 366. Because the taxpayer's economic position had not changed, the Court concluded that the loans were a "façade" and denied the deductions. *Id.* Again, the economic substance doctrine was only relevant because the statutory terms of "interest" and "indebtedness" required consideration of economic reality. *See also Golsen v. Comm'r*, 445 F.2d 985, 986, 988 (10th Cir. 1971) (applying the economic substance doctrine to determine whether the loans created by a series of transactions qualified as a genuine "indebtedness" creating deductions pursuant to I.R.C. § 163(a)); *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 743 (6th Cir. 2003) (same).

Similarly, in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Court held that a taxpayer was entitled to a depreciation deduction stemming from a sale-and-lease-back transaction because the transaction had "economic substance." *Id.* at 580–81, 583–84. The deduction turned on whether the taxpayer was the "owner" of the property as contemplated by the statute. And because the meaning of "owner" turned on economic reality rather than labels, the Court applied the economic substance doctrine and assessed whether the taxpayer's economic position had changed and whether the taxpayer had a nontax purpose for entering into the transaction. *Id.* at 580–83. Because the concept of "ownership" requires consideration of economic reality, the economic substance of this transaction is relevant. *See James v. Comm'r*, 899 F.2d 905, 905–06, 908–11 (10th Cir. 1990) (applying the economic substance doctrine to determine whether a transaction qualified for an ownership-based depreciation deduction).

Courts, including ours, also have invoked the economic substance doctrine when interpreting the statutory term "loss," which makes economic reality relevant. *See Blum v. Comm'r*, 737 F.3d 1303, 1307–08, 1311 (10th Cir. 2013) (construing the term "loss" using the economic substance doctrine and denying the deduction because the "loss was fictional and did not have any real world effect on [the taxpayer's] pocketbook"); *WFC Holdings Corp. v. United States*, 728 F.3d 736, 740, 742–44 (8th Cir. 2013) (applying the economic substance doctrine because the tax treatment of losses "is concerned with [economic] realities"); *Sala v. United States*, 613 F.3d 1249, 1253–54 (10th Cir. 2010) (concluding that the taxpayer had no

statutory "loss" because the transaction lacked "economic reality," resulting in no real loss); *Coltec Indus. v. United States*, 454 F.3d 1340, 1343–46, 1360 (Fed. Cir. 2006) (employing the economic substance doctrine to deny a deduction for purported capital losses because the losses were not in substance losses); *Keeler v. Comm'r*, 243 F.3d 1212, 1214–18 (10th Cir. 2001) (invoking the economic substance doctrine to deny a deduction of losses that "were not losses at all" because whether a taxpayer suffers a "loss" depends on economic reality).

Just as informative are the cases that did not analyze the pertinent transaction using the economic substance doctrine. For instance, in *Summa Holdings*, the Sixth Circuit declined to use the economic substance doctrine to invalidate a claimed deduction and instead allowed the favorable tax treatment according to the plain text of the law. There, taxpayers transferred money from a "domestic international sales corporation (DISC)" to a Roth IRA account, to take advantage of a tax benefit. 848 F.3d at 781. The court held that the IRS can "recharacterize the economic substance of a transaction" but only to "honor the fiscal realities of what taxpayers have done over the form in which they have done it." *Id.* at 785. It went on to declare that economic substance principles are only relevant when "the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process." *Id.* at 787. Thus, because " [b]y congressional design, DISCs are all form and no substance" and "[t]he same is true for the Roth IRAs" economic substance principles did not give the IRS the power to

10

override statutory text when it did not like the way these tax saving mechanisms were being used.[2] *Id.* at 786.

The Supreme Court also declined to invoke the economic substance doctrine in *Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554 (1991), a case which involved a transaction where there was no question that the taxpayer sustained the loss it claimed. *Id.* at 567–68. Economic substance principles were not applicable even though the sale was intended to "generate tax losses" that did not "substantially affect the [taxpayer's] economic position." *Id.* at 557. That was true because the economic reality of the transaction was not at issue; there was no contention that the losses were not bona fide. As such, the Court endorsed the idea that the economic substance doctrine is not relevant to the taxpayer's choice of *when* to recognize gains and losses.

---

[2] The majority argues that *Summa Holdings* is not relevant here because the court in *Summa Holdings* based its decision on an explicit congressional authorization "to engage in transactions 'that have no economic substance at all'" and there is no similar evidence here that Congress intended to exempt the type of transaction in this case. Maj. Op. at 15 n.10 (quoting *Summa Holdings*, 848 F.3d at 786). However, the court in *Summa Holdings* acknowledged that even though Congress had explicitly designed both DISCs and Roth IRAs as tax reduction mechanisms, it was possible that "Congress's decision to permit Roth IRAs to own DISCs was an oversight." *Summa Holdings*, 848 F.3d at 786. The court argued that this possibility "makes no difference" because the actions taken here were "what the law allowed." *Id*. *Summa Holdings* therefore stands for the principle that the government cannot recharacterize individual actions that comply with the explicit directives of the Tax Code as an economic sham because the actions together lead to an outcome Congress did not intend. Contrary to the majority's position, this principle is certainly relevant this case. It demonstrates that when determining whether a transaction has economic substance, courts should look into how the individual components of the transaction are described in the Tax Code, not whether the transaction as a whole led to an outcome intended by Congress.

What these cases make clear is that when economic reality and taxpayer motive are not relevant to the statutory text, neither is the economic substance doctrine. Thus, it is no surprise that the tax court in *Dover Corp. & Subsidiaries v. Commissioner*, 122 T.C. 324 (2004), approved of taxpayers taking advantage of the "check-the-box" regulations to choose the classification of a business for tax purposes. *Id.* at 351 n.19. Specifically, the court concluded that the regulations do not "require that the taxpayer have a business purpose for such an election or, indeed, for any election under those regulations." *Id.* Put another way, the economic substance doctrine is not applicable to those elections because the provisions do not make economic reality or taxpayer motive relevant. The taxpayer's choice of how to classify an entity is a quintessential example of a provision designed for administrability purposes. Such a provision is by design "all form and no substance." *Summa Holdings*, 848 F.3d at 786.

Similarly, the Eleventh Circuit concluded that a taxpayer's choice to finance a transaction using debt or equity does not implicate the economic substance doctrine. *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1019 (11th Cir. 2001). The court ruled that while "[t]here may be no tax-independent reason for a taxpayer to choose between [ ] different ways of financing the business [i.e., through debt or equity]," it does not follow that the decision is invalid under the economic substance doctrine because nothing in the Tax Code suggests that economic reality or taxpayer motive is relevant to that choice. *Id.* "To conclude otherwise would prohibit tax-planning." *Id.*

In sum, precodification cases made clear that courts used the economic substance doctrine to interpret the operative statute; the doctrine did not operate as a free-floating override to a tax-favorable result.  The economic substance doctrine is only applicable when another Code provision makes economic reality or taxpayer motive relevant.  It does not apply to provisions that are by design "all form and no substance."  *Summa Holdings*, 848 F.3d at 786.  The Tax Code is replete with provisions that permit or even encourage taxpayers to engage in, or select the form of, a transaction for no reason other than its tax consequences.  In enacting these provisions, Congress has made a deliberate legislative choice to provide predictability and certainty in the taxation of routine transactions and to incentivize certain behavior through the Tax Code.  The economic substance doctrine does not alter those legislative choices.  *See Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995) ("If the government treats tax-advantaged transactions as shams unless they make economic sense on a pre-tax basis, then it takes away with the executive hand what it gives with the legislative.").

## II.

With that relevancy test in mind, I turn to whether the economic substance doctrine applies to LGI's transaction.[3]  That inquiry begins with the text of the

---

[3] Because we will address the steps of Project Soy individually when determining whether the economic substance doctrine applies, a more detailed explanation of the transaction than the one provided by the majority is appropriate here.

In order to understand the specifics of Project Soy's four steps, it is helpful to understand LGI's corporate structure.  At the time of the transaction here, LGI was

wholly owned by Liberty Global plc, a U.K. corporation.  Through a series of subsidiaries, LGI owned Liberty Global Broadband I Ltd. ("LGI I"), another a U.K. company.  LGI I, in turn, owned 56.6% of TGH, a publicly traded Belgian entity.  *Id.*  TGH owned Telenet Group, also a Belgian entity.  *Id.*  TGH also indirectly owned another subsidiary, Telenet International Financing USD LLC ("TIF LLC"), a U.S. limited liability company.  Both Telenet Group and TIF LLC were "disregarded" entities.  A disregarded entity's activities are "treated" for federal tax purposes as the owner's activities, meaning that the entity's assets and liabilities are generally treated as belonging to the entity's owner.  26 C.F.R § 301.7701-2(a).

In Step 1, on December 26, 2018, Telenet Group reduced the recorded value of its shares by $4.6 billion, using a Belgian corporate-law process.  Because TGH owned Telenet Group, TGH had a monetary claim against Telenet group for $5 billion.

In Step 2, TGH transferred TIF LLC—also a disregarded entity—from one of its disregarded subsidiaries (Telenet Group) to itself for a nominal price of $4, making TIF LLC its direct subsidiary.  Because TIF LLC was a disregarded entity, its loans to Telenet Group were treated as belonging to TGH.

In Step 3, Telenet Group changed its capital structure by replacing some of its common stock with debt and nonqualified preferred stock ("NQPS"), a debt-like instrument that is treated as non-stock property for purposes of I.R.C. § 351.  *Id.* at 213–17.  Telenet Group also converted from a BVBA (akin to a U.S. limited liability company) to an NV/SA (akin to a U.S. corporation) under Belgian law.  By converting to an NV/SA, it became a per se corporation for federal tax purposes under 26 C.F.R. § 301.7701-2(b)(8)(i).  The immediate effect of that change was that Telenet Group converted from a disregarded entity treated as a division of its parent (TGH) to a regarded corporation separate from TGH for tax purposes.

This event triggered gain under § 351(b).  When a disregarded entity becomes a corporation, its owner "is deemed" to have "contribute[d] all of the assets and liabilities of the entity" to the "new" entity "in exchange for" the new entity's stock.  26 C.F.R. § 301.7701-3(g)(1)(iv).  Thus, TGH (Telenet Group's regarded owner) was deemed to contribute all of Telenet Group's assets and liabilities to the newly formed corporation.  In exchange, TGH received common stock of post-conversion Telenet Group, along with NQPS and debt in the amount of its capital claim from Step 1—$4.6 billion.

Section 351(b) required TGH to recognize a $4.6 billion gain, representing the "fair market value" of (1) the NQPS it received from Telenet Group and (2) debt that Telenet Group owed to TIF LLC.

Finally, in Step 4, LGI's foreign subsidiary, LGI I, sold its interest in TGH to LGI's parent, Liberty Global plc, in exchange for a $3.2 billion intercompany note.  LGI I recognized a $2.4 billion gain from that sale, representing Telenet Group's profits and economic value from operating the telecommunications business.

14

provision granting the deduction.  "[T]he focus must be a [ ] reading of the particular portion of the Code in question and not the merits of the transaction in the abstract or the protection of the Code's integrity as a whole."  James S. Halpern, *Putting the Cart before the Horse: Determining Economic Substance Independent of the Language of the Code*, 30 Va. Tax Rev. 327, 332 (2010).

The favorable tax treatment that LGI takes advantage of originates from seven provisions:  I.R.C. §§ 245A, 351, 951A, 958(a), 959(d), 964(e), and 1248.  Under § 245A, when a domestic corporation that owns at least 10% of a foreign corporation receives a "dividend" from that foreign corporation, the domestic corporation "shall be allowed as a deduction an amount equal to the foreign-source portion of such dividend."  And when a domestic corporation that owns 10% or more of the stock in a foreign corporation "sells or exchanges [that] stock," "then the gain recognized" from that transaction "shall be included in the gross income" of that U.S. person "as a dividend"—but only "to the extent of the earnings and profits of the foreign corporation" that are "attributable . . . to such stock."  *Id.* § 1248(a).  To make it abundantly clear, Congress explained that "any amount received by the domestic corporation which is treated as a dividend by reason of [§ 1248] shall be treated as a dividend for purposes of applying section 245A."  *Id.* § 1248(j).

To ensure similar treatment when a controlled foreign corporation ("CFC") (owned by a domestic corporation) sells another CFC lower in the corporate chain, Congress enacted § 964.  That provision stated that if a CFC "sells or exchanges stock in any other foreign corporation, gain recognized on such sale or exchange

15

shall be included in the gross income of such controlled foreign corporation as a dividend to the same extent that it would have been so included under section 1248(a) if such controlled foreign corporation were a United States person." *Id.* § 964(e)(1). And "the deduction under section 245A(a) shall be allowable to the United States shareholder with respect to [that] income." *Id.* § 964(e)(4)(A)(iii).

Additionally, a foreign corporation generates earnings and profits from a § 351 exchange. Those earnings are ordinarily taxed as Global Intangible Low-Taxed Income ("GILTI") under § 951A and by reason of § 959(d), are not a "dividend," meaning they do not qualify for a § 245A deduction. *See* 10 *Mertens Law of Fed. Income Tax'n* § 38B:107. But when a CFC is sold so that it no longer has any U.S. shareholders on the last day of the CFC's tax year, the earnings are no longer subject to GILTI under § 951A. *See* 26 I.R.C. §§ 951A(e)(2), 958(a). The income is not part of the tax base, but qualifies as untaxed earnings and profits, becoming available to support a § 245A deduction.[4]

Thus, the economic substance doctrine *might* be relevant because the favorable tax treatment provided by some of these sections turns on economic reality.[5] But the

---

[4] The reason for this is that the CFC maintains its CFC status following the stock sale under § 958's new attribution rules. *See* N.Y. State Bar Ass'n Tax Section, Report No. 1394, *Report on the GILTI Provisions of the Code* 53–55 (2018).

[5] The majority argues that we should apply the economic substance doctrine to the entirety of Project Soy, not the individual steps. Maj. Op.10 at 6. However, this argument only works in the context of the majority's characterization of the relevance threshold. The majority proposes a broad test focusing on whether the purpose of the transaction complies with congressional intent under which it might make sense to look at Project Soy as a whole. *See id.* at 10 n.6. Because the test

16

doctrine is only relevant to determine whether Project Soy actually generated

"earnings and profit" or whether the stock sale was in economic reality, "gain." In

other words, the doctrine comes into play to determine whether LGI created in

substance what it purports to claim.[6]

However, the government does not contest that LGI realized "actual" gain

from the sale of TGH. Nor could it. The gain from the sale of TGH reflected the

income and capital appreciation stemming from Telenet Group's telecommunication

operation in Europe. And that gain is precisely what the government attempts to tax

here.

What the government actually takes issue with is the sale of the CFC before

the last day of its tax year. That is what caused TGH's earnings to escape taxation

and provided grounds for an inflated deduction under § 245A. But the choice of

*when* to sell a CFC in order to recognize a gain does not turn on economic reality or

taxpayer motive as contemplated by the Code. In fact, the decision of *when* to sell

property has routinely been deemed to be within the taxpayer's province even when

the sale does not change the economic position of the taxpayer and lacks a nontax

business purpose. *See Cottage Savings*, 499 U.S. at 567–68; *Sun Props., Inc. v.*

*United States*, 220 F.2d 171, 174–75 (5th Cir. 1955); *Curry v. Comm'r*, 43 R.C. 667,

---

proposed here focuses on whether the text of the Code addresses economic reality or
taxpayer motive, it follows to instead look at each transaction individually.

[6] Since the majority consistently asserts that mechanical compliance with the
Tax Code is insufficient, *see* Maj. Op. at 5 n.2, 10 n.6, 15 n.9, 18, it is important to
emphasize that this test would look at the substance of what LGI's transactions
created in practice, not mere compliance.

695 (1965). For instance, an organization's decision to sell stock that has decreased in value on the last day of the tax year to generate a loss specifically in order to reduce its taxable income for that year does not implicate the economic substance doctrine. Just as in that example, the economic substance doctrine is not relevant to the timing choice seen here.

The government does assert that the earnings and profits from the § 351 exchange in Step 3 of Project Soy were "manufactured" or "artificial." To some extent, all profits are manufactured, and that circumstance alone does not necessarily implicate the economic substance doctrine. More importantly, the government does not contend that the earnings were a façade. Even though the earnings resulted from a change in corporate form and capital structure, the earnings were still tied to the economic value of Telenet Group's telecommunication business. As the government admits, it would have taxed the earnings and profits from Step 3 under the GILTI provisions (as it did in LGI's initial tax return) had LGI I sold TGH on the last day of the CFC's tax year. The government cannot seriously contend that the earnings were "artificial" when the recognition date was December 28, but real when the recognition date was December 31. The earnings and profits in Step 3 were real, and thus, do not implicate the economic substance doctrine.

The other parts of Project Soy do not make the economic substance doctrine relevant. Telenet Group's conversion to an NV/SA pursuant to the Treasury's "check-the-box" regulations do not make economic reality or taxpayer motive relevant. As such, the economic substance doctrine does not apply. *Dover Corp. &*

18

*Subsidiaries*, 122 T.C. at 351 n.19.  And the statutory provisions governing Telenet Group's capitalization choices, including its use of debt and NQPS, do not condition favorable tax treatment on economic reality or taxpayer motive.  Again, the economic substance doctrine has no role in our analysis here.  *United Parcel Serv.*, 254 F.3d at 1019.

Perhaps the most analogous situation is the one the Supreme Court faced in *Cottage Savings*.  In that case, as here, there was no question that the taxpayer had the gain/loss that it claimed.  As a result, the Court deemed the economic substance doctrine not relevant to the taxpayer's choice of *how* or *when* to recognize the loss, even though the transaction was solely tax-motivated and did not meaningfully change the taxpayer's economic position.  Just as in *Cottage Savings*, LGI and its affiliates' decision of how and when to recognize the gain (by selling the CFC before the last day of its tax year) does not implicate a provision that makes economic reality or taxpayer motive relevant.  As such, the economic substance doctrine does not apply to Project Soy.

This is not a case where the taxpayer's "formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process."  *Summa Holdings*, 848 F.3d at 787.  The majority contends that Congress did not intend for LGI to take advantage of the statutory gap exploited by Project Soy.  Maj. Op. at 5 n.2.  But it is not our province "to rescue Congress from its drafting errors, and to provide for what [we] might think . . . is the preferred result," by applying a doctrine that is not relevant to the transaction at issue.  *Lamie*

19

*v. U.S. Trustee*, 540 U.S. 526, 542 (2004) (quoting *United States v. Granderson*, 511 U.S. 39, 68 (1994)).[7]  Because the majority concludes otherwise, I dissent.[8]

### III.

For these reasons, I respectfully dissent.

---

[7] The government asserts that even if the economic substance doctrine is inapplicable, we should reverse the district court's ruling that the Treasury's temporary regulations were invalid for failing to comply with the Administrative Procedure Act's notice-and-comment requirement and hold that the regulations disallow LGI's deduction. But the district court ruled on the validity of the regulations in a separate summary judgment order.  The government did not cross-appeal that ruling.  Thus, in my view, we do not have jurisdiction over that summary judgment ruling.  *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("[A]n appellate court may not alter a judgment to benefit a nonappealing party."); *June v. Union Carbide Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009) (denying the appellee's request to change a dismissal without prejudice to a dismissal with prejudice absent a cross-appeal).

[8] In addition to challenging Project Soy under the economic substance doctrine, the government argued alternatively that LGI was not entitled to the refund under the step-transactions doctrine.  The district court did not reach that argument.  Thus, I would decline to address this issue and remand to the district court for consideration of the step-transactions doctrine in the first instance.